FILED

2019 OCT 22  AM 11: 05

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR **19CR00642**-VAP |
|---|---|
| Plaintiff, | **I N F O R M A T I O N** |
| v. | [22 U.S.C. §§ 612, 618(a)(2): Violations of the Foreign Agents Registration Act;  26 U.S.C. § 7201: Tax Evasion; |
| IMAAD SHAH ZUBERI, | 52 U.S.C. §§ 30116, 30118, 30121, 30122, 30109(d)(1): Foreign, Conduit, and Other Illegal Campaign Contributions] |
| Defendant. | |

The United States Attorney charges:

INTRODUCTORY ALLEGATIONS

A.    Defendant's Political & Business Activities

1.    From in or about 2010 through the present, defendant IMAAD SHAH ZUBERI operated an informal entity named Avenue Ventures, a venture capital firm.  As part of his operation of Avenue Ventures, defendant ZUBERI told foreign nationals, representatives of foreign governments, and others that he could implement changes to United

//

//

//

DOB

States foreign policy by wielding his influence in Washington, D.C.
Defendant ZUBERI typically advertised these political policy changes
as devices to construct profitable business and investment
opportunities for his clients as well as himself.

2.   Defendant ZUBERI and Avenue Ventures obtained funds from
this business plan in multiple ways.  Some of defendant ZUBERI's
clients agreed to pay him consulting or retainer fees.  Other clients
agreed to transfer money to defendant ZUBERI to invest in specific
business ventures for the benefit of these clients.  Other clients
agreed to transfer money to defendant ZUBERI to fund political
campaign contributions in an effort to create business opportunities
for themselves.

3.   Defendant ZUBERI used a portion of these funds to donate
contributions to the political campaigns of federal and state
officials.  Between on or about September 1, 2011 and on or about
February 24, 2017, the day when defendant ZUBERI became aware of the
U.S. Government's criminal investigation, defendant ZUBERI made over
$3,000,000 in contributions, in either his own name or that of his
spouse, to various Democratic and Republican federal election
campaigns, and Presidential Inauguration Committees.  Between on or
about September 1, 2011 and on or about November 7, 2016, defendant
ZUBERI also "bundled" over a million dollars of contributions from
various third parties as a fundraiser for campaigns for Presidential
elections and several other candidates for elected office.

4.   Through these political contributions, defendant ZUBERI
obtained access to high-level United States officials.  Defendant
ZUBERI attempted to persuade these public officials to modify
existing United States policies and take other actions on behalf of,

2

and favorable to, defendant ZUBERI's clients.  In an effort to
convince his clients of his ability to wield influence, defendant
ZUBERI broadcast this access by distributing photographs of defendant
ZUBERI meeting with high-ranking elected officials and describing
conversations in which they purportedly discussed public policies of
international importance.

   5.   Defendant ZUBERI used a portion of the funds from his
business plan to hire lobbyists and public relations consultants who
assisted his efforts to influence and transform public policy and
opinion in the United States.

   6.   Defendant ZUBERI's campaign contributions, public relations
work, and lobbying efforts generated marginal results.  Some United
States officials, however, were willing to adopt defendant ZUBERI's
requested political positions or otherwise accommodate defendant
ZUBERI's wishes.

   7.   Defendant ZUBERI's business ventures were largely
unsuccessful for his clients.  Indeed, most of defendant ZUBERI's
clients suffered significant monetary losses stemming from their
business associations with defendant ZUBERI.  Many of the lobbyists,
public relations consultants, and other subcontractors also suffered
losses when defendant ZUBERI refused to pay them the agreed-upon fees
for services they rendered.

   8.   In contrast to the losses suffered by his clients and
subcontractors, defendant ZUBERI gained substantial wealth.  This
newfound wealth was almost entirely obtained as a result of (a)
fraudulent representations concerning defendant ZUBERI's education,
experience, family wealth, business, employees, investment successes,
financial condition, political power, and the disposition of client

3

1  funds, and (b) the outright conversion of client money for defendant
2  ZUBERI's own personal benefit.

3  B.   The Foreign Agents Registration Act

4       9.    The Foreign Agents Registration Act ("FARA") was, and is, a
5  disclosure statute that requires any person acting as "an agent of a
6  foreign principal" to register with the Attorney General of the
7  United States in connection with certain types of activities, such as
8  political or public relations efforts on behalf of the foreign
9  principal.  Such registrations are made to the U.S. Department of
10 Justice, National Security Division's FARA Unit.  It is a crime to
11 knowingly and willfully fail to register, and to make false and
12 misleading statements or material omissions in documents submitted to
13 the FARA Unit under the law's provisions.

14      10.   One purpose of FARA is to create transparency regarding the
15 existence and extent of the relationship between individuals
16 operating in the United States and their foreign principals.  Proper
17 registration under the statute allows the U.S. government and the
18 American people to evaluate the statements and activities of
19 individuals who are serving as agents of foreign principals.  Among
20 other things, a FARA registration reveals the identity of the foreign
21 principal on whose behalf a registrant performs services, the type of
22 services the registrant provides the foreign principal, the source
23 and amount of compensation the registrant receives from the foreign
24 principal, and political campaign contributions made by the
25 registrant while the registrant was acting as an agent of the foreign
26 principal.  The Government of Sri Lanka, a country in South Asia,
27 was, and is, a foreign principal under FARA.

28

C.   The Federal Election Campaign Act

11.   The Federal Election Campaign Act ("FECA") governed, and governs, contributions to candidates, their campaign committees, and political committees in United States elections.

12.   FECA requires that federal candidates for public office designate a principal campaign committee to solicit, accept, and receive contributions and to make expenditures for the campaign. FECA also permits the establishment of other political committees, such as national party committees, state party committees, and political action committees, which can solicit, accept, and receive contributions and make expenditures for candidates and political parties.

13.   FECA requires that each treasurer of a political committee that participates in federal elections file periodic reports to the Federal Election Commission ("FEC") identifying contributors by name, address, and occupation, and the contributions provided by those contributors by date and amount.

14.   FECA prohibits:

a.   Contributions from foreign nationals, meaning individuals who are neither citizens of the United States nor permanent residents of the United States, directly or through any other person, in connection with any federal, state, or local election or any presidential inaugural;

b.   Contributions from foreign or domestic corporations, partnerships, associations, or organizations in connection with any federal election for federal office;

1        c.   Conduit contributions, contributions in the name of
2   another, or using one name to effect a contribution by another in
3   connection with any federal election for federal office;

4        d.   Contributions from any person (i) in excess of $2,500
5   during the 2012 election cycle, $2,600 during the 2014 election
6   cycle, and $2,700 during the 2016 election cycle to any candidate's
7   authorized political committee per federal election; (ii) in excess
8   of $30,800 during the 2012 election cycle, $32,400 during the 2014
9   election cycle, and $33,400 during the 2016 election cycle per year
10  to any national party committee; (iii) in excess of $10,000 per year
11  to any state, district, and local party committee, and (iv) in excess
12  of $5,000 per year to any other political committee.

13  D.   Individuals, Entities, & Non-Existent Person

14       15.  Person A was a foreign national, namely, a citizen of both
15  Saudi Arabia and the United Kingdom who resided in the United Kingdom
16  and Switzerland.  Person A was the chairman of Company A, a foreign
17  corporation headquartered in Riyadh, Saudi Arabia.  Person A's
18  spouse, Person B, was a citizen of the United States.

19       16.  Person C was a citizen of both Lebanon and the United
20  States, residing in Kuwait.  Person C was the Chief Executive Officer
21  of Company B, a foreign corporation headquartered in Kuwait City,
22  Kuwait.  Person C's spouse, Person D, was a foreign national, namely,
23  a citizen and resident of Kuwait.

