FILED

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
 1500 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-2468
 Facsimile: (213) 894-2927
 E-mail:   daniel.obrien@usdoj.gov
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
 1500 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-7383
 Facsimile: (213) 894-2927

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2019 OCT 22  AM 11: 06

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

  Plaintiff,

   v.

IMAAD SHAH ZUBERI,

  Defendant.

No. CR 19 CR 00642-VAP

PLEA AGREEMENT

1.   This constitutes the plea agreement between Imaad Shah Zuberi ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>DEFENDANT'S OBLIGATIONS</u>

2.   Defendant agrees to:

a.   Post a $3 million bond at arraignment secured by $3 million transferred into his attorney's trust account prior to arraignment and no later than October 25, 2019.

b.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a three-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with violations of the Foreign Agents Registration Act ("FARA") in violation of 22 U.S.C. §§ 612, 618(a)(2), tax evasion in violation of 26 U.S.C. § 7201, and Federal Election Campaign Act ("FECA") offenses aggregating in excess of $25,000 in violation of 52 U.S.C. §§ 30116, 30118, 30121, 30122, and 30109(d)(1).

c.   Not contest facts agreed to in this agreement.

d.   Abide by all agreements regarding sentencing contained in this agreement.

e.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

f.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

g.   Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

1        h.    Pay the applicable special assessments at or before

2   the time of sentencing.

3                    PAYMENT OF TAXES OWED

4        3.    Defendant admits he owes additional federal income taxes

5   for the years 2012, 2013, 2014, and 2015 as reflected in an Internal

6   Revenue Service ("IRS") closing agreements ("the Closing Agreements")

7   executed by defendant and his spouse on September 17 and on October

8   4, 2019.  Defendant agrees to:

9        a.    Pay the tax deficiencies, fraud penalties imposed by

10  the Internal Revenue Code, and statutory interest obligations as

11  acknowledged in the Closing Agreements, prior to January 31, 2020.

12       b.    Acknowledge that nothing in this agreement forecloses

13  or limits the ability of the IRS to examine and make adjustments to

14  any tax returns filed by defendant for any other year.

15            i.    In the event defendant fails to pay the tax

16  deficiencies, fraud penalties, and statutory interest obligations

17  acknowledged in the Closing Agreements by January 31, 2020, agree the

18  IRS may file and record three quit claim deeds executed by defendant

19  on September 17, 2019 on behalf of the LLCs that own properties in

20  favor of the defendant, file and record liens on these properties,

21  and sell the properties in partial or complete satisfaction of the

22  debt identified in the Closing Agreements.  Any proceeds that exceed

23  amounts owed under the Closing Agreements plus monetary obligations

24  imposed by the court regarding special assessments, restitution or

25  fines at sentencing shall be returned to defendant.

26

27

28                              3

c.   Not file any claim for refund of taxes, penalties, or interest for amounts attributable to the returns filed in connection with this plea agreement.

d.   Give up any and all objections that could be asserted to the Examination Division of the IRS receiving materials or information obtained during the criminal investigation of this matter, including materials and information obtained through grand jury subpoenas.

e.   Allow all funds posted as bond in this matter to be applied by the Court to pay, in order of application, the tax deficiencies, fraud penalties, and statutory interest obligations acknowledged in the Closing Agreements, special assessments, criminal fines, and costs that defendant is required to pay, and execute papers as necessary to accomplish this application.

<u>FARA COMPLIANCE</u>

4.   Defendant agrees to satisfy any and all obligations under FARA prior to sentencing, including registering for any and all activity, past or present, that requires registration under FARA and amending any deficiencies in existing FAFA filings.

<u>THE USAO'S OBLIGATIONS</u>

5.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   Provided that defendant demonstrates an acceptance of responsibility for the charged offenses as defined in U.S.S.G. § 1BE1.1, including as further explained in its application notes and

4

1   in particular Note 1(A), recommend a two-level reduction in the

2   applicable Sentencing Guidelines offense level, pursuant to U.S.S.G.

3   § 3E1.1, and, if necessary, move for an additional one-level

4   reduction if available under that section.

5          d.   Not criminally prosecute defendant for (i) wire fraud

6   or mail fraud during the period 2012 through 2016 arising out of

7   defendant's conduct as described in the agreed-to factual basis or in

8   the information filed in this matter, (ii) Foreign Bank and Financial

9   Account Report ("FBAR") violations for the tax years 2012 through

10  2016, (iii) money laundering, and (iv) obstruction of justice.

11  Defendant disputes that he committed any such crimes but understands

12  that the USAO is free to argue, and that the Court may consider, the

13  aforementioned allegations and any other uncharged conduct in

14  determining applicable Sentencing Guidelines enhancements, the

15  Sentencing Guideline range, the propriety and extent of any departure

16  from that range, and the sentence to be imposed after consideration

17  of the Sentencing Guidelines and all other relevant factors under 18

18  U.S.C. § 3553(a).

19         e.   Not criminally prosecute defendant's spouse for any

20  criminal offense related to (i) her 2012 individual tax return, (ii)

21  the tax returns she co-signed with defendant for the 2013, 2014, and

22  2015 calendar years, and (iii) any of the offenses recited in

23  paragraph 5(d) above.  Defendant disputes that his spouse committed

24  any such offenses.  Defendant acknowledges that he has discussed with

25  his attorney and carefully considered the possible advantages and

26  disadvantages to defendant of entering into this Agreement which

27  includes a package deal, that is, a non-prosecution agreement with

28                                    5

respect to defendant's spouse.  Defendant acknowledges that he is entering into this Agreement as part of the package deal freely and voluntarily because defendant believes this Agreement and the package deal to be in defendant's best interests.  Defendant acknowledges that he is not entering into this Agreement as part of the package deal because of threats, coercion, or other undue influence by the USAO, his spouse, their counsel, anyone acting on their behalf, or anyone else.

f.   Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.

<u>NATURE OF THE OFFENSE</u>

6.   Defendant understands that for defendant to be guilty of the crime charged in count one, that is, FARA offenses in violation of 22 U.S.C. §§ 612, and 618(a)(2), the following must be true:

a.   Defendant acted in the United States as an agent of a foreign government or foreign national;

b.   Defendant was required to file a registration statement with the U.S. Attorney General within ten days of becoming such an agent;

c.   Defendant either filed, or caused to be filed, a registration statement, knowing that the statement contained materially false information, omitted a material fact required to be stated in the registration statement, or withheld material facts or documents necessary to make the statement not misleading; and

d.   Defendant acted willfully.

7.     Defendant understands that for defendant to be guilty of the crime charged in count two, that is, tax evasion, in violation of Title 26, United States Code, Section 7201, the following must be true:

a.     A substantial income tax was due in addition to that declared on the defendant's tax return;

b.     The defendant attempted to evade or defeat this additional tax; and

c.     The defendant acted willfully.

8.     Defendant understands that for defendant to be guilty of the crime charge in count three, FECA offenses aggregating in excess of $25,000, in violation of 52 United States Code §§ 30116, 30118, 30121, 30122, and 30109(d)(1), the following must be true:

a.     Defendant solicited, aided, caused to be made, or made FECA contributions (i) in excess of quantitative limits, (ii) from foreign nationals or entities, (iii) in the name of another person, or (iv) through conduits;

b.     Defendant knew the contributions were unlawful and acted willfully; and

c.     The aggregate value of the illegal contributions exceeded $25,000 within a calendar year.

<u>PENALTIES AND RESTITUTION</u>

9.     Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 22, United States Code, Sections 612 and 618(a)(2) is: five-years imprisonment; a three-year period of supervised release; a fine of $250,000 or twice

1  the gross gain or gross loss resulting from the offense, whichever is
2  greatest; and a mandatory special assessment of $100.
3      10.   Defendant understands that the statutory maximum sentence
4  that the Court can impose for a violation of Title 26, United States
5  Code, Section 7201, is: five-years imprisonment; a three-year period
6  of supervised release; a fine of $250,000 or twice the gross gain or
7  gross loss resulting from the offense, whichever is greatest; and a
8  mandatory special assessment of $100.
9      11.   Defendant understands that the statutory maximum sentence
10 that the Court can impose for a violation of Title 52, United States
11 Code, Sections 30116, 30118, 30121, 30122, and 30109(d)(1) is: five-
12 years imprisonment; a three-year period of supervised release; a fine
13 of $250,000 or twice the gross gain or gross loss resulting from the
14 offense, whichever is greatest; and a mandatory special assessment of
15 $100.
16     12.   Defendant understands, therefore, that the total maximum
17 sentence for all offenses to which defendant is pleading guilty is:
18 15-years imprisonment; a three-year period of supervised release; a
19 fine of $750,000 or twice the gross gain or gross loss resulting from
20 the offenses, whichever is greatest; and a mandatory special
21 assessment of $300.
22     13.   Defendant understands and agrees that the Court: (a) may
23 order defendant to pay restitution in the form of any additional
24 taxes, interest, and penalties that defendant owes to the United
25 States based upon the count of conviction and any relevant conduct;
26 and (b) must order defendant to pay the costs of prosecution, which
27 may be in addition to the statutory maximum fine stated above.
28                                    8

14.  Defendant agrees that any FECA contribution refunds disbursed from political campaign committees relating to offenses identified in this plea agreement or sentencing briefs should be made, by certified check and/or money order, to "Clerk, United States District Court," reference the case name and case number, and be delivered to the Fiscal Department of the Clerk's Office for the Central District of California at 255 East Temple Street, Room 1178, Los Angeles, California 90012.  *Cf. United States v. Gaytan*, 342 F.3d 1010 (9th Cir. 2003).  Defendant agrees that in the event he receives any contribution refunds prior to sentencing he will disgorge those amounts by certified check and/or money order as set forth above. Defendant agrees that at the time of sentencing, restitution should be ordered in an amount equal to the disgorgements received by the Clerk of the Court in favor of the Federal Election Commission. Nothing in this agreement waives or limits in any way the authority of the Federal Election Commission to seek civil penalties or other administrative remedies for violations of FECA pursuant to Title 52, United States Code, Section 30109(a).

15.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

16.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

17.   Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

FACTUAL BASIS

18.   Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts attached as Exhibit B

10

1  and agree that this statement of facts is sufficient to support a

2  plea of guilty to the charges described in this agreement and to

3  establish the Sentencing Guidelines factors set forth in paragraph 20

4  below but is not meant to be a complete recitation of all facts

5  relevant to the underlying criminal conduct or all facts known to

6  either party that relate to that conduct.

7  SENTENCING FACTORS

8      19.  Defendant understands that in determining defendant's

9  sentence the Court is required to calculate the applicable Sentencing

10  Guidelines range and to consider that range, possible departures

11  under the Sentencing Guidelines, and the other sentencing factors set

12  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

13  Sentencing Guidelines are advisory only, that defendant cannot have

14  any expectation of receiving a sentence within the calculated

15  Sentencing Guidelines range, and that after considering the

16  Sentencing Guidelines and the other § 3553(a) factors, the Court will

17  be free to exercise its discretion to impose any sentence it finds

18  appropriate up to the maximum set by statute for the crime of

19  conviction.

20      20.  Defendant and the USAO agree to the following applicable

21  Sentencing Guidelines factors:

22      Tax

23  Base level (loss $3.5m - $9.5m)      = 24  [U.S.S.G §2T1.1(a)(1); 2T4.1]

24      FECA

25  Base offense level               = 8        [U.S.S.G. §2C1.8(a)]

26  Value ($250,000 - $1,500,000)    +12 or 14  [U.S.S.G. §2C1.8(b)(1)]

27  Number of transactions (>30)     +2         [U.S.S.G. §2C1.8(b)(4)]

28                                    11

FARA

The defendant and the USAO agree that the Sentencing Guidelines do not contain a guideline for a FARA violation, but call for the use of the most analogous guideline.  U.S.S.G. §§ 2B1.2(a) and 2X5.1. Under the facts of this case, the parties agree that there is no sufficiently analogous guideline.  Thus, the 3553 factors shall control, except that any guidelines and policy statement that can be applied meaningfully shall remain applicable. U.S.S.G. § 2X5.1.

