NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2468
    Facsimile: (213) 894-2927
    E-mail:    daniel.obrien@usdoj.gov
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. CR 19-642-VAP |
|---|---|
| Plaintiff, | AMENDED GOVERNMENT'S SENTENCING POSITION RE OBSTRUCTION OF JUSTICE; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| IMAAD SHAH ZUBERI, | Date: February 10, 2010 |
| Defendant. | Time: 10:00 a.m. Courtroom: 8A |

Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby submits its position with respect the imposition of a two-level sentencing guideline enhancement against defendant Imaad Shah Zuberi.

1

1        In support of this position, an under seal declaration of

2   Assistant United States Attorney Daniel J. O'Brien will be filed

3   concurrently with the filing of this document.

4   Dated: December 16, 2019          Respectfully submitted,

5                                     NICOLA T. HANNA
                                      United States Attorney
6
                                      BRANDON D. FOX
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                     _____/s/_____
                                      DANIEL J. O'BRIEN
10                                    Assistant United States Attorney

11                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . 1

II.  OBSTRUCTION GENERALLY . . . . . . . . . . . . . . . 2

III.  WITNESS TAMPERING . . . . . . . . . . . . . . . . . 3

    A.  Person LL Background . . . . . . . . . . . . . . 3

    B.  Person LL – Witness Tampering: 5/4/17 . . . . . . 6

    C.  Person C Background . . . . . . . . . . . . . . 10

    D.  Person C Tampering: May 2018 . . . . . . . . . 10

    E.  Zuberi Investigations Become Public – February 2019 . 11

    F.  Person C – Witness Tampering: 2/22/19 . . . . . . 11

    G.  Person LL – Witness Tampering: 2/25/19 . . . . . 13

    H.  Person MM Background . . . . . . . . . . . . . 15

    I.  Person MM Tampering: Unknown date . . . . . . . 16

    J.  U.S. Cares Investors Background . . . . . . . . 16

    K.  U.S. Cares Investors Tampering: 4/28/17 to 3/14/19 . . 19

IV.  DESTRUCTION OF EVIDENCE . . . . . . . . . . . . . . 24

    A.  Summary of Avenueventure.com Email Account Deletion . 24

    B.  Subpoenas for Avenueventure.com Accounts . . . . . 25

    C.  Representations as to Existing Email Accounts . . . 26

    D.  Production Held in Abeyance . . . . . . . . . . 27

    E.  Documents Returned By Defense Counsel to Defendant . . 28

    F.  Missing Avenueventure.com Accounts . . . . . . . 29

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . 30

i

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The plea agreement in this case is limited in scope.  Defendant Imaad Shah Zuberi ("defendant" or "Zuberi") has pleaded guilty to (a) a single Federal Agent Registration Act ("FARA") violation pertaining to his lobbying work on behalf of the Government of Sri Lanka, (b) unspecified Federal Election Campaign Act ("FECA") violations that exceed $250,000, and (c) tax evasion resulting in a loss to the government somewhere between $3,500,000 and $9,500,000. The parties have agreed to litigate several issues at sentencing.

The plea agreement identifies issues in dispute that directly impact the U.S. Sentencing Guideline calculations, namely:

- the total dollar amount of defendant's FECA violations;
- whether some of the FECA violations originated from prohibited foreign sources;
- whether defendant's unreported income derived from criminal activity, specifically, frauds perpetrated against his clients/investors/business associates and a variety of FARA violations;
- whether the commission of defendant's tax offense involved sophisticated means (primarily through the use of undisclosed foreign bank accounts); and
- whether defendant obstructed justice during the government's investigation.

The government intends to litigate other factual issues that bear upon the scope of defendant's offense conduct, his character, and acceptance of responsibility, all of which the Court must consider under 18 U.S.C. 3553(a), including:

- FARA violations for acting as an agent on behalf of governments and foreign nationals in Bahrain, Turkey, Libya, Ukraine, Pakistan, and elsewhere;

- the scope defendant's criminal tax violations;

- defendant's payment of, or offer to pay, gratuities to government officials; and

- assorted bad acts that reflect upon defendant's character.

This sentencing memorandum solely examines defendant's obstruction of the government's investigation during the period April 2017 through April 2019.[1]  Based upon the events detailed below, defendant should receive a two-level enhancement for obstruction of justice pursuant to U.S.S.G § 3C1.1.

## II.   OBSTRUCTION GENERALLY

The United States Attorney's Office and the Federal Bureau of Investigation in the Central District of California (the "government") initiated its criminal investigation of defendant in February 2016.  By early 2017, the government had focused its investigation on defendant's FECA offenses, FARA violations, tax evasion, and fraud against clients, investors, and business associates.

---

[1] At a later point, the government intends to file supplemental sentencing memoranda setting forth evidence relevant to the other issues set forth above.

On February 24, 2017, Special Agents of the Internal Revenue Service ("IRS"), who had joined the government's investigation, attempted to interview defendant.  Shortly thereafter, defendant retained several criminal defense attorneys to represent him.  The government issued grand jury subpoenas to companies under the control of defendant.

Within two months of learning about the government's investigation into his activities, defendant engaged in an effort to obstruct it.  That obstruction consisted of at least three elements: offering money to witnesses in return for their making themselves unavailable to law enforcement or providing false statements to investigators, the destruction of documentary evidence, and attempts to delay the investigation.

## III. WITNESS TAMPERING

### A.   Person LL Background

Person LL is a U.S. citizen who has made substantial contributions to political campaigns.  Beginning in late 2013, Person LL agreed to fund contributions through defendant, largely based upon defendant's claim that Person LL could obtain VIP tickets and better access to politicians this way.[2]  This practice caused

---

[2] The evidence reviewed by the government indicates that Person LL did not knowingly engage in FECA violations.  The checks issued by Person LL to Zuberi typically referenced the specific campaign committee to which the money was to be applied, which is inconsistent with trying to engage in a secret, conduit contribution.  Typically, criminal schemes lack such clear demarcation in order to avoid a direct link between the contribution and its origin.  Communications involving Person LL indicate that he wished to receive credit for such contributions rather than have them falsely attributed to Zuberi.  When campaign committees informed Person LL that contributions could not be routed through Zuberi, Person LL (unsuccessfully) asked Zuberi to refund Person

campaign contributions funded by Person LL to be falsely attributed to defendant in violation of FECA law as charged in the information.[3]

On July 28, 2016, Person LL issued a $50,000 check to defendant noting in the memo portion of the check that it was for an investment called "Rad Pad."  This investment appears to have been a fraud perpetrated against Person LL by Zuberi.  Rather than fund any investment for Person LL, defendant promptly diverted $10,000 on August 1, 2016 by transferring it into a personal bank account in the name of Zuberi and his spouse, diverted $20,000 on April 24, 2017 for the payment of California state taxes, and never used any of the funds for the claimed investment.

