NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2468
     Facsimile: (213) 894-2927
     E-mail:    daniel.obrien@usdoj.gov
EVAN N. TURGEON (D.C. Bar No. 1010816)
Trial Attorney
National Security Division
     950 Pennsylvania Avenue, N.W., Suite 7700
     Washington, D.C. 20530
     Telephone: (202) 353-0176
     E-mail:    evan.turgeon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>IMAAD SHAH ZUBERI,<br><br>          Defendant. | CR No. 19-642-VAP<br><br>GOVERNMENT'S SENTENCING POSITION RE FOREIGN AGENTS REGISTRATION ACT VIOLATIONS; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Date: May 18, 2020<br>Time: 9:00 a.m.<br>Courtroom: 8A |

Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby submits its position with respect to the defendant's Foreign Agents Registration Act ("FARA") violations and his failure to comply with the terms of his plea agreement.

An under seal declaration of Assistant United States Attorney Daniel J. O'Brien in support of this position, with exhibits, will be filed concurrently with this document.

Dated: March 17, 2020                    Respectfully submitted,

                                         NICOLA T. HANNA
                                         United States Attorney

                                         BRANDON D. FOX
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                         _____/s/_____
                                         DANIEL J. O'BRIEN
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ZUBERI'S COULD NOT HAVE DISCLOSED HIS FOREIGN AGENCY WITHOUT
     ABANDONING HIS LARGER CRIMINAL ENTERPRISE . . . . . . . . . 2

III. ZUBERI'S FARA VIOLATIONS WERE PERVASIVE . . . . . . . . . . 5

     A.   ZUBERI LOBBIED CONGRESS AS AN AGENT OF A
          BAHRAINI NATIONAL . . . . . . . . . . . . . . . . . . 7

     B.   ZUBERI LOBBIED CONGRESS AS AN AGENT OF THE TURKISH
          GOVERNMENT . . . . . . . . . . . . . . . . . . . . . 10

     C.   ZUBERI LOBBIED AS AN AGENT OF SELECT MEMBERS OF THE LIBYAN
          GOVERNMENT AND A SAUDI/UNITED KINGDOM NATIONAL . . . . 13

     D.   ZUBERI LOBBIED CONGRESS AS AN AGENT OF A UKRAINIAN
          NATIONAL . . . . . . . . . . . . . . . . . . . . . . 19

IV.  THE SCOPE OF ZUBERI'S FARA VIOLATIONS WERE EXCEPTIONAL . . 22

V.   DEFENDANT HAS FAILED TO COMPLY WITH FARA OBLIGATIONS AS
     REQUIRED BY THE PLEA AGREEMENT . . . . . . . . . . . . . . 24

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 25

i

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.    **INTRODUCTION**

The government disagrees with the characterizations of defendant's Foreign Agents Registration Act ("FARA") violations set forth by the U.S. Probation Office ("USPO") in its Presentence Report ("PSR").  The FARA violations in this case were not merely reporting violations, but rather a crucial ingredient of Zuberi's broader efforts to help foreign governments, entities, and individuals corrupt our public officials, institutions, and democratic processes.  Moreover, although the USPO factually recites several examples of Zuberi's FARA violations, it does not adequately convey their scope, or the pervasive and insidious nature of defendant's corrupt acts.

Nearly the entirety of defendant's business activities and profits involved trading on his ability to influence U.S. government officials by engaging in concerted lobbying efforts and making enormous campaign contributions that, unbeknownst to the recipients and the public, were funded by prohibited foreign sources.  For reasons discussed below, the FARA offenses committed by Zuberi were necessary to execute this criminal scheme.  Defendant's extensive and repeated FARA violations and related nefarious conduct demand substantial punishment.

Moreover, the USPO's valid "concern that our government lacks transparency" and the public's loss of faith stemming from past failures to interdict clandestine foreign efforts to subvert U.S. democratic processes counsel in favor of a significant sentence in

this case to deter other would-be FARA offenders from seeking to
compromise U.S. democracy in exchange for foreign cash.

## II. ZUBERI'S COULD NOT HAVE DISCLOSED HIS FOREIGN AGENCY WITHOUT ABANDONING HIS LARGER CRIMINAL ENTERPRISE

The USPO is mistaken when it characterizes defendants' FARA
violations as a mere failure to comply with reporting requirements.
Although FARA has reporting requirements, FARA prohibits acting as
an unregistered agent of a foreign principal. *United States v.
Manafort*, 318 F. Supp. 3d 1 (D.D.C. 2018). Moreover, the USPO's
assertions that "what make his actions illegal is lack of disclosure
. . . and not the conduct itself" and "he would not have violated
FARA if he properly disclosed that he was working [as] an agent"
fail to consider the reasons why Zuberi concealed his foreign agency
and made false registration filings. Truthful disclosures would
have had devastating ramifications to both Zuberi's "business" and
his ability to alter U.S. foreign policy.

