```
 1  NICOLA T. HANNA
    United States Attorney
 2  BRANDON D. FOX
    Assistant United States Attorney
 3  Chief, Criminal Division
    DANIEL J. O'BRIEN (Cal. Bar No. 141720)
 4  Assistant United States Attorney
    Public Corruption & Civil Rights Section
 5       1500 United States Courthouse
         312 North Spring Street
 6       Los Angeles, California 90012
         Telephone: (213) 894-2468
 7       Facsimile: (213) 894-2927
         E-mail:    daniel.obrien@usdoj.gov
 8  ELISA FERNANDEZ (Cal. Bar No. 172004)
    Assistant United States Attorney
 9
    Attorneys for Plaintiff
10  UNITED STATES OF AMERICA
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. CR 19-642-VAP |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION RE FEDERAL ELECTION CAMPAIGN ACT VIOLATIONS; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| IMAAD SHAH ZUBERI, | Date: May 18, 2020 |
| Defendant. | Time: 9:00 a.m. |
| | Courtroom: 8A |

Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby submits its sentencing position with respect to defendant's Federal Election Campaign Act ("FECA") violations. The government agrees with the U.S. Probation Office's recommendation

1

that the Court impose a 14-level increase for illegal campaign contributions exceeding $550,000 and a two-level sentencing guideline enhancement for engaging in foreign conduit campaign contributions.

An under seal declaration of Assistant United States Attorney Daniel J. O'Brien in support of this position, with exhibits, will be filed concurrently with this document.

Dated: March 18, 2020  Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


  /s/
DANIEL J. O'BRIEN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1
II. DEFENDANT'S FECA VIOLATIONS EXCEEDED $550,000 . . . . . . . . 2
    A.  ZUBERI CONTRIBUTED IN THE NAME OF THIRD PARTIES . . . . 2
    B.  ZUBERI REIMBURSED THIRD PARTY CONTRIBUTIONS . . . . . . 4
    C.  PERSON LL REIMBURSED ZUBERI CONTRIBUTIONS . . . . . . . 4
III. FECA VIOLATIONS WERE FUNDED BY PROHIBITED FOREIGN SOURCES . . 7
    A.  CONTRIBUTIONS WERE FUNDED BY COMPANY A AND COMPANY B . . 8
    B.  CONTRIBUTIONS WERE FUNDED BY PERSON J . . . . . . . . . 11
    C.  ZUBERI KNEW ABOUT FECA'S FOREIGN SOURCE PROHIBITIONS . 12
IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 15

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendant Imaad Shah Zuberi ("Zuberi") violated the Federal Election Campaign Act ("FECA") in numerous respects over a five-year span. The violations exceeded the $550,000 sentencing guideline threshold set forth in U.S.S.G. §§ 2C1.8(b)(1); 2B1.1(b)(1). They consisted of a variety of schemes including: using credit cards in the name of himself and his spouse to make contributions in the names of third parties, reimbursing contributions made by others, and receiving reimbursements for contributions made in his or his spouse's name.[1] The violations also included funding contributions from prohibited, foreign sources that result in the sentencing guideline enhancement set forth in U.S.S.G. §§ 2C1.8(b)(2)(A).

Exhibit 1 is a spreadsheet that identifies FECA violations committed by defendant, both foreign-sourced and domestic. The illegal contributions total $949,558.

Exhibit 2 is a spreadsheet that identifies FECA contributions, either solicited or paid by Zuberi, that were funded by prohibited foreign sources. Company B, a Kuwaiti corporation, owned by Person D, a Kuwaiti citizen, routed $1,533,400 to Zuberi's bank accounts to fund campaign contributions. Company A, a Saudi corporation, owned by Person A, a citizen of Saudi Arabia and the United Kingdom, reimbursed Company B for $430,000 of those transfers. Person MM, a citizen of the United Arab Emirates, routed $290,000 to Zuberi's

---

[1] Zuberi typically paid for smaller contributions in the few thousands of dollars range and sought third party funding for contributions that ranged in the tens or hundreds of thousands of dollars.

bank accounts to fund campaign contributions.  Only $480,908 of this foreign money was used to make illegal campaign contributions.  Zuberi converted $1,351,595 of this foreign money to his own personal use thereby defrauding his foreign clients.

