NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-2468
    Facsimile:  (213) 894-2927
    E-mail:    daniel.obrien@usdoj.gov
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>        v.<br><br>IMAAD SHAH ZUBERI,<br><br>       Defendant. | CR No. CR 19-642-VAP<br><br>GOVERNMENT'S SENTENCING POSITION RE TAX VIOLATIONS; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Date: May 18, 2020<br>Time: 9:00 a.m.<br>Courtroom: 8A |

    Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby submits its sentencing position with respect to defendant Imaad Shah Zuberi's conviction for tax evasion.  This position examines the size of the tax loss, the two-level sentencing

1

guideline enhancement for unreported income derived from criminal activity, and the two-level enhancement for a tax offense involving sophisticated means.

An under seal declaration of Assistant United States Attorney Daniel J. O'Brien, with exhibits, will be filed separately in support of this sentencing position.

Dated: March 20, 2020            Respectfully submitted,

                                 NICOLA T. HANNA
                                 United States Attorney

                                 BRANDON D. FOX
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                      /s/
                                 DANIEL J. O'BRIEN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

2

# TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.    THE FEDERAL TAX LOSSES EQUAL $7,299,556 . . . . . . . . . . 2

III.   DEFENDANT'S TAX FRAUD INVOLVED SOPHISTICATED MEANS . . . . . 3

IV.    ZUBERI DERIVED MOST OF HIS UNREPORTED INCOME FROM FARA
       VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . 8

V.     ZUBERI DERIVED MOST OF HIS UNREPORTED INCOME FROM FRAUD . . 10

       A.   ZUBERI'S ENTIRE BUSINESS OPERATION WAS PREMISED ON
            FRAUD . . . . . . . . . . . . . . . . . . . . . . . 11

       B.   ZUBERI DEFRAUDED CLIENTS WITH REPRESENTATIONS THAT
            THEIR MONEY WOULD BE USED TO MAKE CONTRIBUTIONS TO
            U.S. ELECTION CAMPAIGNS . . . . . . . . . . . . . . 15

       C.   A PORTION OF ZUBERI'S INCOME FROM SRI LANKAN LOBBYING
            EFFORTS WAS PROCURED THROUGH FRAUD . . . . . . . . . 19

       D.   ZUBERI DEFRAUDED U.S. CARES INVESTORS . . . . . . . . 21

       E.   ZUBERI INFLATED EXPENSE REIMBURSEMENT REQUESTS PAID BY
            PERSON J . . . . . . . . . . . . . . . . . . . . . . 22

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 24

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.   **INTRODUCTION**

For the four-year period examined by the government's investigation, defendant Zuberi's Foreign Agent Registration Act ("FARA") and fraud schemes generated over $20,000,000 in income. Zuberi concealed over $19,000,000 of that income from the Internal Revenue Service ("IRS").  His method of evading income consisted of (1) directing foreign clients to route money to overseas accounts, (2) failing to report these overseas accounts to the IRS as required by law, (3) failing to report his lobbying activities on behalf of several foreign governments, entities, and individuals as required by FARA, (4) instructing a proxy to create two shell corporations, one to act as a front for Sri Lankan lobbying activities, and another to redirect funds received from Sri Lanka to Zuberi, (5) directing the proxy not to file a tax return on behalf of the shell corporation that redirected funds to Zuberi, and (6) failing to report income received on his personal tax returns.  The resulting tax loss to the American public amounted to $7,299,556.[1]

The U.S. Probation Office ("USPO") has accurately determined defendant's sentencing guideline for this series of tax violations, including the enhancements for income derived from criminal activity and sophisticated means.  However, the USPO's Presentence Report ("PSR") contains an error as it slightly overstates the federal tax

---

[1] This figure does not include state income tax losses which should be included as relevant conduct for the offense.  The government has not computed such losses because it does not believe the figures, by themselves, would change the sentencing guideline calculations.

loss as $7,694,109.  In addition, the evidence recited by the USPO is somewhat cursory and this memorandum supplements the PSR with pertinent facts.

An appropriate sentence will sanction defendant not only for his commission of FARA and Federal Election campaign Act ("FECA") offenses, but also for his pattern of evading taxes.  Defendant's tax evasion spanned four years and only stopped when he learned of the government's investigation.  The scheme generated $7,299,556 in losses.  The sophistication of the crime merits an increased sentence because complicated evasion schemes pose a greater threat to the government's ability to collect tax revenue.  Moreover, the offense is especially egregious because the unreported income represents the proceeds of multiple different criminal schemes.

The multiple criminal aspects through which Zuberi's wealth was derived demonstrates how much this case exceeds the paradigm envisioned by the guideline enhancement.  The criminal proceeds enhancement would apply regardless of whether the underlying crime was a FARA offense or fraud, how many FARA offenses were committed, and no matter how many of Zuberi's clients were defrauded.  Zuberi's tax fraud is an exceptional case and warrants an extraordinary sentence.

