THOMAS P. O'BRIEN, State Bar No. 166369
IVY A. WANG, State Bar No. 224899
NATHAN F. BROWN, State Bar No. 317300
BROWNE GEORGE ROSS LLP
801 South Figueroa Street Suite 2000
Los Angeles, CA 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808
E-mail: tobrien@bgrfirm.com

EVAN J. DAVIS, State Bar No. 250484
HOCHMAN SALKIN TOSCHER PEREZ P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212-3414
Telephone: (310) 281-3200
Facsimile: (310) 859-1430
E-mail: davis@taxlitigator.com

Attorneys for Defendant
IMAAD SHAH ZUBERI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>       Plaintiff,<br><br>   vs.<br><br>Imaad Shah Zuberi,<br><br>       Defendant. | Case No. LACR19-00642-VAP<br><br>The Hon. Virginia A. Phillips<br><br>**DEFENDANT ZUBERI'S OBJECTIONS TO THE PRESENTENCE REPORT** |

# **TABLE OF CONTENTS**

**Page**

I.   Introduction ................................................................................ 1

II.  Foreign Agents Registration Act ............................................... 1

    A.   Mr. Zuberi Did Not Create WR Group or Beltway Government Services to Conceal His Foreign Connections from the U.S. Government ......................................................................... 2

    B.   Mr. Zuberi's Use of Proceeds of the Sri Lanka-WR Contract Was Not Improper .................................................................. 3

III. Tax Evasion ............................................................................... 4

    A.   Mr. Zuberi's Tax Loss Was Substantially Less than $7,694,109 ........... 4

    B.   Mr. Zuberi's Conduct Did Not Constitute "Sophisticated Means" ........ 4

IV.  Federal Elections Campaign Act ............................................... 6

    A.   Mr. Zuberi Engaged in Less than 117 Contributions that Violated FECA ............................................................................. 7

        1.   Contributions in the Name of Others ............................................. 7

            a.   Person AA ......................................................... 8

            b.   Other Contributors ............................................ 9

        2.   Reimbursements of the Contributions of Others ...................... 12

        3.   Reimbursements from Others for His Own Contributions ......... 12

    B.   The Total Amount of Contributions in Violations of FECA Is Substantially Less than the $756,858 Alleged in the Information ........ 13

    C.   The Contributions, Even if Violations of FECA, Were Not Clearly Based on Foreign Funds ........................................ 14

V.   Non-Relevant Conduct .............................................................. 16

    A.   Bahrain ................................................................................ 17

    B.   Pakistan ............................................................................... 19

VI.  Offense Level Calculation ......................................................... 19

VII. Conclusion ................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page (s)**

**Cases**

*Emily's List v. Fed. Election Comm'n*,
  581 F.3d 1 (D.C. Cir. 2009)............................................................. 13

*McConnell v. Fed. Election Comm'n*,
  540 U.S. 93 (2003), overruled on other grounds by *Citizens United
  v. Fed. Election Comm'n*, 558 U.S. 310 (2010) .................................. 13

*United States v. Hart*,
  324 F.3d 575 (8th Cir. 2003) .............................................................. 5

**Statutes**

18 U.S.C. § 3553(a)(2) ............................................................................ 1

22 U.S.C. § 611..................................................................................... 2

22 U.S.C. § 612..................................................................................... 1

52 U.S.C. § 30101 (8)(A)(i)................................................................... 12

52 U.S.C. § 30116(a)(8) ................................................................. 10, 11

52 U.S.C. § 30121................................................................................ 14

Federal Election Campaign Act.................................................*passim*

Foreign Agents Registration Act ..............................................*passim*

USSG §2T1.1(b)(2) ................................................................................ 4

USSG §2B1.1....................................................................................... 14

USSG §2C1.8(b)(1) .............................................................................. 14

USSG §2C1.8(b)(2)(a)..................................................................... 16, 18

I.      **Introduction**

On January 24, 2020, the U.S. Probation Office ("USPO") filed its Presentence Investigation Report ("PSR").  (Dkt # 58.)  In the PSR, the USPO calculated a total offense level of 29 for Mr. Imaad Zuberi and criminal history category of I, which results in an advisory guideline range of 87 to 108 months. However, taking into account the nature and circumstances of the offenses, the seriousness of the offenses, Mr. Zuberi's history and characteristics, respect for the law and the need to protect the public/deter criminal activity, and the desire for a just punishment, the USPO found 60 months to be sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2).  (Dkt # 57.)

Mr. Zuberi does not object to the USPO's recommended downward variance from the advisory guideline range, but does object to the initial determination of an offense level of 29.  Specifically, Mr. Zuberi objects to: (1) the aggregate amount of violations of the Federal Election Campaign Act; (2) foreign-sourced Federal Election Campaign Act contributions; (3) the total amount of tax loss; and (4) whether Mr. Zuberi's tax offense involved sophisticated means.  In light of analysis below, the USPO should only apply an offense level of 27.  In addition, Mr. Zuberi would like to correct certain factual misstatements in the PSR that do not affect his guideline calculations but portray an inaccurate picture of Mr. Zuberi's character and conduct.

