NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2468
    Facsimile: (213) 894-2927
    E-mail:    daniel.obrien@usdoj.gov
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. CR 19-642-VAP |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| IMAAD SHAH ZUBERI, | |
| Defendant. | Date: June 1, 2020<br>Time: 9:00 a.m.<br>Courtroom: 8A |

Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby submits its response to defendant Imaad Shah Zuberi's objections to the Presentence Report ("PSR").

An under seal declaration of Assistant United States Attorney Daniel J. O'Brien in support of this position, with exhibits, will be filed concurrently with this document.

Dated: April 13, 2020           Respectfully submitted,

                                NICOLA T. HANNA
                                United States Attorney

                                BRANDON D. FOX
                                Assistant United States Attorney
                                Chief, Criminal Division

                                      /s/
                                _____
                                DANIEL J. O'BRIEN
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.    INTRODUCTION...................................................1

II.   DEFENDANT'S FARA OBJECTIONS ARE WITHOUT MERIT.................1

      A.    ZUBERI CONCEALED HIS LOBBYING FROM THE UNITED STATES, NOT
            PAKISTAN...............................................1

      B.    ZUBERI DEFRAUDED THE SRI LANKAN GOVERNMENT.............3

III.  DEFENDANT'S TAX LOSS CALCULATIONS ARE FRIVOLOUS.............4

      A.    ZUBERI'S TAX LOSS IS NOT OVERSTATED....................4

            1.    Zuberi's Fraud Against U.S. Cares Investors Generated
                  Income...........................................5

            2.    Zuberi's Claim that Most of Person J's Transfers
                  Represent Unspecified Investments Lacks Any
                  Evidentiary Support..............................8

            3.    The Government Has Already Credited Zuberi for his
                  Itemized Business Expenses......................10

      B.    ZUBERI'S TAX OFFENSES WERE SOPHISTICATED..............10

IV.   DEFENDANT CANNOT VALIDATE HIS FECA OFFENSES................100

      A.    ZUBERI'S UNLAWFUL CONTRIBUTIONS EXCEED $550,000.........10

            1.    Person J.........................................11

            2.    Person AA.......................................11

            3.    Person GG.......................................14

            4.    Person JJ.......................................16

            5.    Person P........................................16

            6.    Person BB.......................................17

      B.    CONTRIBUTIONS WERE FUNDED BY PROHIBITED FOREIGN SOURCES
108

V.    DEFENDANT DID NOT INVEST AL AREEN..........................23

VI.   DEFENDANT'S PAYMENTS TO BENEFIT A U.S. OFFICIAL IN
      PAKISTAN ARE GRATUITIES, NOT FARA VIOLATIONS.................24

i

VII. **CONCLUSION**..................................................25

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

The government disputes defendant's objections to the PSR. Most of the objections are baseless and frivolous; some are dishonest.  The PSR's sentencing guideline calculations are correct.

**II.   DEFENDANT'S FARA OBJECTIONS ARE WITHOUT MERIT**

A.   <u>ZUBERI CONCEALED HIS LOBBYING FROM THE UNITED STATES, NOT PAKISTAN</u>

Zuberi falsely asserts that he intended to conceal his Sri Lankan lobbying efforts from Pakistan, India, and Bangladesh,[1] not the United States.  The government set forth in its FARA Brief[2] Zuberi's overarching motives in concealing his lobbying efforts. Zuberi's version of events is without evidentiary support,[3] directly contradicted by his interactions with a senior Pakistani official in as part of the Sri Lankan lobbying effort, and logically absurd.

The involvement of a senior Pakistani official in the Sri Lankan lobbying effort flatly contradicts Zuberi's claim that he sought to conceal his lobbying activities from the Pakistani

_____

[1] Defendant provides no evidence as to his business connections with any of these countries.  The government concedes that defendant engaged in a lobbying effort in the U.S. with respect to Overseas Private Investment Corporation ("OPIC") loans for the development of Pakistani wind power; the government is unaware of any business interests by defendant in India or Bangladesh.  Defendant largely concedes these facts stating that he had Indian connections only "to a lesser degree" and mentions Bangladesh only with respect to "future business connections."

[2] This Response references the government's prior sentencing positions filed with the Court on December 16, 2019, March 17, 2020, March 18, 2020, and March 20, 2020, as its Obstruction Brief, FARA Brief, FECA Brief, and Tax Brief, respectively.

[3] Defendant submits no evidence to support his claim that "business ties in one of the countries, particularly with the government, can have significant negative repercussions on business opportunity in the other nations."

government.  Zuberi enlisted the help of a Pakistani Government Minister, who was also a member of the Pakistani Senate, to convince Sri Lankan officials to contract for Zuberi's lobbying services. From November 28 through December 2, 2013, and again, from February 8 through February 12, 2014, the Pakistani Minister travelled to Sri Lanka with Zuberi and met with high-ranking Sri Lankan officials. (Exhibit 1; Exhibit 2: p. 62-63)  In January 2014, Zuberi repeatedly included the Pakistani official in correspondence that discussed inviting members of the U.S. Congress to visit Sri Lanka and having a Sri Lankan delegation visit with U.S. officials in Washington, D.C.  (Exhibit 3)  In May 2014, Zuberi forwarded draft versions of the Sri Lankan contract to the Pakistani Minister.  (Exhibit 4)  In June 2014, the Pakistani Minister was included in correspondence issued by Sri Lankan officials as they discussed deliverables in furtherance of the lobbying contract.  (Exhibit 5: BGS 2757-58)  In July 2014, the Pakistani Minister asked Zuberi for a commission as well as an accounting of disbursed funds.[4]  (Exhibit 5: BGS 1089-93, 1132-38, & 1036-49)

Zuberi's claim that he sought to conceal lobbying efforts from Pakistan and other South Asian governments because of frictions with the Sri Lankan government ignores his repeated violations of FARA with respect to countries in other parts of the world.  Zuberi secretly lobbied the U.S. Congress on behalf of the Turkish and

---

[4] In response, defendant lied to the Pakistani official claiming that the money was in the hands of WR and BGS, accused him of soliciting bribes, relayed information indicating that the official had accused Zuberi of converting money to his own benefit, and then offered to pay the official if he would apologize.  (BGS Selected Production.)

