THOMAS P. O'BRIEN, State Bar No. 166369
IVY A. WANG, State Bar No. 224899
NATHAN F. BROWN, State Bar No. 317300
BROWNE GEORGE ROSS LLP
801 South Figueroa Street Suite 2000
Los Angeles, CA 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808
E-mail: tobrien@bgrfirm.com

EVAN J. DAVIS, State Bar No. 250484
HOCHMAN SALKIN TOSCHER PEREZ P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212-3414
Telephone: (310) 281-3200
Facsimile: (310) 859-1430
E-mail: davis@taxlitigator.com

Attorneys for Defendant
IMAAD SHAH ZUBERI

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. LACR19-00642-VAP |
| Plaintiff, | The Hon. Virginia A. Phillips |
| vs. | **DEFENDANT'S INITIAL SENTENCING MEMORANDUM; DECLARATION OF CLAUDE A. ARNOLD; EXHIBITS** |
| IMAAD SHAH ZUBERI, | |
| Defendant. | Judge: Hon. Virginia A. Phillips |
| | Sentencing Date: July 27, 2020 |
| | Crtrm: 8A |

1563354.1

# **TABLE OF CONTENTS**

**Page**

I.   Introduction ............................................................................................ 1

II.  Federal Elections Campaign Act ......................................................... 2

    A.   The Total Amount of Contributions in Violation of FECA Is Substantially less than the $954,558 Claimed by the Government ........ 2

        1.   Contributions in the Name of Others ............................................ 3

            a.   Person AA ............................................................... 3

            b.   Other Contributors ................................................... 5

        2.   Reimbursements by Mr. Zuberi ..................................................... 9

        3.   Reimbursements of Mr. Zuberi's Contributions ......................... 9

    B.   The Contributions Were Not Clearly Based on Foreign Funds ............ 10

        1.   Person A, Person B, Person C, and Person D ............................. 11

        2.   Company A and Company B ......................................................... 12

    C.   Courts Show Leniency Towards FECA Violations .............................. 15

    D.   The Need to Avoid Unwarranted Sentencing Disparities ..................... 17

III. Tax ......................................................................................................... 18

    A.   The Federal Tax Losses Equals $3,590,634 ......................................... 18

        1.   Person J's oral "75% clawback" agreement rendered these funds not income ....................................................................... 19

    B.   The Tax Crime Did Not Involve Sophisticated Means ......................... 20

    C.   Courts Show Leniency Towards Tax Violations ................................... 21

IV.  FARA ..................................................................................................... 23

    A.   Non-Relevant Conduct .......................................................................... 24

        1.   Bahrain ........................................................................................ 25

        2.   Turkey ......................................................................................... 28

        3.   Libya ........................................................................................... 28

        4.   Ukraine ........................................................................................ 29

1
2

# TABLE OF CONTENTS
## (Continued)

Page

B.   Courts Show Leniency Towards FARA Violations ............................ 30

C.   The Need to Avoid Unwarranted Sentencing Disparities.................... 35

V.   Obstruction ........................................................................................ 38

A.   Witness Tampering ................................................................... 38

1.   Person LL................................................................. 38

a.   Background.................................................... 38

b.   Alleged Fraud ............................................... 39

c.   Alleged Witness Tampering: 5/4/17 ............... 39

d.   Alleged Witness Tampering: 6/21/17-7/28/17.............. 43

2.   Person C ................................................................. 44

a.   Background.................................................... 44

3.   Person MM: .............................................................. 45

a.   Alleged Witness Tampering: Unknown Date ................. 45

4.   USCares Investors .................................................... 46

a.   Alleged Fraud ............................................... 46

b.   Alleged USCares Investors Tampering: 4/28/17 to 3/14/19.................. 47

VI.   Conclusion.......................................................................................... 49

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

**Cases**

4

*Citizens United v. Federal Election Comm'n*,

5

    558 U.S. 310 (2010) ........................................................................... 31

6

*Meese v. Keene*,

    481 U.S. 465 (1987) ........................................................................... 32

7

8

*U.S. v. O'Donnell*,

    608 F.3d 546 (9th Cir. 2010) ............................................................. 6

9

10

*United States v. Ben Israel*,

    No. 1:13-cr-00572 (N.D. Il.) ....................................................... 35, 36

11

*United States v. Chaudhry*,

12

    No. 1:18-cr-00226 (D. Md.) ............................................................. 37

13

*United States v. Hsia*,

14

    176 F.3d 517 (D.C. Cir. 1999).......................................................... 6

15

*United States v. Kanchanalak*,

16

    41 F. Supp. 2d 1 (D.D.C.), rev'd on other grounds, 192 F.3d 1037

    (D.C. Cir. 1999).................................................................................5

17

*United States v. Manafort*,

18

    No. 1:17-cr-00201 (D.D.C.) ............................................................ 36

19

*United States v. Martin*,

20

    278 F.3d 988 (9th Cir. 2002) ........................................................... 33

21

*United States v. Siegelman*,

22

    640 F.3d 1159 (11th Cir. 2011)........................................................ 28

23

*United States v. Siljander*,

24

    No. 4:07-cr-00087 (W.D. Mo.) ............................................ 34, 35, 36

25

*United States v. Terry*,

26

    707 F.3d 607 (6th Cir. 2013)................................................ 28, 29, 32

27

*United States v. Vincent et al.*,

    No. 1:05-cr-00059 (S.D.N.Y) ...................................................... 35, 36

28

1

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

2

<u>Page(s)</u>

3

**Statutes**

4

18 U.S.C. § 3353(a) ............................................................................... 15

5

22 U.S.C. § 611 .............................................................................. 30, 31

6

22 U.S.C. § 613 .............................................................................. 27, 29

7

8

52 U.S.C. § 30116(a)(8) .......................................................................... 6

9

52 U.S.C. § 30122 .................................................................................... 6

10

Federal Elections Campaign Act ................................................... *passim*

11

**Other Authorities**

12

11 CFR § 110.6(c) .................................................................................... 6

13

14

USSG § 1B1.1(a) ................................................................................... 24

15

USSG § 1B1.3(1)(A) .............................................................................. 24

16

USSG § 1B1.3(a)(2) ......................................................................... 24, 25

17

USSG § 2B1.1 ................................................................................... 2, 10

18

USSG § 2C1.8(b)(1) ..................................................................... 2, 10, 15

19

USSG § 2C1.8(b)(2) .............................................................................. 15

20

USSG § 2C1.8(b)(2)(a) .......................................................................... 15

21

22

USSG § 2T1.1(a)(1) ............................................................................... 22

23

USSG § 2T1.1(b)(1) ............................................................................... 22

24

USSG § 2T1.1(b)(2) ............................................................................... 22

25

USSG § 3D1.2(d) .......................................................................... 25, 26, 27

26

USSG § 5G1.2 ....................................................................................... 23

27

28

I.      **Introduction**

Mr. Zuberi does not dispute that he is guilty, or any facts in his plea agreement.  To the contrary, his decision to plead guilty pre-indictment conclusively demonstrates that he has accepted responsibility for his crimes.  The USPO has recognized this by recommending not only acceptance of responsibility credit under the United States Sentencing Guidelines ("Guidelines"), but also a downward variance (to a still-lengthy 60-month recommendation) to appropriately reflect the nature and seriousness of Mr. Zuberi's crimes.

The government's seriatim and extraordinarily lengthy sentencing briefing— unprecedented in both respects in the experience of all defense counsel representing Mr. Zuberi—reflects that the government really, really wants to make an example of Mr. Zuberi well beyond that merited by his actions.  The government is whispering, and sometimes yelling, in the Court's ear that Mr. Zuberi is Paul Manafort, Bernie Madoff, and Leona Helmsley all wrapped into one mendacious package. Notwithstanding the government's burden, all assumptions should be against him. Ignore that he pled guilty and accepted responsibility—the government will file hundreds of pages of sentencing positions and then blame Mr. Zuberi (for "not accepting responsibility") for the government's unnecessarily long briefing.[1]

The USPO listened to the government and Mr. Zuberi, weighed the Guidelines and the § 3553(a) factors, and recommended a below-Guidelines sentence that is still higher than most sentences in similar cases.  Incensed that the USPO did not recommend the pound of flesh that the government desired, the government has now attempted to sensationalize Mr. Zuberi's conduct (relevant or not) and demonize Mr. Zuberi by making innumerable misinterpreted and

---

[1] On the date of this filing, May 18, 2020, the government absurdly recommended that the Court not afford Mr. Zuberi three points for acceptance of responsibility, despite the fact that he pled pre-indictment.  Mr. Zuberi will be addressing this issue in a follow-on filing.

1   unsupported assertions of fact in over 100 pages of briefing.  While Mr. Zuberi is

2   concerned the government will twist his response to claim he is not accepting

3   responsibility, he is compelled to respond to at least some of the exaggerated

4   allegations.  Each of the government's briefs is addressed below.

5   **II.      Federal Elections Campaign Act**

6           Mr. Zuberi does not dispute that since 2015 he has made certain political

7   contributions in the names of others, reimbursed individuals for their political

8   contributions, or received reimbursements for his own contributions in violation of

9   the Federal Elections Campaign Act ("FECA").  However, in its calculations, the

10  government grossly exaggerates Mr. Zuberi's improper contributions in both the

11  number of contributions and the aggregate amount of donations.  Further, while

12  some of the political contributions that Mr. Zuberi helped facilitate did involve

13  foreign individuals, the law in this area is far from clear, and Mr. Zuberi had

14  received conflicting advice from various campaigns as to whether the contributions

15  were permitted or not; this ambiguity and confusion renders the "foreign

16  contributions" enhancement inapplicable.

17          **A.      The Total Amount of Contributions in Violation of FECA Is**

18              **Substantially Less than the $954,558 Claimed by the Government**

19          In its updated FECA spreadsheet, the government has identified 131 political

20  contributions, totaling between $633,538 and $954,558, which it claims violate or

21  potentially violate FECA.  (O'Brien Decl. re Gov. Response to Def. PSR

22  Objections, ECF 109, Ex. 19.)  As will be shown below, this amount far exceeds the

23  actual amount of $385,358.  Because the actual amount of FECA violations

24  committed by or at the behest of Mr. Zuberi is less than $550,000, the proper

25  offense level under USSG § 2C1.8(b)(1) and USSG § 2B1.1 is a 12-level rather than

26  a 14-level increase.

27

28

1.   **Contributions in the Name of Others**

   a.   **Person AA**

In its newest version of the FECA spreadsheet the government has identified 53 contributions in the name of Person AA that it claims were, or were likely, FECA violations and which total $176,000.  (ECF 109, Ex. 19.)  While Mr. Zuberi does not dispute that some of the contributions made in the name of Person AA may have violated FECA, the government has again interpreted all of the identified contributions in the light most unfavorable to Mr. Zuberi, thereby overestimating the total amount of FECA violations made in the name Person AA.

The government concedes that USC Credit Union ("USSCU") account xx6250-xx was a joint account held by Mr. Zuberi and Person AA, and that, out of an "abundance of caution," the Court may choose to not count some of the political contributions made in the name of Person AA from this account.  (Gov. Response to Def. PSR Objections, ECF 106, at 17.)[2]  However, the government asserts that only a $5,200 contribution by Person AA to Campaign FF should be considered potentially valid, as Person AA did not earn enough from Person AA's pension and social security over the time period in question to cover all of Person AA's contributions.  (*Id.* at 16-17.)

