NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2468
    Facsimile: (213) 894-2927
    E-mail:    daniel.obrien@usdoj.gov
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Trial Attorney, National Security Division
EVAN N. TURGEON (D.C. Bar No. 1010816)
Trial Attorney, National Security Division
United States Department of Justice
    950 Pennsylvania Avenue, N.W., Suite 7700
    Washington, D.C. 20530
    Telephone: (202) 353-0176
    E-mail:    evan.turgeon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-642-VAP |
|---|---|
| Plaintiff, | No. CR 20-155-VAP |
| v. | GOVERNMENT'S FINAL SENTENCING POSITION |
| IMAAD SHAH ZUBERI. | Date:        November 30, 2020 |
| Defendant. | Time:        10:00 a.m. |
| | Location:    Courtroom 8A |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, submits its Final Sentencing Position with respect to defendant Imaad Shah Zuberi ("defendant").

Dated: November 9, 2020

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
DANIEL J. O'BRIEN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

DESCRIPTION                                                                 PAGE

TABLE OF AUTHORITIES............................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION.................................................................1

II.   SECTION 3553 SENTENCING FACTORS CALL FOR A LENGTHY TERM OF
      INCARCERATION AND FINE IN EXCESS OF THE GUIDELINE RANGE........3

      A.    Nature and Circumstances of the Offense...................3

      B.    General Deterrence........................................7

      C.    Specific Deterrence.......................................8

      D.    Defendant's History and Characteristics...................8

      E.    Sentencing Disparities Re FECA & FARA Violations........11

      F.    The Court Should Embrace the Commission's FECA And Tax
            Policy Statements and Guidelines, Not Reject Them.......14

      G.    Just Punishment/Seriousness of Offense/Respect for Law...16

III.  CONCLUSION..................................................................19

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**Federal Cases**

Gall v. United States,
  552 U.S. 38, 52 ........................................................ 12

Kimbrough v. United States,
  552 U.S. 89 (2007) ................................................. 14, 15

United States v. Booker,
  543 U.S. 220 (2005) .................................................... 14

United States v. Henderson,
  649 F.3d 955 (9th Cir. 2011) .......................................... 14

United States v. Marcial-Santiago,
  447 F.3d 715, 719 (9th Cir.2006) ...................................... 13

United States v. Miller,
  953 F.3d 1095, 1103 n.10 (9th Cir. 2020) ......................... 12

United States v. Psick,
  434 Fed.Appx. 646 (2011) .............................................. 14

United States v. Treadwell,
  593 F.3d 990, 992 (9th Cir. 2010) ................................. 12

**Federal Statutes**

18 U.S.C. § 3553(a)(2)(B) ................................................. 7

28 U.S.C. § 991(b)(1)(B) .................................................. 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendant's crimes are multifaceted but boil down to four primary aspects.  First, defendant used foreign money to fund illegal campaign contributions that bought him political influence.  Second, using this influence, defendant secretly lobbied United States officials for policy changes on behalf of foreign principals.  Third, defendant reaped huge profits for himself by defrauding clients, investors, subcontractors, and the IRS.  Fourth, defendant obstructed the government's investigation by paying millions of dollars to procure the silence of witnesses and by destroying evidence.

Defendant's failure to accept responsibility cannot be ignored by either the prosecution or the Court.  Despite the passage of a year, defendant has failed to pay millions of dollars in restitution and refused to register under the Foreign Agents Registration Act ("FARA") for his covert foreign influence activity, as required by the plea agreement.  He made tardy attempts to sell properties only after the government began to file nominee liens on all real property subject to his control.  The defendant has made false representations to the Court in his sentencing filings and has frivolously contested sentencing issues.

Thus, the sentencing guideline range of 121 to 151 months is not only the product of the nature of defendant's crimes but also his inexplicable refusal to mitigate the consequences of his crimes, accept responsibility, and demonstrate remorse.  Even then, the guideline range does not adequately take into account the seriousness of defendant's conduct.  First, the U.S. Sentencing Commission has

1

not issued guidelines for foreign influence crimes, such as violations of FARA.  Therefore, one of the main aspects of defendant's malfeasance, which involved many different episodes and foreign principals, had no impact on his guideline calculations. Second, the two-level tax evasion enhancement for income derived from criminal activity fails to reflect the extent and multiple varieties of fraud schemes and FARA offenses that generated almost the entirety of defendant's income.  Third, defendant's obstruction enhancement fails to reflect its multi-faceted nature, which involved millions of dollars of payoffs to several witnesses as well as document destruction.  Only the Federal Election Campaign Act ("FECA") offenses are adequately represented by the guidelines.

