THOMAS P. O'BRIEN, State Bar No. 166369
IVY A. WANG, State Bar No. 224899
NATHAN F. BROWN, State Bar No. 317300
BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
801 South Figueroa Street Suite 2000
Los Angeles, CA 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808
E-mail: iwang@bgrfirm.com

EVAN J. DAVIS, State Bar No. 250484
HOCHMAN SALKIN TOSCHER PEREZ P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212-3414
Telephone: (310) 281-3200
Facsimile: (310) 859-1430
E-mail: davis@taxlitigator.com

Attorneys for Defendant
IMAAD SHAH ZUBERI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>      vs.<br><br>IMAAD SHAH ZUBERI,<br><br>             Defendant. | Case No. LACR19-00642-VAP<br>            LACR20-00155-VAP<br><br>The Hon. Virginia A. Phillips<br><br>**UNDER SEAL FILING**<br><br>**[UNDER SEAL]** |

1692690.12

THOMAS P. O'BRIEN, State Bar No. 166369
IVY A. WANG, State Bar No. 224899
BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
801 South Figueroa Street Suite 2000
Los Angeles, CA 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808
E-mail: tobrien@bgrfirm.com

EVAN J. DAVIS, State Bar No. 250484
HOCHMAN SALKIN TOSCHER PEREZ P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212-3414
Telephone: (310) 281-3200
Facsimile: (310) 859-1430
E-mail: davis@taxlitigator.com

Attorneys for Defendant
IMAAD SHAH ZUBERI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>IMAAD SHAH ZUBERI,<br><br>Defendant. | **\*\* FILED UNDER SEAL \*\***<br><br>Case No. LACR19-00642-VAP<br>LACR20-00155-VAP<br><br>The Hon. Virginia A. Phillips<br><br>**DEFENDANT'S SENTENCING POSITION REGARDING 3553(a) FACTORS**<br><br>Judge:  Hon. Virginia A. Phillips<br><br>Sentencing Hearing: November 30, 2020 |

# **TABLE OF CONTENTS**

**Page**

I.    Introduction ....................................................................................... 1

II.   USPO Sentencing Recommendation ................................................ 2

III.  18 U.S.C. Section 3553(a) Factors ................................................. 3

    A.   The Nature and Circumstances of the Offense ....................... 4

        1.   FECA ............................................................................ 5

        2.   Tax Evasion ................................................................. 6

        3.   FARA ........................................................................... 7

        4.   Obstruction of Justice ................................................. 11

    B.   The History and Characteristics of the Defendant ................ 12

        1.   Mr. Zuberi's Family and Background ......................... 12

        2.   Mr. Zuberi's Medical Issues and the COVID-19 Pandemic ...... 14

        3.   Mr. Zuberi's Acceptance of Responsibility ................ 19

        4.   Mr. Zuberi's Cooperation ........................................... 20

        5.   Mr. Zuberi's Service to Country ................................. 21

        6.   Mr. Zuberi's Charitable Work ..................................... 22

        7.   Mr. Zuberi's Support of Military Veterans ................. 26

        8.   Mr. Zuberi's Support for the Incarcerated .................. 27

        9.   Mr. Zuberi's Financial Generosity ............................. 27

        10.  Mr. Zuberi's Humanitarian Acts ................................. 28

    C.   The Kinds of Sentences Available .......................................... 30

    D.   The Sentencing Range Established Under the Guidelines and the Need to Avoid Unwarranted Sentencing Disparities .................. 30

        1.   FECA ............................................................................ 30

        2.   Tax Evasion ................................................................. 33

        3.   FARA ........................................................................... 35

    E.   The Need to Provide Restitution .............................................. 39

# TABLE OF CONTENTS
### (Continued)

**Page**

F. The Purpose of the Sentence......................................................39

G. The Government's Skewed Perspective ................................41

IV. Conclusion............................................................................46

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

## <u>CASES</u>

4

*Gall v. United States*,

5

    552 U.S. 38 (2007) ................................................................... 3

6

*Grano v. Sodexo Mgmt., Inc.*,

7

    335 F.R.D. 411 (S.D. Cal. 2020) .......................................... 14

8

*Meese v. Keene*,

9

    481 U.S. 465 (1987) ................................................................. 8

10

*United States v. Acevedo-Vila*,

11

    08-cr-00036 (D.P.R.) ............................................................ 33

12

*United States v. Alexander*,

    48 F.3d 1477 (9th Cir. 1995) .................................................. 8

13

*United States v. Arceo*,

14

    2020 WL 4001339 (N.D. Cal. July 15, 2020) ..................... 16

15

*United States v. Armstrong*,

16

    2020 WL 4366015 (S.D. Cal. July 30, 2020)...................... 17

17

*United States v. Arreola-Bretado*,

18

    445 F. Supp. 3d 1154 (S.D. Cal. 2020) ............................... 18

19

*United States v. Barber*,

20

    --- F. Supp. ---, 2020 WL 2404679 (D. Or. May 12, 2020) ............................... 18

21

*United States v. Ben Israel*,

    No. 1:13-cr-00572 (N.D. Il.) ........................................... 36, 37

22

*United States v. Booker*,

23

    543 U.S. 220 (2005) ................................................................. 3

24

*United States v. Cardenas-Juarez*,

25

    469 F.3d 1331 (9th Cir. 2006) ................................................ 3

26

*United States v. Carpenter*,

27

    --- F. Supp. ---, 2020 WL 5851129 (E.D. Cal. Sep. 30, 2020).......................... 18

28

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) (*en banc*) ............................................................. 3

*United States v. Chatwal,*
14-cr-143 (E.D.N.Y.) ............................................................. 33

*United States v. Chaudhry,*
No. 1:18-cr-00226 (D. Md.) ............................................................. 38

*United States v. Cuza,*
05-cr-00344-RGK (C.D. Cal.) ............................................................. 33

*United States v. D'Souza,*
14-cr-34 (S.D.N.Y.) ............................................................. 33

*United States v. Danielzyk,*
11-cr-85 (E.D. Va.) ............................................................. 33

*United States v. Davis,*
--- F. Supp. 3d ---, 2020 WL 3443400 (E.D. Cal. Jun. 23, 2020) ....................... 18

*United States v. Dodd, et al.,*
No. 4:17-cr-00116 (S.D. Tex.) ............................................................. 33

*United States v. Feldman,*
09-cr-75 (E.D. Pa.) ............................................................. 33

*United States v. Fireman,*
No. 1:96-cr-10187 (D. Mass.) ............................................................. 33

*United States v. Gonzalez,*
270 Fed. App'x 702 (9th Cir. 2008) (unpublished) ............................................ 20

*United States v. Jinnah,*
06-cr-00383 (C.D. Cal.) ............................................................. 33

*United States v. Lee,*
2020 WL 3422772 (E.D. Va. June 22, 2020) ............................................... 17

*United States v. Lopez,*
2020 WL 1433158 (E.D. Cal. Mar. 24, 2020) ............................................... 14

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*United States v. Maglioccheti*,
    10-cr-286 (E.D. Va.) ............................................................................... 33

*United States v. Manafort*,
    No. 1:17-cr-00201 (D.D.C.) ................................................................ 37

*United States v. Martin*,
    278 F.3d 988 (9th Cir. 2002) ................................................................ 8

*United States v. McEwan*,
    2020 WL 4035068 (N.D. Cal. June 30, 2020) ...................................... 16

*United States v. McRae*,
    No. 2:16-cr-00566-TS, (D. Utah, May 26, 2020) ................................ 15

*United States v. Mobley*,
    12-cr-00150 (M.D. Fl.) ........................................................................ 33

*United States v. Olawoye*,
    --- F. Supp. 3d ---, 2020 WL 4559816 (D. Or. Aug. 7, 2020) ........... 17

*United States v. Parker*,
    461 F. Supp. 3d 966 (C.D. Cal. 2020) ................................................. 16

*United States v. Percoco*,
    2020 WL 2143033 (S.D.N.Y., May 5, 2020) ...................................... 15

*United States v. Ramsey*,
    2020 WL 3798938 (E.D. Wisc. July 7, 2020) ..................................... 17

*United States v. Ressam*,
    679 F.3d 1069 (9th Cir. 2012) ............................................................. 20

*United States v. Richardson*,
    2020 WL 3402410 (E.D. Cal. Jun. 19, 2020) ................................ 17, 18

*United States v. Romero*,
    514 Fed. Appx. 642 (9th Cir. 2013) .................................................... 19

*United States v. Schwartz*,
    05-cr-00157-RMU (D.D.C.) ................................................................ 33

1

<u>**TABLE OF AUTHORITIES**</u>
**(Continued)**

2

<u>**Page**</u>

3

*United States v. Siljander,*

4

   No. 4:07-cr-00087 (W.D. Mo.) ................................................................ 35, 36, 37

5

*United States v. Stipe,*

6

   03-cr-00128 (D.D.C.) .................................................................................... 33

7

*United States v. Vincent et al.,*

   No. 1:05-cr-00059 (S.D.N.Y) ...................................................................... 36

8

*United States v. Whittemore,*

9

   12-cr-58 (D. Nev.) ....................................................................................... 33

10

*United States v. Zolp,*

11

   479 F.3d 714 (9th Cir. 2007) ...................................................................... 20

12

<u>**STATUTES**</u>

13

18 U.S.C. section 3553(a) ................................................................................ *passim*

14

USSG § 1B1.1(a) ............................................................................................. 10

15

USSG § 1B1.3 .................................................................................................. 10

16

USSG § 1B1.3(1)(A) ....................................................................................... 10

17

USSG § 1B1.3(a)(2) ........................................................................................ 10

18

USSG § 2C1.8(b)(1) ........................................................................................ 5

19

USSG § 2C1.8(b)(2) ........................................................................................ 5

20

USSG § 2T1.1(b)(1) ........................................................................................ 6

21

USSG § 2T1.1(b)(2) ........................................................................................ 6

22

USSG § 3D1.2(d) ............................................................................................. 10, 11

23

USSG § 5G1.2 .................................................................................................. 34

24

25

26

27

28

## I.    <u>Introduction</u>

Imaad Zuberi is a hard-working, charitable, and loving father and husband. He came to this country from Pakistan at the age of four and, despite numerous disadvantages and health issues, molded himself into a successful businessman and entrepreneur in an effort to honor his parents and grandparents. In that pursuit, he admittedly made mistakes—serious mistakes—that have placed him now before this Court to be sentenced for his crimes. He points the finger at nobody but himself, and understands the consequences that his actions will have on his life, his family, and his career. He has been thoroughly humiliated.

But the government's request for a sentence of imprisonment between 121 and 151 months—over double the United States Probation Office's ("USPO") original recommendation, is flatly unreasonable, irreconcilable with sentences in similar cases, and improper under the sentencing factors enumerated in 18 U.S.C. section 3553(a). (*See* ECF No. 120 at 7). Mr. Zuberi is a first-time offender convicted of non-violent crimes. He has accepted responsibility for those crimes by pleading guilty *pre-indictment* and by taking the extraordinary step of pre-paying approximately $10.5 million in restitution as of the filing of this brief, with the balance expected to be transferred from escrow from a sale of a property near the time of sentencing. Further, his long history of charitable and patriotic works reveal that he is not the villain as the government has sought to portray him. Rather, as evidenced by the numerous character letters submitted to this Court that describe his charity and service to country, Mr. Zuberi is a good man who made some uncharacteristic mistakes. Indeed, the Court likely has not, and the undersigned and experienced counsel certainly have not, encountered a defendant who has done so much for his country, at great risk and with no reward.

