Exhibit 28

IMAAD ZUBERI                              Account Ending ███████                              p. 4/15

**Detail**

**IMAAD ZUBERI**
Card Ending ███████

| | | | Foreign Spend | Amount |
|---|---|---|---|---|

| | OPTICIAN | | | |
| 09/13/17 | AIPAC 202-639-5200 | 202-639-5200 | DC | $75,000.00 |

Exhibit 29



**LET THERE BE ... ABUNDANT APPRECIATION**

Thank you for your gift. Your generosity helps ensure UCLA's continued excellence. Together, there is no limit to what we can accomplish.

Gene D. Block
Chancellor

Imaad S. Zuberi

*To update your contact information, see reverse.*
Imaad S. Zuberi

**GIFT RECEIPT**
Date: 12/30/2016
Receipt Number:

Gift Detail:
Anonymous gift

| Designation | Gift Amount | Tax-Deductible Amount |
|---|---|---|
| Burkle Center for International Relations Program on Security and Religion Fund | $300,000.00 | $300,000.00 |

## THANK YOU!

*PLEASE RETAIN THIS RECEIPT FOR TAX PURPOSES. IMPORTANT TAX AND OTHER INFORMATION IS ON REVERSE.*

Your gift to UCLA could double or more. If your organization matches the charitable contributions of employees, retirees or spouses, contact your human resources representative for instructions.

UCLA DEVELOPMENT · 10920 WILSHIRE BOULEVARD · SUITE 1400 · LOS ANGELES, CA 90024-6518
(310) 794-2045 · (310) 794-0933 FAX · GIFTS@SUPPORT.UCLA.EDU · GIVETOUCLA.EDU

Exhibit 30

# 2018 Sponsors

| 2018: Corporate Sponsors | | |
|---|---|---|
| BIOTRONIK INC | CYBER DIAGNOSTICS | DECOR INTERIORS & JEWELRY |
| DIGESTIVE CARE | LAB TEST DIAGNOSTICS | MUBEEN INVESTMENTS |
| ST. JUDE MEDICAL | WONG FAMILY FOUNDATION | |

| 2018: Gold Sponsors | | |
|---|---|---|
| BARRY BRYANT | IMAAD ZUBERI | SYED T. HAIDER |
| ZIA AHMAD | | |

| 2018: Silver Sponsors | | |
|---|---|---|
| AMAL MANSURI | ASIM RAZZAQ | AZFAR MALIK |
| BANK OF AMERICA | ENTERPRISE BANK & TRUST | HELAL EKRAMUDDIN |
| JIM PROBSTEIN | KHALID NASEER | M. AMJAD ALI |
| M. TAHIR | SYED AHSAN | SYED SAMAD |
| TARIQ & ANJUM HASSAN | THE MALIK FAMILY FOUNDATION | |

| 2018: Bronze Sponsors | | |
|---|---|---|
| | | |
| FATIMA AHMAD | MARGUERITE STEFFEL | YOUNAS SHAH |
| HASANALI AHMED | HASHIM RAZA | ARIF RAHMAN |
| NADEEM AHMED | LIESEL DUHON | ERAM MAHMUD |
| CINDY NAEGER | CHRISTINA FERRANTE | GINA HILLESHEIM |
| SIKANDER BAJWA | WAJIHA KARATELA | MICHAEL SHUMAN |
| JULIE HENTSCHER | AFZAL SAYYED | OMAR SHAHAB |
| SAJID ZAFAR | JAMSHED AGHA | LUBNA AGHA |
| M. AMJAD ALI | MEHER MALLICK | AHMED ALI |
| ARIF HABIB | JAHANZEB NASEER | DURRE MUMTAZ |
| OMAR BAIG | ATA SIDDIQUI | THOMAS ELLINWOOD |
| SUMERA SAJID | MEHWISH BILAL | SAIMA BAJWA |
| JIM PROBSTEIN | MOEED SIDDIQUI | SANJAY SUBRAMANIAN |
| SYED D. HASAN | MOHSIN BAJWA | SAAD KHAN |
| MARK WEBER | ASMA RAZA | SRINIVASAN NAGARAJAN |
| RUPA RAJAGOPALAN | TAMI CHELLAIAH | CAROL LOFT |
| CHAUDHARY KHAN | FAHEEM URAIZEE | CHUING TYAN TAN |
| UMMULKHAIR SYED | RICHARD MCCLURE | ANDREA LINGSTON |

| AMY RASMUSSEN | IQBAL AKHTAR | MARGARET YANICS |
|---|---|---|
| ALAN KIDRETH | ERIC WILLIAMS | RALPH ALBANESE |
| CRAIG ARCHER | KENNETH SCHMIDT | .EJER S MALLICK |
| KEVIN DOOLEY | NARAIN DURALSWAMI | AZAM KHAJA |
| IMRAN HASAN | ASIF BHUTTO | CARMEN GAEBLER |
| GELU POPY | ASIM S. RAZA | TAHIR QAYUM |
| CHRISTIAN W. THMOPSON | LARRY ZARIN | MUKUNDAN P. |
| ATIF SHAFQAT | MICHAEL JEFFRIES | AZRA HABIB |
| BAHAR BASTANI | JAMSHED AGHA | MOHAMMAD TAHIR |
| MUJTABA QAZI | DANIELLE N. ZUMSTEG | ARYAN GOWDA |
| MAHJABEEN ISLAM | SABAH A. KHAN | AHMAD HASAN |

# OUR SPONSORS & PARTNERS

   

   

Biking4Books is 501 (C) (3) tax exempt charitable organization.
All donation made to Biking4Books organization are tax deductible.

## QUICK LINKS

HOME (index.html)

DONATION (donation.html)

EVENTS INFO (eventinfo.html)

SPONSORS (sponsors.html)

RENTALS (rentals.html)

REGISTRATION (registration.html)

MEDIA (media.html)

GALLERY (gallery.html)

ABOUT (about_us.html)

CONTACT US (contact.html)

## IF YOU HAVE ANY QUESTIONS PLEASE CONTACT US.

biking4books@yahoo.com

42 Bopp Lane
Saint Louis MO 63131

## CONNECT US

 Facebook
(https://www.facebook.com/Biking-For-Books-331427333634322)

 Twitter
(https://twitter.com/biking4books)

Copyright © 2019 Biking4books.org. All Rights Reserved

Exhibit 31

Honorable Judge Virginia Phillips                                              June 17, 2020
U.S. District Judge
First Street Court House
Court Room 8A
350 West 1st Street
Los Angeles, California 90012

Dear Honorable Judge Philipps:

I have known Imaad Zuberi since 2012 when I started an internship with his Company
while studying at the University of Southern California. I found this internship through the
University Career Center and was given an awesome opportunity to take on an
internship with many responsibilities that someone my age at the time would not have
including working with global influential high-net worth-individuals, projects in Asia, resort
project in Bahrain, investing in start-up companies and doing research on setting up fund
in Asia. One thing I always tell my family and friends is that I am glad to have had this
experience with Imaad being a direct mentor of mine during my college years, because
he played a huge influence on my career path after college graduation.

After I graduated from USC, I wanted to continue to work for Imaad because I was
learning a lot from him and because I could tell he cared about my career growth and my
success. He cares about all his employees and their families. However, he gave me a
good advice to work for a large corporation first, gain more structured experience and we
can always be in touch and work on businesses in the future when our paths overlap
again. I took his advice and began to work for Bank of America Merrill Lynch. He has
always made me feel comfortable and was available to jump on a call if I ever needed
advice in the professional world or to boost my confidence level when things weren't
going right. He is always available for everyone.

From that point on, in addition to being my mentor, Imaad and I became friends over the
years. We were able to get to know each other on a more personal level and to this day,
I can still say that he is a very caring and generous person not only to me but to his other
friends as well.

When I moved to Shanghai to follow my entrepreneurship, Imaad was very supportive of
my decision to move on from a large corporation and in fact introduced me to a lot of his
great contacts in China as soon as I moved to Shanghai, to help me in case I needed
anything while in a foreign country. You can judge a character by their surroundings, and
his personal friends and business contacts have only great things to say about Imaad
and his success in Asia. Everyone in China whether they are his friends, business
associates or business partners say great things about him. Once he makes a
commitment, he keeps it even if he takes losses on it. This is why he is trusted by
everyone in Asia where business is done on history, handshake and trust not with
contracts. I have traveled on business and been in meetings with Imaad therefore I know
how people listen to him.

I started my own yoga clothing line in China in 2018, because I saw the lack of good
quality and stylish yoga wear in the market for the working-class women. I was excited
about the idea and began to execute the business, the first person I called for advice

was Imaad. He was happy for me to have discovered this new venture and helped me with start-up costs as investor and was our company's free advisor. He worked with me to get the concept right. He even told his friends to help me with registering the company, opening bank accounts, helping with contract manufacturing. This is not something anyone would do for you and I was very grateful that he was willing to put in time and money to help me with my first business venture. He goes out of his way to help his friends.

Imaad and I continue to maintain our friendship and also work together on projects in Asia (China, Pakistan, Dubai, Saudi Arabia, Bahrain and other places).

During this Coronavirus Pandemic, I was able to learn even more about Imaad and how giving he is to the world. He asked me to help secure masks and other PPEs through our connections in China and Korea to donate to hospitals in California, across America and governments who were in urgent needs of these PPEs. He also sent me and my family PPE supplies. One thing I know for sure is that Imaad is not a greedy person but cares for everyone's well-being. However, Imaad often likes to act tough and doesn't want people to know when he helps someone.

I know firsthand many instances where he has helped people by giving them money (without asking for it back) if they lost their jobs or were in need for medical attention. Many of his relatives, especially his cousins, are physicians so every time someone had medical issues he called his doctor friends or relatives especially when it is someone's parents or children that are sick. When I was traveling in Dubai for business, I got sick, and I remember Imaad connected me to his cousin who is a doctor for treatment while I was there. All these things no one is aware of because he wants this part of his life hidden.

I knew Imaad when his father had just passed away and his mother had Parkinsons disease. He had his mother move in with him because he didn't want his mother living alone. His mother was in and out of hospitals for various medical conditions. I know numerous times where we were in meetings in Asia and Imaad would just leave for Los Angeles because his mother was taken into Emergency Room. Imaad really took care of his father and mother and always tells me that I should be taking care of my parents. I just want to say that after all these years of friendship and business, he has a good heart.

Please feel free to reach out to me if you have any questions regarding this letter. Thank you very much.

Sincerely,
Katherine Kim

Exhibit 32



November 6, 2020

To Whom It May Concern:

It is my honor and pleasure to write a letter of commendation and support for my good friend Mr. Imaad Zuberi. As the leader of a large local non-profit in Los Angeles that provides food, shelter and care for the homeless, Immad's friendship and partnership has assisted me personally and professionally. I sincerely appreciate his deep concern for the hurting, hungry and marginalized. Besides supporting us financially, he is willing to roll up his sleeves and help cook and serve those most in need.

At a time when the City of Los Angeles is facing homeless and housing crisis, Imaad has demonstrated his true character of compassion and love by assisting Hope of the Valley with the establishment of the 85-bed North Hollywood Bridge Shelter and the 100-bed Van Nuys Shelter. He has amazed me with his willingness to not just lend support from a distance but to engage with homeless moms, kids and single adults.

Imaad is a generous, compassionate and skilled leader. My only regret is that we cannot clone him! We need more people like Imaad in this world who can bridge the gap between poverty and success, reaching with one hand to lift up those in need and reaching out with the other to encourage civic responsibility.

Sincerely,

Ken Craft – Founder and CEO

   

Exhibit 33

P.C.I.
13008 S. Figueroa Street
Los Angeles, CA 90061
Phone:
Fax:
Email:
Website: www.pcicenter.org



"DOING GOOD THINGS FOR URBAN NEIGHBORHOODS"

October 29, 2020

To whom it may concern:

I am Executive Director of Peoples for Community Initiative (PCI), a non-profit helping local communities in Los Angeles. Our primary aim is to support our community with various services, some of them include:
1) Community Events
2) Job Education and Resources Center
3) Youth Dance
4) Youth Education and Violence Prevention
5) Gang Intervention

Imaad has been supporter of ours for past several years. He has been active in supporting our annual Veteran's gala.

He has long gang intervention experience and has been getting involved in our effort here as well.

In general Imaad Zuberi has been supporting us for a while and his help goes a long way in our effort to support our community.

He and his group has started two web portals 1) incarcerated and 2) for veterans who are leaving military service. Our organization will participate in both these efforts along with American Veterans Center and other organizations.

1) incarcerated people coming out of prisons
   The idea here is to provide everything under one roof or one website on all resources someone will need when coming into civilian life

2) military personnel who were recently being discharged
   The idea here is to provide everything under one roof or one website on all resources someone will need when coming into civilian life

Kenneth Jones Executive Director

COMMUNITY PARTNERS

         

Exhibit 34

**CASHIER'S CHECK**

0065907     11-24

Office AU #     1210(8)

SERIAL #: 6590701660

ACCOUNT#:

Remitter:          **IMAAD ZUBERI**
Purchaser:         **WILLA RAD**
Purchaser Account:
Operator I.D.:     **u459635**     a137421
Funding Source:    **Paper Items(s)**
PAY TO THE ORDER OF     ***VOTE VETS***

December 29, 2016

***One million dollars and no cents***

**\*\*$1,000,000.00\*\***

Payee Address:
Memo:

VOID IF OVER US $ 1,000,000.00

**WELLS FARGO BANK, N.A.**
1200 S BALDWIN AVE
ARCADIA, CA 91007
FOR INQUIRIES CALL (480) 394-3122

NOTICE TO PURCHASER – IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE. AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

**NON-NEGOTIABLE**

**Purchaser Copy**

FB004     M4203  50367003



PRINTED ON LINEMARK PAPER - HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

0065907     11-24

Office AU #     1210(8)

**CASHIER'S CHECK**

6590701660

Remitter:     **IMAAD ZUBERI**
Operator I.D.:  **u459635**     a137421

December 29, 2016

PAY TO THE ORDER OF     ***VOTE VETS***

***One million dollars and no cents***

**\*\*$1,000,000.00\*\***

Payee Address:
Memo:

**WELLS FARGO BANK, N.A.**
1200 S BALDWIN AVE
ARCADIA, CA 91007
FOR INQUIRIES CALL (480) 394-3122

AUTHORIZED SIGNATURE

VOID IF OVER US $ 1,000,000.00

AUTHORIZED SIGNATURE

Details on Back.     Security Features Included.

Exhibit 35

| 0065907 | 11-24 |
|---|---|
| Office AU # | 1210(8) |

**CASHIER'S CHECK**

SERIAL #:  6590701645

ACCOUNT#: ▮▮▮▮▮

Remiter:        **IMAAD S ZUBERI**
Purchaser:    **IMAAD S ZUBERI**
Purchaser Account:  ▮▮▮▮▮
Operator I.D.:    **u459635**        **a137421**
Funding Source:  **Paper Items(s)**

**November 17, 2016**

PAY TO THE ORDER OF        ***E PLURIBUS UNUM FOUNDATION, INC.***

***Two hundred thousand dollars and no cents***        **\*\*$200,000.00\*\***

Payee Address:
Memo:        **DONATION**

**WELLS FARGO BANK, N.A.**
1200 S BALDWIN AVE
ARCADIA, CA 91007
FOR INQUIRIES CALL (480) 394-3122

NOTICE TO PURCHASER -- IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE. AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

VOID IF OVER US $   200,000.00

**NON-NEGOTIABLE**

**Purchaser Copy**

FB004    M4203  50367003

---

PRINTED ON LINEMARK PAPER - HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

| 0065907 | 11-24 |
|---|---|
| Office AU # | 1210(8) |

**CASHIER'S CHECK**

6590701645

Remiter:    **IMAAD S ZUBERI**
Operator I.D.:    u459635        a137421

**November 17, 2016**

PAY TO THE ORDER OF        ***E PLURIBUS UNUM FOUNDATION, INC.***

***Two hundred thousand dollars and no cents***        **\*\*$200,000.00\*\***

Payee Address:
Memo:        **DONATION**

**WELLS FARGO BANK, N.A.**
1200 S BALDWIN AVE
ARCADIA, CA 91007
FOR INQUIRIES CALL (480) 394-3122

AUTHORIZED SIGNATURE

VOID IF OVER US $   200,000.00

AUTHORIZED SIGNATURE

Security Features included.    Details on Back.

**The E Pluribus Unum Foundation**

November 21, 2016

Manhattan Street Capital, Inc.
Attn.: Mr. Imaad S. Zuberi
5694 Mission Center Road
Suite 602-468
San Diego, CA 92108

Dear Imaad:

On behalf of the E Pluribus Unum Foundation, I would like to send my sincerest thanks to you for the generous contribution of $200,000 on November 17, 2016.  This donation contributes to our Foundation's ultimate goal of defending and promoting America's values and interests.  Your contribution will support our current strategic projects involving targeted public education and outreach.

For your tax records, please accept this letter as a confirmation of your gift. Note that the E Pluribus Unum Foundation is an organization that has applied for United States Internal Revenue Service (IRS) exemption from federal income taxes pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code") and as a "public charity" within the meaning of Code Section 509(a).  We will share a copy of the official IRS letter confirming our tax-exempt status upon its receipt.

If you would like to learn more about our Foundation, please contact me at jkdemp@gmail.com.

Thank you again for your generosity.

Sincerely,

Jason K. Dempsey, PhD
Chairman

* For tax purposes, we are required to inform you that no goods or services were provided in exchange for your contribution. This letter serves as your receipt.

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date:  **MAR 16 2017**

E PLURIBUS UNUM FOUNDATION INC
C/O AMY WOOD
513 3RD AVENUE SOUTH
NASHVILLE, TN  37210

Employer Identification Number:
 81-4366343
DLN:
 17053004344007
Contact Person:
 DIANE M ECKARD        ID# 31394
Contact Telephone Number:
 (877) 829-5500
Accounting Period Ending:
 December 31
Public Charity Status:
 170(b)(1)(A)(vi)
Form 990/990-EZ/990-N Required:
 Yes
Effective Date of Exemption:
 November 8, 2016
Contribution Deductibility:
 Yes
Addendum Applies:
 No

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax
under Internal Revenue Code (IRC) Section 501(c)(3). Donors can deduct
contributions they make to you under IRC Section 170. You're also qualified
to receive tax deductible bequests, devises, transfers or gifts under
Section 2055, 2106, or 2522. This letter could help resolve questions on your
exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as
either public charities or private foundations. We determined you're a public
charity under the IRC Section listed at the top of this letter.

If we indicated at the top of this letter that you're required to file Form
990/990-EZ/990-N, our records show you're required to file an annual
information return (Form 990 or Form 990-EZ) or electronic notice (Form 990-N,
the e-Postcard). If you don't file a required return or notice for three
consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the
enclosed addendum is an integral part of this letter.

For important information about your responsibilities as a tax-exempt
organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar
to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities,
which describes your recordkeeping, reporting, and disclosure requirements.

Letter  947

E PLURIBUS UNUM FOUNDATION INC

Sincerely,

Jeffrey I. Cooper
Director, Exempt Organizations
Rulings and Agreements

Letter  947

Exhibit 36

Case 2:19-cr-00642-VAP Document 310-6 Filed 02/10/21 Page 23 of 121 Page ID #:5826



All ⌄ | imaad zuberi entrepreneurial mindset

Hello
Select your address

Hello, Sign in
Account ⌄

Returns
& Orders

0

Holiday Deals  Gift Cards  Best Sellers  Prime ⌄  Customer Service  Find a Gift  New Releases  Whole Foods

Shop today's epic deals now

Books  Advanced Search  New Releases  Best Sellers & More  Children's Books  Textbooks  Textbook Rentals  Best Books of the Month


2 months of unlimited reading for $0.99

‹ Back to results

Look inside ↓



See all 2 images

See all 2 images

Share

# The Entrepreneurial Mindset: Making Values-based, Goal-oriented Decisions Paperback – August 28, 2020

by Imaad Zuberi (Author)

See all formats and editions

Paperback
$9.97

1 New from $9.97

Imaad Zuberi learned the power of the entrepreneurial mindset early. Despite immigrating to America as a young boy and not knowing quite how to fit in, he learned the importance of responsibility and personal leadership by observing his parents. They helped him understand that each of us, as a citizen, has to work toward building healthier communities. When problems surface, we have to step in and work toward making things better for all. And when our lives fall off track, we must work to reconcile and make things right.While studying at the University of Southern California, Imaad embraced the concept of servant leadership. When his fellow students elected him to serve the student body as a senator, he collaborated with local law enforcement and community leaders. He volunteered to teach in nearby neighborhoods, tutoring, and mentoring

Read less

**The Amazon Book Review**
Book recommendations, author interviews, editors' picks, and more.
Read it now

## Products related to this item

Page 1 of 31

Sponsored ⓘ



Buy new: **$9.97**

**FREE Shipping** on your first order.
Details

Arrives: **Sunday, Nov 15**

Fastest delivery: **Monday, Nov 9**
Order within 14 hrs and 40 mins
Details

**In Stock.**

Qty: 1

Add to Cart

Buy Now

🔒 Secure transaction

Ships from  Amazon.com
Sold by  Amazon.com

☐ Add gift options

Select delivery location

Add to List

Have one to sell?

Sell on Amazon



amazon book clubs
early access

Add to book club

Not in a club? Learn more

Sponsored

Case 2:19-cr-00642-VAP Document 310-6 Filed 02/10/21 Page 24 of 121 Page ID #:5827



**Find Your True Calling and Purpose: From Impossible to Invincible ( Power of Your p...**
Gary Rich

21

Kindle Edition
$4.99



**When Your Life Depends on It: Extreme Decision Making Lessons from the Antarctic**
Brad Borkan

75

Paperback
$13.34



**Love-Based Money and Mindset: Make the Money You Desire Without Selling Your...**
Michele PW (Pariza Wacek)

*Imagine enjoying a life of peaceful prosperity, especially while you build a business. It's all possible. This book can help.*

19

Kindle Edition
$4.99



Think The L World Entre
James

Paperb
$13.

## Product details

**Item Weight :** 11.7 ounces

**Paperback :** 241 pages

**ISBN-13 :** 979-8680067994

**Product dimensions :** 5 x 0.55 x 8 inches

**Publisher :** Independently published (August 28, 2020)

**Language: :** English

**ASIN :** B08GVJ6HFY

**Best Sellers Rank:** #7,901,284 in Books (See Top 100 in Books)
    #49,256 in Success Self-Help

## Related video shorts (0)   Upload your video



**Be the first video**

Your name here

**Tell the Publisher!**
I'd like to read this book on Kindle

Don't have a Kindle? Get your Kindle here, or download a FREE Kindle Reading App.

**Jesse Eisenberg's latest fiction**
"When You Finish Saving the World" Listen free with trial

## Products related to this item

Sponsored ⓘ

Case 2:19-cr-00643-VAP Document 310-6   Filed 02/10/21   Page 25 of 121   Page ID #:5829



**The 7 Key Habits &
Principles of Elite
Entrepreneurs - Develop
a Powerful Entrepren...**
Walter Grant

35

Paperback
$11.99



**The Cafe on the Edge of
the World: A Story About
the Meaning of Life**
John Strelecky

*More than a fantastic
bestseller, a fantastic way to
look at life.*

28

Kindle Edition
$2.99



**Find Your True Calling
and Purpose: From
Impossible to Invincible (
Power of Your p...**
Gary Rich

21

Kindle Edition
$4.99



**The Minimum Effective
Lifestyle: A lazy man's
guide to a good life**
Karl. N Mark

8

Kindle Edition
$4.99



**When Your Life Depends
on It: Extreme Decision
Making Lessons from the
Antarctic**
Brad Borkan

75

Paperback
$13.34

Sponsored

## How would you rate your experience shopping for books on Amazon today



Very poor  - - - - - - - - - -  Neutral  - - - - - - - - - -  Great



## Customer reviews

| | |
|---|---|
| 5 star | 0% |
| 4 star | 0% |
| 3 star | 0% |
| 2 star | 0% |
| 1 star | 0% |

How are ratings calculated?

**No customer reviews**



The Cafe on the Edge of the World: A Story A...

