TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
Public Corruption & Civil Rights Section
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Trial Attorney, National Security Division
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2468/7383/7280
     Facsimile: (213) 894-2927
     E-mail:  daniel.obrien@usdoj.gov
     E-mail:  elisa.fernandez@usdoj.gov
     E-mail:  judith.heinz@usdoj.gov
EVAN N. TURGEON (D.C. Bar No. 1010816)
Trial Attorney, National Security Division
United States Department of Justice
     950 Pennsylvania Avenue, N.W., Suite 7700
     Washington, D.C. 20530
     Telephone: (202) 353-0176
     E-mail:    evan.turgeon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                 v.<br><br>IMAAD SHAH ZUBERI,<br><br>            Defendant. | No. LACR19-642-VAP<br>No. LACR20-155-VAP<br><br>REDACTED DECLARATION OF DANIEL J. O'BRIEN IN SUPPORT OF SENTENCING POSITION RE OBSTRUCTION OF JUSTICE; REDACTED EXHIBITS (FILED UNDER SEAL IN DOCKET #53) PER COURT'S ORDER DATED 2/9/17 |

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   DANIEL J. O'BRIEN (Cal. Bar No. 141720)
4  Assistant United States Attorney
   Public Corruption & Civil Rights Section
5      1500 United States Courthouse
       312 North Spring Street
6      Los Angeles, California 90012
       Telephone: (213) 894-2468
7      Facsimile: (213) 894-2927
       E-mail:    daniel.obrien@usdoj.gov
8  ELISA FERNANDEZ (Cal. Bar No. 172004)
   Assistant United States Attorney
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11

12                    UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,         CR No. CR 19-642-VAP

15         Plaintiff,                DECLARATION OF AUSA DANIEL J.
                                     O'BRIEN IN SUPPORT OF SENTENCING
16             v.                    POSITION RE OBSTRUCTION OF
                                     JUSTICE; EXHIBITS
17 IMAAD SHAH ZUBERI,
                                     Date: February 10, 2010
18         Defendant.                Time: 10:00 a.m.
                                     Courtroom: 8A
19
                                     (UNDER SEAL)
20

21

22

23

24

25

26

27

28

FILED
CLERK, U.S. DISTRICT COURT

JAN 3, 2020

CENTRAL DISTRICT OF CALIFORNIA
BY:    BH    DEPUTY

1  **DECLARATION OF AUSA DANIEL J. O'BRIEN**

2  I, Daniel J. O'Brien, declare and state as follows:

3  1.  I am an Assistant United States Attorney for the Central

4  District of California assigned to the prosecution of United States

5  v. Imaad Shah Zuberi, CR No. 19-642-VAP.  I make this declaration in

6  support of the government's sentencing position on the applicability

7  of a two-level sentencing guidelines enhancement for obstruction of

8  justice.

9  2.  In later filings with the court, I will submit some of the

10 evidence I merely summarize below, particularly evidence related to

11 the scope of defendant's Federal Election Campaign Act ("FECA")

12 violations and the frauds he perpetrated against his clients,

13 investors, and business associates.

14 The Government's Investigation

15 3.  I was assigned to handle the investigation of Imaad Shah

16 Zuberi ("defendant" or "Zuberi") on February 29, 2016.  At the time,

17 the Federal Bureau of Investigation was the sole criminal

18 investigatory agency assigned to the case.  On September 28, 2016, I

19 issued an invite letter to the Internal Revenue Service ("IRS")

20 requesting their participation in the investigation.  By early 2017,

21 the government had focused its investigation on defendant's

22 violation of FECA, Foreign Agent Registration Act ("FARA") offenses,

23 tax evasion, and fraud.

24 4.  On February 24, 2017, IRS Special Agents attempted to

25 interview defendant.  Shortly thereafter, defendant retained several

26 criminal defense attorneys to represent him.  The attorneys included

27 Jim Bowman of O'Melveny & Myers, LLP; Tom O'Brien and Ivy Wang of

28

1  Brown George Ross, LLP; and Evan Davis of Hochman, Salkin, Rettig,
2  Toscher & Perez, PC.

3      5.    In February 2017, the government issued subpoenas directed
4  to several companies controlled by defendant, including three that
5  bore the "Avenue Ventures" name: Avenue Ventures, LLC, Avenue
6  Capital Group, Inc., and Avenue Investment Services, Inc. (the
7  "Avenue Companies").

