EXHIBIT 14

## STATEMENT OF ▮

1. This statement is based on my best recollection as of April 30, 2019.

2. This supplements my earlier statement, dated December 1, 2017, which is attached hereto.

3. In 2009 and 2010, while I was the head of ▮ ), the global financial crisis led to a decline in the value of my and ▮'s investments in real estate in projects in Jordan, Libya, Tunisia, and elsewhere in the Middle East and North Africa. Just as these investments were stabilizing, the Arab Spring affected many of the countries in which I and ▮ had invested.

4. In approximately late 2010 or 2011, I stepped away from day-to-day management of ▮ and became its Executive Chairman. In 2012, I founded ▮, through which I managed my personal investments in an office located in the same building in which ▮ was located.

5. To protect ▮'s investments and my own, I turned to a variety of sources including Imaad Zuberi. Mr. Zuberi had relationships with businessmen and government officials throughout the region, as well as in the United States. Among other things, I wanted Mr. Zuberi to identify deals in the United States that would be attractive to investors and potential investors in the Gulf Coast Region.

6. Mr. Zuberi had business dealings with me in two respects: private investing of my own assets, including through my company ▮; and investing on behalf of entities on whose behalf I was acting, such as ▮. I was less interested in paperwork for my own investments than on behalf of ▮, and when I left Bahrain at the end of 2013, I lost access to most of the bookkeepers and other administrative employees who kept track of business records. During 2015, ▮ ceased operations.

7. As explained in my earlier statement, throughout the time that I have dealt with Mr. Zuberi, I never felt the need for formal contracts, invoices, progress reports, or other records of our deals or payments. He and I were in frequent contact, I would

accompany him on work trips, he would email or call me about potential investments, and I trusted (and still trust) him to handle my money and ▮'s money in an honest fashion. However, banks frequently require paperwork to permit fund transfers, and particularly fund transfers in large amounts, to infrequent recipients, and to other countries. Further, ▮ had stricter recordkeeping expectations than I set for myself. Additionally, I and ▮ would attempt to determine at the outset what a project should cost and how much to invest, which we would do through both contracts and invoices. As a result, Mr. Zuberi and I would generally create contracts and sometimes would create invoices to reflect the investment that ▮ and I had made in whatever project or projects that Mr. Zuberi was working on at the time. Much of his work was directed to facilitate my and ▮ investors' exit from earlier investments.

8. As also noted in the earlier statement, projects would change and we would generally not alter contracts or invoices to reflect that change. Neither Mr. Zuberi nor I particularly cared about the paperwork, as the paperwork was for others' consumption, not ours. In fact, many of the records in my private office were mis-filed and some of the Zuberi documents were inadvertently destroyed because they were kept in the wrong place.

9. I was aware at the time that I was making payments to Mr. Zuberi on my own behalf that Mr. Zuberi was turning around and investing in real property and other investments, and I assumed at the time that I had an interest in the investment property. I met with persons involved in some of these investments, such as representatives of Fund Athena, Inc. For other investments, I simply discussed them with Mr. Zuberi.

10. I did not need an accounting for the investments, as I trusted Mr. Zuberi to invest my funds on roughly an at-cost basis. Avoiding having my name associated with any particular investments or real property in the United States was in my interest, as I didn't need to travel to US to deal with investments that were so minor in the context of my overall portfolio. For real estate investments in particular, I did not want to have to travel to the United States to sign mortgage or real property transfer documents.

11. Regarding any income that was generated by real property in which I had an interest, I instructed Mr. Zuberi not to distribute any income to me, and instead let any income

remain in the investment to continue to grow. Further, as noted in detail in my earlier statement, I expected Mr. Zuberi to make purchases of automobiles, watches and other items on my behalf including airplane tickets. I knew that such purchases would offset any income that otherwise would have been paid to me from the investments.

12. Every foreign transaction in or out of my bank would cause me to have to explain to the bank the purpose of the amount, so it was easier for me to avoid receiving any payments where possible.