24       17.  Person E was a foreign national, namely, a citizen of
25  Venezuela who resided in Saudi Arabia and was employed by Company A.
26  Person E's spouse, Person F, was a foreign national, namely, a
27  Venezuelan citizen residing in Saudi Arabia.

28

18.   Person G was a citizen of the United States.   Person G's spouse, Person H, was a foreign national, namely, a citizen of Brazil.

19.   Person I was a non-existent person created by defendant ZUBERI to aid in his schemes.

20.   U.S. Cares, LLC ("U.S. Cares"), also known as America Cares, was a Delaware limited liability corporation, created at the direction of defendant ZUBERI on or about December 13, 2013.   On or about November 24, 2014, defendant ZUBERI submitted an application on behalf of U.S. Cares for a license from the Office of Foreign Assets Control ("OFAC") to allow U.S. Cares to export humanitarian items, including food, medicine, and medical supplies, to Iran.

21.   Person J was a foreign national, namely, a citizen of Bahrain, executive of Company C, and Chairman of Company D, both foreign entities.   In or about August 2013, Company D invested in U.S. Cares.

22.   Person K was a foreign national, namely, a citizen of the United Arab Emirates and Singapore and Managing Partner of Company E, a foreign entity.   In or about August 2013, Company E invested in U.S. Cares.

23.   Person L was a foreign national, a citizen of United Arab Emirates and Chief Executive Officer of Company F, a foreign entity. In or about October 2013, Company F invested in U.S. Cares.   On or about April 29, 2014, OFAC designated both Person L and Company F as Specially Designated Nationals.   This designation prohibited United States persons from engaging in business with, blocked the assets of, and imposed other restrictions against Person L and Company F.   In or

1   about November 2014, Company F sold its shares in U.S. Cares to
2   Company D.

3       24.  Person M was a foreign national, namely, a citizen of
4   Kuwait and principal of Company G, a foreign entity.  In or about
5   December 2013, Company G invested in U.S. Cares.

6       25.  Person N was a foreign national, namely, a citizen of India
7   and principal of Company H, a foreign entity.  In or about December
8   2013, Company H invested in U.S. Cares.

9       26.  From on or about April 9, 2009 through July 14, 2014, WR
10  Group was an informal entity.  On or about April 19, 2009, Person O
11  opened a Bank of America account in the name of WR Group ("WR"), with
12  herself as sole signatory, in which she described WR as a sole
13  proprietorship.

14      27.  Person P was a former college classmate of defendant
15  ZUBERI.  From January 2014 through October 2015, defendant ZUBERI
16  paid Person P $5,000 per month to perform a variety of tasks on
17  behalf of defendant ZUBERI and Avenue Ventures.  On or about July 14,
18  2014, at the direction of defendant ZUBERI, Person P obtained a
19  certificate of organization in Washington, D.C. designating WR Group
20  as a limited liability company ("WR, LLC").

21      28.  On or about May 23, 2014, at the direction of defendant
22  ZUBERI, Person P incorporated Beltway Government Services, Inc.
23  ("BGS").  That same day, Person P opened several Wells Fargo bank
24  accounts (the "BGS accounts") in which he identified himself as owner
25  and sole signatory.

26      29.  Person Q was an associate of defendant ZUBERI.  From July
27  2014 through September 2014, defendant ZUBERI directed Person P to
28  pay $2,500 per month out of the BGS accounts to the benefit of Person

1  Q in return for his agreement to act as a second signatory on the BGS

2  accounts.

3       30.  Throughout the existence of WR LLC and BGS, Person P

4  nominally governed both entities but they were actually always

5  subject to the control of defendant ZUBERI.  Defendant ZUBERI

6  directed Person P to sign contracts, issue invoices, transfer funds,

7  pay expenses, and forebear from paying expenses.  Person P followed

8  defendant ZUBERI's instructions with respect to how to operate these

9  entities.

10       31.  Person R was a business associate of defendant ZUBERI and a

11  candidate for federal elective office during the 2016 election cycle.

12       32.  Person S was a foreign national, namely, a citizen of

13  Bahrain, and high-ranking official of the Bahrain government.

14  E.   Conduit Campaign Contributions

15       33.  From on or about April 27, 2012 through on or about October

16  26, 2016, defendant ZUBERI paid for campaign contributions donated in

17  the name of other individuals by making the following online payments

18  with credit cards belonging to defendant ZUBERI and his spouse:

| Date | Campaign | Contributor | Amount |
|------|----------|-------------|--------|
| 4/27/12 | Campaign A | Person BB | $2,500 |
| 4/27/12 | Campaign A | Person CC | $2,500 |
| 4/27/12 | Campaign A | Person DD | $2,500 |
| 10/26/12 | Campaign B | Person EE | $5,000 |
| 4/5/13 | Campaign C | Person FF | $2,600 |
| 4/14/13 | Campaign C | Person FF | $2,600 |
| 4/22/13 | Campaign D | Person B | $2,600 |
| 4/22/13 | Campaign D | Person B | $2,600 |
| 5/31/13 | Campaign C | Person B | $2,600 |
| 5/31/13 | Campaign C | Person B | $2,600 |
| 5/31/13 | Campaign C | Person C | $2,600 |
| 5/31/13 | Campaign C | Person C | $2,600 |
| 12/23/13 | Campaign E | Person FF | $2,600 |
| 12/23/13 | Campaign E | Person FF | $2,600 |

| 12/26/13 | Campaign F | Person FF | $2,600 |
|---|---|---|---|
| 12/26/13 | Campaign F | Person FF | $2,600 |
| 1/27/14 | Campaign C | Person GG | $2,400 |
| 1/27/14 | Campaign F | Person GG | $2,600 |
| 1/27/14 | Campaign C | Person GG | $2,600 |
| 1/27/14 | Campaign F | Person GG | $2,600 |
| 1/27/14 | Campaign C | Person P | $2,400 |
| 1/27/14 | Campaign F | Person P | $2,600 |
| 1/27/14 | Campaign C | Person P | $2,600 |
| 1/27/14 | Campaign F | Person P | $2,600 |
| 4/19/14 | Campaign G | Person FF | $2,600 |
| 4/19/14 | Campaign G | Person FF | $2,600 |
| 5/14/14 | Campaign G | Person FF | $2,600 |
| 5/14/14 | Campaign G | Person HH | $2,600 |
| 9/25/14 | Campaign H | Person FF | $2,600 |
| 2/3/15 | Campaign I | Person C | $5,200 |
| 3/3/15 | Campaign J | Person B | $2,700 |
| 3/3/15 | Campaign J | Person FF | $2,700 |
| 3/3/15 | Campaign J | Person A | $2,700 |
| 3/3/15 | Campaign J | Person C | $2,700 |
| 5/27/15 | Campaign C | Person B | $5,400 |
| 9/28/16 | Campaign J | Person C | $400 |
| 9/28/16 | Campaign J | Person B | $2,700 |
| 9/28/16 | Campaign J | Person B | $2,700 |
| 9/28/16 | Campaign J | Person A | $2,700 |
| 9/28/16 | Campaign J | Person A | $2,700 |
| 9/28/16 | Campaign J | Person II | $2,700 |
| 9/28/16 | Campaign J | Person II | $2,700 |
| 10/26/16 | Campaign K | Person B | $2,700 |