21.  Defendant and the USAO agree that the FECA and tax fraud offenses do not group for purposes of U.S.S.G § 3D1.2(d).

22.  Defendant understands that the USAO reserves the right to argue that the following additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate:

a.    unreported income derived from criminal activity exceeding $10,000 pursuant to U.S.S.G § 2T1.1(b)(1);

b.    tax offense involving sophisticated means pursuant to U.S.S.G § 2T1.1(b)(2);

c.    aggregate amount of FECA violations pursuant to U.S.S.G § 2C1.8(b)(1);

d.    foreign sourced FECA contributions pursuant to U.S.S.G § 2C1.8(b)(2); and

e.    obstruction or impeding the administration of justice pursuant to U.S.S.G § 3C1.1.

Subject to paragraph 36 below, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed.

23.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

WAIVER OF CONSTITUTIONAL RIGHTS

24.  Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel -- and if necessary have the court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the court appoint counsel -- at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.   The right to confront and cross-examine witnesses against defendant.

f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

13

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF STATUTE OF LIMITATIONS

25.   Having been fully advised by defendant's attorney regarding application of the statute of limitations to the offenses to which defendant is pleading guilty, defendant hereby knowingly, voluntarily, and intelligently waives, relinquishes, and gives up: (a) any right that defendant might have not to be prosecuted for the offenses to which defendant is pleading guilty because of the expiration of the statute of limitations for those offenses prior to the filing of the information alleging those offenses; and (b) any defense, claim, or argument defendant could raise or assert that prosecution of the offenses to which defendant is pleading guilty is barred by the expiration of the applicable statute of limitations, pre-indictment delay, or any speedy trial violation.

## WAIVER OF VENUE

26.   Having been fully advised by defendant's attorney regarding the requirements of venue with respect to the offenses to which defendant is pleading guilty, to the extent the offenses to which defendant is pleading guilty were committed, begun, or completed outside the Central District of California, defendant knowingly, voluntarily, and intelligently waives, relinquishes, and gives up: (a) any right that defendant might have to be prosecuted only in the district where the offenses to which defendant is pleading guilty were committed, begun, or completed; and (b) any defense, claim, or

14

1  argument defendant could raise or assert based upon lack of venue

2  with respect to the offenses to which defendant is pleading guilty.

3  <u>WAIVER OF APPEAL OF CONVICTION</u>

4      27.  Defendant understands that, with the exception of an appeal

5  based on a claim that defendant's guilty plea was involuntary, by

6  pleading guilty, defendant is waiving and giving up any right to

7  appeal defendant's convictions on the offenses to which defendant is

8  pleading guilty.  Defendant understands that this waiver includes any

9  and all claims that the statement of facts provided herein is

10 insufficient to support defendant's plea of guilty.

11     <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

12     28.  Defendant agrees that, provided the Court imposes a total

13 term of imprisonment on all counts of conviction within or below the

14 range corresponding to an offense level of 32 and the criminal

15 history category calculated by the Court, defendant gives up the

16 right to appeal all of the following: (a) the procedures and

17 calculations used to determine and impose any portion of the

18 sentence; (b) the term of imprisonment imposed by the Court; (c) the

19 fine imposed by the court, provided it is within the statutory

20 maximum; (d) to the extent permitted by law, the constitutionality or

21 legality of defendant's sentence, provided it is within the statutory

22 maximum; (e) the term of probation or supervised release imposed by

23 the Court, provided it is within the statutory maximum; and (f) any

24 of the following conditions of probation or supervised release

25 imposed by the Court: the conditions set forth in General Order 18-10

26 of this Court; the drug testing conditions mandated by 18 U.S.C.

27

28                                 15

1  §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
2  authorized by 18 U.S.C. § 3563(b)(7).
3      29.  The USAO agrees that, provided that the Court imposes a
4  term of imprisonment within the statutory maximum, to give up its
5  right to appeal any portion of the sentence, with the exception that
6  the USAO reserves the right to appeal the amount of restitution
7  ordered.
8                 RESULT OF WITHDRAWAL OF GUILTY PLEA
9      30.  Defendant agrees that if, after entering guilty pleas
10 pursuant to this agreement, defendant seeks to withdraw and succeeds
11 in withdrawing defendant's guilty pleas on any basis other than a
12 claim and finding that entry into this plea agreement was
13 involuntary, then (a) the USAO will be relieved of all of its
14 obligations under this agreement; and (b) should the USAO choose to
15 pursue any charge that was either dismissed or not filed as a result
16 of this agreement, then (i) any applicable statute of limitations
17 will be tolled between the date of defendant's signing of this
18 agreement and the filing commencing any such action; and
19 (ii) defendant waives and gives up all defenses based on the statute
20 of limitations, any claim of pre-indictment delay, or any speedy
21 trial claim with respect to any such action, except to the extent
22 that such defenses existed as of the date of defendant's signing this
23 agreement.
24                RESULT OF VACATUR, REVERSAL OR SET-ASIDE
25     31.  Defendant agrees that if any count of conviction is
26 vacated, reversed, or set aside, the USAO may: (a) ask the Court to
27 resentence defendant on any remaining count of conviction, with both
28                                  16

1  the USAO and defendant being released from any stipulations regarding
2  sentencing contained in this agreement, (b) ask the Court to void the
3  entire plea agreement and vacate defendant's guilty plea on any
4  remaining count of conviction, with both the USAO and defendant being
5  released from all their obligations under this agreement, or
6  (c) leave defendant's remaining conviction, sentence, and plea
7  agreement intact.  Defendant agrees that the choice among these three
8  options rests in the exclusive discretion of the USAO.

9                         EFFECTIVE DATE OF AGREEMENT

10      32.  This agreement is effective upon signature and execution of
11 all required certifications by defendant, defendant's counsel, and an
12 Assistant United States Attorney.

13                         BREACH OF AGREEMENT

14      33.  Defendant agrees that if defendant, at any time after the
15 signature of this agreement and execution of all required
16 certifications by defendant, defendant's counsel, and an Assistant
17 United States Attorney, knowingly violates or fails to perform any of
18 defendant's obligations under this agreement ("a breach"), the USAO
19 may declare this agreement breached.  All of defendant's obligations
20 are material, a single breach of this agreement is sufficient for the
21 USAO to declare a breach, and defendant shall not be deemed to have
22 cured a breach without the express agreement of the USAO in writing.
23 If the USAO declares this agreement breached, and the Court finds
24 such a breach to have occurred, then: (a) if defendant has previously
25 entered a guilty plea pursuant to this agreement, defendant will not
26 be able to withdraw the guilty plea, and (b) the USAO will be
27 relieved of all its obligations under this agreement.

28                                 17

34.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

35.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this

18

1  agreement and need not accept any of the USAO's sentencing

2  recommendations or the parties' agreements to facts or sentencing

3  factors.

4      36.  Defendant understands that both defendant and the USAO are

5  free to: (a) supplement the facts by supplying relevant information

6  to the United States Probation and Pretrial Services Office and the

7  Court, (b) correct any and all factual misstatements relating to the

8  Court's Sentencing Guidelines calculations and determination of

9  sentence, and (c) argue on appeal and collateral review that the

10  Court's Sentencing Guidelines calculations and the sentence it

11  chooses to impose are not error, although each party agrees to

12  maintain its view that the calculations in paragraph 20 are

13  consistent with the facts of this case.  While this paragraph permits

14  both the USAO and defendant to submit full and complete factual

15  information to the United States Probation and Pretrial Services

16  Office and the Court, even if that factual information may be viewed

17  as inconsistent with the facts agreed to in this agreement, this

18  paragraph does not affect defendant's and the USAO's obligations not

19  to contest the facts agreed to in this agreement.

20      37.  Defendant understands that even if the Court ignores any

21  sentencing recommendation, finds facts or reaches conclusions

22  different from those agreed to, and/or imposes any sentence up to the

23  maximum established by statute, defendant cannot, for that reason,

24  withdraw defendant's guilty pleas, and defendant will remain bound to

25  fulfill all defendant's obligations under this agreement.  Defendant

26  understands that no one -- not the prosecutor, defendant's attorney,

27  or the Court -- can make a binding prediction or promise regarding

28                                  19

1  the sentence defendant will receive, except that it will be within

2  the statutory maximum.

3                          NO ADDITIONAL AGREEMENTS

4       38.  Defendant understands that, except as set forth herein,

5  there are no promises, understandings, or agreements between the USAO

6  and defendant or defendant's attorney, and that no additional

7  promise, understanding, or agreement may be entered into unless in a

8  writing signed by all parties or on the record in court.

9           PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

10      39.  The parties agree that this agreement will be considered

11  part of the record of defendant's guilty plea hearing as if the

12  entire agreement had been read into the record of the proceeding.

13  AGREED AND ACCEPTED

14  UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
15  CALIFORNIA

16  NICOLA T. HANNA
    United States Attorney

17

18  _____        10/8/19
    DANIEL J. O'BRIEN                       _____
19  Assistant United States Attorney        Date

20  _____        10/6/2019
    IMAAD SHAH ZUBERI                       _____
21  Defendant                               Date

22

    _____        10.7.19
23  THOMAS P. O'BRIEN                       _____
    Attorney for Defendant                  Date
24  Imaad Shah Zuberi

    _____        10/6/19
25  EVAN J. DAVIS                           _____
    Attorney for Defendant                  Date
26  Imaad Shah Zuberi

27

28                              20

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          _10/6/2019_
IMAAD SHAH ZUBERI                          Date
Defendant

CERTIFICATION OF DEFENDANT'S ATTORNEY

We are Imaad Shah Zuberi's attorneys.  We have carefully and thoroughly discussed every part of this agreement with our client. Further, we have fully advised our client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors

21

1   set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

2   provisions, and of the consequences of entering into this agreement.

3   To our knowledge: no promises, inducements, or representations of any

4   kind have been made to our client other than those contained in this

5   agreement; no one has threatened or forced our client in any way to

6   enter into this agreement; our client's decision to enter into this

7   agreement is an informed and voluntary one; and the factual basis set

8   forth in this agreement is sufficient to support our client's entry

9   of a guilty plea pursuant to this agreement.

10

11

12   THOMAS P. O'BRIEN                          10.7.19
     Attorney for Defendant                     Date

13   Imaad Shah Zuberi

14

15

16   EVAN J. DAVIS                              _____
     Attorney for Defendant                     Date

17   Imaad Shah Zuberi

18

19

20

21

22

23

24

25

26

27

28                              22

1          EXHIBIT A

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,          No. CR

11              Plaintiff,          I N F O R M A T I O N

12              v.                [22 U.S.C. §§ 612, 618(a)(2):
                                  Violations of the Foreign Agents
13  IMAAD SHAH ZUBERI,            Registration Act;  26 U.S.C.
                                  § 7201: Tax Evasion;
14              Defendant.         52 U.S.C. §§ 30116, 30118, 30121,
                                  30122, 30109(d)(1): Foreign,
15                                Conduit, and Other Illegal
                                  Campaign Contributions]

16

17       The United States Attorney charges:

18              INTRODUCTORY ALLEGATIONS

19  A.   Defendant's Political & Business Activities

20       1.    From in or about 2010 through the present, defendant IMAAD

21  SHAH ZUBERI operated an informal entity named Avenue Ventures, a

22  venture capital firm.  As part of his operation of Avenue Ventures,

23  defendant ZUBERI told foreign nationals, representatives of foreign

24  governments, and others that he could implement changes to United

25  //

26  //

27  //

28  DOB

1  States foreign policy by wielding his influence in Washington, D.C.
2  Defendant ZUBERI typically advertised these political policy changes
3  as devices to construct profitable business and investment
4  opportunities for his clients as well as himself.