Defendant also defrauded Person LL in connection with an aborted contribution to the 2017 Presidential Inaugural Committee

---

LL's payments and offered to reissue his contributions directly to the campaign.

The evidence compiled by the government also does not implicate the referenced political campaigns or inaugural committees in any illegal activity.

[3] For example, on September 16, 2014, defendant made a $32,400 contribution to the Democratic National Committee ("DNC").  On November 10, 2014, Renee Wu, a fictitious person and alter ego of defendant created by defendant, sent an email to Person LL stating, "For HRC in event NYC, we paid $32,400 for Imaad + guest.  therefore half of this is $16,200.  Please mail check …" On January 28, 2015, Person LL issued a $16,000 check to defendant for "Clinton event."

As another example, on April 7, 2016, defendant informed Person LL and others that he had "paid for everyone" with regard to a Hillary Clinton event in Los Angeles and that he would "get it from you later."  On April 7 and 14, 2016, defendant contributed a total of $200,000 to the Hillary Victory Fund.  On April 22, 2016, Person LL issued a $35,000 check to defendant for "HVF."

("2017 PIC").  On November 9, 2016, the day following the election,

Person LL agreed to contribute $50,000:[4]

| 11/9/16 | LL | sorry, **i will do $50k and you said you will take me white house** |
|---|---|---|
| 11/10/16 | Zuberi | … I have ducking repeatedly told you not to email or text me on political contribution stuff… |
| 11./11/16 | Zuberi | You are confirmed for Tuesday dinner in Washington.  Please bring your $50,000 check |

On November 15, 2016, Person LL issued a $50,000 check to

defendant for, according to its memo line, "Inauguration 2017."

Defendant never actually forwarded Person LL's money to the 2017

PIC.  Instead, in response to Person LL's request that defendant

invite a high-level foreign government official to the inauguration

(an official with whom defendant had an acrimonious dispute),

defendant told Person LL he was returning his $50,000 check:

| 12/21/16 | Zuberi | Absolutely not |
|---|---|---|
| 12/21/16 | Zuberi | Please don't event ask me this |
| 12/21/16 | Zuberi | There is no way he will be able to go to special VIP events |
| 12/21/16 | LL | yes there is a good opportuniyy .you are not the only way … |
| 12/21/16 | Zuberi | I am sure I am not the only one but I don't think anyone else has access to VIP.  If someone else does then let them do it.  They are welcome |
| 12/21/16 | LL | someone close to [prospective public official] |
| 12/21/16 | LL | realy close |
| 12/21/16 | Zuberi | Okay good.  Please have them take him.  I promise I prefer this |
| 12/21/16 | Zuberi | Please don't text me about this again |
| 12/21/16 | Zuberi | I am tired |
| 12/21/16 | Zuberi | **Your check for $50,000 is being mailed today by our office** |
| 12/21/16 | Zuberi | You should go with him… |
| 12/25/16 | Zuberi | Not only I won't take him I will block him do you fucking understand? |

Contrary to defendant's claim that he had arranged for a refund

check to be mailed on December 21, no such check was sent, even

after Person LL made repeated inquiries as to its status.  For

example:

---

[4] The communications set forth in charts are verbatim excerpts
from text messages obtained from Person LL. All bolding is for
emphasis added by the government.

| 1/15/17 | LL | Imaad I need a lot of money. … **I did not get That $50k you said you sent.** Would yku exlediate. |
| 1/15/17 | Zuberi | **Ask [foreign official]** |
| 1/15/17 | LL | come on. I ask many times to add my name to list and **you said you sent my check. and so I am in [foreign country] and can not come. I need my 50k . this has nothing to do with [foreign official]. Please send that money urgentmy**. thanks |

B.    <u>Person LL – Witness Tampering: 5/4/17</u>

Defendant took steps to refund Person LL's $50,000 aborted contribution to the 2017 PIC only after learning about the government's criminal investigation into defendant's activities.  On April 11, 2017, in response to Person LL's request for the return of his $50,000 2017 PIC contribution as well as a certificate to verify his participation in the Rad Pad investment, defendant instead told Person LL to come to Los Angeles.  Defendant was adamant that the repayment would not be discussed through text messages or emails but rather in person:

| 4/11/17 | LL | **please keep you promisd. you said you would send the check and did mot do yet.** also I did not sent the certifacte of my investment either . i have people and pushing me |
| 4/11/17 | LL | also nothing wrong to ask this you promose. i am going rrwlay through tough time. i always trusted you when you ask me. Know pleasd help me |
| 4/11/17 | Zuberi | **I told you to come to Los Angeles? When you come we will talk. Please do not send me messages.** |
| 4/11/17 | Zuberi | I am in Dubai for meeting. |
| 4/11/17 | Zuberi | I have your investment document in hard copy to give to you |
| 4/11/17 | LL | imaad you dont understand me. **i gave you some money to invest and i am waiting to get certifiacate. i gave you somether money and it did not work and you were going to send my check and i said ok but. you did not sennt it pleas don't make it complicate it. i am in need .** realy. Otherwise I would not bug you… |
| 4/11/17 | Zuberi | **Please stop sending me text messages I have told you. What language I have to tell you stop sending me text messages. You will get you stock certificate when I see you…** |
| 4/16/17 | Zuberi | **I have check for you for $50,000…** |
| 4/16/17 | LL | tnak yku please rush… |
| 4/17/17 | LL | where are you now |

| 4/18/17 | Zuberi | I am in Geneva … |
| 4/20/17 | LL | where r you? I meed to talk to you for something else |
| 4/20/17 | Zuberi | I am in Dubai. Come to Los Angeles next week |

Defendant arranged to meet Person LL at Los Angeles International Airport ("LAX") on May 4, 2017. Prior to the meeting, defendant asked that Person LL contact him through a telephone specifically designated by Zuberi for that particular meeting, stating, "I will be using 626.818.4820 number for tomorrow Thursday May 4 only. Please call this number if I don't pick up my regular number." Text messages demonstrate that the check delivery was scheduled for that morning:

| 5/4/17 | LL | don't forhet certificate and other one I was asking |
| 5/4/17 | LL | coimng at 9.30 breakfast at hyatt recency at lax |
| 5/4/17 | LL | r you on the way? |
| 5/4/17 | Zuberi | On the the way national w |

Defendant picked Person LL up at LAX but declined to discuss the refund check while in the car. After the two stopped at a nearby gas station and exited the car, defendant either asked Person LL to turn off his cell phone or told him to place it within the car (likely to ensure it could not be used to record their conversation). Defendant told Person LL that defendant was being followed by the FBI and further stated that defendant had "tax issues." Defendant asked Person LL not to speak to the FBI and indicated that defendant would get Person LL an attorney if the FBI contacted him.[5] Defendant then provided Person LL with the $50,000 check.