First, Zuberi would have been unable secure foreign clients if
he had filed truthful FARA registrations because secrecy was
integral to his nefarious scheme. The foreign governments and
individuals at issue only retained Zuberi because diplomatic,
transparent, and legal lobbying mechanisms had proved inadequate to
obtain the results they sought. These foreign entities resorted to
paying Zuberi—who was not a registered lobbyist—millions of dollars
for backdoor influence. Zuberi solicited his foreign clients for
illegal campaign contributions. Zuberi also informed clients that
he was party to *quid pro quo* arrangements that involved the exchange
of money in return for U.S. government action that would benefit

their foreign businesses.  One of Zuberi's clients described

Zuberi's sales pitch as follows:

> "I'm in charge of fund-raising for [] President Obama." …
> "When you take pictures with [] President Obama … this
> will open up business for you.  Plus, you know, in the
> States we have [a saying] that says, 'I scratch your back,
> you scratch my back.'" … "You come donate, and you come
> take pictures." … "if you pay, you know, we American[s],
> we can give you business in Libya, we can give you
> business in Kuwait.  You know, there are a lot of military
> work[s] going on.  We can help out there a lot of ways."

This criminal enterprise demanded secrecy.  FARA requires the

identification of all foreign principals on whose behalf the

registrant is acting, foreign monies received by the registrant, the

dispersal of such funds, political activities (such as lobbying)

engaged in by the registrant, and campaign contributions made by the

registrant and associated individuals.  Truthful FARA disclosures

would have revealed defendant's receipt of millions of dollars from

foreign sources, the specific lobbying and public relations efforts

performed, and the millions of dollars of political contributions he

made to the officials he was lobbying.  It would have invited the

same scrutiny defendant encountered when a *Foreign Policy Magazine*

article revealed his Sri Lankan lobbying efforts,[1] a crime to which

defendant has now admitted guilt.

Second, secrecy was necessary to Zuberi's fraud and tax evasion

schemes.  Zuberi converted client funds.  Zuberi didn't report this

stolen money as income nor the money he received from foreign

clients in compensation for his lobbying efforts.  Truthful FARA

registration filings would have revealed defendant's redirection of

---

[1] https://foreignpolicy.com/2015/08/28/elite-fundraiser-for-obama-and-clinton-linked-to-justice-department-probe/

client funds to his own personal benefit, undisclosed foreign bank accounts, and multi-million dollar tax fraud.

Third, Zuberi could not influence and manipulate U.S. government officials without concealing his foreign agency. Zuberi was "insistent that he didn't want to be directly linked" to the Sri Lanka lobbying organization because it would interfere with "fundraising for the Democratic party." As explained by one associate, "if Imaad wasn't involved in the lobbying effort, then he could then pursue his fundraising and involvement in politics, and the foreign moneys wouldn't be directly linked."

Moreover, FARA requires that before a registrant lobbies a policymaker in person, the registrant must reveal to the policymaker that he or she is lobbying on behalf of a foreign principal. Abiding by this requirement would have enabled policymakers to consider Zuberi's lobbying in context. This requirement also likely would have caused policymakers to seek more information on whether Zuberi's campaign contributions were funded by foreign entities, and to reject any contributions of foreign money.

The idea that Zuberi could have simply "properly disclosed" his work as a foreign agent and thereby avoided criminal liability is not a realistic one. Let us assume that Zuberi planned to disclose the true facts to the American public with respect to his Libya FARA violations, discussed below. Zuberi worked on behalf of a faction of the Libyan government and a Saudi national, to release hundreds of billions of dollars of frozen assets, by routing $3 to $5 million in foreign money into U.S. lobbying campaigns, illegal campaign donations, and donations to quasi-political entities, and exerting his influence with the highest elected officials of the United

4

States, in return for a stake in a five percent commission paid by the Libyan officials into an offshore corporation after the frozen funds were released.[2]  Would the foreign clients have agreed to this proposal knowing that it would be publicly disseminated?  Would our elected officials have unfrozen the funds after such public disclosures?  Would the American press deem these matters not newsworthy?  Would the electorate vote for these politicians?  Would the Department of Justice ignore the Federal Election Campaign Act violations?  If the scheme was successful, would the Internal Revenue Service ignore Zuberi's unreported income?

III. **ZUBERI'S FARA VIOLATIONS WERE PERVASIVE**

In addressing the gravity of defendant's work as a foreign agent, the USPO correctly observes that such conduct "ignites the suspicion that we are vulnerable to influence by … foreign governments" and that "Zuberi's actions highlight the frailty of democratic integrity."  While true, this statement understates the impact defendant's FARA violations had on U.S. foreign policy and our democratic institutions.

This case does not merely ignite "suspicions."  Public opinion is already rife with suspicions that foreign influence has compromised our elections and confidence in our democratic institutions has weakened.[3]  The Zuberi case *explicitly verifies through evidentiary proof* pervasive, corrupt foreign interference with our elections and policy-making processes.

---

[2] Regardless of the success of the endeavor, contingency fee arrangements are prohibited under FARA. 22 U.S.C. § 618(h)

[3] See https://web.stanford.edu/~tomz/working/TomzWeeks-ElectoralIntervention-2019-08-13i.pdf

Defendant's entire business model consisted of soliciting foreign governments, entities, and individuals for money -- part of which was earmarked for illegal campaign contributions, part of which was used to engage in unregistered and non-transparent lobbying and public relations activities, and part of which was used to pay Zuberi -- in return for Zuberi wielding influence with members of Congress and the Executive Branch under the false pretense that he acted independently and in the best interest of the United States.  Zuberi's standard consulting contract required him to access government officials in the United States to develop business opportunities throughout the world.[4]  The prosecution has found no instance in which Zuberi made significant money from sources other than foreign interests, little work that did not depend upon illegal lobbying and public relations efforts, and no instance in which Zuberi truthfully revealed to the U.S. government or to the American public his foreign agency or his pecuniary interest in the outcome of his lobbying efforts.