## II. DEFENDANT'S FECA VIOLATIONS EXCEEDED $550,000

### A. ZUBERI CONTRIBUTED IN THE NAME OF THIRD PARTIES

According to publicly available FECA records, defendant and his spouse made about $3 million in campaign contributions during the period 2011 through 2017.  Defendant and his spouse used the mailing address of 10166 Rush Street, El Monte, California 91733 (the "Rush Street address") in connection with their contributions.  This address houses the business CAI Industries Corp. ("CAI"), a Chinese herbal medicine and acupuncture supply distributor, operated by defendant's sister-in-law and her husband.

FECA filings linked to the Rush Street address also show numerous contributions from associates of defendant and his spouse, including Person A, Person B, Person C, Person D, Person P, Person AA (who passed away in April 2016), Person FF, Person GG, Person HH, and Person LL.

FECA records, defendant's bank accounts, and witness testimony,[2] establish that defendant paid for contributions made in the name of these third parties and others.  In the majority of these cases, defendant simply used personal credit cards in his and/or his

---

[2] Two witnesses referenced in Exhibit 1, Person GG and Person JJ, were interviewed by the government and denied that their campaign contributions were illegal.  Person GG claimed to have reimbursed Zuberi for the contributions Zuberi paid for.  Person JJ stated that the cash she received at the time of her contributions was a payment for unspecified services.

2

spouse's name to make online contributions in the names of third parties.

Person FF's testimony confirms that the enumerated contributions made in her name were neither authorized nor reimbursed. She testified that she did not authorize political contributions other than those funded by her own credit cards. She never paid defendant or his spouse's credit card bills. She has not paid significant amounts of cash to either defendant or his spouse other than to pay a portion of dining expenses or give minor holiday gifts not exceeding a few hundreds of dollars.

Person P testified that defendant paid for contributions made in Person P's name. Person P recalled a specific occasion where defendant handed him a credit card to make two campaign contributions while they were sitting in the lobby of the JW Marriott in Washington, D.C. On January 27, 2014, the same day that Person P supposedly contributed $10,200 to the two campaigns referenced in Exhibit 1, defendant's bank records show credit card charges to both the campaigns in those precise amounts.[3]

The FECA violations set forth in Exhibit 1 include $321,000 in contributions made in the name of Person AA. The vast majority of these contributions were paid from defendant's accounts. Person AA held a joint banking account with defendant that funded a few of the contributions. Person AA's net worth and income derived over the pertinent timeframe totaled approximately $108,450. She would have been incapable of financing the entirety of the contributions made

---

[3] Contributions in the name of Person GG were paid by defendant's credit card on this same date.

3

in her name. Person AA passed away in April 2016, months before her final campaign contribution in October 2016.

B. ZUBERI REIMBURSED THIRD PARTY CONTRIBUTIONS

Person P also testified that defendant reimbursed contributions. On April 1, 2015, Person P made two contributions to the campaign referenced in Exhibit 1 totaling $3,000 using his own credit card. At the time, Person P was subsisting on a $5,000 per month salary paid by defendant. On April 9, 2014, eight days after the contributions, defendant wrote two checks to Person P totaling $3,000. These checks are not consistent with the regular salary payments Person P had been receiving from defendant; they are consistent with the reimbursement of the contributions.

Person KK, a university professor and (as discussed in the government's sentencing position related to defendant's FARA violations) a minor participant in defendant's efforts to lobby on behalf of Libyan officials, testified to having made, at defendant's urging, a $2,700 contribution to the campaign referenced in Exhibit 1 on May 17, 2015. Defendant agreed to reimburse half of the contribution. Defendant's bank records confirm a $1,350 check to Person KK for "Paris trip" in connection with the Libyan venture on May 29, 2015, less than two weeks after Person KK's contribution.

C. PERSON LL REIMBURSED ZUBERI CONTRIBUTIONS

As described in the government's sentencing memorandum regarding defendant's obstruction of justice, Person LL is a U.S. citizen who made substantial contributions to political campaigns going back to 2007. Person LL has acknowledged reimbursing defendant for campaign contributions. Person LL agreed to fund contributions through defendant, largely based upon defendant's

4

claim that Person LL could obtain VIP tickets and better access to politicians this way. FECA records falsely report that these contributions were funded entirely by Zuberi.