II. **THE FEDERAL TAX LOSSES EQUAL $7,299,556 AND ZUBERI HAS FAILED TO MAKE PAYMENT AS REQUIRED BY THE PLEA AGREEMENT**

The USPO incorrectly reports the tax loss to be $7,694,109.  As referenced in the plea agreement, the parties entered into a closing agreement and stipulated to the appropriate federal tax figures. The closing agreement sets forth the following amounts and the tax loss equals $7,299,556:

| Year | Unreported Gross Income | Unreported Net Income | Tax Loss |
|------|------------------------|-----------------------|----------|
| 2012 | $1,255,264 | $1,109,355 | $414,918 |
| 2013 | $7,761,120 | $6,772,560 | $2,910,026 |
| 2014 | $8,701,333 | $8,224,315 | $3,478,667 |
| 2015 | $1,375,647 | $1,230,768 | $495,945 |
| Total | $19,093,364 | $17,336,998 | $7,299,556 |

Paragraph 3(a) of the plea agreement requires defendant to pay this tax loss, plus penalties and interest, by January 31, 2020. Zuberi has failed to do so.  The government is amenable to extending this deadline to the current sentencing date of May 18, 2020. However, in the event Zuberi fails to meet his obligation by that time, his failure should be deemed an aggravating factor at sentencing.  Zuberi reports a net worth of over $30 million, most of that consisting of real estate in the United States.  There is nothing prohibiting him from liquidating such holdings in order to meet his obligations.

III. **DEFENDANT'S TAX FRAUD INVOLVED SOPHISTICATED MEANS**

Sophisticated tax evasion schemes pose a significant threat to the government's ability to make sure all Americans fairly share tax burdens.  The Sentencing Guidelines impose a two-level enhancement for such schemes.  U.S.S.G. § 2T1.1(b)(2).  "Sophisticated means are those which are more complex than those involved in the run-of-the-mill tax evasion case." *United States v. Fife*, 471 F.3d 750, 753 (7th Cir. 2006).  The Sentencing Commission specifically contemplated application of the enhancement when, as here, the conduct involved "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore

financial accounts." U.S.S.G. § 2T1.1, comment. (n.5). "[T]he enhancement properly applies to conduct less sophisticated than the list articulated in the application note. *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013). "[T]he essence of the definition is merely 'deliberate steps taken to make the offense . . . difficult to detect.' " *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001). "The sophisticated means enhancement does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual tax evasion case." *Fife*, 471 F.3d at 754; *Jennings*, 711 F.3d at 1147; *Kontny*, 238 F.3d at 821 ("In light of its purpose and context, we think 'sophistication' must refer not to the elegance, the 'class,' the 'style' of the defrauder . . . but to the presence of efforts at concealment that go beyond . . . the concealment inherent in tax fraud.").

Zuberi's tax evasion was significantly more complex than a run-of-the-mill tax case. Zuberi routed income through offshore bank accounts, concealed the existence of those accounts from the IRS, transferred money to the United States through a lengthy series of smaller transactions, created two corporate shell corporations that he controlled through a proxy, directed the proxy not to file a tax return on behalf of one of the shell corporations so as not to reveal suspicious in-and-out transactions to the IRS, instructed the proxy to transfer money to corporate bank accounts controlled by Zuberi, and redirected this money to Zuberi's personal benefit through a series of convoluted transactions.

In the case of Zuberi's conversion of money that he promised to route to political campaigns, Zuberi used an undisclosed foreign bank account in Dubai to conceal the nature of the funds. During

4

the period April 25, 2012 through February 27, 2013, Zuberi had clients transfer nearly $1,500,000 for political contributions into his Dubai bank account.  Zuberi then engaged in over 40 wire transfers from the Dubai account to a USC Credit Union account held jointly by Zuberi and his elderly, ill mother that depleted these funds.  Such staging made the transfers appear to have originated from Zuberi's overseas wealth rather than from foreign clients.

In the case of U.S. Cares, Zuberi directed investors to wire almost half of the money into two Dubai bank accounts and then transferred the funds to the United States to make personal real estate and brokerage investments and pay personal expenses.

Zuberi concealed the existence of his overseas accounts from the IRS by failing to file Foreign Bank and Financial Account Reports ("FBARs") in any of the tax years in question or report the foreign accounts, as required, on his personal tax returns.[2]

With respect to his Sri Lankan income, Zuberi created two corporate shells, ostensibly controlled by another individual, who actually took directions from Zuberi.  One shell corporation, Beltway Government Strategies ("BGS"), acted as a front for Sri Lankan lobbying activities so that Zuberi could divorce himself from any lobbying activity.  Zuberi initially used the other shell corporation, WR Group ("WR"), as an instrument to avoid placing his name on the Sri Lanka contract.  However, when Sri Lanka insisted that the money be directed to the contracting party, WR, Zuberi

---

[2] Zuberi was aware of the FBAR filing requirement having filed two such reports when he was employed by Transamerica Life Insurance in June and July 2009.