II.     **Foreign Agents Registration Act**

Mr. Zuberi objects to several of the assertions in the paragraphs underlying the Foreign Agents Registration Act ("FARA") allegations (Paragraphs 18-27). Under FARA, "[n]o person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto . . . ."  22 U.S.C. § 612.  However, the terms "foreign principal" and "agent" have very specific meanings under FARA that would limit this statute's application to Mr. Zuberi's alleged behavior.

Within the construct of FARA, a "foreign principal" includes:

> (1) a government of a foreign country and a foreign political party; (2) a person outside of the United States, unless it is established that such person is an individual and a citizen of and domiciled within the United States, or that such person is not an individual and is organized under or created by the laws of the United States or of any State or other place subject to the jurisdiction of the United States and has its principal place of business within the United States; and (3) a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country.

22 U.S.C. § 611.  Additionally, not every American citizen who interacts with a foreign principal is considered an "agent" of that principal.  A person is required to register as an "agent of a foreign principal" under FARA if the person:

> (i) engages within the United States in political activities for or in the interests of such foreign principal; (ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal; (iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or (iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States[.]

22 U.S.C.A. § 611.

Undoubtedly, Mr. Zuberi is an American citizen who has extensive business interactions with various foreign individuals and entities.  However, for the reasons discussed below, not every action by Mr. Zuberi described in the PSR would qualify as a violation of FARA.  Ultimately, Mr. Zuberi admits that he did not register under FARA in a timely and complete manner, but Mr. Zuberi would offer certain clarifications to the facts asserted in the PSR regarding his FARA registration.

**A.** **Mr. Zuberi Did Not Create WR Group or Beltway Government Services to Conceal His Foreign Connections from the U.S. Government**

Mr. Zuberi objects to the allegation in Paragraph 21 of the PSR that Mr. Zuberi directed Person P to create Beltway Government Services ("Beltway") and WR Group "to insulate and conceal his own involvement" *from the government of*

*the United States.*  He concealed his involvement from entirely different countries.

Mr. Zuberi agrees that Beltway and WR Group were created to provide separation from Mr. Zuberi and his primary corporate entity, Avenue Ventures. However, this separation was not intended to conceal his involvement from the government of the United States, but from the governments of Pakistan, India, Bangladesh and Sri Lanka.  Since their independence, the countries of Pakistan, India, Bangladesh, and Sri Lanka have had an uneasy relationship.  Often substantial business ties in one of the countries, particularly with the government, can have significant negative repercussions on business opportunities in the other nations.

At the time of the Sri Lanka-WR contract, Mr. Zuberi and Avenue Ventures already had significant business connections throughout Pakistan and, to a lesser degree, India.  Out of concern that a contract between Mr. Zuberi or Avenue Ventures and the Government of Sri Lanka ("GOSL") would negatively impact his (or Avenue Ventures') existing or future business connections in Pakistan, India, and Bangladesh, Mr. Zuberi created Beltway and WR Group to provide some level of separation between Avenue Ventures and the GOSL.  This separation was not designed to avoid compliance with FARA regulations.

**B.     Mr. Zuberi's Use of Proceeds of the Sri Lanka-WR Contract Was Not Improper**

Mr. Zuberi objects to the statement in Paragraph 23 of the PSR that Mr. Zuberi "used for his personal benefit" the proceeds of the Sri Lanka-WR Contract as irrelevant to the offense conduct.  There is nothing in the Sri Lanka-WR Contract that would indicate that the mere presence of these funds in accounts controlled by Mr. Zuberi, or even the use of these funds for his personal benefit, would in any way be improper.  Exhibit 1.  There is no restriction in the Sri Lanka-WR Group Contract that would prohibit the funds from being held in accounts controllable by Mr. Zuberi.  *Id.*  Likewise, there is no restriction on how WR Group or Mr. Zuberi was to use the proceeds of the contract.  Even if Mr. Zuberi did use all $6,500,000

DEFENDANT ZUBERI'S OBJECTIONS TO THE PRESENTENCE REPORT

1   earned under the contract for his own personal use, these funds were legitimately

2   earned and could have been distributed by him as he saw fit.

3   **III.   Tax Evasion**

4       Mr. Zuberi objects to several of the alleged facts discussed in the PSR

5   underlying the tax evasion allegations, as discussed in Paragraphs 28-33, as well as

6   some of the specific offense characteristics as determined in Paragraphs 83-97.

7       **A.   Mr. Zuberi's Tax Loss Was Substantially Less than $7,694,109**

8       Mr. Zuberi does not dispute the allegation in Paragraph 28 that he failed to

9   include all sources of income in his tax returns.  In fact, the Paragraph 28 accurately

10  reflects Mr. Zuberi's tax obligation includes these missing amounts "*less any*

11  *unclaimed business expenses.*"  (emphasis added).  However, Mr. Zuberi objects to

12  the USPO's calculation of a total loss of $7,694,109 in Paragraph 33.