Libyan governments as well as Ukrainian, Saudi, and Bahraini
entities and individuals.  (FARA Brief, pp. 7-21.)

Even if the Court somehow embraced Zuberi's factual claim that
he wished to conceal his activities from other countries, it does
not rebut the fact that he concealed these activities from the
United States government.  FARA required Zuberi to file information
with the U.S. Government, not other nations.  Such FARA filings are
publicly available.  Thus, a desire to conceal information from one
foreign government would necessarily require concealment from the
U.S. Government and the American people.  At best, defendant could
only argue that he constructed WR Group ("WR") and Beltway
Government Strategies ("BGS") to conceal his lobbying from multiple
countries, including the United States.

B.   <u>ZUBERI DEFRAUDED THE SRI LANKAN GOVERNMENT</u>

Zuberi falsely asserts that he was entitled to keep all the
money distributed by the Sri Lankan government.  His claim that the
contract does not prohibit Zuberi taking the money ignores his
repeated false statements and inducements to Sri Lankan officials
that convinced them to sign the contract and pay invoices.

The government's Tax Brief cites concrete examples of Zuberi's
fraud against the Sri Lankan government.  Zuberi promised to spend
the overwhelming majority of Sri Lankan funds on lobbying, public
relations, and legal fees.  (Exhibit 2: p. 54-63, Exs. 173 & 174)
Zuberi failed to pay subcontractors who performed such services
thereby terminating their completion of assigned tasks.  (Exhibit 6:
BGS 663, 855-56; Exhibit 7)  Zuberi diverted funds that Sri Lankan
officials insisted be directed to WR, the contracting party.
(Exhibit 8: WRG 409-12, 337; Exhibit 7)  When the Pakistani Minister

3

asked for an accounting, Zuberi falsely asserted, "Again, the money is not with me but with the entity that signed the contract.  If the Sri Lankans want the money back then they need to ask the people with whom they signed the contract." (Exhibit 6: BGS 506-10.)

Zuberi's argument that he was entitled to 100 percent of the disbursed funds demonstrates a complete disconnect between his understanding of honest business practices and those required by the law and ethics.  This disconnect speaks to his character and brings into question his acceptance of responsibility.

**III.  DEFENDANT'S TAX LOSS CALCULATIONS ARE FRIVOLOUS**

A.   ZUBERI'S TAX LOSS IS NOT OVERSTATED

After signing a civil closing agreement with the Internal Revenue Service ("IRS") that stipulates to a tax loss of $7,299,556, Zuberi argues that this loss is substantially less for criminal purposes.  Zuberi's claim that the tax loss should only be $3,590,634 does not alter the relevant guideline calculations because the sentencing guidelines bracket losses between $3,500,000 and $9,500,000.

Defendant's stipulation should be sufficient to establish by a preponderance of the evidence the criminal loss figure as $7,299,556.  More importantly, Zuberi's attempts to lower the tax loss are premised upon three false claims: the money he stole from U.S. Cares investors constitutes "non-income," 75 percent of funds he received from Person J represent investments, and the closing agreement did not consider $2,647,070 in business expenses.

4

1.   <u>Zuberi's Fraud Against U.S. Cares Investors Generated Income</u>

Defense Exhibit 2, p.2 sets forth transfers into Zuberi's accounts, totaling $7,119,494,[5] for investments in U.S. Cares. Defense Exhibit 2, p. 1 characterizes $5,119,494 of this money as "non-income deposits."  This amount represents roughly $2 million received from Person N and his Company H, and $3 million received from Person J in connection with U.S. Cares.[6]

All but about $200,000 of this money was income to Zuberi because he fraudulently converted the money.  The government previously summarized this fraud (Tax Brief, pp. 21-22 and Exhibit 9A), and now highlights the following additional evidence:

- Defendant and Renee Wu (defendant's alter ego) falsely informed Person N that investment spots were closing and that Zuberi was having difficulty reconciling amounts received because of the high number of deposits received from other investors.  On December 6, 2013, Zuberi said, "Hello, [Person N]- Here is the promissory note for you to sign for the remainder of the $1,250,000 after you wire $500,000 this Monday.  Please make sure the deadlines are met because we have lot of interest from other people.  The huys (sic) are asking me why I am holding place for you when we have people ready to invest today." (Exhibit 9: 1898)  On December 25, 2013, Renee Wu told [Person N], "Imaad told me you have wired or deposited $1.75 million into Emirates NBD and Bank of America accounts.  Can you please email me how much you deposited in each account?  There have

---

[5] The government largely accepts defendant's figures.  However, defendant characterizes the $199,814 transferred on May 28, 2013 as an investment from Person N while the government sees only a transfer between Zuberi controlled accounts.  Also, defendant notes the return of $2 million to investors in 2017 even those these returns occurred after defendant became aware of the government's investigation.  The Government discussed these partial repayments in its Obstruction Brief.