The "abundance of caution" advice is well-taken, as the government never tried to develop or present a full picture of Person AA's worldwide financial picture, resulting in the government failing to carry its burden to show that any person of Person AA's contributions should be included in Mr. Zuberi's FECA computation. The government acknowledges that, during that time period, Mr. Zuberi transferred $330,400 into that joint account.  (*Id.* at 16.)  Due to their close personal relationship, Mr. Zuberi and Person AA maintained an equally close financial

---

[2] Note that all page citations to documents filed with the Court are to the ECF page number, not necessarily the page number noted on the bottom of the document.

relationship, as evidenced by their multiple joint accounts and credit cards.  To the extent that Mr. Zuberi chose to finance Person AA's spending or provide Person AA with extra income, Person AA had the authority and agency to spend those additional funds however Person AA wished, including by making political contributions.  Additionally, in claiming that Person AA only earned $108,450 over the time period in question,  the government fails to take into account any additional sources of funds Person AA had outside of Person AA's pension or social security. For example, Person AA earned rental income from property Person AA owned overseas and held additional funds in a joint bank account with Mr. Zuberi there as well.  (*See*, Decl. of Nathan F. Brown in Support of Defendant's Sentencing Position Memo., ¶ 3) (discussing an additional joint bank account in Pakistan between Mr. Zuberi and Person AA.)  Since the government has not taken into account all of Person AA's potential sources of funds, and overlooks Person AA's authority to spend all funds in Person AA's joint accounts with Mr. Zuberi, it simply cannot credibly assert that Person AA had insufficient funds to pay the contributions in Person AA's name.  As such, the Court should not include any of the contributions made from Person AA's USSCU joint account xx6250-xx.

In addition, as stated in Mr. Zuberi's PSR objections, Person AA was an authorized user of a Chase credit card xxx7267.  (Def. Objections to PSR, ECF 90, at 11.)  Person AA made a $5,000 contribution from that card on September 27, 2012.  (ECF 109, Ex. 19.)  Despite the fact that this card was in the name of Person AA, the government claims this contribution was illegal because the charge was paid by the USSCU account xx6700-xx.  Regardless of whether the USSCU account xx6700-xx was a joint account at the time of the transaction, Person AA was authorized to spend funds on Chase credit card xxx7267 as Person AA's own. Person AA's contribution on Chase credit card xxx7267 should therefore be backed out of the Court's calculations.

The government also erroneously claims that, with the exception of Person

AA's contributions to Campaign FF, all of Person AA's contributions were ultimately sourced by Mr. Zuberi's foreign clients.  (ECF 106, at 14.)  The government has produced a spreadsheet purportedly identifying the foreign source of each of Person AA's potentially valid contributions.  (ECF 109, Ex. 25.)  Mr. Zuberi does not deny he was conducting business with Person J and the Sri Lanka government at the time.  However, other than a similar timeframe, the government has failed to make any connection between the transfers from Person J and the Sri Lanka wire to any political contributions.[3]  The subsequent transfers from Mr. Zuberi's Barclays account to his American accounts prove nothing more than that Mr. Zuberi, as he often did, moved money earned outside of the United States into his joint account with Person AA, thereby increasing their liquidity.  Ultimately, other than the fact that these wires from foreign sources occurred at a similar time as the contributions in question, the government has not shown that these wires were intended as reimbursements for Person AA's contributions.  These mere inferences based on timing cannot support the government's claims of FECA violations.  "In such a First Amendment-sensitive area as the regulation of campaign contributions by felony prosecution, it simply is constitutionally impermissible to pile so many inferences on top of each other."  *United States v. Kanchanalak*, 41 F. Supp. 2d 1, 5 (D.D.C.), rev'd on other grounds, 192 F.3d 1037 (D.C. Cir. 1999)).

Based on these arguments, the Court should subtract the additional $10,000 of contributions that were sourced directly or indirectly from Person AA's joint accounts with Mr. Zuberi from the FECA violation calculations.

### b.   <u>Other Contributors</u>

While FECA does prohibit contributions in the name of another, it is only in

---

[3] Mr. Zuberi disputes the government's claim that his objection lacks good faith, as Mr. Zuberi will dispute the foreign nature of the contributions to Campaign DD.

situations where the true/original source of the contribution is hidden.[4]  Indeed, the statute itself contemplates the use of intermediaries or conduits in facilitating contributions to federal committees and candidates: "The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient."  52 U.S.C. § 30116(a)(8).[5]

The purpose of the FECA prohibition against contributions in the names of others to promote transparency by ensuring the true or original sources of the contributions are reported.  *United States v. Hsia*, 176 F.3d 517, 524 (D.C. Cir. 1999) (holding that FECA's "demand for identification of the 'person ... who makes a contribution' is not a demand for a report on the person in whose name money is given; it refers to the true source of the money.").

For this reason, the vast majority of the reported cases of prosecutions of conduit contributions are where individual A made a contribution to a federal candidate, but individual B either gave individual A the funds to make the contribution or later reimbursed individual A for that contribution.  If individual A is the mere mechanism for the contribution, but the true source of funds is reported, it

---

[4] Note the referenced Section 441f of FECA has been re-codified as 52 U.S.C. § 30122.

[5] The government claims that Mr. Zuberi's reference to earmarked contributions is misplaced.  (ECF 106, at 19, n.18.)  Mr. Zuberi is not claiming that he properly followed every earmark reporting requirement as required under 11 CFR § 110.6(c).  He merely cites this provision of the law to show that his earmarked contributions were, as the Probation Officer Recommendation described, "problematic, [but] not usually illegal.  Instead, what makes his actions illegal is lack of disclosure and material omission of his conduct and not the conduct itself."  (ECF 57, at 5.)  While the government claims that earmarked contributions are generally conducted by political actions committees, unregistered conduits can still participate in earmarked contributions.  *Earmarked Contributions*, Federal Election Commission, https://www.fec.gov/updates/earmarked-contributions/ (last visited May 18, 2020).  Simply put, had Mr. Zuberi properly filed the required paperwork with the Federal Elections Commission, there would potentially be no issue with these contributions.

is not a violation of FECA.  *U.S. v. O'Donnell*, 608 F.3d 546, 550 (9th Cir. 2010) ("To identify the individual who has made the contribution, we must look past the intermediary's essentially *ministerial role* to the substance of the transaction.") (emphasis added).   Such was the case in many of the contributions facilitated by Mr. Zuberi.

In Person GG's interview with the FBI, Person GG stated that this was the exact method by which Person GG made a contribution through Mr. Zuberi. (Brown Decl. re Def. PSR Objections, ECF 103, Ex. 7, at 3-4.)  Person GG agreed to make campaign contributions, but, since Person GG did not have his credit card, Person GG authorized Mr. Zuberi to make the contribution in Person GG's name. (*Id.*)  Person GG later repaid Mr. Zuberi in cash and had the remainder deducted from Person GG's salary.  (*Id.*)  While the government claims there was "no pattern of reduced payments to Person GG," (ECF 106, at 20), the payments from Mr. Zuberi to Person GG identified by the government corroborate Person GG's statements that he was only paid around $2,500, rather than the $4,000 he was owed. (ECF 109, Ex. 26.)  Therefore, since the ultimate source of the funds used to make the contribution – i.e., Person GG –  was the individual  identified on the contribution, these contributions met the spirit, if not the text, of FECA.

In his PSR objections, Mr. Zuberi noted that while Person P made two contributions using Mr. Zuberi's credit card, the government has produced insufficient evidence to show Person P's lack of reimbursement.  (ECF 90, at 11)  In an attempt to remedy this, the government provided a summary of financial transactions between Mr. Zuberi and Person P.  (ECF 109, Ex. 28.)  The government acknowledges that this spreadsheet indicates that there was an interruption in payments to Person P in 2015, but explains, based on the statement of a psychologist dealing with Person P's child custody issues, that the "logistics of [Person P's] business is beyond my scope of expertise," and that there was a temporary "misunderstanding" regarding the payments.  (ECF 109, Ex. 29, at 3.)  In addition to

the fact that this witness has no percipient knowledge of Mr. Zuberi's financial relationship with Person P, the government's filings fail to point out that the "misunderstanding" in question revolved around Mr. Zuberi "asking [Person P] to return funds."  (*Id.*)  If anything, the government's Exhibit 29 shows that Mr. Zuberi's expected financial reimbursement for the $10,200 contributions made by Person P was satisfied by the two missing $5,000 payments to Person P in June and July of 2015.

In his PSR objections, Mr. Zuberi also identified an April 27, 2012 contribution by a Person BB that appeared to be a mere filing error.  (ECF 90, at 14.)  As stated in his PSR objections, Mr. Zuberi and his spouse, Person O, often made simultaneous contributions to political candidates.  (*Id.*)  While Mr. Zuberi made a contribution to Campaign A on April 27, 2012, there was no corresponding contribution from Person O, but there was a contribution by Person BB.  (ECF 109, Ex. 19.)  While researching the FECA violations alleged by the government, Mr. Zuberi's legal team discovered that if one were to conduct a Google search for "Imaad Zuberi spouse," Person BB is the first name that results from the search results.  (ECF 90, at 14.)  Person O's likely intent regarding this contribution can be inferred by her common pattern of donating.[6]

Finally, as will be discussed in more detail below, the contributions that Mr. Zuberi facilitated on behalf of Person A, Person B, Person C, Person D, and their relatives were made either with the individuals' own credit cards or at the direction of those individuals, who later reimbursed Mr. Zuberi.  While Person C has testified that no such person as Margaret [Last name of Person C] exists (ECF 106, at 24),

---

[6] The government further claims that had Person BB's contribution been credited to Mr. Zuberi's spouse, the campaign limitations for Campaign A would have been violated, as there was a *later* contribution in the name of "William W. Rao."  (ECF 106, at 21, n. 20.)  William W. Rao is not Mr. Zuberi's spouse, and Mr. Zuberi does not argue that this contribution is a valid contribution in the name of his spouse.

the government has not proven that it was Mr. Zuberi who caused the name
Margaret to be used on the contribution.  Although Person A and Person D are
foreign nationals, and the funds for Person A, Person B, Person C, Person D were
routed through the foreign Company A or Company B, for the reasons outlined in
the following section, these contributions should not be considered foreign for the
purposes of determining the total amount of FECA violations.

Accordingly, of the alleged FECA violations for contributions made in the
names of others, $238,800 should be backed out for the reimbursed contributions on
behalf of Person GG, Person P, and Person BB, Person A, Person B, Person C,
Person D, and their relatives.

### 2.    Reimbursements by Mr. Zuberi

In his PSR objections, Mr. Zuberi disputed the inclusion of the May 5, 2015
contribution by Person JJ.  (ECF 90, at 12.)  Person JJ told investigators that she
made contributions in her own name using her own credit card, and only used Mr.
Zuberi's donor code.  (ECF 109, Ex. 13.)  Person JJ also told investigators that she
was not reimbursed by Mr. Zuberi for these contributions, but was reimbursed for
certain business expenses.  (*Id.*)  The government simply has not produced sufficient
evidence to prove that Mr. Zuberi's payments to Person JJ were a reimbursement for
her $2,700 political contribution and not for other purposes.

### 3.    Reimbursements of Mr. Zuberi's Contributions

The government has identified contributions made in the name of either Mr.
Zuberi or his spouse that were allegedly funded by foreign sources.  (ECF 106, at
21-22.)  Although the government has produced an email in which Mr. Zuberi told
Person C that a contribution had been made in his name to Campaign D may not
have been true (ECF 109, Ex. 37a), that email alone does not prove that the $90,000
wire from Person C was instead used to fund contributions to Campaign D on behalf
of Mr. Zuberi, Person O, and Person AA.  The same can be said of Person O's
contributions to Campaign DD, which although near in time to the $136,600 wire,

cannot be immediately tied to it.  Finally, the only information that can connect Mr. Zuberi's email regarding the $33,400 contributions, which is addressed to unknown individuals and makes the demand for reimbursement, is Person C, whose lack of credibility will be discussed below.  (ECF 109, Ex. 39.)  As such, the Court should not count any of the contributions identified in the government's Exhibit 35 as violations of FECA.

In total, combining all the contributions from the above described categories, the Court should back out $389,000 from the $633,538 total of alleged FECA violations, resulting in a total amount of all contributions that legitimately violate FECA of only $385,358.  Using this new amount, the proper offense level under USSG § 2C1.8(b)(1) and USSG § 2B1.1 is a 12-level rather than a 14-level increase.