A term of imprisonment within the guideline range is necessary in this case.  It must be sufficient to punish defendant's many offenses and to implement deterrence in a much-needed area. Clandestine foreign efforts to subvert U.S. democratic processes in recent years have caused a significant portion of the body politic to lose faith in our public institutions.  It is of crucial importance to restore such faith so that our government can function in accordance with its founding principles.  This case represents an egregious example of corrupt foreign influence peddling and has received significant public scrutiny.  A sentence within the guideline range is necessary to deter other would-be FARA and FECA offenders from compromising our elections and institutions with foreign cash.

Defendant's crimes have made him an extremely wealthy man.  Over approximately five years, he increased his net worth from about $1

million to about $32 million.  A fine well in excess of the guideline range is necessary for defendant to disgorge his ill-gotten gains.

## II. SECTION 3553 SENTENCING FACTORS CALL FOR A LENGTHY TERM OF INCARCERATION AND A FINE IN EXCESS OF THE GUIDELINE RANGE

### A.    Nature and Circumstances of the Offense

Defendant's FARA offenses are pervasive and among the most wide-ranging ever prosecuted.  Defendant's entire business centered on acting as an undisclosed agent for foreign principals.[1]  He retained several foreign governments and individuals as clients and received approximately $20 million in receipts.  He established relationships with officials at the highest levels of our government, including the Presidency.  He used millions of dollars of foreign money to influence and attempt to influence our public officials, institutions, and democratic processes.

Characterizing his offenses as technical reporting violations, defendant argues that he would have been equally successful had he filed accurate disclosures and that there is no evidence that foreign clients hired him because transparent methods of persuasion had

---

[1] Defendant's references to other business ventures (Dkt 122, p. 34) do not pertain to legitimate business activity.  His solicitation of $50,000 for a "Rad Pad" investment (*id.*) was never invested, but converted to his own use.  (Obstruction Brief, p. 4)  His claim that he deposited those funds into his personal account for lack of a Rad Pad corporate account (Dkt 122, p. 39) does not explain why he used a portion of those funds to pay his taxes.  (*Id.*)  He cannot fairly characterize U.S. Cares transactions as legitimate business activity (Dkt. 122, p. 34) because he used those funds to purchase real estate in his own name.  (Tax Brief, pp. 21-22)  His "construction projects" (Dkt 122, p. 34) represented a payment for engaging in unlawful lobbying on behalf of Turkey.  (FARA Brief, p. 13)  With the exception of some wire transfers from Person J for consulting services, the government is unaware of any profitable business venture engaged in by defendant that did not involve unregistered lobbying of U.S. public officials on behalf of foreign principals.

3

failed.  The litany of examples provided in prior briefings demonstrates otherwise.

Campaign contributions provide access to public officials, and discrete access provides opportunities for persuasion.  However, foreign actors face legal impediments from engaging in such activities.  Foreign contributions are prohibited.  Foreign agents are required by law to disclose their agency relationships, compensation, and campaign contributions.  Defendant's willingness to circumvent these laws made him a valuable commodity to foreign interests.

Defendant did not want to register under FARA because doing so would severely impede his fundraising efforts.  (FARA Brief, Ex. 6, pp. 33-35 & 60-61)[2]  By secretly routing foreign money to political campaigns and engaging in undisclosed lobbying efforts on behalf of foreign clients, defendant circumvented these obstacles.  Contrary to defendant's assertions, there is ample evidence that defendant succeeded where transparent lobbying efforts by foreign principals had failed.  In the case of Turkey, defendant announced his success in arranging for the Turkish Ambassador to "see senators and congressmen who weren't giving him time."  (Ex. 1A)  Defendant's successful lobbying efforts culminated with the Ambassador telling

---

[2] Government filings are referenced as Obstruction Brief (Dkt. 42 filed on 12/16/19), FARA Brief (Dkt. 84 filed on 3/17/20), FECA Brief (Dkt. 87 filed on 3/18/20), Tax Brief (Dkt. 89 filed on 3/20/20), Response Brief (Dkt. 106 filed on 4/13/20), Acceptance Brief (Dkt. 120 filed on 5/8/20), Second Response Brief (filed concurrently with this document on 11/9/20), and Reply Acceptance Brief (filed concurrently with this document on 11/9/20).