Moreover, such a lengthy prison sentence for Mr. Zuberi would potentially place his life in jeopardy. Mr. Zuberi suffers from a number of medical conditions, including type-2 diabetes, hypertension, hyperlipidemia, kidney insufficiency, and

1  Hepatitis A.  Individually, each of these conditions places him at substantially

2  increased risk of severe complications from the COVID-19 virus.  Together, the risk

3  is substantially greater.  And, given the cramped conditions and less than sterile

4  environment of most federal prisons, if Mr. Zuberi were incarcerated he would be

5  unable to take the proper precautions necessary to ensure he is not exposed to the

6  COVID-19 virus, just as a "second wave" is arriving.  While Mr. Zuberi is

7  deserving of punishment, he is not deserving of a sentence that threatens his life.

8  **II.    USPO Sentencing Recommendation**

9         In its initial Presentence Report ("Initial PSR"), and having taken into account

10  the government's extensive briefing filed before the PSR was issued but without

11  accounting for Mr. Zuberi's remarkable and extensive assistance to the country, the

12  USPO calculated a total offense level of 29 and a criminal history category of I,

13  resulting in: (1) a United States Sentencing Guideline ("Guideline") sentence of 87

14  to 108 months; (2) supervised release of 1 to 3 years; and (3) a fine between $30,000

15  to $20,319,686.  (ECF No. 58 at 4).  After consideration of the other factors

16  pertinent to sentencing under 18 U.S.C. section 3553(a), the USPO recommended a

17  downward variance and a sentence consisting of: (1) 60 months imprisonment; (2)

18  restitution in the amount of $7,816,076.97; (3) a total fine of $1,750,000; and (4) 3

19  years of supervised release with specified conditions. (Recommendation Letter, ECF

20  No. 146).

21        Subsequently, the government informed this Court and the USPO that it

22  would not recommend an acceptance of responsibility reduction despite the fact that

23  Mr. Zuberi pleaded guilty pre-indictment.  (Govt. Position re Acceptance of

24  Responsibility, ECF No. 120).  The USPO determined that contrary to the

25  government's argument, Mr. Zuberi was still entitled to a two-level reduction for

26  acceptance of responsibility.  (Revised Presentence Report, ECF No. 147).

27  However, because, unlike this Court, the USPO did not have authority to grant the

28  third-level of the reduction absent a recommendation by the government, the USPO

issued a Revised Presentence Report ("Revised PSR") raising the Guideline total offense level to 30, and resulting in: (1) a Guideline sentence of 97 to 121 months; (2) supervised release of 1 to 3 years; and (3) a fine between $30,000 and $20,207,334.  (*Id.* at 4).  Again, and still without knowing of Mr. Zuberi's assistance to the country, the USPO recommended a downward variance and an actual sentence consisting of: (1) 70 months imprisonment; (2) restitution in the amount of $15,705,080.11; (3) a total fine of $1,750,000; and (4) 3 years of supervised release with specified conditions. (Revised Recommendation Letter, ECF No. 146).

## III.    18 U.S.C. Section 3553(a) Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines "effectively advisory."  *United States v. Cardenas-Juarez*, 469 F.3d 1331, 1333 (9th Cir. 2006); *see also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory.").  Thus, although the Guidelines may be considered as a "starting point and the initial benchmark" in determining a sentence, the Court "may *not* presume that the Guideline range is reasonable."  *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (emphasis added).  Nor must it find "extraordinary circumstances" to "justify a sentence outside the guideline range."  *Id.* at 47.  Instead, the Court "must make an individualized assessment based on the facts presented."  *Id.* at 50.

Title 18, United States Code, section 3553(a) governs this individualized assessment.  It provides that, in imposing a sentence, this Court shall consider:

- the nature and circumstances of the offense and the history and characteristics of the defendant

- the kinds of sentences available

- the sentencing range established under the Guidelines

- any pertinent policy statement issued by the Sentencing Commission

- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

- the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After weighing these factors, the Court must impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes set forth in subsection 3553(a)(2), including the need for the sentence to:

- reflect the seriousness of the offense, promote respect for the law, and provide just punishment

- afford adequate deterrence to criminal conduct

- protect the public from further crimes of the defendant

- to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner

*Id.*

Despite filing over one-hundred and forty pages of briefing thus far, the government cannot show that any of these section 3553(a) factors weigh in favor of a sentence at, or above, the advisory Guideline range. To the contrary, as the USPO already correctly found, a careful consideration of these factors supports a sentence far below that range.

### A.   The Nature and Circumstances of the Offense

Mr. Zuberi has fully admitted and accepted complete responsibility for the facts underlying his convictions. These facts, which have already been recounted in great detail several times over in the plea agreement, the Information, the Revised PSR, and the numerous briefs by both parties do not require further repetition here.[1]

However, the conclusion to be drawn as to the overall nature of Mr. Zuberi's crimes does merit further exposition. At some point during its investigation, the government reached the erroneous conclusion that Mr. Zuberi was a criminal through and through, with few if any redeeming qualities and deserving of the

---

[1] To the extent Mr. Zuberi disagrees with any of the factual findings made in the PSR, those objections have already been presented in Mr. Zuberi's Objections to the Presentence Report and Initial Sentencing Position. (*See* ECF Nos. 90, 122).

harshest possible sentence.  This conclusion has distorted the government's view of evidence, leading it to see lies and scheming where none exists and to overlook and discount what in any other defendant would be among the most remarkable list of assistance to the country encountered by experienced counsel and the Court.  The conclusion has also led the government to expend extraordinary effort—the lengthy information that did not match the plea agreement factual basis, the tremendous volume of sentencing briefs, bringing charges in another district that the plea agreement specifically prohibits in this district, fighting efforts to let the Court learn of Mr. Zuberi's assistance, even ignoring a clear case of Mr. Zuberi's signature being forged on a document the government is still trying to use for a "sophisticated means" sentencing enhancement—to convince the Court to impose the highest possible sentence that exceeds the advisory Guideline range calculated by the USPO.  However, despite the rhetoric, the government points to no peculiarity in the nature or circumstances of Mr. Zuberi's offense that demands extraordinary punishment at or above that Guideline range.

## 1.    FECA

Mr. Zuberi's FECA violation stemmed from non-disclosure and a failure to follow the proper procedures, but it was not malicious or intended to cause injury.  Nonetheless, the government contends that severe punishment is warranted for the FECA count because the "FECA violations were egregious as to length and scope" and "many of these FECA violations were intertwined with Zuberi's efforts to corrupt democratic processes and institutions while acting as an agent for foreign interests."  (Govt. Position re FECA, ECF No. 87 at 15).  But, even assuming the government and the USPO correctly calculated the Guideline range (which they did not), the government has not justified going beyond that range.  The Guidelines already more than account for the number and scope of the violations.  *See* USSG § 2C1.8(b)(1).  The same is true for the fact that the government claims some donations came from foreign sources.  *See* USSG § 2C1.8(b)(2).  This assertion by

1  the government is based on the uncorroborated testimony of one witness.  The

2  nature and circumstances of Mr. Zuberi's FECA crimes are not unique simply

3  because the government has, several times, recited the underlying facts in

4  exhaustive detail throughout more than one-hundred pages of briefing and countless

5  more pages of exhibits.

6             **2.    <u>Tax Evasion</u>**

7             The same is true as to the nature of the tax count.  The government again

8  argues that "the guidelines calculations do not adequately reflect the aggravating

9  circumstance of Zuberi's tax offense" because (1) it was extensive and involved a

10 large amount of tax loss; (2) it was related to the FARA violations and fraud; and (3)

11 it involved sophisticated means. (Govt. Position Re Tax Violations, ECF No. 89 at

12 24).  But, again, these considerations are already more than accounted for in the

13 Guideline calculations.  *See* United States Sentencing Commission¸ *Guidelines*

14 *Manual* (USSG) § 2T1.1(a)(1) (Nov. 2018) (determining base offense level based

15 on amount of tax loss); USSG § 2T1.1(b)(1) (considering whether offense involved

16 funds derived from criminal activity): USSG § 2T1.1(b)(2) (considering whether

17 offense involved sophisticated means).  Further, as noted below, the government

18 persists in asserting erroneously the sophisticated means enhancement applies based

19 on Mr. Zuberi's use of a foreign account coupled with what the government claims

20 is proof that Mr. Zuberi knowingly hid the account by not filing an FBAR form

21 despite having filed one before; however, in October the government finally

22 produced the supposed FBAR filing and the signature does not even remotely

23 resemble Mr. Zuberi's signature, thereby confirming Mr. Zuberi's consistent

24 assertion that he had never seen or heard of an FBAR form before this investigation.

25 The enhancement does not apply, but the government's refusal to abandon this

26 argument further demonstrates the government's skewed view of the evidence.

27 Despite endless briefing, the government simply has not shown any unusual

28 aggravating circumstances that demand extraordinary punishment.

### 3.   **FARA**

With respect to the FARA count, as the USPO correctly found, "what makes [Mr. Zuberi's] actions illegal is a lack of disclosure and material omission of his conduct and not the conduct itself.  For example, Mr. Zuberi would not have violated FARA if he properly disclosed he was working for an agent of the Sri Lankan government."  (ECF No. 146 at 5).[2]  In other words, Mr. Zuberi's crime—for which he accepts full responsibility—was his failure to properly register under FARA, not espionage.  Indeed, Mr. Zuberi *did* register under FARA, only not in a timely or proper manner, which is a crime that is almost never—if ever—prosecuted.  The government's relentless attempts to transform this paper or disclosure crime into something far more sinister fails.

First, the government contends this case merits exceptional punishment because "Zuberi would have been unable to secure foreign clients if he had filed truthful FARA registrations."  (Govt. Sentencing Position re FARA, ECF No. 84 at 5, 7).  According to the government, the "foreign governments and individuals at issue only retained Zuberi because diplomatic, transparent, and legal lobbying mechanisms had proved inadequate to obtain the results they sought."  (*Id.*).  This is pure speculation, assumes the worst motives (which is not true in this case) and is indicative of the government's overreaching in this case.  Lobbying is legal.  FARA-registered lobbyists are hired routinely.  There is simply nothing to support this allegation by the government.

Second, the government contends this case merits exceptional punishment because truthful FARA disclosures would have revealed Mr. Zuberi's source of funding for his lobbying efforts.  According to the government, this "would have

---

[2] Indeed, this conclusion is confirmed by the FARA Unit Chief, who has "noted that foreign government lobbying in the United States is not itself inappropriate or unlawful, and that foreign agents who are not otherwise exempt must register under FARA."  Ex. 42 at 8.

enabled policymakers to consider Zuberi's lobbying in context" and "likely have caused policymakers to seek more information on whether Zuberi's campaign contributions were funded by foreign entities, and to reject any contributions of foreign money." (*Id.* at 6-7).  But none of these hypotheticals make Mr. Zuberi's violation unique or worthy of extra blame.  Those theoretical effects of non-disclosure are inherent in *any* FARA violation.  Indeed, the government conceded as much when it stated in the information in this case that:

> "One purpose of FARA is to create transparency regarding the existence and extent of the relationship between individuals operating in the United States and their foreign principals.  Proper registration under the statute allows the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals."