28

Shop now

$2.99

Sponsored

Back to top

## Get to Know Us

Careers

Blog

About Amazon

Press Center

Investor Relations

Amazon Devices

Amazon Tours

## Make Money with Us

Sell products on Amazon

Sell apps on Amazon

Become an Affiliate

Advertise Your Products

Self-Publish with Us

Host an Amazon Hub

› See More Make Money with Us

## Amazon Payment Products

Amazon Rewards Visa Signature Cards

Amazon.com Store Card

Amazon Business Card

Amazon Business Line of Credit

Shop with Points

Credit Card Marketplace

Reload Your Balance

Amazon Currency Converter

## Let Us Help You

Amazon and COVID-19

Your Account

Your Orders

Shipping Rates & Policies

Amazon Prime

Returns & Replacements

Manage Your Content and Devices

Amazon Assistant

Help

English    United States

Amazon Music
Stream millions
of songs

Amazon
Advertising
Find, attract, and
engage customers

Amazon Drive
Cloud storage
from Amazon

6pm
Score deals
on fashion
brands

AbeBooks
Books, art
& collectibles

ACX
Audiobook
Publishing
Made Easy

Alexa
Actionable
Analytics
for the Web

Sell on
Amazon
Start a Selling
Account

Amazon
Business
Everything For
Your Business

Amazon Fresh
Groceries & More
Right To Your Door

AmazonGlobal
Ship Orders
Internationally

Home Services
Experienced Pros
Happiness Guarantee

Amazon Ignite
Sell your original
Digital
Educational
Resources

Amazon Rapids
Fun stories for
kids on the go

Amazon Web
Services
Scalable Cloud
Computing
Services

Audible
Listen to Books &
Original
Audio
Performances

Book Depository
Books With Free
Delivery Worldwide

Box Office
Mojo
Find Movie
Box Office Data

ComiXology
Thousands of
Digital Comics

DPReview
Digital
Photography

East Dane
Designer Men's
Fashion

Fabric
Sewing, Quilting
& Knitting

Goodreads
Book reviews
&
recommendations

IMDb
Movies, TV
& Celebrities

IMDbPro

Kindle Direct
Publishing

Prime Now
FREE 2-hour
Delivery
on Everyday Items

Amazon Photos
Unlimited Photo
Storage
Free With Prime

| Prime Video | Shopbop | Amazon Warehouse | Whole Foods Market | Woot! | Zappos | Ring |
|---|---|---|---|---|---|---|
| Direct | Designer | Great Deals on | America's | Deals and | Shoes & | Smart Home |
| Video | Fashion Brands | Quality Used Products | Healthiest | Shenanigans | Clothing | Security Systems |
| Distribution |  |  | Grocery Store |  |  |  |
| Made Easy |  |  |  |  |  |  |

Get Info Entertainment Professionals Need

Indie Digital & Print Publishing Made Easy

| eero WiFi | Neighbors App | Amazon Subscription Boxes | PillPack | Amazon Renewed | Amazon Second Chance |
|---|---|---|---|---|---|
| Stream 4K Video | Real-Time Crime | Top subscription boxes – right | Pharmacy | Like-new products | Pass it on, trade it in, |
| in Every Room | & Safety Alerts | to your door | Simplified | you can trust | give it a second life |

Conditions of Use    Privacy Notice    Interest-Based Ads    © 1996-2020, Amazon.com, Inc. or its affiliates

Exhibit 37



November 7, 2020

Honorable Judge Virginia Phillips
United States District Court Judge
Central District of California
First Street Courthouse
Courtroom 8A, Eighth Floor
350 West First Street
Los Angeles, CA 90012

Regarding: Imaad Zuberi

Dear Judge Phillips:

I'm writing this testimonial letter for Imaad Zuberi, with hopes of apprising the Court and all stakeholders of his contribution to teach and inspire people in prison.

Imaad Zuberi reached out to our team more than one year ago. He inquired about the work we do. I told him about our efforts to improve outcomes of America's prison system. Imaad spoke openly with me about his regret for making decisions that led him into the criminal justice system. In an effort to make amends, he said that he wanted to help advance our cause. He asked what he could do.

Many people in jails and prisons live without hope. We showed Imaad a video that we filmed with U.S. District Court Judge Mark Bennett, from the Southern District of Iowa. In that video, Judge Bennett spoke about the importance of helping people in prison prepare for law-abiding, contributing lives.

Since recording that video with Judge Bennett, I told Imaad that our team at Prison Professors began opening relationships with prison administrators across America. We created digital courses to teach people in prison how to prepare for law-abiding, contributing lives. Three federal prisons, including Atwater, Victorville, and Florence use our curriculum. In addition, every state prison in California uses programs that Prison Professors creates.

When Imaad told us that he wanted to help, we told him that we needed more resources to teach people how to prepare for employment upon release. Imaad volunteered to write a book and a course. He called his project *The Entrepreneurial Mindset*, which made sense to us. Since many people have a hard time finding employment upon release from prison, Imaad designed a curriculum that would teach people how to create their own income streams.

When Imaad said that he would write a book and a course, and that he would donate it to Prison Professors so we could expand our curriculum, I gratefully accepted. He began sharing drafts of his manuscript. Then he surprised me by sending a digital file of the book, and softcover books for me to use as teaching resources.

Prisons that use our curriculum hold more than 100,000 people across America. Thanks to Imaad's generous contribution, those people now have access to *The Entrepreneurial Mindset*, and to the videos he produced to help us teach.

I offer this letter with hopes that it may help the Court's deliberations about his character.

Respectfully,

*Michael Santos*

Michael Santos
Founder, Prison Professors
Michael@PrisonProfessors.com

Exhibit 38

**CHRISTIAN D. ORR**
2331 Middle Creek Lane
Reston, VA 20191
U.S. Mobile/Viber/WhatsApp: ███████
Personal Email: ███████
LinkedIn Profile: https://www.linkedin.com/in/christian-d-orr-97a7412

15 May 2019

To whom it may concern,

I have had the honor of knowing Imaad Zuberi as a friend for the past 25 years, ever since we were classmates, Student Senate colleagues, and roommates at the University of Southern California. Speaking as someone who has faithfully served our great nation for 19 years as a former military officer (U.S. Air Force), Federal civilian law enforcement officer (U.S. Customs & Border Protection and Immigration & Customs Enforcement), and overseas private military contractor (with assignments in Iraq, Japan, Kosovo, and the United Arab Emirates [UAE]), I consider myself a good judge of character, and as such can attest that Imaad is a patriotic American, an upstanding citizen with a high degree of intelligence, ambition, entrepreneurial drive (a common trait I've witnessed amongst legal immigrants who become naturalized American citizens), and sense of communitarianism. He's a credit to his community and to our country and I'm proud to count him among my friends.

To expand further, Imaad and I were roommates for 3 years, and when you live under the same roof with someone for that amount of time, you really get to know them as a person. Imaad was a truly generous supportive friend (morally and sometimes financially) when times were tough, such as when I went through two different periods of joblessness, or when I was enduring academic stress. He was also very respectful and hospitable to my elderly parents when they would come over for a visit. Speaking of parents, I can also attest that Imaad was a good son to his own parents, fiercely devoted to, and protective of, his mother in particular.

Please contact me if you have any questions. Thank you very much for your time and consideration.

Respectfully submitted,

CHRISTIAN D. ORR, Former Capt, USAF, former Federal law enforcement officer

Exhibit 39

May 16, 2019


To Whom It May Concern:


It is a true pleasure for me to write this letter to endorse the kindness, compassion, and professionalism of Mr. Imaad Zuberi, who has been a wise mentor and a supportive friend of mine since 2013.

In preparation for my application to the Master of Accounting program at University of Southern California (USC), I contacted Mr. Zuberi and asked him questions regarding the culture and his study experiences at USC.  As an alumni, Mr. Zuberi gave me unreserved advice regarding how to succeed in studying at USC. He also encouraged me to further my finance knowledge through the professional licenses study program.  With the help of his professional guidance, I obtained multiple employment opportunities and passed professional license exams, which have become great assets in my finance career.

Mr. Zuberi also extended generous assistance to me when my family member had a severe medical condition in 2017. After knowing my mother was in critical medical situation, Mr. Zuberi asked for my address, drove to my location, and gave me a check of $5,000 to help with my mother's surgical expenses. Mr. Zuberi is not a friend that I contact frequently, nor is he closely related, but he is the one who offered immediate help during a most difficult time in my life. Mr. Zuberi inspired me to be thoughtful, generous, and helpful to other people in difficulties. I am grateful to have such a person in my life as a mentor and a friend.

Please do not hesitate to contact me should you have any further queries.


Yours sincerely,

Yubei Liu
Mobile:
E-mail:

Exhibit 40



The Order of the Knights of Pythagoras King Solomon Council #10
1600 W. Century Blvd. Los Angeles, California 90047-4218| ██████████ |email:
████████████████████████

From: PM Elroy Johnson Sr.

November 06, 2020

To: The Honorable Judge Virginia Phillips

First Street Courthouse

Courtroom 8A, 8th Floor

350 West 1st Street

Los Angeles, CA 90012

I am at your humble grace to provide you this letter of character reference to inform you of Mr. Imaad Zuberi. He has provided donations to these non-profit organizations that I am currently serving as secretary and a Pastmaster respectfully (2007, 2010, 2016-2018) and assistant secretary (2019 and 2020). As a Pastmaster we guide our organization in civic and charitable engagements which may direct us to seek donations for charitable causes. As an advisor of the youth department we offer guidance to alternatives away from gangs by emphasising civic engagements for our youth. These tasks sometimes take trips to different cities and educational materials such as books and engaging in activities such as archery classes as well as crafts and arts to activate the youth creativity places the organization at an economic disadvantage.

(1 of 2)

There are two divisions that I am a member and advisor; one is Advisor and Secretary of The Order of the Knights of Pythagoras King Solomon Council No. 10, a youth organization serving under the guidance of the Youth Department of the Most Worshipful Prince Hall Grand Lodge of the State of California Incorporated (MWPHGLC) 501 c3, under the Most Worshipful Grand Master Samuel T. King 9027 South Figueroa Los Angeles Ca. , and also as assistant secretary of the subordinate Lodge Highland Heights No. 59 1650 W 45th St. Los Angeles, CA 90062 (as well under The MWPHGLC).

Mr. Imaad Zuberi has made it possible with his fundings to allow me to assist the youth of South Los Angeles in keeping them focused on serving the community such as transporting them to events. One in particular was held in San Diego, CA 2019 commemorating the great American Prince Hall who valiantly served in the American Revolutionary War. Prince Hall is the founder of African-American Freemasonry and he has instilled American patriotism in our teachings as well as educating African-American youth at a time when it was not in the interest to do so in America late 1700's. As a token to some of our past work I have provided a yearbook that took donations like provided by Mr. Imaad Zuberi to have published indicating when I served as a Pastmaster of this venerable institution and a calendar where I am currently serving as secretary of the youth department thank you for your time. I can be reached at the number provided.

Respectfully,

PM Elroy Johnson Sr. ███████████.

(2 of 2)

Exhibit 41



## Office of the Inspector General
U.S. Department of Justice

# Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## EXECUTIVE SUMMARY

The Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C § 611 *et seq.*, as amended, is a disclosure statute that requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities. According to the Department of Justice (Department), this disclosure facilitates evaluation by the government and the American people of the statements and activities of such persons in light of their function as foreign agents. The FARA Registration Unit (FARA Unit) of the Counterintelligence and Export Control Section (CES) within the Department's National Security Division (NSD) is responsible for the administration and enforcement of the Act. A willful failure to register as an agent of a foreign principal may result in criminal prosecution and a sentence of a fine and up to 5 years in prison. There also is a civil enforcement provision that permits the Department to seek to enjoin a party from acting as an agent of a foreign principal in violation of FARA.

This review was initiated in response to a requirement by the U.S. House of Representatives Committee on Appropriations that the OIG review the Department's enforcement of FARA. Based on this direction, our audit objectives were to review and evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration, and to identify areas for the Department to consider seeking legislative or administrative improvements.

During our audit, we found that the number of active FARA registrations peaked in the 1980s, with a high of 916 active registrations in 1987, and began to fall sharply in the mid-1990s. The Department has not performed an analysis on the decline, but NSD officials speculated that the imposition of FARA registration fees in 1993 and the passage of the Lobbying Disclosure Act (LDA), which carved out a significant exemption to FARA in 1995, were likely factors. In addition to the declining trend in registrations, we also found that there historically have been very few FARA prosecutions. Between 1966 and 2015 the Department only brought seven criminal FARA cases – one resulted in a conviction at trial for conspiracy to violate FARA and other statutes, two pleaded guilty to violating FARA, two others pleaded guilty to non-FARA charges, and the remaining two cases were dismissed. We were also told by NSD that the Department has not sought civil injunctive relief under FARA since 1991.

In discussions with several Federal Bureau of Investigation (FBI) counterintelligence agents and Assistant United States Attorneys (AUSA), as well as NSD officials, we found differing understandings between field agents and prosecutors and NSD officials about the intent of FARA as well as what constitutes a

"FARA case."  The primary difference stemmed from the belief of investigators that investigations conducted pursuant to a separate criminal provision, 18 U.S.C. § 951 (Section 951), were FARA cases.  However, NSD officials stated that unlike FARA and the LDA, Section 951 can be aimed at political or non-political activities of agents under the control of foreign governments.  Although registration under FARA can serve as the required notification to the Attorney General under Section 951, the criminal activity targeted is different.  According to NSD officials, who must approve both FARA and Section 951 cases, a true FARA case can only be brought pursuant to 22 U.S.C. § 611, *et seq.*, and these officials stated that NSD currently is engaged in ongoing outreach activities that will help better educate investigators about FARA.  We believe these differing understandings are indicative of the lack of a comprehensive Department enforcement strategy on FARA, which the Department should develop and integrate with its overall national security efforts.

Further, the majority of those agents interviewed believed that NSD's review of what they believed to be FARA cases was generally slow and that NSD is reluctant to approve these charges.  Some investigators believed that NSD has a clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution, which in their opinion, leaves an important counterintelligence tool underutilized.  NSD officials told us that they believed that even though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure.  These NSD officials also disputed that there is any reluctance on their part to approve either true FARA or Section 951 cases, and stated that they approve charges when the evidence presented leads them to judge that a provable willful violation exists.

Timely submission of required documentation is essential for full and complete public disclosure.  However, we found in our testing that 62 percent of initial registrations were untimely, and that 50 percent of registrants filed at least one supplemental statement late.  We also found that NSD needs to improve its controls and oversight of FARA registrations, particularly involving its inspections of registered foreign agents and enforcing the complete and timely submission of required documentation.  Agents of foreign principals are required to maintain records of activities on behalf of their principal for the duration of the agreement and 3 years thereafter.  These records are subject to inspection by the NSD's FARA Unit.  If an inspection identifies deficiencies in an agent's disclosures, the FARA Unit advises the registrant of the deficiencies and actions required for resolution.  We noted, however, that several inspection recommendations issued by the FARA unit still remained unresolved and believe that NSD can further improve its monitoring efforts by developing a policy to ensure appropriate resolution of recommendations identified in its inspection reports.  NSD stressed to us that because the FARA Unit has limited staff and considerable responsibilities follow-up can be difficult.  We understand this challenge but believe improvements can still be made.

With regard to potential legislative improvements, NSD officials stated that a major difficulty is a lack of authority to compel the production of information from persons who may be agents.  As a result, NSD is currently pursuing civil investigative demand (CID) authority from Congress in order to enhance its ability

to assess the need for potential agents to register.  While we concur that CID could be a useful tool for NSD, there are important competing considerations at stake, and we believe that any expansion of such authority must also include appropriate controls and oversight to ensure it is used appropriately.  Another difficulty NSD cited relates to the breadth and scope of existing exemptions to the FARA registration requirement and determining whether activities performed by certain groups, such as think tanks, non-governmental organizations, university and college campus groups, foreign media entities, and grassroots organizations that may receive funding and direction from foreign governments fall within or outside those exemptions.  According to the FARA Unit, these types of organizations generally claim that they act independently of foreign control or are not serving a foreign interest and are not required to register.

NSD officials also told us that the enactment of the LDA in 1995 may have contributed to the recent decline in FARA registrations.  The LDA focuses on those engaged in lobbying activities on behalf of domestic and foreign interests and those agents of foreign principals who engage in lobbying activities and who register under the LDA, and, as a result, are exempt from registration under FARA.  However, NSD believes that because FARA disclosure requirements are more rigorous than those of the LDA, those lobbying on behalf of foreign commercial interests should not be exempt from FARA registration.  We believe that the development of an enforcement strategy for FARA cases should include an assessment of the LDA exemption and its impact to determine if legislative changes should be sought.

In this report we make 14 recommendations to help improve NSD's enforcement and administration of FARA.  We found that several of these recommendations were similar to those made over the years in reports by the Government Accountability Office, and its predecessor the General Accounting Office, and by public interest organizations, and that these recommendations should be seriously considered if the purposes of FARA are to be fully realized.

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

    History of FARA ........................................................................................ 2

    NSD's Administration and Enforcement of FARA ..................................... 3

    FARA Registration Trends ........................................................................ 5

    OIG Audit Approach .................................................................................. 6

    Prior Reports ............................................................................................ 7

FINDINGS AND RECOMMENDATIONS ........................................................... 8

    Efforts to Enforce FARA ........................................................................... 8

    Administration and Monitoring of FARA Registrations ............................ 13

    Other Possible Legislative Improvements that the Department Might Seek  17

    Conclusion .............................................................................................. 21

    Recommendations .................................................................................. 21

STATEMENT ON INTERNAL CONTROLS ....................................................... 23

STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS ............... 24

APPENDIX 1:  OBJECTIVES, SCOPE, AND METHODOLOGY .......................... 25

APPENDIX 2:  PRIOR REPORTS INVOLVING FARA ......................................... 27

APPENDIX 3:  NATIONAL SECURITY DIVISION'S RESPONSE TO
                THE DRAFT REPORT ................................................................ 29

APPENDIX 4:  OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY
                OF ACTIONS NECESSARY TO CLOSE THE REPORT ...................... 37

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## INTRODUCTION

The Foreign Agents Registration Act (FARA) of 1938, as amended, requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as well as their activities, receipts and disbursements in support of those activities.[1] According to the Department of Justice (Department or DOJ), such disclosure enables the American people to evaluate the statements and activities of such persons in light of their function as foreign agents.

Individuals or entities may act as agents or employees of foreign governments or interests on a variety of matters, including for instance lobbying a member or committee within Congress. FARA requires an agent, upon entering into an agreement with a foreign principal, to submit an initial registration to the Department. This registration must describe the agent registering, the foreign principal, the nature of work to be performed, and include a copy of the agreement between the agent and the associated foreign principal. These registrations must be filed within 10 days of an agreement to become an agent of a foreign principal, and the foreign agent must pay a filing fee of $305.[2]

Every 6 months after the initial filing, the agent is required to submit a supplemental statement to the FARA Unit describing activities performed during that period and the amounts paid for that work. Each supplemental statement also requires the agent to pay an additional $305 fee for each foreign principal represented during the period.

The agent also is required to submit to the FARA Unit any informational materials produced on behalf of the principal and transmitted to two or more persons within 48 hours of transmittal. These informational materials must contain a conspicuous statement that the materials were distributed by an agent on behalf of a foreign principal, and that further information is on file with DOJ.

As discussed in detail below, there are multiple exemptions to FARA registration requirements, including persons whose activities are of a purely commercial nature or solely of a religious, scholastic, academic, scientific or fine arts nature, as well as attorneys engaged in legal representation of foreign principals so long as they do not try to influence policy at the behest of their client. In addition, any agent who is engaged in lobbying activities and is registered under

---

[1] 22 U.S.C. § 611, *et seq.*

[2] Specific requirements for the registration and its submission are contained in a regulation promulgated by the Department, 28 C.F.R. § 5.1, *et seq.*

the Lobbying Disclosure Act (LDA) is exempt from registration under FARA if the representation is on behalf of a foreign commercial interest rather than a foreign government or foreign political party.[3]  As we discuss later in the report, there are different requirements for registrants under the LDA that may impact the Department's efforts under FARA.  LDA is administered by Congress rather than the Department.  FARA Unit staff told us they review LDA filings, typically once a month, looking for potential FARA registrants.  The unit looks for direction, control, and tasking from a foreign government.  When a potential FARA obligation is found, the unit sends the potential registrant a letter of inquiry.

**History of FARA**

FARA was enacted in 1938 in response to recommendations of a special congressional committee investigating anti-American activities in the United States. The committee studied the rise of propaganda activity by European fascist and communist governments to determine whether the United States needed a new means to protect its citizens from political propaganda from foreign sources.  A significant finding of the committee's study was that the Nazi German government had established an extensive underground propaganda apparatus using American firms and citizens.

From its passage in 1938 until amendments made in 1966, FARA primarily focused on propagandists.  The 1966 amendments, which still form the core of the current Act, shifted its focus to protecting the integrity of the government's decision-making process and to the identity of the sources of political propaganda. The 1966 amendments also narrowed the reach of FARA so that the government has to prove that a foreign agent is acting at the order, request, or under the direction and control of a foreign principal.  The amendments led DOJ to allow persons who believe they may be subject to FARA requirements, or their attorneys, to request an advisory opinion from the Department regarding their obligation to register.[4]  According to FARA Unit staff, the 1966 amendments reduced the incidence of criminal FARA prosecutions in favor of increased civil and administrative resolution of FARA violations.

The next significant legislative change affecting FARA resulted from the 1995 passage of the LDA. Under the LDA, any agent who is engaged in lobbying activities and is registered under the LDA is exempt from FARA registration if the representation is on behalf of a foreign commercial interest rather than a foreign government or foreign political party.  The term "political propaganda" was also removed from FARA and replaced with the term "informational materials," which is not defined.  According to FARA Unit staff, Congress believed the term "propaganda" to be an unnecessary remnant of the original law and believed the

---

[3]  2 U.S.C § 613(h).

[4]  28 C.F.R. § 5.2

change to "informational materials" reflected the shift in focus to the public disclosure of agents engaged in the U.S. political process.

**NSD's Administration and Enforcement of FARA**

The National Security Division's (NSD) Counterintelligence and Export Control Section (CES), and its FARA Registration Unit are primarily responsible for the enforcement and administration of FARA.  CES and the FARA Unit have been part of NSD since the Division's creation in 2006.  Prior to 2006, CES and the FARA Unit were part of the Department's Criminal Division.  The NSD maintains a publicly available page on the Department's website at www.fara.gov, which contains information on the statute and filing requirements and contact information for the FARA Unit.  The fara.gov webpage also contains an e-filing capability for registrations, a document search page that allows for public access to initial and supplemental registration statements and their Exhibits, and the semiannual reports from the Department to Congress that are required by the Act and list registered agents of foreign interests and their activities.  FARA cases are primarily investigated by Federal Bureau of Investigation (FBI) counterintelligence agents and prosecuted by United States Attorney's Offices (USAO) after receiving NSD approval as required by Section 9-90.710 of the United States Attorneys' Manual.  A willful violation of FARA, including false statements or omission of material facts, carries a penalty of a fine or imprisonment for up to 5 years, or both.

During our audit the FARA Unit was comprised of one Unit Chief, who is also an attorney; two staff attorneys; one Supervisory Program Manager; one Intelligence Research Specialist; one Program Specialist; and two Case Management Specialists.[5]  NSD staff emphasized that this is a limited staff, which is responsible for a considerable range of activities.  The unit is responsible for processing and monitoring new and existing FARA registrations on an ongoing basis.  This includes receiving, reviewing and processing documentation and payments, and addressing late or inaccurate submissions.  The unit also performs periodic formal inspections to assess the adequacy of registrant reporting and disclosure, and conducts open source searches to identify individuals that may be obligated to register.  It also provides, upon request, advisory opinions to individuals who are unsure whether FARA registration is required of them and maintains foreign agent submissions in electronic and hard copy form for public consumption.  The unit has received 14 requests for advisory opinions since the beginning of 2013.  We inquired whether advisory opinions were made publicly available as an informational resource.  Unit staff responded that advisory opinions are not made public, adding that each request is unique, opinions rely on the information provided by the requestor, and that advisory requests involve proposed activity.  However we note that the Office of the Inspector General (OIG) posts investigative findings on its public website, and that the DOJ Criminal Division posts

---

[5]  One of these two staff attorneys joined the FARA Unit during our audit.  At the conclusion of our audit we were informed that the FARA Unit was back to one staff attorney, however the unit planned to hire a replacement.

Foreign Corrupt Practices Act opinions as well, both in anonymized form.[6]  We believe the FARA advisory opinions may be a worthwhile informational resource, and recommend NSD consider whether there is value in making them publicly available.  The FARA Unit also assists CES, FBI and USAOs with FARA-related investigations as needed.