8      6.    From April 2017 through February 2019, at the request of
9  defendant ███████████████████████, the government refrained
10 from issuing third party subpoenas that might reveal the
11 investigation to certain percipient witnesses and to the public.

12     7.    On June 2, 2017, in partial response to the February 2017
13 subpoenas, the defense produced various emails issued from and/or to
14 the following accounts ending in avenueventure.com.  These emails
15 were issued/received as far back as 2010, as listed below:

| Account | Earliest Reference |
|---|---|
| imaad.zuberi@avenueventure.com | 7/6/10 |
| renee.wu@avenueventure.com | 11/9/10 |
| Karen.Hernandez@avenueventure.com | 11/9/10 |
| Wess.wijesinghe@avenueventure.com | 11/18/10 |
| willa.rao@avenueventure.com | 11/27/10 |
| Nancy.Johnson@avenueventure.com | 12/2/10 |
| Robert.Reed@avenueventure.com | 12/2/10 |
| Tahir.Hasan@avenueventure.com | 1/12/11 |
| Craig.Reed@avenueventure.com | 5/1/11 |
| James.Reed@avenueventure.com | 5/16/12 |
| mark.skarulis@avenueventure.com | 8/20/12 |
| jon.carpenter@avenueventure.com | 2/4/13 |
| Robert.Sweeney@avenueventure.com | 4/9/13 |
| ██████████@avenueventure.com | 8/23/13 |

24     8.    In November 2017, the government served additional
25 subpoenas upon the Avenue Companies seeking "[a]ll correspondence of
26 [the Avenue Companies] including but not limited to email
27 correspondence using the domain @avenueventure.com for the time
28 period of 2010 through present."

9.   On January 8, 2018, defense counsel Bowman requested that the government limit the scope of the November subpoenas stating that efforts to review all such correspondence would be burdensome, that certain documents were subject to attorney/client and marital privileges, and that certain items were personal in nature and not properly within the custody and control of the Avenue Companies.

10.   During the period January 9, 2018 through February 1, 2018, the government and defense counsel Bowman exchanged emails to discuss concerns raised by defense counsel Bowman's letter.   During these discussions, defense counsel Bowman made the following representations on behalf of his clients:

a.   Email correspondence using the domain avenueventure.com was retained on servers maintained by Go Daddy, Inc.

b.   In response to the February 2017 subpoenas, the defense collected emails from defendant's own avenueventure.com account (imaad.zuberi@avenueventure.com) and produced some of them to the government.  The defense did not produce 5,990 of these emails because they were not responsive to the February subpoenas. There were 6,278 additional imaad.zuberi@avenueventure.com emails still stored on the Go Daddy server that had not been collected.

c.   Other than defendant's avenueventure.com account, there were 14 avenueventure.com accounts stored on the Go Daddy servers as follows:

▓▓▓▓▓▓@avenueventure.com
info@avenueventure.com
job@avenueventure.com
john.sandweg@aveuventure.com
john.warren@avenueventure.com
jon.carpenter@avenueventure.com

3

```
                        █████████ @avenueventure.com
       mark.skarulis@avenueventure.com
       martin.vanvalkenburg@avenueventure.com
                        █████████ @avenueventure.com
       nina.wen@avenueventure.com
       renee.wu@avenueventure.com
                        █████████ @avenueventure.com
       willa.rao@avenueventure.com
```

d.    Defendant had the power to access these third party avenueventure.com email accounts in his capacity as administrator or by changing the passwords of the individuals.  Accessing these accounts as administrator would affect the metadata of these emails and would create an undue burden because thousands of emails would have to be saved one-by one.  Accessing these accounts by changing the passwords would alert the users that someone was accessing their account.

11.   On January 29, 2018, in response to defense counsel Bowman's request, the government agreed to delay production of emails currently stored on the Go Daddy server.  The government also limited the scope of production from defendant's own avenueventure.com account (previously collected from the server) by creating date limitations (emails generated between 2010 and 2016), withdrawing requests for emails involving defendant's spouse and attorneys, and permitting the defense to carve out emails that were entirely personal in nature.  I notified defense counsel Bowman that these limitations were temporary in nature and were contingent upon the defense retain all emails for possible future production.