13. I understand and was aware at the time that Mr. Zuberi did not keep investment funds segregated in a particular bank account and were instead comingled with his personal funds and funds of other investors. Given the fact that he would owe me 75% of invested funds back if an investment were unsuccessful, it is difficult to see how he could have segregated all of my funds. Because I trusted Mr. Zuberi to invest the value of my funds and to guarantee at least 75% of any investment, I would not have cared and do not care now, that Mr. Zuberi made these expenditures from the bank account.

14. Mr. Zuberi has informed me during our meeting that the IRS has questioned whether certain payments to him were taxable income, instead of investments by me. I am not giving an opinion about whether something was taxable under U.S. tax laws but Mr. Zuberi asked me to explain the background concerning certain invoices and my payments to him in general.

15. Regarding the payments in general, I recognize that contracts and invoices state that Mr. Zuberi is receiving money in exchange for his work on a particular project or projects. Although very few of the contracts, invoices and payments reflect this fact, most of our business dealings had an implicit or unwritten "success fee" embedded in the deal. That allowed me, on the one hand, to require Mr. Zuberi to share in the risk by ensuring I would never lose more than 25% of my payments in any project. If the project failed then Mr. Zuberi would be required to take 75% of my payments and convert them into something valuable, such as an interest in Mr. Zuberi's real property, for repayment to me at the appropriate time. In my earlier statement, I described this as being in the nature of a "convertible loan," which is common in our part of the world and I have used with persons other than Mr. Zuberi. The additional terms (duration, which assets I would own, etc.) of the convertible loans were not documented, but we

discussed converting the loans as it became apparent that projects were unsuccessful. On the other hand, the success fee allowed Mr. Zuberi, who generally was not putting money into the projects, to receive up to tens of millions of dollars if the projects became successful.

16. This was the arrangement from the beginning. After a few years of projects not coming to fruition, in late 2015 and early 2016 we started discussing how to allocate my investments in the real property and other investments that he had made with my funds. We reached the agreement mentioned in my earlier statement and are now finalizing an agreement to identify my interest in holdings held by Mr. Zuberi.

17. In 2015 and 2016, both Mr. Zuberi and I were dealing with difficult personal situations. Mr. Zuberi was dealing with his mother's sickness and eventual death, and I had a personal health issue that culminated in an organ transplant in May 2016, involving prolonged medical treatment before and after in Geneva.

18. The result of our unwritten 75/25 agreement is that, even if the invoices and contracts state that Mr. Zuberi would earn and be able to keep 100 percent of the money received, in fact under our oral agreement he would only be allowed to keep 100 percent of the money if the related project were successful.

19. Regarding particular invoices and payments, I recall the following:

   a. The September 7, 2012 $45,000 wire transfer was associated with August 28, 2012 invoice from Avenue Ventures. This related to my personal investment in a Libya project to create an "Auto City" and involved Mr. Zuberi flying to Germany and Libya and approaching BMW to gauge whether BMW was interested in joining the project. I understand Mr. Zuberi paid a former BMW executive, Hans Halbach, to assist as well as expended funds on travel. Although this invoice specifically mentions Libya, I also had other projects with Mr. Zuberi at the same time, so it is difficult to narrow down any payment as being for just one project. In this and other circumstances, we may have wrapped multiple projects into a single bill without having identified all the projects involved.

4

b.  The October 18, 2012 $59,988 wire transfer was associated with an August 9, 2012 invoice for Mr. Zuberi's work on the Tunisia Financial Harbor (TFH) project. Mr. Zuberi intended to negotiate with an insurance company to join the project, which had faltered as a result of the financial crisis. The insurance company pulled out of negotiations and I asked Mr. Zuberi to take 25% of this to cover his expenses and use the remaining 75% to capitalize future (unidentified) investments.

c.  Another October 18, 2012 $59,988 wire transfer was associated with a different August 9, 2012 invoice for "Jordan Gate Amman," which was another one of my projects. We hired Mr. Zuberi to attempt to attract American companies to the project, which we had had difficult doing to that point. I offered Mr. Zuberi a 25-30% success rate payment. Mr. Zuberi worked with American franchises with whom he had relationships but was not successful in attracting them to the project. As with the other payments, I agreed to let Mr. Zuberi keep 25% of these funds and to have 75% applied to other investments.