34.   From on or about February 26, 2013 through on or about October 28, 2016, defendant ZUBERI paid for campaign contributions donated in the name of Person AA, a family member who passed away on or about April 2, 2016, by making the following online payments with credit cards belonging to defendant ZUBERI:

| Date | Campaign | Contributor | Amount |
|---|---|---|---|
| 4/22/13 | Campaign D | Person AA | $2,600 |
| 4/22/13 | Campaign D | Person AA | $2,600 |
| 12/6/13 | Campaign E | Person AA | $2,600 |
| 12/6/13 | Campaign E | Person AA | $2,600 |
| 12/26/13 | Campaign F | Person AA | $2,600 |

| 12/26/13 | Campaign F | Person AA | $2,600 |
|---|---|---|---|
| 1/3/14 | Campaign L | Person AA | $2,600 |
| 1/15/14 | Campaign M | Person AA | $2,600 |
| 1/15/14 | Campaign M | Person AA | $2,600 |
| 2/19/14 | Campaign N | Person AA | $2,600 |
| 2/19/14 | Campaign N | Person AA | $2,600 |
| 2/28/14 | Campaign O | Person AA | $2,600 |
| 2/28/14 | Campaign B | Person AA | $2,600 |
| 2/28/14 | Campaign B | Person AA | $2,600 |
| 2/28/14 | Campaign O | Person AA | $2,600 |
| 3/21/14 | Campaign L | Person AA | $2,600 |
| 3/21/14 | Campaign L | Person AA | $2,600 |
| 4/19/14 | Campaign O | Person AA | $2,600 |
| 4/19/14 | Campaign O | Person AA | $2,600 |
| 4/19/14 | Campaign P | Person AA | $2,600 |
| 4/19/14 | Campaign L | Person AA | $2,600 |
| 4/19/14 | Campaign G | Person AA | $2,600 |
| 4/19/14 | Campaign G | Person AA | $2,600 |
| 6/14/14 | Campaign Q | Person AA | $2,600 |
| 7/3/14 | Campaign R | Person AA | $2,600 |
| 7/3/14 | Campaign R | Person AA | $2,600 |
| 7/3/14 | Campaign S | Person AA | $2,600 |
| 7/3/14 | Campaign S | Person AA | $2,600 |
| 8/16/14 | Campaign J | Person AA | $2,600 |
| 1/23/15 | Campaign F | Person AA | $2,600 |
| 1/23/15 | Campaign F | Person AA | $2,600 |
| 2/3/15 | Campaign I | Person AA | $5,200 |
| 2/5/15 | Campaign T | Person AA | $5,000 |
| 3/3/15 | Campaign J | Person AA | $2,700 |
| 3/9/15 | Campaign C | Person AA | $2,700 |
| 3/9/15 | Campaign C | Person AA | $2,700 |
| 3/21/15 | Campaign U | Person AA | $2,700 |
| 3/21/15 | Campaign U | Person AA | $2,700 |
| 3/22/15 | Campaign V | Person AA | $2,700 |
| 3/22/15 | Campaign V | Person AA | $2,700 |
| 4/12/15 | Campaign W | Person AA | $2,700 |
| 6/12/15 | Campaign X | Person AA | $2,700 |
| 12/16/15 | Campaign Y | Person AA | $2,700 |
| 12/16/15 | Campaign Y | Person AA | $2,700 |
| 10/28/16 | Campaign Z | Person AA | $2,700 |

35.  Although Person AA shared certain joint bank accounts with defendant ZUBERI, none of those joint accounts financed the above-referenced contributions in Person AA's name, Person AA lacked sufficient income to pay for all the contributions made in Person

11

AA's name, and at the time the October 28, 2016 contribution was made in Person AA's name, Person AA was deceased.

36. From on or about April 1, 2014 through on or about May 17, 2015, defendant ZUBERI reimbursed the following conduits for campaign contributions they had donated at defendant ZUBERI's direction:

| Date | Campaign | Contributor | Amount |
|------|----------|-------------|--------|
| 4/1/14 | Campaign E | Person P | $400 |
| 4/1/14 | Campaign E | Person P | $2,600 |
| 5/5/15 | Campaign W | Person JJ | $2,700 |
| 5/17/15 | Campaign W | Person KK | $1,350 |

37. From on or about September 27, 2013 through on or about April 14, 2016, defendant ZUBERI solicited and received the following reimbursements for campaign contributions, or portions of campaign contributions, defendant ZUBERI had donated in his own name:

| Date | Campaign | Source of Funds | Amount |
|------|----------|-----------------|--------|
| 9/27/13 | State Campaign AA | Person J | $25,000 |
| 9/16/14 | Campaign BB | Person LL | $16,000 |
| 4/14/16 | Campaign CC | Person LL | $35,000 |

F.   Foreign Sources of Campaign Contributions

38. Beginning on or about May 2, 2012 and continuing to on or about February 11, 2016, in response to defendant ZUBERI's solicitations, Person A and Person C caused Company A and Company B to issue the following wire transfers into a foreign bank account in the name of defendant ZUBERI ("the IZ Barclays Dubai account") that either funded or reimbursed contributions to the following political campaigns and a FECA-regulated event ("Event EE"):

| Company A to Company B | Date | Company B to Zuberi | Date | Zuberi Acct. | Purpose |
|---|---|---|---|---|---|
| | | $136,600 | 5/1/12 | Zuberi Barclays Dubai | Campaign B & Campaign DD |
| | | $71,600 | 6/11/12 | Zuberi Barclays Dubai | Campaign DD |
| | | $90,000 | 9/26/12 | Zuberi Barclays Dubai | Campaign DD |
| $180,000 | 10/10/13 | $180,000 | 10/1/12 | Zuberi Barclays Dubai | Campaign DD |
| | | $100,000 | 10/21/12 | Zuberi Barclays Dubai | Campaign DD |
| | | $100,000 | 11/12/12 | Zuberi Barclays Dubai | Event EE |
| | | $500,000 | 12/10/12 | Zuberi Barclays Dubai | Event EE |
| $150,000 | 1/16/13 | $150,000 | 1/14/13 | Zuberi Barclays Dubai | Event EE |
| $100,000 | 5/2/13 | $100,000 | 2/27/13 | Zuberi Barclays Dubai | Event EE photos |
| | | $5,000 | 4/30/13 | Zuberi Barclays Dubai | Campaign D |
| | | $100,200 | 2/11/16 | Avenue Ventures Wells Fargo US | Campaign DD |

39.   Defendant ZUBERI caused Avenue Ventures to issue invoices that disguised the nature of these foreign conduit campaign contributions, typically by falsely characterizing the transfers as "international consulting."

40.   These foreign, conduit contributions were donated in the names of Person A, Person B, Person C, Person D, Person E, Person F, Person I, Person O, Person AA, and defendant ZUBERI.