5      2.   Defendant ZUBERI and Avenue Ventures obtained funds from
6  this business plan in multiple ways.  Some of defendant ZUBERI's
7  clients agreed to pay him consulting or retainer fees.  Other clients
8  agreed to transfer money to defendant ZUBERI to invest in specific
9  business ventures for the benefit of these clients.  Other clients
10  agreed to transfer money to defendant ZUBERI to fund political
11  campaign contributions in an effort to create business opportunities
12  for themselves.

13      3.   Defendant ZUBERI used a portion of these funds to donate
14  contributions to the political campaigns of federal and state
15  officials.  Between on or about September 1, 2011 and on or about
16  February 24, 2017, the day when defendant ZUBERI became aware of the
17  U.S. Government's criminal investigation, defendant ZUBERI made over
18  $3,000,000 in contributions, in either his own name or that of his
19  spouse, to various Democratic and Republican federal election
20  campaigns, and Presidential Inauguration Committees.  Between on or
21  about September 1, 2011 and on or about November 7, 2016, defendant
22  ZUBERI also "bundled" over a million dollars of contributions from
23  various third parties as a fundraiser for campaigns for Presidential
24  elections and several other candidates for elected office.

25      4.   Through these political contributions, defendant ZUBERI
26  obtained access to high-level United States officials.  Defendant
27  ZUBERI attempted to persuade these public officials to modify
28  existing United States policies and take other actions on behalf of,

1  and favorable to, defendant ZUBERI's clients.   In an effort to
2  convince his clients of his ability to wield influence, defendant
3  ZUBERI broadcast this access by distributing photographs of defendant
4  ZUBERI meeting with high-ranking elected officials and describing
5  conversations in which they purportedly discussed public policies of
6  international importance.

7      5.   Defendant ZUBERI used a portion of the funds from his
8  business plan to hire lobbyists and public relations consultants who
9  assisted his efforts to influence and transform public policy and
10 opinion in the United States.

11     6.   Defendant ZUBERI's campaign contributions, public relations
12 work, and lobbying efforts generated marginal results.   Some United
13 States officials, however, were willing to adopt defendant ZUBERI's
14 requested political positions or otherwise accommodate defendant
15 ZUBERI's wishes.

16     7.   Defendant ZUBERI's business ventures were largely
17 unsuccessful for his clients.   Indeed, most of defendant ZUBERI's
18 clients suffered significant monetary losses stemming from their
19 business associations with defendant ZUBERI.   Many of the lobbyists,
20 public relations consultants, and other subcontractors also suffered
21 losses when defendant ZUBERI refused to pay them the agreed-upon fees
22 for services they rendered.

23     8.   In contrast to the losses suffered by his clients and
24 subcontractors, defendant ZUBERI gained substantial wealth.   This
25 newfound wealth was almost entirely obtained as a result of (a)
26 fraudulent representations concerning defendant ZUBERI's education,
27 experience, family wealth, business, employees, investment successes,
28 financial condition, political power, and the disposition of client

1  funds, and (b) the outright conversion of client money for defendant

2  ZUBERI's own personal benefit.

3  B.   The Foreign Agents Registration Act

4       9.   The Foreign Agents Registration Act ("FARA") was, and is, a

5  disclosure statute that requires any person acting as "an agent of a

6  foreign principal" to register with the Attorney General of the

7  United States in connection with certain types of activities, such as

8  political or public relations efforts on behalf of the foreign

9  principal.  Such registrations are made to the U.S. Department of

10 Justice, National Security Division's FARA Unit.  It is a crime to

11 knowingly and willfully fail to register, and to make false and

12 misleading statements or material omissions in documents submitted to

13 the FARA Unit under the law's provisions.

14      10.  One purpose of FARA is to create transparency regarding the

15 existence and extent of the relationship between individuals

16 operating in the United States and their foreign principals.  Proper

17 registration under the statute allows the U.S. government and the

18 American people to evaluate the statements and activities of

19 individuals who are serving as agents of foreign principals.  Among

20 other things, a FARA registration reveals the identity of the foreign

21 principal on whose behalf a registrant performs services, the type of

22 services the registrant provides the foreign principal, the source

23 and amount of compensation the registrant receives from the foreign

24 principal, and political campaign contributions made by the

25 registrant while the registrant was acting as an agent of the foreign

26 principal.  The Government of Sri Lanka, a country in South Asia,

27 was, and is, a foreign principal under FARA.

28

4

1   C.    <u>The Federal Election Campaign Act</u>

2       11.   The Federal Election Campaign Act ("FECA") governed, and

3   governs, contributions to candidates, their campaign committees, and

4   political committees in United States elections.

5       12.   FECA requires that federal candidates for public office

6   designate a principal campaign committee to solicit, accept, and

7   receive contributions and to make expenditures for the campaign.

8   FECA also permits the establishment of other political committees,

9   such as national party committees, state party committees, and

10   political action committees, which can solicit, accept, and receive

11   contributions and make expenditures for candidates and political

12   parties.

13       13.   FECA requires that each treasurer of a political committee

14   that participates in federal elections file periodic reports to the

15   Federal Election Commission ("FEC") identifying contributors by name,

16   address, and occupation, and the contributions provided by those

17   contributors by date and amount.

18       14.   FECA prohibits:

19         a.   Contributions from foreign nationals, meaning

20   individuals who are neither citizens of the United States nor

21   permanent residents of the United States, directly or through any

22   other person, in connection with any federal, state, or local

23   election or any presidential inaugural;

24         b.   Contributions from foreign or domestic corporations,

25   partnerships, associations, or organizations in connection with any

26   federal election for federal office;

27

28

1          c.   Conduit contributions, contributions in the name of
2    another, or using one name to effect a contribution by another in
3    connection with any federal election for federal office;
4          d.   Contributions from any person (i) in excess of $2,500
5    during the 2012 election cycle, $2,600 during the 2014 election
6    cycle, and $2,700 during the 2016 election cycle to any candidate's
7    authorized political committee per federal election; (ii) in excess
8    of $30,800 during the 2012 election cycle, $32,400 during the 2014
9    election cycle, and $33,400 during the 2016 election cycle per year
10   to any national party committee; (iii) in excess of $10,000 per year
11   to any state, district, and local party committee, and (iv) in excess
12   of $5,000 per year to any other political committee.
13   D.   Individuals, Entities, & Non-Existent Person
14        15.   Person A was a foreign national, namely, a citizen of both
15   Saudi Arabia and the United Kingdom who resided in the United Kingdom
16   and Switzerland.  Person A was the chairman of Company A, a foreign
17   corporation headquartered in Riyadh, Saudi Arabia.  Person A's
18   spouse, Person B, was a citizen of the United States.
19        16.   Person C was a citizen of both Lebanon and the United
20   States, residing in Kuwait.  Person C was the Chief Executive Officer
21   of Company B, a foreign corporation headquartered in Kuwait City,
22   Kuwait.  Person C's spouse, Person D, was a foreign national, namely,
23   a citizen and resident of Kuwait.
24        17.   Person E was a foreign national, namely, a citizen of
25   Venezuela who resided in Saudi Arabia and was employed by Company A.
26   Person E's spouse, Person F, was a foreign national, namely, a
27   Venezuelan citizen residing in Saudi Arabia.
28

                                    6

1     18.   Person G was a citizen of the United States.   Person G's

2    spouse, Person H, was a foreign national, namely, a citizen of

3    Brazil.

4     19.   Person I was a non-existent person created by defendant

5    ZUBERI to aid in his schemes.

6     20.   U.S. Cares, LLC ("U.S. Cares"), also known as America

7    Cares, was a Delaware limited liability corporation, created at the

8    direction of defendant ZUBERI on or about December 13, 2013.   On or

9    about November 24, 2014, defendant ZUBERI submitted an application on

10   behalf of U.S. Cares for a license from the Office of Foreign Assets

11   Control ("OFAC") to allow U.S. Cares to export humanitarian items,

12   including food, medicine, and medical supplies, to Iran.

13    21.   Person J was a foreign national, namely, a citizen of

14   Bahrain, executive of Company C, and Chairman of Company D, both

15   foreign entities.   In or about August 2013, Company D invested in

16   U.S. Cares.

17    22.   Person K was a foreign national, namely, a citizen of the

18   United Arab Emirates and Singapore and Managing Partner of Company E,

19   a foreign entity.   In or about August 2013, Company E invested in

20   U.S. Cares.

21    23.   Person L was a foreign national, a citizen of United Arab

22   Emirates and Chief Executive Officer of Company F, a foreign entity.

23   In or about October 2013, Company F invested in U.S. Cares.   On or

24   about April 29, 2014, OFAC designated both Person L and Company F as

25   Specially Designated Nationals.   This designation prohibited United

26   States persons from engaging in business with, blocked the assets of,

27   and imposed other restrictions against Person L and Company F.   In or

28

1  about November 2014, Company F sold its shares in U.S. Cares to
2  Company D.

3      24.  Person M was a foreign national, namely, a citizen of
4  Kuwait and principal of Company G, a foreign entity.  In or about
5  December 2013, Company G invested in U.S. Cares.

6      ·25.  Person N was a foreign national, namely, a citizen of India
7  and principal of Company H, a foreign entity.  In or about December
8  2013, Company H invested in U.S. Cares.

9      26.  From on or about April 9, 2009 through July 14, 2014, WR
10 Group was an informal entity.  On or about April 19, 2009, Person O
11 opened a Bank of America account in the name of WR Group ("WR"), with
12 herself as sole signatory, in which she described WR as a sole
13 proprietorship.

14     27.  Person P was a former college classmate of defendant
15 ZUBERI.  From January 2014 through October 2015, defendant ZUBERI
16 paid Person P $5,000 per month to perform a variety of tasks on
17 behalf of defendant ZUBERI and Avenue Ventures.  On or about July 14,
18 2014, at the direction of defendant ZUBERI, Person P obtained a
19 certificate of organization in Washington, D.C. designating WR Group
20 as a limited liability company ("WR, LLC").

21     28.  On or about May 23, 2014, at the direction of defendant
22 ZUBERI, Person P incorporated Beltway Government Services, Inc.
23 ("BGS").  That same day, Person P opened several Wells Fargo bank
24 accounts (the "BGS accounts") in which he identified himself as owner
25 and sole signatory.

26     29.  Person Q was an associate of defendant ZUBERI.  From July
27 2014 through September 2014, defendant ZUBERI directed Person P to
28 pay $2,500 per month out of the BGS accounts to the benefit of Person

1  Q in return for his agreement to act as a second signatory on the BGS

2  accounts.

3     30.   Throughout the existence of WR LLC and BGS, Person P

4  nominally governed both entities but they were actually always

5  subject to the control of defendant ZUBERI.  Defendant ZUBERI

6  directed Person P to sign contracts, issue invoices, transfer funds,

7  pay expenses, and forebear from paying expenses.  Person P followed

8  defendant ZUBERI's instructions with respect to how to operate these

9  entities.

10     31.   Person R was a business associate of defendant ZUBERI and a

11  candidate for federal elective office during the 2016 election cycle.