---

[5] The record suggests that Person LL never agreed to remain silent in return for the money. Person LL has been cooperative with the government with respect to its FECA investigation. Person LL was entitled to the return of his money.

1    Sometime prior to June 21, 2017, Person LL misplaced the
2    $50,000 check and asked defendant to reissue it.[6]  Defendant
3    repeatedly invoked the gas station meeting near LAX (where he had
4    told Person LL about his concerns regarding the government's
5    investigation) and again insisted on an in-person meeting.  The
6    meeting was ultimately consummated in the late evening and early
7    morning of July 27-28, 2017 in New York City:

8

| 6/21/17 | LL | **Please send the check and the certificate** |
|---|---|---|
| 6/21/17 | Zuberi | In the mail tomorrow |
| 6/21/17 | LL | Thanks… |
| 7/17/17 | LL | **You are making me realy realy said by not sending check and certificates unbelivabme.**  Whay dont you send both check… |
| 7/17/17 | Zuberi | I have it with me. One and get it |
| 7/17/17 | Zuberi | **Come and I will give** |
| 7/17/17 | LL | You promosed me to send it.. don't chanhe your word |
| 7/17/17 | Zuberi | **I am serious. You need to come here. We talked about this** |
| 7/17/17 | Zuberi | **We talked at the gas station** |
| 7/17/17 | Zuberi | Remember |
| 7/17/17 | LL | No. Lasttime yoj asked my adressto send . |
| 7/17/17 | Zuberi | Please stop being stupid. **You remember gas station talk by the airport** in Los Angeles |
| 7/17/17 | LL | **Yesw but all you have to send the check.**  Which you promise. It is simple |
| 7/17/17 | Zuberi | …-stop. **Come here and I will give** |
| 7/17/17 | Zuberi | Stop being a child |
| 7/17/17 | LL | No you promised me to send sehxk and certificate. What yku donis childish. I tild yku I am gking trough hard tiem. Don't give shit. Be a friend. Send it to me. Asap… |
| 7/23/17 | Zuberi | **For investment document you and I need to sign so after Washington I can come to NYC** and you can meet me there |
| 7/23/17 | LL | **But before documents, you need to send my promised check .please** |
| 7/23/17 | Zuberi | **We need to talk before anything** so let me know if you want me to come to NYC or not next Friday? … |

24    ――――――――――――――

25        [6] Defendant's personal bank statement during this timeframe
shows that check #1233 never posted to his account.  Based upon the
26   issue dates and posted dates of the surrounding checks, check #1233
was drafted at least a week prior to the May 4 meeting, perhaps as
27   early as April 16, 2017, the same day defendant texted, "I have
check for you for $50,000."  (See O'Brien Declaration, p. 11,
28   footnotes 5 & 6.)  This evidence corroborates Person LL's statement
that he received, but lost, this check before depositing it.

8

| 7/27/17 | Zuberi | Reninance Hotel Times Square |
|---------|--------|------------------------------|
| 7/27/17 | LL | Ok I will bs there at 11 pm and levave back to home tonihht… |
| 7/27/17 | LL | I beg you don't play game with me. If you are nkt bringin the check and certificacate, please don't waste my time. I am extremely busy these. I am vki g hard time |
| 7/27/17 | LL | Where are you. I am 10 mins away |
| 7/27/17 | LL | I am at the hotel |
| 7/28/17 | Zuberi | Coming up |
| 7/28/17 | Zuberi | elevator |

After midnight, defendant handed Person LL a $50,000 check that was dated July 25, 2017 and posted to defendant's account on August 11.  Despite the prior agreement that defendant would refund Person LL's aborted contribution to the 2017 PIC and supply a certificate verifying Person LL's Rad Pad investment, defendant sought to create a false paper trial connected to the July 2017 check and wrote "investment payback" on the memo portion of the check.[7]

Subsequent text messages indicate that the memo section was an artifice by defendant to disguise the nature of the check from government investigators.  Indeed, in the months ahead, defendant continued to promise supplying a certificate that verified Person LL's Rad Pad investment which would not be necessary had defendant actually cancelled the investment by issuing Person LL a July 2017 refund check:

| 12/13/17 | LL | You are not taking me with ykur friends anymore? |
|----------|----|-----------------------------------------------------|
| 12/13/17 | Zuberi | Stop. With all the bull shit I have put up with you. Please refund my money in investment and etc  You should be happy I am talking to you |
| 12/13/17 | LL | What are you talking about? **Yiu did not send me my certifate yet?** |
| 12/13/17 | Zuberi | **I refunded you $50,000** |
| 12/13/17 | Zuberi | **For other I have it with me** |

---

[7] Regardless of what the money was for, defendant's statements on May 4, 2017 to Person LL, described above, demonstrate that defendant attempted to use the payment to convince Person LL to not speak with investigating agents.  Consequently, the payment was both an attempted bribe and act of obstruction.

| 12/13/17 | Zuberi | **Stop texting we talk when we meet** |

C. <u>Person C Background</u>

Person C was a U.S. citizen residing in Kuwait who routed funds to defendant from a foreign corporation in Kuwait for the explicit purpose of making contributions to U.S. political campaigns and the 2013 Presidential Inaugural Committee ("2013 PIC"). From May 2012 through February 2016, Person C wired $1,533,400 to defendant's bank account for this purpose, but defendant donated only $480,908 to the campaigns. Defendant converted the remainder for his own personal use without Person C's knowledge.

Throughout their dealings, Person C expressed frustration with defendant's failure to deliver on promises that business opportunities would develop as a result of Person C's contributions. On numerous occasions, Person C asked defendant to refund at least a portion of that money.

D. <u>Person C Tampering: May 2018</u>

In May 2018, defendant met with Person C at defendant's hotel suite in Dubai. Defendant asked for Person C's mobile phone, told him that the FBI might be listening, placed both Person C's and his own the phone in the bedroom (likely to prevent recording of their conversation), and escorted Person C to the dining room. Defendant searched Person C to determine if he was wearing a wire through which Person C might record their conversation.