Defendant repeatedly used foreign money to influence U.S. elections (e.g., on behalf of Saudi, Kuwaiti, and Bahraini entities/individuals), perpetrate frauds on the U.S. Congress (e.g., on behalf of a Bahraini entity/individual), and alter U.S. foreign policy (e.g., on behalf of the Sri Lankan, Turkish, and Libyan governments) in efforts to generate criminal proceeds for himself.

---

[4] For example, an August 26, 2013 contract stated that "Avenue understands that [Company D] wishes Avenue to approach government entities, semigovernment entities and private companies/entities in the United States, Asia, Africa and the Middle East, to find, structure and execute on opportunities for various business transactions . . . ."

This foreign money gave the election campaigns of Zuberi's political cronies an unfair advantage over opponents.  His foreign-financed lobbying efforts resulted in over a dozen Members of Congress falsely condemning one foreign nation for interfering with U.S. foreign investments and the withdrawal of a House Resolution condemning another foreign nation that had actually engaged in objectionable conduct.

In addition to the Sri Lankan lobbying activity that forms the basis of defendant's FARA conviction, the government provides the following additional examples of FARA violations by the defendant to demonstrate the scope and nature of defendant's criminal activity.[5]

A.   ZUBERI LOBBIED CONGRESS AS AN AGENT OF A BAHRAINI NATIONAL

As alleged in the Information, Zuberi secretly lobbied the U.S. Congress as an agent of a Bahraini national.  This episode amplifies the insidious nature of Zuberi's FARA offenses.  Not only did Zuberi conceal his foreign agency, he constructed a fraudulent artifice that deceived a dozen members of Congress into exerting pressure on the Foreign Minister of Bahrain under false pretenses.  In sum, Zuberi concocted a scheme to fool members of Congress into believing that he had invested millions of dollars in a Bahraini development project and that he had been unfairly harassed by the Bahraini

---

[5] The government disagrees with the PSR's description of defendant's repeated FARA violations as "not part of relevant conduct."  The Sentencing Guidelines include within the definition of relevant conduct offenses "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.1(a).  *See also* § 3553(a)(1) (requiring the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"); § 3553(a)(2)(B-C) (requiring the Court to consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct."

government in such a way that Congress should intervene.  A truthful FARA filing would have revealed this artifice to be a sham and that, in reality, Zuberi made no such investment.  Rather, a foreign national had paid Zuberi millions of dollars to engage in an anti-Bahrain lobbying effort.

In February 2013, the Government of Bahrain froze the personal assets of Person J, a Bahrain citizen, and delayed the continued development of the Al Areen Palace & Spa ("Al Areen"), a resort in which Person J had a financial interest.  Throughout 2013 and early 2014, in return for approximately $1,500,000[6] provided by Person J, Zuberi implemented an elaborate scheme to convince both the Bahraini and U.S. governments that his business, Avenue Ventures, had invested millions of dollars in Al Areen.  Zuberi then engaged in an intensive lobbying campaign to convince members of Congress to pressure the government of Bahrain to stop its interference in "U.S. foreign investment."

Zuberi's fraudulent effort to convince the world of his "investment" in Al Areen ranks high in its level of audacity.  Using money supplied by Person J, Zuberi paid a former high-ranking U.S. military official over $150,000 to travel twice to Bahrain, meet with Bahraini officials to demonstrate Person J's influence in the United States, and participate in an April 29, 2013 publicity stunt in which Avenue Ventures supposedly acquired a 35% stake in Al Areen.  The publicity stunt consisted of an event in Los Angeles at which Person J and a representative of Avenue Ventures purportedly

---

[6] Zuberi received another $500,000 from Person J in connection with Al Areen in 2015.

signed a partnership agreement in which Avenue Ventures acquired a 35% stake in the project in return for a multi-million dollar investment.  Zuberi hired a public relations firm to distribute news and photographs of the event throughout the world.  No such agreement was executed; nor was any such investment ever made.

Zuberi's lobbying effort was extensive.  Zuberi tasked the former U.S. military official and other proxies to assist him in enlisting the support of a high-ranking U.S. State Department official posted in Bahrain.  In an effort to convey his clout, Zuberi told the State Department official that Zuberi might be accompanied by a "former POTUS as well."  Zuberi, the former U.S. military official, and other proxies of Zuberi lobbied U.S. State Department officials and a members of the House Foreign Affairs Committee ("HFAC") in Washington, D.C. to convince the U.S. government to exert pressure on Bahrain.

In or around December 2013, Zuberi began soliciting members of Congress to write letters to the Bahraini government condemning its interference in Al Areen.  Zuberi falsely informed Congress that "a major investment by a US company in Bahrain is experiencing significant interference from Bahraini authorities acting on behalf of a member of the royal family" and that Avenue Ventures "is seeking support from its government for a cessation of interference in its project in Bahrain."

A component of Zuberi's lobbying effort involved illegal campaign contributions.  From December 2013 through April 2014, Zuberi made nearly $225,000 in campaign contributions to eleven members of Congress who were subjects of his lobbying efforts, to their political action committees, and to the national campaign

committees for their political parties.  Of this amount, $78,000 constituted illegal "conduit" contributions made in the names of third parties.  As a result of these undisclosed, fraudulent, and illegal actions, twelve[7] Members of Congress wrote letters to the Foreign Minister of Bahrain asking that his government stop its "interference" and "harassment" of "U.S. investors."