Documents produced by Person LL verify his assertions. For example, on September 16, 2014, Zuberi made a $32,400 contribution to the Democratic National Committee ("DNC").[4] On November 10, 2014, Renee Wu, a fictitious person and alter ego of defendant created by defendant, sent an email to Person LL stating, "For HRC in event NYC, we paid $32,400 for Imaad + guest. therefore half of this is $16,200. Please mail check …" On January 28, 2015, Person LL issued a $16,000 check to defendant for "Clinton event."

As another example, on April 7 and 14, 2016, Zuberi contributed a total of $200,000 to the Hillary Victory Fund. Defendant informed Person LL and others that he had "paid for everyone" with regard to a Hillary Clinton event in Los Angeles and that he would "get it from you later." On April 22, 2016, Person LL issued a $35,000 check to defendant for "HVF."

Lengthy text conversations concerning this arrangement reveal how Person LL believed that his $35,000 would be reflected as a contribution in his own name and that Zuberi deceived the campaign committee into believing that the contribution came from Zuberi's own money:

---

[4] The government has no evidence suggesting that any agent for any of the campaigns identified in this memorandum (or those set forth in Exhibits 1 or 2) were aware of the illegal contributions. Indeed, the record established efforts by the campaigns to ensure compliance with the law.

5

| Date | Sender | Message |
| --- | --- | --- |
| 4/14/16 | Person LL | imaad. i am too much spread. I am not a milionare like you. i told you i can only pay very important event. my business need s money. **I just wanto make sure money youbpaid 35k will be credit to me officialy. and able to come vip event (50k) this is a very strext and I hop you understand me** |
| | | … |
| 4/14/16 | Zuberi | I will not pay anything for you. Enough is enough |
| 4/14/16 | Zuberi | I have had enough. I don't have time, energy not money to play these Turkish games |
| 4/14/16 | Person LL | what ever. no Turkish gamem imaad. i am just saying that iam spread thing snd need your helpnfor onky importsnt vebt and asking you to watch me as brother. when inhad exra money i can help you. i only want to go nimportant ones with your guidance. saying this one should not made youbupset |
| | | … |
| 4/14/16 | Zuberi | **Bring your $35,000 check I have paid $50,000 for you** |
| 4/14/16 | Zuberi | **Rest you owe me when your business is good** |
| | | … |
| 5/11/16 | Person LL | **… [Campaign staffer] told me that check your friend came to vlooney event bounce it.[5] so he has to refund you money and you need tobrefund me and I have to give them directly. [Campaign staffer] was not happy** but he is trying to no challenge you on this |
| 5/11/16 | Zuberi | This is not what he told me |
| | | … |
| 6/23/16 | Person LL | **… my contribution to HVF dos not alpear in their list. that will getmensome advantages. Per [campaign staffer's] suggestion, please refund the 35k and i can pay back to hvf. i think this is the only way** |
| | | … |
| 6/23/16 | Zuberi | **I will get this refunded tehn you will handle your own Convention package?** |
| 6/23/16 | Zuberi | **I will do as you want but even with several hundred you will get to pint to get VVIP** |
| 6/23/16 | Person LL | **imaad it is not about . you got me wrong. they say it is need to be by books. Getting my convention from you is different. And I ned you help on that** |

Zuberi was well aware that such reimbursements were prohibited. Indeed, Person's LL's attempts to get his money refunded so that he

---

[5] Bank records reveal that Zuberi's contributions did not bounce. Rather, contributions were made in Zuberi's name and Person LL reimbursed Zuberi for a portion of those contributions.