5

siphoned off the money received by WR through a series of convoluted transactions that helped conceal his conversion of the money.

For example, out of $1 million transferred to WR in July 2014, Zuberi routed the money as follows:

| 1st Transfer[3] | 2nd Transfer[4] | 3rd Transfer | Beneficiary |
|---|---|---|---|
| $250,000 to ISZ 9 | $225,000 to BofA (IZ/WRZ) | $100,000 to Etrade | Zuberi/Rao |
| | | $100,000 to Etrade | Zuberi/Rao |
| $250,000 to Fountain 8 | $225,000 to BofA (IZ/WRZ) | $113,484 to American Express | Zuberi/Rao |
| | | $100,000 to Etrade | Zuberi/Rao |
| $250,000 to Clary 6 | $240,000 to AIS | $135,000 to BGS | BGS |
| | | $50,000 to American Central Escrow | Zuberi/Rao |
| | | $50,000 to American Central Escrow | Zuberi/Rao |
| $200,000 to ACG | $140,000 to BGS | | BGS |
| | $25,000 to Person R | | Person R |
| | $25,000 to Person R | | Person R |
| $40,000 to BGS | | | BGS |
| $5,000 to BGS | | | BGS |
| $5,000 to Person P | | | Person P |

---

[3] ISZ 9, Fountain 8, and Clary 6 are all limited liability corporations set up by Zuberi for the purpose of acquiring real estate in the United States.  In these instances, they were merely used to funnel Sri Lankan money into the personal bank accounts of Zuberi and his spouse.

[4] The Bank of America, Etrade, Schwab, and American Express accounts were all held in the name of Zuberi and/or Rao.

Out of $1 million transferred to WR in September 2014, Zuberi routed the money as follows:

| 1st Transfer[5] | 2nd Transfer | 3rd Transfer | Beneficiary |
|---|---|---|---|
| $475,000 to ACG (2 cks) | $390,000 to BofA (IZ/WRZ) | $56,674 to American Express | Zuberi/Rao |
| | | $100,000 to Etrade | Zuberi/Rao |
| | | $100,000 to Schwab | Zuberi/Rao |
| | | $100,000 to Schwab | Zuberi/Rao |
| | $35,000 to Nelson Mullins | | Subcontractor |
| | $13,500 to BGS | | BGS |
| | $10,121 to Person P | | Person P |
| | $5,000 to Person GG | | Person GG |
| $475,000 to AIS (2 cks) | $355,000 to Bank of America | $100,000 to Etrade | Zuberi/Rao |
| | | $100,000 to Etrade | Zuberi/Rao |
| | | $100,000 to Etrade | Zuberi/Rao |
| | | $66,674 to American Express | Zuberi/Rao |
| | $50,000 to BGS | | BGS |
| | $6,000 to BGS | | BGS |
| $24,750 to BGS | | | BGS |
| $8,750 to BGS | | | BGS |
| $16,500 to Person P | | | Person P |

When informed of a tax preparer's advice that the in-and-out aspect of the WR transactions would appear suspicious to the IRS, Zuberi counseled his proxy not to file a tax return on behalf of WR.

---

[5] ACG and AIS stand for Avenue Capital Group, Inc. and Avenue Investment Services, Inc., two corporations controlled by Zuberi.

Without a report of income flowing through WR to Zuberi's accounts, Zuberi was able to omit such income from his personal tax returns without detection.

## IV.   **ZUBERI DERIVED MOST OF HIS UNREPORTED INCOME FROM FARA VIOLATIONS**

Sentencing guideline 2T1.1(b)(1) imposes a two-level enhancement if the defendant failed to reported income exceeding $10,000 from criminal activity.  Application note 4 of that guideline defines criminal activity as "any conduct constituting a criminal offense under federal, state, local, or foreign law."

As set forth in the government's sentencing position on defendant's FARA violations, much of Zuberi's unreported gross income was derived by unlawfully acting as a foreign agent for foreign governments, entities, and individuals.  Zuberi illegally received income from (1) the Sri Lankan government for its lobbying efforts relating to its human rights violations against an ethnic minority ($6.5 million), (2) a citizen of Bahrain who perpetrated a fraud on the U.S. Congress (≈$2 million), and (3) a Ukrainian oligarch who sought to evade extradition to the United States and profit from Russia's invasion of his homeland ($1 million).  Zuberi concealed his FARA-regulated activities by failing to make appropriate registration statements and by falsely reporting his involvement in the Sri Lanka lobbying effort.