13      In claiming that Mr. Zuberi failed to pay a total of $7,694,109 in taxes from

14  2012-2015, the USPO fails to take into account the unclaimed business expenses

15  and other non-income sources which would substantially decrease Mr. Zuberi's tax

16  obligation.  Exhibit 2 (spreadsheet from Mr. Zuberi's accountants noting that from

17  2012-2015, Mr. Zuberi incurred $2,647,070 in business expenses).  When taking

18  these significant deductions into account, Mr. Zuberi's tax obligation is substantially

19  less than the $7,694,109 claimed in the PSR.  Rather, at total tax loss of $3,590,634

20  is a more accurate calculation when Mr. Zuberi's non-income and expenses are

21  properly extracted.  *Id.*

22      **B.   Mr. Zuberi's Conduct Did Not Constitute "Sophisticated Means"**

23      Mr. Zuberi also objects to the application of the "sophisticated means"

24  enhancement to the 2T1.1 Guideline calculation, as stated in Paragraphs 88 to 91.

25      The USPO asserts that the two-point enhancement under USSG §.

26  2T1.1(b)(2) applies because Mr. Zuberi purportedly instructed Person P to create

27  Beltway and WR "to engage in lobbying and public relations services, open bank

28  accounts for those companies, sign contracts on behalf of Beltway . . . and directed

whom Person P was to pay and not pay on behalf of Beltway and WR, all to insulate and conceal his own involvement with Beltway and WR.  In reality, Beltway and WR acted as alter egos of Zuberi and efforts undertaken by those entities were directed by Zuberi.  Zuberi's sophisticated actions were committed in a manner that allowed him to attempt to evade taxes."

This recitation of the facts supporting the enhancement conflicts with other portions of the PSR.  As noted in Paragraph 23 of the PSR, the first two payments from Sri Lanka, totaling $4,500,000, were wired "**into Zuberi's personal bank account**. . . ."  (emphasis added.)  Such a movement of the majority of money paid by Sri Lanka into accounts in Mr. Zuberi's own name, is by definition not sophisticated.  Paragraph 28 of the PSR reflects his tax crime, namely, that he failed to report on his personal income tax return, the flow-through income from the Sri Lanka-WR contract.  Depositing the funds in accounts in his own name makes it easier, not harder, for the IRS to detect the tax crime.

Further, the Guideline itself requires more of a connection than merely "allowing him to attempt to evade taxes."  Instead, it requires that a defendant use sophisticated techniques to hide his identity.  Application Note 5 states "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."

Case authority supports that hiding one's identity from the IRS is required for the government to demonstrate the sophisticated means enhancement applies.  For example, *United States v. Hart*, 324 F.3d 575 (8th Cir. 2003), involved arguably more-sophisticated actions by a defendant, but the Eighth Circuit focused exclusively on whether the sophisticated actions hid the defendant's income from the IRS.  A lengthy quotation is helpful, because it underscores that Mr. Zuberi's open actions of depositing $4.5 million in his own account do not qualify as

1  sophisticated means.

2      The guidelines do not permit an enhancement for any and all offense
3  conduct that conceals an offense. The sophisticated means
   enhancement only applies when a defendant uses "especially complex
4  or especially intricate offense conduct." U.S.S.G. § 2T1.1 cmt. n.4. We
   have unearthed no case which concludes that the mere failure to keep
5  records, standing alone, evinces sophisticated means to conceal tax
   evasion. *Cf. United States v. Furkin*, 119 F.3d 1276, 1285 (7th
6  Cir.1997) (mentioning failure to keep records as one ground for
   sophisticated means enhancement in case which also involved
7  defendant's use of fictitious names, destruction of records, and cash
   purchases of equipment without preparing an inventory or advising
8  accountants of the cash purchases). We can think of no less
   sophisticated means of concealing a tax evasion offense than by simply
9  failing to keep records of personal income. We recognize the lack of
   records made it extremely difficult for the government to calculate the
10 total loss attributable to Hart's tax evasion. But extreme difficulty in
   calculating the tax loss can stem from unsophisticated means. The mere
11 fact the tax loss was difficult to calculate does not prove sophisticated
   means were used to conceal the offense.

12     Nor do we believe this is a case in which Hart's failure to keep records
13 can be combined with other factors to justify a sophisticated means
   enhancement. In addition to the lack of record keeping, the district
14 court relied on the fact that Hart directed Plaza Motors to issue the
   personal income commission checks in the name of Midtown Motors.
15 The fact Hart directed the commission checks be made payable to
   Midtown Motors, rather than himself personally, did not result in
16 concealment of the offense. Hart provided his corporation's tax
   identification number to Plaza Motors, and Plaza Motors reported all of
17 its commission payments to the government on Form 1099s. *Cf. United
   States v. Elton*, 69 F.3d 542, 1995 WL 649696, at **1 (8th Cir.1995)
18 (unpublished table disposition) (upholding sophisticated means
   enhancement where defendant transferred income to and from a non-
19 interest-bearing checking account because the conduct generated no
   1099 Forms for filing with the IRS). Neither Hart nor Midtown Motors
20 filed tax returns for the income reported by Plaza Motors. Thus, the
   government clearly had notice of a potential offense. While Hart may
21 have mis-classified the nature of the payments when the payments were
   disclosed to the government, he took no steps to conceal the income.
22 The government could trace all of the income back to Hart through his
   corporation's tax identification number.