[6] The Government has been notified by defense counsel that defendant does not seek to back out the $2 million received from Person M through his business, Company G.

5

been many deposits into these accounts recently, I want to make sure we associate those deposits and wire to you." (Exhibit 9: 1894-95) In a December 25, 2013 email, Zuberi told [Person N], "For the $750,000 in deposits in AED [Emirati Dirham], we got high number of deposits in Emirates NBD, when we take them apart and reconcile all the deposits we get AED 2.7 million for you. Would this be correct?" (Exhibit 9: 1896-97)

In fact, defendant's accounts received no other investment funds in December 2013. (Defense Exhibit 2) Rather than impose deadlines, defendant continued to solicit and receive money from other investors after Person N's investment. Avenue Ventures issued a $2,000,000 invoice to [Person M's Company G]" for "US Cares capital infusion" on December 17, 2013. (Exhibit 10) On January 28, 2014, Person M's Company G transferred $2,000,000 to Zuberi's Emirates account. (Defense Exhibit 2)

- The U.S. Cares operating agreement required the segregation of investor funds. Avenue Ventures was required to maintain a capital account for each investor. The funds were required to be "held in the name of the Company," "not be commingled with those of any other Person," and "used only for the business of the Company." (Exhibit 11: ZUB 8906) In his December 25 email, Zuberi confirmed that notwithstanding the transfers into his personal overseas accounts, investor funds would be segregated in a U.S. Cares bank account, stating, "we need repatriate the $750,000 to USCares here." (Exhibit 9: RS 1896-97)

In actuality, Zuberi transferred investor funds from his foreign accounts to his personal U.S. bank accounts. Zuberi routed the entirety of the $499,592 received from Person J in October 2013 from Zuberi's Barclays account into Zuberi's Emirates account.[7] This transfer, added to the deposits from Person M and Person N, increased the balance of the Zuberi's Emirates account to approximately $3,200,000 by the end of January 2014. Zuberi then transferred all of these funds to his personal accounts in the United States in three installments and spent the money as follows: (Exhibit 12)

On February 6, 2014, ZUBERI wired $1,500,000 of the investment funds to his Bank of America account for the "purchase of real

---

[7] Zuberi's Barclays (Dubai) account, into which Person J's $499,592 was deposited, was closed with the issuance of a $510,735 check on November 7, 2013 made payable to Zuberi. On January 8, 2014, Zuberi deposited the check into his Emirates (Dubai) account.

estate."  (Exhibits 12 & 13) Over the next two weeks, Zuberi converted the funds as follows:

>     $512,376.03 to pay off a JP Morgan Chase mortgage on Zuberi's Clary property;[8]
>     $600,000 to Zuberi's personal brokerage accounts;
>     $250,000 to Bill Clinton (cashiers check deposited into a Clinton Foundation account);
>     $79,361 to Zuberi's American Express card (mostly campaign contributions & travel expenses).
> (Exhibit 13)

On April 10, 2014, Zuberi wired $700,000 of the investment funds to his Bank of America account to "payoff mortgage." Over the next two weeks, Zuberi expended the funds as follows:

>     $480,000 to Zuberi's personal brokerage accounts;
>     $178,546 to Zuberi's American Express card (mostly campaign contributions & travel expenses);
>     $16,520 to the IRS to pay personal income taxes.
> (Exhibit 13)

On October 12, 2015, Zuberi wired the remaining $1,000,000 of the investment funds to Seright Escrow in connection with the purchase of Zuberi's McCulloch property. (Exhibit 12)

- Similarly, Zuberi converted almost the entirety of investor funds wired directly into his U.S. bank account.

Zuberi disbursed the $1,222,988 transfer from Person J on November 20, 2013, the $500,000 transfer from Person N on December 10, 2013, and the $500,000 transfer from Person N's Company H on December 24, 2013 prior to the end of the year as follows:

>     $1,550,000 to Zuberi's personal brokerage accounts;
>     $200,000 to Zuberi's spouse's checking account which then transferred the funds to her personal brokerage accounts;
>     $182,642 to Zuberi's American Express card (mostly campaign contributions & travel expenses);
>     $100,000 check to Zuberi;
>     $50,000 cashier's check to the Smithsonian Institution;
>     $31,250 to a former U.S. military official;

---

[8] All real properties referenced in this Memorandum were owned by limited liability corporations that were in turn owned by Zuberi and/or his spouse.  Zuberi included these properties as personal assets in the PSR.

$10,823 to Zuberi's Chase credit card;
$10,777 to Zuberi's Chase credit card.
(Exhibit 14)

Zuberi converted the $500,000 received from Person J on February 21, 2014 as follows:

$400,000 to Zuberi's personal brokerage accounts;
$73,526 to Zuberi's American Express card (mostly campaign contributions & travel).
(Exhibit 13)

Zuberi converted the $832,145 received from Person J on March 11, 2014 as follows:

$700,000 to Zuberi's personal brokerage accounts
$56,000 to Zuberi's American Express card (mostly campaign contributions & travel expenses)
(Exhibit 13)

- Other than issuing two $90,000 payments to a law firm, defendant took no steps to apply investor funds to the project. (Exhibit 15)