## B. The Contributions Were Not Clearly Based on Foreign Funds

Mr. Zuberi does not deny that some of the contributions he helped to facilitate involved foreign individuals.  However, as stated in his PSR objections, Mr. Zuberi relied upon the confirmations of various political campaigns that a foreign national could make a political contribution to attend a function as the guest of his or her spouse who was a United States citizen.  (ECF 90, at 18.)  Mr. Zuberi does not deny that he made solicitations for such contributions – only that, based on the information provided to him by the campaigns, he was under the impression, even if a mistaken one, that such practices were permissible.[7]

As an initial matter, the introduction section of the government's FECA sentencing position paper baldly asserts that "Person MM, a citizen of the United

---

[7] Mr. Zuberi readily admits that at least one campaign informed him that a contribution on behalf of Person A could not be made.  However, this guidance conflicted with both his directives of other campaigns, and his previous experience. As a result of the confusion guidance, Mr. Zuberi chose to follow the recommendations proclaiming the legitimacy of the contributions.

1  Arab Emirates,[8] routed $290,000 to Zuberi's bank accounts to fund campaign

2  contributions."  (ECF 87, at 4-5.)  However, Person MM is never again mentioned

3  in either the government's FECA Sentencing Position Paper or the government's

4  Response to Mr. Zuberi's Objections to the PSR.  (ECF 87, at 106.)  Since the

5  government has offered no further evidence or argument as to this alleged $290,000

6  contribution, the Court should not consider these funds when determining whether

7  foreign funds were used in violation of FECA.

8  ### 1.  Person A, Person B, Person C, and Person D

9  The vast majority of contributions that the government claims are foreign

10  involve Mr. Zuberi's facilitation of contributions on behalf of Person A, Person B,

11  Person C, and Person D.  Mr. Zuberi does not deny that Person A and Person D are

12  foreign nationals.  Mr. Zuberi also does not deny that he helped facilitate

13  contributions on behalf of Person A and Person D.  However, Person A is married to

14  a United States citizen, Person B, and Person D is married to another United States

15  citizen, Person C.

16  Mr. Zuberi only began to help facilitate the contributions of Persons A and D

17  after staffers at a major political campaign informed Mr. Zuberi that foreign national

18  spouses to United States citizens could contribute towards and attend political

19  events with their spouses.  (*See, e.g.*, ECF 103, Ex. 14.)  Initially, Mr. Zuberi made

20  it abundantly clear to the campaign that Person D was a foreign national, and

21  questioned the campaign multiple times to make sure it was permissible for Person

22  D to attend with Person A, a United States citizen.  (*Id.*)  While it may be true that

23  the information the campaign provided to Mr. Zuberi was incorrect, his reliance on

24  the campaign's approval after questioning it multiple times was understandable.

25  Based on his understanding from this precedent and the attempts of various

26  campaigns to invite Person C and Person D, Mr. Zuberi continued to rely on the

27

28  [8] Mr. Zuberi believes Person MM is actually a citizen of Kuwait.

campaigns' consent to facilitate contributions on behalf of Person A to accompany Person B, and Person D to accompany Person C, to various political functions throughout the United States and the world.

The government disputes Mr. Zuberi's reliance on the campaign's previous acceptance of Person D by pointing to an episode where Mr. Zuberi invited Person E and Person F to attend a political event with Person C.  (ECF 109, Ex. 30A, 30G.)  When Person E pointed out that the contribution form stated that foreign nationals are prohibited from contributing, Mr. Zuberi responded that "[w]e will try to do the same way we did for [Person D]."  (ECF 109, Ex. 30A.)  Unsurprisingly, the government interprets this exchange to infer some type of nefarious intent by Mr. Zuberi.  However, "the way [Mr. Zuberi] did for [Person D]" previously was not to hide Person D's nationality from the campaign, but to clearly inform the campaign of Person D's foreign nationality and check to make sure she was allowed to attend. (ECF 103, Ex. 14.)  The government's Exhibit 30G is consistent with this approach, as Person E and Person F clearly identified their foreign P.O. Box on the form for Mr. Zuberi to forward to the campaign.  (ECF 109, Ex. 30G.).  Additionally, because the events attended by Persons A, B, C, and D, supported high level politicians, the campaigns required, and Mr. Zuberi supplied, the passport information for these individuals.  (Exhibit 1.)  Such activity is not consistent with an individual attempting to hide the foreign nationality of a contributor.

The government further disputes Mr. Zuberi's reliance on the political campaign's acceptance by pointing out that Mr. Zuberi frequently had to read boilerplate statements specifically forbidding foreign contributions prior to every contribution.  Mr. Zuberi does not deny the existence of these jargony admonitions displayed in small font, but admits that he simply did not pay attention to them while filing his contributions.

### 2.   <u>Company A and Company B</u>

While Mr. Zuberi was also aware that corporations are prohibited from

making political contributions, Mr. Zuberi always thought of the contributions made on behalf of Persons A, B, C, and D as being made in their individual capacities regardless of how the funds were transferred to him.

In support of its argument, the government points to an email Mr. Zuberi sent to Person LL in which he acknowledges that contributions cannot come from corporations.  (ECF 109, Ex. 33.)  However, Mr. Zuberi only made that statement because Person LL attempted to wire funds directly from his company to a political campaign.  (*Id.*)  Such was not the case here.  Company A and Company B were not attempting to make contributions to the campaigns directly, but were merely the channel through which the owners/operators of those companies, Person A and Person C, and their spouses, Person B and Person D, could route their money to Mr. Zuberi.[9]  Company A and Company B, even if they are foreign, were not the ultimate source of the funds; they were merely the vehicle through which United States citizens Person A and Person C sent their funds.  If a U.S. person owns a foreign corporation and pays a campaign contribution from the foreign corporation's bank account with funds the corporation owed to the U.S. Person (e.g. deferred salary or bonus), this does not alter the character of the contribution as being from a U.S. person.  The substance is the same either way, regardless whether the U.S. person had the foreign corporation pay him first and then paid the contribution personally, or instead just had his company cut the check directly.  At minimum, the government cannot show Mr. Zuberi committed a crime by treating a direct payment from a U.S. person's corporation as being from the U.S. person.

The government also erroneously claims that nearly all of the more than $1.5

---

[9] The government assumes without offering any proof that Mr. Zuberi knew that the U.S. person-husband Person C had put the ownership of his company in the name of his wife Person D, presumably to avoid U.S. taxes; Person C ran the company and there was no reason for Mr. Zuberi to know that Person C had no formal ownership thereof.

million in wire transfers from Person C to Mr. Zuberi were for political contributions (ECF 87, at 8), despite the fact that Mr. Zuberi and Person C had a long-standing business relationship.  Mr. Zuberi admits that some of the wire transfers sent by Person C were for political contributions for Persons A, B, C, and D to attend certain events.  But Mr. Zuberi disputes Person C's claim that *all* of the wires from Person C through Company B were for contributions.  Person C's claim rings hollow given the fact that the government has also claimed that Mr. Zuberi earned over a million dollars in unreported, taxable income from work done for Company B.

The government additionally claims that Mr. Zuberi "manufactured fraudulent invoices to conceal foreign corporation funding of contributions . . . ." (ECF 106, at 22.)  While Mr. Zuberi does not dispute that the description of the invoices may not have expressly detailed the political nature of the wire transfers, the government cannot prove that these invoices were created with the intent of concealing the nature of political contributions from the United States government. Rather, even Person C testified that the only reason that the invoices were created at all was to appease the banks in Kuwait.  (Exhibit 2.)  Therefore, the fact that the invoices were inaccurate do not establish that Mr. Zuberi knew that United States citizens cannot route their political contributions through their foreign companies.

Mr. Zuberi also rejects the government's allegation that he engaged in widespread fraudulent practices against those whose political contributions he solicited.  As stated above, Mr. Zuberi had extensive business relationships with Person A and Person C.  While he did facilitate political contributions on behalf of Person A, Person C, and their respective spouses, any amount outside of the political contribution was merely compensation for their ongoing business relationships. Furthermore, Person C's claim that all wires to Mr. Zuberi were solely for the purpose of political contributions is not credible, Person C's lack of credibility will be discussed more in depth below.

Ultimately, since Mr. Zuberi relied on his previous experience that it was permissible for American citizens to make contributions in their own names as well as the names of their spouse, and all allegedly foreign funds identified by the government can be tied to Person C and Person B, both of whom are United States citizens, the Court should not apply a two-level increase under USSG § 2C1.8(b)(2)(a) for involving foreign nationals.

### C.    Courts Show Leniency Towards FECA Violations

Despite the foregoing, Mr. Zuberi recognizes and accepts responsibility for the fact that he did, on numerous occasions, violate FECA.  Nevertheless, the government's contention that severe punishment is warranted at, or above, the Guideline range, is unsupported.  The crux of the government's argument is that Mr. Zuberi's "FECA violations were egregious as to length and scope" and "many of these FECA violations were intertwined with Zuberi's efforts to corrupt democratic processes and institutions while acting as an agent for foreign interests."  (ECF 87, at 15.)  The government fails to recognize that the Guidelines already more than account for the number and scope of the violations, through adding two additional points to his Guideline calculations.  *See,* USSG § 2C1.8(b)(1); (ECF 58, ¶¶ 111-113.)  Similarly, they already account for the alleged fact that some of the donations came from foreign sources.  *See* USSG § 2C1.8(b)(2).  These facts do not make Mr. Zuberi's crime unique or worthy of additional punishment beyond the Guidelines.

To the contrary, courts have consistently found that that the advisory Guideline range for these crimes suggests far greater punishment than necessary to meet the goals of 18 U.S.C. § 3353(a).  Within-Guideline sentences are the exception, and well-below-Guideline sentences are the norm.  The Sentencing Commission's 2019 Annual Report and Sourcebook of Federal Statistics reveals the following data for bribery and corruption crimes, which includes FECA violations[10]:

---

[10] All figures in tables based on the data in Exhibit 3.

-15-
DEFENDANT'S SENTENCING MEMORANDUM

| Metric | All Guidelines[11] | 2C1.8 |
|---|---|---|
| Sentences within Guideline Range | | |
| Frequency | 18.5% | 0.0% |
| Downward Departures | | |
| Frequency | 42.5% | 0.0%[12] |
| Mean Decrease | 61.7% | N/P |
| Median Decrease | 55.6% | N/P |
| Downward Variances | | |
| Frequency | 35.3%[13] | 100.0%[14] |
| Mean Decrease | 55.2% | N/P |
| Median Decrease | 50.0% | N/P |

In other words, less than 19 percent of courts determined that the Guideline range reflected an appropriate punishment for these types of crimes.  More than 35 percent of defendants received a downward variance and more than 42 percent

_____

[11] This includes all guidelines that fall within the "bribery/corruption" category. Appendix A states that "*Bribery/Corruption* includes offenses involving public officials and violations of federal election campaign laws . . . [including, among other crimes,] making, receiving, or failing to report a contribution, donation, or expenditure in violation of the Federal Election Campaign Act."  It also specifically "includes offenders sentenced under USSG §§. . . 2C1.8," among others.  (Exhibit 3.)

[12] The Commission's report only included two cases.

[13] Table 31 shows 133 variances at a percentage of 39.0%.  (Exhibit 3.)  However, Table 36 indicates that 5 of these 133 variances were upward.  (*Id*.)  Mr. Zuberi's counsel has used these numbers to calculate the figure shown in the chart.

[14] The Sentencing Commission's report does not indicate whether either of the variances was upward.

received a downward departure.  The average variance resulted in a sentence more than 55 percent shorter than the low-end of the Guideline range.  The average departure resulted in a sentence more than 61 percent shorter than the low-end Guideline range.  In Mr. Zuberi's case, even an average downward variance would result in a sentence of approximately 31 months.[15]  An average downward departure would result in a sentence of about 27 months.