Defense filing are referenced by docket number.

4

him that, "he owes him one." (FARA Brief, p. 11) In the case of Libya, defendant said, "if it weren't for us, the Libyans wouldn't even get meetings." (Ex. 1B)

Defendant made abundantly clear his corrupt intention to make contributions to political campaigns and political foundations worth millions of dollars in order to generate official action worth billions of dollars. According to defendant, "I scratch your back, you scratch my back,"[3] "You want billions unfrozen. This [$3 – $5 million in donations] is nothing," and "this is how America work[s]." (FARA Brief, pp. 15-17) Defendant was able to defeat proposed legislation and change U.S. foreign policy to meet his clients' needs. In the case of Turkey, defendant was able to procure an about-face on proposed legislation from at least one of the measure's sponsors, and the measure was never passed. (*Id*., p. 11) In the case of Qatar, U.S. policy was changed to align with Qatar's interests.[4]

Similarly, defendant's FECA offenses represent one of the largest such schemes prosecuted, approaching nearly a million dollars in illegal campaign contributions. These contributions were almost entirely funded by prohibited foreign sources, presenting a threat to the integrity of our elections. This was not a case where passionate beliefs resulted in overzealousness; defendant was purely a mercenary, funneling money to whomever he believed would do his

---

[3] As part of his attempt to attack the credibility of Person C, defendant claims that the suggestion he was in charge of fundraising for President Obama was false. Defendant was Co-Chair of President Obama's National Finance Committee. (Reply Acceptance Brief, Ex. 6)

[4] See under seal filing.

bidding, as long as doing so would generate profits for both his clients and himself.

For example, on the night of the 2016 Presidential election, defendant was in New York City attending Hillary Clinton's anticipated victory celebration at the Javits Center. Days prior, he wrote, "Trump will be looked into after the election for his: 1) traitor (i.e. Russian) behavior, 2) tax fraud, 3) sexual harassment, 4) wages fraud and non-payment to contractors and his other scumbag behavior which might be illegal." (Ex. 2A)  Within days of President Trump's election, however, defendant began soliciting contributions to the 2017 Presidential Inaugural. (Ex. 2B)  By December 13, defendant was Co-Chair of the Trump Presidential Inauguration Committee. (Ex. 2C)

Defendant multiplied the proceeds of his crimes by defrauding clients, converting money intended for political campaigns, and welching on contractual obligations to subcontractors. He then expanded his illicit gains by evading taxes on almost all the income he generated. By itself, the tax fraud is an exceptional case that merits a significant sentence -- defendant concealed over $19,000,000 in income, a staggering amount.

Defendant compounded the gravity of his offenses by obstructing two separate criminal investigations by paying off witnesses, deleting emails, presenting false claims to the Court in connection with sentencing, and reneging on obligations in the plea agreement to pay restitution, file FARA registration statements, and correct

1    previous public filings.  Notwithstanding his plea of guilty,

2    defendant's unrepentant, corrupt behavior has never ended.[5]

3         **B.   General Deterrence**

4         Deterrence is a very important factor in fashioning an

5    appropriate sentence in this case.  Prior clandestine foreign efforts

6    to subvert U.S. democratic processes have caused a loss of faith in

7    government on the part of many Americans.  Defendant's successes in

8    changing U.S. foreign policy with undisclosed foreign money, coupled

9    with his high profile, will have exacerbated that disillusionment.

10        The public's faith and trust in government is crucial for the

11   government to sustain its right to govern.  Earning that trust by

12   successfully prosecuting corrupt conduct is especially difficult

13   where, as here, clients and bank accounts were located overseas and

14   defendant broadcast his political power to deter victim complaints.

15   In those instances where such crimes are uncovered and prosecuted

16   successfully, a message should be sent to others.  It is of paramount

17   importance to deter would-be FARA and FECA offenders from corrupting

18   the fabric of our democracy in exchange for foreign cash.[6]

19        The methods employed by defendant to evade income taxes also

20   demonstrate the need for deterrence.  Defendant perpetrated his

21   evasion using foreign entities, foreign bank accounts, shell

22   corporations, and an accomplice, demonstrating a degree of

23   sophistication that made the crime difficult to detect.  Such

24   ────────────────

25        [5] Defendant's efforts to interfere with witnesses may have
     continued into the present year.  See attached O'Brien Declaration;
26   Exs. 8, 9, 9A, 9B, & 9C.