(Information, ECF No. 1, ¶ 10); *see also Meese v. Keene*, 481 U.S. 465, 469 (1987) (FARA's purpose is "that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in light of their associations and activities.").

Third, the government contends that Mr. Zuberi's FARA violations merit severe punishment because they were "necessary to Zuberi's fraud and tax evasion schemes."  (ECF No. 84 at 3).  In other words, the government seeks to bootstrap the conduct already fully accounted for in the tax fraud Guideline calculation into the FARA sentencing determination.  But this attempt runs afoul of the Guidelines and would lead to impermissible double-counting of the same conduct.  *See United States v. Martin*, 278 F.3d 988, 1004-05 (9th Cir. 2002) ("Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.") (*quoting United States v. Alexander*, 48 F.3d 1477, 1492 (9th Cir. 1995)).

Fourth, plainly alluding to alleged Russian interference in the 2016 presidential election, the government argues that exceptional punishment is

warranted because "[p]ublic opinion is already rife with suspicions that foreign influence has compromised our elections and confidence in our democratic institutions has weakened." (ECF No. 84 at 9). In essence, the government argues this Court should increase Mr. Zuberi's sentence to punish entirely unrelated and mutually exclusive crimes allegedly committed by Russian President Vladimir Putin and others with whom Mr. Zuberi has no connection. It is axiomatic that this unrelated conduct by totally different individuals says nothing about the nature and circumstances of *Mr. Zuberi's* offense. Mr. Zuberi should not be made the scapegoat for conduct with which he had no involvement or knowledge.

Fifth, the government argues that Mr. Zuberi's "entire business model consisted of soliciting foreign governments, entities, and individuals for money . . . in return for Zuberi wielding influence with members of Congress and the Executive Branch under the false pretense that he acted independently and in the best interest of the United States." (*Id.*). This is completely inaccurate. As an initial matter, there is no evidence to show that Mr. Zuberi's lobbying—which arose after his business development contract with Sri Lanka—was contingent on maintaining the "false pretense" that he was not acting as an agent of a foreign individual or entity. Moreover, Mr. Zuberi engaged in significant business outside of lobbying. *See* Ex. 1. Indeed, the government must know its statement is inaccurate because it is contradicted by numerous references to Mr. Zuberi's other endeavors in the government's briefs. (*See* Amended Government Sentencing Position re Obstruction, ECF No. 42 at 7) (discussing investment in Rad Pad company); (*id.* at 14 (referencing Mr. Zuberi's "various real estate holdings"); (*id.* at 20) (discussing the USCares project); (ECF No. 84 at 16) (discussing Mr. Zuberi's construction projects). Lobbying was only a fraction of Mr. Zuberi's business portfolio. In no way was Mr. Zuberi dependent upon the lobbying activities at issue for his livelihood, nor are the problems with his FARA registration paperwork related to any such economic dependence.

Finally, the government argues that Mr. Zuberi's FARA violations go beyond the basis of the plea agreement and included "relevant conduct" consisting of lobbying on behalf of (1) a Bahraini national, (2) the Turkish government, (3) the Libyan government and a Saudi/United Kingdom national; and (4) a Ukrainian national. (ECF No. 84 at 6). But, as the USPO already correctly found, those alleged violations are not within the scope of conduct relevant for sentencing. (*See* ECF No. 147 at 20); USSG § 1B1.3. Rather, the Guidelines provide that relevant conduct includes:

> "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and *that occurred during the commission of the offense of convictions, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.*"

USSG § 1B1.3(1)(A) (emphasis added). Here, the conduct that the government seeks to define as relevant did not occur during, in preparation for, or in the course of attempting to avoid detection for, the Sri Lanka offense. Rather, it involves different clients, different work projects, different objectives and different time periods. *See* (ECF No. 147 at 19-24). Simply put, they are not related to the crime of conviction.

The government's contention to the contrary is wrong. The government cites to USSG § 1B1.3(a)(2),[3] to argue that the conduct is "relevant" because it was "part of the same course of conduct or common scheme or plan as the offense of conviction." (ECF No. 84 at 7 n.5). However, the government omits the words preceding this quote, which expressly provide that this test applies "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." USSG § 1B1.3(a)(2). In turn, USSG § 3D1.2(d) requires grouping only if: (1) the offense level is determined largely on the basis of total

---

[3] The government's citation to USSG § 1B1.1(a) in its brief appears to be a typographical error.

aggregate harm or loss or (2) if the offense behavior is ongoing or continuous in nature *and* the offense guideline is written to cover such behavior. *Id.* Neither prong of this test is satisfied here. The first prong is inapplicable because the offense level for FARA violations, unlike fraud or drug cases, is not determined by calculating the total amount of harm or loss caused. The second prong fails because there is no guideline for FARA violations that demands grouping. In fact, there is no guideline for FARA violations at all. Thus, FARA counts are *not* required to be grouped under § 3D1.2(d) and the government's argument that the conduct was part of a the "same course of conduct" or a "common scheme" fails.

### 4.   <u>Obstruction of Justice</u>

As previously detailed in Mr. Zuberi's Initial Sentencing Memorandum, the government mischaracterizes many of the facts that it contends support the obstruction of justice count and/or enhancement. (*See* ECF No. 122 at 38-47). Moreover, the government's characterization of this conduct as egregious and worthy of extreme punishment is disingenuous. In reality, as part of the plea agreement and after consideration of the relevant facts, the United States Attorney's Office for the Central District of California actually agreed not to charge Mr. Zuberi with obstruction of justice. Yet, *after* Mr. Zuberi agreed to the plea, the United States Attorney's Office for the Southern District of New York turned around and charged him with obstruction of justice for the same conduct covered by the non-prosecution language in the plea agreement. *See United States v. Zuberi*, 2:20-cr-00155-VAP, ECF No. 1. Although the SDNY and CDCA are different districts, they are part of a single U.S. Justice Department and having one arm promise a non-prosecution to get Mr. Zuberi to sign a plea agreement while the other is lying in wait to prosecute him for the same conduct is as unjust as it is unusual. Now, after originally agreeing to not prosecute Mr. Zuberi on this count, the government has filed over thirty-pages of briefing disingenuously claiming Mr. Zuberi's conduct was egregious and worthy of extreme punishment. (Govt. Position re Obstruction of

1  Justice, ECF No. 42).

2  **B.    The History and Characteristics of the Defendant**

3      As demonstrated above, nothing about the nature or seriousness of Mr.

4  Zuberi's offenses merits extraordinary punishment in this case.  Actually, as the

5  USPO properly found, there are compelling reasons, including but not limited to Mr.

6  Zuberi's history and characteristics, to impose a sentence far below the Guideline

7  range.

8      Contrary to how the government has maligned and mischaracterized Mr.

9  Zuberi as a greedy fraudster completely motivated by self-interest, Mr. Zuberi has

10  lived a life of charity, mentorship, and service to country.[4]  The numerous letters

11  written by those who know Mr. Zuberi shed light on his acts of service, generosity,

12  and kindness.  In their own words, these individuals describe Mr. Zuberi's true

13  character and how, throughout his life, he has helped those in need and served his

14  country, without seeking recognition and without receiving remuneration or benefit.

15  In sum, the facts below regarding Mr. Zuberi's history and characteristics strongly

16  support a significant downward variance from the suggested Guideline sentence.

17      **1.    Mr. Zuberi's Family and Background**

18      Mr. Zuberi was born on August 3, 1970 in Karachi, Pakistan to his parents

19  Mubarak Zuberi and Asifa Zuberi.  (ECF No. 147 at 26).  Mr. Zuberi had a difficult

20  childhood, as he was born with Hirschsprung disease, which required him to

21  undergo seven surgeries before he was ten years old.  (*Id.*)  At the age of four, he

22  moved to New York with his parents so he could receive the treatment he needed.

23  (*Id.*).  He did not immediately fit in the All-American city of Albany, and his health

24  complications compelled him to work harder than his peers to keep up.  Due to an

25

26  ───────────────

27  [4] The factual errors regarding the government's allegations of uncharged and unsubstantiated fraud and misconduct by Mr. Zuberi have already been corrected in
28  Mr. Zuberi's Initial Sentencing Memorandum.  (*See* ECF No. 122).

1 undiagnosed attention deficit disorder as a child, he initially struggled in school.

2 But his parents and grandparents impressed upon him the importance of learning,

3 growing, and contributing.  With their help, and hard work and determination, he

4 eventually earned a graduate degree and established himself as a successful

5 businessman and entrepreneur.

6        However, the business and financial success Mr. Zuberi eventually achieved

7 is only a small portion of his story.  He was also a loving son.  For over twenty-three

8 years, Mr. Zuberi's mother suffered from Parkinson's disease, multiple strokes,

9 heart valve malfunction, congestive heart failure, and chronic obstructive pulmonary

10 disease.  His father also suffered from diabetes, heart disease, liver disease, kidney

11 disease, and hypertension.  Despite his own busy schedule and obligations, Mr.

12 Zuberi took care of them as best that he could, often flying at a moment's notice

13 from China to Los Angeles or New York to be there for them and to support them in

14 the hospital when they had health scares.  *See* Ex. 2.  Indeed, around 2003, when

15 Mr. Zuberi's father had a non-fatal stroke, Mr. Zuberi contemplated quitting his job

16 to return to Los Angeles to be with his father.  (ECF No. 147 at 27).  In the end, he

17 decided to attend business school in Los Angeles while spending the other half of

18 his time in China on business.  (*Id.*).  When his parents were hospitalized, Mr.

19 Zuberi missed work and spent twelve hours a day—every day—with them,

20 providing them with anything they needed, including moral, medical, and financial

21 support.  (*Id.*).  He was there so often that he became acquainted with everyone at

22 the hospital—from the president of the hospital to the janitors.  (*Id.*).  After Mr.

23 Zuberi's father passed away, he moved his mother in with him to care for her until

24 her passing.  (*Id.*).  On numerous other occasions he has also helped support family

25 members either emotionally or financially, including by taking care of his Uncle,

26 ████████, who has no children.  Exs. 3-4.  Mr. Zuberi provides for his uncle's

27 housing, pays for his medical bills and caregiver, pays for his groceries and checks

28 on his uncle's welfare regularly.  Ex. 4.

Moreover, Mr. Zuberi considers his in-laws his parents and he has helped care for them as he did his own parents. ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ On a daily basis, Mr. Zuberi checks in on his in-laws, does grocery shopping for them, takes them for medical appointments and provides the care expected for people of advanced age or with serious medical issues.

Mr. Zuberi is also a caring husband and father. *See* Ex. 5.  In 2009, Mr. Zuberi married his wife, ████████ and together they have two young children: ████████████████████████████. (*Id.*). ████████ speaks fluent Chinese and likes to practice karate, swimming, piano, drums, and pottery. (*Id.*). ████████ is still very young but is learning to swim. (*Id.*). Mr. Zuberi is a loving father, and his children are the center of the world to him. (*Id.*); Ex. 6.  When he is not traveling, Mr. Zuberi spends all his time with his wife and children.