The FARA Unit Chief reports to the Section Chief of CES.  As noted above, the U.S. Attorneys' Manual requires NSD approval before a USAO can charge a FARA violation.  CES reviews and approves or declines FARA charges in consultation with the FARA Unit.

---

[6]  See https://oig.justice.gov/reports/inv-findings.htm and https://www.justice.gov/criminal-fraud/opinion-procedure-releases.

**FARA Registration Trends**

We compiled data on foreign agent registrations under FARA from 1966 to the present.  The following charts show the number of annual active and new registered agents and foreign principals as of the end of each calendar year.

**Figure 1**

**Active Registrants and Foreign Principals per Year**



Source: www.fara.gov

**Figure 2**

**New Registrant and Foreign Principals per Year**



Source: www.fara.gov

As reflected in Figures 1 and 2 above, the number of active registrations for foreign agents under FARA peaked at 916 in 1987.  However, in the mid-1990s active FARA registrations began falling sharply after the imposition of fees in 1993 and the passage of the LDA in 1995, leaving a total of 360 as of the end of 2014.  Consequently, the number of active foreign principals also fell sharply in the mid-1990s from a high of 2079 in 1991, and was at 561 as of the end of 2014.  New registrations have followed a similar trend, peaking at 157 in 1986 to a total of 66 new registrations in 2014.  Since the abrupt decline in the mid-1990s, registrations have continued to trend down, albeit at a more gradual pace.

While no formal analysis on the decline has been performed by the Department, FARA Unit staff speculated that the imposition of FARA registration fees in 1993 and the passage of the LDA in 1995 were likely factors. While the OIG does not dispute that these factors played some role in declining number of FARA registrations, we could not definitively correlate specific causation for the declining trend.[7]

## OIG Audit Approach

The Department of Justice Office of the Inspector General (OIG) initiated this audit at the request of the U.S. House of Representatives Committee on Appropriations, which required the OIG to review the Department's enforcement of FARA. The Committee requirement specifically directed the OIG to review the Department's enforcement of FARA, specifying:

> The report should take into account FARA filing trends and foreign government tactics to engage in public advocacy in the United States while avoiding FARA registration. The report shall recommend administrative or legislative options for the improvement of FARA enforcement.[8]

Based on this request, the objectives of our audit were to review and evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration, and to identify areas for the Department to consider seeking legislative or administrative improvements.

We also inquired about tactics to avoid FARA registration and learned from the Assistant United States Attorneys (AUSA) and FBI case agents with whom we spoke that the impetus for FARA avoidance often appears to come not from the foreign principal, but from the agent, who is conscious of the need to preserve credibility by concealing the support of the foreign principal. FBI staff told us the foreign principal typically is indifferent to FARA requirements. The FARA Unit disagreed with the FBI staff assessment and told us that in its experience foreign principals are not indifferent to FARA requirements.

To accomplish our objectives, we interviewed staff from the National Security Division, including its Counterintelligence and Export Control Section and its FARA Unit. We also interviewed AUSAs and FBI counterintelligence agents from district and field offices involved with FARA investigations. We also spoke with staff from the FBI's Counterintelligence Division and National Security Law Branch, and with staff from the Department of Justice's Office of Legislative Affairs. Lastly, we

---

[7] Direct staff knowledge of the FARA Unit's history extends back to 1984. The Unit Chief has been with the FARA Unit since that time.

[8] House Report 113-448- Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2015.

reviewed FARA registered agent documentation and FARA Unit records and communications.

The results of our audit are detailed in the Findings and Recommendations section of this report.  Appendix 1 contains more information about our objectives, scope, and methodology, and Appendix 2 provides information on prior reports conducted by both government and private organizations that have reviewed the Department's administration and enforcement of FARA.

**Prior Reports**

Our research identified three prior reports prepared by the General Accounting Office (now known as the Government Accountability Office) that dealt with the administration and enforcement of the Foreign Agents Registration Act.[9] Although these reports date back to 1974, 1980, and 1990, they identified some of the same issues identified in this report, including timeliness and the use of available enforcement tools.  We believe that these recommendations should be seriously considered if the purposes of FARA are to be fully realized.  Additional details on these reports, as well as more recent reports produced by public interest organizations, can be found in Appendix 2.

---

[9] There also was a 2008 GAO report that referenced certain FARA authorities as discussed below.

# FINDINGS AND RECOMMENDATIONS

We found that field level agents and prosecutors expressed frustration as they attempted to develop FARA investigations due to the perception that NSD, which must concur before charges can proceed, is reluctant to approve FARA charges.  NSD officials denied that they are reluctant to approve FARA charges and told us that in the few instances where FARA charges were proposed but not pursued it was due to insufficient evidence of willful conduct necessary to bring a FARA case.  Nevertheless, NSD officials acknowledged that communication about why cases might not be approved can be improved.  NSD officials also acknowledged that even though criminal penalties are available under FARA, it primarily views FARA as disclosure statute, and this could also be communicated better to field agents and prosecutors.  We believe this is indicative of the lack of a comprehensive FARA enforcement strategy, which the Department should develop and integrate with its overall national security efforts. In addition, we found that FARA registrants often submitted required documentation late, and were not always responsive to FARA Unit requests and recommendations to update information and correct deficiencies.  We also learned about several proposals developed by NSD for legislative improvements to FARA that could improve its enforcement efforts if enacted.

## Efforts to Enforce FARA

During our audit we found that historically there have been hardly any FARA prosecutions.  Over the past 50 years, between 1966 and 2015, the Department reported to us that it brought, in total, only seven criminal FARA cases – one resulted in a conviction at trial for conspiracy to violate FARA and other statutes, two pleaded guilty to violating FARA, two others pleaded guilty to non-FARA charges, and the remaining two cases were dismissed.[10]  Another was approved for prosecution by NSD in November 2015.[11]  We also found that the NSD does not track the number of FARA cases declined for prosecution, or the reasons for such declinations.  Therefore, the OIG cannot determine quantitatively whether foreign governments employ any specific tactics to avoid FARA registration.  We did, however, review the cases that have been filed alleging FARA violations and spoke to the FARA Unit Chief about this topic.  The FARA Unit Chief noted that foreign government lobbying in the United States is not itself inappropriate or unlawful, and that foreign agents who are not otherwise exempt must register under FARA.  While

---

[10]  According to the Department, the two dismissed FARA cases resulted from a statute of limitations issue, and the resignation of the principal prosecutor handling the case, respectively.

[11]  In addition to criminal penalties, FARA allows the Department to seek civil injunctive relief when it identifies a foreign agent it believes to be in violation of the statute.  The last civil enforcement action by NSD occurred in 1991.  As explained in further detail in this report, NSD has been reluctant to pursue civil injunctive relief since that time.

foreign governments may be creative in their attempt to influence U.S. policy and sway public opinion, if it is done in a way that does not create a statutory agency relationship on the part of the agent acting within the United States at the direction or control of the foreign government, then there is no agent of a foreign principal with an obligation under FARA.

*FARA Criminal Investigations and Prosecutions*

We learned that the focus of the FARA Registration Unit's enforcement efforts is encouraging voluntary compliance, rather than pursuing criminal or civil charges. Conversely, we found that FBI and USAO staff members with whom we spoke are actively pursuing FARA criminal charges.  FBI staff told us they believe this to be an effective tool carrying sufficient penalties to deter foreign principals from exerting undisclosed influence, or to compel the development of cooperating sources. Although NSD officials disagreed with the assessment offered by these FBI staff members, we believe this disagreement reflects the lack of a comprehensive Department enforcement strategy, and a lack of mutual understanding and clarity in enforcement goals as discussed in greater detail below.

This was confirmed when we spoke about the process for pursuing FARA prosecutions with NSD officials, as well as FBI counterintelligence agents and AUSAs with experience investigating FARA cases.  During these discussions we found differing understandings between field agents and prosecutors and NSD officials about the intent of FARA as well as what constitutes a prosecutable FARA case.  Most notably, when we discussed FARA with FBI personnel, we found that they considered a "FARA case" to be a case investigated pursuant to either the FARA, 22 U.S.C. § 611, *et seq.*, *or* 18 U.S.C. § 951 (Section 951), which is the federal statute that provides criminal penalties for certain agents of foreign governments who act in the United States without first notifying the Attorney General.[12]  Unlike Section 951, FARA requires agents of foreign principals engaged in legal political or quasi-political activities such as lobbying, government and public relations, tourism promotion, and foreign economic development activities in the United States to register and make detailed disclosures of their activities in the United States conducted on behalf of their foreign principals.[13]

By contrast, Section 951 was described to us by the NSD as "espionage lite" because a Section 951 case generally involves espionage-like or clandestine behavior or an otherwise provable connection to an intelligence service, or information gathering or procurement-type activity on behalf of a foreign

---

[12]  According to NSD, notification under Section 951 may be made by registration under FARA in circumstances where the activity requiring notice is disclosed on the FARA registration form.

[13]  Political activities are defined by the statute as "any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party."

government.  Although FARA registration can serve as the required notification to the Attorney General under Section 951, NSD officials told us FARA and Section 951 involve different sets of elements and different types of issues.  According to NSD officials, only 22 U.S.C. 611 *et seq.* constitutes a FARA case.  Nevertheless, NSD officials acknowledged the differing views on what constitutes a FARA charge and are currently engaged in an ongoing effort to better educate field investigators and prosecutors on the difference.  However, in reviewing the training developed by NSD we noted that it did not appear to include specifics on how FARA cases would gain approval to proceed from NSD or what is included in case reviews to give agents and prosecutors an understanding of the length of time needed for such reviews.  We therefore recommend that NSD update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these cases for prosecution.

We asked the FBI for data about FARA cases presented and not prosecuted, but we were told by the FBI that their case coding commingles both FARA and Section 951 cases.  Therefore, we were unable to isolate cases presented under FARA alone.  We believe segregating these two types of cases in the FBI's classification codes may help advance NSD's efforts to clarify the distinction for case agents, and we recommend NSD discuss the feasibility of this with the FBI.

In addition, the majority of FBI field personnel we interviewed believed that NSD's review of FARA cases was generally slow and that NSD is reluctant to approve FARA charges, although these individuals generally speculated as to why NSD might be reluctant.  We found that the NSD does not track the timeliness of its handling of FARA referrals, with the general view that the matters will take as long as they take.  One person from the FBI with whom we spoke told us that, as a result, what could be an extraordinarily effective tool has instead become a point of contention and frustration, and found not just a lack of support from NSD, but "negative support."  Some FBI personnel we spoke with told us that CES generally appeared to lack confidence in FARA because it was too seldom used or too difficult to prosecute.  Most personnel from the FBI however told us that they came away from their interactions frustrated with CES because they were not given any explanation from CES as to why what they believed to be solid evidence of a FARA violation was declined for prosecution.[14]  Some of these agents noted that NSD has a clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution, in keeping with its voluntary compliance approach.  FBI and USAO staff we spoke with told us that they have been asked, repeatedly in some instances, to solicit voluntary registration from targets of investigations despite the fact that it is evident to the investigators that the target has no intention of complying. NSD officials denied this and stated that the FARA Unit is unaware of any instance in which it requested the FBI or any USAO to ask the target of an ongoing criminal investigation to register.

---

[14]  *Cf.* USAM 9-27.270(A), providing that attorneys from the government should ensure that the reasons for declinations are communicated to the investigative agency and documented in the file.

Further, FBI personnel with whom we spoke believed that FARA carries a penalty sufficient enough to serve as a deterrent to both the agent and his foreign principal or to induce the target of an investigation to become a cooperating source. These agents felt that the Department's reluctance to bring charges in FARA cases resulted in missed opportunities to deter agents of foreign principals from criminal or other misconduct or to obtain valuable cooperation. Some staff with whom we spoke expressed concern about case agent morale and discouragement toward pursuing future FARA investigations as a result of this reluctance.

We also heard frustration expressed from FBI and AUSAs with respect to the parameters of CES' approval authority. For example, in one instance, we were told that CES cited jury appeal as a factor in declining a FARA prosecution. The AUSAs and FBI staff we spoke to about this expressed doubt whether it was appropriate for CES to overrule local prosecutors, who were in a much better position to assess the jury appeal of a case in their local jurisdiction, on this basis. NSD disagreed with this view, and told us that in any circumstance where NSD has approval authority, it must reach a conclusion by assessing prosecution risk as per the U.S. Attorney's Manual to obtain and sustain a conviction. Among the matrix of factors it considers are how a case is presented, and the risk of jury nullification.

We also noted that some of the AUSAs and FBI personnel with whom we spoke recognized the value of CES' role in the process and, in particular, stated CES can provide sound judgment, experience, and expertise when evaluating FARA investigations. Some also praised the new leadership at CES for its willingness to be more candid and communicative with the FBI and the USAOs.

CES officials acknowledged to us that even though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure. These NSD officials also disputed that there is any reluctance on their part to approve FARA criminal charges (or Section 951 charges), and stated that criminal charges are approved when the evidence presented leads them to judge that a provable criminal violation has occurred. NSD also stated that criminal FARA cases are difficult to prove because prosecutors under FARA must demonstrate both willfulness on the part of the accused to avoid registration or to make a false statement or omission in their filings, and that the agent was directed and controlled by a foreign principal. Though we do not dispute these difficulties, we found that there was not a coordinated strategy on FARA enforcement at the Department and, in particular, there was no strategy addressing how FARA fits into the Department's overall national security efforts. We therefore recommend that the Department develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and integrates with the Department's overall national security efforts. We also recommend that the NSD ensure that it informs investigators and prosecutors in a timely fashion of the reasons for which FARA cases are not approved.

In addition, because NSD does not track the number of cases it receives for enforcement consideration, we recommend that it maintain information on the

number of cases submitted for review, the amount of time such review takes, and the final determination made on the case.  We believe this will enable the Department to assess and improve its handling of FARA cases.  In particular, trends could be determined regarding what case information has been used to move forward with prosecutions, or whether NSD is making determinations on a timely basis.

*Civil Enforcement of FARA*

In addition to criminal penalties, FARA allows the Department to seek civil injunctive relief when it identifies a foreign agent it believes to be in violation of the statute.  In order to seek injunctive relief, the Attorney General may petition the appropriate U.S. District Court for an order temporarily or permanently disallowing the alleged foreign agent from acting as an agent of a foreign principal.  This type of remedy could be sought in instances where an alleged agent failed to register or was delinquent in filing their supplemental statements.  It could also be used in instances where a registered foreign agent fails to address recommendations stemming from an inspection by the FARA Unit.

When we inquired about the Department's use of injunctive relief, we were told that it has not made use of the remedy since 1991, for several reasons.  First, according to FARA Unit staff, in order to pursue a petition seeking to enforce registration, the Department must have specific evidence of foreign direction and control to be successful.  According to these staff members, it is rare that such evidence exists.  In addition, we were told that, as a matter of practice, before the unit would seek injunctive relief that will require registration or remedying delinquent filings, it would have to have sought voluntary registration and received a direct refusal.  According to the FARA Unit, they do not typically encounter such scenarios.

FARA Unit staff also told us that the unit sought authority to impose civil fines for delinquencies twice in the 1990s, without success.  However, current staff added that they would be reluctant to seek civil fines at present because it would be counterproductive in that it could serve as a deterrent to disclosure to seek fines for lateness against a registrant who is otherwise in compliance with FARA, and it would add administrative costs to the unit's work.

Nevertheless, based on the widespread delinquencies we found, we believe that there may be circumstances in which an injunctive remedy or other penalty is merited.  For instance, as discussed later in this report, when we reviewed FARA Unit inspection reports from 2008 to 2014, we found instances where the unit issued recommendations to the registrant requesting submission of late supplemental statements; however, the requested supplemental statements do not appear in the FARA database, and appear to remain delinquent despite the inspection and notification of the deficiencies.  Although we are not questioning that NSD needs to have the ability to use its discretion when deciding whether to pursue criminal penalties or an injunctive remedy against an alleged violator of FARA, we

believe NSD should ensure that it appropriately utilizes all of the enforcement tools available to it.

**Administration and Monitoring of FARA Registrations**

The FARA Unit is responsible for the monitoring of new and existing FARA registrations on an ongoing basis.  This includes receiving, reviewing and processing documentation and payments, and addressing late or inaccurate submissions.  As of the end of calendar year 2014, the FARA Unit was responsible for a foreign agent registrant pool of 360 agents representing 561 foreign principals.  We tested documentation dating back to 2013 from a judgmentally selected risk-based sample of 78 FARA registrants, representing approximately 22 percent of the total, to evaluate the effectiveness of the FARA Unit's monitoring efforts.  Generally, we found that the required documents were complete.  However, we also found that documents were routinely submitted late, and in some instances registrants had ceased submitting required documentation entirely.  These findings are further detailed in the sections below.

*Identifying Potential Registrants*

The FARA Unit attempts to identify and make contact with individuals or entities that may have an obligation to register under FARA.  Identification is made primarily through review of a range of publications, web sites, and LDA filings for indications of a connection between a potential agent and a foreign principal.  Potential registrants may also be identified through review of existing registrant information, or through referral from other government offices or agencies, or from the public.

When a potential obligation to register is found, the unit issues a letter of inquiry to the potential registrant advising of FARA requirements, and requests additional information relevant to registration status.  The FARA Unit has found that most of the recipients of such letters responded within what it has considered to be a reasonable amount of time and either register or offer what the unit finds to be sufficient explanation that FARA requirements do not apply to them.  If there is no response to the letter, a seemingly false response, or another reason to believe a significant FARA offense has been committed, FARA personnel will refer the matter to the FBI.

The FARA Unit stated it has issued approximately 130 letters of inquiry over the past ten years.  Thirty-eight of the recipients were found to have an obligation to register under FARA, and subsequently did so.  The remaining recipients were found to either have no obligation to register, or the FARA Unit is continuing to seek additional information to make a determination.

*New Registrations*

Thirteen of the 78 agent files from 2013 to 2015 that we reviewed had registrations that were initiated after January 1, 2013.  We considered these to be

"new" registrations for testing purposes, and they were filed as such.  However, we found that only 3 of these 13 registrations, or 23 percent, were submitted within 10 days of the underlying contract's execution as required by FARA.  Eight of the 13 registrations, or 62 percent, were submitted late; with the lateness ranging from 7 to 343 days.  The remaining two agent files involved verbal agreements with no contract execution date provided to the FARA Unit.[15]  Without the contract execution dates, which NSD does not require, we could not assess the timeliness of these two registrations.[16]

Timely submission of initial registration documentation is essential for full and complete public disclosure of foreign agents engaged in the U.S. political process on behalf of foreign principals.  However, we understand that it is difficult for NSD to ensure the timely registration of a foreign agent when it has no easy independent way to know of the foreign agent's obligation to register.

*Supplemental Statements*

Every 6 months after their initial registration, a foreign registered agent must submit a supplemental statement describing activities performed and sums transacted during that period.  We found that 34 of 78 (44 percent) foreign agents we reviewed submitted supplemental statements in a timely manner - however half, 39 of 78, did not.[17]  Of these 39, 8 (10 percent of the total) had not submitted *any* supplemental statements since January 1, 2013.  FARA Unit staff believed that the registered agents who ceased filing supplemental documentation likely concluded their work for the foreign principal, but either neglected to formally inform the FARA Unit of the termination or were unaware of their obligation to do so, although 28 C.F.R. 5.205 includes a requirement to notify the FARA Unit of such termination.  However, the possibility remains that these registrants may still be active.

In addition to the 8 agents who had not filed at all since January 2013, we found that 4 other agents in our sample had filed previously during that period, but were more than 6 months delinquent as of the end of 2014.  In total, 12 of the 78 (15 percent) of active agents we reviewed had ceased filing altogether or were over six months delinquent.  For these delinquent agents, we found that the FARA Unit sent delinquency notices periodically, but the notices did not appear to be sent

---

[15]  FARA Unit personnel told us that they typically do not seek to impose any penalties such as late fees in such instances because they would rather see a complete submission sent in late than an incomplete one sent in on time.

[16]  During discussions with the FARA Unit about enhancements to its electronic filing system, we suggested adding a field requiring registrants to enter a date for verbal agreements, in order that adherence to the ten day requirement for such agreements may be assessed going forward.  FARA Unit staff agreed to consider this.

[17]  Five of the foreign agents we reviewed had terminated their contracts as of January 1, 2013, and were not required to submit supplemental statements during our testing period.  These five contained anomalies – duplicate registrations, terminated registration with active short forms, etc., – that caused us to include them in the sample.

consistently or on a regular schedule. FARA Unit staff told us they are working on a standardized system for batching and sending delinquency notices at regular intervals. This effort was still in development at the time of our audit and we recommend that the FARA Unit ensure the system is completed and implemented.

In addition to ensuring consistency when sending delinquency notices, we recommend that NSD develop a policy and procedures that ensure that registration files are timely closed and that it fully investigates when agents cease meeting their supplemental filing obligations for an extended period of time. We believe that enhancing the sources of information available to the Unit as discussed above will facilitate such efforts.

*Registration of New Contracts*

Registered agents under contract with a particular foreign principal may periodically enter into additional contracts with different foreign principals. In the 78 foreign agent files we reviewed, we found a total of 86 'new business' contracts. We found that 34 of the 86 new contracts were registered timely, but 49 of the 86 (57 percent) were not.[18] Further, we found that the late contract registrations were submitted an average of 57 days past the ten day requirement specified in FARA, ranging from 4 to 251 days late, even though these agents would have been familiar with the requirements and process from prior registrations. We recommend that the FARA Unit should consider expanding the sources of information beyond those it currently uses to locate potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.

*Filing of Informational Materials*

FARA does not limit the lobbying activity or the nature of the materials distributed by agents of foreign principals, but it does require that such agents file with the Department any informational materials produced on behalf of their principal, and transmitted to two or more persons, to the FARA Unit within 48 hours of the beginning of transmittal. These informational materials must contain a conspicuous statement that the materials are distributed by an agent on behalf of a foreign principal, and that further information is on file at the Department of Justice.

We tested informational materials submitted by the 78 agents of foreign principals we reviewed to determine if the documentation was submitted within the 48 hour requirement and included the required disclosure statement. We identified a total of 1,278 pieces of informational material, 780 pieces of which were submitted by one agent, and 498 of which were submitted by the other 77 agents. It appears that many of the one agent's submissions were late because they were batched and mailed monthly without apparent regard to the date and time of

---

[18] We could not determine the timeliness of three of the contracts because they were verbal agreements and no date of execution was provided to the FARA Unit.

transmission to the recipients, although each contained the requisite disclosure statement. As for the 498 pieces of information submitted by the other 77 agents, we found that only 457 included a date and time of transmittal to the recipients. The remaining 41 did not, which made determining timeliness for them impossible. Of the 457 pieces of informational materials with an identifiable transmittal date and time, we found that 179 (39 percent) were submitted timely within 48 hours of transmittal, but 278 (61 percent) were not.  We also found that almost half or 234 of the 498 items of information materials (47 percent) did not include the required disclosure statement.  We believe that these compliance rates are unacceptable, and that the FARA Unit and the Department need to either take steps to improve them to achieve the purposes of the Act or, if the Unit considers the standard unreasonable, pursue appropriate modifications.  We discuss potential modifications to informational materials requirements below.

*FARA Inspections of Existing Registrants*

Registered foreign agents are required by FARA and its implementing regulation to maintain accounts and records of their activities on behalf of their principals and make the records available for inspection by NSD for the duration of the agreement and for 3 years thereafter.  The FARA Unit conducts these formal inspections of FARA registrants and told us that it selects files to review based on multiple factors, such as deficiencies identified during the initial review, delinquent filings, suspected undisclosed activities, and information drawn from news or law enforcement sources.  An inspection involves review of all the registrant's activity files, correspondence, accounting records, invoices, and receipts related to the agent's representation of the foreign principal.  If the FARA Unit finds deficiencies in an agent's disclosures, it will summarize its findings and advise the registrant of the deficiencies and provide recommendations for correcting them.

We inquired about the number of inspections conducted since 2000 and found that the FARA Unit conducted a total of eight inspections from 2000 through 2007.  From 2008 through 2014, the Unit completed 87 inspections, and the current target is to perform 14 inspections per year.  We believe the higher rate of inspections performed since 2008 is a positive development and, having reviewed recent inspection reports and the worthwhile recommendations they have produced, we encourage the FARA Unit to continue to maximize its inspection efforts.