12.   On March 28, 2018, the defense produced several thousand emails sent from, or received by, defendant's avenueventure.com account.  In a cover letter, Mr. Bowman stated that the production was limited to documents previously collected in response to the

4

February 2017 subpoenas. Based upon this representation, I believe
that the defense did not review or produce thousands of defendant's
own avenueventure.com documents stored on the GoDaddy server.
Moreover, by mutual agreement, production with respect to the other
avenueventure.com accounts were placed in hiatus.

13. On February 5, 2019, a newspaper article reported that it
was in possession of a subpoena issued by the U.S. Attorney's Office
for the Southern District of New York ("SDNY") seeking records in
connection with the 2017 Presidential Inaugural ("2017 PIC"). The
subpoena mentioned defendant by name. On February 6, 2019, in light
of these developments, the government determined that it would no
longer delay its own investigation as requested by defendant.

14. On February 7, 2019, I prepared multiple subpoenas for
witnesses with whom defendant had direct contact, including ▇▇▇▇
▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇. On February 13,
2019, I informed defendant's counsel that the government would
proceed with its investigation and indictment without further delay.
On February 16, 2019, at my request, the FBI attempted to serve the
▇▇▇▇▇ subpoena at an address in ▇▇▇▇▇ ▇▇▇▇ provided by ▇▇▇▇
in connection with his campaign contributions. The FBI informed me
that the address turned out to be the residence of ▇▇▇▇▇▇
▇▇▇▇.

15. On February 8, 2019, defense counsel Bowman informed the
government that his firm no longer represented defendant or the
Avenue Companies in connection with the government's investigation.
Defense counsel Bowman stated that inquiries should be directed to
defendant's new lead counsel, Mr. O'Brien. Defense counsel Bowman
stated that his firm returned electronic storage media previously

5

1  collected from defendant (as custodian for the Avenue Companies)

2  that were potentially responsive to the grand jury subpoenas, as

3  well as all images of that electronic storage media, to the custody

4  of defendant (rather than to Mr. O'Brien or other counsel).

5      16.  On February 21, 2019, the government informed defense

6  counsel O'Brien that it required production of the emails stored on

7  the Go Daddy server.  In response to a request by the defense, the

8  government limited the scope of the subpoenas to emails generated

9  from the inception of the accounts up until February 28, 2017.  The

10  government again directed that emails generated after February 28,

11  2017 should be retained and indicated that it would issue a more

12  specific subpoena for those emails at a later date.

13      17.  On August 15, 2019, Zuberi's counsel produced Go Daddy

14  emails in response to the subpoena.  The production consisted of 246

15  documents many of which appear to be personal, and hence non-

16  corporate, emails such as mass advertisements from various retail

17  stores.  The responsive production was largely devoid of emails for

18  the pertinent timeframe (the oldest email was dated August 12, 2016)

19  and irrelevant to the government's investigation.

20      18.  More significantly, in connection with that production,

21  defense counsel Wang stated that the following accounts, previously

22  represented by defense counsel Bowman as residing on the Go Daddy

23  server, "do not exist on the GoDaddy server:"

24          job@avenueventure.com

25          john.warren@avenueventure.com
        jon.carpenter@avenueventure.com

26          renee.wu@avenueventure.com

27  //

28  //

■■■■■

19. ■■■■ is a U.S. citizen who, according FEC records, made substantial contributions to political campaigns.

20. Bank records obtained by the government identify the following transactions between defendant and ■■■■ that appear most relevant to the government's investigation:

| Posted Date | Amount | Payor | Payee | Memo |
|---|---|---|---|---|
| 1/28/15 | $16,000 | ■■■■ | Zuberi | Clinton Event |
| 4/22/16 | $35,000 | ■■■■ | Zuberi | HVF |
| 8/1/16 | $50,000 | ■■■■ | Zuberi | RAD PAD |
| 11/17/16 | $50,000 | ■■■■ | Zuberi | Inauguration 2017 |
| 8/11/17 | $50,000 | Avenue Capital Group | ■■■■ | Investment payback |
| 3/1/19 | $50,000 | Avenue Ventures | ■■■■ | refund |

21. Attached as Exhibit 1 is a memorandum of interview conducted of ■■■■ ■■■■■■■■■■ ■■■■.[1] ■■■■ statements during

---

[1] ■■■■ was provided with a letter granting him use immunity within the Central District of California as well as court-ordered immunity from within the Southern District of New York prior to the interview.