d.  Yet another October 18, 2012 payment, this for $55,895, was associated with a Royal Ranches Marrakech (Morocco) real estate project, also known as Equestrian City. Mr. Zuberi flew to various locations to meet with hotel executives and others. Once I left my company, Mr. Zuberi and I stopped working on the project and included these payments in the 75/25 allocation.

e.  A final October 18, 2012 payment, for $50,000, is not associated with a particular invoice. I think it related to my donation to the Islamic Center of the San Gabriel Valley. A U.S. doctor with whom we hoped to do business had asked that I contribute toward building a parking lot for the mosque. I agreed to contribute $500,000, although I think I contributed less and Mr. Zuberi made up the difference with his own contribution.

f.  The wire of $149,984 on January 14, 2013 followed a December 24, 2012 invoice from Avenue Ventures for Royal Ranches Tangier/Morocco (known as Royal Resort Cap Malabata), which I think I made to Mr. Zuberi even though the account from which the funds were wired is not identified on the available bank documents. This was a payment to Mr. Zuberi for him to use to obtain

developers in the project but was not successful and therefore, was subject to our 75/25 deal.

g. A January 19, 2013 $250,000 wire to Mr. Zuberi likely was from me and I believe it related to the Al-Areen project.

h. A $200,000 wire on January 22, 2013 and $279,985 wire on February 6, 2013 appear to relate to invoices on January 10, 2013 and January 29, 2013 regard Royal Ranches. These were for work that I expected Mr. Zuberi to do or if he did not, to use the funds to invest on my behalf. In 2016, he and I agreed to treat $500,000 as an investment and $379,000 as revenue from these two payments as well as the $250,000 payment on January 19, 2013.

i. March 6, 2013 wire of $1,196,598 followed an invoice to ▇ for seven different sub-charges. The first was for $400,000 paid to General Wesley Clark by Mr. Zuberi, for which I was reimbursing him. There is also reimbursement for $350,000 paid to Islamic Center of the San Gabriel Valley, which was part of my $500,000 pledged donation.

j. A $1,216,394 wire on April 17, 2013 is not facially related to a particular invoice or contract but I believe it was related to the Al-Areen project. Mr. Zuberi and I signed a contract for $500,000 for Al-Areen so this payment could not have been entirely for Al-Areen. I am not sure exactly what makes up the balance, but I know that Mr. Zuberi brought both doctors and General Wesley Clark to Al-Areen in relation to developing a healthcare center and to publicize investment, respectively.

k. On June 3, 2013, Mr. Zuberi issued an invoice to me (although titled for both ▇▇▇, who were beneficiaries of the work), for $232,389 for a variety of work and to fund pre-operating expenses for a Syrian project that was meant to be public/private partnership fund to rebuild Syria with European and Gulf banks.

6

l. On October 2, 2013, I wired $277,858.53 to Mr. Zuberi in response to two invoices, one for $250,000 regarding a "2013 contract" and the other for $27,900.81 for expenses relating to General Michael Barbero. In total, we paid General Barbero more than $200,000.

m. On November 20, 2013, I transferred $1,222,988 to Mr. Zuberi. I don't recall what that transaction that related to.

n. I am aware of at least three invoices in 2015 and 2016 prepared by Mr. Zuberi that I never paid.

o. Wires of $500,000 on February 21, 2014 and $832,145 on March 11, 2014 were my investment in AmericaCares LLC (later known as USCares). In addition to these funds, I paid another investor, ▓▓▓▓, directly to buy out its position. I believe the total investment in USCares was approximately $1.8 to $1.9 million. I am aware that Mr. Zuberi used some of the invested funds to pay legal bills for USCares but the bulk of the money was comingled with other funds and used for various purposes including real estate purchases and other investments as described in further detail below.

p. The wire of $1,00,000 on August 4, 2015 was in response to a July 1, 2015 invoice showing $500,000 for Al-Areen project and $500,000 for Paris Chateau China investors project. I understood at the time that Mr. Zuberi would be using some or all of this money to purchase real estate in the United States. The expectation at the time was that he may eventually earn the money but if not, then I would receive an interest in his investments, such as real property purchased soon after I sent the $1,000,000. I believe he had already been paid for Al-Areen and was focused on caring for his dying mother in 2016 instead of the Paris Chateau sale so this invoice is an example of our using whatever contract was available to ascribe a payment to it, for others who cared about having paperwork. Mr. Zuberi hadn't earned anything related to the Paris Chateau and in fact instead of a flat fee he will earn a commission if he brings a buyer or equity partner to any consummated deal.