41.   From on or about April 14, 2015 through on or about May 5, 2015, defendant ZUBERI also solicited, and caused the following campaign committees to receive, the following direct contributions from foreign nationals knowing that they were foreign nationals:

| Date | Campaign | Contributor | Amount |
|------|----------|-------------|--------|
| 4/14/15 | Campaign W | Person D | $2,700 |
| 4/19/15 | Campaign W | Person A | $2,700 |
| 5/5/15 | Campaign W | Person H | $2,700 |

G.   Conversion of Funds Intended for Political Campaigns

42.   Contrary to the representations made by defendant ZUBERI to Person A and Person C, defendant ZUBERI directed only a portion of the money wired by Company A and Company B to political campaigns and Event EE and converted the remaining amounts to his personal benefit:

| Wire to Zuberi | Date | Intended Campaign | Amounts Donated to Campaign | Amounts Converted |
|----------------|------|-------------------|-----------------------------|-------------------|
| $136,600 | 5/1/12 | Campaign B & Campaign DD | $100,000 | $36,600 |
| $71,600 | 6/11/12 | Campaign DD | $0 | $71,600 |
| $90,000 | 9/26/12 | Campaign DD | $89,000 | $1,000 |
| $180,000 | 10/1/12 | Campaign DD | $40,000 | $140,000 |
| $100,000 | 10/21/12 | Campaign DD | $0 | $100,000 |
| $100,000 | 11/12/12 | Event EE | $0 | $100,000 |
| $500,000 | 12/10/12 | Event EE | $62,500[1] | $437,500 |
| $150,000 | 1/14/13 | Event EE | $35,000 | $115,000 |
| $100,000 | 2/27/13 | Event EE (photos) | $0 | $100,000 |
| $100,200 | 2/11/16 | Campaign CC | $100,000 | $200 |
| Total | | | Total Converted by ZUBERI | $1,101,900 |

43.   For example, on or about September 24, 2012, in connection with his solicitation of the $90,000 and $180,000 wire transfers, defendant ZUBERI falsely informed Person C and Person E that he had incurred expenses of $270,000 by making contributions on their behalf.   Deliberately using the name of a fictitious employee, defendant ZUBERI sent an email from Robert.Reed@avenueventure.com that falsely stated:

---

[1] From on or about December 27, 2012 through on or about January 15, 2013, defendant ZUBERI made contributions of $62,500, $62,500, $62,500, $35,000 and $35,000, totaling $257,500, and thereafter obtained refunds from the inauguration committee of $160,000, making the actual expenses incurred only $97,500.

> Please get me the forms and the wire as soon as possible
> because there are limited number of seats available.  I
> have used American Express of Imaad to pay for everyone's
> dues.  We need to put the names through vettin [sic]
> process as well.  After the wire is done, please email me
> so we can move it into the correct sub-account.  Thanks Rob

44.  That same day, defendant ZUBERI falsely informed Person C that defendant ZUBERI was approaching the credit limit on his American Express card because of the $270,000 in contribution expenses incurred, and attached a notice from American Express to purportedly confirm that assertion.  In fact, defendant ZUBERI fraudulently prepared the American Express notice to inflate his outstanding balance from approximately $3,943 to $279,998 and his credit limit from $19,000 to $300,000.

45.  From on or about September 27, 2012 through on or about October 12, 2012, defendant ZUBERI converted approximately $141,000 of the $270,000 he received as part of this scheme and used the majority of those funds to (a) pay off a $68,679 mortgage balance on his personal residence, (b) transfer $40,000 to a business operated by his spouse and her close relative, and (c) withdraw $5,000 in cash for himself.

46.  On or about January 21, 2013, defendant ZUBERI falsely informed Person A, Person C, and Person E that there was a shortfall in their contributions to Event EE and that a hold had been placed on their photographs with the President and Vice-President, writing:

> [Y]ou guys were supposed to take only two people for the
> photo.  These were $250,000 per person with President and
> Vice President.  I told you by mistake they had put wrong
> names on the photo line.  When the photo (sic) are out they
> will match it with who went to the photo line versus who
> paid for them or how many paid.  It won't take long for
> them to figure this out.  There were four people instead of
> two.  It will make me look like I am trying to play a fast
> one with them.  I do not want to take chance with my

15

reputation for a couple hundred thousand dollars. It is not worth it for me and I have too much to lose.  I told them there was a mistake made and to hold our photo until I tell them which one to release and not release.  You need to tell me which two people photo you want released.  Let me make it clear, except for [Person C], both [Person E] and [Person A] have not paid enough for this specific photo.

47.  In fact, as defendant ZUBERI knew, there was no shortfall in contributions to Event EE and, in the weeks ahead, defendant ZUBERI actually received refunds for some contributions defendant ZUBERI had made to Event EE.

48.  From on or about January 22, 2013 through or about February 25, 2013, defendant ZUBERI falsely informed Person C that defendant ZUBERI personally paid $250,000 for the additional photo and that defendant ZUBERI expected Person A to reimburse him for that expense or else he would inform business associates not to work with Person A.  Ultimately, defendant ZUBERI informed Person A that he would accept the reduced amount of $100,000 from Person A for the purported reimbursement.

H.   Income From anti-Bahrain Lobbying Effort

49.  In or about February 2013, Person J informed defendant ZUBERI that he was engaged in a financial dispute with Person S. According to Person J, Person S won a monetary arbitration award against Person J for services rendered in connection with the development of the Al Areen Palace & Spa ("Al Areen"), a master planned development in southern Bahrain.  According to Person J, as a result of this dispute with Person S, the Government of Bahrain had frozen Person J's personal assets and delayed further development of Al Areen, which was causing significant financial harm to Person J.

50.  To remedy Person J's financial dispute, defendant ZUBERI proposed to use his connections with current and former high-ranking

16

1   U.S. Government officials to dissuade the Bahraini government from

2   engaging in conduct antithetical to Person J's financial interests

3   ("the anti-Bahrain lobbying effort").

4       51.   Defendant ZUBERI further proposed that he and Person J

5   convey the appearance that Avenue Ventures was investing in Al Areen.

6   By injecting a U.S. "investor" into the project, defendant ZUBERI

7   believed he could convince high-ranking U.S. Government officials to

8   apply political pressure on the Bahrain government into stopping its

9   interference in the Al Areen development because of its adverse

10  financial impact on a U.S. entity.   Defendant ZUBERI proposed a

11  circular scheme through which the appearance of a U.S. investment

12  would be created:   (a) Person J would invest in a U.S. company; (b)

13  the U.S. company would invest in Avenue Ventures; and (c) Avenue

14  Ventures would then invest in an Al Areen Holding Company ("AHC")

15  that purportedly owned Al Areen.

16      52.   From on or about March 3, 2013 through on or about May 28,

17  2013, defendant ZUBERI enlisted the support of a former high-ranking

18  U.S. official to speak with members of the Bahrain government, U.S.

19  State Department officials, and a Member of Congress in furtherance

20  of the anti-Bahrain lobbying efforts.

21      53.   From on or about March 12, 2013 through on or about March

22  5, 2014, defendant ZUBERI enlisted the support of a high-ranking U.S.

23  State Department official in Bahrain to visit Al Areen, meet with

24  members of the Bahrain government, and speak with Members of Congress

25  in furtherance of the anti-Bahrain lobbying effort.

26      54.   From on or about March 15, 2013 through on or about June 1,

27  2013, defendant ZUBERI discussed with Members of Congress and their

28  staffs how to enlist the support of the U.S. State Department in

1   furtherance of the anti-Bahrain lobbying effort and arranged for

2   these Congresspersons to meet with Bahrain government officials.

3       55.  On or about April 29, 2013, defendant ZUBERI staged a

4   public event in Los Angeles, California, at which Person J and other

5   individuals purported to sign a partnership agreement in which Avenue

6   Ventures acquired a 35% stake in AHC in return for its having made a

7   sizable U.S. foreign investment in Al Areen.  In fact, no such

8   agreement was executed.

9       56.  Defendant ZUBERI solicited Person J for money in return for

10  acting as an unregistered foreign agent of Person J.  On or about

11  August 3, 2013, defendant ZUBERI told Person J and others:

12      It has been several months since the Al-Areen press
        conference.  We need to put closure on this by Thursday
13      August 15.  We have been asked about this project by [State
        Department Official] and others including calls from
14      [Bahrain government officials . . .] If it is not moving
        forward then we will let US State Department know that we
15      are not moving forward with this project. . . .