12     32.   Person S was a foreign national, namely, a citizen of

13  Bahrain, and high-ranking official of the Bahrain government.

14  E.   Conduit Campaign Contributions

15     33.   From on or about April 27, 2012 through on or about October

16  26, 2016, defendant ZUBERI paid for campaign contributions donated in

17  the name of other individuals by making the following online payments

18  with credit cards belonging to defendant ZUBERI and his spouse:

| Date | Campaign | Contributor | Amount |
|---|---|---|---|
| 4/27/12 | Campaign A | Person BB | $2,500 |
| 4/27/12 | Campaign A | Person CC | $2,500 |
| 4/27/12 | Campaign A | Person DD | $2,500 |
| 10/26/12 | Campaign B | Person EE | $5,000 |
| 4/5/13 | Campaign C | Person FF | $2,600 |
| 4/14/13 | Campaign C | Person FF | $2,600 |
| 4/22/13 | Campaign D | Person B | $2,600 |
| 4/22/13 | Campaign D | Person B | $2,600 |
| 5/31/13 | Campaign C | Person B | $2,600 |
| 5/31/13 | Campaign C | Person B | $2,600 |
| 5/31/13 | Campaign C | Person C | $2,600 |
| 5/31/13 | Campaign C | Person C | $2,600 |
| 12/23/13 | Campaign E | Person FF | $2,600 |
| 12/23/13 | Campaign E | Person FF | $2,600 |

9

| 12/26/13 | Campaign F | Person FF | $2,600 |
| 12/26/13 | Campaign F | Person FF | $2,600 |
| 1/27/14 | Campaign C | Person GG | $2,400 |
| 1/27/14 | Campaign F | Person GG | $2,600 |
| 1/27/14 | Campaign C | Person GG | $2,600 |
| 1/27/14 | Campaign F | Person GG | $2,600 |
| 1/27/14 | Campaign C | Person P | $2,400 |
| 1/27/14 | Campaign F | Person P | $2,600 |
| 1/27/14 | Campaign C | Person P | $2,600 |
| 1/27/14 | Campaign F | Person P | $2,600 |
| 4/19/14 | Campaign G | Person FF | $2,600 |
| 4/19/14 | Campaign G | Person FF | $2,600 |
| 5/14/14 | Campaign G | Person FF | $2,600 |
| 5/14/14 | Campaign G | Person HH | $2,600 |
| 9/25/14 | Campaign H | Person FF | $2,600 |
| 2/3/15 | Campaign I | Person C | $5,200 |
| 3/3/15 | Campaign J | Person B | $2,700 |
| 3/3/15 | Campaign J | Person FF | $2,700 |
| 3/3/15 | Campaign J | Person A | $2,700 |
| 3/3/15 | Campaign J | Person C | $2,700 |
| 5/27/15 | Campaign C | Person B | $5,400 |
| 9/28/16 | Campaign J | Person C | $400 |
| 9/28/16 | Campaign J | Person B | $2,700 |
| 9/28/16 | Campaign J | Person B | $2,700 |
| 9/28/16 | Campaign J | Person A | $2,700 |
| 9/28/16 | Campaign J | Person A | $2,700 |
| 9/28/16 | Campaign J | Person II | $2,700 |
| 9/28/16 | Campaign J | Person II | $2,700 |
| 10/26/16 | Campaign K | Person B | $2,700 |

34.  From on or about February 26, 2013 through on or about October 28, 2016, defendant ZUBERI paid for campaign contributions donated in the name of Person AA, a family member who passed away on or about April 2, 2016, by making the following online payments with credit cards belonging to defendant ZUBERI:

| Date | Campaign | Contributor | Amount |
| --- | --- | --- | --- |
| 4/22/13 | Campaign D | Person AA | $2,600 |
| 4/22/13 | Campaign D | Person AA | $2,600 |
| 12/6/13 | Campaign E | Person AA | $2,600 |
| 12/6/13 | Campaign E | Person AA | $2,600 |
| 12/26/13 | Campaign F | Person AA | $2,600 |

10

| 12/26/13 | Campaign F | Person AA | $2,600 |
|----------|------------|-----------|--------|
| 1/3/14   | Campaign L | Person AA | $2,600 |
| 1/15/14  | Campaign M | Person AA | $2,600 |
| 1/15/14  | Campaign M | Person AA | $2,600 |
| 2/19/14  | Campaign N | Person AA | $2,600 |
| 2/19/14  | Campaign N | Person AA | $2,600 |
| 2/28/14  | Campaign O | Person AA | $2,600 |
| 2/28/14  | Campaign B | Person AA | $2,600 |
| 2/28/14  | Campaign B | Person AA | $2,600 |
| 2/28/14  | Campaign O | Person AA | $2,600 |
| 3/21/14  | Campaign L | Person AA | $2,600 |
| 3/21/14  | Campaign L | Person AA | $2,600 |
| 4/19/14  | Campaign O | Person AA | $2,600 |
| 4/19/14  | Campaign O | Person AA | $2,600 |
| 4/19/14  | Campaign P | Person AA | $2,600 |
| 4/19/14  | Campaign L | Person AA | $2,600 |
| 4/19/14  | Campaign G | Person AA | $2,600 |
| 4/19/14  | Campaign G | Person AA | $2,600 |
| 6/14/14  | Campaign Q | Person AA | $2,600 |
| 7/3/14   | Campaign R | Person AA | $2,600 |
| 7/3/14   | Campaign R | Person AA | $2,600 |
| 7/3/14   | Campaign S | Person AA | $2,600 |
| 7/3/14   | Campaign S | Person AA | $2,600 |
| 8/16/14  | Campaign J | Person AA | $2,600 |
| 1/23/15  | Campaign F | Person AA | $2,600 |
| 1/23/15  | Campaign F | Person AA | $2,600 |
| 2/3/15   | Campaign I | Person AA | $5,200 |
| 2/5/15   | Campaign T | Person AA | $5,000 |
| 3/3/15   | Campaign J | Person AA | $2,700 |
| 3/9/15   | Campaign C | Person AA | $2,700 |
| 3/9/15   | Campaign C | Person AA | $2,700 |
| 3/21/15  | Campaign U | Person AA | $2,700 |
| 3/21/15  | Campaign U | Person AA | $2,700 |
| 3/22/15  | Campaign V | Person AA | $2,700 |
| 3/22/15  | Campaign V | Person AA | $2,700 |
| 4/12/15  | Campaign W | Person AA | $2,700 |
| 6/12/15  | Campaign X | Person AA | $2,700 |
| 12/16/15 | Campaign Y | Person AA | $2,700 |
| 12/16/15 | Campaign Y | Person AA | $2,700 |
| 10/28/16 | Campaign Z | Person AA | $2,700 |

35.  Although Person AA shared certain joint bank accounts with defendant ZUBERI, none of those joint accounts financed the above-referenced contributions in Person AA's name, Person AA lacked sufficient income to pay for all the contributions made in Person

11

1   AA's name, and at the time the October 28, 2016 contribution was made

2   in Person AA's name, Person AA was deceased.

3       36.   From on or about April 1, 2014 through on or about May 17,

4   2015, defendant ZUBERI reimbursed the following conduits for campaign

5   contributions they had donated at defendant ZUBERI's direction:

| Date | Campaign | Contributor | Amount |
|------|----------|-------------|--------|
| 4/1/14 | Campaign E | Person P | $400 |
| 4/1/14 | Campaign E | Person P | $2,600 |
| 5/5/15 | Campaign W | Person JJ | $2,700 |
| 5/17/15 | Campaign W | Person KK | $1,350 |

10      37.   From on or about September 27, 2013 through on or about

11  April 14, 2016, defendant ZUBERI solicited and received the following

12  reimbursements for campaign contributions, or portions of campaign

13  contributions, defendant ZUBERI had donated in his own name:

| Date | Campaign | Source of Funds | Amount |
|------|----------|-----------------|--------|
| 9/27/13 | State Campaign AA | Person J | $25,000 |
| 9/16/14 | Campaign BB | Person LL | $16,000 |
| 4/14/16 | Campaign CC | Person LL | $35,000 |

17  F.    Foreign Sources of Campaign Contributions

18      38.   Beginning on or about May 2, 2012 and continuing to on or

19  about February 11, 2016, in response to defendant ZUBERI's

20  solicitations, Person A and Person C caused Company A and Company B

21  to issue the following wire transfers into a foreign bank account in

22  the name of defendant ZUBERI ("the IZ Barclays Dubai account") that

23  either funded or reimbursed contributions to the following political

24  campaigns and a FECA-regulated event ("Event EE"):

25

26

27

28

| Company A to Company B | Date | Company B to Zuberi | Date | Zuberi Acct. | Purpose |
|---|---|---|---|---|---|
| | | $136,600 | 5/1/12 | Zuberi Barclays Dubai | Campaign B & Campaign DD |
| | | $71,600 | 6/11/12 | Zuberi Barclays Dubai | Campaign DD |
| | | $90,000 | 9/26/12 | Zuberi Barclays Dubai | Campaign DD |
| $180,000 | 10/10/13 | $180,000 | 10/1/12 | Zuberi Barclays Dubai | Campaign DD |
| | | $100,000 | 10/21/12 | Zuberi Barclays Dubai | Campaign DD |
| | | $100,000 | 11/12/12 | Zuberi Barclays Dubai | Event EE |
| | | $500,000 | 12/10/12 | Zuberi Barclays Dubai | Event EE |
| $150,000 | 1/16/13 | $150,000 | 1/14/13 | Zuberi Barclays Dubai | Event EE |
| $100,000 | 5/2/13 | $100,000 | 2/27/13 | Zuberi Barclays Dubai | Event EE photos |
| | | $5,000 | 4/30/13 | Zuberi Barclays Dubai | Campaign D |
| | | $100,200 | 2/11/16 | Avenue Ventures Wells Fargo US | Campaign DD |

39.   Defendant ZUBERI caused Avenue Ventures to issue invoices that disguised the nature of these foreign conduit campaign contributions, typically by falsely characterizing the transfers as "international consulting."

40.   These foreign, conduit contributions were donated in the names of Person A, Person B, Person C, Person D, Person E, Person F, Person I, Person O, Person AA, and defendant ZUBERI.

41.   From on or about April 14, 2015 through on or about May 5, 2015, defendant ZUBERI also solicited, and caused the following campaign committees to receive, the following direct contributions from foreign nationals knowing that they were foreign nationals:

| Date | Campaign | Contributor | Amount |
|------|----------|-------------|--------|
| 4/14/15 | Campaign W | Person D | $2,700 |
| 4/19/15 | Campaign W | Person A | $2,700 |
| 5/5/15 | Campaign W | Person H | $2,700 |

G.   Conversion of Funds Intended for Political Campaigns

42.   Contrary to the representations made by defendant ZUBERI to Person A and Person C, defendant ZUBERI directed only a portion of the money wired by Company A and Company B to political campaigns and Event EE and converted the remaining amounts to his personal benefit:

| Wire to Zuberi | Date | Intended Campaign | Amounts Donated to Campaign | Amounts Converted |
|----------------|------|-------------------|------------------------------|-------------------|
| $136,600 | 5/1/12 | Campaign B & Campaign DD | $100,000 | $36,600 |
| $71,600 | 6/11/12 | Campaign DD | $0 | $71,600 |
| $90,000 | 9/26/12 | Campaign DD | $89,000 | $1,000 |
| $180,000 | 10/1/12 | Campaign DD | $40,000 | $140,000 |
| $100,000 | 10/21/12 | Campaign DD | $0 | $100,000 |
| $100,000 | 11/12/12 | Event EE | $0 | $100,000 |
| $500,000 | 12/10/12 | Event EE | $62,500[1] | $437,500 |
| $150,000 | 1/14/13 | Event EE | $35,000 | $115,000 |
| $100,000 | 2/27/13 | Event EE (photos) | $0 | $100,000 |
| $100,200 | 2/11/16 | Campaign CC | $100,000 | $200 |
| Total | | | Total Converted by ZUBERI | $1,101,900 |

43.   For example, on or about September 24, 2012, in connection with his solicitation of the $90,000 and $180,000 wire transfers, defendant ZUBERI falsely informed Person C and Person E that he had incurred expenses of $270,000 by making contributions on their behalf.  Deliberately using the name of a fictitious employee, defendant ZUBERI sent an email from Robert.Reed@avenueventure.com that falsely stated:

---

[1] From on or about December 27, 2012 through on or about January 15, 2013, defendant ZUBERI made contributions of $62,500, $62,500, $62,500, $35,000 and $35,000, totaling $257,500, and thereafter obtained refunds from the inauguration committee of $160,000, making the actual expenses incurred only $97,500.