Defendant asked if Person C had been stopped upon recent entries into the United States. After Person C responded, "no," defendant asked Person C not to enter the United States because "we're going to have a problem" and told him that he would hire an attorney for Person C so that they "could be on the same page."

Person C inquired as to the nature of the problem, but ZUBERI told him that they could discuss it later.

On July 3, 2018, defendant wired $100,000 into Person C's bank account.  Defendant thereafter promised to send Person C additional funds after defendant liquidated various real estate holdings.

E.   Zuberi Investigations Become Public – February 2019

From April 2017 through February 2019, at the request of defendant and various government agencies, the government refrained from issuing third party subpoenas that might reveal the investigation to certain percipient witnesses and the public.

On February 5, 2019, a newspaper article reported that it was in possession of a subpoena issued by the U.S. Attorney's Office for the Southern District of New York ("SDNY") seeking records in connection with the 2017 PIC.  The subpoena mentioned defendant by name.

On February 6, 2019, in light of these developments, the government determined that it would no longer delay its own investigation as requested by defendant.  On February 7, 2019, the government prepared multiple subpoenas for witnesses with whom defendant had direct contact, including Person LL and Person C.  On February 13, 2019, the government informed defendant's counsel that it would proceed with its investigation and indictment without further delay.

F.   Person C – Witness Tampering: 2/21-22/19

On February 16, 2019, the FBI knocked on the door of Person C's brother in Texas in an effort to serve Person C with a subpoena for his testimony related to his interactions with defendant.  Person C lived in Kuwait but his brother relayed this information to him.

On February 21, 2019, Person C contacted defendant, who was in China, and informed him of this development.  Defendant responded by asking Person C to meet him in Dubai.  Defendant promised to get Person C an attorney "before you do anything."

| Date | Sender | Message |
|------|--------|---------|
| 2/21/19 | C | **FBI came to Brother's house asking about me and my wife** |
| 2/21/19 | Zuberi | I will call you when I land |
| 2/21/19 | C | ok |
| 2/21/19 | Zuberi | **Can you come to Dubai tomorrow or Saturday?** |
| 2/21/19 | C | i might have to come |
| 2/21/19 | Zuberi | **We will get you lawyer before you do anything** |
| 2/21/19 | C | **when you are leaving Dubai** |
| 2/21/19 | Zuberi | Sunday morning |
| 2/21/19 | C | i thought monday morning |
| 2/21/19 | Zuberi | **I will leave early because now I have to take care of this stuff** |
| 2/21/19 | C | i will try to come Saturday afternoon |

On February 22, 2019, ZUBERI arrived in Dubai and booked a hotel room for himself and for Person C.

| Date | Sender | Message |
|------|--------|---------|
| 2/22/19 | Zuberi | **Please call** |
| 2/22/19 | Zuberi | **I will get room for you for tomorrow at same hotel as me** |
| 2/22/19 | C | i had already booked a room in other hotel |
| 2/22/19 | Zuberi | I booked one for you as well we can decide tomorrow when you arrive |

Person C consulted with his spouse and an attorney who advised him that, in light of the criminal investigation, he should not meet with defendant.  Person C falsely told defendant that he had a friend in the intensive care unit of a hospital in an effort to put defendant off.

Defendant spoke to Person C over the telephone and implored him to come to Dubai.  He told Person C that he would go to prison for three years without Person C's help.  He repeatedly asked Person C not to say anything [to the FBI].  He asked Person C not to travel to the United States.  He offered Person C $1,000,000 if he would

12

come to Dubai.  He offered Person C $2,000,000 afterwards, an amount
that greatly exceeded the amount Person C had lost in their
financial dealings.  The excess amounts defendant offered to Person
C demonstates that defendant was seeking to buy Person C's silence.

Person C eventually stopped responding to defendant.  In
response to Person C's silence, over several days, defendant
repeatedly texted Person C in a panicked effort to thwart the
government's investigation:

| Date | Sender | Message |
|------|--------|---------|
| 2/23/19 | Zuberi | Please call |
| 2/23/19 | C | i can not |
| 2/23/19 | Zuberi | Can I call you? |
| 2/23/19 | Zuberi | When can you call? |
| 2/23/19 | Zuberi | Please call me |
| 2/23/19 | Zuberi | Please call me please |
| 2/23/19 | Zuberi | Please call me when you are out of ICU |
| 2/23/19 | Zuberi | Sorry to hear about your friend |
| 2/23/19 | C | i will |
| 2/24/19 | Zuberi | Please call me |
| 2/24/19 | Zuberi | How is your friend? I am boarding for Los Angeles I will call when I land |
| 2/24/19 | C | he is still in the ICU |
| 2/24/19 | Zuberi | How old is he? |
| 2/24/19 | Zuberi | You don't want to reply to me? |
| 2/24/19 | C | 59 |
| 2/24/19 | Zuberi | I am back in Los Angeles. Please let me k ow when we can talk? |
| 2/26/19 | Zuberi | Call me |
| 2/26/19 | Zuberi | You are online |

G.   Person LL – Witness Tampering: 2/22-25/19

On February 12, 2019, Person LL told defendant he was incurring
financial difficulties.  He asked for the return of the additional
$50,000 owed to him, pointing out that he never received his
investment certificate.  Person LL also asked that defendant loan
him additional funds:

| Date | Sender | Message |
|------|--------|---------|
| 2/12/19 | LL | **Imaad I am in realy deep trouble for cash. Can you send me my 50k+50 k please.** I did not even get any certificate. I realy need . Thansk |
| 2/12/19 | Zuberi | Let's talk tomorrow |
| 2/12/19 | LL | I mean it. I lost a lot of money new project and also hit with huge claim I xan show you |
| 2/12/19 | Zuberi | Let's talk tomorrow |
| 2/12/19 | LL | Ok thanks. **Also if you can get me guratted loan of 250 or 300 k or 500k** would be very helpfull |

Defendant agreed to pay Person LL the $50,000.  Defendant's willingness to refund Person LL's $50,000 Rad Pad investment can best be understood in the context of his simultaneous obstructionist actions with respect to Person C.  Defendant's statement to Person C, "I will leave early [for Los Angeles] because now I have to take care of this stuff" occurred on February 21, 2019, at approximately 10:26 p.m. in Dubai.[8]  On February 22, 2019, the next morning, at either 6:33 a.m. or 9:33 a.m. in Dubai, defendant texted Person LL, saying: "Call me when you get a chance."  On February 22, 2019, at approximately 6:22 p.m. or 9:22 p.m. in Dubai, defendant followed this up with another text to Person LL, saying: "Monday in Los Angeles?"[9]  Thus, it appears that upon learning of the government's attempts to subpoena witnesses, defendant promptly undertook efforts pay them money in return for their silence.[10]

---

[8] The text message reflects a time of 9:26 p.m. but produced by Person C who resided in Kuwait.  Kuwait's time zone is one hour earlier than that of Dubai.