B. ZUBERI LOBBIED CONGRESS AS AN AGENT OF THE TURKISH GOVERNMENT

Zuberi's actions at the direction of the Turkish government demonstrate how a foreign government may seek to manipulate the U.S. Congress to do its bidding by employing proxies willing to violate U.S. law.  As detailed below, Zuberi concealed from the public his orchestration of this attempt to manipulate Congress.

On May 20, 2015, thirty Members of Congress introduced House Resolution 279 ("HR 279") "urging respect for freedom of expression and human rights in Turkey."  The bill cited Turkey's intimidation of the media, exploitation of anti-terrorism laws to target the media on questionable charges, and ban of Twitter and YouTube.  The Resolution called on Turkey to "lift restrictions on freedom of expression."

On the very same day HR 279 was presented, a high-ranking Turkish official requested Zuberi's assistance in opposing the resolution.  Seeking free land to engage in property development projects in Turkey, Zuberi agreed to use his influence with Members of Congress to defeat the resolution.  After meeting with other

---

[7] Zuberi had already made $26,000 in campaign contributions to the twelfth member of Congress, a U.S. Senator, of which $15,600 were illegal conduit contributions made in the names of third persons back in April 2013.

high-ranking agents of the Turkish government, Zuberi personally urged members of the HFAC and several sponsors of HR 279 to first delay the measure, and later, to let it die without receiving a vote.  Zuberi not only solicited help from members of the House of Representatives, but members of the Senate Foreign Relations Committee and other powerful politicians as well.

On June 1, 2015, Zuberi informed the Turkish official that his efforts had resulted in a delay of the measure:

> "[Two Members of Congress] told me this will be delayed by a week 99% because they control the Foreign Affairs Committee. You … push me so hard I pushed [] harder than I have ever pushed them for anything. Both asked me why I am pushing this hard for Turkey."

The Turkish official responded that the official "owes him one" and that "You can rest assured that this will be the first step towards a mutually beneficial relationship."

Zuberi continued his lobbying efforts to defeat the resolution over the following months.  On June 2, 2015, after Zuberi privately met with one of the HR 279 sponsors in California and urged him to reconsider his position, Zuberi reported to the Turkish official that he could easily "pick off" that Congressman.  On July 1, 2015, Zuberi again personally met that sponsor who told Zuberi that the day after Zuberi sought his help, he went to the leadership of the HFAC and told them that HR 279 should be delayed or he would "withdraw his signature from the resolution."  In the end, HR 279 never progressed beyond its initial referral to the HFAC.

Between the submission of HR 279 and the end of 2015, Zuberi, Person LL, and their spouses funded approximately $150,000 in campaign contributions earmarked for politicians they lobbied to

defeat the resolution.[8]   Zuberi brought home the connection between some of these contributions and the support he received from members of Congress.   For example, on June 23, 2015, he informed a staffer for a Congressman Zuberi lobbied in connection with HR 279 that Person LL gave $33,400 to a national campaign committee on behalf of the Congressman and that the staffer should let the Congressman know.

Zuberi's profit motive, rather than a goal to serve the interests of his country, was demonstrated by his bitter complaints, the following year, about Turkey's failure to compensate him for his efforts:

| 4/23/16 | Person LL | Please get me an appointment with [Congressman], [Congressman]  and a couple of congresman or senator this monday or tuesday |
| 4/23/16 | Person LL | this will make good impresion on your project |
| 4/23/16 | Zuberi | **No more appointments until we go to Turkey first.** Please do not ask me again |
| | | … |
| 4/24/16 | Zuberi | I am not interested in calling anyone.  **You have donated mere fraction of what I have done.  You are taking advantage of all the millions I have spent over past 10 years.**  You have benefited enough from me.  I am tired. **I will not do anything before I get signal this will work from Turkey…** |
| 4/24/16 | Person LL | imaad. you are wrong. **We will go turkey. this people are very senior advisor and working on our project.** it will be nice to see them. i just need you do this for me. i told him that we can have an apoinment for [Congressman] or one or two people. |
| 4/24/16 | Person LL | we can discuss this later. i did not have interest doing this project. **I amnonly talking them for you. yes it takes time. but we make progress …** |
| 4/24/16 | Zuberi | **I will ask [Congressman] tomorrow…** |
| | | … |
| 5/2/16 | Zuberi | **I will tell the [Turkish official] this is the last time.  I get million times more from Saudis for doing less than I have done for Turkey.  Enough is enough** |
| | | … |

---

[8] Zuberi and Person LL also bundled tens of thousands of dollars in contributions during this timeframe.

12

| 5/2/16 | Zuberi | Only come with the [Turkish official] if you want me to be honest with him because I am going to tell him this. **I spent several hours with him and you last year but nothing happened afterwards...** |
|--------|--------|------|
| 5/2/16 | Zuberi | Please make sure you let the [Turkish official] **know that I am not happy for the one-way relationship  I get many times more from people others and do a lot less for them.  This one-way relationship need to end or Turkish side needs to deliver** |
|        |        | ... |
| 5/2/16 | Zuberi | **It is not just Saudi Kingdom but other places as well** (more democratic than Turkey). **Where I do much less than for Turkey but get way more** Again, I don't want to repeat myself but **I am getting tired of one-way street I need to start seeing some benefits otherwise we need to end these Turkish games** |

Zuberi went so far as to threaten Turkish officials if he was not adequately compensated.  On May 10, 2016, Zuberi told Person LL that he would block Turkish officials from meeting with members of Congress unless his demands were met, asking if he should "get [Congressman] and [Congressman] for [Turkish official] or you want me to block them."  In December 2016, Person LL tried to get Zuberi to pay for a Turkish official's tickets to the 2017 Presidential Inauguration, saying that it would be a "golden opportunity" for Zuberi to get his construction contracts.  Zuberi demanded an apology and told Person LL he would "block" the Turkish official from the Inaugural if his demands were not met.