6

could make campaign contributions legitimately created a paper trail that spawned nervousness on the part of Zuberi:

| 11/7/16 | Zuberi | **I will get the Clooney event credit to you. It is best for us to avoid conflict. I do my thing and you do your thing. We can be friends and do other business but nothing to do with politics or Turkey.** I am really tired of all this mess … |
|---|---|---|
| | | … |
| 11/7/16 | Person LL | …**[Campaign staffer] told me many time i have to $50k pay them directly not thorugh you for clooney event. I have always done as you said**. i paid more than $200k for your request. No problem. I did not igve you headeach. **Please pay campaign 85k under my name you said you could do it in miami. i will make it up . . please.** |
| 11/7/16 | Zuberi | **Why can't you listen? What make you do thing that we discussed you won't do like writing email and text. Why are you testing me this and emailing me? What part of don't email and don't text you don't understand?** What is wrong with you? Will you ever change? |
| 11/7/16 | Zuberi | **Why you want to create unnecessary problem for you self and me? Why?** |
| | | … |
| 11/7/16 | Person LL | …there is nothing wrong if you made contribution and I go to event as your guest |
| | | … |
| 11/7/16 | Zuberi | **I will support you but please please please please please please do not email me or text me** |
| 11/7/16 | Zuberi | I am blocking your emails and texts |
| 11/7/16 | Zuberi | I do not want to get email or text from you |
| 11/7/16 | Person LL | ok |

## III. FECA VIOLATIONS WERE FUNDED BY PROHIBITED FOREIGN SOURCES

A breakdown of the disposition of monies sourced from foreign entities and individuals for the purpose of making campaign contributions is set forth in Exhibit 2. The spreadsheet tallies money transferred from overseas for three categories: valid contributions, illegal contributions, and fraudulent conversions of money by Zuberi.

A.  CONTRIBUTIONS WERE FUNDED BY COMPANY A & COMPANY B

Person C is a naturalized U.S. citizen who lives in Kuwait. His spouse, Person D, is a citizen of Kuwait. Person C created, and Person D owned, Company B, a business headquartered in Kuwait.

Person C testified that he and several of his family relations and associates became involved in Zuberi's efforts to fund U.S. political campaigns with foreign money. Person C's testimony is corroborated by hundreds of emails and business documents. This evidence demonstrates that Zuberi gathered almost two million dollars from foreign nationals for the purpose of influencing U.S. elections, made hundreds of thousands of dollars in illegal foreign contributions, and siphoned off over a million dollars for his personal use, defrauding his foreign clients in the process.

In 2012, Zuberi told Person C that if Person C made contributions to President Obama and other politicians, he could secure U.S. help in opening up business opportunities throughout the world. Zuberi frequently distributed photographs of himself with officials from the highest levels of the U.S. government discussing issues of international importance. Zuberi also frequently claimed to possess extraordinary wealth and power. Person C was beguiled, began donating to political campaigns, attended fundraisers, and obtained photographs with various politicians that defendant explained would be valuable for business development. At Zuberi's urging, Person C then solicited his family members and business associates to do the same. By the conclusion of Person C's relationship with Zuberi, Company B had transferred over $1,500,000 to Zuberi for various political campaigns and the 2012 Presidential Inaugural.

Person C produced extensive documentation that demonstrates Zuberi's willful violations of FECA law.  For example, on April 28, 2012, Renee Wu, a purported employee of Avenue Ventures, but actually an alter ego of Zuberi,[6] using the email address renee.wu@avenueventure.com, emailed Person C instructions on how to make contributions to an Obama/Biden event.[7]  The email copied Zuberi's personal email account, imaad.zuberi@mindspring.com. "Renee Wu" stated that,

> "Imaad told me to pay for you and your wife's contribution towards Presidential Partner of $75,800 each less $20,000 that you wired in to the campaign's account.  The total is: $151,600 ($75,800 x 2) less $20,000 = $131,600 +$5,000 for Congressman [ ] = $136,600.  I will email you wire instruction for transfer of the funds."

Zuberi then took steps to disguise these contributions as consulting fees.  On April 29, 2012, Zuberi directed "Renee Wu" to "do an invoice for Libya consulting services for Korean companies and General Motors."  Wu then sent Company B an Avenue Ventures invoice for $136,000 regarding "International business development consulting relating to Korean companies and General Motors."

On April 30, 2012, Company B transferred these funds to Zuberi's personal bank account in Dubai.  Zuberi then used these funds to make a total of $100,000 in donations to Obama Victory 2012 and another Congressional campaign.  Unbeknownst to Person C or Person D, Zuberi pocketed the remaining $36,600.