Defendant has acknowledged failing to report $6,500,000 in gross income obtained through unregistered lobbying activity on behalf of Sri Lanka.  On May 9, 2014, and June 18, 2014, Sri Lanka wired $3,500,000 and $1,000,000, respectively, into Zuberi's personal bank account for services related to the Sri Lanka-WR

8

contract.  On each of July 18, 2014, and September 10, 2014, Sri
Lanka wired $1,000,000 into a WR bank account.  Zuberi then directed
Person P to transfer the majority of these funds into accounts
controlled by Zuberi.

Defendant received at least three wire transfers from Person J
in relation to his fraudulent scheme to lobby Congress to stop
Bahrain's interference in the development of the Al Areen Palace &
Spa ("Al Areen").  On April 16, 2013, Person J wired $1,216,394 to
Zuberi's account in Dubai in connection with Al Areen.[6]  On September
30, 2013, Person J wired $277,858 to Zuberi's Dubai account of which
$250,000 was related to an invoice directed from Avenue Ventures to
Al Areen Holding Company ("AAHC").[7]  On August 4, 2015, Person J
wired $1,000,000 to Zuberi's Wells Fargo account in the United
States of which $500,000 related pertained to the "Al Areen
project."

On March 27, 2014, Company I wired $1,000,000 to defendant's
Wells Fargo account in the United States in relation to his lobbying
work on behalf of Dmitry Firtash, who was seeking to avoid

---

[6] On April 16, 2013, "Renee Wu" issued an invoice on behalf of
Avenue Ventures to an entity controlled by Person J stating, "Here
is the revised invoice based on the new people who will be coming
for the medical center to Bahrain."  The next day, Person J
responded that he had given instructions for payment and a
$1,216,394 wire transfer issued the same day.  On May 14, 2013,
shortly after a press release announcing Avenue Ventures
"investment" in Al Areen, Avenue Ventures issued additional press
releases to announce the planned development of a medical center for
Al Areen.

[7] In the weeks prior to this payment, Avenue Ventures issued
invoices to both AAHC and another entity controlled by Person J,
both in the amount of $250,000.  Emails from Person J's attorney,
however, specifically requested that Zuberi issue the invoice to
AAHC.

extradition to the United States and get government support for a Ukrainian investment fund in the wake of Russia's military incursion.

Defendant's illegal lobbying activity on behalf of foreign interests generated over $9 million in income that he failed to report.  The two-level enhancement unquestionably applies.

V.    **ZUBERI DERIVED MOST OF HIS UNREPORTED INCOME FROM FRAUD**

Most of Zuberi's unreported gross income was derived from defrauding clients and business associates.  Zuberi (1) converted money that he promised to route towards for political contributions (≈$1.35 million), (2) converted money intended for the Sri Lankan lobbying effort (perhaps roughly $5 million),[8] (3) failed to pay lobbying and public relations firms retained in furtherance of the Sri Lankan effort (≈0.5 million), (4) defrauded U.S. Cares investors (≈$7 million), and (5) inflated expense reimbursement requests to his client from Bahrain, Person J (≈0.5 million).

---

[8] Zuberi initially promised the Sri Lankans that he would spend $2.25 million per quarter for lobbying, public relations, and legal expenses which would total $9 million in one year.  The price for Zuberi's personal services was not stated, but Zuberi clearly misdirected the funds transmitted to WR, the entity with whom Sri Lanka had contracted, into his personal bank account. Representatives of the Sri Lankan government complained, terminated the contract, and discontinued payments.  In the end, Zuberi spent only about $0.8 million on behalf of the Sri Lankan lobbying effort and kept the remainder, about $5.7 million.

Zuberi would be entitled to some markup for his efforts, however.  His associate, who prepared the costs estimates with Zuberi, told him that an appropriate markup for coordination of the lobbying efforts might be 15 percent but Zuberi responded that he wanted a 100 percent markup.  The actually markup Zuberi reaped was closer to 700 percent.

A.   ZUBERI'S ENTIRE BUSINESS OPERATION WAS PREMISED ON FRAUD

It is difficult to any identify income generated by Zuberi that did not involve a backdrop of fraudulent representations.  Zuberi's ability to obtain introductions to wealthy clients, politicians, and business associates often began with false representations concerning his pedigree, education, experience, business, investment successes, and financial condition.[9]

Zuberi lied about his family's history and wealth claiming that his father had earned a fortune as principal executive of RJ Reynolds at the time of its merger with Nabisco and, upon his death, left Zuberi's mother with $18 million.  In fact, Zuberi's father worked in public relations for Philip Morris.  An analysis of Zuberi's mother's bank accounts reveal that she had about $108,450 in financial resources during the period 2012 through 2015, primarily derived from pension, social security, and interest income.

Zuberi also claimed that he reaped $50 million in profits by investing $25,000 in Tesla prior to its initial offering in January 2010.  The financial accounts of Zuberi and his spouse reveal no such wealth, but rather a net worth of approximately $1.5 million as of January 1, 2012.[10]

Zuberi went to great lengths to convince clients that Avenue Ventures was a large and successful venture capital firm.