23     Finally, the district court relied on the transfer of the commission
24 checks to a private banker. This conduct, however, also resulted in no
   concealment of the offense. Hart's subsequent use of such a bank-like
25 conduit could not conceal the disclosure that had already taken place
   when the government received the Form 1099s reporting all of Hart's
26 commission income from Plaza Motors.

27 **IV.**   **Federal Elections Campaign Act**

28     Mr. Zuberi objects to several of the alleged facts discussed in the PSR

1    underlying the FECA allegations, as discussed in Paragraphs 34-38, as well as some

2    of the specific offense characteristics as determined by the USPO in Paragraphs 98-

3    110.

4         A.    **Mr. Zuberi Engaged in Less than 117 Contributions that Violated**

5               **FECA**

6         According to the PSR, in 2015 Mr. Zuberi allegedly engaged in three separate

7    types of FECA violations:  (1) contributions in the name of others; (2)

8    reimbursements for the contributions of others, and (3) receipt of reimbursements

9    from others for his own contributions.  ¶ 34.  While Mr. Zuberi agrees that some of

10   his political contributions were violations of FECA, Mr. Zuberi objects to the claim

11   in Paragraph 38 that he made or solicited over 117 transactions in violation of

12   FECA.

13        The 117 transactions appear to be derived from the government's FECA

14   Violation spreadsheet, which was also produced to Mr. Zuberi in discovery.  Exhibit

15   3.  The government's spreadsheet identifies 123 campaign contributions between

16   April 2012 and October of 2016 that allegedly involved Mr. Zuberi in some fashion.

17   In its calculations, the USPO appears to have subtracted five contributions in the

18   name of Person AA that were financed from a joint account between Mr. Zuberi and

19   Person AA, as well as one additional transaction that is not immediately apparent,

20   resulting in 117 alleged violations.  Exhibit 4 (email from AUSA Daniel O'Brien

21   explaining the significance of "unbolded" entries on the FECA Violation

22   Spreadsheet).  However, the total number of contributions that actually violated

23   FECA is substantially less than 117.  Based on the analysis below, at most only 78

24   of the identified contributions could have violated FECA (73 in the names others,

25   three reimbursements by Mr. Zuberi, and two reimbursements of Mr. Zuberi).

26        1.    **Contributions in the Name of Others**

27        Paragraph 35 of the PSR claims that Mr. Zuberi "knowingly and willfully

28   made campaign contributions in the name of other individuals by making online

1   contributions with credit cards belonging to himself and his spouse." Of the 123

2   contributions identified on the FECA spreadsheet, 109 are contributions in the name

3   of others that were allegedly funded from an account associated with Mr. Zuberi.

4   Of the 109 contributions in the names of others, 53 were made in the name of

5   Person AA.

6             **a.**       **Person AA**

7          On the FECA spreadsheet, the government identifies 53 contributions made in

8   the name of Person AA that were financed from accounts allegedly belonging to Mr.

9   Zuberi.  As described above, the USPO has subtracted five contributions in the

10  name of Person AA that were financed from joint accounts between Mr. Zuberi and

11  Person AA, or from Person AA's own account.  Exhibit 4.

12         The vast majority of the contributions made in the name of Person AA were

13  financed from Mr. Zuberi's credit cards.  The government alleges that since these

14  cards were in the name of Mr. Zuberi, this violated FECA.  However, while Mr.

15  Zuberi may have been the primary cardholder on these accounts, on at least one card

16  Person AA was also an authorized user on the account, and shared the same credit

17  card number as Mr. Zuberi.  Declaration of Nathan F. Brown ¶ 6.  The FECA

18  spreadsheet identifies a $5,000 contribution from Person AA to the Campaign DD

19  on September 27, 2012.  The spreadsheet claims that this contribution was financed

20  by Mr. Zuberi's Chase credit card..  However, Person AA also had her own Chase

21  credit card with the exact same card number.  Declaration of Nathan F. Brown ¶ 6.

22  Like the five contributions discussed above, this donation was financed from an

23  account shared by Person AA, and should be removed from the tally of FECA

24  violations.

25         In its calculations, the USPO did not count any contributions in the name of

26  Person AA that were financed directly from a joint account between her and Mr.

27  Zuberi at USC Credit Union.  The USPO did count all contributions made from Mr.

28  Zuberi's credit cards, regardless of the source of payment on those credit cards.

However, upon review of the financial records for Mr. Zuberi's credit cards, it is clear that at least some of expenses on his cards were paid for by the joint USC Credit Union account.  For example, Person AA's $25,000 contribution to the Campaign DD on September 27, 2012 and two $2,600 contributions to Campaign D by Person AA on April 22, 2013 appear to have been paid for by cards belonging to Mr. Zuberi, but these cards were in turn paid off by the joint account at USC Credit Union.  Exhibits 5-6.  Therefore, even though Mr. Zuberi's credit card may have been the card that ultimately enabled the contribution, the funds used to finance the contribution came from an account belonging to both Mr. Zuberi and Person AA. For the same reason the USPO did not consider Person AA's contributions from her joint USC Credit Union account to be FECA violations, the USPO should not consider Person AA's contributions facilitated by credit cards financed from that joint account as FECA violations.

If the USPO subtracts the contributions which were sourced directly or indirectly from Person AA's joint accounts with Mr. Zuberi, at most only 44 of the 53 identified contributions in the name of Person AA could be considered FECA violations.