- When sanctions against Iran were lifted in January 2016, rendering the business plan essentially moot, defendant made no efforts to refund investor money. In February 2016, when OFAC determined that the proposed transactions "appear to be generally authorized," defendant made no efforts to implement the project. (Exhibits 16A & 16B)

- Both Person M and Person N have complained that Zuberi refused to return their money. One hired a law firm to threaten a lawsuit. The other sought the help of a Zuberi associate to convince him to return the money. (Obstruction Brief) Zuberi returned only half of the money to these two investors and only after he became aware of the government's criminal investigation. (Defense Exhibit 2)

    2. <u>Zuberi's Claim that Most of Person J's Transfers Represent Unspecified Investments Lacks Any Evidentiary Support</u>

In another attempt to reduce the scope of his income tax evasion, Defense Exhibit 2 claims that 75 percent of all non-U.S. Cares transfers from Person J represent funds "held for investments." Defendant does not identify the nature of these

8

investments nor provide any underlying documentary support for their existence.

Defendant has lied so much he can no longer keep his lies straight.  He claims that 75 percent of the $1,999,980 he received from Person J in 2015 (i.e. $1,499,985) wasn't income, but rather "held for investments."  (Defense Exhibit 2)  Yet, when defendant filed his 2015 tax returns, he actually reported the entire $1,999,980 as income.  Defendant's return for Avenue Capital Group ("ACG") reported $2,259,979 in total income.  (Exhibit 17A)  A reconciliation of ACG's bank records show total deposits of the same amount, $2,259,979, in 2015.  The overwhelming bulk of that money originated from Person J in the form of two wire transfers of $1,000,000 and $999,980.  (Exhibit 17B)

The government wishes to avoid burdening the court with additional documents to demonstrate that money defendant received from Person J represented income.  The calculations now at issue were accepted by defendant in a civil closing agreement with the IRS, accepted by the Probation Office ("USPO") in the PSR, and make no difference to the sentencing guideline calculations.  The government has submitted a summary of all monetary transfers from Person J to defendant with citations to the underlying documentary support.  (Tax Brief Exhibit 8.)[9]  The summary identifies approximately $3 million invested in U.S. Cares that Zuberi converted, $2 million in payments for services related to the Al Areen scam, $3 million in consulting fees and expense

---

[9] The government will provide the underlying documents to rebut any further submissions from defendant on this issue.

reimbursements, and $500,000 in fraudulent expenses reimbursements. All these amounts represent income to Zuberi.

### 3. The Government Has Already Credited Zuberi for his Itemized Business Expenses

Defendant complains that the income calculations fail to consider business expenses that total $2,647,070. The government has already credited defendant for these expenses. As an example, defendant claims $681,385 in expenses for 2013. (Defense Exhibit 2) The government's tax calculations includes these same expenses plus an additional $180,000 for defendant's expenses relating to U.S. Cares. (Exhibit 18: p. 5)

### B. ZUBERI'S TAX OFFENSES WERE SOPHISTICATED

Defendant argues that transfers routed through WR and BGS cannot support a sophisticated means enhancement because Sri Lanka directed the first two payments directly to defendant's personal bank account. The government concedes that the initial transfers into defendant's account were not sophisticated. However, once Sri Lanka insisted that funds be issued to the contracting party, Zuberi engaged in sophisticated efforts to funnel the money into his own accounts without detection by the IRS. Moreover, defendant engaged in other sophisticated efforts to evade taxes on income generated through other schemes. (Tax Brief, pp. 3-8)

## IV. DEFENDANT CANNOT VALIDATE HIS FECA OFFENSES

### A. ZUBERI'S UNLAWFUL CONTRIBUTIONS EXCEED $550,000

Defendant has submitted an assortment of objections to the FECA violations enumerated in the PSR. The government groups its response by each supposed contributor.

10

1      1.   Person J

2      The defense wishes to eliminate contributions paid by Person J,

3 a foreign national, from the PSR's tally by claiming FECA does not

4 prohibit foreign contributions to state election campaigns.[10]

5 Defense counsel is wrong on the law.[11]   FECA prohibits contributions

6 made, directly or indirectly, by foreign nationals in connection

7 with any election – federal, state, or local.   52 U.S.C.

8 § 30121(a)(1)(A).[12]

9      2.   Person AA

10     With respect to Person AA's contributions, the government bears

11 some responsibility for creating an issue that defendant chose to

13 ───────────────

14     [10]   The precise amount of campaign contributions intentionally
funded by Person J is uncertain.   FECA Brief Exhibit 1 only
demonstrates an express agreement to reimburse $25,000 of $200,000
15 in contributions and draws an inference as to the rest.   The PSR
only included $25,000 in its tally.

17     Tax Brief Exhibit 8 shows that the wire from Person J was
payment for defendant's Al Areen lobbying services.   Given
18 defendant's explanations to others as to the importance of campaign
contributions, Person J likely intended to pay defendant for
19 consulting services, but with knowledge that a portion of the money
would be used to make contributions.   In such a case, the money
20 would constitute both illegal campaign contributions and taxable
income without an offsetting expense deduction.   Under 26 U.S.C. §
21 162(e)(1), no deduction is allowed for any lobbying or political
expenditures paid in connection with influencing legislation,
22 participating in any political campaign, influencing the public with
respect to elections or legislative matters, and any direct
23 communication to influence senior executive official actions.   Under
26 U.S.C. § 162(c)(2), any illegal payment, including illegal
campaign contributions, are not deductible as business expenses.