### D.   The Need to Avoid Unwarranted Sentencing Disparities

A review of individual cases also demonstrates that a below-Guideline sentence is necessary to avoid unwarranted sentencing disparities between similar defendants.  The following table provides a sampling of sentences in similar FECA cases, in descending order of FECA contribution amount and showing the longest sentence imposed was 28 months even including cases with obstruction and perjury and without acceptance of responsibility:

| Case | Amount | Characteristics | Prison Sentence |
| --- | --- | --- | --- |
| *United States v. Dodd, et al.*, No. 4:17-cr-00116 (S.D. Tex.) | $800,000 | (1) Illegal conduit contributions; (2) Fraudulent solicitation of donations | 18 months |
| *United States v. Magliocchetti*, 10-cr-286 (E.D. Va.) | $350,000 | (1) Illegal reimbursements of donations; (2) Pleaded on eve of trial | 28 months (Guideline range of 46-57 months) |
| *United States v. Stipe*, 03-cr-00128 (D.D.C.) | $250,000 | (1) Illegal conduit contributions; (2) Perjury; (3) Obstruction | None |
| *United States v. Danielzyk*, 11-cr-85 (E.D. Va.) | $186,600 | (1) Illegal reimbursements of campaign donations in effort to obtain appointment as ambassador; (2) Obstruction and falsifying documents | 28 months (Guideline range of 63-78 months) |
| *United States v. Whittemore*, 12-cr-58 (D. Nev.) | $150,000 | (1) Illegal reimbursement; (2) Conviction at trial; (3) Obstruction and repeated lies to government during investigation | 24 months (Guideline range of 41-51 months) |

---

[15] These figures are based on an offense level of 27 and a Guideline range of 70 to 87 months, as calculated and explained in Mr. Zuberi's objections to the PSR.

| Case | Amount | Characteristics | Prison Sentence |
|---|---|---|---|
| *United States v. Fireman*, No. 1:96-cr-10187 (D. Mass.) | $120,000 | (1) Illegal contributions | None (4 months home confinement) |
| *United States v. Chatwal*, 14-cr-143 (E.D.N.Y.) | $120,000 | (1) Illegal conduit contributions; (2) Aggravating role; (3) Obstruction | None (Guideline range of 57-71 months) |
| *United States v. Schwartz*, 05-cr-00157-RMU (D.D.C.) | $102,214 | (1) Improper conduit contributions | None |
| *United States v. Cuza*, 05-cr-00344-RGK (C.D. Cal.) | $102,214 | (1) Improper conduit contributions | None |
| *United States v. Acevedo-Vila*, 08-cr-00036 (D.P.R.) | ~$100,000 | (1) Improper reimbursement of contributions to gain influence over gubernatorial candidate | None |
| *United States v. Feldman*, 09-cr-75 (E.D. Pa.) | ~$100,000 | (1) Improper reimbursement of contributions | None |
| *United States v. Mobley*, 12-cr-00150 (M.D. Fl.) | $94,500 | Improper conduit contributions | Probation |
| *United States v. Jinnah*, 06-cr-00383 (C.D. Cal.) | $53,000 | Conduit contributions; Intimidated employees into participating; Fled the country after being indicted | Probation |
| *United States v. D'Souza*, 14-cr-34 (S.D.N.Y.) | $20,000 | Conduit contributions; Obstruction; Failure to accept responsibility | Probation |

Overall, FECA convictions rarely result in prison sentences, much less a sentence as lengthy as the one requested by the government in this case.

## III. Tax

### A. The Federal Tax Losses Equals $3,590,634

In his objections to the PSR, Mr. Zuberi demonstrated that the government has overstated his criminal tax loss, although the dispute with the government does not affect the Guideline calculation. The appropriate tax loss, as shown in forensic CPA Gary Howard's spreadsheet attached to the PSR Objections as Exhibit 2, is $3,590,634. (ECF 103, Ex. 2.)

The government attempts to carry its burden to demonstrate the tax loss was much higher (but still within the same Guideline range) in two briefs: a Tax Brief (ECF 89) and a Response to Defendant's PSR Objections (ECF 106).  These briefs fall short.

In contravention to the law concerning the difference between civil and criminal tax loss, the government attempts to use the agreed-to civil tax loss figure to shortcut meeting its burden under the Guidelines.  Pursuant to 2T1.1(c)(1), the criminal tax loss "is the total amount of loss that was the object of the offense."  If a defendant intentionally omitted certain items of income on a return but also omitted an item where there was a substantial question whether to include the item, then only the intentionally omitted items that were the object of the offense should be included in the computation.  Otherwise, the Court would be over-calculating criminal sentencing guidelines by lumping together both civil and criminal tax issues.

The bulk of disputed (for criminal purposes) tax loss is in two categories: (1) investments in USCares by three investors that Mr. Zuberi borrowed and the government characterized as taxable fraud proceeds instead of non-taxable; and (2) loans payments from Person J ostensibly for work performed by Mr. Zuberi, but for which he had an obligation to repay 75% if the related project failed.[16]

### 1.   Person J's oral "75% clawback" agreement rendered these funds not income

In a case where the government has charged a defendant for filing false returns, it is surprising that the government is relying on the returns as accurate

---

[16] Mr. Zuberi also feels compelled to address the government's allegation that he fraudulently used an alter ego named Renee Wu.  The mere fact that the government has not spoken to a person who knows Renee Wu does not prove that she is not a real person.  Indeed, Ms. Wu was a part-time assistant from China hired by Mr. Zuberi through his contacts at Aegon.  (Exhibits 4-5).

when stating that all of Person J's payments were income.  The government notes that some of Person J payments were characterized as income on the 2015 return and asks the Court to consider this part of the return accurate and to ignore evidence of the 75% clawback arrangement.  (ECF 106, at 9).  Characterization of payments subject to repayment is difficult for any taxpayer or tax preparer, and the fact that Mr. Zuberi over-reported Person J's payments as income, when only 25% should have been reported, is not an example of Mr. Zuberi being unable to "keep his lies straight."  (*Id*.)  Therefore, the criminal computation should only include the 25% that Mr. Zuberi was permitted to keep.  The government has failed to meet its burden on this point, and Mr. Zuberi's tax loss is $3,590,634.

The government tries to brush past its burden by asserting that the civil closing agreement is sufficient to establish by a preponderance of the evidence that the tax loss figure is accurate.  (ECF 106, at 4;19-20.)  Notably, the government cites no authority for this proposition, which is unsurprising because the proposition is wrong.  As noted above, there is a difference between civil and criminal tax loss computations, and for items such as debatable expenses and debatable income, it is appropriate to include them in civil but not criminal computations.

### B.     The Tax Crime Did Not Involve Sophisticated Means

As noted in Mr. Zuberi's PSR Objections, sophisticated means requires hiding one's identity, which Mr. Zuberi did not do in conjunction with his tax crime.  (ECF 90, at 7-8.)  First, he wired the first two payments from Sri Lanka directly to his personal account.  Far from hiding his identity, he was shining a spotlight on himself from a tax standpoint.  The government concedes Mr. Zuberi only stopped directly depositing funds into his personal account because Sri Lanka insisted on not paying Mr. Zuberi directly.  "Realizing that the first two payments had been paid without appropriate traceability, Sri Lanka insisted that payments be made directly to WR [Group], the entity that executed the contract.  Faced with this insistence, Zuberi merely directed his proxy to siphon off the money from WR and transfer it to

other companies controlled by Zuberi." (ECF 89, at 23.) Because of Sri Lanka's insistence, Mr. Zuberi had the funds sent to the entity that contracted with Sri Lanka – hardly sophisticated, and hardly done with the intent to hide from the IRS.

Further, there was no effort to hide the foreign accounts into which funds were transferred. The government gave the Court only part of the picture, suggesting that Mr. Zuberi transferred funds into undisclosed foreign accounts that the IRS wouldn't be able to find. The government fails to mention that Mr. Zuberi sent most of the foreign money into his U.S. bank accounts, which is the last thing that persons hiding money in overseas accounts do because it exposes them to reporting by the U.S. banks. The facts of Mr. Zuberi's case are exactly the opposite of typical (and sophisticated) foreign bank "FBAR" cases, in which persons do everything possible to hide their connection to the foreign account. Mr. Zuberi filled out FACTA forms with the Dubai bank well before he knew about the investigation, which information is designed to be transmitted to the IRS. (Exhibit 6). Regarding FBAR forms, the government is aware that FBAR forms were filed for Mr. Zuberi in his professional capacity for his former employer Transamerica's overseas accounts. The government does not have the forms to show Mr. Zuberi actually signed them, and the government failed to investigate the circumstances of their filing despite that Mr. Zuberi explained that he did not recall signing them and had never heard of an FBAR form until learning it from his lawyer on this case. The Court should disregard the allegation that Mr. Zuberi was aware of the FBAR filing requirement and that he was somehow hiding his income in foreign accounts when his receipt of the funds was not concealed from the IRS.

Mr. Zuberi's tax crime was as simple as not listing all of his income on the return. There is nothing sophisticated about that crime, and no effort to conceal his income from the IRS.

### C.    Courts Show Leniency Towards Tax Violations

The government erroneously argues that "the guidelines calculations do not

1  adequately reflect the aggravating circumstance of Zuberi's tax offense" because (1)

2  it was extensive an involved a large amount of tax loss; (2) it was related to the

3  FARA violations and fraud; and (3) it involved sophisticated means.  (ECF 89, at

4  27.)  But, as the USPO already found, this is simply not true.  USPO Disclosed

5  Recommendation, ECF 57 at 5.  These considerations are already more than

6  accounted for in the Guideline calculations.  *See* USSG § 2T1.1(a)(1) (determining

7  base offense level based on amount of tax loss); USSG § 2T1.1(b)(1) (considering

8  whether offense involved funds derived from criminal activity):USSG § 2T1.1(b)(2)

9  (considering whether offense involved sophisticated means).  Despite endless

10  briefing, the government simply has not shown any unusual aggravating

11  circumstances that demand unusual punishments.

12        To the contrary, courts have consistently found that the advisory Guideline

13  range for tax crimes overstates the punishment necessary to meet the goals of

14  section 3553(a).  The Sentencing Commission's 2019 Annual Report and

15  Sourcebook of Federal Statistics shows the following data for tax crimes:

| Category | All Guidelines | 2T1.1 |
|---|---|---|
| **Sentences Within Guideline Range** | | |
| Frequency | 25.4% | 26.2% |
| **Downward Departures** | | |
| Frequency | 15.5% | 14.3% |
| Mean Decrease | 57.0% | N/P[17] |
| Median Decrease | 57.1% | N/P |
| **Variances** | | |

---

[17] Data not provided in the Commission's report.

| Category | All Guidelines | 2T1.1 |
|----------|----------------|-------|
| Frequency | 57.4%[18] | 59.5%[19] |
| Mean Decrease | 61.6% | N/P |
| Median Decrease | 55.4% | N/P |

In sum, the data reveals that only about 25 percent of courts determined that the tax guidelines reflected an appropriate level of punishment. More than 57 percent of defendants received a downward variance and more than 15 percent received a downward departure. The average variance resulted in a sentence more than 61 percent shorter than low-end of the Guideline range. The average departure resulted in a sentence 57 percent shorter than the low-end Guideline range. In Mr. Zuberi's case, even an average downward variance would result in a sentence of approximately 27 months. An average downward departure would result in a sentence of about 30 months.[20]

## IV.   **FARA**

Mr. Zuberi accepts responsibility for his FARA violation with respect to his work for Sri Lanka. Those facts are recounted in detail in the plea agreement and the PSR and require no further recitation here. Further, to the extent that Mr. Zuberi

---

[18] Table 31 shows 323 variances at a percentage of 59.0%. (Exhibit 3.) However, Table 36 indicates that nine of these 323 variances were upwards. (*Id.*) Mr. Zuberi's counsel has used these numbers to calculate the figure shown in the chart.