27        [6] Defendant's argument that he should not be punished for
     "entirely unrelated crimes committed by different individuals" (Dkt
     122, p. 33) ignores the requirement that the Court consider general
28   deterrence as a sentencing factor.  18 U.S.C. § 3553(a)(2)(B).

sophistication presents a greater threat to the government's ability to fairly collect tax revenues and should be addressed more firmly than less sophisticated cases.

### C.   Specific Deterrence

The need to protect the public from further crimes by the defendant is another important sentencing factor.  Upon learning of the government's investigation, defendant's response was to delay matters so that he could not only obstruct the investigation, but also continue his criminal activity.  In 2017, he perpetrated another scheme to violate FARA by secretly lobbying on behalf of the Qatar government and secure foreign policy changes from the Trump Administration.  He has presented an incorrigible attitude during the sentencing process, minimizing the scope and seriousness of his crimes, reneging on agreements, and filing fraudulent and specious objections.  Such unrepentant behavior[7] suggests a significant risk of recidivism that militates in favor of a lengthy term of incarceration.

### D.   Defendant's History and Characteristics

Defendant's history and character present both mitigating and aggravating factors.

Certain mitigating factors, such as the payment of tax obligations, registering under FARA, correcting existing FARA filings, and sincerely expressing remorse, would have inured to

---

[7] Defendant's ongoing behavior prior to sentencing is important to consider.  His recent attempts to liquidate the *entirety* of his real estate holdings, after having claimed for months that these assets were encumbered by pledges to his foreign clients, may be an attempt to spirit away assets to avoid paying fines levied by the Court.

defendant's benefit.  However, defendant has taken the opposite approach.

A remaining mitigating factor consists of defendant's lack of a prior criminal record.  However, the five-year duration of defendant's multitude of crimes offsets this factor to a significant degree.  It is difficult to argue that defendant had a clean record when he repeatedly engaged in a variety of criminal offenses over several years.

Another mitigating factor is that defendant has dutifully provided for his family.  From what the government has been able to glean, defendant was a loving son who cared for his mother through illness until her death.  He directed a portion of his newly acquired wealth for his children's schooling and care.  He did not operate entirely as a spendthrift, but invested most of his ill-gotten gains in real estate.[8]

Another mitigating factor is that defendant is a very hard worker.  The government has had the benefit of reviewing much of defendant's life through a plethora of emails that chronicle his daily activities.  They reflect that defendant was constantly travelling overseas, networking, and negotiating deals.  However, this mitigating factor is largely offset by the criminal aspects of his business arrangements and by an unscrupulous, win-at-any-cost mentality.  As an example, in early 2015, defendant was attempting to broker a deal involving Person J and an Emirates businessman. Defendant became frustrated when some of his telephone calls were not returned, and responded as follows:

---

[8] Defendant's commitment to family is not without caveats, as set forth in the accompanying under seal declaration.

9

```
    I would like to avoid where we go head-on because you guys
    will lose. Please get back to me before actions are taken
    by me where you won't be able to board airplanes, trains or
    cross borders. We don't give a shit who you know in GCC or
    Europe because they won't be able to stop when US wants to
    do something.

    Ismail-this involves you as well. You bullshitted me in
    Munich. You won't be able to come to NYC for your cancer
    treatments, go to Morocco for fucking girls and etc. This
    is not a threat but a promise. I keep my promises. Fuck
    everything, I will fuck you in Dubai. I promise. I have had
    enough bullshit from everyone. Fucking fix this or I fuck
    you. Do you understand?
```

(Ex. 3)

As the Court is aware from prior filings, threatening to revoke

visas and travel authorizations was a common tactic utilized by

defendant to coerce others, but threatening to deny someone cancer

treatments is especially unconscionable and reflects poorly upon

defendant's character.

Another example of defendant's character appears in connection

with payments for the benefit of a U.S. official's paramour who

worked as a freelance journalist.  (Response Brief, p. 24-25)  After

making payment, defendant determined to profit from the journalist's

indebtedness, pressuring her to return the favor by publishing

stories to destroy the reputation of a Pakistani official.  (Exs. 4A-

C)  The defendant's manipulation and exploitation of the journalist

speaks loudly to his character.