Mr. Zuberi accepts responsibility for his transgressions, and is ashamed of them.  But he is also resolute to not make the same mistakes.  This case has been a wake-up call to Mr. Zuberi, and he is determined to get back to what matters most to him: his family.  Mr. Zuberi earnestly hopes that this Court will impose a sentence that will allow him to get back to providing for the health and security of his family as soon as possible.

## 2. Mr. Zuberi's Medical Issues and the COVID-19 Pandemic

Due to the current COVID-19 pandemic, Mr. Zuberi's medical conditions weigh strongly in favor of a reduced sentence or home confinement.  On March 4, 2020, the Governor of California "proclaimed a state of emergency in California as a result of COVID-19." *Grano v. Sodexo Mgmt., Inc.*, 335 F.R.D. 411, 412 (S.D. Cal. 2020).  On March 11, 2020, "[t]he World Health Organization declared COVID-19 a global pandemic" and on March 19, 2020, the President "declared the outbreak to constitute a national emergency." *See United States v. Lopez*, 2020 WL

1433158 at *1 (E.D. Cal. Mar. 24, 2020).

This pandemic has caused imprisonment to become extremely dangerous to those with certain underlying medical conditions.  As described in a March 27, 2020 sworn affidavit by Dr. Brie Williams, Professor of Medicine at the University of California, San Francisco and Director of UCSF's Criminal Justice & Health Program: "Because inmates live in close quarters, there is an extraordinary high risk of accelerated transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat together and use the same bathrooms and sinks.  They eat together at small tables that are cleaned only irregularly.  Some are not given tissues or sufficient hygiene supplies." *United States v. McRae*, No. 2:16-cr-00566-TS, ECF No. 181-3, (D. Utah, May 26, 2020).  "Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands." *Id.*

Similarly, Chris Beyrer, M.D. professor of Epidemiology, International Health and Medicine at the Johns Hopkins Bloomberg School of Public Health explained that "COVID-19 poses a serious risk to inmates and workers in detention facilities . . . long been known to be associated with high transmission probabilities of infectious diseases. . . ." *Id.*, ECF No. 181-2.  "Infections that are transmitted through droplets, like influenza [and the COVID-19 virus], are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible." *Id.*  The heightened risks in a prison environment include, "physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves. . . ." *Id.*

Given these unsurmountable issues in containing the spread of the virus in prison populations, on March 26, 2020 and April 3, 2020, the Attorney General of

the United States issued memoranda directing the Bureau of Prisons in certain circumstances "to grant home confinement to inmates seeking home confinement in connection with the ongoing COVID-19 pandemic." *United States v. Percoco*, 2020 WL 2143033 (S.D.N.Y., May 5, 2020).  Specifically, the Attorney General directed that "[i]n assessing which inmates should be granted home confinement . . . consider the totality of the circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors," including (1) "[t]he age an vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines" and (2) "[t]he inmate's crime of conviction, and assessment of the danger posed by the inmate to the community."  Ex. 7.

These two factors weigh strongly in favor of home confinement, rather than a lengthy prison sentence, in this case.  First, Mr. Zuberi's type-2 diabetes, kidney insufficiency, hypertension, hyperlipidemia, and liver disease are all conditions that increase the risk of severe complications from COVID-19 according to the CDC guidelines.  *See* CDC People with Certain Medical Conditions (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html) (identifying diabetes, hypertension, and liver disease as risk factors).  This fact is not in dispute, and, "[s]ince the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release." *United States v. Parker*, 461 F. Supp. 3d 966, 979-80 (C.D. Cal. 2020).  Indeed, type-2 diabetes, kidney insufficiency, and hypertension are three of the most deadly risk factors for COVID-19.  Ex. 8.

As such, courts have routinely relieved defendants and inmates of prison sentences in favor of home confinement if they suffer, from type-2 diabetes and hypertension.  *See e.g. United States v. McEwan*, 2020 WL 4035068, at *3-4 (N.D.

Cal. June 30, 2020) (imposing home confinement because "it is well documented that hypertension and Type II diabetes are associated with increased risk of infection and worse outcomes in lung injury and mortality"); *United States v. Arceo*, 2020 WL 4001339, at *1-2 (N.D. Cal. July 15, 2020) (granting compassionate release because "Defendant's hypertension, type 2 diabetes mellitus, and obesity place him at an elevated risk for severe COVID-19 complications"); *United States v. Armstrong*, 2020 WL 4366015, at *3 (S.D. Cal. July 30, 2020) (granting motion to reduce sentence because "the fact that [defendant] has type-2 diabetes, is obese, and suffers from high blood pressure all increase the risk that any infection could be very serious for him"); *United States v. Richardson*, 2020 WL 3402410, at *3-4 (E.D. Cal. Jun. 19, 2020) (granting compassionate release because "hypertension or obesity alone—regardless of age—place a defendant at higher risk of COVID-19 complications").  The same is true of other conditions suffered by Mr. Zuberi, like hyperlipidemia and liver conditions such as Hepatitis A.  *See e.g. United States v. Ramsey*, 2020 WL 3798938 (E.D. Wisc. July 7, 2020) (granting compassionate release to 34-year old defendant with type 2 diabetes, obesity, and hyperlipidemia); *United States v. Lee*, 2020 WL 3422772 (E.D. Va. June 22, 2020) (granting compassionate release to 46-year-old defendant with diabetes and hyperlipidemia); *United States v. Olawoye*, --- F. Supp. 3d ---, 2020 WL 4559816 at *2-6 (D. Or. Aug. 7, 2020) (granting reduction of sentence due to defendant's type 2 diabetes, hypertension, and Hepatitis A, among other conditions).

Here, 50 year-old Mr. Zuberi suffers from type-2 diabetes, hypertension, hyperlipidemia, kidney insufficiency, and Hepatitis A (a form of liver infection)— all of which make him acutely vulnerable to severe complications from COVID-19 under the CDC guidelines.  Ex. 9.  His doctor has explained that "he should take extreme caution to prevent infection with" the COVID-19 virus.  *Id.*  Placing Mr. Zuberi in a prison environment would drastically increase his chances of a severe negative health outcome, as he would be unable to take the proper medical

precautions to avoid being exposed to the virus.  As numerous other courts have already found in similar circumstances, Mr. Zuberi's medical conditions weigh strongly against a sentence including an incarceration term.

Second, Mr. Zuberi presents no danger to the community if permitted to serve his sentence on home confinement.  Courts have routinely found that where the defendant (1) has no prior criminal history; (2) has been convicted of a non-violent crime; and/or (3) has accepted responsibility for the offense(s), home confinement and compassionate release are appropriate to mitigate the dangers presented by the COVID-19 pandemic.  *See United States v. Davis*, --- F. Supp. 3d ---, 2020 WL 3443400 (E.D. Cal. Jun. 23, 2020) (granting compassionate release because "Defendant's offenses were non-violent, he has no prior criminal history, he accepted responsibility for his offenses, he assisted authorities in his prosecution. . . ."); *United States v. Carpenter*, --- F. Supp. ---, 2020 WL 5851129 at *3 (E.D. Cal. Sep. 30, 2020) (releasing defendant due to COVID-19 and finding he did not pose a danger to community because his "fraud-related crimes were non-violent" and he had "no prior criminal history"); *Richardson*, 2020 WL 3402410, at *4-5 (E.D. Cal. June 19, 2020) (granting compassionate release to and finding no danger to community because "Defendant's crime was not violent, and his prison disciplinary record is clean"); *United States v. Barber*, --- F. Supp. ---, 2020 WL 2404679, at *6 (D. Or. May 12, 2020) (ordering home confinement after finding that former drug dealer did not present a danger to the community); *United States v. Arreola-Bretado*, 445 F. Supp. 3d 1154, 1159 (S.D. Cal. 2020) (granting compassionate release because defendant was convicted of nonviolent crime and had no prior criminal history).

Here, it is undisputed that Mr. Zuberi has not been convicted of a violent crime and has no prior criminal record.  And, as described in more detail below, he has fully accepted responsibility for these failures by pleading guilty pre-indictment and taking the extraordinary step of paying at least $10.5 million in restitution even

1  before sentencing.  Mr. Zuberi is sincerely remorseful for his transgressions, and has

2  demonstrated he poses no future risk to the community.

3      Mr. Zuberi recognizes and accepts that he did wrong, and this Court has

4  discretion to impose in how it will impose punishment for it.  However, Mr. Zuberi

5  is not deserving of a sentence that risks his life.  As many other courts have found,

6  he should be permitted to serve his sentence in home confinement, where he can

7  take proper precautions to avoid exposure to the COVID-19 virus and obtain

8  appropriate medical treatment.

### 3.   Mr. Zuberi's Acceptance of Responsibility

10     Mr. Zuberi's acceptance of responsibility also independently merits a reduced

11  sentence under § 3553(a)—even if the government wrongly refuses to recommend a

12  reduction under the Guidelines.  *See United States v. Romero*, 514 Fed. Appx. 642,

13  642 (9th Cir. 2013) ("[I]n lieu of an acceptance of responsibility adjustment, the

14  court granted a two-level downward variance under 18 U.S.C. § 3553(a) to reflect

15  the fact that [defendant] did not contest [the crime].").  As explained in more detail

16  in Mr. Zuberi's Response to Government's Position Re Acceptance of

17  Responsibility, Mr. Zuberi has demonstrated a rare level of acceptance and remorse

18  of his convictions.  (ECF No. 136).  Specifically, Mr. Zuberi took the uncommon

19  step of admitting guilt even prior to indictment, and has truthfully and steadfastly

20  admitted the allegations in the factual basis of the plea agreement, saving the

21  government and this Court the time and expense of preparing for trial.

22     Moreover, he has already made substantial efforts towards restitution, having

23  paid approximately $10.5 million to date and planning to pay an additional $3

24  million in the coming weeks, with the remainder to follow shortly thereafter.  The

25  prepayment of millions of dollars of restitution prior to sentencing is highly unusual,

26  and demonstrates how sincerely Mr. Zuberi has accepted responsibility and has gone

27  to great lengths to make things right.  Given these efforts, it is apparent that a severe

28  sentence is not necessary to further punish Mr. Zuberi or to discourage him from

1 | any further unlawful conduct.

2 | ### 4.    **Mr. Zuberi's Cooperation**

3 | As with acceptance of responsibility, "[c]ooperation may be included as part

4 | of consideration of § 3553(a) factors after a Guidelines sentencing range is

5 | calculated." *United States v. Ressam*, 679 F.3d 1069, 1091 (9th Cir. 2012). This is

6 | because "Section 3553(a)(1) identifies 'the history and characteristics of the

7 | defendant' as one of the factors to consider in imposing a sentence. That factor may

8 | include the defendant's cooperation with authorities." *Id.* at 1092; *see also United*

9 | *States v. Zolp*, 479 F.3d 714, 721-22 (9th Cir. 2007) ("[T]he district court did not err

10 | by considering [defendant's] cooperation as part of its analysis under 18 U.S.C.