However, we noted during our review of the 87 inspections conducted since 2008 that insufficient follow-up was performed on several recommendations made by the FARA Unit, and that the deficiencies identified and communicated to registrants in these recommendations remained unresolved as of the time of our audit work.  Specifically, we found 11 inspection reports (12.6 percent) which recommended submission of documentation such as amendments or delinquent supplemental statements; however we found the requested documentation was not posted to the FARA web site as of January 2016.  We found an additional two inspection reports for which requested documentation was not submitted until well over a year after the inspection date.  NSD stressed to us that because the FARA

Unit has limited staff and considerable responsibilities follow-up on inspection reports can be difficult.  We understand this challenge but believe improvements can still be made.  We recommend that NSD further improve its overall monitoring efforts by developing a policy and practices that ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.

**Other Possible Legislative Improvements that the Department Might Seek**

Throughout this audit we discussed with NSD and FBI officials whether there were any legislative improvements that the Department might seek to FARA that would help in its efforts to administer and enforce the law.  The FBI did not have any suggestions but the NSD officials indicated that in recent years they have pursued some key legislative changes to FARA, but these efforts have largely been unsuccessful.

One area that was identified as a possible subject for such amendments is the statutory exemptions to FARA's registration requirement.  There are a number of statutory exemptions to FARA registration requirements, which were summarized on the NSD website as of January 2016 as follows:

- Diplomats and officials of foreign governments, and their staffs, if properly recognized by the U.S. State Department.

- Persons whose activities are of a purely commercial nature or solely of a religious, scholastic, academic, scientific or fine arts nature.

- Certain soliciting or collecting of funds to be used for medical aid, or for food and clothing to relieve human suffering.

- Lawyers engaged in legal representation of foreign principals in the courts or similar type proceedings, so long as the attorney does not try to influence policy at the behest of their client.

- Any agent who is engaged in lobbying activities and is registered under the Lobbying Disclosure Act if the representation is on behalf of a foreign commercial interest rather than a foreign government or foreign political party.

NSD officials indicated to us that broadly worded exemptions make criminal or civil enforcement difficult, though they did not propose any specific changes to these categories.  We believe that this is an area that the Department should examine to determine if additional refinement of these categories is warranted.

*The Lobbying Disclosure Act and FARA*

FARA Unit staff believed that the passage of the Lobbying Disclosure Act (LDA) in 1995 contributed to the steep decline in FARA registrations in the years that followed.  We were told that because the LDA allowed agents representing foreign commercial interests to register as lobbyists under LDA, rather than as

17

foreign agents under FARA, FARA is now largely limited to those who represent foreign governmental and political party interests.

In the FARA Unit's judgment, registration and disclosure requirements under the LDA are less stringent and result in less transparency than FARA, specifically with respect to funds transacted and activities performed.  In addition, unlike FARA, lobbyists with income or expenses below certain thresholds are not required to register under LDA.  If a lobbyist representing a foreign commercial interest does not meet LDA thresholds, that lobbyist may have no obligation to register under either statute, because the activity serves a commercial rather than foreign governmental or political interest.  Moreover, the LDA is administered by the Congress and, according to the FARA Unit, the LDA staffs who reside in the U.S. Senate and U.S. House of Representatives do not perform inspections of registrants, as the FARA Unit does for FARA registrants.  FARA Unit staff also expressed concern that because of the LDA amendments to FARA, foreign governmental and commercial interests, which are not always as distinct from one another as in the United States, could use LDA as a loophole to avoid FARA registration and disclosure, even though they are acting under the direction and control of a foreign government.

NSD officials believe that Congress should act and once again require those who lobby for foreign commercial interests to register under FARA.  We agree with the concern that foreign governmental and commercial interests overseas may not always be distinct and we recommend that NSD perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change is warranted.

*Civil Investigative Demand Authority*

As discussed above, one of the tasks for the FARA Unit is to locate foreign agents who may have an obligation under FARA but either knowingly or unknowingly fail to register.  The FARA Unit told us that, when it successfully identifies a potential agent, it can sometimes be difficult to obtain the necessary information the FARA Unit needs to determine whether registration is required.  Civil investigative demand authority (CID) allows the Department to compel the production of records, or response to written interrogatories or oral testimony concerning such records.  The Department submitted legislative proposals seeking CID authority for the FARA Unit in 1991, and again in 1999.  A GAO report in 2008 also recommended CID authority for the FARA Unit.[19]  However, the Department's attempts to obtain this authority in 1991 and 1999 were unsuccessful.  Neither NSD officials nor the Department's Office of Legislative Affairs could offer an opinion as to why these efforts were unsuccessful; however, FARA Unit staff did provide some insight as to how this authority could help it better determine when FARA violations are occurring, specifically identifying think tanks, non-governmental and grass roots

---

[19]  U.S. Government Accountability Office, *Post-Government Employment Restrictions and Foreign Agent Registration,* GAO-08-855 (July 30, 2008).

organizations, organizations operating on college or university campuses, and foreign media outlets operating in the United States as potential registrants as to which it can be difficult to obtain information for a variety of reasons. Such organizations may receive funding from foreign governments and subsequently take public political positions that are favorable to those governments. According to the FARA Unit, these types of organizations generally claim that they act independently of foreign control or are not serving a predominantly foreign interest and are not required to register.

The FARA Unit has identified the above as its primary enforcement challenge, and believes CID is vital in determining whether FARA violations are occurring. We do not dispute that CID authority would provide FARA Unit staff with a very useful additional tool in its efforts to administer and enforce FARA. However, we believe CID authority is a powerful authority that can be subject to overreach and abuse if left unchecked, and which cannot be allowed to be used to overcome legitimate and important legal protections and interests. Therefore, we believe that any such expansion of CID authority would have to include rigorous controls and oversight to ensure that it is being used appropriately.

*Process for Filing Informational Materials*

As discussed earlier in this report, FARA requires registrants who transmit informational materials on behalf of their foreign principal to appropriately mark that material and file it with the Department of Justice within 48 hours of the beginning of transmittal. The FARA Unit told us that the term "informational materials," which replaced the term "propaganda" in 1995, is not formally defined in the Act or its implementing regulation. As a result, the FARA Unit has developed its own working definition of what constitutes informational materials in order to fairly advise registrants of the requirements. However, without a statutory definition of the term "informational materials," the FARA Unit cannot be certain it is satisfying Congressional intent for FARA.

Additionally, the FARA Unit believes that advances in information technology have made the 48-hour rule outdated. Registered foreign agents now send out informational materials via Twitter and other social media on a near-continuous basis. Trying to enforce the requirement for them to submit all of these materials in hard copy within 48 hours of dissemination creates a constant and unrealistic burden on registrants to submit materials, and on FARA personnel to police their submissions. Allocating resources to enforcing the 48 hour rule also would consume a disproportionate amount of time on the part of FARA unit, often to the detriment of other crucial aspects of their work. FARA Unit staff also told us that informational materials mailed via the U.S. Postal Service in hard copy must pass through screening prior to delivery. This often results in submissions being delayed for weeks or longer before arriving at the FARA Unit's office. The FARA Unit believes that the statute should be amended to allow registrants to compile informational materials and submit them semi-annually with each supplemental statement.

19

Lastly, the FARA Unit believes that the labeling requirement needs to be updated to address the internet and social media as means of conveying informational materials.  Twitter, for instance, allows a limited number of characters per message, and the FARA Unit told us that registrants find it impractical to include the disclaimer within these types of messages.

We believe the Department should continue to consider whether to seek legislative changes to address these and other issues as identified in this report consistent with the requirements of FARA and other laws.

*Resources*

FARA Unit staff told us that budget and staffing have improved since moving from the Criminal Division to NSD in 2006, and that these additional resources have allowed the unit to develop new technologies.  The FARA Unit staff spends a significant amount of the time on the collection and processing of FARA filing fees.  FARA fees were first imposed on FARA registrants in 1993.  As noted above, the FARA Unit believed that this imposition of fees contributed, at least in part, to the substantial decline in registrations that began in the mid-1990s.  In addition, we learned that a proposal to increase FARA fees in 2010 was declined by NSD due to concerns that it would deter registrations.  Fee collections have also been declining along with registrations since their imposition, and in 2014 totaled only $283,441 according to FARA Congressional reporting.  Because of limited staffing, other priorities, and the possibility that fees may serve as a deterrent to registration, we believe it is possible that the overall cost of the time spent collecting and processing fees may not be justifiable.  We therefore recommend that NSD conduct a formal cost-benefit analysis to determine whether the current FARA fee structure is appropriate or whether it should seek modifications in the future.

*Tools and Technologies*

Since joining NSD in 2006, there have been significant improvements to the tools and technologies used to ensure foreign agents comply with FARA.  In 2007, the FARA Unit established a searchable online database of disclosure documents.  In 2011, an e-file application was established that allowed registrants to register and file documentation online.  We were told that the application is currently being updated to implement other improvements that will standardize and eliminate redundant entry of information, improve search capability, and ensure completeness of submissions.  It will provide a more user-friendly, interactive guided interview process for entering forms, and the improved application will mask from public view personally identifiable information required on certain forms.  Previously, registrants had to formally request removal of this information from the publically available forms.

We believe the e-file application improvements are a positive development.  As discussed above, we also believe the application presents opportunities to allow the FARA Unit to better manage and improve the timeliness of registrant submissions, and that it should be developed with this in mind in addition to the

other opportunities it presents.  We therefore recommend that NSD include improvement of timeliness as an objective in the development of the e-file system, to include requiring execution dates for all contracts.

**Conclusion**

We found that FARA registrants are frequently late in submitting required documentation and are often unresponsive to FARA Unit requests to update their information.  Because timely and complete disclosure of foreign agent political and quasi-political activities are central to the act, we believe the FARA Unit should be more proactive and assess whether additional tools may be available to assist it in its efforts to identify and monitor these foreign agents.  With regard to proposed criminal FARA charges, investigators and prosecutors believe that a greater effort should be made by NSD officials to improve communication, transparency, and responsiveness regarding approval decisions.  We believe that there may well be room for the Department to make use of the civil injunctive provision in FARA in appropriate cases.  To help address this we believe that the Department should develop a comprehensive enforcement strategy for FARA that fits within its overall national security effort.  There also are a number of areas where the Department should consider whether to seek administrative or legislative changes to enhance its efforts to enforce FARA and achieve the purposes for which it was enacted into law.

**Recommendations**

We recommend that the National Security Division:

1.  Consider the value of making FARA advisory opinions publicly available as an informational resource.

2.  Update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these types of cases for prosecution.

3.  Explore with the FBI the feasibility of distinct classification codes for FARA and Section 951 in its record keeping system.

4.  Develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and that is integrated with the Department's overall national security efforts.

5.  Ensure that it timely informs investigators and prosecutors regarding the reasons for decisions not to approve FARA prosecutions.

6.  Establish a comprehensive system for tracking the FARA cases received for review, including whether cases are approved for further criminal or civil action, and the timeline for approval or denial.

7.  Complete its effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and develop policy and procedures that ensure appropriate follow up on them.

8.  Develop a policy and tracking system that ensures that registration files are timely closed and that when agents cease meeting their supplemental filing obligations for an extended period of time an appropriate investigation is conducted.

9.  Consider expanding the sources of information beyond those currently used by the FARA Unit to help identify potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.

10. Either take steps to improve the compliance rates for the filing of informational materials to achieve the purposes of the Act or, if the Unit considers the current 48-hour standard unreasonable, pursue appropriate modifications.

11. Ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.

12. Perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change on any of these exemptions is warranted.

13. Conduct a formal cost-benefit analysis to determine whether the current FARA fee structure is appropriate.

14. Include improvement of timeliness as an objective in the development of the e-file system, to include requiring execution dates for all contracts.

## STATEMENT ON INTERNAL CONTROLS

As required by the Government Auditing Standards, we tested, as appropriate, internal controls significant within the context of our audit objectives.  A deficiency in an internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to timely prevent or detect:  (1) impairments to the effectiveness and efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations.  Our evaluation of internal controls was not made for the purpose of providing assurance on the Department's internal control structure as a whole.  The Department and the individual components discussed in this report are responsible for the establishment and maintenance of internal controls.

Through our audit testing, we did not identify any deficiencies in the National Security Division's internal controls that are significant within the context of the audit objectives and based upon the audit work performed that we believe would affect the National Security Division's ability to effectively and efficiently operate, to correctly state financial and performance information, and to ensure compliance with laws and regulations.

Because we are not expressing an opinion on the Department's internal control structure as a whole, this statement is intended solely for the information and use of the Department and the individual components discussed in this report. This restriction is not intended to limit the distribution of this report, which is a matter of public record.

## STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS

As required by the *Government Auditing Standards* we tested, as appropriate given our audit scope and objectives, selected statistics, procedures, and practices to obtain reasonable assurance that NSD complied with federal laws and regulations for which noncompliance, in our judgment, could have a material effect on the results of our audit.  NSD is responsible for ensuring compliance with applicable federal laws and regulations.  In planning our audit, we identified the following laws and regulations that were significant within the context of the audit objectives:

- 22 U.S.C. § 611, *et seq.* (Foreign Agents Registration Act)

- 18 U.S.C. § 951

- 2 U.S.C. § 1601, *et seq.* (the Lobbying Disclosure Act of 1995)

- 28 C.F.R. § 5.1, *et seq.*

Nothing came to our attention that caused us to believe that the Department or its components discussed in this report were not in compliance with the aforementioned laws and regulations.

APPENDIX 1

# OBJECTIVES, SCOPE, AND METHODOLOGY

## Objectives

The U.S. House of Representative Committee on Appropriations requested that the OIG review the Department of Justice's enforcement of the Foreign Agents Registration Act.[20]  The Committee requested that the report should take into account FARA filing trends and foreign government tactics to engage in the public advocacy of the United States while avoiding FARA registration, and that the report should recommend administrative or legislative options for the improvement of FARA enforcement.

The objectives of our audit were to review and evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration, and to identify areas for the Department to consider seeking legislative or administrative improvements.

## Scope and Methodology

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

To accomplish our objectives, we interviewed staff from National Security Division, including the Counterintelligence and Export Control Section and its FARA Unit.  We also interviewed Assistant U.S. Attorneys and FBI counterintelligence agents from all of the district and field offices involved with each FARA investigation we learned of.  We spoke with staff from the FBI's Counterintelligence Division and National Security Law Branch and with staff from the Department's Office of Legislative Affairs.  We also reviewed FARA registered foreign agent documentation, as well as FARA Unit records and communications.

We attempted to meet with the Clerk of the House and Secretary of the Senate staffs to obtain their views on the Lobbying Disclosure Act issue identified in this report and to learn about any best practices for registrant management and oversight.  They instead offered to review and try to answer specific questions in writing, but given time constraints we were not able to pursue that option further.

---

[20]  U.S. House Committee Report Committee Report 113-448.

*FBI and USAO Interviews*

Because CES does not maintain a record of FARA charges brought to it for review, we began by interviewing AUSAs and FBI agents involved in those FARA charges we learned of through our discussions with CES staff or our review of CES documents. We also interviewed staff at FBI Counterintelligence Division headquarters in Washington, D.C. During these discussions, we learned about additional FARA charges, involving both FARA, 22 U.S.C. 611 *et seq.*, and a related statute, 18 U.S.C. § 951 (Section 951). Section 951 provides criminal penalties for certain agents of foreign governments who act in the United States without first notifying the Attorney General. Registration under FARA can serve as the requisite notification. We learned that the FARA Unit is called upon by CES to advise on Section 951 cases. Given this, we considered the information we received about Section 951 cases during our interviews.

*FARA Document Review*

To review FARA Unit monitoring of existing registrants, we selected a judgmental, risk based sample of 22 percent of the total registered agents as of May 2015. Factors in selecting our sample included payment amounts, weighted toward the more active registrants; and anomalies such as duplicate registrations and apparent discrepancies between long and short form registrations. We did not intend this sample to be projected to the universe of registered agents.

After we selected the sample, we reviewed documentation submitted by selected agents during calendar years 2013, 2014, and 2015. We reviewed all documents submitted including initial registration and accompanying exhibits, supplemental statements, amendments, and informational materials. We elected not to include short form registrations, which include information about the registrant's individual employees engaged in activities in furtherance of the foreign principal's interests, in our testing because these forms included personally identifiable information.

APPENDIX 2

# PRIOR REPORTS INVOLVING FARA

Our research and interviews with FARA Unit personnel has identified four reports prepared by the General Accounting Office (now known as the Government Accountability Office), one report from the Project on Government Oversight (POGO), and one report from the Sunlight Foundation all which dealt with the execution and administration of the Foreign Agents Registration Act (FARA). Although some of these reports are over 10 years in age, they have identified some of the same issues discussed in this report. These issues include timeliness and adequacy of information submitted on behalf of registrants, not making full use of its authority to enforce the act and related regulations, efforts to have civil investigative demand authority (CID) passed denied, and the lack of tools required and necessary to enforce the statue properly.

In 1974, the General Accounting Office, now known as the Government Accountability Office, issued a report titled, *Effectiveness of the Foreign Agents Registration Act of 1938, As Amended, and Its Administration by the Department of Justice*. At the time of the report, the General Accounting Office reported that many agents' statements to the Department of Justice were not filed on a timely basis or lacked sufficient detail to adequately describe the registered agents' activities on behalf of their foreign principals. The report also stated that the Department of Justice was not making full use of its authority to enforce the act and related regulations.

In 1980, the General Accounting Office, now known as the Government Accountability Office, issued a follow-up report to their 1974 report titled, *Improvements Needed in the Administration of Foreign Agents Registration.* The General Accounting Office reported that despite the Department of Justice's efforts to improve the administration of the act, people were acting as foreign agents without registering, registered agents were not fully disclosing their activities, and officials in the executive branch were often unaware of the act's requirements. Thus, the act's goal of providing the public with sufficient information on foreign agents and their activities was not completely fulfilled.

In 1990, the General Accounting Office, now known as the Government Accountability Office, issued an update to its 1980 report titled, *Foreign Agent Registration: Justice Needs to Improve Program Administration.* The report was issued to provide the United States Senate an update of the prior 1980 report. The purpose of the report was to apprise on whether the recommendations made in the 1980 report have been implemented and if foreign agents are complying with the law by registering with the Department of Justice, by fully disclosing their activities, and by filing required reports on time. The report noted deficiencies; including lateness and inadequately disclosing forms from foreign principals. The General Accounting Office explained that both foreign agents and the Department of Justice officials who review the agents' registration forms lack specific written guidance on what should be reported.

27

In 2008, the Government Accountability Office issued a report titled, *Post-Government Employment Restrictions and Foreign Agent Registration*. The Government Accountability Office reported that in order for the Department of Justice to enhance their ability to ensure that the American people know the identity of persons trying to influence the United States government policy on behalf of foreign entities, Congress may wish to consider granting the Department of Justice civil investigative demand authority (CID).  This recommendation was essentially closed and not implemented as Congress did not take any action in response to this matter.

In 2014, the Sunlight Foundation, issued a report titled, *Sunlight Foundation Recommendations to the Department of Justice Regarding the Foreign Agents Registration Act.*  The Sunlight Foundation reported that the current method of recording the disseminated material submitted by foreign agents is outdated and is not fully transparent.  Sunlight explained that an implementation of a new, modernized FARA collection and disclosure system that collects and releases detailed structured data would promote greater transparency.

Finally in 2014, the Project on Government Oversight (POGO), issued a report titled, *Loopholes, Filing Failures, and Lax Enforcement:  How the Foreign Agents Registration Act Falls Short.*  POGO reported that countless documents in the FARA database do not conform to the requirements of the FARA statue. Furthermore, POGO reports, that it is next to impossible to determine if the 573 U.S. firms, corporations, and individuals registered with FARA, between their scope of 2009 and 2012, filed every document they disseminated. POGO concluded that the Department of Justice must use the enforcement power it has to ensure that registrants, and those who do not register, comply with all aspects of the law. Merely relying on "voluntary compliance" allows for rampant rule breaking in the timely filing and labeling of informational materials.

**APPENDIX 3**

# NATIONAL SECURITY DIVISION'S RESPONSE TO DRAFT REPORT



**U.S. Department of Justice**

National Security Division

*National Security Division*                                   *Washington, D.C. 20530*

August 12, 2016

Jason R. Malmstrom
Assistant Inspector General for Audit
Office of the Inspector General

RE:    OIG's Draft Audit Report –The National Security Division's Enforcement and
           Administration of the Foreign Agents Registration Act

Dear Mr. Malmstrom:

        The National Security Division (NSD) appreciates the opportunity to review and provide
comments to the Office of Inspector General's Draft Audit Report (Report) concerning NSD's
Enforcement and Administration of the Foreign Agents Registration Act (FARA or the Act),
which you provided to NSD on July 22, 2016.  NSD provides below general comments on the
Report, followed by specific comments on the 14 recommendations contained in the Report.

**General Comments**

        The enforcement and administration of FARA is an important responsibility of NSD, and
NSD appreciates the time and effort taken by the Office of the Inspector General (OIG) to
conduct this audit.  In addition to providing overall perspective in assessing the administration
and enforcement of FARA, the audit was helpful in reviewing some trends in registrations, the
timeliness and sufficiency of FARA registration filings, and some areas for administrative or
legislative improvements to achieve FARA's primary goal:  greater transparency of foreign
influence in the United States.  NSD was pleased to have the opportunity to inform OIG of the
complexities of FARA and the challenges NSD faces in applying FARA's criminal and civil
enforcement provisions.  The audit prompted a productive dialogue about the criminal
enforcement of FARA and the key role administrative authorities play in promoting visibility
into the identities, activities, and information provided by persons acting as agents of foreign
principals.  NSD anticipates that the audit will lead to improved efforts to help others better
understand FARA's role, as well as increase the Act's effectiveness.

        As noted in the report, the OIG interviewed AUSAs and FBI personnel who
complimented NSD's Counterintelligence and Export Control Section's (CES) evaluation of
FARA cases and specifically noted the sound judgment, experience, and expertise of CES in
handling FARA investigations.  The AUSAs and FBI personnel also praised the new leadership

at CES for its candid assessment of cases and communication with the FBI and U.S. Attorney's Offices.[1]

Although OIG's report reflects some criticism of aspects of NSD's review of FARA cases, NSD notes at the outset, as OIG acknowledged in the Report, that personnel interviewed in preparation of the Report frequently confused FARA (22 U.S.C. § 611 *et seq*) with 18 U.S.C. § 951 ("Section 951"), a criminal statute entitled "Agents of foreign governments." Although the two statutes have similar terms, they address different types of conduct. The typical conduct to which Section 951 applies consists of espionage-like behavior, information gathering, and procurement of technology, on behalf of foreign governments or officials. FARA, on the other hand, is designed to provide transparency regarding efforts by foreign principals (a term defined more broadly than foreign governments or officials) to influence the U.S. government or public through public speech, political activities, and lobbying. Accordingly, Section 951 is codified in Title 18 of the U.S. Code (designated for "Crimes and Criminal Procedure"), while FARA is codified in Title 22 (designated for "Foreign Relations"). Section 951 is aimed exclusively at criminally punishing individuals who violate its terms, and lacks a formal administrative registration regime. FARA, in contrast, is predominantly a disclosure statute, under which there is an administrative registration regime, and while the Act authorizes criminal penalties for willful violations, the primary means of achieving FARA's main purpose of transparency is through voluntary disclosure in compliance with the Act. The mistaken conflation of the two statutes can lead to undue weight being given to criminal prosecution as the measure of FARA enforcement and insufficient recognition of the significance of administrative enforcement efforts relating to the FARA registration regime. It is therefore essential to understand the distinctions between FARA and Section 951 for purposes of this audit, the scope of which is expressly limited to the enforcement and administration of FARA.[2]

The administrative enforcement efforts undertaken by FARA Unit staff focus on identifying foreign agents with an obligation to register and achieving compliance with the Act's provisions. Actions undertaken by FARA Unit staff in furtherance of these goals include: combing public source information for prospective registrants; reviewing registration materials submitted by existing registrants and inspecting registrants' books and records for information pertaining to registration obligations for other entities and individuals; analyzing referrals or information provided by other government agencies or offices; and reviewing information obtained from the public. Based on that work, FARA Unit staff draft and issue letters to

---

[1] To NSD's knowledge, during its audit, OIG did not contact or interview any existing FARA registrants or firms that represent FARA registrants, although NSD provided contact information for those groups. Existing FARA registrants and firms who represent FARA registrants are significant stakeholders who have extensive knowledge of and experience with the administration and enforcement of FARA. NSD understands that OIG did seek to interview officials at the U.S. House of Representatives and U.S. Senate who are responsible for the administration of the Lobbying Disclosure Act ("LDA"), a statute which has certain overlaps with FARA, although those officials declined to be interviewed. NSD believes those officials also may possess useful insights into FARA's administration and enforcement.