The evidence reviewed by the government indicates that ■■■■ did not knowingly engage in FECA violations. ■■■■ stated that he agreed to route contributions through defendant, largely based upon defendant's claim that ■■■■ could obtain VIP tickets and better access to politicians. The checks issued by ■■■■ to Zuberi typically referenced the specific campaign committee to which the money was to be applied, which is inconsistent with trying to engage in a secret, conduit contribution. Typically, criminal schemes lack such clear demarcation in order to avoid a direct link between the contribution and its origin. Communications involving ■■■■ indicate that he wished to receive credit for such contributions rather than have them falsely attributed to Zuberi. When campaign committees informed ■■■■ that contributions could not be routed through Zuberi, ■■■■ (unsuccessfully) asked Zuberi to refund

the interview are inconsistent with respect to the purpose of the final two checks, those issued to ████, and therefore I describe the particulars of the above-referenced transactions so that the factual record is correct:

a. During his interview, ████ acknowledged that the $16,000 "Clinton Event" payment represented ████'s reimbursement of half of a FECA contribution made by Zuberi. Consistent with this representation, ████ produced an email he received from Renee Wu,[2] supposedly an employee of defendant, stating, "For HRC in event NYC, we paid $32,400 for Imaad + guest. therefore half of this is $16,200. Please mail check …"

_____

████'s payments and offered to reissue his contributions directly to the campaign.

The evidence compiled by the government also does not implicate the referenced political campaigns or inaugural committees in any illegal activity.

[2] Renee Wu appears to be a fictitious person created by defendant to act as his alter ego and perhaps also his spouse, Willa Rao. Mark Skarulis has ████ that Wu and several other people with avenueventure.com email addresses were fictitious individuals. At Zuberi's direction, Skarulis created some of these accounts and/or linked them to Zuberi's personal phone. Zuberi would lie to third parties saying that he and Skarulis had discussed matters with Renee Wu. In 2014 text message communications, Skarulis described how he was told by Zuberi to pick up his check from Renee Wu at CAI. Skarulis ████ that when he picked up the check, it was delivered by Rao.

On at least one occasion, it appears that Zuberi inadvertently signed an email message "Imaad" that was supposedly authored by Renee Wu. Zuberi's bank records reflect no payments of salary or expenses to any Renee Wu. Database searches for Wu come up with no results.

Both Rao and Wu are ethnically Chinese names. Rao's initials are the obverse of Wu's. Renee Wu often asks as an assistant to Zuberi scheduling trips, accommodations, and arranging for payments.

1    b.    ████████ acknowledged that his $35,000 "HVF" check to

2   defendant was a partial reimbursement of a FECA contribution made by

3   defendant to the Hillary Victory Fund.    ████ produced an email from

4   defendant stating that he had "paid for everyone" with regard to a

5   Hillary Clinton event in Los Angeles and that he would "get it from

6   you later."

7    c.    ████████ stated that the $50,000 check labelled "Rad

8   Pad" was for an investment solicited by defendant.    Defendant's bank

9   statements demonstrate that, rather than fund any investment for

10   ████, defendant diverted $10,000 of ████'s investment on August 1,

11   2016 by transferring it into a personal bank account in the name of

12   Zuberi and his spouse, diverted $20,000 on April 24, 2017 for the

13   payment of Zuberi's California state taxes, and never used any of

14   ████ s funds for the claimed investment.

15    d.    The $50,000 check labeled "inauguration 2017" never

16   actually funded a contribution to the 2017 PIC.    ████████ never

17   attended the inauguration.    Defendant agreed to return the

18   contribution to ████ in December 2017.    Defendant's bank records do

19   not show any correlation between the $50,000 received from ████ and

20   payments made to the 2017 PIC.