7

q. The wire of $999,980 on October 26, 2015 from ▓▓▓▓ was in response to an October 26, 2015 invoice stating 2015 ADIH contract due. The intention at the time was for Zuberi to use the money to obtain "deal flow" for ▓▓▓, but as a result of health issues of both myself and Mr. Zuberi's mother (who Mr. Zuberi was taking care of), almost nothing came of this contract. Mr. Zuberi and I later agreed to treat 25% as earned by him and 75% as held for investment, consistent with our practice.

20. Finally, a question apparently has been raised whether I was aware of and if not, whether I would have had concerns with, movements of money and payments made by Mr. Zuberi after having received money from me. The money would either have been an outright investment or a payment for services with the same "convertible loan" concept attached to it.

21. As noted above, I would not have cared what Mr. Zuberi did with the money I wired to him that I considered an investment as I believed and still believe that he always had sufficient assets, net worth and access to funds, to cover any amounts that I was investing. Obviously, a portion of these wires were his to keep as discussed above, even if the projects to which they related ultimately did not succeed.

22. However, I was aware of at least some of his actions in the wake of his having received funds from me. In particular, I was aware that, soon after receiving funds from me, he made real estate purchases. Mr. Zuberi would email me or otherwise show me information about properties that he was buying in part with my funds; I even visited some properties during my visits to Los Angeles. He also made investments on behalf of both of us in FundAthena, among other investments.

23. In preparation to sign this statement, I have been told the following additional information about what payments were made following Mr. Zuberi's receipt of funds from me. As noted above, I understand the funds were not segregated and were held with personal funds of Mr. Zuberi and funds from other investors. This obviously means that he made some expenditures on his own behalf, including personal expenditures as well as business expenditures for projects not related to me in addition to expenditures on behalf of the projects described above. I understand that examples of significant expenditures include:

8

a. paying tens of thousands of dollars at a time to pay his business credit card bill, which I understand would have included my personal expenditures as well as expenditures related to other business deals but also included business expenditures on my projects and purchases on my behalf as described in my original statement;

b. rental real estate purchases in the United States, many of which I discussed with Mr. Zuberi before he made them;

c. expenses related to rental real estate, such as real property taxes;

d. payments to lawyers such as Basel Korkor and Dentons related to our projects including Sri Lanka;

e. payments to consultants on our projects and perhaps projects related or unrelated to me, including Mark Skarulis, Mike Gilmore, John Kyte, Adia Erin Smith, Eric Miller, Robert Sweeney, Karen Hernandez, Eugene Kang and General Wesley Clark;

f. Mr. Zuberi's personal political contributions totaling hundreds of thousands of dollars, which had nothing to do with me and which at the time I told him were a waste of his money (I never made any political contributions in the United States or asked him to make contributions on my behalf);

g. the contributions to the mosque described above;

h. transfers to his investment accounts for an extended duration, which I understand initially was to obtain a higher interest rate;

i. non-credit card purchases for me, including automobiles (Tesla cars, Mercedes, BMW), as described in my original statement; and

    j. Mr. Zuberi's personal charitable contributions, such as to the Smithsonian Institution, which were unknown to me at the time and with which I was not involved.

24. Although he did not tell me about these expenditures at the time, having heard about them today does not change my opinion that, given his obligation to repay me or give me equity in his various investments, I would not have cared about his having used the funds in these ways.

25. As noted above, attached hereto is my original statement, including the two attachments to the earlier statement.

26. I declare the foregoing is true and correct, to the best of my recollection. Signed in Geneva, Switzerland, on ___Scott___ April___, 2019.

[signature redacted]