16      57.  On or about August 18, 2013, defendant ZUBERI warned

17  Person J:

18      Next week we need to either get documents signed or we need
        to have a press release that we agreed not to move forward
19      thereby disengaging.  It has been over 5-6 months which is
        way too long.  Tomorrow, if someone challenged this then
20      what document do I have to prove this is a real
        transaction?
21

22      58.  On or about August 26, 2013, Person J executed a contract

23  with Avenue Ventures on behalf of Company D.  Under the terms of the

24  contract, Avenue Ventures would provide consultancy services to

25  further Company D's attempts to enter into business relationships

26  throughout the world on an as-needed basis.  In return, Company D

27  would pay Avenue Ventures a retainer of $250,000 per year plus

28

18

1    additional retainers and success fees as projects were realized, as

2    well as expenses.

3         59.  Defendant ZUBERI failed to register under FARA as an agent

4    of Person J, a foreign national, and received income for acting as an

5    unregistered agent of Person J.  For example, in or about August

6    2013, Avenue Ventures issued an invoice to Company D seeking $250,000

7    per the "2013 contract."  On or about August 29, 2013, Avenue

8    Ventures issued an invoice to Company D for $27,900 for expenses

9    incurred in relation to the anti-Bahrain lobbying effort.  On or

10   about September 2013, Company D wired $277,858 to the IZ Barclays

11   Dubai account in payment on those invoices related to defendant

12   ZUBERI's anti-Bahrain lobbying efforts.

13        60.  From on or about January 15, 2014 through on or about March

14   5, 2014, defendant ZUBERI prevailed upon Members of Congress to issue

15   official letters to the Foreign Minister of Bahrain in support of the

16   anti-Bahrain lobbying efforts.  In order to achieve this goal,

17   defendant ZUBERI falsely informed Members of Congress:

> [A] major investment by a US company in Bahrain is
> experiencing significant interference from Bahraini
> authorities acting on behalf of a member of the royal
> family. . . . [Avenue Ventures] is seeking support from its
> government for a cessation of interference in its project
> in Bahrain.

22        61.  In fact, Avenue Ventures had not invested any money or

23   acquired any stake in either AHC or Al Areen and the true purpose of

24   the lobbying efforts was to financially benefit Person J.

25        62.  From on or about January 15, 2014 through on or about March

26   5, 2014, in response to the lobbying efforts of defendant ZUBERI on

27   behalf of Person J, twelve Members of Congress issued official

28   letters to the Foreign Minister of Bahrain citing the purported

1  "harassment" of "U.S. investors" and asking that his government stop
2  its "interference."

3  I.   Conversion of Funds/Income Received From U.S. Cares Investors

4      63.   From on or about August 12, 2013 through on or about
5  January 27, 2014, defendant ZUBERI solicited Person J, Person K,
6  Person L, Person M, and Person N to invest in U.S. Cares and caused
7  Avenue Ventures to enter into an operating agreement with their
8  respective companies.

9      64.   The operating agreement that defined the investment
10 assigned the following ownership percentages in the venture: Avenue
11 Ventures (28.5%), Company D (20%), Company F (9.5%), Company E (2%),
12 Company G (20%), and Company H (20%).  The agreement required the
13 establishment of a capital account with respect to each member's
14 capital contributions.

15     65.   From on or about September 28, 2013 through on or about
16 March 11, 2014, the U.S. Cares investors wired approximately
17 $7,000,000 into the IZ Barclays Dubai account, an individual Emirates
18 Bank account in the name of defendant ZUBERI located in Dubai ("the
19 IZ Emirates Dubai account"), and a Bank of America account in the
20 United States held jointly in the name of defendant ZUBERI and his
21 spouse ("the IZ/WR BofA account").

22     66.   Capital investments from Person N and his business, Company
23 H, and Person M's business, Company G, were wired to defendant ZUBERI
24 as follows:

| Transfer Date | Transfer Amount | Payor | Zuberi Account |
|---|---|---|---|
| 12/10/2013 | $500,000 | Person N | IZ/WR BofA US |
| 12/12/2013 | $490,070 | Person N | IZ Emirates Dubai |
| 12/22/2013 | $245,031 | Person N | IZ Emirates Dubai |
| 12/24/2013 | $500,000 | Company H | IZ/WR BofA US |
| 1/27/2014 | $2,000,000 | Company G | IZ Emirates Dubai |

67.   Defendant ZUBERI did not transfer any of the funds received from U.S. Cares investors into a U.S. Cares capital account as required by the operating agreement.  Instead, from on or about December 5, 2013 through on or about October 12, 2015, defendant ZUBERI used over 90% of the investor funds to (a) purchase real estate in the names of various limited liability companies owned entirely by himself and his spouse ("IZ/WR Real Property LLCs"), (b) pay down mortgages owed by IZ/WR Real Property LLCs, (c) remodel property owned by IZ/WR Real Property LLCs, (d) invest in brokerage accounts in the names of defendant ZUBERI and his spouse, (e) donate $250,000 to a non-profit organization established by a former high-ranking elected official, and (f) pay down personal credit card debt, most of which was incurred to pay campaign contributions and travel, meal, entertainment, and personal expenses.

68.   Out of approximately $7,000,000 wired to defendant ZUBERI by U.S. Cares investors, less than $250,000 was spent in furtherance of defendant ZUBERI's advertised business purpose.  On or about October 7, 2013 and on or about December 9, 2013, defendant ZUBERI issued two $90,000 checks to a law firm in connection with the creation of U.S. Cares and preparing a license application to OFAC. From in or about October 2013 through in or about February 2016, defendant ZUBERI paid another attorney approximately $20,000 in connection with the U.S. Cares license application.

69.   In or about January 2016, United States sanctions against Iran were lifted, which impacted OFAC regulations pertaining to U.S. Cares.

70.   On or about February 22, 2016, OFAC responded to U.S. Cares license application, stating that ". . . the Applicant's proposed

transactions related to the exportation and reexportation of the goods as described in the application appear to be generally authorized[.]"

71.  After the OFAC response, defendant ZUBERI took no further action with respect to the license application, nor did he use any of the converted funds to engage in the planned distribution of humanitarian supplies to Iran.

J.   Conversion of Funds/Income Received From Sri Lankan Government

72.  From on or about November 28, 2013 through on or about March 5, 2014, defendant ZUBERI met with high-ranking officials of the Government of Sri Lanka and negotiated an agreement whereby Avenue Ventures, or a special-purpose company created by Avenue Ventures, would engage in lobbying and public relations efforts to rehabilitate Sri Lanka's image in the United States.  This proposed lobbying and public relations effort focused on modifying United States policies, particularly through the issuance of Congressional resolutions, and improving public perception relating to Sri Lanka's alleged persecution of its minority Tamil population.

73.  On or about March 5, 2014, defendant ZUBERI pledged to expend $2,250,000 per quarter in support of this effort with $1,500,000 per quarter for lobbying expenses, $500,000 per quarter for legal expenses, and $250,000 per quarter for media buys. Defendant ZUBERI told Sri Lankan officials that the effort would include introducing Sri Lankan officials to executive branch administration officials, Senators, and Congresspersons, and recruiting Sri Lankan expatriates to engage in political organizing in the United States.

74.   On or about April 26, 2014, WR entered into a contract, effective May 1, 2014, with the Central Bank of Sri Lanka ("the Sri Lanka-WR contract").   The Sri Lanka-WR contract described WR's services as "(i) strategic advice related to commercial and public policy considerations related to the US and other parties;" and (ii) "identification of consultants or other legal or non-legal advisors to [Sri Lanka] and the Central Bank as may effectuate Sri Lanka's commercial and diplomatic objectives."   In return, the Sri Lanka-WR contract required the payment of $8,500,000 in accordance with the following schedule: $3,500,000 on May 1, 2014, and five payments of $1,000,000 per month from June through October 2014.