14

1  Please get me the forms and the wire as soon as possible
   because there are limited number of seats available.  I
2  have used American Express of Imaad to pay for everyone's
   dues.  We need to put the names through vettin [sic]
3  process as well.  After the wire is done, please email me
   so we can move it into the correct sub-account.  Thanks Rob

4

5      44.  That same day, defendant ZUBERI falsely informed Person C

6  that defendant ZUBERI was approaching the credit limit on his

7  American Express card because of the $270,000 in contribution

8  expenses incurred, and attached a notice from American Express to

9  purportedly confirm that assertion.  In fact, defendant ZUBERI

10 fraudulently prepared the American Express notice to inflate his

11 outstanding balance from approximately $3,943 to $279,998 and his

12 credit limit from $19,000 to $300,000.

13     45.  From on or about September 27, 2012 through on or about

14 October 12, 2012, defendant ZUBERI converted approximately $141,000

15 of the $270,000 he received as part of this scheme and used the

16 majority of those funds to (a) pay off a $68,679 mortgage balance on

17 his personal residence, (b) transfer $40,000 to a business operated

18 by his spouse and her close relative, and (c) withdraw $5,000 in cash

19 for himself.

20     46.  On or about January 21, 2013, defendant ZUBERI falsely

21 informed Person A, Person C, and Person E that there was a shortfall

22 in their contributions to Event EE and that a hold had been placed on

23 their photographs with the President and Vice-President, writing:

24     [Y]ou guys were supposed to take only two people for the
       photo.  These were $250,000 per person with President and
25     Vice President.  I told you by mistake they had put wrong
       names on the photo line.  When the photo (sic) are out they
26     will match it with who went to the photo line versus who
       paid for them or how many paid.  It won't take long for
27     them to figure this out.  There were four people instead of
       two.  It will make me look like I am trying to play a fast
28     one with them.  I do not want to take chance with my

1    reputation for a couple hundred thousand dollars. It is not
   worth it for me and I have too much to lose.  I told them
2    there was a mistake made and to hold our photo until I tell
   them which one to release and not release.  You need to
3    tell me which two people photo you want released.  Let me
   make it clear, except for [Person C], both [Person E] and
4    [Person A] have not paid enough for this specific photo.

5    47.   In fact, as defendant ZUBERI knew, there was no shortfall

6 in contributions to Event EE and, in the weeks ahead, defendant

7 ZUBERI actually received refunds for some contributions defendant

8 ZUBERI had made to Event EE.

9    48.   From on or about January 22, 2013 through or about February

10 25, 2013, defendant ZUBERI falsely informed Person C that defendant

11 ZUBERI personally paid $250,000 for the additional photo and that

12 defendant ZUBERI expected Person A to reimburse him for that expense

13 or else he would inform business associates not to work with Person

14 A.  Ultimately, defendant ZUBERI informed Person A that he would

15 accept the reduced amount of $100,000 from Person A for the purported

16 reimbursement.

17 H.   Income From anti-Bahrain Lobbying Effort

18    49.   In or about February 2013, Person J informed defendant

19 ZUBERI that he was engaged in a financial dispute with Person S.

20 According to Person J, Person S won a monetary arbitration award

21 against Person J for services rendered in connection with the

22 development of the Al Areen Palace & Spa ("Al Areen"), a master

23 planned development in southern Bahrain.  According to Person J, as a

24 result of this dispute with Person S, the Government of Bahrain had

25 frozen Person J's personal assets and delayed further development of

26 Al Areen, which was causing significant financial harm to Person J.

27    50.   To remedy Person J's financial dispute, defendant ZUBERI

28 proposed to use his connections with current and former high-ranking

1  U.S. Government officials to dissuade the Bahraini government from

2  engaging in conduct antithetical to Person J's financial interests

3  ("the anti-Bahrain lobbying effort").

4      51.  Defendant ZUBERI further proposed that he and Person J

5  convey the appearance that Avenue Ventures was investing in Al Areen.

6  By injecting a U.S. "investor" into the project, defendant ZUBERI

7  believed he could convince high-ranking U.S. Government officials to

8  apply political pressure on the Bahrain government into stopping its

9  interference in the Al Areen development because of its adverse

10 financial impact on a U.S. entity.  Defendant ZUBERI proposed a

11 circular scheme through which the appearance of a U.S. investment

12 would be created:  (a) Person J would invest in a U.S. company; (b)

13 the U.S. company would invest in Avenue Ventures; and (c) Avenue

14 Ventures would then invest in an Al Areen Holding Company ("AHC")

15 that purportedly owned Al Areen.

16     52.  From on or about March 3, 2013 through on or about May 28,

17 2013, defendant ZUBERI enlisted the support of a former high-ranking

18 U.S. official to speak with members of the Bahrain government, U.S.

19 State Department officials, and a Member of Congress in furtherance

20 of the anti-Bahrain lobbying efforts.

21     53.  From on or about March 12, 2013 through on or about March

22 5, 2014, defendant ZUBERI enlisted the support of a high-ranking U.S.

23 State Department official in Bahrain to visit Al Areen, meet with

24 members of the Bahrain government, and speak with Members of Congress

25 in furtherance of the anti-Bahrain lobbying effort.

26     54.  From on or about March 15, 2013 through on or about June 1,

27 2013, defendant ZUBERI discussed with Members of Congress and their

28 staffs how to enlist the support of the U.S. State Department in

17

1  furtherance of the anti-Bahrain lobbying effort and arranged for

2  these Congresspersons to meet with Bahrain government officials.

3      55.   On or about April 29, 2013, defendant ZUBERI staged a

4  public event in Los Angeles, California, at which Person J and other

5  individuals purported to sign a partnership agreement in which Avenue

6  Ventures acquired a 35% stake in AHC in return for its having made a

7  sizable U.S. foreign investment in Al Areen.   In fact, no such

8  agreement was executed.

9      56.   Defendant ZUBERI solicited Person J for money in return for

10  acting as an unregistered foreign agent of Person J.   On or about

11  August 3, 2013, defendant ZUBERI told Person J and others:

12      It has been several months since the Al-Areen press
       conference.  We need to put closure on this by Thursday
13      August 15.  We have been asked about this project by [State
       Department Official] and others including calls from
14      [Bahrain government officials . . .] If it is not moving
       forward then we will let US State Department know that we
15      are not moving forward with this project. . . .

16      57.   On or about August 18, 2013, defendant ZUBERI warned

17  Person J:

18      Next week we need to either get documents signed or we need
       to have a press release that we agreed not to move forward
19      thereby disengaging.  It has been over 5-6 months which is
       way too long.  Tomorrow, if someone challenged this then
20      what document do I have to prove this is a real
       transaction?

21

22      58.   On or about August 26, 2013, Person J executed a contract

23  with Avenue Ventures on behalf of Company D.   Under the terms of the

24  contract, Avenue Ventures would provide consultancy services to

25  further Company D's attempts to enter into business relationships

26  throughout the world on an as-needed basis.   In return, Company D

27  would pay Avenue Ventures a retainer of $250,000 per year plus

28

18

1  additional retainers and success fees as projects were realized, as
2  well as expenses.
3      59.  Defendant ZUBERI failed to register under FARA as an agent
4  of Person J, a foreign national, and received income for acting as an
5  unregistered agent of Person J.  For example, in or about August
6  2013, Avenue Ventures issued an invoice to Company D seeking $250,000
7  per the "2013 contract."  On or about August 29, 2013, Avenue
8  Ventures issued an invoice to Company D for $27,900 for expenses
9  incurred in relation to the anti-Bahrain lobbying effort.  On or
10 about September 2013, Company D wired $277,858 to the IZ Barclays
11 Dubai account in payment on those invoices related to defendant
12 ZUBERI's anti-Bahrain lobbying efforts.
13     60.  From on or about January 15, 2014 through on or about March
14 5, 2014, defendant ZUBERI prevailed upon Members of Congress to issue
15 official letters to the Foreign Minister of Bahrain in support of the
16 anti-Bahrain lobbying efforts.  In order to achieve this goal,
17 defendant ZUBERI falsely informed Members of Congress:
18         [A] major investment by a US company in Bahrain is
           experiencing significant interference from Bahraini
19         authorities acting on behalf of a member of the royal
           family. . . . [Avenue Ventures] is seeking support from its
20         government for a cessation of interference in its project
           in Bahrain.
21
22     61.  In fact, Avenue Ventures had not invested any money or
23 acquired any stake in either AHC or Al Areen and the true purpose of
24 the lobbying efforts was to financially benefit Person J.
25     62.  From on or about January 15, 2014 through on or about March
26 5, 2014, in response to the lobbying efforts of defendant ZUBERI on
27 behalf of Person J, twelve Members of Congress issued official
28 letters to the Foreign Minister of Bahrain citing the purported

                                   19

1  "harassment" of "U.S. investors" and asking that his government stop

2  its "interference."

3  I.   Conversion of Funds/Income Received From U.S. Cares Investors

4       63.   From on or about August 12, 2013 through on or about

5  January 27, 2014, defendant ZUBERI solicited Person J, Person K,

6  Person L, Person M, and Person N to invest in U.S. Cares and caused

7  Avenue Ventures to enter into an operating agreement with their

8  respective companies.

9       64.   The operating agreement that defined the investment

10 assigned the following ownership percentages in the venture: Avenue

11 Ventures (28.5%), Company D (20%), Company F (9.5%), Company E (2%),

12 Company G (20%), and Company H (20%).   The agreement required the

13 establishment of a capital account with respect to each member's

14 capital contributions.

15      65.   From on or about September 28, 2013 through on or about

16 March 11, 2014, the U.S. Cares investors wired approximately

17 $7,000,000 into the IZ Barclays Dubai account, an individual Emirates

18 Bank account in the name of defendant ZUBERI located in Dubai ("the

19 IZ Emirates Dubai account"), and a Bank of America account in the

20 United States held jointly in the name of defendant ZUBERI and his

21 spouse ("the IZ/WR BofA account").

22      66.   Capital investments from Person N and his business, Company

23 H, and Person M's business, Company G, were wired to defendant ZUBERI

24 as follows:

25

| Transfer Date | Transfer Amount | Payor | Zuberi Account |
|---|---|---|---|
| 12/10/2013 | $500,000 | Person N | IZ/WR BofA US |
| 12/12/2013 | $490,070 | Person N | IZ Emirates Dubai |
| 12/22/2013 | $245,031 | Person N | IZ Emirates Dubai |
| 12/24/2013 | $500,000 | Company H | IZ/WR BofA US |
| 1/27/2014 | $2,000,000 | Company G | IZ Emirates Dubai |

26

27

28

67.   Defendant ZUBERI did not transfer any of the funds received from U.S. Cares investors into a U.S. Cares capital account as required by the operating agreement.  Instead, from on or about December 5, 2013 through on or about October 12, 2015, defendant ZUBERI used over 90% of the investor funds to (a) purchase real estate in the names of various limited liability companies owned entirely by himself and his spouse ("IZ/WR Real Property LLCs"), (b) pay down mortgages owed by IZ/WR Real Property LLCs, (c) remodel property owned by IZ/WR Real Property LLCs, (d) invest in brokerage accounts in the names of defendant ZUBERI and his spouse, (e) donate $250,000 to a non-profit organization established by a former high-ranking elected official, and (f) pay down personal credit card debt, most of which was incurred to pay campaign contributions and travel, meal, entertainment, and personal expenses.

68.   Out of approximately $7,000,000 wired to defendant ZUBERI by U.S. Cares investors, less than $250,000 was spent in furtherance of defendant ZUBERI's advertised business purpose.  On or about October 7, 2013 and on or about December 9, 2013, defendant ZUBERI issued two $90,000 checks to a law firm in connection with the creation of U.S. Cares and preparing a license application to OFAC. From in or about October 2013 through in or about February 2016, defendant ZUBERI paid another attorney approximately $20,000 in connection with the U.S. Cares license application.