[9] The time in Dubai is somewhat uncertain because the texts were produced by Person LL who resided on the east coast but travelled to San Diego around this time.  The two texts were received by Person LL on February 21, 2019 at 9:33 p.m. and February 22, 2019 at 9:22 a.m., respectively, but it is not clear which time zone is reflected in those texts.

[10] Person LL's current recollection is inconsistent as to the purpose of the various refund checks he received from Zuberi.  The government believes this confusion may stem from the fact that at the time of his interview, Person LL was not presented with the July

1    Subsequent text messages between defendant and Person LL

2 established a meeting point between Los Angeles and San Diego in

3 Orange County, California.  On February 25, 2019, defendant and

4 Person LL met in San Clemente, California.  Defendant then wrote out

5 a $50,000 check to Person LL.[11]

6    H.   Person MM Background

7    On October 3, 2016, Person MM, a Kuwaiti citizen, wired

8 $250,000 to the bank account of one of defendant's companies for the

9 purpose of making a campaign contribution to the Hillary Victory

10 Fund in connection with a Clinton birthday celebration on October

11 24, which would constitute a FECA violation.  By October 17, 2016,

12 Person MM's plans changed and he requested that defendant refund the

13 money.

14

15

---

16 2017 $50,000 refund check.  At the time of his interview, Person LL
   appears to have believed that no check was tendered in May 2017, a
17 $50,000 check was tendered in July 2017 and lost, and a $50,000
   check was tendered in February 2019 and deposited.  In fact, bank
18 records and text messages between Zuberi and Person LL demonstrate
   that a $50,000 check was tendered in May 2017 and lost, a $50,000
19 check was tendered in July 2017 and deposited, and a third $50,000
   check was tendered in February 2019 and deposited.
20

21    [11] At the time Zuberi issued the February 2019 $50,000 check,
   SDNY was engaged in an investigation of Zuberi's contributions to
22 the 2017 PIC.  Evidence demonstrating defendant's obstruction of the
   government's investigation does not foreclose the possibility that
23 defendant also sought to obstruct the SDNY investigation.  Indeed,
   in a telephone conversation leading up to his meeting with defendant
24 on February 25, 2019, Person LL mentioned a February 5, 2019 news
   article about a subpoena issued by SDNY regarding the 2017 PIC.  At
25 the February 25, 2019 meeting, defendant and Person LL discussed the
   news article and Person LL told defendant he had written
26 "Inauguration 2017" on his November 2016 check.  Defendant then
   backdated the check to February 1, 2019, a date prior to the
27 publication of the news article.

28

15

1    Defendant falsely replied that the money had been sent to the

2  campaign and that he would request a refund for Person MM.   In fact,

3  defendant made no contributions to either the Hillary Victory Fund

4  or the Democratic National Committee during the period October 3

5  through October 17.

6    Nor did defendant return the money.   Instead, following the

7  election of President Trump, defendant suggested that Person MM

8  apply the funds to the 2017 PIC.   On December 7, 2016, Person MM

9  agreed.   No specific evidence indicates that defendant ever applied

10 these funds to the 2017 PIC, which suggests he pocketed this money

11 for his personal use.

12    I.   Person MM Tampering: Unknown date

13    In early March 2019, Person C was flying from Kuwait to Dubai

14 in business class and encountered Person MM.   Person C told Person

15 MM that he had received a subpoena relating to defendant and didn't

16 want defendant to know that he was in Dubai.   Person C also warned

17 Person MM that he shouldn't sit alone in a room with defendant.

18 Person MM responded that he had already learned that lesson because

19 defendant previously had taken his phones and asked him not to visit

20 the United States.   Person MM informed Person C that he didn't

21 acquiesce to defendant's request and visited the United States on at

22 least two subsequent occasions.

23    J.   U.S. Cares Investors Background

24    From September 2013 through March 2014, Person L, Person M,

25 Person N, and Person J, individually and/or through their companies,

26 invested approximately $7 million in U.S. Cares for the ostensible

27 purpose of applying for a license from the Office of Foreign Assets

28

Control ("OFAC") permitting it to export food, medicine, and medical supplies from the U.S. to Iran.

Defendant made false representations designed to pressure at least one investor to transfer funds into defendant's accounts. In a series of December 2013 emails, defendant and Renee Wu, defendant's alter ego,[12] falsely informed Person N that investment spots were closing because of the high degree of interest from other investors and reiterated that fiction by falsely claiming he was having difficulty reconciling amounts received from Person N because of the high number of deposits received from other investors. In fact, defendant's accounts received no other investment funds in December 2013. Moreover, defendant continued to solicit and receive money from other investors well after Person N's investment.

The contract, or operating agreement, that defined the terms of the investment required the placement of investor funds into a U.S. Cares capital account. Instead, defendant instructed his victims to transfer funds into his personal bank accounts. Defendant also falsely assured Person N that he would place investor funds into a U.S. Cares capital account, stating: "we need repatriate the $750,000 to USCares here." Defendant did not transfer any of the funds received from U.S. Cares investors into a U.S. Cares capital account as required by the operating agreement, but instead converted these funds to his own benefit.

Other than incurring minor costs in connection with retaining attorneys and submitting an application to OFAC, defendant took no steps to apply investor funds to the project. When sanctions

---

[12] See O'Brien Declaration, p. 8, footnote 2.

against Iran were lifted in January 2016, rendering the business plan essentially moot, defendant made no efforts to refund investor money.  In February 2016, when OFAC determined that the proposed transactions "appear to be generally authorized," defendant made no efforts to implement the project.

On October 16, 2016, Person N sent defendant an email asking for the return of his investment:

> "I was awaiting your call back the last time we spoke, but I guess you got busy with the elections.  I am writing to you with regard to US Cares.  It has been more than three years since I invested approximately USD 2 million in the project.  I understand the fact that due to various reasons, some of them beyond our control, the project hasn't materialized.  I would therefore suggest that we dissolve the company and refund the balance to the various shareholders in the ratio of their respective shareholding.  As far as I know, the only major expense incurred by the company has been legal fees to file the application with the Treasury Department as well as company incorporation expenses.  I am under tremendous financial pressure on various accounts and I'm counting on easing some of this through this process."