C.   ZUBERI LOBBIED AS AN AGENT OF SELECT MEMBERS OF THE LIBYAN GOVERNMENT AND A SAUDI/UNITED KINGDOM NATIONAL

Zuberi lobbied members of the HFAC as an undisclosed agent of select members of the Libyan Government and Person A, a Saudi/United Kingdom national, in 2015 and 2016.  Libya was riven by civil war, with two competing governments in Tobruk and Tripoli[9] and several militias exercising de facto control over various parts of the

---

[9] The U.S. government and western powers recognized the Tobruk government.

country.  Overseas Libyan assets had been frozen by the United States and other nations pending the establishment of a stable Libyan government.

Zuberi, Person A, and select representatives of the Tobruk government negotiated an arrangement through which Zuberi would exert his influence with the U.S. Congress to unfreeze these funds and, if successful, the Libyan government would pay a commission to an offshore entity organized by Person A and a Libyan businessman. The profits generated by this venture would be distributed to various individuals participating in this endeavor.  Members of the Libyan delegation and Person A promised to pay Zuberi compensation for his efforts, but the precise source and timing of that payment was a continued source of friction.

Zuberi's lobbying efforts began in January 2015 and included: (1) obtaining a March 26, 2015 letter of invitation to a Libyan delegation from two members of the HFAC and one U.S. Senator, (2) engaging in backdoor channels with Congress and the State Department to obtain visas for the delegation on April 18, 2015 so that they could visit the United States, (3) recruiting a group of individuals in May 2015 to lay the groundwork for the lobbying effort, (4) meeting with the Libyan delegation in Paris in March and May 2015 to convince them of his ability to secure the release of the frozen funds, and (5) fronting money in support of the effort, primarily in the form of payments to retain associates, pay travel expenses, and make campaign contributions.

From January 23 through March 9, 2015, Zuberi made $70,300 in contributions to the campaign committees and PACs of the three members of Congress who issued the letter of invitation and to

another Senator he lobbied in connection with the effort to procure
the invitation.  Of these contributions, $30,800 were made in the
names of third parties, including Person A, a foreign national.
From March 19 through October 22, 2015, Zuberi orchestrated a series
of contributions totaling $232,300 that appear linked to the Libya
lobbying effort, which included contributions to the Hillary for
America campaign, the Hillary Victory Fund, and the national
congressional campaign committees for both the Democratic and
Republican parties.  Of these contributions, $120,250 were made by
prohibited foreign sources, including Person A, by Zuberi in the
name of a third party, or were reimbursed by Zuberi.

    Zuberi's demands for money up front reveal that his covert
lobbying effort depended upon foreign-funded contributions to
political campaigns, corrupt donations to organizations affiliated
with politicians, and lobbying activities concealed from the
American public:

| 4/15/15 | Zuberi | **I want the Libyans to pay what they promised in Paris...** |
|---|---|---|
| 4/15/15 | Zuberi | **Well they will have to do this prior to coming to US** |
| 4/30/15 | | [Note: Visas for Libyan delegation approved] |
| 5/1/15 | Zuberi | **I told you these idiots will get their visas**. We have done everything they want (a little late because of me). **Now we need to see something from them to continue. Out of all the oil barrels they have promised there needs to be some barrels of oil as down payment now.** |
| 5/1/15 | Zuberi | If the motherfucker [Member of Libyan Parliament] doesn't pay then he should not come or come and we will hold him at the airport. It is called VVVIP treatment. We check everything including cavities, assholes for hemorrhoids and etc |
| 5/7/15 | Zuberi | The Libyans need to put down payment. Otherwise we are wasting our time. |
| 5/7/15 | Person C | **we said that we should look for someone in the Gulf to put down payment. the libyans will not put a downpayment. What is the next step?** |
| 5/10/15 | Zuberi | **I am not going to spend all $3 to $5 million personally so we need to come up with this.  This is the next step.  Maybe you and [Person A] don't know how things work in America this is why you guys keep** |

| | | |
|---|---|---|
| | | **asking me to do something which I can't do without everyone contributing.** |
| 5/13/15 | Zuberi | [In response to his receiving FARA registration filing by Qorvis concerning Libya]: Why are we helping them if they are going around talking to other people? Why don't we let them talk to everyone and when no one can deliver then they can come to us to get it done. |
| 5/14/15 | Zuberi | **Please make sure you are working on getting people to put in $3 to $5 [million] we talked about …** |
| 5/14/15 | Person C | Ok everything but the 3 to 5 [million] is so hard unbelievable |
| 5/14/15 | Zuberi | **You want billions unfrozen. This is nothing. Iranians spent $150 [million] to get $25 billion released…** |
| 5/15/15 | Zuberi | I am in Washington for our Arab friends. Going to NYC early morning to meet Hillary Clinton. Can you please call me tomorrow to catch up because I saw people from State at lunch and dinner. We talked about your country. On the way to Washington **I read the new book Clinton Cash.[10] You must read because it discussed how Indian businessman helped make US Indian civilian nuclear deal happen via Clinton.** |
| 5/14/15 | Person C | **Wow** |
| 5/14/15 | Person C | Indians are really smart |
| 5/15/15 | Zuberi | **Donations** |
| 5/15/15 | Person C | I agree but you have to teach me how |
| 5/15/15 | Zuberi | **Start by the 3 to 5 [million] and work on getting people for Clinton** |
| 5/15/15 | Zuberi | **Read the book** |
| 5/15/15 | Zuberi | **Read the book now** |
| | | **…** |
| 5/15/15 | Person C | **I already got you 6 [campaign contributions][11] and told me that it is good for this month plus the others…** |