---

[6] Evidence that establishes Renee Wu as an alter ego of defendant is set forth in the government's sentencing brief on tax issues because the fraudulent aspect of defendant's unreported income is a guideline enhancement for the tax offense.

[7] As stated above, the government has no evidence suggesting that any agent for any of the campaigns identified in this memorandum were aware of the illegal contributions.

Some of Company B's transfers to Zuberi were ultimately sourced by Company A, a Saudi business operated by Person A. For example, on October 10, 2012, Company A reimbursed Company B for $180,000 that had been wired to Zuberi for four tickets to an Obama Victory 2012 event, priced at $45,000 each, for the attendance of Person A, Person B, Person E, and Person F. Out of these individuals, only Person B was a U.S. citizen, eligible to contribute. Zuberi used only $40,000 of this money to make contributions to Obama Victory 2012 in the name of Person B, a U.S. citizen. Unbeknownst to those who had transferred the funds from Company A through Company B, Zuberi pocketed the remainder.

The illegal foreign contribution/fraud scheme also included contributions to the 2013 Presidential Inaugural Committee.[8] From December 10, 2012 through February 27, 2013, Company B wired $750,000 to Zuberi in connection with the Presidential Inauguration. From January 16 through May 2, 2013, Company A reimbursed $250,000 of these transfers. From December 27, 2012 through January 15, 2013, Zuberi made only $257,500 in contributions to the 2013 Presidential Inaugural Committee. He then obtained $160,000 in refunds from the committee, making his actual incurred expenses only $97,500.

The pattern of defendant openly soliciting Person C and others for illegal foreign contributions, preparing fraudulent invoices characterizing the foreign wires as consulting fees, and fraudulently converting a portion of these funds to his own benefit

---

[8] FECA requires the reporting of contributions in excess of $200 to a Presidential Inaugural Committee and prohibits donations to such committees from foreign nationals.

10

operated from April 2012 through February 2016. Person C refused to act on these solicitations after April 2013 because none of defendant fantastic claims of business opportunities materialized. Nevertheless, in 2015, while Person C and Person A were pursuing a business opportunity with defendant involving the government of Libya, they assented to the resumption of contributions. In September 2015, defendant falsely represented to Person C that he had made three contributions to the Hillary Victory Fund for $33,400 each.[9] On February 11, 2016,[10] Company B wired $100,200 to Zuberi.

B. CONTRIBUTIONS WERE FUNDED BY PERSON J

Zuberi also solicited foreign nationals for contributions to a gubernatorial campaign.[11] From August 23, 2013 through November 27, 2013, Zuberi made eight contributions of $25,000 each to the campaign. One of these contributions was dated November 5, 2013. On November 5, 2013, Zuberi sent an email to Person N, a citizen of India, seeking contributions to either the campaign or its related inaugural committee. On November 6, Zuberi emailed Person N, copying Person J and "Renee Wu" stating that:

> "[Person J] paid for your $25,000 contribution to [ ].
> Please give [Person J] the $25,000. Come to [ ]'s
> inauguration on January 8 …"

---

[9] In September 11, 2015, Zuberi obtained three cashier checks for $33,400 each to convince Person C and Person A that he had made the contributions. On October 22, 2015, Zuberi did make a contribution of $100,000 to the Hillary Victory Fund in his own name. On November 2, 2015, he redeposited the cashier checks back into his account.

[10] Person C did not transfer the money until February 2016 because it took substantial time for Person C and Person A to discuss the issue.

[11] FECA prohibits foreign contributions to state campaigns.

11

On November 8, 2013, "Renee Wu" sent Person N an Avenue Ventures invoice in the amount $25,000 for "donation."

Three years later, Person N reflected on these events while forwarding these emails to one of Zuberi's Avenue Ventures associates. Person N referenced, "The invoice for the donation I made to [Governor's] campaign to cover campaign debts," and stated, "This is a clear admission from Imaad that he was soliciting and that he received campaign contributions for [Governor] from foreign nationals…"

C. <u>ZUBERI KNEW ABOUT FECA'S FOREIGN SOURCE PROHIBITIONS</u>

Defendant was well aware of the prohibitions on foreign contributions going back at least to 2012.