---

[9] For an example of how Zuberi portrayed himself publicly, see https://en.wikipedia.org/wiki/Imaad_Zuberi

[10] Net worth as of January 1, 2012 was used due to the availability of financial records and may include money Zuberi obtained from foreign sources.

In 2011, Zuberi claimed to be a "Partner" of "Avenue Ventures, LLC," headquartered at 600 West 9th Street, Los Angeles, California.  By 2013, Zuberi claimed to be "Vice-President," or "Vice-Chairman" of Avenue Ventures, a global venture capital firm that had closed $15 billion in financial deals, with offices in Los Angeles, New York, Washington, D.C., London, Dubai, Riyadh, Mumbai, Hong Kong, and Shanghai.  Zuberi told clients and business associates that he was one of several owners or partners in Avenue Ventures.  He engaged in correspondence with clients that linked them to a variety of email accounts ending in avenueventure.com that were all supposedly used by officers and employees of Avenue Ventures.

In reality, Avenue Ventures was merely a name used by Zuberi to conduct personal business dealings.  Zuberi created no legal entity with the Avenue Ventures name until 2014.  Zuberi opened no bank accounts using the Avenue Ventures name until 2014.  Both before and after the creation of these accounts, Zuberi instructed clients to wire payments to Avenue Ventures that were actually bank accounts in his own name.  "Avenue Ventures" had no officers, other than Zuberi and his spouse, and no employees in a legal sense.  Avenue Ventures had no physical address.  The Los Angeles address referenced above was merely a condominium where Zuberi and his spouse resided. Later, Zuberi had clients direct their mail to an address on Rush Street in South El Monte, California that was actually a Chinese herbal medicine and acupuncture supply company run by his sister-in-law.

A typical device utilized by Zuberi to convey that he ran a large, thriving business was to engage in multi-party email conversations with fake employees that were actually alter egos of

Zuberi.  Person P testified that Zuberi had him create

avenueventure.com email addresses for fictitious individuals and

link them to Zuberi's personal phone.

The most frequent fake personage utilized by Zuberi, and

perhaps his spouse,[11] was "Renee Wu."  No witness contacted by the

government ever met "Renee Wu."  A search of law enforcement

databases reveal no such person.  Zuberi bank records reflect no

payments of salary or expenses to any "Renee Wu."  According to

Person P, Zuberi occasionally lied to third parties saying that he

and Person P had met with Renee Wu.

Another common fake personage used by Zuberi was "Robert Reed."

As in the case of Wu, no evidence demonstrates the existence of any

such person.  On the contrary, on one occasion, Zuberi inadvertently

ended an email from "Robert Reed" with the closing, "imaad."

On some occasions, Zuberi was able to convince a few people

perform work for Avenue Ventures on an *ad hoc* basis and he paid them

sporadically.  For example, in 2013, Zuberi convinced an

acquaintance to perform some work for Avenue Ventures as its "Senior

Executive Vice-President."  As the "Senior Executive Vice-President"

testified:

> Q:  . . . was that your understanding that you had a
> position, an officer position with Avenue Ventures?
>
> A:  That was always a to be delivered. That was a -- that
> was what we were to get to. Right? My -- I didn't have a
> contract with them as yet. You know, my view of this or
> understanding of this is okay, we need to sort of figure

---

[11] The initials of Zuberi's spouse are the obverse of Renee Wu.
Both are Chinese ethnic names.  Correspondence involving Person P in
2014 reveals that Zuberi directed him to pick up a check at the El
Monte address from "Renee Wu."  Person P testified that he travelled
to the address and received if from Zuberi's spouse.

out what we have here, get it structured, get something in place. This was what was promised.

Q:   Okay.

A:   One of the reasons I wound up bailing out is it wasn't and wasn't really comfortable with how things were going. Yeah.

Q:   Do you consider that you were -- do you consider yourself as having been an employee of Avenue Venture?

A:   No, not in -- not in the -- not formally. I was there was no contract. There was no paperwork to that extent.

Q:   Did you receive a salary from them?

A:   No. As I say, that is a this is your position, but we need to make it real. We need to get the projects in place and this is what you will have. This is what was promised.

Zuberi used such *ad hoc* arrangements to create the illusion that "Avenue Ventures" operated as a thriving business.  For example, in an effort to convince Person J to wire Zuberi money, Zuberi tasked his "Senior Executive Vice-President" to relay a conversation with non-existent business partners:

Q:   All right. And then there's an email from you?

A:   Uh-huh.

Q:   August 17th to Imaad Zuberi, subject Al Areen press release.

"Imaad, the 15th was last Thursday. The [press] conference announcing our withdrawal from the Al Areen project is ready to go.

The cost and geographic distribution are the same as the first one.

We are under heavy fire from the other partners. What's the plan?

Let me know, preferable today.

Sent from my iPhone."

A:   Right.

Q:   So did you write this email?

A:   I did.

Q:   And in what circumstances?