### b.    Other Contributors

In addition to the 53 campaign contributions attributed to Person AA, the FECA spreadsheet identifies an additional 56 campaign contributions attributed to various other individuals that were allegedly financed by Mr. Zuberi.  Exhibit 3. These contributions appear to have been financed primarily through credit cards associated with Mr. Zuberi or his wife.  *Id.*

Under FECA, in certain circumstances, a contributor can directly or indirectly "earmark" a contribution to a clearly identified federal candidate, which is to be received and facilitated through a conduit or intermediary.  52 U.S.C. § 30116(a)(8). In such situations, a conduit or intermediary can help facilitate the contribution of another through reimbursements without violating FECA.  *Id.*

Using this construct, some of the contributions identified on the FECA spreadsheet should not be considered a violation of FECA, as Mr. Zuberi only acted as a conduit or intermediary to help valid contributors provide funds to the campaigns.  Generally, Mr. Zuberi would act as a conduit or intermediary by making the initial payment on his credit card, which was often on file with the campaigns, and would be reimbursed by the contributor after the fact.  For example, in his interview with the government, Person GG told investigators that he did not have his credit card available when he was going to make four contributions in January of 2014, and he asked Mr. Zuberi to make them for him with Mr. Zuberi's credit card.  Exhibit 7.  Person GG said he later reimbursed Mr. Zuberi with cash. *Id.*

Other individuals would similarly use Mr. Zuberi as a conduit or intermediary and would reimburse Mr. Zuberi from wire transfers.  For example, the government's own FECA spreadsheet indicates that wires from Company B were used to reimburse Mr. Zuberi for seven contributions made on behalf of Person C and his wife, Person D.  Person C testified before the grand jury that he was aware that Mr. Zuberi would make contributions on Mr. Zuberi's credit card, and Person C would reimburse him for these contributions via wire transfer.  Exhibits 8-9.

Likewise, the spreadsheet also indicates that a wire from Company A[1] was used to reimburse Mr. Zuberi for at least two contributions made on behalf of Person B.  Person B told government investigators that she approved an additional nine contributions to be made in her name by Mr. Zuberi.  Exhibit 10.  Person B further explained that her husband, Person A, would then wire funds to Mr. Zuberi to reimburse him for the contributions.  *Id.*  Because these 18 contributions were

---

[1] Mr. Zuberi now recognizes that Company A and Company B are foreign corporations, but for reasons explained in Section IV.C, at the time, Mr. Zuberi believed payments from Company were valid reimbursements on behalf of U.S. citizens.

1  made at the behest of the identified contributors, who antecedently or subsequently

2  reimbursed Mr. Zuberi for the payment, they were valid earmarked contributions

3  and should not be considered FECA violations.  52 U.S.C. § 30116(a)(8)

4          Person P, Mr. Zuberi's former employee, has also testified that Mr. Zuberi

5  handed Person P his credit card and asked Person P to make four contributions using

6  Mr. Zuberi's card.  Exhibit 11.  Mr. Zuberi does not deny that this took place.

7  However, Person P never stated, at least in the portion of his transcript that has been

8  provided to Mr. Zuberi, that he did not reimburse Mr. Zuberi for the use of Mr.

9  Zuberi's credit card – for example, by reduced payments of his salary from Mr.

10 Zuberi.  *Id.*  Therefore, the government has produced insufficient evidence to show a

11 lack of reimbursement, as Mr. Zuberi often did with his other earmarked

12 contributions.

13         At least one of the allegedly improper contributions also appears to be a

14 simple filing error.  The April 27, 2012 contribution from Person BB to Campaign A

15 seems to have simply misidentified Mr. Zuberi's spouse.  Mr. Zuberi and his wife,

16 Person O, would often simultaneously make contributions to various candidates.

17 Often, the paperwork for these contributions would be made through an intern in

18 Mr. Zuberi's company or at the campaign.  Like Person BB, Mr. Zuberi also made a

19 contribution to Campaign A on April 27, 2012.  However, there is no record of

20 Person O making a contribution on that date.  However, if one were to conduct a

21 simple Google search of "Imaad Zuberi" and "spouse" the top hit incorrectly

22 identifies the spouse of Imaad Zuberi as Person BB.  Exhibit 12.  Based on these

23 circumstances, it is likely that Mr. Zuberi instructed either his own intern or one at

24 Campaign A to file a contribution in his own name and that of his wife, but the

25 intern or staffer did not know or forgot Person O's real name.  A quick Google

26 search likely resolved the issue for the staffer, who inadvertently included the wrong

27 name.  Mr. Zuberi should not be held responsible for the misfiling of this

28 contribution.

Accordingly, of the 109 alleged FECA violations for contributions made in the names of others, at most only 44 of the contributions from Person AA and 29 of the contributions from other individuals could be counted as FECA violations.