25     [11] Defense counsel's citation to *McConnell v. Fed. Election
Comm'n*, 540 U.S. 93, 122 (2003) is non sequitur.   The reference
26 provision in the former FECA statute pertained to dollar limitations
on contributions, not prohibitions on foreign contributions.

27     [12] The $25,000 contribution is illegal for two reasons: it was
paid by Person J and solicited of Person N, both of whom are foreign
28 nationals.

exploit.  To save labor and reduce the scope of litigation, the government initially backed out contributions in the name of Person AA that were paid from joint accounts Person AA shared with defendant.  Defendant seeks to back out additional contributions by tracing to joint accounts the payment of debts incurred on Zuberi credit cards for campaign contributions.  The defense has selectively conducted its tracing effort and achieved an incorrect result.

The government has now traced the sources of payment for Person AA's contributions, discovered some minor errors in its prior submission, and made appropriate changes.[13]  (Exhibit 19)  The net result is that total contributions should be at least $774,358 and at most $954,558.

Much of defendant's argument is premised on USC Credit Union ("USCCU") account xx6700-xx having been identified as a joint account.  (FECA Brief Exhibit 1)  This was an error by the government; in fact, defendant was the sole owner and signatory. (Exhibit 20)

The only bank account jointly held by Person AA and defendant was USC Credit Union account xx6250-xx.  This account received Person AA's retirement and social security checks totaling $108,450 and $330,400 in transfers from defendant's accounts during the relevant timeframe.  (Exhibit 21)  The joint bank account funded two contributions from Person AA: $5,200 to Campaign FF on August 15,

---

[13] The revised version of the FECA violation spreadsheet highlights changes in bold and now totals $954,558.  If the USPO backs out the $175,000 of the contributions to Campaign AA and the $5,400 in contributions to Campaign FF, its new figure should be $774,358.

2013 and $10,000 to Campaign J on August 22, 2014.  A $30,000 transfer from Zuberi's brokerage account funded the $10,000 contribution to Campaign J and should not be backed out.  (Exhibit 21)  The contribution to Campaign FF could have been funded by Person AA's retirement and social security income.  (Exhibit 21)  Even though Person AA's signature on the contribution check appears inconsistent with the signature she provided on account opening documents (Exhibits 22A & 22B), and she would have had to expend all of her retirement income accrued over three months to make the contribution (Exhibit 21), the Court may wish to back out this transaction from the list of FECA violations in an abundance of caution.

Defendant points out that Person AA was an authorized user on Zuberi's Chase credit card xxx7267, which made a $5,000 contribution to Campaign DD on September 27, 2012.  However, the same tracing methodology demonstrates that Zuberi personally paid for this contribution with funds drawn from his personal USC account, xx6700-xx.  (Exhibit 23)[14]

Defendant's attempt to trace the source of two Person AA contributions, $25,000 to Campaign DD on September 27, 2012 and $2,600 to Campaign D on April 22, 2013, from Zuberi's American Express credit card account to a joint account is similarly flawed.

---

[14] Exhibit 23 shows that the balance on the Chase account as of September 21, 2012 was $308.  Adding expenses incurred on the credit card from September 21 to October 3 resulted in a debt of approximately $29,278.78.  A credit to the account and three payments from Zuberi's personal USC bank account between September 27 and October 6 totaled the same amount, $29,278.79.

Both credit card expenses were paid by Zuberi's personal USC account, xx6700-xx.[15]  (Exhibits 24A & 24B)

Moreover, any good faith effort[16] to trace the source of the funds would lead to defendant's overseas clients.  Exhibit 25 traces the origin of all nine Person AA contributions challenged by the defense.  The sources of all but two of the contributions originated from foreign clients, passed though Zuberi accounts, and in some cases through joint accounts held by Zuberi and Person AA before reaching the campaigns.  Two contributions appear to have been paid with Person AA's retirement income, assuming that she was willing to pay the entirely of her social security and retirement income received over a three-month span to pay $5,200 to a Los Angeles Congresswoman's campaign.[17]  That assumption is difficult to make given that the remainder of Person AA's $170,800 in contributions were illegal conduit and foreign transactions orchestrated by defendant.

### 3.  Person GG

Person GG, a cousin of Zuberi, who has no history of making campaign contributions, claims to have reimbursed defendant for

---

[15] The credit card debt incurred by the $25,000 contribution was paid the same day the debt was incurred; otherwise, defendant would have exceeded his credit limit.  This is the same account where defendant forged correspondence with the credit card company to convince clients that he had incurred large debts funding their foreign contributions.  (Tax Brief, pp. 16-17)

[16] Defendant's objection to these transactions lacks good faith.  As set forth in the Tax Brief and FECA Brief, defendant emails show that he solicited and obtained illegal funding for the Campaign DD contribution from his foreign clients.

[17] The government has no evidence that Person AA had any knowledge of the contributions made in her name.