[19] The Sentencing Commission's report does not indicate how many of these variances might have been upwards, if any.

[20] Of course, the Court should not simply add the sentence attributable to the tax fraud count to the sentence attributable to the FECA count. Rather, each sentence should run concurrently. *See* USSG § 5G1.2 ("If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all the counts shall run concurrently, except to the extent otherwise required by law.").

1  disagrees with the PSR's characterization of those facts, those objections have

2  already been presented.  (ECF 90.)  Accordingly, Mr. Zuberi will not burden this

3  Court with additional arguments regarding Sri Lanka.

4      However, the government now also contends that Mr. Zuberi committed

5  numerous other FARA violations with respect to work entirely unrelated to the Sri

6  Lanka project.  The government's arguments pertain to non-relevant conduct and, in

7  any event, badly mischaracterize the facts.

8          **A.    <u>Non-Relevant Conduct</u>**

9      The government argues that Mr. Zuberi's FARA violations go beyond the

10  basis of the plea agreement and include "relevant conduct" consisting of lobbying

11  on behalf of (1) a Bahraini national, (2) the Turkish government, (3) the Libyan

12  government and a Saudi/United Kingdom national; and (4) a Ukrainian national.

13  (Govt. FARA Position, ECF 84, at 9.)  But, as the USPO already correctly found,

14  those alleged violations are not within the scope of conduct relevant for sentencing.

15  (ECF 58, at 19.)  Rather, the Guidelines provide that relevant conduct includes:

16      "all acts and omissions committed, aided, abetted, counseled,
    commanded, induced, procured, or willfully caused by the defendant;
17      and . . . *that occurred during the commission of the offense of
    convictions, in preparation for that offense, or in the course of
18      attempting to avoid detection or responsibility for that offense.*"

19  USSG § 1B1.3(a)(1)(A) (emphasis added).  Here, the conduct that the government

20  seeks to define as relevant did not occur during, in preparation for, or in the course

21  of attempting to avoid detection for, the Sri Lanka offense.  Rather, each instance

22  involves different clients, different work projects, different objectives and different

23  time periods.  (*See* ECF 58, at 19-24.)  Simply, they are not related to the crime of

24  conviction.

25      The government's contention to the contrary is wrong.  The government cites

26  to USSG § 1B1.3(a)(2),[21] to argue that the conduct is "relevant" because it was "part

27  ────────────

28  [21] The government's citation to USSG § 1B1.1(a) in its brief appears to be a

of the same course of conduct or common scheme or plan as the offense of conviction."  (ECF 84, at 10 n.5.)  However, the government omits the immediately preceding words, which expressly provide that this test applies "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts."  USSG § 1B1.3(a)(2).  In turn, USSG § 3D1.2(d) requires grouping only if: (1) the offense level is determined largely on the basis of total aggregate harm or loss or (2) if the offense behavior is ongoing or continuous in nature *and* the offense guideline is written to cover such behavior.  *Id.*  Neither prong of this test is satisfied here.  The first prong is inapplicable because the offense level for FARA violations, unlike fraud or drug cases, is not determined by calculating the total amount of harm or loss caused.  The second prong fails because there is no guideline for FARA violations that demands grouping.  In fact, there is no guideline for FARA violations at all.  Thus, FARA counts are *not* required to be grouped under § 3D1.2(d) and the government's argument that the conduct was part of a the "same course of conduct" or a "common scheme" fails.

Nevertheless, Mr. Zuberi must correct the record with respect to the government's public allegations on these issues.  In an effort to paint Mr. Zuberi in a negative light, the government has warped and sensationalized many of the underlying facts.  Mr. Zuberi addresses those mischaracterizations below.

### 1.   **Bahrain**

The government contends that "Zuberi secretly lobbied the U.S. Congress as an agent of a Bahraini national," Person J, by "concoct[ing] a scheme to fool members of Congress into believing that [Mr. Zuberi] had invested millions of dollars in [Person J's] Bahraini development project and that he had been unfairly harassed by the Bahraini government in such a way that Congress should intervene." (ECF 84, at 10-11.)  Specifically, the government believes Mr. Zuberi committed a

---

typographical error.

FARA violation when he engaged in a campaign allegedly involving (1) organizing a phony publicity stunt regarding his investment; (2) bringing former U.S. military officers and politicians to Al Areen events to demonstrate Mr. Zuberi's influence; and (3) obtaining letters from Congressmen regarding Bahrain's harassment of Mr. Zuberi.  The government is wrong about the facts and wrong about the law.

The truth is that Mr. Zuberi *did* have a stake in the Bahraini project and he *was* unfairly harassed by the Bahraini government.  Both Mr. Zuberi and Al Areen signed a Stock Purchase Agreement dated April 30, 2013, which was notarized in both the United States and the United Kingdom.  (ECF 90, at 21.)  This contract, which contains no provisions purporting to require Mr. Zuberi to act as an agent of a foreign principal, shows that Mr. Zuberi had a legitimate business interest in Al Areen.  Likewise, Mr. Zuberi was harassed by Bahraini officials when he visited the project in early 2013.  While traveling by car across the Bahraini desert to an Al Areen construction site, the car carrying Mr. Zuberi was stopped by Bahraini police officers without any justification.  For nearly two and a half hours, Mr. Zuberi was falsely detained without any probable cause in a scorching desert with no viable method of escape.  Upon his return to the United States, Mr. Zuberi was incensed at the harassment he had been forced to endure at the hands of the Bahraini police, and in response he contacted several members of Congress to express his extreme displeasure with his treatment.  (ECF 90, at 17.)  It was this unsavory episode that served as the impetus of the various Congressional letters to the Foreign Minister of Bahrain complaining about the treatment of U.S. citizens (which could not have included Person J as he is not a U.S. citizen).  (*Id.*)  These letters are a common constituent service, not the result of improper influence.[22]

---

[22] The government contends that these letters were the result of Mr. Zuberi's illegal campaign contributions, yet it provides no evidence of this connection.  In any event, Mr. Zuberi disputes that the contributions referenced by the government were illegal campaign contributions.  These arguments are discussed in detail in Section

1    Accordingly, Mr. Zuberi was not fabricating stories in an effort to lobby on

2  behalf of a foreign principal.  He was advancing his own interests.  Such conduct

3  does not constitute a FARA violation.  The government's arguments to the contrary

4  are merely speculation.  Specifically, the government concludes that the Stock

5  Purchase agreement must be a sham because it was not executed until 2014.  (ECF

6  106, at 28.)  But all this shows is that the parties delayed in finalizing the paperwork

7  for their agreement.  It does not mean the agreement was fake.[23]  Indeed, the

8  document was notarized years before Mr. Zuberi became aware of any investigation

9  into his conduct.  Next, the government contends that the Stock Purchase Agreement

10  must be a sham because it is "without legal effect" due to its failure to include terms

11  such as amount, price, or date.  (*Id.*)  The government appears to confuse

12  unenforceability with falsification.  The fact that a party might have a legal defense

13  to enforcement of the contract does not mean that the contract is fake.  The point,

14  which the government apparently misses, is that the document demonstrates the

15  parties understood that Mr. Zuberi invested in Al Areen.

16    Moreover, even assuming *arguendo* that Mr. Zuberi did not have a bona fide

17  interest in Al Areen, the government complains of conduct that does not violate

18  FARA in any event.  For example, the government takes issue with the fact that Mr.

19  Zuberi allegedly sought to associate himself with former military officers and

20  politicians to demonstrate his influence in the United States.[24]  (ECF 84, at 11.)  But

21  this is not a FARA violation.  There is no evidence Mr. Zuberi sought to influence

---

II, *supra*.

[23] Eventually, at least a portion of Mr. Zuberi's interest in Al Areen was swapped with an interest in a chateau in France, which Person J owned.

[24] The government references a "former POTUS" in its brief.  The former POTUS was approached to give a commencement speech in the area, but the deal was never consummated.

U.S. policy through these people.  At most, he simply thought that being associated with them would help him in his business endeavors abroad.  *See* 22 U.S.C. § 613 (FARA requirements do not apply to "[a]ny person engaging in or agreeing to engage only (1) in private nonpolitical activities . . . or (2) in other activities not serving predominantly a foreign interest").

### 2. <u>Turkey</u>

The government also twists the story related to Mr. Zuberi's dealings with Turkey.  For example, the government suggests that Mr. Zuberi engaged in misconduct when he "informed a staffer for a Congressman Zuberi lobbied in connection with HR 279 that Person LL gave $33,400 to a national campaign committee on behalf of the Congressman and that the staffer should let the Congressman know."  (ECF 84, at 15.)  There is nothing illegal about informing a staffer about another United States citizen's donation.  There is no indication that there was any agreement or demand for a specific benefit in return for this donation, which had already been made.  *See United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) (bribery does not occur "unless 'the defendant and the official *agree* that the official will take specific action in exchange for the thing of value.'") (emphasis in original); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions.  No bribe thus occurs if the elected official later does something that benefits the donor.").

As another example, the government decries "Zuberi's profit motive." However, there is nothing unusual or improper about conducting business for profit. Despite the government's best efforts to vilify Mr. Zuberi, his actions with respect to Turkey were not inherently corrupt.

### 3. <u>Libya</u>

The government also exaggerates Mr. Zuberi's role with respect to the Libya conduct.  (ECF 84, at 17.)  Although the government paints Mr. Zuberi as the

architect of this scheme, it was Person A and Person C, prior associates of Mr. Zuberi's, who formulated this plan well before Mr. Zuberi joined.  They were the ones who had a pre-existing deal with Libya before Mr. Zuberi even got involved and they were the ones who continued to carry out the plan long after Mr. Zuberi abandoned it.  (ECF 84, at 16-18) (showing texts between Mr. Zuberi and Person A and Person C demonstrating their continuation of the plan)

### 4.    <u>Ukraine</u>

Finally, the government contends that Mr. Zuberi worked as an unregistered foreign agent for a Ukranian national, Dmitry Firtash.  The government misconstrues the facts.  In sum, the government believes that in August 2014, Mr. Zuberi "enlisted a Washington, D.C. lobbying firm to come up with a proposal for Group DF (Dmitry Firtash's company) to clean up Firtash's public image."  (ECF 84, at 23.)  This project involved work that Mr. Zuberi knew required FARA registration.  (*Id.*)  However, the lobbying firm was never actually retained.  (*Id.*)  The government's theory is that when Mr. Zuberi issued a $1,000,000 invoice to Group DF about four months later on January 1, 2015, he must have done the work that the lobbying firm was going to do and thereby violated FARA by not registering his activities.  (*Id.*)

The government is making criminal accusations based on rank speculation.  With no factual support, the government assumes Mr. Zuberi must have done the same work he would have given the registered lobbying firm.  The government guesses wrong.  Mr. Zuberi was paid pursuant to a legitimate commercial contract with Group GF, not for activity that requires registration under FARA.  (*See* Exhibit 7) (showing $1 million contract relating to production and distribution of fertilizer); 22 U.S.C. § 613.  Indeed, all of the alleged activity that the government claims Mr. Zuberi participated in with respect to Group DF occurred *after* Mr. Zuberi's invoice.  Thus, it is clear the payment was entirely unrelated to any alleged FARA violations.  (ECF 84, at 22-23.)

The government attempts to support its logical leap by pointing to events after the invoice that purportedly show Mr. Zuberi engaged in activity requiring registration.  Specifically, the government claims that in "January 2015, Zuberi solicited and received from two members of the HFAC letters of invitation addressed to two members of the United Kingdom and German legislatures who . . . had previously operated as lobbyists and/or agents of Dmitry Firtash."  (*Id.* at 23.) However, the government provides no actual evidence that Mr. Zuberi solicited these letters.  Nor does it provide any evidence that the legislators had any current affiliation with Group DF at all.