The defense will likely present the Court with letters vouching

for defendant's character, but such communications should be met with

skepticism.  In connection with soliciting such letters, the

defendant often falsely represented that he was only the subject of a

tax investigation.  At least one letter drafted in support of

defendant for purposes of sentencing has been disavowed by its

author.  Person KK has testified that defendant falsely told him that
he was merely the subject of a tax investigation, that defendant
coached him in writing the letter, and that representations in the
letter were distortions of the truth.  (Exs. 5A-B)  According to
Person KK, he wrote the letter because he wanted to continue
receiving payments from defendant.  (Ex. 5A)  Letters from Members of
Congress should be met with similar scrutiny.  The government has
seen at least one recommendation letter from a politician (Exs. 6 &
6A) who previously wrote a letter that incorporated false
representations made by defendant in connection with the Al Areen
lobbying effort.  (Ex. 6B)

**E.   Sentencing Disparities Re FECA & FARA Violations**

Defendant argues that a guideline sentence would result in
unwarranted sentencing disparities with respect to other defendants
convicted of FECA violations.  In support of this argument, he
references approximately 14 cases that resulted in sentences ranging
from probation to 28-months imprisonment.

The most common method to avoid sentencing disparities is to
impose a sentence within the recommended guideline range.  Congress
directed the Sentencing Commission to establish policies and
practices that "avoid[] unwarranted sentencing disparities among
defendants with similar records who have been found guilty of similar
criminal conduct.  28 U.S.C. § 991(b)(1)(B).  The Court is "entitled
to rely" on the properly calculated Guidelines range in determining
there is no substantive "unwarranted disparity" between defendants.
*United States v. Treadwell*, 593 F.3d 990, 992 (9th Cir. 2010),

*overruled on other grounds by United States v. Miller,* 953 F.3d 1095, 1103 n.10 (9th Cir. 2020).

Anecdotal cases typically provide a poor basis for comparative analysis.  "A district court . . . cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before.  Too many factors dictate the exercise of sound sentencing discretion in a particular case to make the inquiry . . . helpful or even feasible." *Treadwell,* 593 F.3d at 994, 992 (9th Cir. 2010), "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52.

The references by the government (and the defense) to sentences imposed in previous FARA cases is a different matter.  Because the sentencing guidelines do not address FARA offenses, the Court has not received the benefit of the Sentencing Commission's analysis of the offense or guidelines calculations from which to fashion an appropriate sentence.  Under such circumstances, canvassing prior cases is helpful.

None of the cases cited by the defense (or the government) are analogous to the defendant's conduct, the particular aspects of his character, or his refusal to atone for his myriad violations of law. Here, defendant committed several different crimes (FARA, FECA, tax evasion, and obstruction), of tremendous scope (millions of dollars and multiple instances over several years), that harmed others financially (fraud against clients and business associates), involved

particularly reprehensible goals (altering important U.S. national
and international policies through undisclosed lobbying and
prohibited contributions), and were motivated for entirely selfish
reasons (influence peddling directed at competing political parties
to further lucrative business deals).  He has demonstrated a
disreputable character (the payment of a gratuity, payments routed to
quasi-political entities that were intended as bribes, and the
manipulation of others through extortion, intimidation, and threats).
His continued involvement in crime while knowing he was under
investigation (FARA violations regarding Qatar), multiple and diverse
efforts to obstruct justice, and failure to accept responsibility
(refusal to mitigate damage as required by the plea agreement through
restitution and corrective FARA filings, fraudulent and specious
submissions to the court) demonstrate a complete lack of remorse.

Although they differ in important respects, the most analogous
FARA case to defendant's is Paul Manafort's guilty plea to conspiracy
to defraud the United States in connection with his failure to
register under FARA as an agent of the Government of Ukraine, that
country's Party of Regions, and former Ukrainian president Viktor
Yanukovych.  In the same count, Manafort also pleaded guilty to
conspiracy in connection with FARA-related false statements and
misrepresentations to the Department of Justice, in violation of both
FARA and 18 U.S.C. § 1001.  Manafort was sentenced to 73 months'
imprisonment, including the statutory maximum 60 months for the
conspiracy to violate FARA.