11 | § 3553(a) rather than as part of its advisory guidelines calculations."); *United States*

12 | *v. Gonzalez*, 270 Fed. App'x 702, 704 (9th Cir. 2008) (unpublished) (same).

13 | From the start of this case, Mr. Zuberi has been ready, willing, and eager to

14 | cooperate with authorities in any way he could. He participated with multiple

15 | proffers with the government, answering all questions and providing all requested

16 | information. *See* Ex. 10. In addition, he agreed to go undercover and act as a

17 | confidential informant against ███████ Mayor ███████████ However, when a

18 | subpoena from United States Attorney's Office for the Southern District of New

19 | York naming Mr. Zuberi individually was leaked to the public, Mr. Zuberi's ability

20 | to work as a confidential informant was abruptly terminated. In fact, Mr. Zuberi

21 | was preparing at an FBI office for a recorded conversation with ████ on the same

22 | day the SDNY subpoena was issued and immediately hit the press, leading to agents

23 | having to cancel this opportunity to help both himself at sentencing and the CDCA

24 | in an important public corruption investigation.

25 | Mr. Zuberi's willingness to cooperate has in fact been confirmed by the

26 | United States Attorney's Office for the Southern District of New York. That

27 | District has acknowledged that Mr. Zuberi participated in at least seven proffers

28 | and/or meetings in which he was forthcoming and provided credible information.

1  Indeed, his cooperation and assistance to this country has spanned over a decade, as

2  described in more detail in Mr. Zuberi's CIPA filing.

3     Mr. Zuberi's willingness to cooperate demonstrates his remorse for his

4  actions and his desire to be a fully law-abiding citizen.  Although the  Central

5  District of California refuses to make a motion for a downward departure for Mr.

6  Zuberi's substantial assistance, the Southern District for New York has recognized

7  Mr. Zuberi's cooperation with law enforcement.  This Court should recognize this

8  assistance from Mr. Zuberi in the form of leniency in his sentence.

9          **5.     Mr. Zuberi's Service to Country**

10     In addition to his devotion to his family, Mr. Zuberi has exhibited a pattern of

11  devotion and service to the United States of America throughout his adult life, both

12  by direct service and by leveraging his influence as a businessman to support U.S.

13  diplomatic missions.  Ex. 11.  While not an exhaustive list, the examples below are

14  representative:

15     1.     While a university student in New York, Mr. Zuberi enlisted in the U.S.

16  Army.  During basic training, he suffered an injury resulting in medical testing that

17  revealed he had diabetes.  Consequently, Mr. Zuberi was honorably discharged.

18  (ECF No. 147 at 28).

19     2.     In or around 2003, Mr. Zuberi assisted the Los Angeles Sheriff's

20  Department ("LASD"), with its efforts to address violent extremism.  At that time,

21  there was a credible threat against the tallest building in Los Angeles.

22     3.     ████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████

27  ██████████████████████████

28     4.     In or about 2012, Mr. Zuberi identified several instances of fraud being

perpetrated against the Overseas Private Investment Corporation (OPIC) by Southeast Asian countries.  Ex. 13.  OPIC is a U.S. taxpayer-funded program to finance overseas projects involving U.S. companies or investors that are in the U.S. national interest.  The information Mr. Zuberi provided to OPIC resulted in the cancellation of several projects that had been defrauding OPIC, which saved U.S. taxpayers hundreds of millions of dollars.

5.      From 2014 to 2018, Mr. Zuberi served on the Board of Advisors for America Abroad Media.  The board included influential members such as former Secretary of State Madeline Albright, former Secretary of Homeland Security Michael Chertoff, former Director of the CIA and NSA Michael Hayden, and former CIA Director James Woolsey.  The mission of America Abroad Media was to promote the United States as a positive force versus evil in the world by winning the hearts and minds of the populations of America's adversaries.  Mr. Zuberi contributed greatly to this effort by donating money, his time, and domestic and international resources.  Ex. 14.

6.      As an American businessman with considerable overseas ventures and contacts, Mr. Zuberi has promoted American ideals and economic interests overseas since 2004.  From start-ups to Fortune 500 companies, Mr. Zuberi has helped U.S. companies expand in Asia.  Exs. 11, 14-15.  Consistently, Mr. Zuberi has staunchly defended American ideals and systems.  Exs. 2, 16-17.

**6.    Mr. Zuberi's Charitable Work**

Following the spirit of altruism he learned from his grandparents and parents, Mr. Zuberi began his philanthropic activity as a young college student at the University of Southern California ("USC") and continued throughout his adult life. His work has included, but is not limited to, the following:

1.      In 1995, Mr. Zuberi was the Chairman of the USC Student Senate Security Committee during a bloody street gang war between two gangs whose territories bordered the USC campus.  During a shootout between the gangs, a USC

student was shot.  Recognizing the ongoing threat to the local community, including the USC student body, Mr. Zuberi organized a conference with law enforcement and community groups.  Exs. 6, 18-23.  Participants included the Los Angeles Police Department ("LAPD"), LASD, the USC Department of Public Safety ("DPS"), the California Highway Patrol ("CHP"), the FBI Safe Streets Task Force and community groups (notably, Unity One).  As a result of this conference, numerous security strategies were implemented to protect students and the community, including: (1) the creation of a hotline for USC students to call the USC DPS regarding any type of threat; (2) the creation of a LAPD and CHP hotline for community members to report gang activity and/or threats; (3) increased budget for USC DPS's personnel and patrols; (4) increased budget for LAPD patrols; (5) the donation from General Motors to USC DPS of ten vehicles for security and anti-gang work.

2.     In college, Mr. Zuberi worked with Darren "Bo" Taylor, a former gang member and founder of Unity One, a gang intervention non-profit organization.  Ex. 22.  Mr. Zuberi solicited donations from fellow students to donate money to facilitate Unity One's gang intervention programs beginning with middle and high schools surrounding USC.

3.     To further encourage kids to stay out of gangs and continue their education in college, Mr. Zuberi started the Career Advantage Program ("CAP"), in which he and other USC students tutored math and science for students at inner city schools.  Ex. 22, 24.  That program continues today and has expanded countywide.

4.     In addition to the gang intervention and CAP programs, Mr. Zuberi was directly responsible for initiating programs that improved the quality of life for the approximately 32,000 USC students and the residents of the surrounding community.  Ex. 18-21, 25.  Some of these efforts included: (1) initiating a program, which continues today, for USC to employ graduate students to stand on every street corner within a one-mile radius of the USC campus from sunset to sunrise, 365 days

a year, to enhance student and community safety; (2) encouraging the installment of public safety emergency telephones throughout campus and near student housing so anyone in distress can directly contact first responders; (3) facilitating a program within USC Auxiliary Services to provide free holiday meals (Christmas, Thanksgiving and Easter) to underprivileged members of the surrounding community; and (4) donating laptop computers to USC student organizations, such as CAP, and to local community groups such as Unity One.

5. In or around 1995, Mr. Zuberi donated $20,000 and laptop computers to the LAPD Abused Child Unit. Ex. 25.

6. In the wake of the September 11, 2001, terrorist attacks, Mr. Zuberi recognized the need to strengthen interfaith relationships. Beginning in 2002, he gave more than $250,000 to Muslim, Christian, and Jewish interfaith dialogue organizations, including $50,000 to Unity Productions Foundation to help fund a film, *MUHAMMAD: LEGACY OF A PROPHET*, that was aired on PBS nationwide as part of that effort (https://www.upf.tv/). *See Muhammad: Legacy of a Prophet*, Unity Productions Foundation (https://www.upf.tv/films/muhammad-legacy-of-a-prophet/watch/) (credits of full-length film at 1:01).

7. As the manager and part-owner of multiple rental properties, Mr. Zuberi has provided apartments for Section 8 housing and to charitable organizations at a discounted rate. He has routinely forgiven rent for tenants who have become unemployed, had other family-related financial difficulties, or were elderly or had medical issues. Ex. 26.

8. Since 2010, Mr. Zuberi has funded the drilling of more than 50 wells to provide drinking water to impoverished villages in Asia. In addition to the charity of providing this resource to those less fortunate, Mr. Zuberi had U.S. flags painted on the pumps of the wells to generate goodwill towards the United States. Ex. 2.

9. From 2012 to 2015, Mr. Zuberi and associates donated $500,000 to the San Gabriel Valley, California Mosque. Ex. 27.

10.     In 2015, Mr. Zuberi donated approximately $100,000 to American Israel Public Affairs Committee ("AIPAC") to support birthright educational trips to Israel for young Jewish-Americans.  Ex. 28.

11.     In 2016, Mr. Zuberi donated $300,000 to the University of California, Los Angeles Law school for their legal clinics.  Ex. 29.

12.     For the past 20 years, Mr. Zuberi has supplied books and school supplies to many of underprivileged students at elementary schools in Pakistan.  Ex. 2.

13.     For several years, until 2018, Mr. Zuberi was a Gold Sponsor of Biking 4 Books, a charity that organizes bike rights to promote physical fitness and to raise money to supply books to inner city students in St. Louis, Missouri.  Ex. 30.

14.     At the beginning of the COVID-19 pandemic, during which there was a shortage of personal protective equipment in the United States, Mr. Zuberi used his extensive Asian business contacts to procure, import, and donate hundreds of thousands of masks to hospitals, homeless shelters, and small businesses in the United States, entirely at his expense.  Exs. 17, 22, 23, 31.

15.     Mr. Zuberi's father was Chairman of the Red Crescent (Red Cross) in Sind, Pakistan and setup the blood banks for that organization in the 1970s.  Since his father's death, Mr. Zuberi has continued to support those blood banks financially and with personnel from his Pakistan based companies.  Ex. 4.

16.     Mr. Zuberi helped ex-gang member and convict Jesse Shaw set up two mini-mart convenience stores, one in Lynwood, CA and the other in Los Angeles, CA.  Ex. 23.

17.     For years, Mr. Zuberi has assisted Hope of the Valley Rescue Mission, one of the largest providers of homeless shelters in metropolitan Los Angeles, with business advice to help set up their facilities, with monetary donations and by cooking for and serving the needy.  Ex. 32.

### 7.   Mr. Zuberi's Support of Military Veterans

Since being honorably discharged from the U.S. Army, Mr. Zuberi has been a champion of U.S. military veterans' causes and has been involved in numerous endeavors for their benefit.  Mr. Zuberi's efforts in this field were ignited in approximately 2004 by his interactions (including donations and volunteer work) with organizations that provide services for homeless people in Los Angeles.  There, Mr. Zuberi encountered a significant number of able-bodied veterans who, because of their inability to find employment, had joined the homeless population.  In response to the problem, Mr. Zuberi began donating money to national and local veterans organizations and he started assisting veterans organizations and their members with job placement and financial literacy instruction.

For example, since 2011, Mr. Zuberi has funded numerous dinner galas for veterans organizations across the nation where veterans and their families are honored while they celebrate the holidays.  Ex. 33.  In addition, beginning in 2015, Mr. Zuberi has supported the American Veterans Center by donating $100,000 to help fund several of the National Memorial Day Parades and by securing key American political speakers at those events.  Moreover, on December 29, 2016, Mr. Zuberi donated $1 million to VoteVets for veteran advocacy and to help veterans to register to vote.  Ex. 34.  And on November 17, 2016, Mr. Zuberi donated $200,000 to the E Pluribus Unum Foundation in support of government transparency in relation to veterans affairs.  Ex. 35.