[2] NSD further notes that in the Report, the OIG states that they "were told by FBI that their case coding commingles both FARA and Section 951 cases" and therefore the OIG was "unable to isolate cases presented under FARA alone." For this reason, among others, NSD believes that many of the references in the Report to *FARA* cases or investigations were actually references to cases or investigations relating to *Section 951*.

individuals or entities they identify who may have an obligation to register. In those letters, they outline the information potentially giving rise to an obligation to register and seek information to make a determination regarding that obligation. They analyze the responses to those letters and continue to research public information to assess whether a registration obligation does in fact exist. The letters they send frequently result in the filing of registrations by the individuals or entities, thus achieving FARA's transparency purpose. Once a registration is on file, FARA Unit staff carefully reviews registration filings for deficiencies, seeks amendments to correct those deficiencies, and conducts inspections (and follow-up inspections) to ensure continued compliance. FARA Unit staff also provides advisory opinions regarding the application and requirements of the Act.

In addition to activities devoted to administrative enforcement of the Act, FARA Unit personnel produce and process a significant volume of registration forms and associated filing fees; provide support, guidance, and assistance to registrants, potential registrants, their attorneys, and other government agencies concerning FARA issues; produce a semi-annual report to Congress; maintain a public office reading room; process a high volume of database searches for the FBI, Department of Homeland Security, Senate Foreign Relations Committee, and other government agencies; handle frequent media inquiries; and assist numerous members of the public with registration and search guidance through in-person meetings, e-mail exchanges, and telephone inquiries. They perform all of these duties while maintaining and enhancing the FARA e-File system and database, and while providing extensive customer service to users of the system.

As noted above and in the Report, FARA contains a criminal penalty provision, and NSD approves criminal prosecution as an enforcement mechanism if there is sufficient admissible evidence of a willful violation of FARA, and the standards applicable to all federal criminal prosecutions set forth in the U.S. Attorney's Manual are otherwise satisfied. The high burden of proving willfulness, difficulties in proving "direction and control" by a foreign principal, and exemptions available under the statute make criminal prosecution for FARA violations challenging. These challenges are compounded by the government's current inability to compel the production of records from potential and current registrants, a situation NSD is working to remedy by proposing legislation for consideration by the Department of Justice (Department). Despite these challenges, the Department has brought four FARA criminal cases since 2007, all of which resulted in convictions (one conviction at trial for conspiracy to violate FARA and other statutes; two guilty pleas for violating FARA; and one guilty plea to related non-FARA charges).

The OIG Report, however, also cites a view that the limited number of FARA criminal prosecutions is indicative of a counterintelligence tool that is underutilized. To demonstrate this, the Report refers to a belief by some FBI staff that the prospect of FARA charges might assist in obtaining cooperation from FARA violators, presumably in counterintelligence investigations. This, again, is most likely indicative of a mistaken conflation of Section 951 with FARA. It might be possible to use Section 951 in this manner; however, given the considerable challenges cited above in developing viable, appropriate prosecutions for FARA-related activity, such a use of FARA to obtain cooperation is unlikely at best. By promoting disclosures that unmask foreign political influence and foreign direction of political activities, FARA is an effective

counterintelligence tool.   In the alternative, a reluctance to register and disclose under FARA can, in fact, deter a foreign principal from engaging in political activities in the United States in the first place.

The Report devotes significant emphasis to the timeliness of filings by registrants.  NSD notes that well over half of the filings categorized as late were filed within 30 days after the filing deadline.  In addition, in a number of filings considered late in the Report, the FARA Unit provided an extension to the registrant, which mitigated the lateness.  Under FARA's current statutory and regulatory authorities, there is no penalty for lateness.  Although the Department previously has proposed legislation imposing fines for late filing under FARA, NSD's recent assessment is that imposing fines for late filing could act as a disincentive to registration and result in less transparency.  Many parties who register late do so because they are unaware of the existence of FARA.  Penalizing someone who, when informed about the Act, complies with the statute, could serve as a deterrent to registration.  NSD believes that encouraging disclosure is preferable to fines in furthering the national security mission of FARA.

**OIG Recommendations**

1. **OIG Recommendation** – Consider the value of making FARA advisory opinions publicly available as an information resource.

   **NSD Response – Agree.**  Prior to this audit, NSD determined it was appropriate to release, in response to specific FOIA requests, redacted versions of advisory opinions issued to persons who subsequently registered based on the decision in the advisory opinion.  By March 31, 2017, NSD will review its policy and practices regarding FARA advisory opinions and determine how to expand public accessibility of these opinions.

2. **OIG Recommendation** – Update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these types of cases for prosecution.

   **NSD Response – Agree.**  NSD will continue to update and provide training for investigators and prosecutors regarding FARA, to include information about the time it takes and the process used by NSD to approve or deny FARA cases for prosecution.  NSD already commenced efforts to enhance prosecutors' understanding of FARA with multiple presentations to prosecutors and law enforcement partners around the country in 2016.  These presentations delineated the differences between FARA and Section 951, and highlighted the types of cases suitable for prosecution under each statute.  NSD will continue to deliver such training to prosecutors and agents.  In addition, CES has initiated preparation of a monograph on FARA and Section 951 for broad dissemination to prosecutors and agents.  NSD anticipates completion of the monograph by September 30, 2017.

3. **OIG Recommendation** – Explore with the FBI the feasibility of distinct classification codes for FARA and Section 951 in its record keeping system.

   **NSD Response – Agree.**   Although the FBI already has distinct codes, as indicated in the Report, FBI personnel often commingle the coding, causing confusion.  It is imperative that agents are aware of the correct code to use for FARA investigations, and NSD will meet with the FBI prior to September 30, 2016 to explore resolution of this issue.

4. **OIG Recommendation** – Develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and that is integrated with the Department's overall national security efforts.

   **NSD Response – Agree.**  NSD agrees with the importance of having a comprehensive strategy regarding FARA that is integrated within the Department's overall national security efforts.  In fact, in March 2015, NSD conducted its own written internal assessment of the existing strategy for enforcement and administration of FARA, identifying key current issues and strategies for addressing them, and then took active steps to implement those new strategies.  The Department has an "all tools" approach to addressing national security threats, and NSD currently includes FARA as one of those tools.  Efforts to enforce compliance with FARA include research, identification of potential agents, inquiry, investigation, and prosecution if willful conduct is found.  FARA fits into the Department's overall national security efforts by promoting detection of, discouraging, and neutralizing undisclosed foreign messaging and forcing disclosure of foreign efforts to influence United States domestic and foreign policy, as well as public opinion.  As noted above, CES has initiated preparation of a monograph on FARA and Section 951 for broad dissemination to prosecutors and agents that it anticipates will be completed by September 2017.  This will clarify for agencies the use of FARA and Section 951, and NSD also will include discussion of its comprehensive strategy in its ongoing training for investigators and prosecutors.  NSD's comprehensive strategy will include updates to its FARA-related training materials to provide helpful information regarding NSD's evaluation of potential criminal cases under FARA.  These updates will be included in all FARA-related training presentations going forward.

5. **OIG Recommendation** – Ensure that it timely informs investigators and prosecutors regarding the reasons for decisions not to approve FARA prosecutions.

   **NSD Response – Agree.**  As noted in the OIG Report, CES has taken steps to ensure that it timely informs investigators and prosecutors in individual cases regarding the reasons for not approving FARA charges and will continue these efforts in all FARA investigations and prosecutions.  In addition, as discussed in the response to OIG Recommendation 2 and 4, NSD is updating its FARA-related training materials to provide helpful information regarding NSD's evaluation of potential criminal cases under FARA.  These updates will be included in all FARA-related training presentations going forward.

6. **OIG Recommendation** – Establish a comprehensive system for tracking the FARA cases received for review, including whether cases are approved for further criminal or civil action, and the timeline for approval or denial.

   **NSD Response – Agree**. NSD will improve tracking of FARA matters through: (1) the efforts set forth in Recommendation 3 above regarding working with the FBI to ensure FARA matters are coded correctly; and (2) improvements to NSD's case tracking system to ensure ready identification of those FARA matters. Moreover, NSD will ensure the case tracking system captures actions that are taken and approved, and, consistent with Recommendations 2 and 5, also captures dates the matter was received, as well as dates of actions and approvals. As noted above, NSD will meet with FBI on the coding issue prior to September 30, 2016. Improvements to the case tracking system to ensure identification of FARA matters will take place on an ongoing basis as NSD's new case management system is developed and implemented during 2016 and 2017.

7. **OIG Recommendation** – Complete its effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and develop policy and procedures that ensure appropriate follow up on them.

   **NSD Response – Agree**. NSD is committed to completing its current effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and to develop policy and procedures that ensure appropriate follow-up. During the past year, the FARA Unit has standardized a system for batching and sending registration delinquency notices at regular intervals. It is currently in the process of expanding on this system to ensure appropriate tracking of responses, and estimates that the enhancement will be completed by September 30, 2017. When the system is complete, NSD will ensure that FARA Unit personnel will be able to adequately and efficiently track compliance and that they take appropriate measures to address delinquency.

8. **OIG Recommendation** – Develop a policy and tracking system that ensures that registration files are timely closed and that when agents cease meeting their supplemental filing obligations for an extended period of time an appropriate investigation is conducted.

   **NSD Response – Agree**. NSD will develop a policy and tracking system that ensures that registration files are timely closed and that appropriate action is taken when supplemental filing obligations are not met for an extended period of time. NSD's current efforts to update its system for batching and sending registration delinquency notices at regular intervals will help to identify candidates for termination. These upgrades will help to determine which registrants are no longer active and enable the FARA Unit to take appropriate action to terminate the registrations. NSD anticipates this policy will be developed by March 31, 2017.

9. **OIG Recommendation** – Consider expanding the sources of information beyond those currently used by the FARA Unit to help identify potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.

   **NSD Response – Agree**. NSD agrees that expansion of sources of information would assist in identifying potential or delinquent foreign agents. NSD has already engaged in outreach to other government agencies that might have access to additional information that would assist the FARA Unit's efforts. NSD will continue to pursue that outreach on an ongoing basis and also will work to identify other sources of information that would be useful to the Unit in fulfilling its mission.

10. **OIG Recommendation** – Either take steps to improve the compliance rates for the filing of informational materials to achieve the purposes of the Act or, if the Unit considers the current 48-hour standard unreasonable, pursue appropriate modifications.

    **NSD Response – Agree**. NSD considered this issue and determined that the 48-hour rule is out of date and unreasonable. To that end, NSD drafted appropriate modifications to address this issue that are being reviewed within the Department.

11. **OIG Recommendation** – Ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.

    **NSD Response – Agree**. Many of the inspections conducted by the FARA Unit are conducted to correct deficiencies in registrations, and to bring into compliance untimely registrations. NSD notes that OIG viewed most (87.4 percent) inspection follow-up as timely. To ensure appropriate and timely follow-up and resolution of inspections, the FARA Unit's efforts with respect to Recommendation 7 and 8 above will provide benefits here as well. In addition, the FARA Unit will standardize its electronic calendaring of inspections and timelines for completion of recommendations after inspections. NSD expects enhancements to its inspection practices to be completed by September 30, 2017.

12. **OIG Recommendation** – Perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change on any of these exemptions is warranted.

    **NSD Response – Agree**. NSD endorses, and will undertake, a formal assessment of the LDA and other current FARA exemptions. As noted in the Report, the FARA Unit has attributed a decrease in the number of registrants and foreign principals to the enactment of the LDA exemption and has also noted that the reporting requirements of LDA are not as robust as those under FARA. Prior to the OIG Report, NSD embarked on efforts to study the LDA and other FARA exemptions. Those efforts will continue, and NSD will determine the need and viability of legislative changes by June 30, 2017.

13. **OIG Recommendation** – Conduct a formal cost-benefit analysis to determine whether the current fee structure is appropriate.

**NSD Response – Agree**.  NSD will conduct a formal cost-benefit analysis to determine whether the current fee structure is appropriate by September 30, 2017.  Included in this analysis will be an assessment of whether the processing of fees takes valuable time and resources of the FARA Unit that could be better utilized on enforcement.

14. **OIG Recommendation** – Include improvement of timeliness as an objective in the development of the eFile system, to include requiring execution dates for all contracts.

**NSD Response – Agree.**  The FARA Unit has discussed this issue with the FARA eFile system development team and has received positive feedback that it is feasible to add a field to the eFile system to collect the date of the registrant's agreement with the foreign principal.  This feature will be included in the roll out of the FARA eFile system, which is anticipated by September 30, 2017.

**Conclusion**

NSD appreciates the time and effort of the OIG in conducting its audit.  The enforcement and administration of FARA is an important responsibility, and NSD welcomes the opportunity to improve efforts to help others better understand FARA's administration and enforcement, as well as increase the Act's effectiveness.

Sincerely,

G. Bradley Weinsheimer
Acting Chief of Staff
National Security Division

**APPENDIX 4**

# OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY OF ACTIONS NECESSARY TO CLOSE THE REPORT

The Office of the Inspector General (OIG) provided a draft of this audit report to the National Security Division (NSD).  NSD's response is incorporated in Appendix 3 of this final report.  The following provides the OIG analysis of the response and summary of actions necessary to close the report.

**Analysis of NSD Response**

In its response, NSD agreed with each of our recommendations and discussed the actions it will implement in response.  NSD also provided general comments on the report.  In its general comments, NSD reemphasized what NSD officials told us during the audit - although 22 U.S.C. § 611, *et seq.* (FARA) and 18 U.S.C. § 951 (Section 951) have similar terms, they address different types of conduct.  NSD also reemphasized that it generally disagrees with investigators who believe that FARA can serve as an effective tool to compel the development of cooperating sources.  We acknowledge both of NSD's points in the report and continue to believe that these differing understandings among key personnel are the result of insufficient training on FARA for field investigators and the lack of a comprehensive FARA enforcement strategy within the Department.  As we state in the report, we believe our recommendations, once implemented, have the potential to greatly improve the Department's overall FARA enforcement efforts by helping to ensure that field personnel and NSD officials are in agreement on their approach to these important statutes.

NSD also noted in a footnote to its general comments that the OIG did not interview any FARA registrants.  NSD is correct.  The OIG determined that although FARA registrants might be in a position to offer an opinion about their interactions with NSD, interviewing these individuals would not significantly advance our objective to evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration and to identify areas where the Department might make administrative or seek legislative improvements to its FARA enforcement efforts.  In performing our audit, we ensured that we performed appropriate analysis and conducted numerous interviews, including discussions with individuals external to NSD and the Department of Justice, who provided us with an appropriate and sufficient understanding of FARA administration and enforcement.

Lastly, in its general comments, NSD addressed our findings with respect to late submissions by FARA registrants.  NSD stated that for a number of filings we considered to be late in the report, the FARA Unit had provided an extension to the registrant, which mitigated the lateness.  In our review and analysis of registrant documentation during our audit, we included all extensions that we found within registrant files in calculating the timeliness of submitted documentation and, as a result, believe that our calculations accurately reflect the timeliness of submissions.

**Summary of Actions Necessary to Close the Report**

1.  **Consider the value of making FARA advisory opinions publicly available as an informational resource.**

    Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that by March 31, 2017, it would review its policy and practices regarding FARA advisory opinions and determine how to expand public accessibility.

    This recommendation can be closed when we receive evidence that this review was conducted and of the actions taken as a result of the review.

2.  **Update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these types of cases for prosecution.**

    Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it would continue to update its FARA training for investigators and prosecutors, to include information about the time it takes and the process used by NSD to approve or deny FARA cases.

    This recommendation can be closed when we receive evidence that the relevant training was updated and provided to prosecutors and agents.

3.  **Explore with the FBI the feasibility of distinct classification codes for FARA and Section 951 in its record keeping system.**

    Resolved.  NSD agreed with our recommendation.  In its response NSD noted that, to its understanding, the FBI already has distinct classification codes for these statutes.  However, NSD also acknowledged possible confusion and commingling of those codes.  We note that we asked FBI officials about its classification codes for FARA cases both during our audit and subsequent to the issuance of our draft report to NSD, and were told by the FBI that both statutes are recorded under a single FARA code.  NSD stated it intends to meet with FBI prior to September 30, 2016, to explore resolution of this issue.

    This recommendation can be closed when we receive evidence that NSD explored with the FBI the feasibility of distinct classification codes in its record keeping system.

4.  **Develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and that is integrated with the Department's overall national security efforts.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that it has conducted an internal assessment of FARA enforcement and administration and has begun implementing strategies resulting from that assessment.  NSD's response stated that FARA fits into the Department's overall national security efforts by promoting the detection of, discouraging, and neutralizing undisclosed foreign messaging, and forcing disclosure of foreign efforts to influence United States foreign and domestic policy and public opinion.  NSD's comprehensive strategy will include updates to FARA training materials to provide helpful information regarding NSD's evaluation of FARA criminal charges.

This recommendation can be closed when we receive evidence of a completed comprehensive strategy that includes the agencies that perform FARA investigations and prosecutions and is integrated with the Department's overall national security efforts.

5.  **Ensure that it timely informs investigators and prosecutors regarding the reasons for decisions not to approve FARA prosecutions.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it has taken steps to ensure that it timely informs investigators and prosecutors in individual cases regarding the reasons for FARA decisions.  NSD added that it intends to update training materials to provide helpful information regarding evaluation of FARA charges.

This recommendation can be closed when we receive evidence of the steps described and of the updated training materials.

6.  **Establish a comprehensive system for tracking the FARA cases received for review, including whether cases are approved for further criminal or civil action, and the timeline for approval or denial.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it intends to address this recommendation by addressing classification coding with FBI as described in recommendation 3 above, and by improvements to NSD's case tracking system to ensure ready identification of FARA matters, to include dates of receipt, action, and approval of FARA matters.  Case tracking improvements are anticipated to take place during 2016 and 2017.

This recommendation can be closed when we receive evidence of the classification code resolution with FBI, and of a case tracking system that includes information about approval for further criminal or civil action, and the timeline for approval or denial.

7.  **Complete its effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and develop policy and procedures that ensure appropriate follow up on them.**

<u>Resolved.</u>  NSD agreed with our recommendation.  In its response, NSD stated that in the past year it has standardized a system for batching and sending registration delinquency notices at regular intervals.  NSD also noted that it is currently in the process of expanding the system, which is anticipated to be complete by September 30, 2017.  Additionally, NSD stated that it is committed to developing policy and procedures that ensure appropriate follow-up.  NSD stated that upon completion of the delinquency notice system, it will ensure FARA Unit staff adequately and efficiently track compliance and take appropriate measures to address delinquency.

This recommendation can be closed when we receive evidence of the completion and implementation of the delinquency notice system, and policy and procedures to ensure appropriate follow-up.

8.   **Develop a policy and tracking system that ensures that registration files are timely closed and that when agents cease meeting their supplemental filing obligations for an extended period of time an appropriate investigation is conducted.**

<u>Resolved.</u>  NSD agreed with our recommendation.  In its response, NSD stated it intends to address this recommendation through the development of the delinquency notice system described in recommendation 7 above, which will help identify candidates for termination, and through the development of policy to ensure registration files are timely closed and appropriate actions are taken when obligations are not met for an extended period of time.  NSD anticipates this policy will be developed by March 31, 2017.

This recommendation can be closed when we receive evidence of the completion and implementation of the delinquency notice system, a policy is implemented to ensure registration files are timely closed, and appropriate actions are taken when obligations are not met for an extended period of time.

9.   **Consider expanding the sources of information beyond those currently used by the FARA Unit to help identify potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.**

<u>Resolved.</u>  NSD agreed with our recommendation.  In its response, NSD stated it has already engaged in outreach to other government agencies that might have such sources of information.  NSD stated it will continue to pursue that outreach on an ongoing basis, and additionally will work to identify additional sources of information.

This recommendation can be closed when we receive evidence of such outreach and identification.

10. **Either take steps to improve the compliance rates for the filing of informational materials to achieve the purposes of the Act or, if the Unit considers the current 48-hour standard unreasonable, pursue appropriate modifications.**

   Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it has determined the 48-hour standard is out of date and unreasonable.  NSD has drafted appropriate modifications to address the issue which are under review within the Department of Justice.

   This recommendation can be closed when we receive evidence of the modifications or steps taken to improve the compliance rates for the filing of informational materials.

11. **Ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.**

   Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that, in addition to its actions with respect to recommendations 7 and 8 above, the FARA Unit will standardize its electronic calendaring of inspections and timelines for completion, anticipated to be complete by September 30, 2017.

   This recommendation can be closed when we receive evidence of appropriate and timely follow-up and resolution of findings identified in inspection reports.

12. **Perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change on any of these exemptions is warranted.**

   Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that it has already embarked on a study of Lobbying Disclosure Act and other exemptions, that these efforts will continue, and that NSD will make determinations with respect to need and viability of legislative changes by June 30, 2017.

   This recommendation can be closed when we receive evidence of the completed LDA assessment and the results of any additional exemption assessments performed by NSD.

13. **Conduct a formal cost-benefit analysis to determine whether the current FARA fee structure is appropriate.**

   Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it will conduct a formal cost benefit analysis of the fee structure by September 30, 2017.

This recommendation can be closed when we receive evidence of that analysis and NSD's resulting decision about the current fee structure.

**14.   Include improvement of timeliness as an objective in the development of the e-file system, to include requiring execution dates for all contracts.**

<u>Resolved.</u>  NSD agreed with our recommendation.  In its response, NSD stated it has determined it is feasible to add a field to collect execution dates for all contracts; however, NSD's response was silent on the overarching issue of incorporating timeliness as an objective in the development of the e-file system, beyond the specific contract date issue.  We continue to believe that e-file presents opportunities to better manage and ultimately improve registrant timeliness, and recommend that e-file develop with timeliness as a consideration.