21    e.    ████████ stated that in 2017, defendant told him about

22   the government's criminal investigation during a meeting at a gas

23   station near Los Angeles International Airport ("LAX"), asked him to

turn off his cellphone or leave it in the car,[3] told ███ not to talk to government investigators,[4] indicated that he would retain an attorney for ███, and refunded his $50,000 check to the 2017 PIC. ███ subsequently lost the check and asked that defendant reissue it.

   f.   In an effort to determine the sequence of events, the government requested additional documentation from ███. ███ subsequently provided the government with WhatsApp chat messages (referenced below) in which defendant told ███, "I have check for you for $50,000" on April 16, 2017. The WhatsApp message reveal that the LAX gas station meeting occurred on May 4, 2017. ███ also produced an email defendant sent him the day prior to the meeting, stating, "I will be using 626.818.4820 number for tomorrow Thursday May 4 only. Please call this number if I don't pick up my regular number."

   g.   The government subsequently reviewed defendant's bank statements during this timeframe in an effort to locate the check ███ lost. Defendant's personal bank account during the April/May 2017 timeframe shows that check #1233 never posted to defendant's

_____

   [3] The memorandum of interview does not recite ███'s statement that Zuberi asked him to turn off or leave his cellphone but is based upon my personal recollection of the interview.

   [4] The record suggests that ███ never agreed to remain silent in return for money. ███ has been cooperative with the government's investigation and was entitled to a refund of his money.

1  account.  Check numbers that follow check #1233 indicate that check

2  #1233 was drafted on or before April 25, well before the May 4, 2017

3  meeting.[5]  Check numbers that precede check #1233 suggest that they

4  may have been issued on or prior to April 16, the same day defendant

5  told ██████, "I have check for you for $50,000," but possibly

6  sometime on or after April 21.[6]

7          h.    Due to an error in financial summaries prepared by

8  the government for use in its investigation, at the interview, the

9  government did not present ██████ with the replacement $50,000 check

10  issued by defendant's corporation, Avenue Capital Group, on July 25,

11

12

13

14  _____

15     [5]    Checks that follow the unposted check, #1233, reveal a
   normal sequence of dating, demonstrating that the unposted check was
16  prepared prior to the May 4 meeting:

17         Check #          Issued Date      Posted Date
           1234             April 25         May 5
18         1235             April 26         April 26
           1236             April 26         May 11
19

20     [6]    Checks that precede the unposted check, #1233, are more
   difficult to reconcile because some bear obvious indicia of
21  postdating.
           Checks 1228 and 1229 were for tax payments made payable to the
22  U.S. Treasury.  Dated April 17, they may have been postdated given
   that April 17 was the due date for filing.  Both checks cleared on
23  April 24.
           Check 1230 was for a down payment on preschool attendance.
24  Dated April 21, the check may have been postdated to the first date
   of attendance.  The check cleared on May 9.
25         Checks 1231 and 1232 were monthly rental payments issued and
   clearly postdated to the first of each month, May 1 and June 1,
26  respectively.  The checks cleared on those precise dates, May 1 and
   June 1.
27

28

2017. This check was deposited into ▮▮▮▮'s bank account and posted on August 11, 2017.

      i.    The government did present ▮▮▮▮ with the $50,000 check handed by defendant to ▮▮▮▮ on February 25, 2019. At the interview, ▮▮▮▮ stated that he believed this check was intended to refund his donation to the 2017 PIC. Given that ▮▮▮▮ was not presented with the July 2017 $50,000 check that posted to his account in August 2017, I believe ▮▮▮▮ was mistaken as to the purpose of the 2019 check.

      j.    The WhatsApp and text messages make clear that ▮▮▮▮ received three $50,000 refund checks from defendant: one in May 2017 to refund his 2017 PIC donation (which ▮▮▮▮ lost), one in July 2017 to refund the 2017 PIC donation, and one in February 2019 to refund his Rad Pad investment. Indeed, the fact that the February 2019 check pertained to the Rad Pad investment is confirmed by ▮▮▮▮'s frequent requests for a certificate verifying his investment leading up to February 2019.

    22.    Attached as Exhibit 2 are WhatsApp chat messages produced by ▮▮▮▮ for the period November 6, 2016 through February 25, 2017.