75.   On or about May 9, 2014, at defendant ZUBERI's request, the Central Bank of Sri Lanka wired $3,500,000 to the IZ/WR BofA account.

76.   In or about May 2014, defendant ZUBERI transferred $1,600,000 of the Sri Lankan money into his personal brokerage accounts, $1,500,000 to escrow accounts for the purchase of real property in the name of an IZ/WR Real Property LLC, $300,000 to pay debt on personal credit card accounts, and most of the remaining $100,000 into bank accounts held by IZ/WR Real Property LLCs ("IZ/WR Real Property LLC accounts").

77.   On or about June 18, 2014, at defendant ZUBERI's request, the Central Bank of Sri Lanka wired $1,000,000 to the IZ/WR BofA account.

78.   In or about June 2014, defendant ZUBERI transferred approximately $650,000 of Sri Lanka money into his brokerage accounts and almost $200,000 of Sri Lanka money into IZ/WR Real Property LLC accounts.

79.   In or about July 2014, Sri Lankan officials insisted that the payments in connection with the Sri Lanka-WR contract be disbursed to the contracting party, WR, rather than to defendant ZUBERI's personal bank account.  In addition, Sri Lankan officials requested receipts from WR with respect to the wire transfers already made.

80.   On or about July 9 and 10, 2014, defendant ZUBERI directed Person P to issue fraudulent receipts on behalf of WR for the $3,500,000 and $1,000,000 wire transfers, despite the funds having been received into defendant ZUBERI's personal bank account and spent for defendant ZUBERI's personal benefit.

81.   On or about July 18, 2014, the Central Bank of Sri Lanka wired $1,000,000 into a WR bank account.

82.   From in or about July 2014 through in or about September 2014, defendant ZUBERI directed Person P to transfer over $500,000 of Sri Lankan money from WR to corporate entities controlled by defendant ZUBERI and his spouse, including Avenue Capital Group, LLC ("ACG"), ISZ 9 LLC ("ISZ"), Fountain, LLC ("Fountain"), and Clary LLC ("Clary").  Defendant ZUBERI then transferred most of the Sri Lankan money into the IZ/WR BofA account, which were then used for defendant ZUBERI's personal benefit, including brokerage account investments, real estate investments, and to pay debt on his personal credit cards.  The transactions are summarized below:

| 1st Transfer | 2nd Transfer | 3rd Transfer | Beneficiary |
|---|---|---|---|
| $250,000 to ISZ 9 | $225,000 to IZ/WR BofA | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |

| | | | |
|---|---|---|---|
| $250,000 to Fountain | $225,000 to IZ/WR BofA | $113,484 to American Express | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| $250,000 to Clary | $240,000 to AIS | $135,000 to BGS | BGS |
| | | $50,000 to American Ctrl Escrow | IZ/WR |
| | | $50,000 to American Ctrl Escrow | IZ/WR |
| $200,000 to ACG | $149,000 to BGS | | BGS |
| | $25,000 to Person R | | PERSON R |
| | $25,000 to Person R | | PERSON R |
| $40,000 to BGS | | | BGS |
| $5,000 to BGS | | | BGS |
| $5,000 to Person P | | | PERSON P |

83.   On or about September 10, 2014, the Central Bank of Sri Lanka wired $1,000,000 into a WR bank account.

84.   From in or about September 2014 through in or about October 2014, defendant ZUBERI directed Person P to transfer approximately $725,000 of Sri Lankan money from WR to corporate entities controlled by defendant ZUBERI, including ACG and Avenue Investment Services, LLC ("AIS").   Defendant ZUBERI then transferred most of the funds into the IZ/WR BofA account, which were then used for defendant ZUBERI's personal benefit, including brokerage account investments and to pay debt on his personal credit cards.   The transactions are summarized below:

| 1st Transfer | 2nd Transfer | 3rd Transfer | Beneficiary |
|---|---|---|---|
| $475,000 to ACG (2 cks) | $390,000 to IZ/WR BofA | $36,674 to American Express | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Schwab | IZ/WR |
| | | $100,000 to Schwab | IZ/WR |
| | $35,000 to Nelson Mullins | | NM |
| | $13,500 to BGS | | BGS |
| $475,000 to AIS (2 cks) | $355,000 to IZ/WR BofA | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| | | $66,674 to American Express | IZ/WR |
| | $50,000 to BGS | | BGS |
| | $6,000 to BGS | | BGS |
| $24,750 to BGS | | | BGS |
| $8,750 to BGS | | | BGS |
| $16,500 to Person P | | | PERSON P |

85.   Out of the $6,500,000 wired from Sri Lanka pursuant to the Sri Lanka-WR contract, defendant ZUBERI directed over $5,650,000 to the benefit of defendant ZUBERI and his spouse.

86.   Out of the $6,500,000 wired from Sri Lanka pursuant to the Sri Lanka-WR contract, less than $850,000 was paid to lobbyists, public relations firms, law firms, and other subcontractors identified by defendant ZUBERI and retained by BGS.

87.   At defendant ZUBERI's direction, Person P failed to pay certain invoices issued by these subcontractors.  Defendant ZUBERI

1  falsely represented to these unpaid subcontractors that Sri Lanka had
2  provided insufficient funds to make payment and that BGS and Person P
3  were in possession of funds received from Sri Lanka when, in fact,
4  defendant ZUBERI had directed Person P to transfer the Sri Lankan
5  funds to benefit defendant ZUBERI personally.

6  K.   Income Received in 2015

7       88.  On or about March 27, 2015, Company I, a Ukrainian foreign
8  entity, wired $1,000,000 to the IZ/WR BofA account as payment on an
9  invoice for consulting services issued by defendant ZUBERI.

10      89.  Defendant ZUBERI used the majority of the Company I funds
11 for his personal benefit as follows: $650,000 to defendant ZUBERI's
12 personal brokerage accounts, $174,000 to pay debt on his personal
13 credit card, $39,500 to purchase a BMW automobile, and $22,408 to pay
14 taxes he owed to the California Franchise Tax Board.

15      90.  On or about August 4, 2015, Person J wired $1,000,000 to an
16 ACG bank account for "Consultancy Fees from Al-Areen project."

17      91.  On or about August 5, 2015, defendant ZUBERI used the
18 majority of the funds received from Person J to issue a $770,000
19 check that he deposited into the IZ/RW BofA account.  These funds
20 were combined with other funds to wire $3,183,800 to an escrow
21 company in connection with the purchase of a property in the name of
22 an IZ/WR Real Property LLC.

23      92.  On or about October 26, 2015, Company C wired $999,980 to
24 an ACG bank account for an "Engagement Fee."  The fee constituted a
25 retainer for Avenue Ventures to provide consultancy services to
26 assist Company C to engage in business relationships with government
27 entities and private companies throughout the world on an as-needed
28 basis.

93.   On or about October 28, 2015, defendant ZUBERI's spouse used the majority of the funds received from Company D to purchase a $626,000 cashier's check payable to an escrow company in connection with the purchase of a property in the name of an IZ/WR Real Property LLC.

L.   Unreported Income

94.   Defendant ZUBERI had a legal obligation to file an U.S. Individual Income Tax Return, IRS Form 1040 ("Form 1040") for the 2012 calendar year because, at a minimum, defendant ZUBERI received approximately $886,700 from Company B for campaign contributions that defendant ZUBERI instead converted to his own benefit. Notwithstanding this obligation, defendant ZUBERI did not file a Form 1040 reporting income he received during the 2012 calendar year.