69.   In or about January 2016, United States sanctions against Iran were lifted, which impacted OFAC regulations pertaining to U.S. Cares.

70.   On or about February 22, 2016, OFAC responded to U.S. Cares license application, stating that ". . . the Applicant's proposed

1  transactions related to the exportation and reexportation of the
2  goods as described in the application appear to be generally
3  authorized[.]"

4      71.  After the OFAC response, defendant ZUBERI took no further
5  action with respect to the license application, nor did he use any of
6  the converted funds to engage in the planned distribution of
7  humanitarian supplies to Iran.

8  J.  Conversion of Funds/Income Received From Sri Lankan Government

9      72.  From on or about November 28, 2013 through on or about
10  March 5, 2014, defendant ZUBERI met with high-ranking officials of
11  the Government of Sri Lanka and negotiated an agreement whereby
12  Avenue Ventures, or a special-purpose company created by Avenue
13  Ventures, would engage in lobbying and public relations efforts to
14  rehabilitate Sri Lanka's image in the United States.  This proposed
15  lobbying and public relations effort focused on modifying United
16  States policies, particularly through the issuance of Congressional
17  resolutions, and improving public perception relating to Sri Lanka's
18  alleged persecution of its minority Tamil population.

19      73.  On or about March 5, 2014, defendant ZUBERI pledged to
20  expend $2,250,000 per quarter in support of this effort with
21  $1,500,000 per quarter for lobbying expenses, $500,000 per quarter
22  for legal expenses, and $250,000 per quarter for media buys.
23  Defendant ZUBERI told Sri Lankan officials that the effort would
24  include introducing Sri Lankan officials to executive branch
25  administration officials, Senators, and Congresspersons, and
26  recruiting Sri Lankan expatriates to engage in political organizing
27  in the United States.

28

1       74.   On or about April 26, 2014, WR entered into a contract,

2   effective May 1, 2014, with the Central Bank of Sri Lanka ("the Sri

3   Lanka-WR contract").   The Sri Lanka-WR contract described WR's

4   services as "(i) strategic advice related to commercial and public

5   policy considerations related to the US and other parties;" and (ii)

6   "identification of consultants or other legal or non-legal advisors

7   to [Sri Lanka] and the Central Bank as may effectuate Sri Lanka's

8   commercial and diplomatic objectives."   In return, the Sri Lanka-WR

9   contract required the payment of $8,500,000 in accordance with the

10   following schedule: $3,500,000 on May 1, 2014, and five payments of

11   $1,000,000 per month from June through October 2014.

12       75.   On or about May 9, 2014, at defendant ZUBERI's request, the

13   Central Bank of Sri Lanka wired $3,500,000 to the IZ/WR BofA account.

14       76.   In or about May 2014, defendant ZUBERI transferred

15   $1,600,000 of the Sri Lankan money into his personal brokerage

16   accounts, $1,500,000 to escrow accounts for the purchase of real

17   property in the name of an IZ/WR Real Property LLC, $300,000 to pay

18   debt on personal credit card accounts, and most of the remaining

19   $100,000 into bank accounts held by IZ/WR Real Property LLCs ("IZ/WR

20   Real Property LLC accounts").

21       77.   On or about June 18, 2014, at defendant ZUBERI's request,

22   the Central Bank of Sri Lanka wired $1,000,000 to the IZ/WR BofA

23   account.

24       78.   In or about June 2014, defendant ZUBERI transferred

25   approximately $650,000 of Sri Lanka money into his brokerage accounts

26   and almost $200,000 of Sri Lanka money into IZ/WR Real Property LLC

27   accounts.

28

79.   In or about July 2014, Sri Lankan officials insisted that the payments in connection with the Sri Lanka-WR contract be disbursed to the contracting party, WR, rather than to defendant ZUBERI's personal bank account.  In addition, Sri Lankan officials requested receipts from WR with respect to the wire transfers already made.

80.   On or about July 9 and 10, 2014, defendant ZUBERI directed Person P to issue fraudulent receipts on behalf of WR for the $3,500,000 and $1,000,000 wire transfers, despite the funds having been received into defendant ZUBERI's personal bank account and spent for defendant ZUBERI's personal benefit.

81.   On or about July 18, 2014, the Central Bank of Sri Lanka wired $1,000,000 into a WR bank account.

82.   From in or about July 2014 through in or about September 2014, defendant ZUBERI directed Person P to transfer over $500,000 of Sri Lankan money from WR to corporate entities controlled by defendant ZUBERI and his spouse, including Avenue Capital Group, LLC ("ACG"), ISZ 9 LLC ("ISZ"), Fountain, LLC ("Fountain"), and Clary LLC ("Clary").  Defendant ZUBERI then transferred most of the Sri Lankan money into the IZ/WR BofA account, which were then used for defendant ZUBERI's personal benefit, including brokerage account investments, real estate investments, and to pay debt on his personal credit cards.  The transactions are summarized below:

| 1st Transfer | 2nd Transfer | 3rd Transfer | Beneficiary |
|---|---|---|---|
| $250,000 to ISZ 9 | $225,000 to IZ/WR BofA | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |

24

| | | | |
|---|---|---|---|
| $250,000 to Fountain | $225,000 to IZ/WR BofA | $113,484 to American Express | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| $250,000 to Clary | $240,000 to AIS | $135,000 to BGS | BGS |
| | | $50,000 to American Ctrl Escrow | IZ/WR |
| | | $50,000 to American Ctrl Escrow | IZ/WR |
| $200,000 to ACG | $149,000 to BGS | | BGS |
| | $25,000 to Person R | | PERSON R |
| | $25,000 to Person R | | PERSON R |
| $40,000 to BGS | | | BGS |
| $5,000 to BGS | | | BGS |
| $5,000 to Person P | | | PERSON P |

83.   On or about September 10, 2014, the Central Bank of Sri Lanka wired $1,000,000 into a WR bank account.

84.   From in or about September 2014 through in or about October 2014, defendant ZUBERI directed Person P to transfer approximately $725,000 of Sri Lankan money from WR to corporate entities controlled by defendant ZUBERI, including ACG and Avenue Investment Services, LLC ("AIS").  Defendant ZUBERI then transferred most of the funds into the IZ/WR BofA account, which were then used for defendant ZUBERI's personal benefit, including brokerage account investments and to pay debt on his personal credit cards.  The transactions are summarized below:

| 1st Transfer | 2nd Transfer | 3rd Transfer | Beneficiary |
|---|---|---|---|
| $475,000 to ACG (2 cks) | $390,000 to IZ/WR BofA | $36,674 to American Express | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Schwab | IZ/WR |
| | | $100,000 to Schwab | IZ/WR |
| | $35,000 to Nelson Mullins | | NM |
| | $13,500 to BGS | | BGS |
| $475,000 to AIS (2 cks) | $355,000 to IZ/WR BofA | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| | | $100,000 to Etrade | IZ/WR |
| | | $66,674 to American Express | IZ/WR |
| | $50,000 to BGS | | BGS |
| | $6,000 to BGS | | BGS |
| $24,750 to BGS | | | BGS |
| $8,750 to BGS | | | BGS |
| $16,500 to Person P | | | PERSON P |

85.   Out of the $6,500,000 wired from Sri Lanka pursuant to the Sri Lanka-WR contract, defendant ZUBERI directed over $5,650,000 to the benefit of defendant ZUBERI and his spouse.

86.   Out of the $6,500,000 wired from Sri Lanka pursuant to the Sri Lanka-WR contract, less than $850,000 was paid to lobbyists, public relations firms, law firms, and other subcontractors identified by defendant ZUBERI and retained by BGS.

87.   At defendant ZUBERI's direction, Person P failed to pay certain invoices issued by these subcontractors.  Defendant ZUBERI

1    falsely represented to these unpaid subcontractors that Sri Lanka had

2    provided insufficient funds to make payment and that BGS and Person P

3    were in possession of funds received from Sri Lanka when, in fact,

4    defendant ZUBERI had directed Person P to transfer the Sri Lankan

5    funds to benefit defendant ZUBERI personally.

6    K.   Income Received in 2015

7         88.  On or about March 27, 2015, Company I, a Ukrainian foreign

8    entity, wired $1,000,000 to the IZ/WR BofA account as payment on an

9    invoice for consulting services issued by defendant ZUBERI.

10        89.  Defendant ZUBERI used the majority of the Company I funds

11   for his personal benefit as follows: $650,000 to defendant ZUBERI's

12   personal brokerage accounts, $174,000 to pay debt on his personal

13   credit card, $39,500 to purchase a BMW automobile, and $22,408 to pay

14   taxes he owed to the California Franchise Tax Board.

15        90.  On or about August 4, 2015, Person J wired $1,000,000 to an

16   ACG bank account for "Consultancy Fees from Al-Areen project."

17        91.  On or about August 5, 2015, defendant ZUBERI used the

18   majority of the funds received from Person J to issue a $770,000

19   check that he deposited into the IZ/RW BofA account.  These funds

20   were combined with other funds to wire $3,183,800 to an escrow

21   company in connection with the purchase of a property in the name of

22   an IZ/WR Real Property LLC.

23        92.  On or about October 26, 2015, Company C wired $999,980 to

24   an ACG bank account for an "Engagement Fee."  The fee constituted a

25   retainer for Avenue Ventures to provide consultancy services to

26   assist Company C to engage in business relationships with government

27   entities and private companies throughout the world on an as-needed

28   basis.

1    93.   On or about October 28, 2015, defendant ZUBERI's spouse

2  used the majority of the funds received from Company D to purchase a

3  $626,000 cashier's check payable to an escrow company in connection

4  with the purchase of a property in the name of an IZ/WR Real Property

5  LLC.

6  L.    Unreported Income

7     94.   Defendant ZUBERI had a legal obligation to file an U.S.

8  Individual Income Tax Return, IRS Form 1040 ("Form 1040") for the

9  2012 calendar year because, at a minimum, defendant ZUBERI received

10 approximately $886,700 from Company B for campaign contributions that

11 defendant ZUBERI instead converted to his own benefit.

12 Notwithstanding this obligation, defendant ZUBERI did not file a Form

13 1040 reporting income he received during the 2012 calendar year.

14    95.   On or about April 15, 2014, defendant ZUBERI and his spouse

15 caused the electronic filing of a Form 1040 for the 2013 calendar

16 year.   Defendant ZUBERI falsely reported on line 22 of that tax

17 return a total income of $182,211.   This amount was understated

18 because, at a minimum, the Form 1040 failed to account for (a)

19 approximately $215,000 defendant ZUBERI received from Company B for

20 contributions to Event EE that defendant ZUBERI instead converted to

21 his own benefit and (b) approximately $2,223,000 defendant ZUBERI

22 converted from U.S. Cares investors during the 2013 calendar year.

23    96.   On or about April 15, 2015, defendant ZUBERI and his spouse

24 caused the electronic filing of a Form 1040 for the 2014 calendar

25 year.   Defendant ZUBERI falsely reported on line 22 of that tax

26 return a total income of $558,233.   This amount was understated

27 because, at a minimum, the return failed to account for (a)

28 approximately $5,650,000 defendant ZUBERI received either directly

1  from Sri Lanka or indirectly from Sri Lanka through WR in connection

2  with the Sri Lanka-WR contract and which defendant ZUBERI expended

3  for his own personal benefit and (b) approximately $2,200,000

4  defendant ZUBERI converted from U.S. Cares investors during the 2014

5  calendar year.