Person N's efforts to secure the return of his investment from defendant met with no success.  He solicited an associate of defendant to help Person N secure the return of his investment.  He sent that associate the U.S. Cares operating agreement as well as a series of communications received from defendant designed to prove Person N had indeed invested $2 million.  He offered that associate 10 percent of any funds he recovered.  He asked the associate for referrals to attorneys who could pressure or sue defendant for the return of the money.  He and the associate discussed referring the matter to OFAC or the U.S. Department of Justice's Criminal Division, particularly its Public Integrity and Fraud Sections.

Similarly, on April 13, 2017, Person M, through the U.S. law firm of Baker McKenzie, issued defendant a demand for repayment.

The demand letter recited the terms under which Person M's company invested in US Cares, how "despite repeated requests, [Person M's company] has yet to received written confirmation of its completed investment," how there was "no evidence that the underlying purpose of this investment was ever pursued," Person M's belief that "[defendant] and Avenue have in fact kept the investment, in direct breach of [defendant's] obligations and duties," and that defendant failed to adequately respond to "repeated demands and ample opportunity to refund the investment."  The demand letter threatened legal action, including "fraud and breach of fiduciary duty" for defendant's "malicious and oppressive conduct" unless the entire $2 million was return by April 19, 2017.

K.    U.S. Cares Investors Tampering: 4/28/17 to 3/14/19

Only after the government informed defendant of the government's criminal investigation did he reverse course and begin to refund a portion of these investments.  On April 28, 2017, defendant executed a contract in which he agreed to refund half of Person M's investment.  Pursuant to that agreement, from June 5 through December 26, 2017, defendant issued a series of wire transfers to Person M and his company that totaled $1,000,000.  On May 17, 2018, defendant wired $1,000,000 to Person N and $1,000,000 to Person J to refund a portion of their U.S. Cares investments.

During discussions with the government, defense counsel forwarded newly obtained statements issued by Person N, Person M, and Person J that served to exonerate defendant of fraud allegations and reduce his exposure to any tax evasion charge.[13]  These

---

[13] Nothing in this memorandum is meant to suggest any improper activity by any attorney.  The only allegation raised by the

19

statements were diametrically opposed to prior statements issued by Person N and Person M and inconsistent with the documentary evidence, particularly with respect to defendant's business dealings with Person J.

On March 14, 2019, despite having threatened defendant with a lawsuit based upon fraud, breach of fiduciary duty, and malicious conduct, Person M authored an email to defendant in which he stated, "It was good to meet you early last week in Dubai looking in other business.  You told me that my lawyer or I accused you of stealing our money.  I do not think you stole our money.  We continue to have good relationship with you."

Defendant's meeting with Person M in the early portion of the week of March 3-9, 2019 would have been approximately ten days after his offer of $1 million to Person C in return for meeting defendant in Dubai and $2,000,000 to Person C in return for silence.  Person M's meeting would have been approximately one week after defendant paid $50,000 to Person LL with the prior understanding that Person LL would not talk to the FBI.  The timeline of events for each of these witnesses, particularly when taken together, strongly corroborates that defendant engaged in a (largely successful) campaign to purchase the silence or alteration of incriminating testimony against him.

On March 19, 2019, despite Person N's earlier statements in which he referenced: the U.S. Cares operating agreement to prove he invested $2,000,000; accused defendant of ignoring demands for the

---

government with respect to the preparation or production of the witness statements or obstruction is against defendant.

return of the money; offered a 10% finder's fee for securing the
return of his money; sought referrals to attorneys who could
initiate legal proceedings; and discussed referring the matter to
the U.S. Department of Justice's Criminal Division for fraud, Person
N authored a declaration in support of defendant, stating:

> • "I know there is a contract between myself and
> Mr. Zuberi related to these funds, but I never read the
> contract and am not concerned about its terms…

> • "I know that Mr. Zuberi pursued and will
> continue to pursue the OFAC license…

> • "I am working on seven or eight deals with Mr.
> Zuberi right now, because I continue to trust him even
> knowing he might have borrowed and used the US Cares funds
> for other purposes.

> • "He and I both do business recognizing that
> neither would take the reputational risk of stealing
> money, and that we will pay funds back at the end of the
> day if a business deal does not work out. …

> • "I don't believe that Mr. Zuberi's actions were
> in any way fraudulent, even knowing he bought property
> using the US Cares money.  That money was effectively
> loaned to him, and he will repay it at the appropriate
> time."

The timing of the refunds paid to Person M and Person N and the
witnesses' abrupt turnabouts demonstrate the nexus between these
refunds the exonerating statements.  Defendant obstructed the
government's investigation by obtaining these statements from Person
M and Person N, just as defendant did in the case of Person C and
Person LL.

Similarly, on December 1, 2017, a few months before Person J
received a partial refund of his U.S. Cares investment, Person J
signed a "memorandum"[14] claiming that he approved of defendant's

---

[14] Person J supplemented his December 1, 2017 memorandum with an
April 30, 2019 "statement."

rerouting of U.S. Cares funds so that defendant could purchase real property in the United States under defendant's name:[15]

> "I have sent Mr. Zuberi funds to invest directly on my behalf or as an investment for my companies. This includes the AmericaCares and USCares projects, in which I invested approximately two million dollars and provided money for certain legal expenses for those ventures. When we were not able to go forward with those projects, Mr. Zuberi and I agreed that the funds I had provided would be invested in other matters, such as real property, though some funds have been returned to me or used for other purposes at my direction."

Person J's December 1, 2017 memorandum is incompatible with the facts because defendant violated the terms of the U.S. Cares operating agreement from its inception, not "when we were not able to go forward with those projects."[16]

Defendant converted almost the entirety of a $1,222,988 transfer from Person J on November 20, 2013,[17] a $500,000 transfer from Person N on December 10, 2013, and a $500,000 transfer from Person N's business on December 24, 2013 prior to the end of December 2013.  These conversions occurred all while defendant continued to solicit Person M to join in as another U.S. Cares

---

[15] Person J's motives may be more complicated than merely issuing a statement in return for $1,000,000.  As set forth in the information charging defendant (at pages 16-20), Person J's participated in defendant's fraud against the U.S. Congress with respect to the Al Areen investment.

[16] Person J's December 1, 2017 memorandum is also incompatible with Person N's statement that he knows defendant "will continue to pursue the OFAC license."