---

[10] The book in question alleges that Indian entities and individuals donated millions of dollars to the Clinton Foundation to ensure Secretary Clinton's support for the exportation of U.S. nuclear technology to India.  The Clinton Foundation has denied any link between the contributions and Secretary Clinton's official acts.  See https://timesofindia.indiatimes.com/world/us/Charges-fly-over-alleged-Indian-money-to-Clintons-to-push-nuclear-deal/articleshow/47116471.cms  Between October 2013 and February 2014, Zuberi donated over $300,000 to the Clinton Foundation, a portion of which was reimbursed by a Person LL.  The government possesses no evidence suggesting that the Clinton Foundation engaged in any illegal activity.

[11] The six contributions were issued by Person A, Person B, Person C, Person D, Person G, and Person H to Hillary for America. Three of these individuals were foreign nationals and therefore were prohibited from contributing to U.S. election campaigns.  Upon discovery of Person A's foreign status, Hillary for America refunded his contribution.  The government has no information suggesting that Hillary for America was aware of the illegal nature of the contributions.

| | | ... |
|---|---|---|
| 5/15/15 | Zuberi | Hey the book **Clinton Cash** |
| 5/15/15 | Zuberi | You read and and have Mohammed read it |
| 5/15/15 | Zuberi | **This is how America work** |
| 5/15/15 | Zuberi | **How Washington work** |
| | | ... |
| 5/16/15 | Person C | [Person A] is talking to the minister and other libyans that they have to consider to pay some amounts |
| 5/16/15 | Person C | However [Person A] is going to Riyadh on monday to discuss with saudi libyan guy I told you about |
| 5/16/15 | Person C | I think this guy is our best bet. |
| 5/16/15 | Zuberi | Without this it is no go. If I spend the money and do all the work then I will want 90% |

By June 2015, a disagreement as to payment resulted in Zuberi threatening to remove himself from the project and block the efforts of his erstwhile partners:

| | | |
|---|---|---|
| 5/22/15 | Zuberi | **I haven't heard back from you guys so I am taking it that this is off and canceling everything to do with Libya i.e. letter, visa, appointment and etc. I am a little irritated because I was push hard by both of you to:**<br>**• Come meet these guys in Paris earlier in the year. The Libyan-French guy promised which was never delivered**<br>**• To get them the letter. Which I did by calling in favors from people. Which will now be wasted**<br>**• Get these Libyan the US visa. Which I did without them going to the US Embassy. Usually this is not done. This was a waste**<br>**• Come to Paris to help them get the presentation done. I flew 3 people there at my expense more importantly I dropped other project to get to Paris myself because you guys asked** |
| 6/5/15 | Person C | Hi, we are about to finalize the Libyan thing by Tuesday but we are waiting the approval of the Parliament on tuesday and the negotiation is towards 3.5 to 4% or it will not fly. This is for your information. I did not discuss it with any of the 3 guys you brought... |
| 6/15/15 | Zuberi | **...please tell the Libyan that this is off** |
| 6/15/15 | Zuberi | **I can't work like Libyan do ...** |
| 6/15/15 | Person C | **I think they might have another route to the congress ...** |
| 6/15/15 | Zuberi | **Okay good** |
| 6/15/15 | Zuberi | **I will block it** |
| | | ... |
| 6/15/15 | Zuberi | **Please tell them they will have to get new visa because these will be cancelled this week** |
| | | ... |
| 6/15/15 | Person C | Take care and thank you for the work you did |
| 6/15/15 | Zuberi | **You will be wasting your time because Libyan will be blocked** |

| 6/15/15 | Zuberi | **I will make sure they get nothing** |
| 6/15/15 | Zuberi | **They won't even be allowed to enter the country** |

However, in September 2015, shortly after Person A executed an agreement to establish the offshore vehicle through which payments could be made, Zuberi resumed his efforts in support of the endeavor.  On September 28, 2015, one of Zuberi's hirelings prepared a report regarding the location of over $200 billion in frozen assets.  On February 2, 2016, Zuberi enlisted the help of an attorney to assist the Libyan delegation in lifting the freeze.  On March 1, 2016, Zuberi obtained a second letter of invitation for the delegation from members of the HFAC.