FECA Regulations require disclosures, admonitions, and acknowledgements with respect to online contributions. Records obtained from several of the campaigns include snapshots of websites where compliance banners appear. For example, NGP VAN, a software provider for numerous election campaigns, contains this standard warning:

> By clicking on the "Contribute" button you confirm that the following statements are true and accurate:
>
> I am not a foreign national who lacks permanent residence in the United States.
>
> This contribution is made from my own funds, and not those of another.
>
> This contribution is not made from the funds of a corporation or labor organization.
>
> This contribution is made on a personal credit card or debit card for which I have the legal obligation to pay, and is not made either on a corporate or business entity card or on the card of another person.
>
> I am at least eighteen years old.
>
> Contributions or gifts are not tax deductible.

As a general matter, the frequency and scope of defendant's contributions over many years should be sufficient to refute any

claims that standard warnings were unnoticed.  Moreover, defendant was not merely a contributor, but also a major fundraiser for both the Obama and Clinton campaigns for President.

More importantly, defendant's email communications with associates show repeated instances in which he revealed his knowledge of, or was reminded of, FECA limitations.

On May 13, 2012, Person C became concerned as to whether Zuberi's contribution scheme was on the up and up.  He contacted a representative of the Obama campaign and expressed concerns.  Zuberi replied in an email that same day, "[Person C], just to correct the record, you are doing everything right. I will have a conversation with [campaign committee staff].  Just keep getting Americans and Green Card holders to keep contributing to Obama-Biden and other Democrats ..."

On September 24, 2012, Person E noted the foreign donor prohibitions set forth on the donor form in an email to Zuberi:

> "I'm [Person E], [Person C's] brother.  Kindly note On the form that we were asked to fill, there is clause whereby Foreign nationals are prohibited from contributing. Please clarify if the form needs to be filled up for non-US citizens or non-permanent residents."

Zuberi, undeterred, replied:

> "We will try to do the same way we did for [Person C's] wife [Person D].  Just leave it blank for now."

Person C chimed in with his own concerns:

> ". . . I do not accept any confusion. What do you want me guests to fill up and 4 of them are not American and only one is American.  Please be sure that the money is not an issue as long as we are doing things right.  Let's push things in the right direction."

Zuberi successfully deflected these concerns by conflating the vetting of FECA and security issues:

13

> ". . . we are trying to manage people vetting process for this event. There should be no confusion. Just send the form over to Robert."

On April 17, 2015, as a bundler, defendant claimed credit for contributions Person A and Person B made to the Hillary for America campaign, saying, "[Person B] just donate $5400 for her and her husband." The Hillary campaign asked Person A and Person B for copies of their passports to prove citizenship. In response, Person A sent Zuberi an email stating, "What shall we do about this?" Zuberi replied that he would "handle it." The Hillary campaign returned the contribution, but Zuberi never informed the campaign about similar foreign contributions made by Person D and Person H around the same time, nor did he stop soliciting contributions from Person A. Indeed, Zuberi solicited and fronted money for two contributions made by Person A to a Senatorial campaign on September 28, 2016.

On January 4, 2016, Person LL issued a $35,000 wire transfer from his corporation to the Hillary Victory Fund. When the campaign returned the contribution because it came from a prohibited source, defendant was looped into the conversation because he had bundled it. Defendant told Person LL, "it has to be person not from company . . . This is not my rule. The contribution has to from personal account."

//
//
//
//
//
//

14

**IV. CONCLUSION**

The contributions set forth in Exhibit 1 demonstrate that Zuberi solicited over $550,000 in illegal FECA contributions. The contributions set forth in the Exhibit 2 show that Zuberi solicited foreign conduit contributions. Consequently, the Court should apply the 14-level enhancement for conduit contributions that exceed $550,000 and the two-level sentencing guideline enhancement for foreign conduit contributions.

Zuberi's FECA violations were egregious as to length and scope. As explained in the government's sentencing position with respect to FARA issues, many of these FECA violations were intertwined with Zuberi's efforts to corrupt democratic processes and institutions while acting as an agent for foreign interests. This case merits a significant sentence not only to punish Zuberi's extensive conduct but also to deter those who would embark on similar schemes.