A:   I remember the circumstances of that which are Imaad had called me and said we need to put pressure on [Person J] to execute the contract and I need you to write him an email and tell him that we're getting pressure -- and I am getting pressure from my other partners. I don't know them. Meaning I don't know them. And here's what you should tell them. Right? Just tell them we're prepared to pull out, we're going to announce this to the world, we're under fire from the pressure, we're under pressure from the other partners -- meaning his partners in Avenue Ventures and what's the plan. And essentially what I think he was looking for there is sort of triangulation third-party validation of the idea that it's not just him pressuring, but there's a real organizational or institutional pressure existing to get the contract done.

Q:   Got it. So let me ask you this: Was the press release announcing the withdrawal ready to go?

A:   I don't -- I don't know. No. Not that I was involved in. Right? Yeah.

Q:   And I take it you weren't involved in any discussions with partners?

A:   No, I was not involved in any discussion.

Q:   And you certainly weren't receiving any heavy fire from anybody else?

A:   No. No.

Q:   So this is just basically you writing what Mr. Zuberi --

A:   Zuberi had asked me to, yes.


B.   ZUBERI DEFRAUDED CLIENTS WITH REPRESENTATIONS THAT THEIR MONEY WOULD BE USED TO MAKE CONTRIBUTIONS TO U.S. ELECTION CAMPAIGNS

Exhibit 13 demonstrates the ultimate use of foreign money transferred to Zuberi for U.S. election campaigns.  As previously discussed in the government's sentencing position regarding defendant's FECA violations, the spreadsheet shows that out of

15

roughly $1.8 million wired to Zuberi from Company B and Person MM,[12] for purposes of influencing U.S. elections, Zuberi converted approximately $1.3 million to his own benefit.  Here, the government provides a few specific examples that demonstrate the applicability of the two-level guideline enhancement for unreported income derived from fraud.[13]

In September 2012, Zuberi solicited Person A, Person C, Person E and their spouses, Person B, Person D, and Person F, to donate $45,000 each to Obama Victory 2012.  These contributions would permit the donors to attend an October 7, 2012 campaign fundraising dinner in Los Angeles that featured the President.  On September 22, 2012, "Robert Reed" wrote,

> "I have blocked seats for six people $45,000 times six equals $270,000.  I will use American Express of Imaad to pay for these today.  I need your remaining two guest's passport and contact information.  Please see attached invoice for your reference."[14]

---

[12] Defendant's solicitation of foreign campaign contributions from Person MM resulted in two wire transfers that Zuberi converted. On April 25, 2012, Person MM wired $40,000 into Zuberi's Dubai bank account for an Obama Victory 2012 event featuring Vice President Biden.  On October 3, 2016, Person MM wired $250,000 into Zuberi's Wells Fargo account in the United States in connection with a Hillary Victory Fund birthday celebration.  After the 2016 election, the parties agreed that the $250,000 donation would be redirected to President Trump's inauguration.  Neither of these contributions ever went to the designated campaigns.  Nor does it appear that Zuberi ever returned the money.

[13] The examples are not exhaustive, but demonstrate the applicability of the enhancement.  As set forth in the government's sentencing position on obstruction, defendant defrauded Person LL of $50,000 in relation to an investment called "Rad Pad" and another $50,000 in relation to an aborted contribution to the 2017 Presidential Inaugural Committee.  Defendant only repaid these funds as part of his effort to stop Person LL from cooperating with law enforcement.

[14] The attached Avenue Ventures invoice falsely claimed to be for "international consulting."

16

On September 24, 2012, Person C and Person E expressed concern that the contribution would be illegal, citing the prohibition on contributions from foreign nationals referenced on the campaign donor forms.  Later that day, Zuberi pressured Person C to pay the invoice, falsely representing that he incurred $270,000 on his credit card to purchase the six tickets and that he was nearing his credit limit.  Zuberi forwarded to Person C a notice from American Express stating that he was nearing his credit limit.  In fact, Zuberi had not yet purchased the tickets and he edited the American Express notice, fraudulently inflating his balance and credit limit from roughly $3,000 and $19,000, respectively, to roughly $270,000 and $300,000, respectively.

Company B paid the $270,000 invoice with wire transfers of $90,000 and $180,000 issued on September 26 and October 1, 2012, respectively.  On October 10, 2012, Company A, a foreign entity owned by Person A that employed Person E, reimbursed Company B for the $180,000 transfer to cover the cost of four tickets.  Zuberi used less than half of the money to make the following political donations:

| Date | Campaign | Donor | Amount |
|------|----------|-------|--------|
| 9/27/12 | Obama Victory 2012 | Person AA | $25,000 |
| 9/27/12 | Obama Victory 2012 | Person AA | $5,000 |
| 9/30/12 | Obama Victory 2012 | Person C | $19,000 |
| 9/30/12 | Obama Victory 2012 | Person D | $25,000 |
| 10/3/12 | Obama Victory 2012 | Person B | $20,000 |
| 10/3/12 | Obama Victory 2012 | Person B | $20,000 |
| Total | | | $114,000 |

Zuberi pocketed the remainder.