## 2. Reimbursements of the Contributions of Others

Paragraph 36 claims that Mr. Zuberi "knowingly and willfully solicited and reimbursed conduit contributors for campaign contributions they had made." The government's FECA spreadsheet identifies four potential contributions that were allegedly reimbursed by Mr. Zuberi. Mr. Zuberi objects to the inclusion of the May 5, 2015 contribution by Person JJ. Person JJ has never claimed that she was reimbursed by Mr. Zuberi for her contributions. Rather, Person JJ had an ongoing business relationship whereby Mr. Zuberi often covered her expenses. Exhibit 13. Person JJ stated that any payments made by Mr. Zuberi to her were done so in exchange for various services performed, or to cover expenses unrelated to political contributions. *Id.* Person JJ informed the government that she made donations in her own name, but simply used Mr. Zuberi's donor code. *Id.* Therefore, at most, only three of these contributions included impermissible reimbursements.

## 3. Reimbursements from Others for His Own Contributions

Paragraph 37 claims that Mr. Zuberi "knowingly and willfully solicited and accepted reimbursements from other individuals for campaign contributions he made."

Mr. Zuberi objects to the claim that the November 5, 2013 contribution to Campaign AA was a violation of FECA. FECA is designed to regulate contributions which could influence election for *federal office*. 52 U.S.C. § 30101 (8)(A)(i). However, "[d]onations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 122 (2003), overruled on other grounds by *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *see also, Emily's List v. Fed. Election Comm'n*, 581 F.3d 1, 20 (D.C. Cir. 2009). As noted in

the Information, this campaign contribution solely involved a state, not federal, campaign. As such, even if the Information is correct that Person J reimbursed Mr. Zuberi for this contribution, because this contribution was for a state rather than a federal campaign, the laws of Virginia apply to this contribution rather than FECA. Therefore, as a matter of law, this contribution cannot violate FECA.

Mr. Zuberi also objects to the inclusion of contributions in his name or his wife's name from May 22-23, September 27, and December 27 of 2012, January 15 and January 30, 2013, and October 22, 2015, as these were simply donations that Mr. Zuberi or his wife made with funds they procured through his business transactions. As discussed above, Mr. Zuberi often received wire transfers from citizens abroad that would include reimbursements for the political contributions of the citizens abroad as well as compensation for Mr. Zuberi for various business expenses and investments. The government has not shown how any of these wired funds were directed by the provider to reimburse Mr. Zuberi for his *own* existing or future contributions. Rather, once Mr. Zuberi had sufficient liquidity based on his income from the contracts, he and his wife decided to make contributions of their own volition. The mere fact that Mr. Zuberi made money off contracts with foreign individuals does not mean that he cannot use the proceeds of his labor to then provide political contributions without running afoul of campaign finance laws.

Based on these arguments, these eight contributions should not be considered violations of FECA, and should not count towards Mr. Zuberi's sentencing guideline calculation. In total, this would result in, at most, only 78 FECA violations: 73 contributions in the name of others, three contributions reimbursed by Mr. Zuberi, and two reimbursements of Mr. Zuberi's contributions.

**B.** **The Total Amount of Contributions in Violations of FECA Is Substantially Less than the $756,858 Alleged in the Information**

Mr. Zuberi objects to the allegation in Paragraph 38 that he "made or solicited $756,858" worth of transactions in violation of FECA. As an initial matter, the

1   $756,858 appears to be based on the government's FECA violation spreadsheet.

2   The government has explained that it attempted to exclude contributions made in

3   Person AA's name from Mr. Zuberi's joint account with his mother, which are

4   unbolded contributions in column F.  Exhibit 4.  At the bottom of Column F, the

5   government excludes $17,700 from the total of Person AA's contributions.  Exhibit

6   3.  However, the sum of the five unbolded contributions is $20,200, not $17,700.

7   Therefore, this amount is off by at least $2,500.

8          This amount is further reduced once the analysis from the previous section

9   removes the amounts of all contributions that do not violate FECA.  Using the

10  analysis above to subtract all contributions that do not violate FECA, the total

11  amount of all contributions that legitimately violate FECA is only $262,050.  Using

12  this new amount, the proper offense level under USSG §2C1.8(b)(1) and USSG

13  §2B1.1 is a 12-level rather than a 14-level increase.

14         **C.**   **The Contributions, Even if Violations of FECA, Were Not Clearly**

15               **Based on Foreign Funds**

16         Mr. Zuberi objects to the allegation in Paragraph 38 that claims that $472,808

17  of the alleged FECA violations were reimbursed or paid in advance by foreign

18  nationals.  Under 52 U.S.C. § 30121, a foreign national is prohibited from directly

19  or indirectly making "a contribution or donation of money or other thing of value, or

20  to make an express or implied promise to make a contribution or donation, in

21  connection with a Federal, State, or local election . . . ."  For the purposes of FECA,

22  a foreign national is defined as "an individual who is not a citizen of the United

23  States or a national of the United States . . . and who is not lawfully admitted for

24  permanent residence . . . ."  *Id*.  The government has only identified two sources of

25  the identified contributions that were alleged foreign nationals:  Company A on

26  behalf of Person A, and Company B on behalf of Person C, who is a U.S. Citizen.

27         Mr. Zuberi was aware that foreign nationals could not, on their own,

28  contribute to the campaigns of American politicians.  However, as a "bundler" for

various campaigns, Mr. Zuberi had previously assisted U.S. citizens who were married to foreign nationals in their attendance of various political functions in which a campaign contribution was bundled into an overall ticket price for the event. *See, e.g.*, Exhibit 14. In these situations, Mr. Zuberi had worked closely with campaign officials who had regularly approved foreign nationals accompanying their U.S. citizen spouses to these functions. *Id*.