$10,200 in contributions made in Person GG's name.   Contrary to
defense counsel's legal argument, such reimbursements are prohibited
and not valid "earmarks."[18]   Regardless, the government has already
set forth sufficient evidence for the Court to reject Person GG's
claim that on January 27, 2014, he agreed to contribute maximum
amounts, didn't have his credit cards handy, asked Zuberi to front
the money, and either repaid Zuberi with money he kept in an
unspecified drawer in his home or through reductions in salary
payments that don't appear in his bank accounts.   (FECA Brief,

---

[18] Defendant's claim that he conveyed earmarked contributions as
a *designated* intermediary does not constitute a defense.   "For
purposes of the limitations imposed by this section, all
contributions made by a person, either directly or indirectly, on
behalf of a particular candidate, including contributions which are
in any way earmarked or otherwise directed through an intermediary
or conduit to such candidate, shall be treated as contributions from
such person to such candidate.   The intermediary or conduit shall
report the original source and the intended recipient of such
contribution to the Commission and to the intended recipient."   52
U.S.C. § 30116(a)(8).   This provision commonly relates to
fundraising by Political Action Committees, see
https://www.fec.gov/help-candidates-and-committees/filing-
reports/contributions-received-through-conduits, and is subject to
disclosure requirements. 52 CFR § 110.6(c)(1)(iii).   FEC records
demonstrate that defendant made no disclosures of earmarked
contributions.   Moreover, contrary to the circumstances in this
case, the intermediary may exercise no direction over the choice of
the recipient candidate.   52 CFR § 110.6(d).

Contributions made in the name of another, such as those
engaged in by defendant, are criminal offenses.   52 U.S.C. § 30121.
Defendant was well aware of that he could not make donations in the
names of others.   Indeed, he repeatedly lied in connection with
making these donations posing as the contributor online and
certifying, "this donation is made from my own funds and not those
of another." (FECA Brief p. 12.)

Regardless, the government has not included in its calculations
any reimbursed or funneled contributions correctly attributed to the
true source, even when reimbursements occurred after a significant
time lag.   For example, the government did not include a
contribution defendant made in the name of Person LL on June 23,
2015 that Person LL reimbursed on January 7, 2016.

O'Brien Declaration, ¶13)  The only transfers into Zuberi's bank accounts from Person GG are regular $500 per month payments for a car rental that began months prior to the contributions and continued thereafter.  Zuberi's accounts show no pattern of reduced payments to Person GG sufficient to offset the $10,200 in illegal campaign contributions.  (Exhibit 26)

### 4.   Person JJ

Person JJ, a student[19] who had no history of making campaign contributions, claims that the $2,500 in cash she received from Zuberi the day prior to her maximum permitted contribution of $2,700 was for unspecified business services she performed, despite not reporting such income on her income tax returns.  The government has already set forth sufficient evidence for the Court to reject Person JJ's testimony.  (FECA Brief, O'Brien Declaration, ¶14.)

### 5.   Person P

Without submitting any declaration of evidence in support, defendant speculates that Person P may have reimbursed contributions defendant made in Person P's name.  Zuberi suggests, again without evidence, that such reimbursement may have taken the form of reduced salary.

Contrary to defendant's assertion, Person P testified that his contributions were paid by Zuberi.  Zuberi either let him use Zuberi's credit card to make contributions or Zuberi would reimburse Person P for any contributions Person P made.  This is sufficient evidence to meet the preponderance of evidence standard of proof at

---

[19] Defendant's objection mischaracterizes his relationship with Person JJ.

sentencing.   Regardless, the government provides the following additional evidence to refute the unsubstantiated claim that Person P reimbursed Zuberi for contributions funded by Zuberi:

- The campaign committees that received these funds were for the Democratic and Republican ranking members of the House Foreign Affairs Committee.  At the time of the contributions, January 27, 2014, Zuberi was in Washington, D.C. in connection with meetings scheduled on January 27-30, 2014 involving these two Congressmen, 15 other Congresspersons and Senators, and a delegation from Sri Lanka.  (Exhibit 27)

- Person P's financial transactions with Zuberi show no evidence that he reimbursed Zuberi for any campaign contributions nor any salary reduction for Person P in 2014.  In fact, there were thirteen payments of $5,000 that year and Zuberi issued a 1099 for $60,000 in payments that Person P reported on his tax return.  (Exhibit 28) There was an interruption in payments in 2015 but that was based upon a temporary "misunderstanding" with defendant that was quickly resolved.  (Exhibit 29)

6.   Person BB

Zuberi's claim that a campaign staffer may have mistakenly identified Contributor BB through an internet search is pure speculation.  There is no declaration by defendant's spouse that she intended to make the contribution, any explanation as to how the contributor name was incorrectly linked to Zuberi on the internet, or evidence that the internet posting occurred before the contribution rather than the other way around.  There is evidence that Zuberi fabricated the name, because he fabricated another name to the same campaign committee: Margaret [Person C surname].[20]

---

[20] If Person BB's contribution should have been credited to defendant's spouse, the limitations on contributions to Campaign A would have been violated.  The government has discovered another $5,000 contribution in the name of "William W. Rao," referencing employment at CAI and an address in El Monte, to Campaign A.

17

B.    <u>CONTRIBUTIONS WERE FUNDED BY PROHIBITED FOREIGN SOURCES</u>

Zuberi's argument that he was unaware he solicited or received prohibited foreign contributions is absurd.  Zuberi frequently solicited such contributions, concealed the foreign national status of some contributors, manufactured fraudulent invoices to conceal foreign corporation funding of contributions, and continued to make contributions in the name of Person A even after a campaign informed Zuberi that it rejected a contribution from Person A because he was a foreign national.

All of the contributions in the name of Persons A, B, C, D, E, and F identified by the government as FECA violations were funded entirely by Company A, a foreign corporation, by Company B, a foreign corporation, or by Zuberi personally.  Of these individuals, only Person B and Person C were eligible to make campaign contributions and, on occasion, did so with their own funds.  The government has not included these legal contributions in its tally of violations.