Next, the government claims that on February 7, 2015, Mr. Zuberi, "members of Zuberi's U.S. entourage and the Group DF representatives traveled to Munich to meet with the members of a Congressional delegation attending the annual Security Conference."  (*Id.*)  Again, without direct citation to evidence, the government claims that Mr. Zuberi "engaged in private conversations with two U.S. Senators" and that they told him "the idea needed more development."  (*Id.*)  But even if true, this would not constitute a FARA violation.  To violate FARA, an agent of a foreign principal must engage or act "within the United States."  22 U.S.C. § 611.  This alleged conversation occurred in Munich.

**B.     Courts Show Leniency Towards FARA Violations**

The particulars of Mr. Zuberi's conduct aside, the reality is that Mr. Zuberi is guilty of a technical reporting violation.  As the USPO correctly found, "what makes [Mr. Zuberi's] actions illegal is a lack of disclosure and material omission of his conduct and not the conduct itself.  For example, Zuberi would not have violated FARA if he properly disclosed he was working for an agent of the Sri Lankan government."  (ECF 58, at 5.)[25]  In other words, Mr. Zuberi's crime—for which he

---

[25] Indeed, this conclusion is confirmed by the FARA Unit Chief, who has "noted that foreign government lobbying in the United States is not itself inappropriate or

accepts full responsibility—was his failure to timely register under FARA, not espionage.  The government's relentless attempts to transform this crime into something far more sinister fails.

First, the government contends this case merits exceptional punishment because "Zuberi would have been unable to secure foreign clients if he had filed truthful FARA registrations."  (ECF 84, at 5, 7.)  According to the government, the "foreign governments and individuals at issue only retained Zuberi because diplomatic, transparent, and legal lobbying mechanisms had proved inadequate to obtain the results they sought."  (*Id.*)  This is pure speculation and indicative of the government's overreaching in this case.  Lobbying is legal.  FARA-registered lobbyists are hired routinely.  There is simply nothing to support this allegation by the government.

Second, the government also contends that Mr. Zuberi indicated "he was party to *quid pro quo* arrangements that involved the change of money in return for U.S. government action."  (ECF 84, at 5.)  Specifically, the government claims Mr. Zuberi said:

> "I'm in charge of fund-raising for [] President Obama." … "When you take pictures with [] President Obama … this will open up business for you.  Plus, you know, in the States we have [a saying] that says, 'I scratch your back, you scratch my back.'" … "You come donate, and you come take pictures." … "if you pay, you know, we American[s], we can give you business in Libya, we can give you business in Kuwait.  You know, there are a lot of military work[s] going on.  We can help out there in a lot of ways."

But this testimony comes from Person C, who as explained below in Section V(A)(2), is not a reliable witness.  In fact, documentary evidence shows that Mr. Zuberi was not at all in charge of fundraising for President Obama.  (ECF 103, Ex. 14) (showing Mr. Zuberi's communications with persons who actually were in charge)  Moreover, even if the statements were true, they do not describe a *quid pro*

---

unlawful, and that foreign agents who are not otherwise exempt must register under FARA."  Exhibit 8 at 8.

*quo*.  In context, Mr. Zuberi the statements merely suggest that Mr. Zuberi explained that taking pictures with high-ranking public officials or making political contributions would "open up business."  (ECF 84, at 5.)  He never mentioned giving a specific contribution for a specific benefit.  Expecting to receive the general goodwill and ingratiation that results from political donations is not criminal.  *See Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 360 (2010) ("Ingratiation and access . . . are not corruption."); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions.  No bribe thus occurs if the elected official later does something that benefits the donor.").  The government either fundamentally misunderstands the law regarding political contributions or, if not, baselessly seeks to disparage Mr. Zuberi in public filings.

Third, the government argues severe punishment is warranted because truthful FARA disclosures would have revealed Mr. Zuberi's source of funding for his lobbying efforts.  According to the government, this "would have enabled policymakers to consider Zuberi's lobbying in context" and "likely have caused policymakers to seek more information on whether Zuberi's campaign contributions were funded by foreign entities, and to reject any contributions of foreign money." (ECF 84, at 6-7.)  But none of these hypotheticals make Mr. Zuberi's violation unique or worthy of extra blame.  Instead, those theoretical effects of non-disclosure are inherent in *any* FARA violation.  Indeed, the government conceded as much when it stated in the information in this case that:

> "One purpose of FARA is to create transparency regarding the existence and extent of the relationship between individuals operating in the United States and their foreign principals.  Proper registration under the statute allows the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals."

(Information, ECF 1, ¶ 10); *see also Meese v. Keene*, 481 U.S. 465, 469 (1987) (FARA's purpose is "that the Government of the people of the United States may be

1  informed of the identity of such persons and may appraise their statements and

2  actions in light of their associations and activities.").

3        Fourth, the government contends that Mr. Zuberi's FARA violations merit

4  severe punishment because they were "necessary to Zuberi's fraud and tax evasion

5  schemes."  (ECF 84, at 6.)  In other words, the government seeks to bootstrap the

6  conduct already fully accounted for in the tax fraud Guideline calculation into the

7  FARA sentencing determination.  But this attempt runs afoul of the Guidelines and

8  would lead to impermissible double-counting of the same conduct.  *See United*

9  *States v. Martin*, 278 F.3d 988, 1004-05 (9th Cir. 2002) ("Impermissible double

10  counting occurs only when one part of the Guidelines is applied to increase a

11  defendant's punishment on account of a kind of harm that has already been fully

12  accounted for by application of another part of the Guidelines.") (*quoting United*

13  *States v. Alexander*, 48 F.3d 1477, 1492 (9th Cir. 1995)).

14        Fifth, plainly alluding to the Russian interference in the 2016 presidential

15  election, the government argues that exceptional punishment is warranted because

16  "[p]ublic opinion is already rife with suspicions that foreign influence has

17  compromised our elections and confidence in our democratic institutions has

18  weakened."  (ECF 84, at 9.)  In essence, the government argues this Court should

19  increase Mr. Zuberi's sentence to punish entirely unrelated crimes committed by

20  different individuals.  It is axiomatic that this unrelated conduct by different

21  individuals says nothing about nature and circumstances of *Mr. Zuberi's* offense.

22  Mr. Zuberi should not be made the scapegoat for conduct that he had nothing to do

23  with.

24        Sixth, the government argues that Mr. Zuberi's "entire business model

25  consisted of soliciting foreign governments, entities, and individuals for money . . .

26  in return for Zuberi wielding influence with members of Congress and the Executive

27  Branch under the false pretense that he acted independently and in the best interest

28  of the United States."  (ECF 84, at 9.)  This is inaccurate.  As an initial matter, and

as explained above, there is no evidence to show that Mr. Zuberi's lobbying was contingent on maintaining the "false pretense" that he was not acting as an agent of a foreign individual or entity.  Moreover, Mr. Zuberi engaged in significant business outside of lobbying activity.  Indeed, the government must know its statement is inaccurate because it is contradicted by numerous references to Mr. Zuberi's other endeavors in the government's briefs.  (*See* Amended Government Sentencing Position re Obstruction, ECF 42, at 7.) (discussing investment in Rad Pad company); (*id.* at 14.) (referencing Mr. Zuberi's "various real estate holdings"); (*id.* at 20.) (discussing the USCares project); (ECF 84, at 16.) (discussing Mr. Zuberi's construction projects).

In the end, Mr. Zuberi is guilty of the FARA count with which he is charged.  But he is guilty of a technical reporting violation.  For the better part of a century, neither courts nor law enforcement have treated this crime as one worthy charging, let alone a significant prison sentence.  Indeed, a 2016 audit report by the Office of the Inspector General determined that "historically there have been hardly any FARA prosecutions.  Over the past 50 years, between 1966 and 2015, [the DOJ] reported to us that it brought, in total, only seven criminal FARA cases."  (Exhibit 8 at 8.)[26]  This dearth of prosecutions is not due to an absence of violations—in fact, the audit report found that 62 percent of FARA registrations were incomplete or untimely, like Mr. Zuberi's.  (*Id.* at 14.)  Rather, the reason for the dearth of prosecutions and convictions is that the violations have never been treated as serious criminal offenses.  Instead, the National Security Division "has a clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution."  (*Id*. at 10.)  "[E]ven though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure."  (*Id*. at 11.)

---

[26] Only three of those prosecutions resulted in convictions.  *Id.*

**C.**    **The Need to Avoid Unwarranted Sentencing Disparities**

The government's argument that sentences in other cases demonstrate that a lengthy sentence should be imposed is disingenuous.  In fact, the cases cited by the government demonstrate just the opposite.

In *United States v. Siljander*, No. 4:07-cr-00087 (W.D. Mo.), the defendant received a prison sentence of only one year and one day for his FARA violation, which also included an obstruction enhancement, while his co-defendant received no prison sentence at all.  However, the *Siljander* defendant's FARA violation was actually more severe than Mr. Zuberi's for two reasons.  First, unlike Mr. Zuberi, the defendant was lobbying for a group that "was included on the United States Senate Finance Committee list identifying charities suspected of funding terrorism." *Id.*, ECF 640, at 4.  Thus, unlike Mr. Zuberi's lobbying, which was permissible if properly disclosed, the defendant's lobbying was inherently illegal.  Second, unlike Mr. Zuberi, who agreed to plead guilty pre-indictment, the defendant failed to show the same level of remorse for his actions by waiting until the eve of trial to plead guilty.  *Id.*, ECF 435, 539.

Similarly, in *United States v. Ben Israel*, No. 1:13-cr-00572 (N.D. Il.), the defendant was sentenced to only seven months for conduct that was more serious than Mr. Zuberi's.  There, the defendant's lobbying for Zimbabwe violated an executive order issued by the President pursuant to the International Emergency Economic Powers Act ("IEEPA"), which stated that:

> the actions of members of the Zimbabwe "to undermine Zimbabwe's democratic processes or institutions, contributing to the deliberate breakdown in the rule of law in Zimbabwe, to politically motivated violate and intimidation in that country, and to political and economic instability in the Southern African region, constitute an unusual and extraordinary threat to the foreign policy of the United States.

*Id.*, ECF 116.  Thus, as in *Siljander*, the defendant's violation was not just the failure to report under FARA.  Rather the lobbying, in and of itself, was illegal.

In *United States v. Vincent et al.*, No. 1:05-cr-00059 (S.D.N.Y), the

government correctly notes that the defendant was sentenced to five years for FARA violations related to his work with Iraq.  (ECF 84, at 25.)  However, the government fails to mention the following critical facts, which made that case exceptional.  First, the defendant fled the country to avoid a grand jury subpoena and the charges against him, requiring the government to issue an Interpol red notice for his arrest. *Vincent*, ECF 74.  Second, even after his arrest, he took his case to trial and refused to plead guilty and accept responsibility, unlike Mr. Zuberi.  Third, unlike Mr. Zuberi, who has no criminal history whatsoever, the defendant had previously been charged with a FARA violation in 1977, which made his conviction essentially his second offense.[27]  *Id*.  Fourth, like the defendants in *Ben Israel* and *Siljander*, and unlike Mr. Zuberi, the defendant's lobbying was illegal in and of itself.  The defendant's lobbying (1) was expressly prohibited by executive order of the President pursuant to the IEEPA; (2) violated United Nations economic sanctions; and (3) contravened established U.S. foreign policy because Iraq "was a country designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism." *Id.*, ECF 61.  Fifth, unlike Mr. Zuberi's FARA crime, the defendant's conduct went well beyond lobbying and involved the bribing of U.N. officials and the abetting of a fraud perpetrated by the Iraqi government with respect to international oil sanctions.  *Id.*

Likewise, in *United States v. Manafort*, No. 1:17-cr-00201 (D.D.C.), the defendant received a five-year sentence, but again the conduct at issue in that case was drastically different.  First, the defendant refused to plead guilty and accept responsibility for his violation until after he was found guilty and convicted of separate charges in the Eastern District of Virginia.  Even then, he waited until the eve of trial, forcing the government to expend time and resources to prepare for trial. Second, unlike Mr. Zuberi, the defendant continued to lie to the government and

---

[27] The first FARA charge was dropped in exchange for the defendant's cooperation.

obstruct justice even after he purportedly agreed to cooperate, which vitiated any acceptance of responsibility. *Id.*, ECF 528. Third, the defendant, a career lobbyist unlike Mr. Zuberi, committed his FARA violations after being expressly "warned by the Department of Justice about the law's strictures" numerous times. *Id.* Fourth, and perhaps most importantly, the defendant's conduct was highly publicized, strongly influential, and closely tied with foreign governmental interference in the outcome of our country's presidential elections. The government cannot with a straight face compare the defendant's involvement in that political scandal with Mr. Zuberi's business-oriented conduct.