Cases like Manafort's demonstrate that -- as defendant notes --
the Department of Justice has shifted in recent years "from treating

1    FARA as an administrative obligation and regulatory obligation to one

2    that is increasingly an enforcement priority."[9]  Indeed, the Russian

3    government's efforts to covertly interfere in the 2016 presidential

4    election demonstrated that covert foreign influence is a critical

5    national security issue.  Even so, defendant's numerous, flagrant

6    FARA violations would necessitate criminal prosecution even if FARA

7    were not an enforcement priority for the Department.

8         Moreover, sentencing disparity is only one factor for the Court

9    to consider, and the many factors referenced above demonstrate the

10   importance of a within-guidelines sentence.  *See United States v.*

11   *Marcial-Santiago*, 447 F.3d 715, 719 (9th Cir. 2006) ("Even if this

12   disparity were assumed to be unwarranted, however, that factor alone

13   would not render Appellants' sentences unreasonable; the need to

14   avoid unwarranted sentencing disparities is only one factor a

15   district court is to consider in imposing a sentence").  The Court

16   should impose a sentence based upon the particular facts and

17   circumstances of this case, all of which support a term of

18   incarceration within the guideline range.

19        **F.    The Court Should Embrace the Commission's FECA And Tax**
              **Policy Statements and Guidelines, Not Reject Them**
20

21        Defendant argues that the Court should impose a sentence below

22   the guideline range because he claims other courts have shown

23   leniency with respect to FECA and tax offenses.  The Court, of

24   course, is not required to adopt all of the Sentencing Commission's

25   policies, *Kimbrough v. United States*, 552 U.S. 89 (2007) (non-

26        [9] Katie Benner, Justice Dept. to Step Up Enforcement of Foreign
     Influence Laws, N.Y. Times (Mar. 6, 2019),
27   https://www.nytimes.com/2019/03/06/us/politics/fara-task-force-
     justice-department.html (quoting Assistant Attorney General for
28   National Security John C. Demers).

1  empirically driven crack and powder cocaine disparities); *United*
2  *States v. Henderson*, 649 F.3d 955 (9th Cir. 2011) (non-empirically
3  driven child pornography sentences), nor is it bound by the
4  Sentencing Guidelines, *United States v. Booker*, 543 U.S. 220 (2005).

5       The statistics cited by defendant do not demonstrate that other
6  courts view FECA and tax cases as deserving less punishment than that
7  recommended by the guidelines.  The referenced statistics relate to a
8  variety of offenses and do not provide statistics with respect to the
9  particular crimes here.  Nor do they provide the particular reasons
10 why courts imposed those sentences.  In *United States v. Psick*, 434
11 Fed. Appx. 646 (2011),[10] the Ninth Circuit found no abuse of
12 discretion when the district court rejected an argument identical to
13 that articulated by the defense "because the statistics lacked the
14 kind of specificity that would make meaningful comparisons possible."
15 434 Fed. Appx. at 648.

16      The Sentencing Commission and the guidelines it generates
17 provide a more reliable basis for the Court to impose a just
18 sentence.  As the Sentencing Commission's Annual Report and
19 Sourcebook[11] make clear, the Sentencing Commission has statutory
20 duties that include "collecting, analyzing and reporting sentencing
21 data systematically *to detect new criminal trends* [*and*] *assess*
22 *federal sentencing policies*."  (Report at p. 2)  The Commission "uses
23 these analyses when considering proposed changes to the guidelines."
24 The guidelines therefore apply particular conduct engaged in by

25
26      [10] The opinion is unpublished but eligible for citation under the
     Appellate Rules.
27      [11] https://www.ussc.gov/sites/default/files/pdf/research-and-
     publications/annual-reports-and-sourcebooks/2019/2019-Annual-Report-
28   and-Sourcebook.pdf.

particular defendants to current data.  (*Id.* at p. 6)  The Commission

serves an important institutional role because it has the "capacity

courts lack to base its determinations on empirical data and national

experience, guided by a professional staff with appropriate

expertise."  *Kimbrough*, 552 U.S. at 109.

Any policy statement by the Court with respect to FECA and tax

offenses should amplify the seriousness of such crimes and adopt the

guidance of the Commission, especially with respect to punishing

corrupt schemes.  Secret influence peddling by foreign governments

and individuals is a fundamental threat to our democratic

institutions.  The government must demonstrate to the American public

its ability to punish and deter political corruption.  This case

involves an amalgamation of several crimes that together form an

especially dangerous synergy of malfeasance.