As a result of his extensive involvement in veteran advocacy, Mr. Zuberi also realized the unfortunate reality that many veterans don't take advantage of the benefits they are due, the services that are available to them, and they otherwise have a difficult time reintegrating into civilian life.  Accordingly, since 2019, Mr. Zuberi has been directly involved in leading and financing an effort to develop a nationwide web portal, globally available to all military personnel and veterans, that will be a virtual one-stop shopping center for all the resources necessary for a

1 veteran to successfully return to civilian life.  Ex. 33.

2 ### 8.   Mr. Zuberi's Support for the Incarcerated

3 In addition to his great work on behalf of veterans, Mr. Zuberi has also made

4 substantial contributions aimed at helping formerly incarcerated individuals to

5 reintegrate into society.  Recognizing that it is extremely difficult for convicts to

6 find employment upon release from incarceration, Mr. Zuberi authored the book *The*

7 *Entrepreneurial Mindset* and created companion courses with the assistance of

8 prisoner reintegration consultant Michael Santos.  Ex. 36.  Mr. Santos is the founder

9 of Prison Professors, a resource that helps society improve outcomes of American's

10 criminal justice system by teaching and inspiring those serving prison sentences,

11 after he served a twenty five-year sentence himself.  Mr. Zuberi's book and courses

12 are now a part of the Prison Professors curriculum.  Ex. 37.

13 As of this writing, administrators in every state prison in California use Prison

14 Professors programs to teach and inspire people.  *Id.*  Further, administrators in the

15 federal prisons of Atwater, California, Victorville, California, and Florence,

16 Colorado use the programs as well.  The book and courses Mr. Zuberi created are

17 being distributed to teach and inspire more than 100,000 people every year and will

18 be able to have an impact on improving outcomes for people in jails and prisons

19 across America.

20 In addition, because individuals released from prison experience challenges

21 during reentry to society similar to those of veterans transitioning from the military

22 to civilian life, since 2019, Mr. Zuberi has been spearheading and funding an effort

23 to develop a web portal—similar to the one being created for veterans—as a virtual

24 one-stop shopping center for the resources necessary to facilitate the successful

25 reentry of released prisoners into society.

26 ### 9.   Mr. Zuberi's Financial Generosity

27 In addition to his work for veterans and the incarcerated, throughout his life,

28 Mr. Zuberi has provided financial assistance to organizations and individuals that

has positively impacted thousands of people.  These selfless acts include, but are not limited to, the following:

    1.    During college, Mr. Zuberi financially helped fellow student, ████ ████ by helping pay his terminally ill father's medical expenses over a period of approximately two years.  Ex. 38.

    2.    For over two decades, Mr. Zuberi routinely paid for housing, weddings, medical expenses, funerals and other necessary expenses of employees, their family members and others.  Exs. 2, 17, 39.

    3.    For three years, Mr. Zuberi provided financial assistance to ████ ████ during his daughter's cancer treatment.  Ex. 15.

    4.    When former LAPD Commander and former Los Angeles County Chief Probation Officer ████ son-in-law, a Glendale, California police officer, was fatally shot in the line of duty, Mr. Zuberi donated $25,000 as a scholarship fund for the fallen officer's children.  Ex. 6.

    5.    Despite the fact that a ████ employee stole approximately $7,000 in cash and property from him, Mr. Zuberi showed him mercy and continued to employ the man so that he could repay the debt.  Ex. 2.

    6.    Throughout college and during his professional career, Mr. Zuberi has provided academic and professional mentoring to students, interns, community leaders, the disadvantaged, and colleagues.  Exs. 16-17, 31, 39-40.

### 10.   <u>Mr. Zuberi's Humanitarian Acts</u>

    Perhaps one of the greatest measures of Mr. Zuberi's character are the actions he has taken to save lives, including the following incidents:

    1.    During a USC graduate school trip to Mexico City, one of Mr. Zuberi's classmates experienced a severe allergic reaction resulting in anaphylactic shock during a meal.  The classmate's throat had swollen shut and she was having trouble breathing.  Mr. Zuberi was the only person in the group to take the initiative to accompany his fellow student to the hospital.  Not only did Mr. Zuberi pay his

classmate's medical expenses, but when the medical staff refused to treat her because they said they didn't have the requisite medicine to treat his classmate, Mr. Zuberi paid extra to have them expeditiously acquire the necessary medicine to save his classmate's life.  Ex. 24.

       2.     In approximately 2004, Mr. Zuberi was having dinner in Shanghai, China with fellow members of the U.S. China Business Association that included an executive from United Airlines.  The airline executive started choking during the meal.  Because the executive did not speak Chinese, Mr. Zuberi and his Chinese-speaking secretary, assistant, and driver transported the airline executive to the hospital and accompanied him through his medical treatment.  Mr. Zuberi also paid for the treatment.  Exs. 17, 24.

       3.     In 2018, Mr. Zuberi donated money for the criminal defense of ███ ████████████ Christian woman ████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████ Her life was threatened by religious extremists.  Mr. Zuberi helped to facilitate her relocation to ██████ Ex. 2.

      In total, these numerous acts of kindness, charity, and generosity reveal a good-hearted man—not the villain the government seeks to establish.[5]  Mr. Zuberi made mistakes and he has fully accepted responsibility for them and has been humiliated.  But his history and characteristics make certain that a lengthy prison sentence is not necessary, or justified, to meet the goals of sentencing.

---

[5] Mr. Zuberi maintains this character in his day-to-day life, even when nobody is watching.  For example, in March 2019, after accidentally backing into an unoccupied vehicle, Mr. Zuberi waited almost an hour for the vehicle owner to arrive so that he could make amends for the damage.  The vehicle owners have written a letter thanking Mr. Zuberi for his integrity.  Ex. 53. [Car accident letter 04-2019]

**C.   The Kinds of Sentences Available**

Mr. Zuberi's four counts of conviction have a combined statutory maximum of thirty five years with no minimum sentence or supervised release.  (ECF No. 146 at 7).

**D.   The Sentencing Range Established Under the Guidelines and the Need to Avoid Unwarranted Sentencing Disparities**

The USPO calculated a total offense level of 30, which results in an advisory Guideline sentence of 97 to 121 months.  (ECF No. 147 at 4).  As explained in his prior briefing, Mr. Zuberi contends that a correct calculation results in an offense level of 27, which results in an advisory Guideline sentence of 70 to 87 months.  (ECF Nos. 90, 122, 136).  However, in either case, as the vast majority of courts have determined, the advisory Guideline ranges for Mr. Zuberi's crimes significantly overstate the level of punishment necessary to meet the goals of 18 U.S.C. 3553(a)(2).[6]

**1.   FECA**

After consideration of the section 3553(a) factors, Courts have consistently sentenced defendants guilty of FECA violations to terms of incarceration far below the advisory Guideline range.  The Sentencing Commission's 2019 Annual Report and Sourcebook of Federal Statistics reveals the following data for bribery and corruption crimes, which includes FECA violations:[7]

---

[6] There is no advisory Guideline range for the FARA conviction.

[7] Appendix A states that "*Bribery/Corruption* includes offenses involving public officials and violations of federal election campaign laws . . . [including, among other crimes,] making, receiving, or failing to report a contribution, donation, or expenditure in violation of the Federal Election Campaign Act."  It also specifically "includes offenders sentenced under USSG §§. . . 2C1.8," among others.  Ex. X.

| Category | All Guidelines[8] | 2C1.8 |
|---|---|---|
| Sentences within Guideline Range | | |
| Frequency | 18.5% | 0.0% |
| Downward Departures | | |
| Frequency | 42.5% | 0.0%[9] |
| Mean Decrease | 61.7% | N/P |
| Median Decrease | 55.6% | N/P |
| Downward Variances | | |
| Frequency | 35.3%[10] | 100.0%[11] |
| Mean Decrease | 55.2% | N/P |
| Median Decrease | 50.0% | N/P |

In other words, less than 19 percent of courts determined that the Guideline range for a FECA-type offense reflected an appropriate punishment for the crime. More than 35 percent of defendants received a downward variance and more than 42 percent received a downward departure. The average variance resulted in a sentence that imposed an incarceration term more than 55 percent shorter than the low-end of

---

[8] This includes all guidelines that fall within the "bribery/corruption" category. Appendix A states that "*Bribery/Corruption* includes offenses involving public officials and violations of federal election campaign laws . . . [including, among other crimes,] making, receiving, or failing to report a contribution, donation, or expenditure in violation of the Federal Election Campaign Act." It also specifically includes "offenders sentenced under USSG §§. . . 2C1.8," among others. Ex. X.

[9] The Commission's report only included two cases.

[10] Table 31 shows 133 variances at a percentage of 39.0%. Ex. 41. However, Table 36 indicates that 5 of these 133 variances were upward. *Id.* Mr. Zuberi's counsel has used these numbers to calculate the figure shown in the chart.

[11] The Sentencing Commission's report does not indicate whether either of the variances was upward.

the Guideline range.  The average departure resulted in a sentence that imposed an incarceration term more than 61 percent shorter than the low-end Guideline range. In Mr. Zuberi's case, even an average downward variance would result in a sentence of approximately 31 months based on the USPO's Guideline calculation.[12]  An average downward departure would result in a sentence of about 27 months.

Indeed, a review of individual similar cases reveals that a sentence at the Guideline range suggested by the government would lead to unwarranted sentencing disparities.  The following table illustrates the typical sentences in cases, many of which involve additional criminal conduct and/or aggravating factors not present here:

| Case | Amount | Characteristics | Prison Sentence |
|------|--------|-----------------|-----------------|
| *United States v. Dodd, et al.*, No. 4:17-cr-00116 (S.D. Tex.) | $800,000 | (1) Illegal conduit contributions; (2) Fraudulent solicitation of donations | 18 months |
| *United States v. Magliocchetti*, 10-cr-286 (E.D. Va.) | $350,000 | (1) Illegal reimbursements of donations; (2) Pleaded on eve of trial | 27 months (Guideline range of 46-57) |
| *United States v. Stipe*, 03-cr-00128 (D.D.C.) | $250,000 | (1) Illegal conduit contributions; (2) Perjury; (3) Obstruction | None (6 months home confinement) |
| *United States v. Danielzyk*, 11-cr-85 (E.D. Va.) | $186,600 | (1) Illegal reimbursements of campaign donations in effort to obtain appointment as ambassador; (2) Obstruction and falsifying documents | 28 months (Guideline range of 63-78 months) |
| *United States v. Whittemore*, 12-cr-58 (D. Nev.) | $150,000 | (1) Illegal reimbursement; (2) Conviction at trial; (3) Obstruction and repeated lies to government during investigation | 24 months (Guideline range of 41-51 months) |
| *United States v. Fireman*, No. 1:96-cr-10187 (D. Mass.) | $120,000 | (1) Illegal contributions | None (4 months home confinement) |
| *United States v. Chatwal*, 14-cr-143 (E.D.N.Y.) | $120,000 | (1) Illegal conduit contributions; (2) Aggravating role; (3) Obstruction | None (Guideline range of 57-71 months) |

---

[12] These figures are based on an offense level of 27 and a Guideline range of 70 to 87 months, as calculated and explained in Mr. Zuberi's objections to the PSR.

| Case | Amount | Characteristics | Prison Sentence |
|------|--------|-----------------|-----------------|
| *United States v. Schwartz*, 05-cr-00157-RMU (D.D.C.) | $102,214 | (1) Improper conduit contributions | None |
| *United States v. Cuza*, 05-cr-00344-RGK (C.D. Cal.) | $102,214 | (1) Improper conduit contributions | None |
| *United States v. Acevedo-Vila*, 08-cr-00036 (D.P.R.) | ~$100,000 | (1) Improper reimbursement of contributions to gain influence over gubernatorial candidate | None |
| *United States v. Feldman*, 09-cr-75 (E.D. Pa.) | ~$100,000 | (1) Improper reimbursement of contributions | None |
| *United States v. Mobley*, 12-cr-00150 (M.D. Fl.) | $94,500 | Improper conduit contributions | Probation |
| *United States v. Jinnah*, 06-cr-00383 (C.D. Cal.) | $53,000 | Conduit contributions; Intimidated employees into participating; Fled the country after being indicted | Probation |
| *United States v. D'Souza*, 14-cr-34 (S.D.N.Y.) | $20,000 | Conduit contributions; Obstruction; Failure to accept responsibility | Probation |

The government's proposed sentence is inconsistent with the sentences in the cases cited above, involving much of the same conduct. Overall, a FECA conviction rarely results in a prison sentence, much less one as lengthy as the one requested by the government in this case.