This recommendation can be closed when we receive documentation demonstrating that NSD has included the improvement of timeliness as an objective in the development of the e-file system, including the requirement of execution dates for all contracts.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations. Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig

Exhibit 42

**Table 31**

**SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE
BY TYPE OF CRIME[1]
Fiscal Year 2019**

| TYPE OF CRIME | TOTAL | WITHIN GUIDELINE RANGE | | DEPARTURE UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | **76,034** | 39,078 | 51.4 | 364 | 0.5 | 7,272 | 9.6 | 7,119 | 9.4 | 3,162 | 4.2 | 19,039 | 25.0 |
| **Administration of Justice** | **695** | 357 | 51.4 | 12 | 1.7 | 36 | 5.2 | 6 | 0.9 | 43 | 6.2 | 241 | 34.7 |
| **Antitrust** | **20** | 2 | 10.0 | 0 | 0.0 | 15 | 75.0 | 0 | 0.0 | 0 | 0.0 | 3 | 15.0 |
| **Arson** | **68** | 35 | 51.5 | 2 | 2.9 | 9 | 13.2 | 0 | 0.0 | 2 | 2.9 | 20 | 29.4 |
| **Assault** | **768** | 380 | 49.5 | 18 | 2.3 | 39 | 5.1 | 1 | 0.1 | 55 | 7.2 | 275 | 35.8 |
| **Bribery/Corruption** | **341** | 63 | 18.5 | 0 | 0.0 | 118 | 34.6 | 0 | 0.0 | 27 | 7.9 | 133 | 39.0 |
| **Burglary/Trespass** | **64** | 40 | 62.5 | 1 | 1.6 | 1 | 1.6 | 0 | 0.0 | 2 | 3.1 | 20 | 31.3 |
| **Child Pornography** | **1,368** | 413 | 30.2 | 10 | 0.7 | 30 | 2.2 | 0 | 0.0 | 95 | 6.9 | 820 | 59.9 |
| **Commercialized Vice** | **90** | 32 | 35.6 | 1 | 1.1 | 9 | 10.0 | 0 | 0.0 | 7 | 7.8 | 41 | 45.6 |
| **Drug Possession** | **490** | 445 | 90.8 | 2 | 0.4 | 2 | 0.4 | 0 | 0.0 | 3 | 0.6 | 38 | 7.8 |
| **Drug Trafficking** | **19,813** | 6,734 | 34.0 | 64 | 0.3 | 4,460 | 22.5 | 1,224 | 6.2 | 846 | 4.3 | 6,485 | 32.7 |
| **Environmental** | **173** | 82 | 47.4 | 0 | 0.0 | 10 | 5.8 | 0 | 0.0 | 14 | 8.1 | 67 | 38.7 |
| **Extortion/Racketeering** | **183** | 88 | 48.1 | 2 | 1.1 | 21 | 11.5 | 0 | 0.0 | 9 | 4.9 | 63 | 34.4 |
| **Firearms** | **8,474** | 4,618 | 54.5 | 56 | 0.7 | 563 | 6.6 | 8 | 0.1 | 305 | 3.6 | 2,924 | 34.5 |
| **Food and Drug** | **48** | 34 | 70.8 | 1 | 2.1 | 0 | 0.0 | 0 | 0.0 | 1 | 2.1 | 12 | 25.0 |
| **Forgery/Counter/Copyright** | **276** | 135 | 48.9 | 1 | 0.4 | 29 | 10.5 | 0 | 0.0 | 11 | 4.0 | 100 | 36.2 |
| **Fraud/Theft/Embezzlement** | **6,273** | 2,991 | 47.7 | 19 | 0.3 | 830 | 13.2 | 17 | 0.3 | 205 | 3.3 | 2,211 | 35.2 |
| **Immigration** | **29,239** | 19,193 | 65.6 | 103 | 0.4 | 205 | 0.7 | 5,852 | 20.0 | 1,141 | 3.9 | 2,745 | 9.4 |
| **Individual Rights** | **64** | 34 | 53.1 | 0 | 0.0 | 7 | 10.9 | 0 | 0.0 | 3 | 4.7 | 20 | 31.3 |
| **Kidnapping** | **96** | 30 | 31.3 | 2 | 2.1 | 18 | 18.8 | 0 | 0.0 | 9 | 9.4 | 37 | 38.5 |
| **Manslaughter** | **74** | 39 | 52.7 | 7 | 9.5 | 0 | 0.0 | 0 | 0.0 | 5 | 6.8 | 23 | 31.1 |
| **Money Laundering** | **1,174** | 289 | 24.6 | 4 | 0.3 | 333 | 28.4 | 7 | 0.6 | 67 | 5.7 | 474 | 40.4 |
| **Murder** | **373** | 143 | 38.3 | 4 | 1.1 | 87 | 23.3 | 0 | 0.0 | 33 | 8.8 | 106 | 28.4 |
| **National Defense** | **193** | 54 | 28.0 | 0 | 0.0 | 40 | 20.7 | 0 | 0.0 | 23 | 11.9 | 76 | 39.4 |
| **Obscenity/Other Sex Offenses** | **392** | 235 | 59.9 | 3 | 0.8 | 0 | 0.0 | 1 | 0.3 | 12 | 3.1 | 141 | 36.0 |
| **Prison Offenses** | **610** | 402 | 65.9 | 3 | 0.5 | 11 | 1.8 | 3 | 0.5 | 30 | 4.9 | 161 | 26.4 |
| **Robbery** | **1,825** | 711 | 39.0 | 29 | 1.6 | 262 | 14.4 | 0 | 0.0 | 100 | 5.5 | 723 | 39.6 |
| **Sexual Abuse** | **1,165** | 458 | 39.3 | 14 | 1.2 | 58 | 5.0 | 0 | 0.0 | 77 | 6.6 | 558 | 47.9 |
| **Stalking/Harassing** | **223** | 113 | 50.7 | 4 | 1.8 | 2 | 0.9 | 0 | 0.0 | 15 | 6.7 | 89 | 39.9 |
| **Tax** | **547** | 139 | 25.4 | 0 | 0.0 | 69 | 12.6 | 0 | 0.0 | 16 | 2.9 | 323 | 59.0 |
| **Other** | **915** | 789 | 86.2 | 2 | 0.2 | 8 | 0.9 | 0 | 0.0 | 6 | 0.7 | 110 | 12.0 |

[1]  Of the 76,538 cases, 504 were excluded because information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range.  Descriptions of variables used in this table are provided in Appendix A.

SOURCE:  U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

**Table 32**

**SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE BY PRIMARY SENTENCING GUIDELINE[1]**
**Fiscal Year 2019**

| Guideline | Total | Within Guideline Range | Up | §5K1.1 | §5K3.1 | Down | Variance | Guideline | Total | Within Guideline Range | Up | §5K1.1 | §5K3.1 | Down | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| §2A1.1 | 260 | 99 | 0 | 70 | 0 | 18 | 73 | §2D1.8 | 12 | 4 | 0 | 3 | 0 | 0 | 5 |
| §2A1.2 | 45 | 16 | 4 | 5 | 0 | 4 | 16 | §2D1.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A1.3 | 27 | 15 | 3 | 0 | 0 | 2 | 7 | §2D1.10 | 7 | 0 | 0 | 1 | 0 | 0 | 6 |
| §2A1.4 | 47 | 24 | 4 | 0 | 0 | 3 | 16 | §2D1.11 | 27 | 0 | 0 | 6 | 0 | 0 | 21 |
| §2A1.5 | 46 | 20 | 0 | 4 | 0 | 8 | 14 | §2D1.12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A2.1 | 169 | 72 | 1 | 26 | 0 | 5 | 65 | §2D1.13 | 3 | 3 | 0 | 0 | 0 | 0 | 0 |
| §2A2.2 | 413 | 185 | 15 | 10 | 1 | 39 | 163 | §2D1.14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A2.3 | 111 | 79 | 1 | 0 | 0 | 4 | 27 | §2D2.1 | 172 | 149 | 2 | 2 | 0 | 2 | 17 |
| §2A2.4 | 206 | 113 | 4 | 2 | 4 | 17 | 66 | §2D2.2 | 111 | 94 | 0 | 1 | 0 | 1 | 15 |
| §2A3.1 | 137 | 60 | 2 | 3 | 0 | 17 | 55 | §2D2.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A3.2 | 40 | 26 | 2 | 0 | 0 | 1 | 11 | §2D3.1 | 5 | 5 | 0 | 0 | 0 | 0 | 0 |
| §2A3.3 | 6 | 3 | 2 | 1 | 0 | 0 | 0 | §2D3.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A3.4 | 44 | 24 | 1 | 0 | 0 | 3 | 16 | §2D3.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A3.5 | 360 | 222 | 2 | 0 | 1 | 12 | 123 | §2D3.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A4.1 | 93 | 29 | 2 | 18 | 0 | 9 | 35 | §2D3.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A4.2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | §2E1.1 | 62 | 30 | 1 | 7 | 0 | 6 | 18 |
| §2A5.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2E1.2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| §2A5.2 | 27 | 16 | 1 | 0 | 0 | 2 | 8 | §2E1.3 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| §2A5.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2E1.4 | 6 | 4 | 0 | 1 | 0 | 0 | 1 |
| §2A6.1 | 137 | 73 | 1 | 2 | 0 | 7 | 54 | §2E1.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2A6.2 | 80 | 38 | 3 | 0 | 0 | 7 | 32 | §2E2.1 | 16 | 4 | 0 | 1 | 0 | 3 | 8 |
| §2B1.1 | 5,706 | 2,503 | 19 | 819 | 10 | 198 | 2,157 | §2E3.1 | 29 | 10 | 0 | 1 | 0 | 4 | 14 |
| §2B1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2E3.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B1.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2E3.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B1.4 | 35 | 0 | 0 | 7 | 0 | 2 | 26 | §2E4.1 | 25 | 9 | 0 | 5 | 0 | 0 | 11 |
| §2B1.5 | 12 | 4 | 0 | 0 | 0 | 0 | 8 | §2E5.1 | 7 | 4 | 0 | 2 | 0 | 0 | 1 |
| §2B1.6[2] | 138 | 134 | 0 | 4 | 0 | 0 | 0 | §2E5.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B2.1 | 48 | 27 | 1 | 1 | 0 | 2 | 17 | §2E5.3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| §2B2.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2E5.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B2.3 | 9 | 7 | 0 | 0 | 0 | 0 | 2 | §2E5.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B3.1 | 1,805 | 707 | 29 | 258 | 0 | 99 | 712 | §2E5.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B3.2 | 45 | 22 | 1 | 5 | 0 | 0 | 17 | §2F1.1 | 2 | 0 | 0 | 0 | 0 | 1 | 1 |
| §2B3.3 | 11 | 7 | 0 | 0 | 0 | 0 | 4 | §2F1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B4.1 | 78 | 14 | 0 | 32 | 0 | 1 | 31 | §2G1.1 | 82 | 28 | 1 | 9 | 0 | 6 | 38 |
| §2B5.1 | 229 | 123 | 1 | 21 | 0 | 5 | 79 | §2G1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2B5.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2G1.3 | 375 | 174 | 5 | 34 | 0 | 13 | 149 |
| §2B5.3 | 47 | 12 | 0 | 8 | 0 | 6 | 21 | §2G2.1 | 521 | 161 | 2 | 17 | 0 | 39 | 302 |
| §2B5.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2G2.2 | 1,363 | 411 | 10 | 29 | 0 | 94 | 819 |
| §2B6.1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | §2G2.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2C1.1 | 245 | 40 | 0 | 86 | 0 | 25 | 94 | §2G2.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2C1.2 | 7 | 3 | 0 | 0 | 0 | 1 | 3 | §2G2.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2C1.3 | 7 | 5 | 0 | 0 | 0 | 0 | 2 | §2G2.6 | 18 | 2 | 0 | 2 | 0 | 0 | 14 |
| §2C1.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2G3.1 | 25 | 8 | 1 | 0 | 0 | 0 | 16 |
| §2C1.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2G3.2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| §2C1.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2H1.1 | 26 | 7 | 0 | 5 | 0 | 3 | 11 |
| §2C1.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2H1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2C1.8 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | §2H1.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2D1.1 | 19,460 | 6,574 | 63 | 4,403 | 1,220 | 821 | 6,379 | §2H1.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2D1.2 | 281 | 145 | 1 | 48 | 0 | 16 | 71 | §2H1.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2D1.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2H2.1 | 17 | 15 | 0 | 0 | 0 | 0 | 2 |
| §2D1.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2H3.1 | 7 | 5 | 0 | 1 | 0 | 0 | 1 |
| §2D1.5 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | §2H3.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2D1.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2H3.3 | 3 | 3 | 0 | 0 | 0 | 0 | 0 |
| §2D1.7 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | §2H4.1 | 7 | 1 | 0 | 1 | 0 | 0 | 5 |

## Table 32 (cont.)

| Guideline | Total | Within Guideline Range | Up | §5K1.1 | §5K3.1 | Down | Variance | Guideline | Total | Within Guideline Range | Up | §5K1.1 | §5K3.1 | Down | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| §2H4.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2M5.2 | 141 | 31 | 0 | 31 | 0 | 19 | 60 |
| §2J1.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2M5.3 | 17 | 4 | 0 | 2 | 0 | 3 | 8 |
| §2J1.2 | 131 | 29 | 3 | 16 | 1 | 11 | 71 | §2M6.1 | 6 | 3 | 0 | 0 | 0 | 0 | 3 |
| §2J1.3 | 21 | 10 | 0 | 0 | 0 | 3 | 8 | §2M6.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2J1.4 | 13 | 12 | 0 | 0 | 0 | 0 | 1 | §2N1.1 | 11 | 0 | 1 | 0 | 0 | 1 | 9 |
| §2J1.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2N1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2J1.6 | 34 | 21 | 0 | 0 | 0 | 2 | 11 | §2N1.3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| §2J1.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2N2.1 | 28 | 27 | 0 | 0 | 0 | 0 | 1 |
| §2J1.8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2N3.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2J1.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2P1.1 | 298 | 196 | 3 | 5 | 3 | 16 | 75 |
| §2K1.1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | §2P1.2 | 238 | 158 | 0 | 6 | 0 | 11 | 63 |
| §2K1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2P1.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K1.3 | 27 | 5 | 0 | 6 | 0 | 4 | 12 | §2P1.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K1.4 | 66 | 34 | 2 | 9 | 0 | 2 | 19 | §2Q1.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K1.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2Q1.2 | 31 | 11 | 0 | 1 | 0 | 6 | 13 |
| §2K1.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2Q1.3 | 20 | 6 | 0 | 4 | 0 | 4 | 6 |
| §2K1.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2Q1.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K2.1 | 7,952 | 4,247 | 48 | 511 | 8 | 296 | 2,842 | §2Q1.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K2.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2Q1.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K2.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2Q2.1 | 82 | 40 | 0 | 4 | 0 | 2 | 36 |
| §2K2.4[3] | 413 | 327 | 8 | 39 | 0 | 0 | 39 | §2Q2.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K2.5 | 17 | 14 | 0 | 0 | 0 | 0 | 3 | §2R1.1 | 20 | 2 | 0 | 15 | 0 | 0 | 3 |
| §2K2.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2S1.1 | 990 | 211 | 3 | 324 | 4 | 44 | 404 |
| §2K3.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2S1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2K3.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2S1.3 | 177 | 72 | 1 | 9 | 3 | 23 | 69 |
| §2L1.1 | 3,487 | 1,412 | 4 | 151 | 1,208 | 90 | 622 | §2S1.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2L1.2 | 22,071 | 15,191 | 96 | 29 | 3,990 | 977 | 1,788 | §2T1.1 | 328 | 86 | 0 | 41 | 0 | 6 | 195 |
| §2L1.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T1.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2L2.1 | 104 | 51 | 0 | 18 | 0 | 5 | 30 | §2T1.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2L2.2 | 961 | 697 | 2 | 3 | 54 | 31 | 174 | §2T1.4 | 166 | 36 | 0 | 25 | 0 | 7 | 98 |
| §2L2.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T1.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2L2.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T1.6 | 40 | 10 | 0 | 2 | 0 | 2 | 26 |
| §2L2.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T1.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2M1.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T1.8 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| §2M2.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T1.9 | 2 | 1 | 0 | 1 | 0 | 0 | 0 |
| §2M2.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T2.1 | 3 | 1 | 0 | 0 | 0 | 1 | 1 |
| §2M2.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T2.2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| §2M2.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T3.1 | 3 | 2 | 0 | 0 | 0 | 0 | 1 |
| §2M3.1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | §2T3.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2M3.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2T4.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2M3.3 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | §2X1.1 | 16 | 9 | 0 | 0 | 0 | 0 | 7 |
| §2M3.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2X2.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2M3.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2X3.1 | 88 | 28 | 3 | 17 | 0 | 6 | 34 |
| §2M3.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2X4.1 | 268 | 162 | 4 | 18 | 1 | 8 | 75 |
| §2M3.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2X5.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| §2M3.8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2X5.2 | 214 | 169 | 0 | 0 | 0 | 0 | 45 |
| §2M3.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2X6.1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| §2M4.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | §2X7.1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| §2M5.1 | 14 | 3 | 0 | 6 | 0 | 1 | 4 | §2X7.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | **TOTAL** | 71,859 | 35,901 | 363 | 7,257 | 6,508 | 3,087 | 18,743 |

[1] Of the 76,538 cases, 4,679 were excluded due to one or both of the following reasons:  information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range (504) or missing guideline applied (4,652).  Descriptions of variables used in this table are provided in Appendix A.

[2] In these cases, the offender was convicted of violating 18 U.S.C. § 1028A (Aggravated Identity Theft) as the only count or counts of conviction.  The *Guidelines Manual* provides punishment for this type of offense under §2B1.6.

[3] In these cases, the offender was convicted of violating 18 U.S.C. § 924(c) (Use of Firearm, Armor-Piercing Ammunition, or Explosives During or in Relation to Certain Crimes) as the only count or counts of conviction.  The *Guidelines Manual* provides punishment for this type of offense under §2K2.4.

SOURCE:  U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

**Table 39**

**EXTENT OF OTHER DOWNWARD DEPARTURES
BY TYPE OF CRIME[1]
Fiscal Year 2019**

| TYPE OF CRIME | N | Mean | | | Median | | |
|---|---|---|---|---|---|---|---|
| | | Sentence In Months | Decrease In Months | Percent Decrease | Sentence In Months | Decrease In Months | Percent Decrease |
| **TOTAL** | **3,107** | **38** | **25** | **42.4** | **18** | **12** | **36.7** |
| **Administration of Justice** | 43 | 9 | 9 | 53.9 | 8 | 8 | 49.9 |
| **Antitrust** | 0 | -- | -- | -- | -- | -- | -- |
| **Arson** | 2 | -- | -- | -- | -- | -- | -- |
| **Assault** | 53 | 33 | 18 | 44.4 | 24 | 9 | 37.7 |
| **Bribery/Corruption** | 27 | 12 | 16 | 61.7 | 8 | 10 | 55.6 |
| **Burglary/Trespass** | 2 | -- | -- | -- | -- | -- | -- |
| **Child Pornography** | 93 | 70 | 61 | 48.0 | 60 | 54 | 48.9 |
| **Commercialized Vice** | 7 | 6 | 7 | 77.6 | 0 | 6 | 100.0 |
| **Drug Possession** | 3 | 3 | 2 | 74.5 | 0 | 2 | 100.0 |
| **Drug Trafficking** | 834 | 64 | 40 | 41.2 | 48 | 27 | 36.4 |
| **Environmental** | 12 | 6 | 12 | 76.5 | 0 | 12 | 100.0 |
| **Extortion/Racketeering** | 8 | 37 | 25 | 39.1 | 40 | 13 | 34.7 |
| **Firearms** | 305 | 37 | 20 | 39.8 | 27 | 13 | 31.4 |
| **Food and Drug** | 1 | -- | -- | -- | -- | -- | -- |
| **Forgery/Counter/Copyright** | 11 | 8 | 10 | 61.5 | 8 | 7 | 55.6 |
| **Fraud/Theft/Embezzlement** | 203 | 20 | 17 | 56.1 | 12 | 11 | 52.9 |
| **Immigration** | 1,140 | 14 | 9 | 38.4 | 12 | 6 | 33.3 |
| **Individual Rights** | 3 | 24 | 12 | 52.1 | 12 | 12 | 33.3 |
| **Kidnapping** | 6 | 144 | 126 | 47.2 | 136 | 133 | 48.0 |
| **Manslaughter** | 5 | 54 | 11 | 22.0 | 15 | 4 | 14.8 |
| **Money Laundering** | 66 | 27 | 34 | 61.7 | 10 | 17 | 59.4 |
| **Murder** | 25 | 127 | 89 | 39.3 | 132 | 64 | 36.7 |
| **National Defense** | 23 | 35 | 38 | 46.5 | 26 | 19 | 43.5 |
| **Obscenity/Other Sex Offenses** | 12 | 11 | 9 | 48.0 | 12 | 9 | 31.0 |
| **Prison Offenses** | 30 | 8 | 8 | 51.3 | 7 | 6 | 40.9 |
| **Robbery** | 100 | 70 | 38 | 37.3 | 60 | 27 | 31.7 |
| **Sexual Abuse** | 59 | 153 | 71 | 34.1 | 138 | 60 | 26.7 |
| **Stalking/Harassing** | 14 | 17 | 18 | 56.0 | 21 | 16 | 47.4 |
| **Tax** | 15 | 14 | 16 | 57.0 | 9 | 12 | 57.1 |
| **Other** | 5 | 4 | 4 | 53.6 | 3 | 5 | 46.7 |

---

[1]  Of the 76,538 cases, in 3,162 the sentence was a downward departure from the guideline range, either due to a government motion for a departure (1,410) or a non-government departure (1,752).  Due to an inability to calculate the extent of departure for cases with a guideline minimum of life, 16 offenders were excluded from this table.  Also, 39 offenders were excluded due to several logical criteria.  Sentences greater than 470 months and probation were included in the sentence average computations as 470 months and zero months, respectively.  The information in this table includes conditions of confinement as described in USSG §5C1.1.  Descriptions of variables used in this table are provided in Appendix A.

SOURCE:  U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

**Table 40**

**EXTENT OF DOWNWARD VARIANCES**
**BY TYPE OF CRIME[1]**
**Fiscal Year 2019**

| TYPE OF CRIME | N | Mean | | | Median | | |
|---|---|---|---|---|---|---|---|
| | | Sentence In Months | Decrease In Months | Percent Decrease | Sentence In Months | Decrease In Months | Percent Decrease |
| **TOTAL** | **17,108** | **50** | **26** | **42.9** | **28** | **14** | **34.8** |
| **Administration of Justice** | 217 | 7 | 11 | 67.2 | 4 | 9 | 74.8 |
| **Antitrust** | 2 | -- | -- | -- | -- | -- | -- |
| **Arson** | 15 | 21 | 21 | 56.6 | 24 | 22 | 47.8 |
| **Assault** | 233 | 51 | 22 | 44.1 | 26 | 12 | 33.6 |
| **Bribery/Corruption** | 127 | 24 | 19 | 55.2 | 12 | 12 | 50.0 |
| **Burglary/Trespass** | 16 | 9 | 10 | 54.7 | 9 | 6 | 44.1 |
| **Child Pornography** | 782 | 80 | 51 | 40.5 | 71 | 43 | 38.1 |
| **Commercialized Vice** | 26 | 11 | 8 | 49.3 | 12 | 6 | 48.9 |
| **Drug Possession** | 17 | 1 | 4 | 85.8 | 0 | 2 | 100.0 |
| **Drug Trafficking** | 6,113 | 73 | 36 | 37.8 | 60 | 24 | 31.0 |
| **Environmental** | 64 | 3 | 11 | 84.2 | 0 | 9 | 99.8 |
| **Extortion/Racketeering** | 52 | 20 | 20 | 58.5 | 11 | 13 | 55.2 |
| **Firearms** | 2,582 | 39 | 19 | 40.0 | 27 | 12 | 31.4 |
| **Food and Drug** | 12 | 25 | 21 | 58.7 | 18 | 21 | 61.8 |
| **Forgery/Counter/Copyright** | 91 | 8 | 12 | 60.9 | 6 | 8 | 55.6 |
| **Fraud/Theft/Embezzlement** | 2,061 | 20 | 14 | 54.4 | 12 | 10 | 48.9 |
| **Immigration** | 2,406 | 12 | 7 | 43.6 | 8 | 6 | 33.3 |
| **Individual Rights** | 14 | 32 | 26 | 50.5 | 16 | 11 | 49.1 |
| **Kidnapping** | 31 | 121 | 61 | 33.4 | 108 | 48 | 31.0 |
| **Manslaughter** | 14 | 35 | 16 | 43.4 | 24 | 13 | 22.6 |
| **Money Laundering** | 438 | 50 | 33 | 48.3 | 30 | 19 | 39.8 |
| **Murder** | 51 | 169 | 91 | 34.7 | 150 | 81 | 33.3 |
| **National Defense** | 71 | 39 | 37 | 53.9 | 20 | 26 | 51.4 |
| **Obscenity/Other Sex Offenses** | 123 | 10 | 11 | 53.5 | 9 | 9 | 48.7 |
| **Prison Offenses** | 142 | 9 | 7 | 50.7 | 6 | 6 | 48.3 |
| **Robbery** | 597 | 86 | 29 | 28.1 | 76 | 21 | 21.7 |
| **Sexual Abuse** | 364 | 154 | 65 | 32.5 | 156 | 55 | 28.9 |
| **Stalking/Harassing** | 72 | 16 | 14 | 49.9 | 12 | 10 | 49.8 |
| **Tax** | 311 | 11 | 13 | 61.6 | 8 | 12 | 55.4 |
| **Other** | 64 | 11 | 23 | 77.8 | 0 | 8 | 99.3 |

[1] Of the 76,538 cases, in 17,608 the sentence was a variance below the guideline range, either due to a government motion for a variance (4,083) or a non-government variance (13,525).  Due to an inability to calculate the extent of departure for cases with a guideline minimum of life, 167 offenders were excluded from this table. Also, 333 offenders were excluded due to several logical criteria.  Sentences greater than 470 months and probation were included in the sentence average computations as 470 months and zero months, respectively.  The information in this table includes conditions of confinement as described in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

SOURCE:  U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

# APPENDIX A

*Descriptions of Datafiles and Variables*

# Introduction

The Commission's research program is based on data from the Federal courts.  The Commission collects data regarding every felony and class A misdemeanor offense sentenced each year.  To facilitate this data collection, the courts are statutorily required to submit five sentencing documents to the Commission within 30 days of entry of judgment in a criminal case: (1) the charging document (information/indictment), (2) the plea agreement (if any), (3) the Presentence Report (if any), (4) the Judgment and Commitment Order, and (5) the Statement of Reasons form.  The Commission analyzes these documents and collects information of interest and importance to policymakers and the federal criminal justice community.