    23.    Attached as Exhibit 3 are excerpts of WhatsApp chat messages produced by ▮▮▮▮ for the period March 26, 2017 through December 16, 2017.

    24.    Attached as Exhibit 4 are WhatsApp chat messages produced by ▮▮▮▮ for the period April 11, 2017 through May 7, 2017.

25. Attached as Exhibit 5 are text messages produced by ████ for the period February 12, 2019 through April 3, 2019.

26. Based upon recent filings, the court is aware of a parallel investigation conducted by the U.S. Attorney's Office for the Southern District of New York ("SDNY"). The government has spoken to representatives of SDNY to gain an understanding of their prosecutorial interest in defendant. At the time Zuberi issued the February 2019 $50,000 check, SDNY was engaged in an investigation of Zuberi's contributions to the 2017 PIC. Evidence demonstrating defendant's obstruction of the government's investigation does not foreclose the possibility that defendant also sought to obstruct the SDNY criminal investigation. Indeed, in a telephone conversation leading up to his meeting with defendant on February 25, 2019, ████ mentioned the February 5, 2019 news article about a subpoena issued by SDNY regarding the 2017 PIC. At the February 25, 2019 meeting, defendant and ████ discussed the news article and Guzel told defendant he had written "Inauguration 2017" on his November 2016 check. Defendant then backdated the check to February 1, 2019, a date prior to the publication of the news article.

████

27. ████ is a U.S. citizen who resides in Kuwait. ████ ████████████████████████████████████████████████ According to ████, he routed funds to defendant from a foreign corporation in Kuwait for the explicit purpose of making contributions to U.S. political campaigns and the 2013 Presidential

13

Inaugural Committee ("2013 PIC"). From May 2012 through February 2016, ███ wired $1,533,400 to defendant's bank account for this purpose.

28. Defendant's bank records reveal that, contrary to representations he made to ███, defendant donated only $480,908 to the campaigns. Defendant converted the remainder for his own personal use without ███'s knowledge.

29. According to ███, he expressed frustration with defendant's failure to deliver on promises that business opportunities would develop as a result of ███'s contributions. On numerous occasions, ███ asked defendant to refund at least a portion of the money.

30. ███'s bank records reveal that, on July 3, 2018, well after defendant became aware of the government's investigation, defendant wired $100,000 into ███'s bank account. According to ███, defendant thereafter promised to send ███ additional funds after defendant liquidated various real estate holdings.

31. Attached as Exhibit 6 ██████████ ██████████ ███ pertaining to defendant's attempts to obstruct the government's investigation.

32. Attached as Exhibit 7 are text messages produced by ███ with respect to defendant's obstruction.

//

//

//

33. ████████ ████████ is a Kuwaiti citizen. Defendant's bank records reveal that on April 25, 2012, ████████ wired $40,000 to a bank account in defendant's name at Barclays Bank in Dubai. Emails produced by ████████ reveal that the purpose of ████████ 's wire transfer was to fund a political campaign contribution to the Obama Victory Fund.

34. On October 3, 2016, ████████ wired $250,000 to the bank account of Avenue Capital Group, one of defendant's companies. Emails produced by ████████ reveal that the purpose of the ████████ transfer was to fund a campaign contribution to the Hillary Victory Fund in connection with a Clinton birthday celebration on October 24, 2016.

35. Subsequent emails reveal that, by October 17, 2016, ████████ 's plans changed and he requested that defendant refund the money. Defendant falsely replied that the money had been sent to the campaign and that he would request a refund on ████████ s account. In fact, defendant's bank records reveal that he made no contributions to either the Hillary Victory Fund or the Democratic National Committee during the period October 3 through October 17. Nor did defendant return the money. Instead, following the election of President Trump, defendant suggested that ████████ apply the funds to the 2017 PIC. On December 7, 2016, ████████ agreed. Bank records reveal nothing to confirm that defendant ever applied these funds to the 2017 PIC.

U.S. Cares Investors

36.    The government has compiled evidence pertaining to defendant's U.S. Cares investment scheme primarily through records obtained from the Office of Foreign Assets Control ("OFAC"), bank records, records produced by corporations controlled by defendant, and records produced by Robert Sweeney ("Sweeney"), an individual who worked with defendant as an independent contractor.