95.   On or about April 15, 2014, defendant ZUBERI and his spouse caused the electronic filing of a Form 1040 for the 2013 calendar year.  Defendant ZUBERI falsely reported on line 22 of that tax return a total income of $182,211.  This amount was understated because, at a minimum, the Form 1040 failed to account for (a) approximately $215,000 defendant ZUBERI received from Company B for contributions to Event EE that defendant ZUBERI instead converted to his own benefit and (b) approximately $2,223,000 defendant ZUBERI converted from U.S. Cares investors during the 2013 calendar year.

96.   On or about April 15, 2015, defendant ZUBERI and his spouse caused the electronic filing of a Form 1040 for the 2014 calendar year.  Defendant ZUBERI falsely reported on line 22 of that tax return a total income of $558,233.  This amount was understated because, at a minimum, the return failed to account for (a) approximately $5,650,000 defendant ZUBERI received either directly

1  from Sri Lanka or indirectly from Sri Lanka through WR in connection

2  with the Sri Lanka-WR contract and which defendant ZUBERI expended

3  for his own personal benefit and (b) approximately $2,200,000

4  defendant ZUBERI converted from U.S. Cares investors during the 2014

5  calendar year.

6      97.  On or about October 14, 2016, defendant ZUBERI and his

7  spouse caused the electronic filing of a Form 1040 for the 2015

8  calendar year.  Defendant ZUBERI falsely reported on line 22 of that

9  tax return a total income of $1,959,992.  This tax amount was

10 understated because the return failed to account for (a) $1,000,000

11 received from Company I by ACH, which should have been accounted for

12 on defendant ZUBERI's Form 1040 as business income, and (b)

13 approximately $1,000,000 defendant ZUBERI converted from U.S. Cares

14 investors during the 2015 calendar year.

15 M.  Defendant Zuberi's Lobbying and Public Relation Activities

16     Conducted at the Direction and Control of the Sri Lankan

17     Government

18     98.  From in or about December 2013 through in or about October

19 2014, defendant ZUBERI directed and personally engaged in lobbying

20 and public relations activities targeting United States elected

21 officials and their staff, at the direction and control of Sri Lanka.

22 Defendant ZUBERI (a) solicited, on behalf of Sri Lanka, Members of

23 Congress to accept all-expenses-paid trips to Sri Lanka, (b) authored

24 emails and wrote proposals for Sri Lanka setting forth the strategy

25 of the influence campaign, (c) interviewed, recommended, and

26 negotiated subcontracts with lobbyists for Sri Lanka, (d) organized

27 conference calls with lobbyists to set forth their responsibilities,

28 (e) coordinated a series of meetings in Washington, D.C. between Sri

Lankan officials and United States Senators, Congresspersons, and
their staff, (f) personally introduced members of a Sri Lanka
delegation to Members of Congress, and (g) participated in meetings
with United States Government officials at which the goals of the Sri
Lanka delegation were discussed.

99. From on or about April 26, 2014 through on or about July
14, 2014, defendant ZUBERI directed Person P to sign the Sri Lanka-WR
contract, create BGS and WR, and open bank accounts for those
companies to insulate and conceal defendant ZUBERI's control of the
Sri Lanka lobbying and public relations effort, and defendant
ZUBERI's personal receipt of money from Sri Lanka.  In reality, BGS
and WR acted as alter egos of defendant ZUBERI and all efforts
undertaken by those entities were, in fact, directed by defendant
ZUBERI.

100. Beginning on or about June 2, 2014, defendant ZUBERI
instructed Person P to sign contracts on behalf of BGS in which it
retained various lobbyists to support the Sri Lanka-WR contract.
Defendant ZUBERI instructed Person P when to pay lobbyists and other
subcontractors on behalf of BGS and WR.  Defendant ZUBERI instructed
Person P not to pay certain lobbyists, despite their rendering of
services.

N.   FARA Violations Pertaining to Sri Lanka

101. From in or about December 2013 through in or about October
2014, defendant ZUBERI was the agent of Sri Lanka, and therefore had
personal registration obligations under FARA.

102. Defendant ZUBERI failed to register with the Department of
Justice as a foreign agent of Sri Lanka prior to acting on Sri
Lanka's behalf.

103. In an effort to conceal his conduct at the direction and control of Sri Lanka, defendant ZUBERI directed Person P to register BGS, rather than defendant ZUBERI himself.  On or about June 2, 2014, Person P filed a FARA registration statement for BGS as an agent of Sri Lanka.  On or about August 14, 2014, BGS filed a supplemental registration statement.  In each of these 2014 registration statements, BGS failed to report any of the money it received from Sri Lanka, the money disbursed to companies under defendant ZUBERI's control, or the money disbursed to various subcontractors that had engaged in the Sri Lanka lobbying and public relations effort.

104. On or about June 2, 2014, Person P filed a "short-form" FARA registration statement, identifying himself as a director of BGS.

105. On or about June 2, 2014, at defendant ZUBERI's direction, Person Q filed a short-form FARA registration statement, identifying himself as a director of BGS.

106. On or about August 14, 2014, defendant ZUBERI filed a short-form FARA registration statement, claiming that BGS contracted with him to provide consulting work on behalf of Sri Lanka.

107. Defendant ZUBERI's short-form statement contained material false statements and omitted material facts.  These included, but were not limited to, that defendant ZUBERI willfully and falsely claimed that (a) BGS retained him as a consultant when, in fact, he orchestrated all of BGS's activities, (b) he engaged in no political activity on behalf of Sri Lanka, when, in fact, he lobbied the United States Congress on behalf of Sri Lanka, (c) he merely received a salary from BGS "[n]ot based solely on services rendered to the foreign principal," when, in fact, he received not a salary from BGS,

1  but rather over $5,650,000 of Sri Lanka funds, and (d) he had made no
2  political contributions on his own behalf during the period beginning
3  60 days prior to the date of his obligation to register to the time
4  of the filing of the short-form FARA registration statement, when, in
5  fact, defendant ZUBERI made contributions to dozens of election
6  campaigns during this timeframe.  In addition, in that short-form
7  statement, defendant ZUBERI did not disclose the $3,500,000 and
8  $1,000,000 wire transfers he had received into the IZ/WR BofA account
9  in May and June 2014, or the $500,000 in Sri Lanka funds he had
10 converted from WR to his own benefit in July 2014.

11      108. Notwithstanding WR's contract with Sri Lanka, WR did not
12 register under FARA at any time during the 2014 calendar year.

13      109. The net result of defendant ZUBERI's failure to register
14 under FARA and the 2014 FARA filings containing material false
15 statements and material omissions was that the American public was
16 unaware of millions of dollars routed by Sri Lanka to defendant
17 ZUBERI and the scope of his concerted and foreign-funded efforts to
18 transform United States foreign policy and public opinion to the
19 benefit of that foreign government.

20      110. In or about late July 2015, defendant ZUBERI was contacted
21 by a reporter for an online magazine, who ultimately published an
22 article reporting that defendant ZUBERI had received millions of
23 dollars from the former Government of Sri Lanka, failed to make
24 requisite FARA disclosures, and was the subject of an investigation
25 by the U.S. Department of Justice in Washington, D.C.

26      111. After his contact with the reporter, but prior to the
27 publication of the article, defendant ZUBERI directed Person P to
28 file FARA registration material prepared by an attorney retained by

1  defendant ZUBERI.   On or about August 11, 2015, Person P issued a

2  letter to NSD to "disclose voluntarily a relationship between FARA

3  registrant [BGS and WR], which was not on BGS's FARA registration."