6      97.  On or about October 14, 2016, defendant ZUBERI and his

7  spouse caused the electronic filing of a Form 1040 for the 2015

8  calendar year.  Defendant ZUBERI falsely reported on line 22 of that

9  tax return a total income of $1,959,992.  This tax amount was

10  understated because the return failed to account for (a) $1,000,000

11  received from Company I by ACH, which should have been accounted for

12  on defendant ZUBERI's Form 1040 as business income, and (b)

13  approximately $1,000,000 defendant ZUBERI converted from U.S. Cares

14  investors during the 2015 calendar year.

15  M.  Defendant Zuberi's Lobbying and Public Relation Activities

16      Conducted at the Direction and Control of the Sri Lankan

17      Government

18      98.  From in or about December 2013 through in or about October

19  2014, defendant ZUBERI directed and personally engaged in lobbying

20  and public relations activities targeting United States elected

21  officials and their staff, at the direction and control of Sri Lanka.

22  Defendant ZUBERI (a) solicited, on behalf of Sri Lanka, Members of

23  Congress to accept all-expenses-paid trips to Sri Lanka, (b) authored

24  emails and wrote proposals for Sri Lanka setting forth the strategy

25  of the influence campaign, (c) interviewed, recommended, and

26  negotiated subcontracts with lobbyists for Sri Lanka, (d) organized

27  conference calls with lobbyists to set forth their responsibilities,

28  (e) coordinated a series of meetings in Washington, D.C. between Sri

29

1  Lankan officials and United States Senators, Congresspersons, and

2  their staff, (f) personally introduced members of a Sri Lanka

3  delegation to Members of Congress, and (g) participated in meetings

4  with United States Government officials at which the goals of the Sri

5  Lanka delegation were discussed.

6       99.  From on or about April 26, 2014 through on or about July

7  14, 2014, defendant ZUBERI directed Person P to sign the Sri Lanka-WR

8  contract, create BGS and WR, and open bank accounts for those

9  companies to insulate and conceal defendant ZUBERI's control of the

10  Sri Lanka lobbying and public relations effort, and defendant

11  ZUBERI's personal receipt of money from Sri Lanka.  In reality, BGS

12  and WR acted as alter egos of defendant ZUBERI and all efforts

13  undertaken by those entities were, in fact, directed by defendant

14  ZUBERI.

15      100. Beginning on or about June 2, 2014, defendant ZUBERI

16  instructed Person P to sign contracts on behalf of BGS in which it

17  retained various lobbyists to support the Sri Lanka-WR contract.

18  Defendant ZUBERI instructed Person P when to pay lobbyists and other

19  subcontractors on behalf of BGS and WR.  Defendant ZUBERI instructed

20  Person P not to pay certain lobbyists, despite their rendering of

21  services.

22  N.  FARA Violations Pertaining to Sri Lanka

23      101. From in or about December 2013 through in or about October

24  2014, defendant ZUBERI was the agent of Sri Lanka, and therefore had

25  personal registration obligations under FARA.

26      102. Defendant ZUBERI failed to register with the Department of

27  Justice as a foreign agent of Sri Lanka prior to acting on Sri

28  Lanka's behalf.

1    103. In an effort to conceal his conduct at the direction and

2    control of Sri Lanka, defendant ZUBERI directed Person P to register

3    BGS, rather than defendant ZUBERI himself.  On or about June 2, 2014,

4    Person P filed a FARA registration statement for BGS as an agent of

5    Sri Lanka.  On or about August 14, 2014, BGS filed a supplemental

6    registration statement.  In each of these 2014 registration

7    statements, BGS failed to report any of the money it received from

8    Sri Lanka, the money disbursed to companies under defendant ZUBERI's

9    control, or the money disbursed to various subcontractors that had

10   engaged in the Sri Lanka lobbying and public relations effort.

11   104. On or about June 2, 2014, Person P filed a "short-form"

12   FARA registration statement, identifying himself as a director of

13   BGS.

14   105. On or about June 2, 2014, at defendant ZUBERI's direction,

15   Person Q filed a short-form FARA registration statement, identifying

16   himself as a director of BGS.

17   106. On or about August 14, 2014, defendant ZUBERI filed a

18   short-form FARA registration statement, claiming that BGS contracted

19   with him to provide consulting work on behalf of Sri Lanka.

20   107. Defendant ZUBERI's short-form statement contained material

21   false statements and omitted material facts.  These included, but

22   were not limited to, that defendant ZUBERI willfully and falsely

23   claimed that (a) BGS retained him as a consultant when, in fact, he

24   orchestrated all of BGS's activities, (b) he engaged in no political

25   activity on behalf of Sri Lanka, when, in fact, he lobbied the United

26   States Congress on behalf of Sri Lanka, (c) he merely received a

27   salary from BGS "[n]ot based solely on services rendered to the

28   foreign principal," when, in fact, he received not a salary from BGS,

1  but rather over $5,650,000 of Sri Lanka funds, and (d) he had made no

2  political contributions on his own behalf during the period beginning

3  60 days prior to the date of his obligation to register to the time

4  of the filing of the short-form FARA registration statement, when, in

5  fact, defendant ZUBERI made contributions to dozens of election

6  campaigns during this timeframe.  In addition, in that short-form

7  statement, defendant ZUBERI did not disclose the $3,500,000 and

8  $1,000,000 wire transfers he had received into the IZ/WR BofA account

9  in May and June 2014, or the $500,000 in Sri Lanka funds he had

10  converted from WR to his own benefit in July 2014.

11      108. Notwithstanding WR's contract with Sri Lanka, WR did not

12  register under FARA at any time during the 2014 calendar year.

13      109. The net result of defendant ZUBERI's failure to register

14  under FARA and the 2014 FARA filings containing material false

15  statements and material omissions was that the American public was

16  unaware of millions of dollars routed by Sri Lanka to defendant

17  ZUBERI and the scope of his concerted and foreign-funded efforts to

18  transform United States foreign policy and public opinion to the

19  benefit of that foreign government.

20      110. In or about late July 2015, defendant ZUBERI was contacted

21  by a reporter for an online magazine, who ultimately published an

22  article reporting that defendant ZUBERI had received millions of

23  dollars from the former Government of Sri Lanka, failed to make

24  requisite FARA disclosures, and was the subject of an investigation

25  by the U.S. Department of Justice in Washington, D.C.

26      111. After his contact with the reporter, but prior to the

27  publication of the article, defendant ZUBERI directed Person P to

28  file FARA registration material prepared by an attorney retained by

1   defendant ZUBERI.  On or about August 11, 2015, Person P issued a

2   letter to NSD to "disclose voluntarily a relationship between FARA

3   registrant [BGS and WR], which was not on BGS's FARA registration."

4   The letter falsely asserted that:

> [WR] is a US business consulting entity which performed
> services for the Government of Sri Lanka [] including
> consulting, research, and related services.  [WR] did not
> perform any lobbying services.  [WR] appointed BGS to help
> identify and engage with consultants who could advance [Sri
> Lanka] public policy interests in the US.  There was no
> written contract or specific correspondence to disclose on
> Exhibit B to BGS' Registration Statement.  Additionally,
> there was no set fee for these services, and there was no
> specific term for these activities.  The activity has ended
> and BGS has since filed its termination statement.

11   112. On or about September 9, 2015, over 20 months after having

12   begun working at the direction and control of Sri Lanka, defendant

13   ZUBERI filed a FARA registration statement, including an attached

14   supplemental statement.  In the filing, defendant ZUBERI disclosed

15   his receipt of $3,500,000 on May 9, 2014, and $1,000,000 on June 18,

16   2014, for "business consulting service, including non-specified

17   amount for public affairs."  Defendant ZUBERI also disclosed the Sri

18   Lanka-WR contract, defendant ZUBERI's personal campaign contributions

19   during the relevant timeframe, and disbursements to various lobbyists

20   and other subcontractors.

21   113. Defendant ZUBERI's September 2015 FARA filing nevertheless

22   contained material false statements and omitted material facts.

23   These included, but were not limited to, that defendant ZUBERI

24   willfully and falsely claimed that he provided no services to Sri

25   Lanka after September 2014.  In fact, on October 15, 2014, defendant

26   ZUBERI reported to Sri Lanka officials a pledge from a Member of

27   Congress to visit Sri Lanka in January 2015.  In addition, on

28   December 4, 2014, defendant ZUBERI promised a Sri Lanka official that

33

1  he would "extend[] the current contract up to March 2015 at no cost

2  to [Sri Lanka]."

3      114. Defendant ZUBERI's September 2015 FARA filing was

4  accompanied by a letter from his attorney that falsely described his

5  involvement as merely providing business consulting services to Sri

6  Lanka and funding to BGS for public affairs consulting purposes.  The

7  letter falsely stated that FARA registration was not required because

8  defendant ZUBERI engaged in non-political work in furtherance of

9  commerce, the Sri Lanka-WR contract was only a business consulting

10  contract that did not call for lobbying by defendant ZUBERI or WR,

11  and defendant ZUBERI himself did not conduct or plan to conduct any

12  lobbying or public relations work for Sri Lanka.  In fact, defendant

13  ZUBERI was the primary organizer of paid political efforts to mold

14  the opinion of Members of Congress and executive branch

15  administration officials, at the direction and control of Sri Lanka.

16      115. On or about September 15, 2015, more than 16 months after

17  WR contracted with Sri Lanka, WR filed its initial FARA registration

18  statement and associated forms.  The filing disclosed the two

19  $1,000,000 wire transfers WR received from Sri Lanka in July 2014 and

20  September 2014.  The filing falsely declared that most of WR's

21  activities were not reportable pursuant to FARA because only a

22  portion of the money directed to BGS was for public affairs

23  consulting that had been previously disclosed by registered entities.

24      116. On or about September 15, 2015, BGS filed supplemental FARA

25  registration statements.  The BGS filing reported that BGS had

26  engaged in "general consultative services related to some of foreign

27  principal's work on government affairs" and finally reported the

28

34

money received from defendant ZUBERI and WR as well as disbursements to various lobbyists and other subcontractors.

117. These Introductory Allegations are incorporated into each count of the Information.

1            COUNT ONE

2            [22 U.S.C. §§ 612, 618(a)(2)]

3       On or about August 14, 2014 and September 9, 2015, in Los

4  Angeles County, within the Central District of California, defendant

5  IMAAD SHAH ZUBERI knowingly and willfully made and caused to be made

6  false statements of material fact, willfully omitted material facts

7  required to be stated therein, and willfully omitted material facts

8  necessary to make the statements therein and the copies of documents

9  furnished therewith not misleading, in documents filed with and

10 furnished to the Attorney General under the provisions of the Foreign

11 Agent Registration Act.  Specifically:

12      In box 11 of the short-form registration statement filed on or

13 about August 14, 2014, defendant ZUBERI falsely stated that he was a

14 "Consultant to Beltway Government Strategies."  In fact, as defendant

15 ZUBERI knew at time he made the statement, he created and controlled

16 Beltway Government Strategies.

17      In box 12 of the short-form registration statement filed on or

18 about August 14, 2014, defendant ZUBERI falsely stated that his

19 services to the Government of Sri Lanka did not include political

20 activity, as defined by FARA.  In fact, as defendant ZUBERI knew at

21 the time he made the statement, ZUBERI's services to the Government

22 of Sri Lanka included an extensive amount of political activity.

23      In box 14 of the short-form registration statement filed on or

24 about August 14, 2014, in response to the question, "What

25 compensation or thing of value have you received to date or will you

26 receive for the above services?", defendant ZUBERI falsely stated

27 that he received a salary from BGS "[n]ot based solely on services

28 rendered to the foreign principal" and intentionally omitted that he

36

1   received $3,500,000 in May 2014 and $1,000,000 in June 2014 solely

2   based on lobbying services rendered to Sri Lanka.

3        In box 15 of the short-form registration statement filed on or

4   about August 14, 2014, defendant ZUBERI stated that he had made no

5   political contributions on his own behalf during the period beginning

6   60 days prior to the date of his obligation to register to the time

7   of the filing of the short-form FARA registration statement.   In

8   fact, as defendant ZUBERI knew at the time he made the statement, he

9   had contributed to dozens of election campaigns during this

10  timeframe.