[17] Person J claims that his $2,000,000 in U.S. Cares investments included wire transfers of $500,000 on February 21, 2014 and $832,145 on March 11, 2014.  These two wire transfers were designated as "legal fees" in accompanying instructions.  A November 20, 2013 transfer of $1,222,988, also bearing a "legal fees" designation, also appears to have funded Person J's U.S. Cares investment.  Person J's claims that he has no recollection as to the purpose of the $1,222,988 transfer.

1  investor.  Defendant transferred these funds into the personal

2  brokerage accounts of defendant and his spouse,[18] paid personal

3  credit card debt (that primarily consisted of campaign contribution

4  expenses in defendant's name or the names of various third parties,

5  travel expenses, and dining expenses), and paid for remodeling

6  expenses for an investment property he purchased.

7      Defendant promptly disbursed almost the entirely of Person J's

8  $500,000 wire transfer on February 21, 2014 into defendant's

9  personal brokerage accounts and to payoff personal credit card debt

10  (primarily consisting of campaign contributions and travel).

11     Defendant promptly disbursed almost the entirety of Person J's

12  $832,145 wire transfer on March 11, 2014 into defendant's personal

13  brokerage accounts, to payoff personal credit card debt (primarily

14  consisting of campaign contributions and travel), real property

15  remodeling expenses, and personal real property tax payments.

16     The first indication that defendant might "not able to go

17  forward with the project" was later, when OFAC designated one of the

18  investors as a Specially Designated National ("SDN") on April 29,

19  2014.  Person J remedied this problem by purchasing the SDN's shares

20  in November 2014.  By January 2016, when sanctions were lifted,

21  defendant's ability to circumvent sanctions through his political

22  contacts might have made the venture pointless.  Under such

23  circumstances, the parties might have determined that they "were not

24  able to go forward with the project" and the return or redirection

25

26  _____

27     [18] Defendant and his spouse further demonstrated their
    conversion of funds placed into the brokerage accounts by paying
    taxes on all interest and dividend income generated by their

28  accounts.

1  of investor money would appear warranted.  In the event the parties

2  nevertheless determined to go forward, they could have done so in

3  February 2016, when OFAC stated it saw no impediments to moving

4  forward with the project.[19]

5  **IV.  DESTRUCTION OF EVIDENCE**

6       A.   <u>Summary of Avenueventure.com Email Account Deletion</u>

7       The government believes that defendant also obstructed the

8  government's investigation by deleting emails responsive to

9  subpoenas served upon companies under his control.

10      In November 2017, the government issued a subpoena that

11  required the production of corporate emails for the period 2010

12  through February 2017.

13      In January 2018, defense counsel informed the government there

14  were thousands of emails for an account under defendant's name, and

15  14 additional accounts under other names, residing on a corporate

16  domain maintained by Go Daddy, Inc.  Defense counsel stated that the

17  accounts were accessible to defendant.  In February 2018, in

18  _____

19      [19] Person J's December 1, 2017 memorandum and his April 20, 2019
    statement also claimed that the considerable fortune he paid out to
20  defendant was intended to support investments in specific projects
    that often failed to materialize and that the funds could be
21  thereafter redirected to other investments, such as real estate
    purchases, at defendant's discretion.  Person J characterized his
22  payments to Zuberi as "convertible loans" and defendant used this
    assertion to argue that much of the unreported income identified by
23  the IRS actually constituted non-taxable events.

24      Person J's convertible loan argument is contradicted by
    contracts that reference "consulting fees," email discussions that
25  describe "consulting fees," invoices issued by Zuberi for
    "consulting fees," and wire transfer instructions that reference
26  those invoices, all of which are consistent with defendant receiving
    income for his role in these contracts.  Moreover, defendant used
27  the funds received from Person J for personal expenses and
    investments in his own name rather than investments in which Person
28  J had some ownership interest.

response to various concerns raised by the defense, the parties agreed that the defense could hold off on producing these emails, provided they preserve them for later production.

In February 2019, defense counsel informed the government that documents it had gathered were returned to defendant. That same month, the government required defendant to produce the previously referenced emails. The responsive production is devoid of emails for the pertinent timeframe and largely irrelevant to the government's investigation. Moreover, contrary to prior representations by the defense, defense counsel informed the government that some of the 14 email accounts were no longer located on the Go Daddy server.

B. <u>Subpoenas for Avenueventure.com Accounts</u>

Shortly after defendant Imaad Shah Zuberi ("defendant") learned of the government's investigation, he retained several defense counsel to represent him. The attorneys included Jim Bowman of O'Melveny & Myers, LLP and Tom O'Brien and Ivy Wang of Brown George Ross, LLP.[20]

In February 2017, the government issued subpoenas directed to several companies controlled by defendant, including three that bore the "Avenue Ventures" name: Avenue Ventures, LLC, Avenue Capital Group, Inc., and Avenue Investment Services, Inc. (the "Avenue Companies").

---

[20] Nothing in this memorandum is meant to suggest any improper activity by any attorney. The only allegation raised by the government with respect to the deletion of emails or obstruction is against defendant.

As part of its response to the February 2017 subpoenas, the defense produced several emails issued from and/or to the following accounts ending in avenueventure.com.  These emails were issued/received as far back as 2010, as listed below:

| Account | Earliest Reference |
| --- | --- |
| imaad.zuberi@avenueventure.com | 7/6/10 |
| renee.wu@avenueventure.com | 11/9/10 |
| Karen.Hernandez@avenueventure.com | 11/9/10 |
| Wess.wijesinghe@avenueventure.com | 11/18/10 |
| willa.rao@avenueventure.com | 11/27/10 |
| Nancy.Johnson@avenueventure.com | 12/2/10 |
| Robert.Reed@avenueventure.com | 12/2/10 |
| Tahir.Hasan@avenueventure.com | 1/12/11 |
| Craig.Reed@avenueventure.com | 5/1/11 |
| James.Reed@avenueventure.com | 5/16/12 |
| [Person P]@avenueventure.com | 8/20/12 |
| jon.carpenter@avenueventure.com | 2/4/13 |
| Robert.Sweeney@avenueventure.com | 4/9/13 |
| [Person J]@avenueventure.com | 8/23/13 |

In November 2017, the government served additional subpoenas upon the Avenue Companies seeking "[a]ll correspondence of [the Avenue Companies] including but not limited to email correspondence using the domain @avenueventure.com for the time period of 2010 through present."

C.   Representations as to Existing Email Accounts

On January 8, 2018, defense counsel Bowman requested that the government limit the scope of the November subpoenas stating that efforts to review all such correspondence would be burdensome, that certain documents were subject to attorney/client and marital privileges, and that certain items were personal in nature and not properly within the custody and control of the Avenue Companies.