Shortly thereafter, another dispute erupted between Zuberi and Person A after a staffer for the HFAC informed Zuberi that the lead member of the Libyan delegation was no longer in office.  This resulted in Zuberi disassociating himself from the project.  Person A retained another lobbyist and on April 19, 2016, the Libyan delegation met with a HFAC member.  Zuberi's acrimonious emails in response to being cut out of the deal reveal his continued interest in wielding influence on behalf of the Libyan government independent of any arrangement with Person A:

| 3/1/16 | Zuberi | **I do not want to be involved in the Libya project after I get you the letter**. I do not have the time and I do not want conflict with you. **The way you guys are doing it you have zero chance of getting anything done.** Washington is not London or Riyadh or Beirut or Kuwait City. **If I didn't get you the letter there is no way you would have gotten the letter** but your attitude suggest otherwise… |
| 4/16/16 | Zuberi | I am disappointed in your behavior again.  I hear from people in Washington about the meetings and what I want them to do? … **People have been asking me to help the new coming government in Libya as oppose to the outgoing which you have signed with contract with. I will be going to Tunisia or Egypt to meet with them** |
| 4/16/16 | | [Note: HFAC Congressman schedules meeting with Libyan delegation for April 19] |

18

| 4/18/16 | Zuberi | …Let's see what you can accomplish.  Having meetings with my friends means nothing. |
| 4/18/16 | Zuberi | By the way, if you want we can have all the meetings cancelled? Let's see what your lobbyist can do you reschedule? |
| 4/19/16 | | [Note: Libyan delegation meets with HFAC Congressman] |
| 4/22/16 | Zuberi | I am not happy with the shady way [Person C] took Libyans to Washington based on the letter I got for him and the visa my friends arranged. **I learned from my friends in Washington that this was happening. Next time these meetings will be blocked.** [Person C] and/or [Person A] (whose ever idea this was) didn't have the decency to tell me even when i was in constant contact the days before with [Person C] |
| 6/4/16 | Zuberi | **There is a letter going out from Washington voiding the letter of invitation to former Libyan [official]. We will not be dealing with them going forward. We will work with other people in Libya** |

>    D.    ZUBERI LOBBIED CONGRESS AS AN AGENT OF A UKRAINIAN
>           NATIONAL

The USPO's Presentence Report does not discuss the circumstances of another FARA violation committed by Zuberi that involves unregistered lobbying on behalf of a Ukrainian national, Dmitry Firtash.  This lobbying effort generated $1 million for Zuberi.  It is instructive because Zuberi performed unregistered lobbying activities in tandem with transparent public relations efforts conducted on behalf of Firtash by a FARA registrant.  Well aware of the FARA registration requirement, Zuberi and his conspirators parsed out from disclosure those efforts they wished to have concealed from the American public.

In late 2014, Zuberi engaged in business discussions with Group DF International, a Ukrainian business conglomerate created by Dmitry Firtash, a Ukrainian oligarch.  Firtash is currently under indictment in the United States and facing extradition from Austria. On January 1, 2015, Zuberi issued an invoice to Group DF, which was paid with a $1 million wire transfer on March 27, 2015.

Zuberi's work for Group DF appears to have involved lobbying the U.S. Congress with respect to two issues: (1) Firtash's criminal

19

defense, which largely revolved around the argument that the U.S. prosecution was politically motivated, and (2) the creation, with Congressional support, of a privately funded "Ukraine development fund" that would create business opportunities for Group DF in the Ukraine, after the collapse of its pro-Russian government.

In August 2014, Zuberi enlisted a Washington, D.C. lobbying firm to come up with a proposal for Group DF to clean up Firtash's public image.  Zuberi sent the lobbying firm (1) a June 14, 2014 FARA registration filing made by another Washington D.C. lobbying firm previously retained to represent Firtash, (2) a press article reporting that Firtash had retained that previous firm to "clean his public record," and (3) a proposal from a public relations firm entitled "Personal Reputation Management Campaign for Dmitry Firtash."  Zuberi informed the lobbying firm that they would be doing the same type of work as that performed by the FARA-registered firm, but the lobbying firm was never retained.  However, within four months, Zuberi issued the above-referenced $1,000,000 invoice to Group DF and subsequently received full payment.

In September 2014, Zuberi entered into discussions with various employees, agents, and lobbyists associated with Group DF in an effort to promote Firtash's plan for a Ukraine development fund that would allow Group DF to profit in Ukraine in the wake of the collapse of its pro-Russian government and the United States's imposition of sanctions against Russia.

In January 2015, Zuberi solicited and received from two members of the HFAC letters of invitation addressed to members of the United Kingdom and German legislatures who, according to open source reporting, had previously operated as lobbyists and/or agents of

Dmitry Firtash.  Zuberi forwarded the letters to both the invitees and to two officers of Group DF.  Zuberi told the ensemble of characters that the letters would make this "an official trip" and that they should be prepared to discuss not only the "Ukraine rebuilding fund" but also "Eastern European energy needs when you are in Washington."  Zuberi promised: "We will call US Energy Department (cabinet administration) and members who deal with these issues in Senate and House to discuss this.  US rules and regulations are being changed to make this happen."

On February 7, 2015, Zuberi, members of Zuberi's U.S. entourage and the Group DF representatives traveled to Munich to meet with members of a Congressional delegation attending the annual European Security Conference.  The purpose was to meet with members of Congress to encourage them to support the creation of the Ukraine fund.  The group met with five Senators and a Congressman for dinner.  Zuberi engaged in private discussions with two U.S. Senators.  Zuberi reported to the others that the Senators responded that the idea needed more development.  Zuberi promised the Group DF representatives, that once the concept was more developed, he would bring it forward to Washington using his contacts and resources to achieve results.[12]

---

[12] The HFAC members and two Senators with whom Zuberi met in this instance were the same individuals to whom Zuberi directed $70,300 in contributions discussed in the section of this brief relating to the Libyan lobbying effort.