In one of the most egregious example of fraud, in February 2013, Zuberi extorted a $100,000 wire transfer by withholding a

photograph of his clients posing with President Obama and Vice-President Biden.  On January 21, 2013, Zuberi wrote,

> "[Y]ou guys were supposed to take only two people for the photo.  These were $250,000 per person with President and Vice President.  I told you by mistake they had put wrong names on the photo line.  When the photo are out they will match it with who went to the photo line versus who paid for them or how many paid.  It won't take long for them to figure this out.  There were four people instream of two.  It will make me look like I am trying to play a fast one with them.  I do not want to take chance with my reputation for a couple hundred thousand dollars. It is not worth it for me and I have too much to lose.  I told them there was a mistake made and to hold our photo until I tell them which one to release and not release.  You need to tell me which two people photo you want released.  Let me make it clear, except for [Person C], both [Person E and Person A] have not paid enough for this specific photo."

Thereafter, Zuberi expertly played Person A and Person C to pay the demanded sum.  He told them they he would pay the money out of his own pocket, but then privately asked Person C to pressure Person A to pay or else he would cut off business ties with Person A.  The scheme ultimately resulted in Person A paying $100,000 to get the photograph.

In fact, out of $750,000 wired by Company A and Company B in connection with the inauguration, Zuberi actually made contributions totaling only $257,500.  He then obtained refunds from the inauguration committee of $160,000, making the actual expenses incurred only $97,500.  Zuberi incurred no significant additional expenses in connection with procuring the photograph.  The withholding of the photograph was merely a fraudulent device to obtain additional illicit income.

### C.  A PORTION OF ZUBERI'S INCOME FROM SRI LANKAN LOBBYING EFFORTS WAS PROCURED THROUGH FRAUD

The April 26, 2014 contract between Sri Lanka and WR required the payment of $8,500,000.  Discussions leading up to the execution of the contract contain representations that Zuberi would direct most of that money to pay incurred expenses relating to legal, lobbying, and public relations work.  In reality, Zuberi incurred less than $1,000,000 in expenses relating to the effort and pocketed the remainder for himself.  As a result, Sri Lanka terminated the agreement and paid only $6,500,000 of the contracted amount.

According to Zuberi's "Senior Executive Vice President," Zuberi purposely inflated the expenses he intended to incur.  On March 5, 2014, prior to execution of the contract, Zuberi informed the Sri Lankan government that he expected to incur costs of $2,250,000 *per quarter* consisting of $1,500,000 in lobbying expenses, $500,000 in legal expenses, and $250,000 for media buys.  Zuberi interviewed lobbyists and public affairs firms to determine estimated costs that amounted to $2,000,000 to $3,000,000 *per year*.  Zuberi asked for a reasonable mark up for Avenue Ventures' profit margin and the "Vice President" replied, "15 percent."  Zuberi responded that the markup should be 100 percent and ultimately determined that he would boost the contract amount to about $9,000,000.

Ultimately realizing that Sri Lanka had been short-changed, Sri Lanka officials declined to make the final two payments of one million dollars each as required by the contract.  The first signs of disagreement began in July 2014, when a Pakistani official, who participated in brokering of the deal, asked for an accounting.  On July 25, 2014, Zuberi falsely replied, "the money is not with me but

19

with the entity that signed the contract.  If the Sri Lankans want the money back then they need to ask the people with whom they signed the contract."  Realizing that the first two payments had been paid without appropriate traceability, Sri Lanka insisted that payments be directed to WR, the entity that executed the contract. Faced with this insistence, Zuberi merely directed his proxy to siphon off the money from WR and transfer it to other companies controlled by Zuberi.

After Sri Lanka stopped issuing payment, Zuberi cast blame for the failure of the project upon Sri Lankan officials.  In November 2014 email, Zuberi wrote, "You didn't let us manage these consultants correctly and now no one is doing anything.  I agree you are not getting your money's worth."

Zuberi also defrauded subcontractors who worked on the Sri Lanka lobbying effort.  At Zuberi's direction, BGS retained lobbyists and public relations firms to work on the project. However, many invoices submitted by these subcontractors remained unpaid and several complained.  In response, Zuberi falsely led the subcontractors to believe that the lack of payment was due to Sri Lanka's failure to make the final two payments on the WR contract and because of inadequacies on the part of Person P, who he falsely claimed was in control of the money.  On October 20, 2014, Zuberi told one subcontractor, "we need to get payment from SL to pay."  On November 3, 2014, Zuberi told another subcontractor, "They have not paid for September or October. Please deal with [Person P] on this and not me."