For example, on April 10, 2012 Person C emailed a copy of his wife's Kuwaiti passport to a represetative of Campaign DD, in order to secure entrance to a dinner with the an American politician. *Id.* Even though the campaign representative knew that Person D was not a U.S. Citizen, the campaign representative approved both Person C and Person D to attend the dinner. *Id.* Mr. Zuberi was copied on all of this correspondence. After Person C wired a portion of his contribution, the campaign representative reminded Mr. Zuberi that Person C *still needed to pay for the contribution* for his foreign national wife. Exhibit 15. Later in the year, the campaign representative directly reached out to Person C, once again copying Mr. Zuberi, to invite him to another dinner with a different American politician. Exhibit 16. The campaign representative told Person C that he could bring a guest, and Person C later testified that he brought his wife to this function. Based on his experience where a political campaign repeatedly accepted contributions from a foreign spouse, Mr. Zuberi was under the impression that a U.S. citizen and a foreign spouse could each purchase tickets to these political fundraisers.

The Information accurately states that Person A is a foreign national and a citizen of Saudi Arabia and the United Kingdom. However, Person A is married to Person B, a citizen of the United States. As described above, Mr. Zuberi would often help facilitate the contributions of U.S. citizens when they did not have their method of payment readily available, and he would be reimbursed for the use of his credit card. The government has not identified any funds that were provided

directly from Person A to Mr. Zuberi, and only three wire transfers that originated from Company A.  While Mr. Zuberi was aware that he received the wires from Company A, he always thought that the funds were designed to reimburse him for the legitimate contributions of Person B, or for what he believed to be legitimate political event ticket purchases of Person B and Person A as a couple.

Likewise, the Information also accurately states that Person C is an American citizen.  Therefore, any money that Person C provided to contributions cannot be considered "foreign" under FECA.  Admittedly, Company B is a company headquartered in Kuwait.  Mr. Zuberi has subsequently learned from the government that Company B is wholly owned by Person C's wife, Person D, who is a Kuwaiti citizen.  While Mr. Zuberi was aware of Person D's citizenship, he was not aware that she was the sole owner of Company B.  Rather, since Mr. Zuberi's frequent business and personal transactions with Company B had always been with Person C, who is the CEO and Chairman of the company, he had always reasonably assumed the company was owned by Person C, regardless of where it may be headquartered.  Although the money for Person C's contributions may have gone through Company B to reimburse Mr. Zuberi, it was always Mr. Zuberi's understanding that these funds were not foreign, as they belonged, ultimately, to Person C, a U.S. citizen.

Since Mr. Zuberi relied on his previous experience that it was permissible for American citizens to make contributions in their own names as well as the names of their spouse, and all allegedly foreign funds identified by the government can be tied to Person C and Person B, both of whom are American citizens, the USPO should not apply a two-level increase under USSG § 2C1.8(b)(2)(a) for involving foreign nationals.

## V.   **Non-Relevant Conduct**

Although they do not affect the USPO's offense level calculation, Mr. Zuberi objects to several statements in the portion of the PSR entitled "Offense Behavior

1  Not Part of Relevant Conduct" as mischaracterizing the nature of Mr. Zuberi's

2  conduct.  In order to provide the Court with an accurate depiction of Mr. Zuberi's

3  character and conduct, Mr. Zuberi makes the following objections to the non-

4  relevant conduct described in Paragraphs 122-165 of the PSR.

5       **A.**    **<u>Bahrain</u>**

6       Mr. Zuberi objects to the characterization of an "anti-Bahrain lobbying effort"

7  as described in the PSR.  The PSR erroneously claims that the "anti-Bahrain

8  lobbying effort" was an attempt to "get former and current U.S. government

9  officials to apply pressure on the Bahrain government to release [Person J's] assets

10  and allow for the development of Al Areen." ¶ 123.  Admittedly, Mr. Zuberi, as an

11  investor in Al Areen through Avenue Ventures, did have a vested interest in

12  allowing the Al Areen project to proceed.  With this motivation, he did ask

13  government officials to ask Bahraini officials not to unjustly block the further

14  development of his project.  However, his motivation was never to solely benefit

15  Person J, but to ensure there were no unjust impediments to the development of his

16  legitimate investment in Al Areen.