The defense is wrong with respect to the definition of a prohibited foreign national because they have omitted half of the statutory definition.  "Foreign nationals" include foreign citizens, immigrants not lawfully admitted for permanent residence, foreign corporations, foreign associations, foreign partnerships, foreign governments, foreign political parties, and any other foreign principal, as defined under FARA.[21]  The defense is equally wrong

---

(Exhibit 19A)  This contribution was funded by the $136,600 Company A wire transfer and has been added to the list of FECA violations.

[21] The FECA provision, 52 U.S.C. § 30121, defines "foreign national" as:

when it states that the foreign status of a corporation is dependent upon who owns the entity; rather, it depends upon where the entity was organized and operates its principal place of business.  (Id.)

Defendant cannot seriously contend that he believed contributions funded by Company A and Company B, foreign entities, were permissible.  First, defendant acknowledged that corporate contributions were illegal, telling Person LL, "it has to be person not from company . . . The contribution has to from personal account."  (Exhibit 33)  Second, defendant received literally hundreds of admonitions that both corporate and foreign contributions were strictly prohibited.  (FECA Brief, pp. 12-14)  Third, defendant issued fraudulent invoices to Company B that

---

"(1)  a foreign principal, as such term is defined by [FARA] section 611(b) of title 22, except that the term 'foreign national' shall not include any individual who is a citizen of the United States; or

(2)  an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(20) of title 8."

The referenced FARA provision, 22 U.S.C. § 611(b), defines a foreign principal as-

"(1)  a government of a foreign country and a foreign political party;

(2)  a person outside of the United States, unless it is established that such person is an individual and a citizen of and domiciled within the United States, or that such person is not an individual and is organized under or created by the laws of the United States or of any State or other place subject to the jurisdiction of the United States and has its principal place of business within the United States; and

(3)  **a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country.**"  (emphasis added)

falsely characterized reimbursements of campaign contributions as "consulting fees" to disguise the nature of the transactions. (See, e.g., Exhibit 34)

Defendant also solicited foreign individuals for contributions. For example, in 2012, Person E, a foreign national, told Zuberi that the campaign contribution form had a "clause whereby foreign nationals are prohibited from contributing."  Person C, a U.S. citizen, reiterated the concern, telling Zuberi that four of the five remaining attendees were not American and adding, "*Please be sure that the money is not an issue*[22] as long as we are doing things right."  Despite these warnings, Zuberi replied, "We will try to do the same way we did for [Person C's] wife [Person D, a foreign national]."  (Exhibit 30A)

The way Zuberi did it was to conceal the foreign national status of Person D.  For her first contribution, defendant created an entirely fictitious name for Person D, "Margaret" followed by Person C's surname, and provided the campaign with a bogus address in Derton (sic), Texas, that was actually her brother-in-law's address.  (Exhibit 19: 4/27/12 entry; Exhibits 30B & 30C)  For Person D's next two contributions, defendant used her true name but falsely provided an address in El Monte, California that was actually the business address of Zuberi's sister-in-law.  (Exhibit

---

[22] Zuberi's claim that foreign nationals could attend political events with their U.S. citizen spouses (Defense Brief, p. 15) is a red herring.  A U.S. citizen can purchase multiple tickets to such events, can bring foreign nationals to attend, and the submission of passports is typically required for security purposes.  (Exhibit 30A, p. 3)  As referenced by Person C's email, the limitation pertains to the *money*.  Foreign nationals may attend; they may not contribute.

19: 5/18/12 and 9/30/12 entries; Exhibits 30D & 30E).  Zuberi concealed from the campaign the information Person D provided on her contribution form that showed she lived and worked in Kuwait. (Exhibit 30F)

Zuberi knew that he was soliciting foreign nationals for the money in connection with the 2012 Inauguration.  On January 6, 2013, Zuberi told Person C, "you will get the best package but [Person A] and [Person E] will get better packages than what they should get. For now, [Person A] will get the Adams Package which is for $150,000 *when he paid only $100,000*."  (Exhibit 31A)  On January 21, 2013, Zuberi told Person C that "*[Person A and Person E, both foreign nationals] haven't paid enough for the photo.*"  Zuberi then told Person C to pressure Person A, the foreign national, to pay more and threatened to cut off business ties if he didn't come through with the money.  (Exhibit 31B)

Defendant could not have believed that the U.S. citizen spouse married to a foreign spouse created some sort of defense.  Defendant solicited Person E and Person F, husband and wife, for contributions even though both were foreign nationals.  (Exhibits 30A and 30G) When informed by Campaign W that a contribution in the name of Person A violated the law because he was a foreign national, prompting its return (Exhibits 32A and 32B), defendant nevertheless made another contribution in Person A's name to another campaign committee that didn't appropriately vet the contributions.  (Exhibit 19: 9/28/16 entry)

Zuberi claims that contributions made by himself and his spouse were derived from earned income, not foreign transfers dedicated to making campaign contributions.  The government has already set forth

testimony, correspondence, invoices, and financial information that links the contributions in question to specific international transfers explicitly dedicated for contributions.  (FECA Brief, pp. 8-11)  Exhibit 35 lists the contributions disputed by defendant, summarizes the evidence, and cross-references additional exhibits.