Indeed, the only truly analogous case is *United States v. Chaudhry*, No. 1:18-cr-00226 (D. Md.), in which the defendant also pleaded guilty pre-indictment to a first-time FARA violation for lobbying that was not illegal by itself. In that case, the defendant received <u>no prison sentence</u>. In fact, consistent with the DOJ's longstanding policy of encouraging voluntary registration instead of pursuing criminal prosecution, it appears that there is not a single case in the history of the FARA statute that has imposed a prison sentence on a defendant who has pleaded guilty pre-indictment and accepted responsibility for the violation.

The government's argument as to why Mr. Zuberi's violation "exceeds that of all the above cases" is nonsensical. (ECF 84, at 27.) Essentially, the government ignores all of the distinguishing facts above and instead boils each case down to the number of foreign countries it alleges were involved. Reflective of its decision to file hundreds of pages of briefing and thousands of pages of exhibits where the defendant signed a plea agreement before being charged, as if the volume of sentencing briefs should determine the length of a sentence, the government uses this number as a crude barometer for the severity of the violation. (*Id.*) In the government's eyes, because Mr. Zuberi's alleged FARA violations involved more foreign principals, it must have been more severe. But the government compares apples to oranges. The severity of the violation does not turn on the bare quantity of

the countries involved, even if the conduct were relevant and even if the government had proven all conduct was illegal, which it has not.  Surely, the defendant who spends a single day lobbying for two countries has not committed a more severe violation than the defendant who has persistently and persuasively lobbied for a single country for a decade.  In short, the government's barometer is an inaccurate, if not outright misleading, measure for determining the severity of the violation and the appropriate level of punishment.

## V.   Obstruction

Mr. Zuberi admits, and accepts responsibility for, the fact that he obstructed justice with respect to the February 25, 2019 backdating of a check.  As such, he does not dispute that the two-level enhancement applies.  However, the government mischaracterizes many facts in its brief on the obstruction enhancement.  Mr. Zuberi seeks to correct the record on these points.

### A.   Witness Tampering

#### 1.   Person LL

##### a.   Background

Mr. Zuberi and Person LL were close associates who frequently conducted business together.  Two of those many transactions have been singled out by the government for purposes of sentencing here.  First, on July 28, 2016, Person LL issued a $50,000 check ("Rad Pad Investment") to Mr. Zuberi for an investment in a company called "Rad Pad," which was an online rental housing service.  Second, on November 15, 2016, Person LL issued Mr. Zuberi a $50,000 check ("Inauguration Contribution") for a contribution to the 2017 Presidential Inauguration Committee ("PIC").  Apparently believes—erroneously—that any repayment of an investor who might be a witness is tampering, the government claims that Mr. Zuberi defrauded Person LL out of both these payments and then committed witness tampering by issuing refunds.

b.     **Alleged Fraud**

Neither of Person LL's checks were procured by fraud, as the government asserts.[28]  As to the Rad Pad Investment, the government claims that the Mr. Zuberi committed fraud by failing to deposit the check into a designated Rad Pad account and by using funds from the check for personal expenses.  (ECF 42, at 4.)  While it is true that Mr. Zuberi deposited the proceeds of the investment into a personal account, this was only because no Rad Pad account existed yet.  The mere fact that Mr. Zuberi used this comingled account for personal expenses does not prove that he defrauded Person LL and that he did not intend to honor his investment.  To the contrary, Mr. Zuberi continuously reaffirmed Person LL's right to the money and eventually returned it when asked.  (ECF 42, at 18 n. 10.)

As to the Inauguration Contribution, the government contends that Mr. Zuberi committed fraud by failing to give Person LL's contribution to the PIC.  The government's claim is bizarre.  On November 9, 2016 Person LL gave Mr. Zuberi the Inauguration Contribution.  On December 15, 2016, Mr. Zuberi contributed $900,000 to the 2017 PIC.  (ECF 42, Ex. 3.)  There is no evidence to suggest that Person LL's contribution was not part of $900,000 payment.  Nor is there any evidence that Mr. Zuberi did not intend to honor Person LL's contribution.  To the contrary, Mr. Zuberi continuously reaffirmed Person LL's right to attend the inauguration.  The only reason Person LL did not attend was that he was out of the country on that date.  Mr. Zuberi still gave him a full refund.  (ECF 42, at 18 n. 10.)

c.     **Alleged Witness Tampering: 5/4/17**

Contrary to the government's claim, Mr. Zuberi also did not commit witness tampering with respect to Person LL on May 4, 2017.  After Person LL gave Mr.

---

[28] Indeed, long after he made both payments, Person LL and Mr. Zuberi continued to have a close and positive relationship.  *See* (ECF 53, Ex. 2.) (Person LL telling Mr. Zuberi: "I love you[.] And thank you").

Zuberi the Inauguration Check, Person LL decided that he would not attend the inauguration because he was out of the country.  Mr. Zuberi gave Person LL his money back.  That is all.  The government contends that Mr. Zuberi tampered with Person LL because Mr. Zuberi only made efforts to refund his payment after he became aware of the government's investigation on February 24, 2017, when Special Agents of the Internal Revenue Service ("IRS") attempted to interview him.  (ECF 42, at 3, 5.) As explained below, the government is wrong.

On April 11, 2017, Person LL asked Mr. Zuberi for a refund for the Inauguration Contribution and certificates of his Rad Pad investment.[29]  (ECF 42, at 9.)  Mr. Zuberi was in Dubai at the time, but arranged to meet Person LL in Los Angeles on May 4, 2017, to give him the check and the documents in person.[30]  *Id.* On May 4, 2017, Mr. Zuberi picked Person LL up from LAX and they stopped at a gas station to refuel before going to dinner.[31]  At some point during the meeting, Mr.

---

[29] In an effort to paint Mr. Zuberi in a negative light, the government claims that Person LL informed Mr. Zuberi that he would not attend on December 21, 2016. (ECF 42, at 8.)  The government chooses this date because, on the same day, Mr. Zuberi told Person LL he would mail his check, but didn't actually do so.  *Id.* However, the government fails to mention that subsequent communications between Person LL and Mr. Zuberi reveal that Person LL actually changed his mind again and then waffled for weeks.  This continued until January 4, 2017, when Mr. Zuberi sent Person LL a message stating, "Please confirm you still want r [sic] to go to the Inauguration for me to hold the ticket."  (O'Brien Declaration re Obstruction, ECF 53, Ex. 2.)  It was only at this point that Person LL finally decided that he would not attend because he had "to be in [foreign country] that week."  (ECF 42, at 6.)

[30] The government implies nefarious motives from the request for an in-person meeting.  The texts cited by the government suggest that Mr. Zuberi was out of the country and exasperated from Person LL's frequent texting from a different time zone.  These texts show he was traveling back and forth from Dubai and Geneva likely did not have time to accommodate Person LL's request.  (ECF 42, at 9-10.) Person LL also typically traveled to Los Angeles in May on his own accord.  (ECF 53, Ex. 1.)

[31] The government accurately states that, prior to this meeting, Mr. Zuberi told

1  Zuberi gave Person LL the $50,000 refund he requested.  However, contrary to the

2  government's claim, Mr. Zuberi did not seek to exchange the refund check for

3  Person LL's silence.  Four critical facts debunk the government's argument.  First,

4  Mr. Zuberi actually wrote Person LL a refund check for $50,000 on January 28,

5  2017—*before* his meeting with IRS agents.  (Exhibit 10.) (carbon copy of $50,000

6  check made out to person LL, dated January 28, 2017).)  This check demonstrates

7  his prior intent to reimburse Person LL irrespective of the investigation.  Second,

8  Mr. Zuberi merely provided the check *in response* to Person LL's request for a

9  refund.  (ECF 42, at 9.)  There is no evidence that Mr. Zuberi ever initiated contact

10  with Person LL.  Person LL asked for the money he was entitled to and Mr. Zuberi

11  gave it to him.  (ECF 53, at 10 n. 5.) ("Person LL was entitled to the return of his

12  money.")  Third, as the government concedes, Mr. Zuberi gave Person LL the

13  refund check even though "[t]he record suggests that Person LL never agreed to

14  remain silent. . ." (*Id.*)  In other words, the government admits that Mr. Zuberi's

15  payment was not conditioned on obtaining Person LL's silence.  Fourth, at this point

16  in time, Mr. Zuberi was only aware of the IRS's *tax* investigation into him.  Given

17  that Person LL had no relation to any of Mr. Zuberi's tax crimes, it would not make

18  sense for him to attempt to silence Person LL.

19       The government also blatantly mischaracterizes other important details of this

20  meeting in an effort to vilify Mr. Zuberi.  First, the government states that Mr.

21  Zuberi "told Person LL to turn off his cell phone or told him to place it within the

22  car (likely to ensure it could not be used to record their conversation)."  (ECF 42, at

23  _____

24  Person LL, "I will be using 626.818.4820 number for tomorrow Thursday May 4
    only.  Please call this number if I don't pick up my regular number."  (ECF 42, at

25  10.)  However, the government wrongly attributes sinister motives to this statement.
    This number is, and has been since 2006, Mr. Zuberi's second phone line—not some

26  type of burner phone, as the government insinuates.  (Exhibit 9).  Mr. Zuberi's

27  regular phone was in the possession of his lawyers on this day.  This is another

28  example of the government assuming the worst about Mr. Zuberi.

10.)  But the memorandum of Person LL's interview does not say that.  The memorandum states only that "[Person LL] left his phone in the car when he exited to speak" to Mr. Zuberi.  (ECF 53, Ex. 1.)  Nowhere does it suggest that Mr. Zuberi told him to do so.  (ECF 53, ¶ 10 n.3) ("The memorandum of interview does not recite [Person LL's] statement that Zuberi asked him to turn off or leave his cellphone.")  Buried in a footnote of a declaration, the government admits that this assertion is based on the prosecutor's "personal recollection of the interview."  (*Id.*)  But the *prosecutor's personal recollection* of a double-hearsay statement from an interview conducted months prior to his declaration cannot seriously be considered reliable evidence.[32]  The government provides no explanation as to why such a salacious allegation was left out of the interview memorandum prepared by the FBI agents who were physically present at the interview (unlike the prosecutor who participated via teleconference).  (*Id.*, Ex. 1.)

Second, the government insinuates that Mr. Zuberi told Person LL that he was having "tax issues" because he was requesting his silence.  (ECF 42, at 10.)  However, again, the memorandum of the interview does not say that.  It merely says that Mr. Zuberi "explained to [Person LL] at some point he was having 'tax issues.'"  (ECF 53, Ex. 1.)  The government fails to mention that during this period, Person LL was facing serious business and legal issues of his own that had put him in financial trouble and in "need of a lot of money."  (ECF, at 9) ("I have people pushing and pushing me . . . i [sic] am going rrwlay [sic] through tough time . . . Know [sic] pleasd [sic] help me"))  In addition, because of these financial

---

[32] The prosecutor has made himself a witness and potentially raised conflict of interest issues by his declaration.  Indeed, throughout his declarations, the prosecutor makes numerous assertions of personal knowledge of facts without attaching any supporting evidence.  Mr. Zuberi reserves the right to cross-examine the declarant at the sentencing hearing, unless the government withdraws all of the prosecutor's unsupported assertions.

difficulties, Person LL had previously asked Mr. Zuberi for a $110,000 loan for his business. (*Id.*, Ex. 3.)[33] Thus, Mr. Zuberi brought up his "tax issues" to explain why he could not give Person LL a loan—not to explain what Person LL needed to be silent about. (ECF 42, at 10.)