### G.   Just Punishment/Seriousness of Offense/Respect for Law

At a minimum, a term of imprisonment within the guidelines is

necessary to sufficiently meet the objectives of sentencing set forth

in Section 3553(a)(2).  Defendant is well deserving of such a

sentence.  His multiplicity of offenses, poor character, obstruction

of justice, and failure to accept responsibility easily justify a

within-guidelines sentence of 121 to 151 months imprisonment.  The

government defers to the Court as to what specific sentence it should

impose.

A guideline sentence as to the fine amount would not do justice

in this case.  Defendant accumulated vast wealth through his illegal

conduct.  A fine above the guideline range is necessary to deprive

the defendant of a windfall derived from illegal activity.

In its Tax Brief, the government showed that defendant had a net worth of approximately $1,500,000 as of January 1, 2012, about the time he embarked on his criminal conduct. Over the next six years, he compiled gross income of over $30 million, which included roughly $9.5 million derived from illegal FARA activity (Sri Lanka, Bahrain, and Ukraine), $8.75 million from various frauds, $3 million from Person J for consulting fees and expense reimbursements, and $9.8 million from the Qatar government (most of which appears related to additional activity in violation of FARA). Although defendant incurred some expenses -- primarily campaign contributions and travel -- defendant routed most of his ill-gotten gains into real estate, buying rental properties that parlayed his criminal proceeds into a current net worth of approximately $32 million.

The IRS civil closing agreement requires defendant to pay $15,705,080.10 for unpaid taxes, penalties, and interest. Assuming defendant fails to pay this debt prior to sentencing, the government would be forced to file civil or criminal forfeiture actions against some of defendant's real estate holdings unless the Court issues a restitution order. The plea agreement stipulates that the Court should impose a restitution obligation in favor of the IRS for unpaid taxes, penalties, and interest, which, according to the closing agreement, totals $15,705,080.10. The Court should order this amount paid within one year of the date of sentencing and as a condition of supervised release in the event defendant's intransigence continues.

Assuming the government is able to collect on defendant's tax debt, that leaves almost a $16 million of wealth in defendant's hands, primarily derived through fraud and FARA violations. The

17

maximum fines available for defendant's FARA, FECA, tax, and obstruction offenses are $13,000,000, $250,000, $6,957,334, and $216,665, respectively.   The government recommends a total fine of $10 million: $9.5 million on the FARA count, a $250,000 fine on the FECA count, and a $250,000 fine for the obstruction count.   The fine is particularly appropriate with respect to the FARA count.   It represents an amount equal to the gross income defendant obtained through illegal FARA-related activity as identified in the government's prior pleadings[12] and would therefore require defendant to disgorge these illicit gains.   Coupled with the roughly $16 million to be collected by the IRS, these fines would leave defendant with a net worth of about $6 million, well above the $1.5 million he started with.[13]

The government does not seek a criminal fine as to defendant's tax violations given that civil penalties will be imposed as part of the restitution order.   However, the court is required to order defendant to pay the costs of prosecution with respect to the tax evasion count.   The government has conservatively estimated this amount to be $216,665.   (Ex. 7)

The recommended fine is also necessary to adequately punish and deter defendant's wrongdoing.   As pointed out, the Sentencing Guidelines do not address defendant's FARA offenses, and the final guideline range as to imprisonment includes no punishment for this offense at all.   The most obvious method to deter future crimes by

---

[12] The figure does not include defendant's conduct related to Qatar, for which he was paid $4 million.

[13] The court is powerless to force defendant to disgorge profits earned through the numerous frauds he committed because all of the charged offenses fall outside Title 18 of the United States Code.

18

defendant would be to require him to disgorge amounts that would otherwise constitute an unjust enrichment.

**III. CONCLUSION**

The government respectfully recommends the Court impose a sentence within the guideline range of 121 to 151 months' imprisonment, impose a fine of $10 million, order restitution in favor of the IRS in the amount of $15,705,080.10, and order a payment of $250,000 for the costs of prosecution.

Defendant's bond currently stands at $3 million. Given his overseas wealth and family ties, his attempts to obstruct the investigation, and his failure to accept responsibility, the Court should increase his bond at sentencing to an amount in excess of the fines imposed in order to deter defendant's flight.