### 2.   Tax Evasion

Similarly, courts have routinely found that the Guidelines applicable to tax crimes greatly overstate the punishment required to meet the objectives of 18 U.S.C. section 3553(a)(2). The Sentencing Commission's 2019 Annual Report and Sourcebook of Federal Statistics shows the following data for tax crimes:

| Category | All Guidelines | 2T1.1 |
|----------|----------------|-------|
| **Sentences Within Guideline Range** | | |
| Frequency | 25.4% | 26.2% |
| **Downward Departures** | | |

| Category | All Guidelines | 2T1.1 |
|---|---|---|
| Frequency | 15.5% | 14.3% |
| Mean Decrease | 57.0% | N/P[13] |
| Median Decrease | 57.1% | N/P |
| **Variances** | | |
| Frequency | 57.4%[14] | 59.5%[15] |
| Mean Decrease | 61.6% | N/P |
| Median Decrease | 55.4% | N/P |

In sum, the data reveals that only about 25 percent of courts determined that the tax guidelines reflected an appropriate level of punishment. More than 57 percent of defendants received a downward variance, and more than 15 percent received a downward departure. The average variance resulted in a sentence that imposed an incarceration term more than 61 percent shorter than low-end of the Guideline range. The average departure resulted in a sentence that imposed an incarceration term 57 percent shorter than the low-end Guideline range. In Mr. Zuberi's case, even an average downward variance would result in a sentence of approximately 27 months based on the USPO's Guideline calculation. An average downward departure would result in a sentence of about 30 months.[16]

---

[13] Data not provided in the Commission's report.

[14] Table 31 shows 323 variances at a percentage of 59.0%. However, Table 36 indicates that nine of these 323 variances were upwards. Ex. 41. Mr. Zuberi's counsel has used these numbers to calculate the figure shown in the chart.

[15] The Sentencing Commission's report does not indicate how many of these variances might have been upwards, if any.

[16] Of course, the Court should not simply add the sentence attributable to the tax fraud count to the sentence attributable to the FECA count. Rather, each sentence should run concurrently. *See* USSG § 5G1.2 ("If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment,

1

### 3.   **FARA**

Although there is no Guideline for FARA violations, its treatment by courts and prosecutors over the better part of a century unmistakably demonstrates that a significant prison sentence for a FARA offense is exceptionally rare.  Indeed, a 2016 audit report by the Office of the Inspector General determined that "historically there have been hardly any FARA prosecutions.  Over the past 50 years, between 1966 and 2015, [the DOJ] reported to us that it brought, in total, only seven criminal FARA cases."  Ex. 41.  This dearth of prosecutions is not due to an absence of violations—in fact, the audit report found that 62 percent of FARA registrations were incomplete or untimely, like Mr. Zuberi's was.  *Id.* at 14.  Rather, the reason for the dearth of prosecutions and convictions is that the violations have never been treated as serious criminal offenses.  Instead, the National Security Division "has a clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution."  *Id.* at 10.  "[E]ven though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure."  *Id.* at 11.

Mr. Zuberi acknowledges that he was wrong and that he committed a criminal violation by failing to timely and completely register under FARA.  That being said, for over half a century, these violations have been remedied through voluntary disclosures, not criminal prosecution and lengthy prison sentences like the one the government now seeks.  In particular, it is extremely rare—if not unheard of—for the government to criminally prosecute an individual who did in fact register—only in an untimely or incorrect manner.

Indeed, a review of other cases demonstrates that if the government's recommendation were adopted, it would result in an unwarranted sentencing

_____

then the sentences on all the counts shall run concurrently, except to the extent otherwise required by law.").

disparity.  For example, in *United States v. Siljander*, No. 4:07-cr-00087 (W.D. Mo.), the defendant received a prison sentence of only one year and one day for his FARA violation, which included an obstruction enhancement, while his co-defendant received no prison sentence at all.  However, the *Siljander* defendant's FARA violation was actually more severe than Mr. Zuberi's for two reasons.  First, unlike Mr. Zuberi, the defendant was lobbying for a group that "was included on the United States Senate Finance Committee list identifying charities suspected of funding terrorism."  *Id.*, ECF 640 at 4.  Thus, unlike Mr. Zuberi's lobbying, which was permissible if properly disclosed, the defendant's lobbying was inherently illegal.  Second, unlike Mr. Zuberi, the defendant failed to show the same level of remorse for his actions by waiting until the eve of trial to plead guilty.  *Id.*, ECF 435; 539.

Similarly, in *United States v. Ben Israel*, No. 1:13-cr-00572 (N.D. Il.), the defendant was sentenced to only seven months for conduct that was more serious than Mr. Zuberi's.  There, the defendant's lobbying for Zimbabwe violated an executive order issued by the President pursuant to the International Emergency Economic Powers Act ("IEEPA"), which stated that:

> the actions of members of the Zimbabwe "to undermine Zimbabwe's democratic processes or institutions, contributing to the deliberate breakdown in the rule of law in Zimbabwe, to politically motivated violate and intimidation in that country, and to political and economic instability in the Southern African region, constitute an unusual and extraordinary threat to the foreign policy of the United States.

*Id.*, ECF 116.  Thus, as in *Siljander*, the defendant's violation was not just the failure to report under FARA.  Rather the lobbying, in and of itself, was illegal.

In *United States v. Vincent et al.*, No. 1:05-cr-00059 (S.D.N.Y), the government correctly notes that the defendant was sentenced to five years for FARA violations related to his work with Iraq.  (ECF No. 84 at 25).  However, the government fails to mention the following critical facts, which made that case exceptional.  First, the defendant fled the country to avoid a grand jury subpoena

and the charges against him, requiring the government to issue a Interpol red notice for his arrest. *Vincent*, ECF 74. Second, even after his arrest, he took his case to trial and refused to plead guilty and accept responsibility, unlike Mr. Zuberi. Third, unlike Mr. Zuberi, the defendant had previously been charged with a FARA violation in 1977, which made his conviction essentially his second offense.[17] Fourth, like the defendants in *Ben Israel* and *Siljander* and unlike Mr. Zuberi, the defendant's lobbying was illegal in and of itself. His lobbying on behalf of Iraq (1) was expressly prohibited by executive order of the President pursuant to the IEEPA; (2) violated United Nations economic sanctions; and (3) contravened established U.S. foreign policy because Iraq "was a country designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism." *Id.*, ECF 61. Fifth, unlike Mr. Zuberi's crime, the defendant's conduct went beyond lobbying, and involved the bribing of U.N. officials and the abetting of a fraud perpetrated by the Iraqi government with respect to international oil sanctions. *Id.*

Likewise, in *United States v. Manafort*, No. 1:17-cr-00201 (D.D.C.), the defendant received a five-year sentence, but again the conduct at issue in that case was drastically different. First, the defendant refused to plead guilty and accept responsibility for his violation until after he was found guilty and convicted of separate charges in the Eastern District of Virginia. Even then, he waited until the eve of trial, forcing the government to expend time and resources to prepare for trial. Second, unlike Mr. Zuberi, the defendant continued to lie to the government and obstruct justice even after he purportedly agreed to cooperate, which vitiated any credit for acceptance of responsibility. *Id.*, ECF at 528. Third, the defendant committed his FARA violations after being expressly "warned by the Department of Justice about the law's strictures" numerous times. *Id.* Fourth, and perhaps most importantly, the defendant's conduct was highly publicized, strongly influential, and

---

[17] The first FARA charge was dropped in exchange for the defendant's cooperation.

1   closely tied with foreign interference in the outcome of our country's presidential

2   elections.  The government cannot with a straight face compare the defendant's

3   involvement in that political scandal with Mr. Zuberi's business-oriented conduct.

4          Indeed, the only truly analogous case is *United States v. Chaudhry*, No. 1:18-

5   cr-00226 (D. Md.), in which the defendant also pleaded guilty pre-indictment to a

6   first-time FARA violation for lobbying that was not illegal by itself.  In that case,

7   the defendant received <u>no prison sentence</u>.  In fact, consistent with the DOJ's

8   longstanding policy of encouraging voluntary registration instead of pursuing

9   criminal prosecution, it appears that there is not a single case in the history of the

10   FARA statute that has imposed a prison sentence on a defendant who has pleaded

11   guilty pre-indictment and accepted responsibility for the violation.

12          The government's argument as to why Mr. Zuberi's violation "exceeds that of

13   all the above cases" is nonsensical.  (ECF No. 84 at 27).  Essentially, the

14   government ignores all of the distinguishing facts above and instead boils each case

15   down to the number of foreign countries involved.  Reflective of its decision to file

16   hundreds of pages of briefing and thousands of pages of exhibits where the

17   defendant signed a plea agreement before being charged—as if the volume of the

18   sentencing briefs should determine the length of the sentence—the government uses

19   this number as a crude barometer for the severity of the violation.  (*Id.*).  In the

20   government's eyes, because Mr. Zuberi's alleged FARA violations involved more

21   foreign principals, it must have been more severe.  But the government compares

22   apples to oranges.  The severity of the violation does not turn on the bare quantity of

23   the countries involved, even if the conduct were relevant and even if the government

24   had proven all conduct was illegal, which it has not.  Surely, the defendant who

25   spends a single day lobbying for two countries has not committed a more severe

26   violation than the defendant who has persistently and persuasively lobbied for a

27   single country for a decade.  In short, the government's barometer is an inaccurate,

28   if not outright misleading, measure for determining the severity of the violation and

the appropriate amount of punishment.

### E.    The Need to Provide Restitution

Mr. Zuberi has already accepted responsibility for the counts of conviction and has agreed with the government to provide restitution in a total amount of $15,705,080.11, including interest and penalties.  (ECF No. 147 at 14).  In fact, he has taken the extraordinary step of already paying $10.5 million, with the balance on the way, in restitution even before sentencing.