Tables in this report use the Commission's datafile, USSCFY19, which includes information on the 76,538 individual offenders sentenced between October 1, 2018, through September 30, 2019, for whom sentencing documents were received as of February 21, 2020.  This report also provides data on 118 organizational offenders sentenced during that period.  Also, this report provides data on 5,082 offenders resentenced by the district court or whose sentence was modified in some other way during that period.  Finally, this report provides data on 6,830 appeals cases decided during fiscal year 2019.

Given the nature of the datafile and reporting requirements, the following are not included:  cases initiated but for which no convictions were obtained, offenders convicted but who have not been sentenced, and offenders sentenced but for whom no sentencing documents were submitted to the Commission.  Cases in which a sentence of death was imposed also are not available in this dataset as the sentencing guidelines do not apply to those cases.

Note that for all tables, total percentages may not add up to 100 percent due to rounding.

# Variables

The following section describes the variables used in this report.

### Age

The *Age* of the offender on the day of sentencing is calculated using the date of sentencing as reported in the Judgment and Commitment Order and the offender's date of birth as reported either in the Presentence Report or in the case submission information provided by the court when submitting the case to the Commission.  Offenders under the age of 18 at the time of sentencing were charged as adults for a federal felony or Class A misdemeanor.

### *Anders* Brief

*Anders* Brief cases are those in which the defendant's counsel files a motion for leave to withdraw from representation, and asserts that counsel has reviewed the case and concludes there are no non-frivolous grounds for appeal; whereupon the appellate court, after independently reviewing the record and agreeing that the case is wholly frivolous, affirms the sentence and dismisses the appeal, and grants counsel's motion to withdraw. *See* Anders v. California, 386 U.S. 738 (1967).

### Any Guideline

The Commission collects guideline application information on up to four guidelines in a single computation (more than one guideline can be applied through the cross-reference application in the *Guidelines Manual*). If a guideline is recorded in any of the four collected fields, then it is reported as "any guideline." Note that counts for this category may exceed the total number of offenders in any fiscal year because each offender may have multiple guideline computations and/or multiple reference guidelines applied.

### Appeals

*Appeals* data are derived from analyses of opinions and orders from the courts of appeals. For purposes of the appeals data, an appeals case is one in which a federal court of appeals has issued an opinion or order. Opinions and orders submitted by the courts are collected and coded. All appeals cases are coded for identifying data, such as parties, disposition, date, and circuit. In cases in which the appellate court reverses or remands a sentencing issue, the sentencing issue is coded. Conviction issues are not coded.

### Attribution Category for Sentences Outside the Range

All categories replicate the list of checkboxes available on the Statement of Reasons (SOR) form. Not all checkbox categories are available in both the departure section and sentences outside the guideline system section on this form and multiple checkboxes may be indicated in a single case so that totals in a table may exceed the total number of cases. The Commission uses these checkboxes in determining government sponsorship: all cases in which one of the pursuant to a plea agreement boxes is indicated are attributed to the government. Additionally, cases where a USSG §5K1.1, USSG §5K3.1, or other government motion checkbox was indicated in the pursuant to a motion not in a plea agreement section are also attributed to one of the government motion categories. Additionally, other types of SOR forms may indicate sponsorship in writing, and these attributions are also included in the appropriate category.

### Circuit

Information on judicial *Circuit* is generated using the location of the judicial district in which the offender was sentenced.

### Citizenship Status

Information on the *Citizenship Status* of offenders is obtained from the Presentence Report. Offenders are categorized as one of the following: "U.S. citizen," "resident alien," "illegal alien," "extradited alien," or "non-U.S. citizen, alien status unknown." The latter four categories are collapsed into the category of "non-U.S. citizen."

### Conviction Type

Sentencing classification is defined in 18 U.S.C. § 3559(a). The federal sentencing guidelines apply to felony cases and Class A Misdemeanors (see USSG §1B1.9). For this reason, no information about petty offenses is recorded in the Commission's datafiles.

### Criminal History Category

*Criminal History Category* is derived from the Statement of Reasons provided by the sentencing court. *Criminal History Category* is taken from the Presentence Report when the Statement of Reasons is not available. While the court may disagree with Presentence Report information, the *Criminal History Category* is the same in the vast majority of cases for which both documents were received.

### District

Information on the judicial *District* in which sentencing occurred is obtained from the Judgment and Commitment Order.

### Document Submission Rates

Five documents are represented in the document submission table: Judgment and Commitment Order (J&C), Presentence Report (PSR), Statement of Reasons (SOR), indictment/information (Ind), and plea agreements (Plea). The J&C, SOR, and PSR generally are submitted in a standardized format. PSRs waived by the court are indicated in a separate column. Standardized forms for the SORs are most frequently submitted; however, transcripts or partial SORs and/or transcripts from the sentencing hearing are also included as *Statement of Reasons Received*. Cases in which the Commission was unable to determine definitively whether the offender's guilty plea was entered pursuant to a written agreement are excluded from the Plea totals. The total documents received column is derived from adding the total number of received documents from the J&C, PSR, SOR, Ind, and Plea columns.

### Downward Departure

*Downward Departure* consists of cases in which the sentence imposed was below the applicable guideline range and for which the court cited a reason on Part V of the Statement of Reasons form (Departures Pursuant to the Guidelines Manual).  In these cases, the court may also have cited 18 U.S.C. § 3553 or factors or reasons specifically prohibited in the provisions, policy statements, or commentary of the sentencing guidelines as additional reasons.  This category includes departures that result from government motions as well as from motions by the parties.

### Downward Variance

*Downward Variance* consists of cases in which the sentence imposed was below the applicable guideline range and for which the court cited a reason on Part VI of the Statement of Reasons form (Court Determination for a Variance).  This category includes variances which result from government motions as well as from motions by the defendant.

### Drug Trafficking Guidelines

*Drug Trafficking Guidelines* information is obtained from the Presentence Report and is based on the guidelines in USSG Chapter Two, Part D.  The seven guidelines (USSG §§2D1.1, 2D1.2, 2D1.5, 2D1.6, 2D1.8, 2D1.10, and 2D1.14) represent the guidelines in Chapter Two, Part D that utilize the drug quantity table in USSG §2D1.1 (Drug Trafficking) to determine the base offense level.

### Education

Information on *Education* of the offender is obtained from the Presentence Report and is collapsed into general categories.  Technical, military, and vocational training as well as course work at community colleges is included in the *Some College* category.  A general equivalency degree (GED) is included in the *High School Graduate* category.

### Extent of Decrease

*Extent of Decrease* is calculated based on the difference between the sentence length (including any months of alternative confinement as defined in USSG §5C1.1) and the guideline minimum (including any statutory trumps) for below range cases.  Life imprisonment sentences and cases where the guideline minimum is zero months or life are excluded from all extent of decrease calculations due to the logical difficulty in calculating a decrease from these values.  High values of the guideline minimum are capped at 470 months for analytical purposes.

### Extent of Increase

*Extent of Increase* is calculated based on the difference between the guideline maximum (including any statutory trumps) and the sentence length (including any months of alternative confinement as defined in USSG §5C1.1) for above range cases. Life sentences and cases where the guideline minimum is life are excluded from all extent of increase calculations due to the logical difficulty in calculating an increase from these values. High values of the guideline minimum are capped at 470 months for analytical purposes.

### Federal Offenders Sentenced

Each *Federal Offender Sentenced* or case, as recorded by the Commission, involves a single sentencing event for a single offender. Multiple counts of conviction, including counts of conviction charged on multiple indictments, are considered a single sentencing event if a single sentence was imposed for the counts on the same day at the same time by the same judge. A single offender may account for more than one case if the offender was involved in more than one sentencing event during the fiscal year. Data on co-defendants in the same sentencing will appear as separate cases.

### Fines and Restitution

*Fines and Restitution* information is obtained from the Judgment and Commitment Order (J&C). Fine information may also include cost of supervision. Cases that receive no fine or restitution are not included in the calculation of the means. The number of cases upon which the mean is based may not equal the number of offenders ordered to pay fines and/or restitution; this is due to the failure of some J&Cs to specify the dollar amount ordered. The median of payments ordered reflects the amount located at the fiftieth percentile of all amounts ordered, excluding cases in which the amount was indeterminable or zero.

### Gender

*Gender* of the offender is obtained from the Presentence Report.

### Government Motion (Variance)

*Government Motion (Variance)* consists of cases in which the sentence imposed was below the applicable guideline range pursuant to a government motion and for which the court cited a reason on Part VI of the Statement of Reasons (SOR) form (Court Determination for a Variance). These cases are determined by a yearly case review by Commission staff of both the reasons for the below range sentence and the coding by Commission staff of any indication of government sponsorship as indicated on the SOR form for below range cases. The SOR form has specific checkboxes to indicate the origins of the variance, but cases that do not use this form may also indicate in writing the origins of the variance. Additionally, all cases with one or

more of the following reasons were classified as being sponsored by the government regardless of whether the SOR indicated sponsorship:  pursuant to a plea agreement (binding, non-binding, or unknown), fast track, savings to the government, early plea, waiver of indictment and/or appeal, other government motion, global disposition, due to stipulations, facilitated early release of a material witness, joint recommendation, and large number of immigration cases. This category does not include cases with USSG §5K1.1 Substantial Assistance departures or USSG §5K3.1 Early Disposition Program (EDP) departures.

### Guideline Sentencing Range

The *Guideline Sentencing Range* is taken from the Statement of Reasons provided by the sentencing court.  Alternatively, if the Statement of Reasons is missing, then the information is taken from the Presentence Report.

For tables in this report, unless otherwise indicated, the guideline sentencing range does not take into account applicable statutory restrictions on either the maximum or the minimum of the range; therefore, it may differ from the available range, which does take into account the statutory restrictions.

### Length of Imprisonment

For cases in which a term of imprisonment was imposed, *Length of Imprisonment* reports the mean and median terms of imprisonment imposed in months.  Length of imprisonment also includes any time served amounts and imprisonment under USSG §5G1.3.  This information is obtained from the Judgment and Commitment Order (J&C).  Mean and median imprisonment lengths are rounded to the nearest month.

Any portion of a sentence that is an alternative confinement as described in USSG §5C1.1 is excluded.  Cases in which a term of imprisonment is ordered, but where the length is indeterminable, also are excluded.  When sentences are expressed as "time served" on the J&C, Commission staff uses the dates in federal custody to determine the length of time served provided the offender has been in custody the entire time.  If the offender has been in and out of custody, or the start date is unclear or missing, then the Commission assigns a value of one day as a minimal time served amount for these cases.

In cases where the court imposes a sentence of life imprisonment, a numeric value is necessary to include these cases in any analysis.  Accordingly, life sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal offenders given the average age of federal offenders.  Sentences of greater than 470 months are also reported as 470 months.  The footnote in the relevant tables and figures indicates when this occurs.

**Length of Supervised Release**

For cases in which a term of supervised release was imposed, *Length of Supervised Release* reports the mean and median terms of supervised release imposed in months. This information is obtained from the Judgment and Commitment Order. Cases in which a term of supervised release is ordered, but where the length is indeterminable, are excluded. In cases where the court imposes a supervised release term of lifetime supervision, a numeric value is necessary to include these cases in any sentence length analysis. Accordingly, life terms of supervised release are reported as 470 months, a length consistent with the Commission's assignment of 470 months for life imprisonment sentences.

**Mandatory Minimum Penalties**

Information on *Mandatory Minimum Penalties* is obtained from the Presentence Report and represents the assessment of the probation officer. The sentencing court may alter this mandatory minimum penalty information; occasionally, such changes are not reflected in the documents received by the Commission.

**Mode of Conviction**

Information on *Mode of Conviction* is obtained from the Judgment and Commitment Order. Offenders sentenced subsequent to a plea of guilty or *nolo contendere* are included in the *Plea* category. Offenders sentenced subsequent to a trial by judge or jury are included in the *Trial* category. Rare cases involving both a plea and a trial are included in the *Trial* category.

**Non-Government Departure**

*Non-Government Departure* consists of cases in which the sentence imposed was outside the applicable guideline range and for which the court cited a reason on Part V of the Statement of Reasons form (Departures Pursuant to theGuidelines Manual) other than USSG §5K1.1 or USSG §5K3.1, and where the government did not initiate, propose, or stipulate to the sentence.

**Non-Government Variance**

*Non-Government Variance* consists of cases in which the sentence imposed was outside the applicable guideline range and for which the court cited a reason on Part VI of the Statement of Reasons form (Court Determination for a Variance), and where the government did not initiate, propose, or stipulate to the sentence.

**Non-Prison Sentence**

*Non-Prison Sentence* includes sentences including probation and/or any alternative confinement, as described in USSG §5C1.1 (*i.e.,* the entire sentence was not incarceration in jail/prison only).

**Number of Employees**

The *Number of Employees* identifies the number of persons employed by an organizational offender. This information is obtained from the Presentence Report. The number includes full-time workers, part-time workers, hourly workers, seasonal workers, and contractors. If the organization has undergone a significant down-sizing since the offense was detected by the authorities, the number of employees at the time of the offense is used for this variable.

**Offense Level**

The final *Offense Level* used in these tables is taken from the Statement of Reasons provided by the sentencing court. Alternatively, if the Statement of Reasons is missing, the offense level is taken from the Presentence Report.

**Organizations**

*Organization* is a "person other than an individual." *See* 18 U.S.C. § 18. The term includes corporations, partnerships, associations, joint-stock companies, unions, trusts, pension funds, unincorporated organizations, governments and political subdivisions thereof, and non-profit organizations.

**Other Government Motion (Downward Departure)**

*Other Government Motion* is determined by a yearly case review by Commission staff of both the reasons for the below range sentence and the coding by Commission staff of any indication of government sponsorship as indicated on the Statement of Reasons (SOR) for below range cases. The SOR form has specific checkboxes to indicate the origins of the departure, but cases that do not use this form may also indicate in writing the origins of the departure. Additionally, all cases with one or more of the following reasons were classified as being sponsored by the government regardless of whether the SOR indicated sponsorship: pursuant to a plea agreement (binding, non-binding, or unknown), fast track, savings to the government, early plea, waiver of indictment and/or appeal, other government motion, global disposition, due to stipulations, facilitated early release of a material witness, joint recommendation, and large number of immigration cases. This category does not include cases with USSG §5K3.1 Early Disposition Program (EDP) departures or USSG §5K1.1 Substantial Assistance departures.

**Ownership Structure**

The *Ownership Structure* identifies the legal status of an organizational offender. This information is obtained from the Presentence Report. If an organization is incorporated but is not openly traded, it is classified as "Closely-held or Private." If the financial statements in the presentence investigation report are termed "unaudited," then the company is also classified as "Closely-held or Private."

**Position of Sentence**

The *Position of Sentence* describes within-range guideline sentences in terms of their relative positions within their applicable guideline ranges. Guideline range information is taken from the Statement of Reasons form and sentence information is taken from the Judgement and Commitment Order.

The *Position of Sentence* is determined by dividing the available range in half. This allows a sentence to fall into one of five distinct categories: the guideline minimum; the lower-half of the range (when not at the guideline minimum); the exact midpoint of the range; the upper-half of the range (when not at the guideline maximum) and the guideline maximum. The "available range" is the guideline range with applicable statutory restrictions on either the maximum or the minimum of the range taken into account. For cases in which USSG §5C1.2 was applied, in accordance with the provisions of the guideline, the statutory restrictions on the minimum of the range are removed according to 18 U.S.C. § 3553(f).

In cases in which the sentence is located outside the available sentencing range, departure and/or variance information is provided as reported by the sentencing court. Differences in the number and percentage of cases in each category may differ from other tables presented in this report; this is due to the exclusion of any case missing both complete information from the Statement of Reasons and information on statutory minima and maxima.

**Primary Drug Type**

Information on *Primary Drug Type* is obtained from the Presentence Report, Judgment and Commitment Order, or plea agreement. It is recorded only if at least one of the statutes of conviction recorded by the Commission is an offense under title 21 of the United States Code or an offense under another title when the underlying conduct involves a controlled substance. Information about the drugs in the text and tables is derived from the primary drug type involved in each case. In cases involving more than one drug, the primary drug type is the drug of a quantity producing the highest converted drug weight (as described in USSG §2D1.1, Application note 8).

The category *Fentanyl* are those cases that involve Alpha-Methylfentanyl. The category *Marijuana* includes Hashish and Hashish oil. The category *Methamphetamine* includes pure (actual) methamphetamine, "Ice," methamphetamine mixture, and methamphetamine precursors sentenced under any drug trafficking guideline other than USSG §2D1.11 (for example ephedrine and pseudoephedrine). All drug types not listed separately in this report are collapsed into the "Other" drug category.

**Primary Guideline**

When more than one sentencing guideline is applied in a case, the *Primary Guideline* is the guideline that has the highest adjusted offense level (this includes the Base Offense Level, all applicable Specific Offense Characteristics, and Chapter Three Adjustments prior to the application of Multiple Count Units).

**Race**

Information on *Race* of the offender is obtained from the Presentence Report in separate categories of race and ethnicity (*White, Black, Native American or Alaskan Native, Asian or Pacific Islander, Multiracial, and "Other"*). Ethnicity data indicates whether an offender is of Hispanic origin. For purposes of this report, offenders whose ethnic background is designated as Hispanic are represented as Hispanic in all tables regardless of racial background. The *Other* race category includes offenders of Native American or Alaskan Native, Asian or Pacific Islander, Multiracial, and "Other" origin.

**Reasons for Sentences Outside the Guideline Range**

*Reasons for Sentences Outside the Guideline Range* are obtained from the Statement of Reasons when available. Because courts often provide more than one reason for sentencing outside the guideline range, the frequencies on these tables may add up to more than the number of cases.

**Resentencings and Other Modification of Sentence**

Using information submitted by the district courts, *Resentencings and Other Modifications of Sentence* are classified into eight different categories:

*Correction of Sentence on Remand (18 U.S.C. § 3742(f)(1) and (2))*: Cases in which the original sentence is remanded to the district court by a court of appeals. The possible grounds for this include: (1) the sentence violated the law, (2) the guidelines were incorrectly applied, (3) the sentence is outside the applicable guideline range and the court failed to adequately explain why, (4) the sentence is outside the applicable guideline range and the court relied upon an impermissible reason, (5) the sentence is outside the applicable guideline range and the court departed to an unreasonable degree, or (6) there was no applicable guideline and the sentence is plainly unreasonable;

*Direct Motion to District Court Pursuant to 18 U.S.C. § 3559(c)(7)*: Cases in which an offender received an aggravated penalty imposed under 18 U.S.C. § 3559(c)(7) at the time of original sentence and where a prior conviction for a serious violent felony or serious drug offense that triggered the aggravated penalty was overturned because it was (1) unconstitutional, (2) the offender was actually innocent, or (3) the offender was pardoned because of innocence;

*Direct Motion to District Court Pursuant to 28 U.S.C. § 2255*:  Cases in which a district court determines that (1) the original sentence was imposed in violation of the Constitution or the law, (2) the court lacked jurisdiction to impose the sentence, (3) the sentence was greater than the maximum sentence allowed by the law, or (4) the sentence is otherwise subject to collateral attack;

*Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))*:  Cases in which the district court reduces an original sentence for extraordinary and compelling reasons or because the offender is at least 70 years old, has served at least 30 years for the offense for which the offender is currently imprisoned, and the Federal Bureau of Prisons (BOP) has determined that the offender is not a danger to the safety of any person or the community;

*Modification of Imposed Term of Imprisonment for Retroactive Amendments to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))*:  Cases in which a district court reduces the sentence for an offender who was sentenced based on a sentencing range that later was lowered by the United States Sentencing Commission and where the Commission voted to apply the lowered penalty retroactively.  This reduction can occur through a motion filed by the offender, the director of the BOP, or upon the court's own motion;

*Modification of Restitution Order (18 U.S.C. § 3664)*:  Cases in which the court modifies any part of a judgment ordering restitution be paid to victims;

*Reduction of Sentence for Changed Circumstances (Federal Rule of Criminal Procedure 35(b))*: Cases in which the government files a motion after the original sentence is imposed requesting the court to reduce that sentence because the offender provided substantial assistance to the government; and

*Unknown Type of Resentencing*:  Cases in which a resentencing has occurred but where the type of resentencing cannot be determined.

**Safety Valve**

*Safety Valve* cases are identified based upon the application of the criteria set forth in subdivisions (1)-(5) of subsection (a) of USSG §5C1.2 as described in the Statement of Reasons or Presentence Report.  These criteria are considered as a specific offense characteristic in cases where USSG §2D1.1 or USSG §2D1.11 is the sentencing guideline.

The application of this specific offense characteristic requires that the offender meet the criteria set forth in subdivisions (1)-(5) of subsection (a) of USSG §5C1.2, which are the same criteria as in 18 U.S.C. § 3553(f).  Section 3553(f) requires courts to sentence an offender without regard to any otherwise applicable mandatory minimum penalty when the criteria are met.  Additionally, offenders meeting this criteria receive a reduction of two offense levels pursuant to USSG §2D1.1(b)(18) or USSG §2D1.11(b)(6).  This two-level reduction can occur even if no mandatory minimum penalty might otherwise apply in the case.  Both types of *Safety Valve* application are accounted for in the *Sourcebook* tables.  In a small number of cases the court may not give the two-level reduction but does sentence the offender without regard to an otherwise applicable mandatory minimum penalty.

Because of the continuing refinement of the guidelines, the position of this specific offense characteristic notation within USSG §2D1.1 may vary from year to year.

### Sentence Appeals Disposition

Data is derived from analysis of opinions and orders from the courts of appeals. The appeals disposition code indicates the disposition of the case. *Affirmed* cases are cases in which an appellate court holds that the judgment of the court below is correct and should stand. *Reversed* cases are those in which an appellate court sets aside, annuls, vacates, or changes to the contrary the decision of a lower court. *Affirmed and Reversed* cases are cases in which an appellate court affirmed one or more issues and reversed one or more of the issues that were appealed. *Remanded* cases are those in which the appellate court sent the case back to the lower court to address the issue under appeal. *Dismissed* cases are those an appellate court terminates without a complete trial and without issuing a holding. A dismissal of an appeal places the parties in the same condition as if no appeal had been taken or allowed, and thus acts as a confirmation of the judgment of the court below.

### Sentencing Issues Appealed

Data about the issue or issues appealed are derived from analyses of opinions and orders from the courts of appeals. Each sentencing issue that is reversed or remanded by the appellate court is coded by the guideline involved and description of the particular issue addressed within that guideline. Challenges related to sentencing, but not to guideline application, are coded under categories reserved for "constitutional issues" or "other general sentencing issues."

### Sentence Imposed or Sentence Length

*Sentence Imposed or Sentence Length* reports the mean and median terms of the sentence imposed in months. It also includes any time served amounts and imprisonment under USSG §5G1.3. This information is obtained from the Judgment and Commitment Order (J&C). Mean and median sentence lengths are rounded to the nearest month.

Probation sentences are included as zero months. Any portion of a sentence that is an alternative confinement as described in USSG §5C1.1 is included. Cases in which a sentence is imposed, but where the length is indeterminable, are excluded. When sentences are expressed as "time served" on the J&C, Commission staff uses the dates in federal custody to determine the length of time served when an offender has been in custody the entire time. If the offender has been in and out of custody, or the start date is unclear/missing, then the Commission assigns a value of one day as a minimal time served amount for these cases.

In cases where the court imposes a sentence of life imprisonment, a numeric value is necessary to include these cases in any sentence length analysis. Accordingly, life sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal offenders given the average age of federal offenders. Sentences of greater than 470 months are also reported as 470 months. The footnote in the relevant tables and figures indicates when this occurs.

**Sentences Under the Guidelines Manual**

This category includes offenders whose sentences are determined to be either within the guideline range or outside the guideline range and for which the court cited a reason on Part V of the Statement of Reasons form (Departures Pursuant to the Guidelines Manual).  In these cases, the court may also have cited 18 U.S.C. § 3553 or factors or reasons specifically prohibited in the provisions, policy statements, or commentary of the sentencing guidelines as additional reasons.  This category includes departures which result from government motions as well as from motions by the offender.