37.    From September 2013 through March 2014, ███████ ███████ ███████, Anwar Bukhamseen ("Bukhamseen"), Arun Rangachari ("Rangachari"), and ███████ ███████ individually and/or through their companies, invested approximately $7 million in U.S. Cares for the ostensible purpose of applying for a license from OFAC permitting U.S. Cares to export food, medicine, and medical supplies from the U.S. to Iran.  Although ███████'s investments are somewhat difficult to reconstruct given the large amount of money he transferred to defendant for consulting services around the same time, the government believes to a high degree of certainty that the U.S. Cares investments can be summarized as follows:

| Transfer Date | Transfer Amt | Payor | Zuberi Account |
|---|---|---|---|
| 9/28/13 | $89,926 | ███████ | IZ Barclays Dubai |
| 10/5/13 | $499,592 | ███████ | IZ Barclays Dubai |
| 11/20/13 | $1,222,988 | ███████ | IZ/WRZ BofA |
| 2/21/14 | $500,000 | ███████ | IZ/WRZ BofA |
| 3/11/14 | $832,145 | ███████ | IZ/WRZ BofA |
| 12/10/2013 | $500,000 | Rangachari | IZ/WR BofA US |
| 12/12/2013 | $490,070 | Rangachari | IZ Emirates Dubai |
| 12/22/2013 | $245,031 | Rangachari | IZ Emirates Dubai |
| 12/24/2013 | $500,000 | Rangachari | IZ/WR BofA US |
| 1/27/2014 | $2,000,000 | Bukhamseen | IZ Emirates Dubai |

16

38.   In a series of December 2013 emails, defendant and Renee Wu falsely informed Rangachari that investment spots were closing because of the high degree of interest from other investors. Defendant (Wu) reiterated that fiction by falsely claiming he was having difficulty reconciling amounts received from Rangachari because of the high number of deposits received from other investors.   In fact, defendant's bank accounts show that he received no other investment funds in December 2013.   Moreover, emails reveal that defendant continued to solicit and receive money from other investors well after Rangachari's investment.

39.   According to the contract, or operating agreement, on file with OFAC, investor funds would be placed into a U.S. Cares capital account.   Bank records reveal no such transfers.   Instead, funds were transferred into brokerage accounts in the name of defendant and his spouse or were used to make personal expenditures.

40.   In an email, defendant falsely assured Rangachari that he would place investor funds into a U.S. Cares capital account, stating, "we need repatriate the $750,000 to USCares here."

41.   Defendant's bank records reveal that he did not transfer any of the funds received from U.S. Cares investors into a U.S. Cares capital account as required by the operating agreement. Instead, the bank records reveal a pattern of diversion, including the following:

   a.   Defendant received $1,222,988 from ███████ on November 20, 2013, $500,000 from Rangachari on December 10, 2013, and $500,000 from Rangachari's business on December 24, 2013.   Prior to the end of December 2013, defendant (i) transferred almost the entirety of these funds into the personal brokerage accounts of

defendant and his spouse, (ii) paid down personal credit card debt
(that primarily consisted of campaign contributions in defendant's
name or the names of various third parties, travel expenses, and
dining expenses), and (iii) paid for remodeling expenses for an
investment property defendant purchased.

    b.   Defendant used almost the entirely of ▮▮▮▮'s
$500,000 wire transfer on February 21, 2014 to (i) fund transfers
into defendant's personal brokerage accounts, and (ii) payoff
personal credit card debt (primarily consisting of campaign
contributions and travel).

    c.   Defendant used almost the entirety of ▮▮▮▮'s
$832,145 wire transfer on March 11, 2014 to (i) fund transfers into
defendant's personal brokerage accounts, (ii) payoff personal credit
card debt (primarily consisting of campaign contributions and
travel), (iii) pay real property remodeling expenses, and (iv) pay
personal real property tax payments.

    42.  Other than two $90,000 checks made payable to the Dentons
law firm (which, based upon emails, appear to be connection with
submitting an application to OFAC), bank records reveal that
defendant took no steps to apply investor funds to the project.

    43.  According to OFAC records, on April 29, 2014, OFAC
designated ▮▮▮▮ as a Specially Designated National ("SDN") thereby
prohibiting him from engaging in the U.S. Cares venture. ▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮.  In January 2016, sanctions against Iran were lifted.  In
February 2016, OFAC informed defendant that the proposed
transactions "appear to be generally authorized."