4  The letter falsely asserted that:

> [WR] is a US business consulting entity which performed
> services for the Government of Sri Lanka [] including
> consulting, research, and related services.   [WR] did not
> perform any lobbying services.   [WR] appointed BGS to help
> identify and engage with consultants who could advance [Sri
> Lanka] public policy interests in the US.   There was no
> written contract or specific correspondence to disclose on
> Exhibit B to BGS' Registration Statement.   Additionally,
> there was no set fee for these services, and there was no
> specific term for these activities.   The activity has ended
> and BGS has since filed its termination statement.

11  112. On or about September 9, 2015, over 20 months after having

12  begun working at the direction and control of Sri Lanka, defendant

13  ZUBERI filed a FARA registration statement, including an attached

14  supplemental statement.   In the filing, defendant ZUBERI disclosed

15  his receipt of $3,500,000 on May 9, 2014, and $1,000,000 on June 18,

16  2014, for "business consulting service, including non-specified

17  amount for public affairs."   Defendant ZUBERI also disclosed the Sri

18  Lanka-WR contract, defendant ZUBERI's personal campaign contributions

19  during the relevant timeframe, and disbursements to various lobbyists

20  and other subcontractors.

21  113. Defendant ZUBERI's September 2015 FARA filing nevertheless

22  contained material false statements and omitted material facts.

23  These included, but were not limited to, that defendant ZUBERI

24  willfully and falsely claimed that he provided no services to Sri

25  Lanka after September 2014.   In fact, on October 15, 2014, defendant

26  ZUBERI reported to Sri Lanka officials a pledge from a Member of

27  Congress to visit Sri Lanka in January 2015.   In addition, on

28  December 4, 2014, defendant ZUBERI promised a Sri Lanka official that

1   he would "extend[] the current contract up to March 2015 at no cost

2   to [Sri Lanka]."

3       114. Defendant ZUBERI's September 2015 FARA filing was

4   accompanied by a letter from his attorney that falsely described his

5   involvement as merely providing business consulting services to Sri

6   Lanka and funding to BGS for public affairs consulting purposes.  The

7   letter falsely stated that FARA registration was not required because

8   defendant ZUBERI engaged in non-political work in furtherance of

9   commerce, the Sri Lanka-WR contract was only a business consulting

10  contract that did not call for lobbying by defendant ZUBERI or WR,

11  and defendant ZUBERI himself did not conduct or plan to conduct any

12  lobbying or public relations work for Sri Lanka.  In fact, defendant

13  ZUBERI was the primary organizer of paid political efforts to mold

14  the opinion of Members of Congress and executive branch

15  administration officials, at the direction and control of Sri Lanka.

16      115. On or about September 15, 2015, more than 16 months after

17  WR contracted with Sri Lanka, WR filed its initial FARA registration

18  statement and associated forms.  The filing disclosed the two

19  $1,000,000 wire transfers WR received from Sri Lanka in July 2014 and

20  September 2014.  The filing falsely declared that most of WR's

21  activities were not reportable pursuant to FARA because only a

22  portion of the money directed to BGS was for public affairs

23  consulting that had been previously disclosed by registered entities.

24      116. On or about September 15, 2015, BGS filed supplemental FARA

25  registration statements.  The BGS filing reported that BGS had

26  engaged in "general consultative services related to some of foreign

27  principal's work on government affairs" and finally reported the

28

money received from defendant ZUBERI and WR as well as disbursements to various lobbyists and other subcontractors.

117. These Introductory Allegations are incorporated into each count of the Information.

COUNT ONE

[22 U.S.C. §§ 612, 618(a)(2)]

On or about August 14, 2014 and September 9, 2015, in Los Angeles County, within the Central District of California, defendant IMAAD SHAH ZUBERI knowingly and willfully made and caused to be made false statements of material fact, willfully omitted material facts required to be stated therein, and willfully omitted material facts necessary to make the statements therein and the copies of documents furnished therewith not misleading, in documents filed with and furnished to the Attorney General under the provisions of the Foreign Agent Registration Act.  Specifically:

In box 11 of the short-form registration statement filed on or about August 14, 2014, defendant ZUBERI falsely stated that he was a "Consultant to Beltway Government Strategies."  In fact, as defendant ZUBERI knew at time he made the statement, he created and controlled Beltway Government Strategies.

In box 12 of the short-form registration statement filed on or about August 14, 2014, defendant ZUBERI falsely stated that his services to the Government of Sri Lanka did not include political activity, as defined by FARA.  In fact, as defendant ZUBERI knew at the time he made the statement, ZUBERI's services to the Government of Sri Lanka included an extensive amount of political activity.

In box 14 of the short-form registration statement filed on or about August 14, 2014, in response to the question, "What compensation or thing of value have you received to date or will you receive for the above services?", defendant ZUBERI falsely stated that he received a salary from BGS "[n]ot based solely on services rendered to the foreign principal" and intentionally omitted that he

1  received $3,500,000 in May 2014 and $1,000,000 in June 2014 solely

2  based on lobbying services rendered to Sri Lanka.

3       In box 15 of the short-form registration statement filed on or

4  about August 14, 2014, defendant ZUBERI stated that he had made no

5  political contributions on his own behalf during the period beginning

6  60 days prior to the date of his obligation to register to the time

7  of the filing of the short-form FARA registration statement.   In

8  fact, as defendant ZUBERI knew at the time he made the statement, he

9  had contributed to dozens of election campaigns during this

10  timeframe.

11       In box 7 of the supplemental statement filed on or about

12  September 9, 2015, defendant ZUBERI listed "09/30/2014" as the date

13  when his connection with the Government of Sri Lanka terminated.

14  Similarly, in box 14(a) of the supplemental statement filed on or

15  about September 9, 2015, defendant ZUBERI stated that his

16  relationship with the Government of Sri Lanka "ended in September

17  2014."  In fact, as defendant ZUBERI knew at the time he made these

18  statements, he continued to act as an agent for the Government of Sri

19  Lanka after September 30, 2014.

COUNT TWO

[26 U.S.C. § 7201]

From on or about May 9, 2014, to on or about April 15, 2015, in Los Angeles County, within the Central District of California, defendant IMAAD SHAH ZUBERI, a resident of El Monte, California, willfully attempted to evade and defeat the assessment and payment of the income tax due and owing by him and his spouse to the United States of America for the calendar year 2014, by committing the following affirmative acts, among others:

      a.   Diverting over $5,650,000 received for the purposes of the Sri Lanka-WR contract to the benefit of defendant ZUBERI and his spouse; and

      b.   Causing to be filed with the Director, Internal Revenue Service Center, at Fresno, California, a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040 that stated the joint total income of defendant ZUBERI and his spouse for the calendar year was $558,233 and that the amount of tax due and owing thereon was $52,069. In fact, as defendant ZUBERI then knew, their joint total income for the calendar year 2014 was in excess of $5,650,000, and, upon the additional taxable income, an additional tax was due and owing to the United States of America.

COUNT THREE

[52 U.S.C. §§ 30116, 30118, 30121, 30122, 30109(d)(1)]

During the calendar year 2015, in Los Angeles County, within the Central District of California, defendant IMAAD SHAH ZUBERI knowingly and willfully violated the Federal Election Campaign Act, in amounts aggregating at least $25,000 during that calendar year, by (a) making contributions in the names of other individuals, (b) reimbursing contributions made by other individuals, (c) receiving reimbursements from other individuals for contributions he made, (d) soliciting contributions made by foreign nationals, and (e) making contributions with money received from, or reimbursed by, foreign nationals and foreign entities.

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption &
    Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption &
    Civil Rights Section

ELISA FERNANDEZ
Assistant United States Attorney
Public Corruption &
Civil Rights Section