11       In box 7 of the supplemental statement filed on or about

12  September 9, 2015, defendant ZUBERI listed "09/30/2014" as the date

13  when his connection with the Government of Sri Lanka terminated.

14  Similarly, in box 14(a) of the supplemental statement filed on or

15  about September 9, 2015, defendant ZUBERI stated that his

16  relationship with the Government of Sri Lanka "ended in September

17  2014."   In fact, as defendant ZUBERI knew at the time he made these

18  statements, he continued to act as an agent for the Government of Sri

19  Lanka after September 30, 2014.

20

21

22

23

24

25

26

27

28

COUNT TWO

[26 U.S.C. § 7201]

From on or about May 9, 2014, to on or about April 15, 2015, in Los Angeles County, within the Central District of California, defendant IMAAD SHAH ZUBERI, a resident of El Monte, California, willfully attempted to evade and defeat the assessment and payment of the income tax due and owing by him and his spouse to the United States of America for the calendar year 2014, by committing the following affirmative acts, among others:

     a.   Diverting over $5,650,000 received for the purposes of the Sri Lanka-WR contract to the benefit of defendant ZUBERI and his spouse; and

     b.   Causing to be filed with the Director, Internal Revenue Service Center, at Fresno, California, a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040 that stated the joint total income of defendant ZUBERI and his spouse for the calendar year was $558,233 and that the amount of tax due and owing thereon was $52,069.  In fact, as defendant ZUBERI then knew, their joint total income for the calendar year 2014 was in excess of $5,650,000, and, upon the additional taxable income, an additional tax was due and owing to the United States of America.

COUNT THREE

[52 U.S.C. §§ 30116, 30118, 30121, 30122, 30109(d)(1)]

During the calendar year 2015, in Los Angeles County, within the Central District of California, defendant IMAAD SHAH ZUBERI knowingly and willfully violated the Federal Election Campaign Act, in amounts aggregating at least $25,000 during that calendar year, by (a) making contributions in the names of other individuals, (b) reimbursing contributions made by other individuals, (c) receiving reimbursements from other individuals for contributions he made, (d) soliciting contributions made by foreign nationals, and (e) making contributions with money received from, or reimbursed by, foreign nationals and foreign entities.

NICOLA T. HANNA
United States Attorney


BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption &
    Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption &
    Civil Rights Section

ELISA FERNANDEZ
Assistant United States Attorney
Public Corruption &
Civil Rights Section

EXHIBIT B – FACTUAL BASIS

FARA Violations

Between November 28, 2013 through March 5, 2014, defendant met with high-ranking officials of the Government of Sri Lanka ("Sri Lanka") and negotiated an agreement whereby Avenue Ventures, or a special purpose company created by Avenue Ventures, would engage in lobbying and public relations efforts to rehabilitate Sri Lanka's image in the United States.  This proposed lobbying and public relations effort focused on modifying U.S. Government policies, particularly through the issuance of Congressional resolutions, and improving public perception relating to Sri Lanka's alleged persecution of its minority Tamil population.

On April 26, 2014, WR Group ("WR") entered into a contract, effective May 1, 2014, with the Central Bank of Sri Lanka ("Sri Lanka-WR contract").  The Sri Lanka-WR contract described WR's services as "(i) strategic advice related to commercial and public policy considerations related to the US and other parties;" and (ii) "identification of consultants or other legal or non-legal advisors to [Sri Lanka] and Central Bank as may effectuate Sri Lanka's commercial and diplomatic objectives."  In return, Sri Lanka-WR contract required the payment of $8,500,000 in accordance with the following schedule: $3,500,000 on May 1, 2014, and five payments of $1,000,000 per month from June through October 2014.

Defendant knowingly and willfully acted as an unregistered agent of Sri Lanka by taking the following actions:

Between April 26, 2014 through July 14, 2014, defendant directed Person P to sign the Sri Lanka-WR contract, create Beltway Government Strategies ("Beltway") and, later, WR to engage in lobbying and public relations services, open bank accounts for those companies, sign contracts on behalf of Beltway with various lobbyists and public relations firms, and directed whom Person P was to pay and not pay on behalf of Beltway and WR, all to insulate and conceal defendant's own involvement with Beltway and WR.  In reality, Beltway and WR acted as alter egos of defendant and efforts undertaken by those entities were directed by defendant.

From December 2013 through October 2014, defendant knowingly and willfully acted as an unregistered agent of the GOSL.  Defendant solicited, on behalf of Sri Lanka, Members of the U.S. Congress to accept all-expenses-paid trips to Sri Lanka, authored emails and wrote proposals for Sri Lanka setting forth the strategy of the campaign, interviewed, recommended, and negotiated contracts with lobbyists for GOSL, and coordinated and participated in a series of meetings in Washington, D.C. between a GOSL delegation and members of the U.S. Congress and their staff.

On May 9, 2014 and June 18, 2014, Sri Lanka wired $3,500,000 and $1,000,000, respectively, into defendant's personal bank account for services related to the Sri Lanka-WR contract.  On each of July 18, 2014 and September 10, 2014, Sri Lanka wired $1,000,000 into a WR bank account.  At defendant's direction, Person P transferred the majority of these funds into accounts controlled by defendant, which defendant then used for his personal benefit.

Defendant knowingly and willfully failed to register under FARA, as required by law.  Instead, on June 2, 2014, he caused Person P to file FARA registration statement identifying Beltway as an agent of its principal, Sri Lanka, when in fact he was the agent of Sri Lanka. The registration statement contained material false statements and omitted material facts.  On August 14, 2014, defendant caused Person P to file a supplemental statement on behalf of Beltway, which also contained material false statements and omitted material facts.  At defendant's direction, these two 2014 FARA registration filings failed to report any of the money Beltway received from Sri Lanka, the money disbursed to companies under defendant's control, or the money disbursed to subcontractors that had engaged in the Sri Lankan lobbying and public relations effort.

Defendant knew that he, personally, was legally required to file with the Attorney General a registration statement pursuant to FARA because he had acted as the agent of a foreign principal, specifically Sri Lanka.  Defendant also knew that it was unlawful to file a FARA registration statement containing material false statements or material omissions of fact.

Defendant knowingly and willfully failed to file a FARA Registration as required by law.  Instead, on August 14, 2014, defendant filed

55

with the Attorney General a short-form FARA registration statement, and affirmed the truth and accuracy of the statement under penalty of perjury.  Defendant knowingly and willfully filed the short-form FARA registration that contained materially false statements and omitted material facts.  In particular, defendant represented in section 7 that he was merely a consultant of Beltway, when, in fact, defendant directed all of the activities of Beltway.  In addition, defendant represented in section 14 that he merely received a salary from Beltway that was "[n]ot based solely on services rendered to the foreign principal."  In fact, defendant received not a salary from Beltway, but $6,500,000 million from the foreign principal, GOSL, in return for lobbying and public relations services rendered to GOSL. Finally, in section 15, defendant represented that, for the period beginning 60 days prior to the date of his obligation to register to the time of the short-form, he had not made any contributions of money or other things of value from his own funds on his own behalf in connection with any election to political office or in connection with any primary election, convention or caucus held to select candidates for any political office.  In truth, between February 26, 2014 and August 14, 2014, defendant had made dozens of contributions of money from his own funds in connection with elections to political office or primary elections to select candidates for political office.  Defendant knowingly and willfully made these material false statements and material omissions on the short-form FARA registration statement.

On September 9, 2015, defendant filed a FARA registration statement and an attached supplemental statement for himself personally, which also contained materially false statements and omitted material facts.  In the filing, defendant willfully and falsely claimed that he provided no services to Sri Lanka after September 2014.  In fact, on October 15, 2014, defendant reported to GOSL officials a pledge from a United States Congressman to visit Sri Lanka in January 2015. In addition, on December 4, 2014, defendant promised a GOSL official that he would "extend[] the current contract up to March 2015 at no cost to the [GOSL]."  Defendant's September 2015 filing was accompanied by a letter from his attorney that falsely described his involvement as merely providing business consulting services to Sri Lanka and funding to Beltway for public affairs consulting purposes. The letter falsely stated that FARA registration was not required because defendant engaged in non-political work in furtherance of

commerce.  In fact, defendant was the primary organizer of paid
political efforts to mold the opinion of Members of Congress and
Obama Administration officials, all at the direction and control of,
and to benefit, Sri Lanka.

Tax Violations

On April 15, 2015, defendant caused the electronic filing of an IRS
Form 1040, U.S. Individual Income Tax Return for the 2014 calendar
year, for himself and his spouse.  Line 22 of the tax return showed
total income of $558,233 and line 44 of the tax return showed a tax
amount of $238,105.  The total income and tax amounts were
understated, because the return failed to account for payments of
$3,500,000 and $1,000,000 wired into defendant's personal bank
account and two payments of $1,000,000 each wired into a WR bank
account by Sri Lanka for services rendered in accordance with the Sri
Lanka-WR contract.  These amounts, less any unclaimed business
expenses, should have flowed through to defendant's tax return as
business income.  As a result, Mr. Zuberi owed substantially more
federal income tax for the 2014 calendar year than was declared due
on his income tax return for 2014.

When defendant caused the tax return to be electronically filed, he
knew that the Sri Lankan wire transfers were not included in the
information provided to the tax return preparer to prepare the return
and, as a result, that more tax was owed than was declared due on his
income tax return.  By filing this false return, defendant attempted
to evade and defeat this additional tax and he did so willfully, in
that he knew federal tax law required that he file accurate tax
returns and report accurate tax due amounts, and he intentionally and
voluntarily caused the filing of a tax return that he knew contained
understated tax due amounts.

Defendant received gross income in 2012 that required him to file an
income tax return with the IRS.  Defendant willfully failed to file a
tax return for 2012 despite knowing of his obligation to file.

Defendant  knowingly and willfully attempted to evade and defeat an
income tax by providing inaccurate numbers to his tax return preparer
for 2013 and 2015 that resulted in a substantial income tax due and

57

owing from the defendant in addition to that declared in his income tax return.

The total amount of tax loss for the 2012 through 2015 tax years is between $3.5 million and $9.5 million.

FECA Violations

During the calendar year 2015, defendant knowingly and willfully (a) made contributions in the names of other individuals, (b) reimbursed contributions made by other individuals, and (c) received reimbursements from other individuals for contributions he made in an amount aggregating $25,000 and more, in connection with federal elections.

Defendant knowingly and willfully made campaign contributions in the name of other individuals by making online contributions with credit cards belonging to himself and his spouse.  Defendant knew that the names of the other individuals were not the true sources of the money used for the contributions because he used his own money as the whole or partial source of those contributions.  Defendant also knew that it was unlawful to make these contributions in the names of other individuals using his own money.

Defendant knowingly and willfully solicited and reimbursed conduit contributors for campaign contributions they had made.  Defendant knew that it was unlawful to make conduit contributions or reimburse the contributions of others.

Defendant knowingly and willfully solicited and accepted reimbursements from other individuals for campaign contributions defendant ZUBERI had made.

From 2012 through 2016, defendant made or solicited more than $250,000 but less than $1,500,000 in campaign contributions in violation of the Federal Election Campaign Act.

## CERTIFICATE OF SERVICE

I, **Susana Ybarra**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy:

**PLEA AGREEMENT**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☒ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:
**Thomas O'Brien**
**Browne George Ross, LLP**
**801 S. Figueroa Street, Suite 1800**
**Los Angeles, CA 90017**

**Evan Davis**
**Hochman Salkin Toscher Perez, PC**
**9150 Wilshire Blvd., Suite 300**
**Beverly Hills, CA 90212**

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☐ Electronic Mail as follows:

☐ By Federal Express, as follows:

at the last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on October 22, 2019 Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

*Susana Ybarra*
Susana Ybarra
Legal Assistant