During the period January 9, 2018 through February 1, 2018, the government and defense counsel Bowman exchanged emails to discuss concerns raised by defense counsel Bowman's letter.  During these

1  discussions, defense counsel Bowman made the following

2  representations on behalf of his clients:

3      -  Email correspondence using the domain avenueventure.com was

4         retained on servers maintained by Go Daddy, Inc.

5      -  In response to the February 2017 subpoenas, the defense

6         collected emails from defendant's own avenueventure.com

7         account (imaad.zuberi@avenueventure.com) and produced some of

8         them to the government.  The defense did not produce 5,990 of

9         these emails because they were not responsive to the February

10        subpoenas.  In addition, there were 6,278 additional

11        imaad.zuberi@avenueventure.com emails still stored on the Go

12        Daddy server that had not been collected.

13     -  Other than defendant's avenueventure.com account, there were

14        14 avenueventure.com accounts currently stored on the Go

15        Daddy servers as follows:

16              1.   [Person J]@avenueventure.com
17              2.   info@avenueventure.com
                3.   job@avenueventure.com
18              4.   john.sandweg@avenueventure.com
                5.   john.warren@avenueventure.com
19              6.   jon.carpenter@avenueventure.com
                7.   [Person GG]@avenueventure.com
20              8.   [Person P]@avenueventure.com
                9.   martin.vanvalkenburg@avenueventure.com
21              10.  [Person KK]@avenueventure.com
                11.  nina.wen@avenueventure.com
22              12.  renee.wu@avenueventure.com
23              13.  [Person NN]@avenueventure.com
                14.  willa.rao@avenueventure.com

24     -  Defendant had the power to access these third party

25        avenueventure.com email accounts in his capacity as

26        administrator or by changing the passwords of the

27        individuals.  Accessing these accounts as administrator would

28

27

1        affect the metadata of these emails and would create an undue

2        burden because thousands of emails would have to be saved

3        one-by one.  Accessing these accounts by changing the

4        passwords would alert the users that someone was accessing

5        their account.

6

7        D.   <u>Production Held in Abeyance</u>

8    On January 29, 2018, in response to defense counsel Bowman's

9  request, the government agreed to delay production of emails stored

10  on the Go Daddy server.  The government also limited the scope of

11  production from defendant's own avenueventure.com account

12  (previously collected from the server) by creating date limitations

13  (emails generated between 2010 and 2016), withdrawing requests for

14  emails involving defendant's spouse and attorneys, and permitting

15  the defense to carve out emails that were entirely personal in

16  nature.  The government notified defense counsel Bowman that these

17  limitations were temporary in nature and were contingent upon the

18  defense retaining all emails for possible future production.

19    On March 28, 2018, the defense produced several thousand

20  additional emails sent from, or received by, defendant's

21  avenueventure.com account.  The defense stated that the production

22  was limited to documents previously collected by the defense as

23  potentially responsive the February 2017 subpeonas.  Consequently,

24  it appears that the defense did not produce the thousands of emails

25  from defendant's account housed on the GoDaddy server.  Production

26  with respect to other avenueventure.com accounts were placed in

27  hiatus.

28        E.   <u>Documents Returned By Defense Counsel to Defendant</u>

1    On February 8, 2019, defense counsel Bowman informed the
2    government that his firm no longer represented defendant or the
3    Avenue Companies in connection with the government's investigation.
4    Defense counsel Bowman stated that his firm returned electronic
5    storage media previously collected from defendant and the Avenue
6    Companies that were potentially responsive to the grand jury
7    subpoenas, as well as all images of that electronic storage media,
8    to the custody of defendant.  Defense counsel Bowman stated that
9    further inquiries should be directed to defendant's new lead
10   counsel, Mr. O'Brien.

11        F.   Missing Avenueventure.com Accounts

12        On February 21, 2019, the government informed defense counsel
13   O'Brien that it required production of the emails stored on the Go
14   Daddy server.  In response to a request by the defense, the
15   government limited the scope of production to emails generated from
16   the inception of the accounts up until February 28, 2017.  The
17   government again directed that emails generated after February 28,
18   2017 should be retained and indicated that it would issue a more
19   specific subpoena for those emails at a later date.

20        Zuberi's counsel produced Go Daddy emails in response to the
21   subpoena.  The production consisted of 246 documents many of which
22   appear to be personal, and hence non-corporate, emails such as mass
23   advertisements from various retail stores.  The responsive
24   production was largely devoid of emails for the pertinent timeframe
25   (the oldest email was dated August 12, 2016) and irrelevant to the
26   government's investigation.

27        In connection with that production, defense counsel Wang stated
28   that the following accounts, previously represented by defense

counsel Bowman as residing on the Go Daddy server, "do not exist on the GoDaddy server:"

      3.   job@avenueventure.com
      5.   john.warren@avenueventure.com
      6.   jon.carpenter@avenueventure.com
     12.   renee.wu@avenueventure.com

## V.   CONCLUSION

The court should apply a two-level sentencing guideline enhancement for obstruction of justice. Defendant's obstruction was multi-faceted and prolonged.

Over a two-year period, defendant paid, or offered to pay, over $6,000,000 to six witnesses. In return, he requested that they not fly to the United States, not talk to law enforcement officials, get stories straight, and/or author statements to exonerate defendant of wrongdoing. Some of these payments consisted of refunding sums due to witnesses as a result of defendant's prior frauds. However, in the case of Person C, defendant offered to pay an amount that greatly exceeded the amount owed.

Defendant appears to have also deleted emails pertinent to the government's investigation. In 2018, defense counsel represented to the government that defendant had access to an account, Imaad.zuberi@avenueventure.com, as well as 14 other avenueventure.com accounts. In 2019, four of those accounts, including renee.wu@avenueventure.com, an account that figures prominently in the government's proof, mysteriously disappeared. The date of this disappearance correlates to a time in which defendant requested former defense counsel to return potentially relevant documents to himself personally, rather than other defense counsel retained by defendant.

1      Proof of defendant's obstruction lies in the statement of two
2  percipient witnesses, corroborative WhatsApp and text messages,
3  witness statements presented to the government by the defense that
4  are diametrically opposed to their prior statements, and the
5  temporal correlation of defendant's actions to steps undertaken by
6  the government to secure evidence for the investigation.
7      The proof is overwhelming; the conduct is pernicious and
8  pervasive.  Accordingly, the court should impose the two-level
9  enhancement.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28