IV. **THE SCOPE OF ZUBERI'S FARA VIOLATIONS WERE EXCEPTIONAL**

The Court' should consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The most relevant follow:[13]

In United States v. Manafort, No. 1:17-cr-00201 (D.D.C.), defendant pleaded guilty to (1) conspiracy to violate FARA, commit tax fraud, file false foreign bank account reports ("FBARs"), and launder money, and (2) conspiracy to obstruct justice by tampering with witnesses.  Manafort worked as an unregistered agent of the Government of Ukraine, the Ukrainian Party of Regions, and former Ukrainian President Yanukovych.  The Court sentenced Manafort to 73 months' imprisonment, including the statutory maximum 60 months imprisonment for the conspiracy to violate FARA.  Manafort's parallel sentence for tax and fraud offenses resulted in a total term of incarceration of 90 months' imprisonment.[14]

In United States v. Vincent et al., No. 1:05-cr-00059 (S.D.N.Y), defendant Tongsun Park was convicted at trial for conspiring to violate FARA, to act as an agent of a foreign government without notifying the Attorney General, and to launder money, in connection with a scheme to lobby for easing United States and United Nations sanctions on Iraq and to corruptly influence the

---

[13] The list of cases includes only those most analogous the Zuberi matter.  Sentences imposed against defendants who received reduced sentences for cooperation (United States v. Gates, No. 1:17-cr-00201 (D.D.C.) and United States v. Patten, No. 1:18-cr-00260 (D.D.C.)) have not been included in this analysis.

[14] Manafort's entire sentence equaled 90 months' imprisonment because of a 47-month sentence he received in the Eastern District of Virginia for subscription to false income tax returns, failure to file an FBAR, and bank fraud that ran partially consecutively and partially concurrently to the District of Columbia sentence.

award and conditions of Oil-for-Food contracts.  The Court sentenced
Park to the statutory maximum 60 months' imprisonment.

In United States v. Siljander, No. 4:07-cr-00087 (W.D. Mo.), a
former U.S. Representative pleaded guilty to (1) acting as an
unregistered agent of the Islamic American Relief Agency ("IARA"),
to lobby for IARA's removal from a Senate Finance Committee list of
charities suspected of having terrorist ties, and (2) obstruction of
justice.  His co-defendant, Abdel Azim El-Siddig, pleaded guilty to
conspiring to violate FARA by hiring Siljander.  The Court sentenced
Siljander to one year and one day of imprisonment, and sentenced El-
Siddig to two years' probation.

In United States v. Ben Israel, No. 1:13-cr-00572 (N.D. Il.),
defendant pleaded guilty to failing to register under FARA as an
agent of Zimbabwe.  Between late 2008 and early 2010, Ben Israel
lobbied U.S. state and federal government officials to lift
sanctions on Robert Mugabe and other Zimbabwean government
officials.  The Court sentenced Ben Israel to seven months
imprisonment.

In United States v. Chaudhry, No. 1:18-cr-00226 (D. Md.), the
defendant pleaded guilty for acting as an unregistered agent for
Pakistan.  The defendant's conduct included organizing roundtable
discussions with his contacts in the U.S. government and scholars
employed by Washington, D.C.-area think tanks to solicit information
that could be used to influence U.S. foreign policy and neutralize
unfavorable views of Pakistan held by U.S. officials and scholars.
The defendant briefed high-level Pakistan government officials on
information obtained from his U.S. government and think tank

contacts.  The Court sentenced defendant to three years of probation.

The breadth of Zuberi's FARA violations exceeds that of all of the above cases, as summarized below:

| Defendant | FARA Crimes | Related Crimes | FARA Sentence |
|---|---|---|---|
| Zuberi | Sri Lanka<br>Bahrain<br>Turkey<br>Libya<br>Ukraine<br>Others | defrauded clients<br>tax evasion<br>witness tampering<br>FECA violations | |
| Manafort | Ukraine | bank fraud<br>tax evasion<br>witness tampering<br>laundering | 60 months |
| Vincent | Iraq | laundering | 60 months |
| Siljander | IARA | obstruction | 12 months |
| Ben Israel | Zimbabwe | | 7 months |
| Chaudhry | Pakistan | | probation |

Zuberi's conduct merits a sentence commensurate with the severity of his conduct.

V.  **DEFENDANT HAS FAILED TO COMPLY WITH FARA OBLIGATIONS AS REQUIRED BY THE PLEA AGREEMENT**

Paragraph four of the plea agreement requires the defendant to "satisfy any and all obligations under FARA prior to sentencing, including registering for any and all activity, past or present, that requires registration under FARA and amending any deficiencies in existing FARA filings."

To date, the defendant has made no such filings.  In the event defendant fails make necessary filings prior to sentencing, the government believes the Court should consider this an aggravating factor in determining his sentence.

24

VI.   **CONCLUSION**

Zuberi's repeated conduct constitutes an egregious series of FARA violations.  The offenses involved prohibited activities on behalf of numerous foreign governments, entities, and individuals that transpired over the course of several years.  The violations were part of a larger surreptitious effort to route foreign money into U.S. elections and to use it to corrupt U.S. policy-making processes.  His crimes not only involved the violation of federal election laws and prohibitions on lobbying, but schemes to deceive the United States Congress as to the actions of another nation, defraud clients, and evade the payment of millions of dollars in taxes.

Defendant's own words, quoted throughout this memorandum, demonstrate his corrupt motives.  Defendant explained to his clients that funneling foreign money into U.S. elections and organizations for the benefit of government officials was the "way America works." The Court can reject that proposition by imposing a sentence announcing that America loathes such schemes and that illegal foreign interference in our policy-making processes must stop.