While it was true that Sri Lanka balked at making the final two payments under the WR contract, the actual reason subcontractors

were not paid was because Zuberi direct Person P to route money to companies controlled by Zuberi that had nothing to do with the Sri Lankan lobbying effort.  Zuberi converted these funds to his own personal use.

### D. ZUBERI DEFRAUDED U.S. CARES INVESTORS

From September 28, 2013 through March 11, 2014, U.S. Cares investors wired approximately $7,000,000 into Zuberi's personal bank accounts for the ostensible purpose of applying for a license from the Office of Foreign Assets Control ("OFAC") permitting it to export food, medicine, and medical supplies from the U.S. to Iran.

Zuberi revealed his intent to defraud his investors from the onset of this enterprise.  Defendant made false representations designed to pressure at least one investor to transfer funds into defendant's accounts.  In a series of December 2013 emails, defendant and Renee Wu, defendant's alter ego, falsely informed Person N that investment spots were closing because of the high degree of interest from other investors and reiterated that fiction by falsely claiming he was having difficulty reconciling amounts received from Person N because of the high number of deposits received from other investors.  In fact, defendant's accounts received no other investment funds in December 2013.  Moreover, defendant continued to solicit and receive money from other investors well after Person N's investment.

The contract, or operating agreement, that defined the terms of the investment required the placement of investor funds into a U.S. Cares capital account.  Instead, defendant instructed his victims to transfer funds into his personal bank accounts.  Defendant falsely assured Person N that he would place investor funds into a U.S.

Cares capital account, stating: "we need repatriate the $750,000 to USCares here."  However, defendant did not transfer any of the funds received from U.S. Cares investors into a U.S. Cares capital account as required by the operating agreement, but instead converted these funds to his own benefit.  Most of the funds were used to purchase real estate in the names of limited liability corporations owned by Zuberi and his spouse, payoff mortgages, make investments in Zuberi's personal brokerage accounts, pay Zuberi's personal taxes, and payoff Zuberi's personal credit card debt (much of which had incurred expenses related to contributions to political campaigns and other political entities).

Other than incurring approximately $200,000 in costs in connection with retaining attorneys and submitting an application to OFAC, defendant took no steps to apply investor funds to the project.  When sanctions against Iran were lifted in January 2016, rendering the business plan essentially moot, defendant made no efforts to refund investor money.  In February 2016, when OFAC determined that the proposed transactions "appear to be generally authorized," defendant made no efforts to implement the project.

E.   ZUBERI INFLATED EXPENSE REIMBURSEMENT REQUESTS PAID BY PERSON J

Person J was Zuberi's largest benefactor, having transferred over $8.5 million to Zuberi during the period September 2012 through October 2015.  Person J paid Zuberi roughly $2 million to support his effort to defraud the U.S. Congress in connection with the Al Areen lobbying efforts.  He transferred roughly $3 million to Zuberi as an investor in U.S. Cares.  As Exhibit 8 reveals, most of the remaining money transferred from Person J, approximately $3.5

million, appears to have compensated Zuberi for consulting work and to reimburse expenses incurred.  Zuberi fraudulently inflated about $500,000 of these expenses and reaped a windfall when Person J paid them.

On March 5, 2013, Zuberi directed an Avenue Ventures $1,196,598 invoice to a company affiliated with Person J.  The invoice sought $400,000 for payments to a former U.S. military official who Zuberi had enlisted to support the Al Areen lobbying effort, $250,000 for payments to another former U.S. military official who Zuberi enlisted to support various development projects in the Middle East, and $350,000 for a pledge to the Islamic Center of San Gabriel Valley ("ICSGV") in connection with its grand opening.  On March 7, 2013, Person J personally paid the entire $1,196,598 invoice by wire transfer.  Person J had previously paid Zuberi $50,000 in November 2012 to fund a contribution to the ICSGV.

Zuberi never incurred all these financial expenses.  Prior to his becoming aware of the government's investigation,[15] he paid only $156,250 to the first former U.S. military official and only $125,000 to the second.  He paid only $290,000 to the ICSGV.  Thus, out of $1,050,000 paid by Person J in connection with these three items, Zuberi incurred expenses of only $571,250.

//

//

---

[15] On February 2, 2018, Zuberi paid the first former U.S. military official another $100,000.

## VI.  **CONCLUSION**

The USPO correctly has calculated Zuberi's guideline level for his tax evasion scheme as a level 30, with enhancements for its tremendous scope, sophisticated nature, underlying criminal activity, and obstruction.  Without acceptance of responsibility, the resulting range is 97 to 121 months imprisonment.  With a reduction for acceptance of responsibility, the resulting range is 70 to 87 months imprisonment.

As previously argued, the guideline calculations do not adequately reflect the aggravating circumstance of Zuberi's tax offense.  Zuberi engaged in several different FARA and fraud crimes that gave rise to the income he concealed.  This case is an especially egregious one that merits significant punishment for the tax offense in addition to punishments imposed by the Court for Zuberi's FECA and FARA violations.