17       Further, the "harassment" referred to in Paragraph 133 and the various letters

18  from government officials was not a reference to any harassment of Person J, but

19  was a reference to harassment that Mr. Zuberi experienced at the hands of Bahraini

20  officials during a visit in early 2013.  While traveling by car across the Bahraini

21  desert to an Al Areen construction site, the car carrying Mr. Zuberi was stopped by

22  Bahraini police officers without any justification.  For nearly two and a half hours,

23  Mr. Zuberi was falsely detained without any probable cause in a scorching desert

24  with no viable method of escape.  Upon his return to the United States, Mr. Zuberi

25  was incensed at the harassment he had been forced to endure at the hands of the

26  Bahraini police, and in response he contacted several members of Congress to

27  express his extreme displeasure with his treatment.  *See,* Exhibits 17-24.  It was this

28  unsavory episode that served as the impetus of the various Congressional letters to

-17-

the Foreign Minister of Bahrain complaining about the treatment of U.S. citizens (which could not have included Person J as he is not a U.S. citizen).  *Id.*

Mr. Zuberi objects to the claim in Paragraph 127 that a signing ceremony for the partnership agreement between Avenue Ventures and Al Areen Holding Company was "staged" and "no such agreement was executed."  To the contrary, both entities signed the Stock Purchase Agreement, which was notarized in both the United States and the United Kingdom.  *See*, Exhibit 25; Declaration of Nathan F. Brown ¶ X.

Mr. Zuberi objects to the suggestion in Paragraphs 128-129 of the PSR that the partnership agreement with Al Areen was not legitimate.  Mr. Zuberi stressed to Person J the importance of getting documents signed because the contract between Avenue Ventures and Al Areen would need to be registered and locally recorded in Bahrain to be complete.  Mr. Zuberi's statements do not call into question the legitimacy of the contract, but merely show Mr. Zuberi's urgency to finalize the paperwork to ensure the success of his investment.

Mr. Zuberi objects to the claim in Paragraph 131 of the PSR that he was required to register under FARA for his activities to help his own investment in Al Areen.  As described above, Mr. Zuberi's intention in contacting members of Congress was not an attempt to "engage[] within the United States in political activities for or in the interests of such foreign principal," which would require FARA registration, but rather an attempt to prevent unjust disruption of his own investment, to respond to the unprofessional behavior he had been subjected to at the hands of Bahraini officials, and to ensure further harassment would not continue on future business development in Bahrain.  None of the expenses listed on the invoices identified in Paragraph 131 were for any type of lobbying or other political activity on behalf of a foreign principal.  If any political activity was undertaken, it was to secure the interests of Mr. Zuberi, a U.S. citizen, or Avenue Ventures, a U.S. company, as described in Mr. Zuberi's message quoted in Paragraph 131.

### B.     Pakistan

Mr. Zuberi objects to the suggestion in Paragraphs 157-158 that his payment for Person NN's travel costs to London was improper.  As discussed in Paragraph 158, Person NN traveled to meet with Person J in furtherance of a business contract. While Mr. Zuberi did initially pay for Person NN's travel, he was merely fronting Person J's payment for that travel, and was later reimbursed by Person J for those expenses.

Mr. Zuberi also objects to the claim in Paragraph 160 that he paid the graduate school tuition of a female journalist in Pakistan as a benefit to Person NN. Mr. Zuberi was interested in hiring the journalist, who is well-known in Pakistan, to work for his family's group of television stations in Pakistan.  Mr. Zuberi's $25,000 contribution to her tuition was an effort to boost her competency to handle this position with his family's stations.  Mr. Zuberi was unaware that Person NN was in any type of personal relationship with the journalist, and therefore did not intend it as a benefit to Person NN.

Mr. Zuberi also objects to Paragraphs 161 and 163, as they are completely irrelevant to Mr. Zuberi's own conduct with respect to Pakistan.  Person NN's failure to disclose financial benefits, or Person NN's efforts to author a policy statement regarding helicopters, are completely irrelevant to Mr. Zuberi's involvement with the Pakistani government.

The government has identified a single email in which Mr. Zuberi asked Person NN for a U.S. government official's email address on behalf of a Pakistani government official.  While this exchange may have occurred, the simple forwarding of an email message should not be sufficient to consider Mr. Zuberi an "agent of a foreign principal" for the purposes of FARA.

### VI.   Offense Level Calculation

Based on the analysis above, the USPO should revise the offense level calculation as follows:

| | Tax | FECA |
|---|---|---|
| BASE OFFENSE LEVEL: | 24 | 8 |
| SPECIFIC OFFENSE CHARACTERISTICS | +2[2] | +14[3] |
| ROLE IN THE OFFENSE | 0 | 0 |
| VICTIM ADJUSTMENT | 0 | 0 |
| OBSTRUCTION OF JUSTICE | +2 | +2 |
| ADJUSTED OFFENSE LEVEL | 28 | 24 |
| MULTIPLE COUNT ADJUSTMENT | +2 | |
| CAREER OFFENDER | 0 | |
| ACCEPTANCE OF RESPONSIBILITY | -3 | |
| TOTAL OFFENSE LEVEL | 27 | |

## VII.   Conclusion

The USPO should revise the above addressed factual claims and guideline calculations in line with the above arguments prior to final publication.

DATED:  March 23, 2020                  BROWNE GEORGE ROSS LLP
                                                            Thomas P. O'Brien


                                           By:        /s/ Thomas P. O'Brien
                                                          Thomas P. O'Brien
                                            Attorneys for Defendant Imaad Shah Zuberi

---

[2] This two-level enhancement includes the enhancement for $10,000 or greater of income derived from criminal activity, but not sophisticated means.

[3] This 14-level enhancement includes the two-level enhancement for greater than 30 contributions in violation of FECA, but only a twelve-level enhancement for the value of the contributions in violation of FECA, and no enhancement for foreign sources.