Zuberi can point to no earned income that could have funded these contributions.  All of the contributions in question were funded by Company B wire transfers.  According to Person C, who directed the funds from Company B to Zuberi, all of the referenced transfers were for campaign contributions[23] and Person C specifically declined to pay consulting fees to Zuberi because none of his business propositions had born fruit.  (Exhibit 40)  Indeed, the money from Company B had to have been used to fund the campaign contributions because defendant engaged in the habit of depleting his account prior to the arrival of new funds.  Defendant transferred Company B funds from his Barclays account in Dubai into his USCCU account, xx6700-xx.  (Exhibit 41A)  From there, defendant issued contributions directly to campaigns or paid credit card debt incurred for campaign contribution expenses.[24]  (Exhibit 41B)

---

[23] The only money transferred from Company B to defendant that did *not* pertain to FECA contributions was $21,064.29 to reimburse defendant's expenses incurred during an unsuccessful business development trip to Korea.

[24] For example, Company B transferred $136,600 transfer on May 2, 2012 and $71,600 on June 12, 2012 for the explicit purpose of making campaign contributions.  Defendant transferred all of the funds into his USCCU account, xx6700-xx.  (Exhibit 41A)  Defendant then used the USCCU account to increase his credit card limit and pay credit card debt for several campaign contributions, including those made in the name of Zuberi's spouse to Campaign DD on May 22 ($25,000) and May 24 ($10,000) and to Campaign A on May 29 ($5,000). (Exhibits 41B, 42, 43A, 43B, 43C & 43D)

**V.   DEFENDANT DID NOT INVEST IN AL AREEN**

Defendant persists in the lie that he invested money in Al Areen.[25]   Contrary to press releases that announced Avenue Ventures' heavy investment Al Areen, bank records demonstrate that neither defendant nor Avenue Ventures ever invested a single penny.   In fact, money flowed in the opposite direction.   Contracts, invoices, and email correspondence show that defendant agreed to perform lobbying work on behalf of Person J in connection with Al Areen. Bank records confirm that Person J transmitted about $2 million to defendant in connection with that lobbying effort.

Shortly after an April 30, 2013 ceremony, Zuberi orchestrated the distribution of false and misleading press releases throughout the world, claiming "Al Areen City Development Attracts Foreign Investment from US-based Avenue Ventures" and "F[oreign] D[irect] I[nvestment] Flows In."  (Exhibit 44A)  Over two years later, Foreign Policy Magazine, which published an expose of Zuberi's activities, posted a correction at the request of Zuberi that claimed,  "Businessman and Democratic donor Imaad Zuberi's investment firm, Avenue Ventures, put $700 million into a luxury resort in Bahrain; Zuberi himself did not spend that money." (Exhibit 44B)

Participants to the signing ceremony confirm the non-existence of a contract and explain how Zuberi designed the entire effort to hoodwink the U.S. Congress into putting pressure on the Bahrain government for the benefit of Person C.   (Exhibit 45; FARA Brief pp.

---

[25] Defendant did not include his supposed Al Areen investment in his financial disclosures to the USPO.

7-10)  Correspondence that year shows that, rather than consummating a deal in which Avenue Ventures would purchase shares in the project, Zuberi repeatedly pushed Person J into signing a consulting contract to compensate Zuberi for his lobbying efforts.  (Exhibits 46A, 47B, and 46C)  The parties executed the consulting contract in August 2013 (Exhibit 47), Zuberi issued invoices to Person J's company that same month (Exhibit 48), and those invoices appear to have been paid.  (Tax Brief: Exhibit 8)  Bank records demonstrate that neither Zuberi nor any Avenue Ventures entity sent any money to Person J or his companies (Exhibit 15); rather, money flowed in the opposite direction-—from Person J to Zuberi.  (Tax Brief, p. 22)

The Share Purchase Agreement, the only document touted by Zuberi as proof of his investment, is another sham.  (Exhibit 49) While the agreement bears the same date as defendant's purported investment, April 30, 2013, the notary stamp bears no date. (Exhibit 50)  Notary records shows the agreement actually was executed on November 10, 2014, well after the events in question. Moreover, the agreement is without legal effect because it consists merely of a promise to purchase shares in Al Areen without a specification as to amount, price, or date.

**VI.  DEFENDANT'S PAYMENTS TO BENEFIT A U.S. OFFICIAL IN PAKISTAN ARE GRATUITIES, NOT FARA VIOLATIONS**

The defendant fails to appreciate the significance of his conduct with respect to Person NN, the U.S. official stationed in Pakistan.  Neither the PSR nor the government takes the view that this conduct violated FARA.  Undisclosed payments received by Person NN and the journalist with whom Person NN had a relationship were contemporaneous with Person NN providing assistance to Zuberi's

24

business.  The payment of gratuities to a public official are relevant to defendant's character.  The government will address the particulars with respect to this issue when it files its sentencing recommendation.

**VII. CONCLUSION**

Defendant's objections are largely baseless and include instances of false representation and deceit.  Defendant's has tried to effectively backdate a notarized document, exploit a government error as to the ownership of a bank account, and selectively traced the source of contributions, omitting their foreign source.  Such obfuscations, in tandem with his failure to meet obligations imposed by the plea agreement, bring into question his acceptance of responsibility, particularly with respect to relevant conduct.

While some slight modifications to the PSR are required,[26] the PSR sentencing guideline calculations are correct.  Defendant's guideline level is 32, resulting in a sentencing range of 121 to 151 months imprisonment.  If the court grants defendant complete acceptance of responsibility, his offense level is 29, resulting in a sentencing range of 87 to 108 months imprisonment.

---

[26] At a minimum, the PSR should reflect total illegal campaign contributions of $774,358, not 756,858.  Per the government's Tax Brief (pp. 2-3), the tax loss should be $7,299,556, not 7,694,109.