### d. Alleged Witness Tampering: 6/21/17-7/28/17

The government further claims that Mr. Zuberi committed witness tampering again in July 2017 with respect to Person LL. Again, the government's argument is untethered from the facts. Mr. Zuberi simply refunded Person LL the money he owed him.

Sometime after May 2017 meeting, Person LL lost the reimbursement check that Mr. Zuberi had given him for the Inauguration Contribution. (ECF 42, at 11.) On June 21, 2017, Person LL requested another check from Mr. Zuberi, as well as the certificate for his investment in Rad Pad. (*Id.*) Accordingly, Person LL and Mr. Zuberi met at hotel in New York on July 28, 2017, where Mr. Zuberi handed Person LL another check. (*Id.* at 12.) Other than speculative inferences from Mr. Zuberi's desire to meet with Person LL in person, the government provides no evidence or testimony that Mr. Zuberi indicated that this check was in exchange for, or conditioned on, Person LL's silence.

Recognizing the want of evidence, the government attempts to claim that Mr. Zuberi "sought to create a false paper trail connected to the July 2017 check and wrote 'investment payback' on the memo portion of the check," even though it was for the Inauguration Contribution (ECF 42, at 13.) The evidence does not bear out this assertion.

First, the government glaringly omits from its brief the fact that Person LL

---

[33] Person LL request for a loan from Mr. Zuberi continued through this meeting and until at least February, 2019. (ECF 42, at 17.) ("Also if you can get me guratted [sic] loan of 250 or 300 k or 500k would be very helpful [sic]")

actually stated in his interview that the Inauguration Contribution was not refunded until February, 2019.  (ECF 53, ¶ 21(i).)  If so, then this July check could not have been reimbursement for the Inauguration Contribution, as the government claims. The government's response to this inconvenient fact is simply that it "believe[s] [Person LL] was mistaken."  (*Id.*)  But the prosecutor's belief is not evidence.

Second, government suggests that because Mr. Zuberi also stated he was bringing the Rad Pad certificates to the meeting, the check could not have been related to the investment.  However, the government neglects to mention that Person LL had previously directed Mr. Zuberi to refund only a portion of his investment. (ECF 53, Ex. 3.)  Thus, it would make sense for Mr. Zuberi to bring both a Rad Pad refund check and the certificate.

Third, contrary to the government's interpretation of the subsequent messages between Mr. Zuberi and Person LL, these messages actually suggest that Mr. Zuberi believed he was refunding the Rad Pad investment.  Specifically, when Person LL asked Mr. Zuberi why he did not send the investment certificate yet, Mr. Zuberi responded "I refunded you $50,000."  (ECF 42, at 12.)  Taken together, it is clear that the government has not met its burden to show that Mr. Zuberi sought to throw off investigators by misidentifying the check.  Rather, the evidence reveals that the government will go to great lengths to discount, and hide, any facts that don't fit with its preconceived theories.

### 2.   Person C

#### a.   Background

The government contends that Mr. Zuberi also obstructed justice by tampering with another witness, Person C.  But the government relies entirely on Person C's biased and unreliable testimony on this point.  Person C was intimately involved in conduct that the government now claims constituted criminal FARA violations.  Specifically, Person C was the mastermind of the plan to work in the United States to unfreeze Libyan assets, as described in the government's FARA

brief.  (ECF 84, at 16-17.)  He was the one who approached Mr. Zuberi and asked for his help on the project.  Moreover, he and his partner, Person A, were the ones who continued to pursue the plan even after Mr. Zuberi abandoned it.  (*Id.* at 18.)[34]  Thus, it is no surprise that he attempted to assassinate Mr. Zuberi's character in his testimony.  By attacking Mr. Zuberi's credibility, he could downplay his role in the alleged criminal activity and save his own skin.[35]

In fact, aspects of Person C's account are disproven by documentary evidence.  For example, Person C claims that he met Mr. Zuberi at Mr. Zuberi's hotel room in Dubai in May 2018.  (ECF 42, at 13.)  Once there, he claims that Mr. Zuberi "asked for Person C's mobile phone, told him that the FBI might be listening, placed both Person C's and his own phone in the bedroom (likely to prevent recording of their conversation), and escorted Person C to the dining room" to request that Person C avoid the United States.  (*Id.*)  However, the documentary evidence shows that Mr. Zuberi's hotel room in Dubai was a single-room suite.  *See* (Declaration of Claude Arnold, Exs. A-B.)  The separate dining room where this conversation supposedly took place doesn't exist.  As such, Person C's testimony should not be believed.

### 3.   Person MM:

#### a.   Alleged Witness Tampering: Unknown Date

The government argues that, on some unknown date, Mr. Zuberi visited Person MM and asked him not to visit the United States.  (ECF 42, at 19.)[36]  The

---

[34] Mr. Zuberi abandoned the project after he developed concerns that Person C and others had committed FCPA violations in the process of securing the Libyan official's commitment to the project.

[35] Indeed, the strategy appears to have worked, because Person C, also a U.S. citizen, has not been charged with any crime related to the Libya conduct, which the government now contends was illegal.

[36] The government also asserts that Person MM made illegal campaign contributions

government bases its entire assertion on the statements of Person C, who did not even claim to be present at this meeting.  In fact, Person C did not even know when or where it took place.  Tellingly, the government provides no evidence whatsoever from Person MM, the only actual witness to the alleged encounter, to support its claim.  As explained above, Person C is both a biased and unreliable source.  His double-hearsay statements are not sufficient to meet the government's burden of proof.

### 4.   USCares Investors

The government also alleges that Mr. Zuberi defrauded USCares investors and then committed obstruction of justice by paying them back the money the government concedes they were owed.  Again, the government has not supported its claims.

### a.   Alleged Fraud

Person L, Person M, Person N, and Person J, individually and/or through their companies, were investors in USCares, a company that sought to apply for a license from the Office of Foreign Assets Control ("OFAC") to export food, medicine, and medical supplies from the U.S. to Iran.  The government wrongly claims that Mr. Zuberi perpetrated a fraud against these investors.

First, the government claims that Mr. Zuberi made false representations to pressure one individual into investing.  (ECF 42, at 20.)  Specifically, the government claims that Mr. Zuberi "falsely claimed that investment spots were closing because of the high degree of interest from other investors."  (*Id.*)  These statements, typical in arms-lengths negotiations, are puffery—not materially fraudulent.  A real-estate agent does not commit criminal fraud every time he urges

_____

through Mr. Zuberi in violation of FECA.  The government cites to no evidence of this in its obstruction brief.  FECA related issues are discussed in detail in Section II, *supra*.

1 a potential client to move quickly because there are other motivated buyers.

2     Second, the government claims that Mr. Zuberi defrauded investors by

3 instructing them to transfer their investments into his personal accounts rather than a

4 USCares capital account, in violation of their operating agreement.  (ECF 42, at 20.)

5 Again, this is not fraud.  The government's brief makes clear that Mr. Zuberi did not

6 deceive the investors: he told them their money was not going into a USCares

7 account.  *Id.*  This commingling of assets amounts to, at most, a breach of the

8 operating agreement—not fraud.  In any event, it is not even clear that Mr. Zuberi

9 breached the agreement.  The USCares contract did not prohibit Mr. Zuberi's use of

10 the funds while waiting for the regulatory hurdles to clear.  Instead, it explicitly

11 stated that a Member (Mr. Zuberi was a member) could borrow money from

12 USCares with approval of a manager (Mr. Zuberi was a manager).  (ECF 109, Ex.

13 11.)

14     Third, the government suggests Mr. Zuberi converted the funds for his own

15 benefit without actually performing any work on the project.  Not so.  Mr. Zuberi

16 took numerous steps to implement USCares' business plan, including: (1) retaining

17 a law firm for a "90-day strategic legal and political assessment, to produce a

18 comprehensive risk analysis and a road map and recommendations for advancing

19 the proposed transactions"; (2) retaining the same law firm to assist with "applying

20 for any required US Government licenses and drafting the various commercial

21 agreements required to execute the proposed transactions"; (3) obtaining due

22 diligence reports; (4) drafting licensing applications.  (Exhibit 11.)  After the project

23 failed, Mr. Zuberi returned the investments.  (ECF 42, at 22.)

24     **b.     Alleged USCares Investors Tampering: 4/28/17 to**

25             **3/14/19**

26     The government claims that Mr. Zuberi committed witness tampering by

27 returning the very funds that the government claims the investors were entitled to.

28 (ECF 42, at 23.)  The government presents a conspiratorial view of the facts.

Beginning on or around October 16, 2016, USCares investors began to ask for their investments back and some threatened legal action.  (ECF 42, at 21.)  After back and forth between the parties, on April 28, 2017, Mr. Zuberi began to settle with these investors and paid back their money pursuant to those settlements.  (ECF 42, at 22.) The government does not dispute that these investors were entitled to the money they received.

This is not obstruction.  The government cannot have it both ways.  In the government's view, if Mr. Zuberi refused to pay back the money, he is guilty of fraud.  If he paid back the money, he committed obstruction.  Mr. Zuberi is permitted to settle potential civil lawsuits against him without automatically subjecting himself to criminal liability.  In fact, Mr. Zuberi's counsel volunteered to the government that Mr. Zuberi had begun to undertake this course of action in June 2018, vitiating any implication that he was covertly attempting to obstruct justice.

Moreover, Person N, Person M, and others made unambiguous statements that they were not defrauded by Mr. Zuberi.  (ECF 42, at 24.) ("I don't believe that Mr. Zuberi's action were in any way fraudulent . . . That money was effectively loaned to him, and he will repay it at the appropriate time.").  The government claims that these statements are unreliable because they are "diametrically opposed to prior statements issued by Person N and Person M.  However, the statements are not irreconcilable.  Person N and Person M's previous statements only show that they wanted to recall their investment and were frustrated by the lack of immediate payment—not that they thought they had been defrauded.  Person N made no allegations of fraud in his demand.  (ECF 42, at 21.).  And while Person M's *lawyers* threatened to pursue a fraud claim against Mr. Zuberi as part of a common legal strategy to recover his investment, there's no proof that *Person M* actually believed he was defrauded.  (ECF 42, at 22.)  Even if the investors were frustrated by the slowness of Mr. Zuberi's refunds, the fact that the same investors were no longer frustrated (and were willing to say so) after he honored his obligation and

1  repaid them does not convert the act of repayment into paying the investors to

2  submit false declarations, as the government recklessly argued.

3  **VI.  <u>Conclusion</u>**

4       Mr. Zuberi has accepted responsibility for his crimes by pleading guilty.  Yet,

5  still unsatisfied, the government has filed over one-hundred pages of briefing

6  detailing non-relevant and speculative allegations against Mr. Zuberi in an effort to

7  further vilify Mr. Zuberi in a public forum.  For the foregoing reasons, the Court

8  should reject the government's arguments and find, as the USPO did, that a below-

9  Guideline sentence is appropriate.

10

11  DATED:  May 18, 2020          BROWNE GEORGE ROSS LLP

12                                       Thomas P. O'Brien

13

14                           By:       /s/ Thomas P. O'Brien

15                               Thomas P. O'Brien

16            Attorneys for Defendant Imaad Shah Zuberi

17

18

19

20

21

22

23

24

25

26

27

28