### F.    The Purpose of the Sentence

Pursuant to 18 U.S.C. section 3553, the sentence imposed must be sufficient, *but not greater than necessary*:

    (a)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (b)    to afford adequate deterrence to criminal conduct

    (c)    to protect the public from further crimes of the defendant; and

    (d)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

For the reasons already stated above, a sentence below the Guideline range is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  Moreover, for the reasons stated below, such a sentence would also more than adequately meet section 3553(a)(2)'s goals of deterrence and protection of the public.

Mr. Zuberi feels great humiliation and remorse for the crimes he has committed.  He has accepted full responsibility for those crimes and pleaded guilty pre-indictment to atone for his mistakes.  He knows that he cannot persist in his prior behavior.  He is deeply sorry for his past conduct and desires nothing more than to do better for his young son, daughter, and wife.  He wants to honor his

mother's memory.

But his remorse and rehabilitation are not merely lip service.  As explained, they are corroborated by his actions since he decided to willingly repent by pleading guilty pre-indictment.  Indeed, within weeks of entering into the plea agreement, Mr. Zuberi paid the first $3 million dollars towards restitution and penalties and, has now paid approximately $10.5 million with $3 million more expected to be paid before sentencing.  In addition, as described above, he has been devoting his time, energy, and resources to help veterans and people released from prison.

Furthermore, on a macro-level, the empirical data also reinforces this conclusion that Mr. Zuberi is not a likely candidate to commit further crimes. Specifically, the Sentencing Commission's 2018 statistics illustrate that persons like Mr. Zuberi present a substantially reduced rate of recidivism.



*Fig. 17 Rearrest Rate of Recidivism Study Offenders by Education and Age at Release*





Fig. 22 Rearrest Rate of Recidivism Study Offenders by Criminal History Category and Age at Release

The data shows that persons of Mr. Zuberi's age[18] and education level are rearrested at a rate of 16.5 percent—substantially lower than younger persons and persons with lower education levels.[19]  Similarly, the data shows that persons of Mr. Zuberi's age without prior criminal records are very unlikely to be rearrested, recidivating at a rate of only 16.1 percent.

## G.   The Government's Skewed Perspective

Finally, the government's sentencing position should persuade this Court that its request for a prison sentence over *double* the USPO recommendation is the product of an unfair and incomplete depiction of Mr. Zuberi.  The government's request for a nearly twelve-year sentence for the conduct admitted to by Mr. Zuberi is neither fair nor just.

From the outset, the government has gone well beyond typical prosecutorial efforts in similar cases and bombarded this Court, and Mr. Zuberi, with a truly

---

[18]    The graphs show the prisoner's age at release.

[19] Mr. Zuberi's educational level actually surpasses the category represented in the data, as he has a post-graduate degree.  However, the Sentencing Commission's report does not provide data on this level of education.

spectacular amount of briefing, exhibits, and demands.  The government has taken the unfair view of Mr. Zuberi as deserving of the full weight of the government coming down on him, despite pleading guilty and attempting to repay not just the criminal, but also the civil, tax liability before sentencing.  The government's unusual efforts and sharp tactics have included, but are not limited to:

1.      Contrary to the standard practice of filing an information to support the charges Mr. Zuberi pleaded guilty to, the government filed a thirty nine-page information, replete with disputed, salacious, and unproven allegations.  Many of these allegations had no relation to the actual charges in the plea agreement and served no purpose aside from disparaging Mr. Zuberi in the media.

2.      In a strategy perhaps never before seen in this District, the government filed over one-hundred pages of briefing, and over one thousand pages of exhibits, on the sentencing guidelines before a PSR had even been issued and before Mr. Zuberi had filed a single word regarding sentencing.  (*See* ECF Nos. 40, 42, 84, 87, 89, 90).  In another unprecedented move, the government served thirteen trial subpoenas on Mr. Zuberi and his company, Avenue Ventures, *after* he had already pleaded guilty in an apparent effort to gather further evidence to use against him at sentencing.  Relatedly, the government even felt it necessary to subpoena the psychologist charged with overseeing *a witness's child custody issues* just to obtain any records she might have regarding the witness's financial relationship with Mr. Zuberi.  Ex. 43.

3.      The plea agreement in this case expressly reserved Mr. Zuberi's right to contest sentencing enhancements by leaving them open for litigation before this Court.  Yet, after filing over one hundred pages of briefing, the government took the unprecedented step of refusing to recommend acceptance of responsibility credit to Mr. Zuberi—despite the fact that he had willingly pleaded guilty pre-indictment— because he responded to the government's briefs and exercised his right under the plea agreement to litigate those enhancements.  (*See* ECF No. 136).  Amazingly, on

November 9, 2020, the government submitted three additional sentencing briefs totally 79 additional pages.  In justifying the refusal, the government claimed that Mr. Zuberi's contesting of the sentencing enhancements caused the government an "extraordinary" amount of work.  (*Id.*).  Yet it was the government that had chosen to file over one hundred pages of briefing and numerous exhibits before Mr. Zuberi had challenged a single proposed enhancement in his first sentencing brief.  (*See id.*).  In fact, the government *opposed* Mr. Zuberi's attempt to limit the pages of sentencing briefing.  (*See* ECF Nos. 44, 54).  Thus, the proffered rationale was simply false and, frankly, suggests the government was motivated to withhold its recommendation for acceptance of responsibility in order to unjustly increase his sentence.

4.      As part of the plea agreement, the United States Attorney's Office for the Central District of California agreed to not charge Mr. Zuberi with obstruction of justice.  But this turned out to be little more than a bait-and-switch.  Upon Mr. Zuberi agreeing to the plea offer, he found himself charged with that very offense by a sister Department of Justice office, the United States Attorney's Office for the Southern District of New York.  *See United States v. Zuberi*, 2:20-cr-00155-VAP, ECF No. 1.  The United States Attorney's Office for the Central District of California saw no irony in accepting Mr. Zuberi's change of plea to the very offense it agreed not to prosecute.

5.      The government has frustrated Mr. Zuberi's attempts to pay restitution pursuant to the plea agreement, which could otherwise serve to mitigate Mr. Zuberi's sentence.  Mr. Zuberi's ability to pay the agreed upon roughly $16 million in restitution was always contingent on his ability to travel overseas to sell his foreign assets.  The government has recognized from the outset of plea negotiations that Mr. Zuberi has pledged interests in his U.S. properties to various investors and that selling them would breach those pledges and expose Mr. Zuberi to lawsuits from those investors.  The government was fully aware of this dynamic when it

1   agreed to permit Mr. Zuberi to travel internationally while on Pretrial supervision to

2   gather funds to pay his tax debts.  (*See* Minutes of Information Hearing, ECF 12, at

3   4).  But while the government initially consented to Mr. Zuberi traveling

4   internationally twice after his initial appearance, in February of 2020 the

5   government abruptly revoked Mr. Zuberi's ability to travel despite no material

6   change to Mr. Zuberi's flight risk or risk of danger to the community.  (ECF No.

7   136 at 20).  The prohibition on Mr. Zuberi's travel prevented him from selling his

8   overseas assets and making full restitution payment promptly.[20]  (*Id.*).  Incredibly,

9   the government then refused to recommend acceptance of responsibility credit and

10  requested an increased sentence, in part, because Mr. Zuberi had not yet paid the full

11  restitution.  (*See* ECF No. 120).  Despite the government's actions that hampered

12  Mr. Zuberi's ability to liquidate assets and pay restitution, he has still nearly

13  satisfied the requirement.

14          6.      In support of its arguments on the sophisticated means enhancement for

15  the tax count, the government falsely asserted that Mr. Zuberi failed to file Foreign

16  Bank and Financial Accounts ("FBAR") statements in order to cover up his crimes.

17  (ECF No. 89 at 8).  As its sole evidence of this fact, the government claimed that

18  Mr. Zuberi had previously filed FBARs and thus knew about the requirements.  *Id.*

19  However, when defense counsel received these prior FBARs, it was clear that they

20  did not contain Mr. Zuberi's signature—rather, they contained a signature that

21  looked nothing like those on the plea agreement and other exhibits.  *Compare* Ex. 45

22  *with* ECF No. 1 at 20-21.  Yet, even after being informed that it was clear that

23  someone else signed and filed these documents, the government refused to withdraw

24  its assertion.[21]

25  _____

26  [20] The COVID-19 pandemic also detrimentally affected Mr. Zuberi's ability to sell
    properties to make full restitution payment.  Ex. 44.

27

28  [21] Numerous other erroneous accusations by the government have already been

7.      Again wrongly taking the worst view of Mr. Zuberi, the government wrongly asserted that Mr. Zuberi fabricated persons such as ███████████ ███ based solely on testimony from people who never met ██████████ and merely speculated they did not exist. (*See* ECF No. 1 at 14; ECF No. 42 at 7). Yet, there are thousands of emails supporting the existence of both ██████████ and numerous other individuals have signed letters attesting that they are, in fact, real persons with whom they have interacted in person. *See* Exs. 47-51.

8.      The government has also relied heavily on the testimony of an untrustworthy and not credible witness, Person C. Numerous portions of Person C's testimony were either inconsistent or outright contradicted by the evidence. For example, Person C claimed that Mr. Zuberi committed obstruction of justice in a hotel room that turned out to never have existed. (*See* ECF No. 122 at 50). At one point in his grand jury testimony he claimed that Mr. Zuberi never refunded certain money he was owed, only to contradict himself later and admit that Mr. Zuberi had, in fact, refunded the money. Ex. 46. He claimed to have falsified bank wires by indicating they were for "consulting fees" even when they were not. Ex. 46.. He also admitted to making illegal campaign contributions on his own credit card, without Mr. Zuberi's involvement, in the names of non-U.S. citizens even after he alleged Mr. Zuberi did so. Ex. 46. Indeed, others also noted Person C's untrustworthiness. Ex. 52. Yet, the government was so determined to pursue Mr. Zuberi, that it refused to follow up on these admitted crimes and inconsistencies. Rather, the government preferred to overlook these faults, provide Person C with immunity, and rely solely on his uncorroborated testimony that was clearly designed to implicate Mr. Zuberi to save himself from prosecution from much more serious crimes.

---

addressed in Mr. Zuberi's Initial Sentencing Memorandum. (*See* ECF No. 122).

1

## IV.   <u>Conclusion</u>

2        Plainly, the government's recommendation of a sentence more than *double*

3   the USPO's recommendation comes from a subjectively skewed and unfair view of

4   Mr. Zuberi, and it should not be adopted by this Court.  Mr. Zuberi asks the Court to

5   consider his long history of positive accomplishments to the community and the

6   nation, as well as his early acceptance of responsibility, to impose the appropriate

7   sentence.

8

9   DATED:  November 9, 2020            BROWNE GEORGE ROSS
                                        O'BRIEN ANNAGUEY ELLIS LLP
10                                          Thomas P. O'Brien

11

12

13                                  By:      /s/ Thomas P. O'Brien

14                                        Thomas P. O'Brien
                                    Attorneys for Defendant Imaad Shah Zuberi

15

16

17

18

19

20

21

22

23

24

25

26

27

28