**Type of Appeal**

Data are derived from analyses of opinions and orders from the courts of appeals.  The type of appeals code indicates the types of issues that are raised in the case.  The types of appeals codes are: (1) sentencing issues only, (2) sentencing and conviction issues, (3) conviction issues only, (4) *Anders* Brief, and (5) unknown.

For coding purposes, an appeal involves sentencing issues when the appellant either argues that the district court erred during the sentencing phase or raises issues concerning the applicability of the guidelines to the case at hand.  In some cases, the appellant is challenging some part of the plea agreement involving sentencing.  These issues are also considered sentencing issues.  An appeal involves conviction issues when the appellant claims some sort of error occurred during the investigation, trial, or jury deliberations that did not involve sentencing or the sentencing guidelines.  *Anders* Brief cases are those where the counsel for the appellant has advised the court of appeals that he or she has conscientiously examined the case but finds the appeal to be wholly frivolous and has requested permission to withdraw.  *See Anders v. California*, 386 U.S. 738 (1967).  This disposition code was added in fiscal year 2010.

**Type of Business**

The *Type of Business* identifies the primary industry in which an organizational offender conducted business.  This information is obtained from the Presentence Report.

**Type of Crime**

Information on *Type of Crime* is obtained from the primary guideline detailed in the Presentence Report.  If the primary guideline is an "attempt/conspiracy" guideline, such as USSG §2X1.1, then the underlying guideline is used to determine the type of crime category.

If there is no primary guideline provided, then information about the type of crime category is obtained from the statutes of conviction listed on the Judgment and Commitment Order.  When the "type of crime" for the case is determined from the statutes of conviction, the offense applicable to the count of conviction with the highest statutory maximum becomes the "type of crime."  If two or more counts are found to have the same statutory maximum, the "type of crime" is selected according to which count of conviction has the highest statutory

minimum.  Finally, in the event of a small number of cases still tied, the "type of crime" that best represented the nature of the criminal behavior is chosen.

For convenience in analysis, a summary variable describing "type of crime" is derived. This is generated by grouping similar primary offenses into a smaller set of categories.  Note that the crime categories differ between the individual and organizational offender datafiles. Listed below are the offense types that are grouped into each of the crime categories used in the individual offender datafile tables for this report:

*Administration of Justice Offenses* includes obstructing or impeding officers, contempt, obstruction of justice, perjury or subornation of perjury, bribery of a witness, impersonation, failure to appear by offender, failure to appear by material witness, commission of offense while on release, payment of witness, and misprision of a felony This category includes offenders sentenced under USSG §§2A2.4, 2J1.1, 2J1.2, 2J1.3, 2J1.4, 2J1.6, 2J1.9, and 2X4.1.

*Antitrust* includes bid-rigging, price-fixing, and market allocation agreement.  This category includes offenders sentenced under USSG §2R1.1.

*Arson* includes property damage by explosives and use of fire or explosives to commit a federal felony.  This category includes offenders sentenced under USSG §§2K1.4 and 2K1.7 (deleted).

*Assault* includes attempt to commit murder, assault with intent to murder, threatening communication, aggravated assault, minor assault, and conspiracy that includes assault with attempt to murder.  This category includes offenders sentenced under USSG §§2A2.1, 2A2.2, and 2A2.3.

*Bribery/Corruption* includes offenses involving public officials and violations of federal election campaign laws, bribe involving officials, bribery—bank loan/commercial, loan or gratuity to bank examiner, *etc.*, gratuity involving officials, bribe or gratuity affecting employee plan, conflict of interest, payment or receipt of unauthorized compensation, and making, receiving, or failing to report a contribution, donation, or expenditure in violation of the Federal Election Campaign Act.  This category includes offenders sentenced under USSG §§2B4.1, 2C1.1, 2C1.2, 2C1.3, 2C1.4 (deleted), 2C1.5, 2C1.6 (deleted), 2C1.7 (deleted), and 2C1.8.

*Burglary/Trespass* includes burglary of a residence and burglary of a structure other than a residence, post office burglary, burglary of DEA premises (pharmacy), bank burglary, and trespass.  This category includes offenders sentenced under USSG §§2B2.1, 2B2.2 (deleted), and 2B2.3.

*Child Pornography* includes the receipt or possession of materials involving the sexual exploitation of minors.  This category includes offenders sentenced under USSG §§2G2.2 and 2G2.4 (deleted).

*Commercialized Vice* includes gambling, animal fighting, and prostitution offenses. This category includes offenders sentenced under USSG §2G1.1 where the court did not apply a Base Offense Level of 34, and all offenders sentenced under USSG §§2E3.1, 2E3.2 (deleted), and 2E3.3 (deleted).

212 | *2019 Sourcebook*

*Drug Possession* includes simple possession of all drug types. This category includes offenders sentenced under USSG §2D2.1.

*Drug Trafficking* includes drug distribution/manufacture—conspiracy, continuing criminal enterprise, drug distribution—employee under 21, drug distribution near school, drug import/export, drug distribution to person under 21, establish/rent drug operation, endangering human life while manufacturing, and narco-terrorism. This category includes offenders sentenced under USSG §§2D1.1, 2D1.2, 2D1.5, 2D1.6, 2D1.8, 2D1.10, and 2D1.14.

*Environmental* includes waste discharge; specially protected fish, wildlife, and plants; recordkeeping, tampering, and falsification; tampering with a public water system; mishandling of environmental pollutants; and hazardous devices on federal lands. This category includes offenders sentenced under USSG §§2K3.1 (deleted), 2Q1.1, 2Q1.2, 2Q1.3, 2Q1.4, 2Q1.5 (deleted), 2Q1.6, 2Q2.1, and 2Q2.2 (deleted).

*Extortion/Racketeering* includes extortion by force, or threat of injury or serious damage, extortionate extension of credit, blackmail, Hobbs Act extortion, travel in aid of racketeering, crime relating to racketeering, and violent crimes in aid of racketeering, unlawful conduct relating to contraband cigarettes, and labor racketeering. This category includes offenders sentenced under USSG §§2B3.2, 2B3.3, 2E1.1, 2E1.2, 2E1.3, 2E1.4, 2E1.5 (deleted), 2E2.1, 2E4.1, 2E5.1, 2E5.2 (deleted), 2E5.3, 2E5.4 (deleted), 2E5.5 (deleted), and 2E5.6 (deleted).

*Firearms* includes unlawful receipt/possession/transportation of firearms, ammunition, or explosive material; prohibited transactions involving firearms or ammunition; possession of guns/explosives on aircraft; unlawful trafficking, *etc.*, in explosives; possession of guns/explosives in federal facility/schools; use of fire or explosives to commit felony; use of firearms or ammunition during crime; improper storage of explosive materials; and failure to report theft of explosive materials. This category includes offenders sentenced under USSG §§2K1.1, 2K1.2, 2K1.3, 2K1.5, 2K1.6, 2K2.1, 2K2.2, 2K2.3, 2K2.4, 2K2.5, 2K2.6, and 2K3.2.

*Food and Drug* includes tampering with risk of death or injury, providing false information or tampering with products, tampering to injure business, odometer laws and regulations, and violation of regulations involving food, drugs, *etc.* This category includes offenders sentenced under USSG §§2N1.1, 2N1.2, 2N1.3, 2N2.1, and 2N3.1.

*Forgery/Counterfeiting/Copyright* includes counterfeit bearer obligations and forgery/counterfeit (non-bearer obligations) as well as criminal infringement of copyright or trademark. This category includes offenders sentenced under USSG §§2B5.1, 2B5.2 (deleted), 2B5.3, and 2B5.4 (deleted).

*Fraud / Theft / Embezzlement* includes fraud and deceit, embezzlement—property, embezzlement from labor unions, embezzlement—mail/post office, embezzlement from benefit plans, bank embezzlement, bank larceny, theft from benefit plans, other theft—mail/post office, receipt/possession of stolen property, theft from labor union, theft or damage to cultural heritage resources, insider trading, and aggravated identity theft. This category includes offenders sentenced under USSG §§2B1.1, 2B1.2 (deleted), 2B1.3 (deleted), 2B1.4, 2B1.5, 2B1.6, 2F1.1 (deleted), and 2F1.2 (deleted).

*Immigration* includes trafficking in U.S. passports, trafficking in entry documents, failure to surrender naturalization certificate, fraudulently acquiring U.S. passports, smuggling, transporting, or harboring an unlawful alien, fraudulently acquiring entry documents, and unlawfully entering or remaining in the U.S. This category includes offenders sentenced under USSG §§2L1.1, 2L1.2, 2L1.3 (deleted), 2L2.1, 2L2.2, 2L2.3 (deleted), 2L2.4 (deleted), and 2L2.5.

*Individual Rights* includes interference with rights under color of law; force or threats to deny benefits or rights; obstructing an election or registration; manufacture, *etc.*—eavesdropping device; other deprivations/discrimination; obstructing correspondence; peonage, servitude, and slave trade; intercept communication or eavesdropping; and conspiracy to deprive individual of civil rights. This category includes offenders sentenced under USSG §§2H1.1, 2H1.2 (deleted), 2H1.3 (deleted), 2H1.4 (deleted), 2H1.5 (deleted), 2H2.1, 2H3.1, 2H3.2, 2H3.3, 2H4.1, and 2H4.2.

*Kidnapping* includes hostage and ransom taking, abduction, unlawful restraint, and aircraft piracy. This category includes offenders sentenced under USSG §§2A4.1, 2A4.2, and 2A5.1.

*Manslaughter* includes both involuntary and voluntary manslaughter. This category includes offenders sentenced under USSG §§2A1.3 and 2A1.4.

*Money Laundering* includes laundering of monetary instruments, monetary transaction from unlawful activity, failure to file currency report, and failure to report monetary transactions. This category includes offenders sentenced under USSG §§2S1.1, 2S1.2 (deleted), 2S1.3, and 2S1.4 (deleted).

*Murder* includes first degree murder, second degree murder, and conspiracy or solicitation to commit murder. This category includes offenders sentenced under USSG §§2A1.1, 2A1.2, and 2A1.5.

*National Defense* includes treason, sabotage, espionage, evasion of military service, prohibited financial transactions and exports, providing material support to designated foreign terrorist organizations, nuclear, biological, and chemical weapons, and weapons of mass destruction. This category includes offenders sentenced under USSG §§2M1.1, 2M2.1, 2M2.2 (deleted), 2M2.3, 2M2.4 (deleted), 2M3.1, 2M3.2, 2M3.3, 2M3.4, 2M3.5, 2M3.6 (deleted), 2M3.7 (deleted), 2M3.8 (deleted), 2M3.9, 2M4.1, 2M5.1, 2M5.2, 2M5.3, 2M6.1, and 2M6.2.

*Obscenity/Other Sex Offenses* includes failure to register as a sex offender, recordkeeping offenses involving production of sexually explicit material, and importing, mailing, transporting, or broadcasting obscene material. This category includes offenders sentenced under USSG §§2A3.5, 2A3.6, 2G2.5, 2G3.1, and 2G3.2.

*Prison Offenses* includes contraband in prisons, riots in federal facilities, and escape. This category includes offenders sentenced under USSG §§2P1.1, 2P1.2, 2P1.3, and 2P1.4 (deleted).

*Robbery* includes bank robbery, Hobbs Act robbery, post office robbery, other robbery, and carjacking. This category includes offenders sentenced under USSG §2B3.1.

*Sexual Abuse* includes criminal sexual abuse, sexual abuse of a minor, sexual abuse of a ward, abusive sexual contact, transportation of minor for sex, sex trafficking of children, sex trafficking of adults by force, fraud or coercion, child pornography production, and child exploitation enterprises. This category includes offenders sentenced under USSG §2G1.1 who received a Base Offense Level of 34, and all offenders sentenced under USSG §§2A3.1, 2A3.2, 2A3.3, 2A3.4, 2G1.2 (deleted), 2G1.3, 2G2.1, 2G2.3, and 2G2.6.

*Stalking/Harassing* includes threatening or harassing communications, hoaxes, false liens, stalking, and domestic violence. This category includes offenders sentenced under USSG §§2A6.1 and 2A6.2.

*Tax* includes non-payment of taxes, conspiracy to avoid taxes, offenses relating to withholding statements, aiding or advising tax fraud, failing to collect or truthfully account for and pay over taxes, failing to deposit collected taxes in required accounts after notice, alcohol and tobacco tax offenses, and customs taxes. This category includes offenders sentenced under USSG §§2T1.1, 2T1.2 (deleted), 2T1.3 (deleted), 2T1.4, 2T1.5 (deleted), 2T1.6, 2T1.7, 2T1.8, 2T1.9, 2T2.1, 2T2.2, 2T3.1, and 2T3.2 (deleted).

*Other Miscellaneous Offenses* includes interference with a flight crew, unlawful sale, transportation, possession, manufacturing, or importation of drug paraphernalia, distributing, importing, or exporting listed chemicals, evading reporting or recordkeeping requirements involving chemicals, acquiring a controlled substance by fraud or forgery, border tunnels and subterranean passages, and all other felony and miscellaneous offenses not previously listed in any of the other categories or covered by specific guidelines. This category includes offenders sentenced under USSG §§2A5.2, 2D1.7, 2D1.11, 2D1.12, 2D1.13, 2D2.2, 2D2.3, 2D3.1, 2X5.1, 2X5.2, and 2X7.1. In addition, this category includes offenders sentenced under USSG §§2X1.1, 2X2.1, 2X3.1, 2X6.1, and 2X7.2 if no underlying guideline was provided.

**Sentence Type**

Using sentencing information obtained from the Judgment and Commitment Order, the *Total Receiving Imprisonment* category includes the number of offenders sentenced (and percent of *Total Cases*) who received a commitment to the Bureau of Prisons.  This category is the sum of cases in *Prison Only* and the *Prison and Alternatives* categories.

The *Total Receiving Probation* category includes the number of offenders sentenced (and the percent of Total Cases) who received a term of probation with or without a condition of community confinement, intermittent confinement, or home detention.  This category is the sum of *Probation Only* and *Probation and Alternatives* categories.

The *Prison Only* category includes offenders sentenced to a term of imprisonment only, with no additional conditions of community confinement, home detention or intermittent confinement.

The *Prison and Alternatives* category includes all cases in which offenders received prison and conditions of alternative confinement as defined in USSG §5C1.1.  This category includes, but is not limited to, Zone A, Zone B, or Zone C cases receiving prison with additional conditions of a term of community confinement, home detention, or intermittent confinement.

The *Probation Only* category includes the number of offenders who received a term of probation without a condition of community confinement, intermittent confinement, or home detention.

*Probation and Alternatives* category includes the number of offenders who received a term of probation with a condition of community confinement, intermittent confinement, or home detention.

The *Fine Only* category includes the number of offenders who received no prison, no probation, and no time of alternative confinement as defined in USSG §5C1.1.  Most of these offenders received a fine and/or a special assessment.

**Upward Departure**

*Upward Departure* consists of cases in which the sentence imposed was above the applicable guideline range and for which the court cited a reason on Part V of the Statement of Reasons form (Departures Pursuant to the Guidelines Manual).  In these cases, the court may also have cited 18 U.S.C. § 3553 or factors or reasons specifically prohibited in the provisions, policy statements, or commentary of the sentencing guidelines as additional reasons.  This category includes departures which result from government motions as well as from motions by the parties.

## Upward Variance

*Upward Variance* consists of cases in which the sentence imposed was above the applicable guideline range and for which the court cited a reason on Part VI of the Statement of Reasons form (Court Determination for a Variance). This category includes variances which result from government motions as well as from motions by the offender.

## Weapon Involvement

*Weapon Involvement* in a case is identified either by the application of a guideline enhancement for weapon involvement or a conviction under 18 U.S.C. § 924(c), or both. This variable does not identify cases in which a weapon is present in the offense, but the offender was not convicted of 18 U.S.C. § 924(c) or did not receive a weapon-related sentencing enhancement. It does not identify cases in which the specific enhancement can be applied for multiple reasons; for example, the specific enhancement can be applied if the offense involved either physical contact or if a dangerous weapon was possessed. Finally, this variable does not identify cases sentenced as weapon offenses under USSG Chapter Two, Part K, unless they were convicted of 18 U.S.C. § 924(c).

## Within Guideline Range

Offenders are classified in this category when the sentence is within both the guideline range and within the statutory minimum and maximum. The sentence must meet minimum zone requirements as well. In rare instances when a very small departure or variance is granted, but the sentence is still within the original guideline range, the sentence is reported as within range.

## Year

Information on *Year* is obtained from the Judgment and Commitment Order. Unless otherwise indicated, the sentencing year is defined as the fiscal year in which the offender was sentenced.

## Zone

The Sentencing Table is categorized into sentencing *Zones*. Courts may impose various types of punishment as alternatives to imprisonment. Alternative types of punishment include probation, home detention, community confinement, and intermittent confinement. Imposition of alternative types of punishment is restricted to offenders within specific sentencing zones. See Chapter 5 of the *Guidelines Manual* for a description of alternatives to imprisonment and the conditions under which they apply.

Exhibit 43

1       DECLARATION OF CUSTODIAN CERTIFYING BUSINESS RECORD

2       I, _Renée A Cohen_, hereby declare as follows:
                 (name)

3       1.   I am a duly authorized custodian of records for

4    _Renée A. Cohen, Ph.D._ (the "Business Entity").  In that capacity, I am
     (name of business entity)
5    knowledgeable about the matters set forth herein and I am qualified

6    and authorized to make this declaration.

7            a.   My job title/position is: _Licensed Psychologist_

8            b.   I have been employed in this capacity for

9    _35+ years_. and by the Business Entity for _____.
       (duration)                                              (duration)

10           c.   My job duties are:

11   _Providing clinical & forensic psychological services._

12

13

14           d.   I am knowledgeable about the matters set forth herein

15   and the relevant record-keeping practices of the Business Entity

16   based upon (check all that apply):

17       [ ] Training.

18       [ ] Familiarity with relevant policy/policies.

19       [ ] Hands-on experience.

20       [ ] Supervision of one or more others with hands-on experience.

21       [✓] Other.  Describe:

22   _I am the sole practitioner of my_

23   _psychology practice._

24

25       2.   Attached hereto or enclosed herewith are originals/(true and

26   correct duplicates) of a record or records of a regularly conducted

27   activity of the Business Entity named above. _Renée A. Cohen, Ph.D._

28   _re: Skarulis._

1

2   (Circle either "originals" or "true and correct duplicates" and

3   strike out the other term.)

4        3.   I certify that the attached record(s):

5             a.   was/were made at or near the time of the occurrence of

6   the matters set forth therein,

7             b.   was/were made by, or from information transmitted by,

8   a person with knowledge of those matters;

9             c.   was/were kept in the course of the regularly conducted

10  activity of the Business Entity;

11            d.   was/were made by and in the course of the regularly

12  conducted activity as a regular practice;

13            e.   if not original records, are exact duplicates of

14  original records.

15       I declare under penalty of perjury that the foregoing is true

16  and correct.  This declaration is executed at _Santa Monica, CA_ ,
                                                   (place document was signed)

17  on  _Jan. 11, 2019_ .
        (date document was signed)

18                                    _Renée A. Cohen_
                                      (signature)

19

20                                    _Renée A. Cohen_
                                      (typed or printed name)

21

22

23

24

25

26

27

28

2

This is the only part of my Custody Evaluation Report that pertained to Mr. Zuberi and Mr. Skarulis' finances.

*As stated, it was beyond the scope of the Child Custody Evaluation and beyond my scope of expertise.


**Imaad Zuberi – Angel Investor in Father's business**


Mr. Zuberi met Father when they were in a MBA class together.  Mr. Zuberi is an investor in startup companies in America.  Avenue Ventures is made up of personal investors and company investors.  Funding for Father is partially out of pocket, partially from company funds and personal money.


He states that Father receives a salary and development costs from Avenue Ventures for his product.  He states that Mark owns 69% of his software product and he (Mr. Zuberi) has a 20% share and the rest is other investors.


According to Mr. Zuberi, Father coordinated parts of a contract that they had with the Sri Lanka government.  However, the government changed and they are no longer involved in that project.


*The logistics of Father's business is beyond my scope of expertise.  Mr. Zuberi at one point stated he was asking Father to return funds, and then stated there was a misunderstanding.  If more information is needed, I would defer this aspect of the investigation to a forensic accountant.


Please see **Appendix 1** for the exchange of emails between Mr. Zuberi and the evaluator.



APPENDIX 1

imaad
Actions
Dr. Renee A. Cohen
6/05/15
To: imaad zuberi


**Does this mean he returns all salary income earned in 2014 and 2015? or money invested in
the project? or Both?

Renée A. Cohen, Ph.D.
Clinical & Forensic Psychology
(310) 828-1027
Offices in Brentwood & Hermosa Beach


Website: racphd.com
Actions

████████████████████████

Add to contacts
6/05/15

To: imaad zuberi


**We are exiting Circa and have asked Mark for the money we have invested in
the company.
imaad

-----Original Message-----
From: imaad zuberi [████████████████████████]
Sent: Wednesday, June 3, 2015 3:25 PM
To: 'drreneeacohen@hotmail.com'
Subject: FW: Skarulis

Sorry for the delay. Please see reply below imaad

------------
From: Dr. Renee A. Cohen <████████████████████
Sent: Wednesday, May 27, 2015 6:01 PM
To: ████████████████████
Subject: Skarulis

Mr. Zuberi,

To: 'Dr. Renee A. Cohen'

\*\*I spoke to Mark on Friday. We cleared up the misunderstanding about documentation we
thought was missing. We are now committed to funding Circa till the end of the year. Hopefully
by then Circa will have customer by which it will be self funded
imaad

**From:** Dr. Renee A. Cohen ███████████████
**Sent:** Sunday, June 14, 2015 9:50 AM
**To:** imaad zuberi
**Subject:** Re: Skarulis

Thank you for keeping me updated.

Sent from my iPhone
Actions
Dr. Renee A. Cohen
6/14/15
To: imaad zuberi

Thank you for keeping me updated.

Sent from my iPhone
Actions
imaad zuberi ███████████████
Add to contacts
6/10/15

To: 'Dr. Renee A. Cohen'

I am trying to get hold of Mark without success. He didn't return the many phone call message I left for
him. I need to talk to him to get to a resolution
imaad
Actions
imaad zuberi ███████████████
Add to contacts
6/08/15

To: 'Dr. Renee A. Cohen'

I have called Mark and waiting to hear back from him. I will discuss way forward with him when I meet
him

Dr. Renee A. Cohen
Wed 5/27/2015, 5:01 PM
Mr. Zuberi,

Thank you for returning my call.

If you could provide the following information it would help to clarify the accounting.

**Information for 2015:**

What is Mr. Skarulis' salary?

How is he paid?  e.g. personal checks; business checks?

Please provide the checks that are for salary.

Please provide the checks that are for development or other spending.

How much of the company do the investors (Ave. Venture) own?

How much of Cirqa does Mr. Skarulis own?

How long has Avenue Venture been affiliated with Mr. Skarulis?

What is your commitment to the project?  e.g. Is there a limit to your financial backing?

How much travel will Mr. Skarulis be obligated to do for photo gallery accumulation?
Marketing?

Projected time for the app to be ready for market/sale?

Thank you for your assistance.


Renée A. Cohen, Ph.D.
Clinical & Forensic Psychology

*Mr. Zabert answers.*

Thank you for returning my call.

If you could provide the following information it would help to clarify the accounting.  Answers provided next to question

Information for 2015:

What is Mr. Skarulis' salary?  It is $5000/month plus

How is he paid?  e.g. personal checks; business checks?  A variety depending on what accounts we utilize

Please provide the checks that are for salary.  The checks to Mark Skarulis have been for salary. Mark should have copy

Please provide the checks that are for development or other spending. No checks, all other payments have been credit card

How much of the company do the investors (Avenue Venture) own? (~36%)

How much of Cirqa does Mr. Skarulis own? (~50%)

How long has Avenue Venture been affiliated with Mr. Skarulis? formally 1.5 Years. I have known him longer

What is your commitment to the project?  e.g. Is there a limit to your financial backing? Through the end of 2015 sale/exit, ongoing self-funded entity

How much travel will Mr. Skarulis be obligated to do for photo gallery accumulation? Marketing? Currently focused on Southern California, immediately there is no significant travel scheduled outside of the Los Angeles area

Projected time for the app to be ready for market/sale?  it is being marketed currently. it will not be fully functional until Santa Monica Pier and Beverly Hills are finished

Thank you for your assistance.

Renée A. Cohen, Ph.D.
Clinical & Forensic Psychology