44. Attached as Exhibit 8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ pertaining to the U.S. Cares investment.

45. Attached as Exhibit 9 are documents ▮▮▮▮▮▮▮▮▮▮▮ that relate to Rangachari's efforts to secure the return of his investment.

46. Attached as Exhibit 10 are documents produced by defendant's corporations that relate to a lawsuit threatened by attorneys retained by Bukhamseen in an effort to secure the return of Bukhamseen's investment.

47. Defendant's bank records reveal that, from June 5 through December 26, 2017, as part of a settlement agreement, well after he became aware of the government's investigation, defendant issued a series of wire transfers to Bukhamseen and his company that totaled $1,000,000. On May 17, 2018, defendant wired $1,000,000 to Rangachari. That same day, defendant wired $1,000,000 to ▮▮▮▮▮▮

48. Attached as exhibits 11 and 12 are statements issued by Rangachari and Bukhamseen, presented by the defense to the government. Both statement serve to exonerate defendant of wrongdoing.

49. Attached as exhibits 13 and 14 are statements issued by ▮▮▮▮▮▮ presented by the defense to the government. Both statements characterize ▮▮▮▮▮'s monetary transfers to Zuberi as "convertible loans" and defendant used this assertion to argue that much of the unreported income identified by the IRS actually constituted non-taxable events.

50. ▮▮▮▮▮'s convertible loan argument is contradicted by contracts that reference "consulting fees," email discussions that describe "consulting fees," invoices issued by Zuberi for

19

1   "consulting fees," and wire transfer instructions that reference

2   those invoices, all of which are consistent with defendant receiving

3   income in return for consulting services. Moreover, defendant used

4   the funds received from █████ for personal expenses and investments

5   in his own name rather than investments in which ████ had some

6   ownership interest.

7        Anonymous References in the Information

8       51. Attached as exhibit 15 is a legend that identifies

9   persons, companies, and political campaigns described in the

10   information and in the concurrently filed sentencing memorandum with

11   anonymous identifiers.

12       I declare under penalty of perjury under the laws of the United

13   States of America that the foregoing is true and correct and that

14   this declaration is executed at Los Angeles, California, on December

15   16, 2019.

16

17                    Daniel J. O'Brien

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

1    I, Sandy Ear, declare:

2    That I am a citizen of the United States and a resident of or

3  employed in Los Angeles County, California; that my business address

4  is the Office of United States Attorney, 312 North Spring Street, Los

5  Angeles, California 90012; that I am over the age of 18; and that I am

6  not a party to the above-titled action;

7    That I am employed by the United States Attorney for the Central

8  District of California, who is a member of the Bar of the United

9  States District Court for the Central District of California, at whose

10  direction the service by mail described in this Certificate was made;

11  that on December 16, 2019, I deposited in the United States mail at

12  the United States Courthouse in the above-titled action, in an

13  envelope bearing the requisite postage, a copy of: service was:

14  **Declaration of AUSA Daniel J. O'Brien in Support of Sentencing**

15  **Position re Obstruction of Justice; Exhibits (Under Seal)**

16  ☐ Placed in a closed envelope      ☒ Placed in a sealed envelope
    for collection and inter-            for collection and mailing via
17   office delivery, addressed as       United States mail, addressed
     follows:                            as follows:
18

19  ☐ By hand delivery, addressed as  ☐ By facsimile, as follows:
      follows:

20  ☐ By Email, as follows:          ☐ By Federal Express, as
                                        follows:
21

22  Thomas Peter O'Brien              Evan J Davis
    Browne George Ross LLP            Hochman Salkin Toscher Perez PC
23  801 S. Figueroa St., Suite 2000   9150 Wilshire Blvd., Suite 300
    Los Angeles, CA 90017             Beverly Hills, CA 90012-3414
24

25  Ivy A Wang
    Browne George Ross LLP
26  801 S. Figueroa St., Suite 2000
    Los Angeles, CA 90017
27

28

at their last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on December 16, 2019 at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

/s/ Sandy Ear

SANDY EAR
Legal Assistant

2