1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**              )
                                               )
6                    **Plaintiff,**            )
                                               )
7      **vs.**                                 )   **Case Nos. CR 19-642 VAP**
                                               )              **CR 20-155 VAP**
8   **IMAAD SHAH ZUBERI,**                     )
                                               )
9                    **Defendant.**            )
    _____)

10

11      **REPORTER'S TRANSCRIPT OF VIDEO TELECONFERENCE PROCEEDINGS**
                         **MOTION HEARING**
12                     **MONDAY, MAY 3, 2021**
                           **9:01 A.M.**
13                  **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22   _____

23      **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-2305


                    **UNITED STATES DISTRICT COURT**

1               **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4         TRACY L. WILKISON
          Acting United States Attorney
5         BY:  DANIEL J. O'BRIEN
          BY:  ELISA FERNANDEZ
6         BY:  JUDITH A. HEINZ
          BY:  MACK JENKINS
7              Assistant United States Attorneys
          United States Courthouse
8         312 North Spring Street
          Los Angeles, California  90012
9
          U.S. DEPARTMENT OF JUSTICE
10        NATIONAL SECURITY DIVISION
          BY:  EVAN N. TURGEON
11             Assistant United States Attorney
          950 Pennsylvania Avenue NW, Suite 7700
12        Washington, DC  20530

13

14    **FOR THE DEFENDANT:**

15        KUTAK & ROCK, LLP
          BY:  DAVID A. WARRINGTON
16             Attorney at Law
          901 East Byrd Street, Suite 1000
17        Richmond, Virginia  23219

18        STEPTOE & JOHNSON, LLP
          BY:  ASHWIN J. RAM
19             Attorney at Law
          633 West Fifth Street, Suite 1900
20        Los Angeles, California  90071

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                    MONDAY, MAY 3, 2021; 9:01 A.M.

 2                      LOS ANGELES, CALIFORNIA

 3                              -oOo-

 4             THE COURTROOM DEPUTY:  This United States District

 5   Court is now in session, the Honorable Virginia A. Phillips,

 6   United States District Judge presiding.

 7             Calling Item No. 1, LA CR 19-642 VAP and

 8   LA CR 20-155 VAP, United States of America versus Imaad Shah

 9   Zuberi.

10             Counsel, please state your appearances.

11             MR. RAM:  Good morning, Your Honor.  Ashwin Ram on

12   behalf of defendant Imaad Zuberi who is present by virtue of

13   the VTC.  And I'm joined by co-counsel David Warrington.

14             MR. WARRINGTON:  Good morning, Your Honor.

15             THE COURT:  Thank you.  Good morning.

16             MS. FERNANDEZ:  Good morning, Your Honor.  This is

17   Assistant United States Attorney Elisa Fernandez.  And with me

18   at VTC is AUSA Judith Heinz.  We're actually waiting for AUSA

19   Dan O'Brien.  And DOJ Attorney Evan Turgeon as well as possibly

20   AUSA Mack Jenkins haven't been able to be admitted.  I know I

21   got kicked off twice.

22             THE COURTROOM DEPUTY:  Sorry about that.

23             So I just admitted -- I believe Mr. Jenkins and

24   Mr. O'Brien -- and, Counsel, you mentioned there was one more

25   individual?
```

1              MS. FERNANDEZ:  Evan Turgeon from DOJ.

2              THE COURTROOM DEPUTY:  Mr. Turgeon has been

3    admitted.  So sorry about that.

4              THE COURT:  All right.  Mr. Zuberi.

5              THE DEFENDANT:  Yes.

6              THE COURT:  We cannot see you on the screen.  Can

7    you hear me?

8              THE DEFENDANT:  Yes, I can hear you.  I have it on,

9    Your Honor, but I don't know why this screen is not working,

10   the camera.  I have it on.

11             THE COURT:  All right.  So you submitted a signed

12   waiver --

13             THE DEFENDANT:  Yes.

14             THE COURT:  -- of your presence and you're willing

15   to have this matter go forward by videoconference.

16             THE DEFENDANT:  Correct.

17             THE COURT:  All right.  And now you are on screen.

18             All right.  This matter is on the calendar on the

19   defense motion to extend the time for self-surrender by

20   90 days.  The defendant is scheduled or has been ordered to

21   self-surrender by May 25th.

22             Has an institution been designated for Mr. Zuberi?

23   Mr. Ram?

24             MR. RAM:  Yes.  We learned from the Government's

25   filing that USP Leavenworth has been designated, Your Honor, in

1    Kansas.

2              THE COURT:  That's right.  All right.  Thank you.

3              All right.  There's much, especially in the reply,

4    that I have not considered, which is -- it is not relevant or

5    germane to this motion.  But the motion is based on a couple of

6    issues.  One is Mr. Zuberi's health condition and his alleged

7    need to continue consulting with his doctors.

8              At first -- well, the motion led me to believe that

9    he had -- was saying that he wasn't going to get vaccinated, he

10   hadn't decided whether to get vaccinated.  In the reply, that

11   has shifted somewhat to deciding which vaccinations and

12   opinions that have been submitted to the Court with respect to

13   his medical condition.

14             But in terms of the fact that he is a diabetic, for

15   example -- diabetics were urged to get the vaccine early and

16   had priority to get the vaccine.  So Mr. Zuberi has been able

17   to be vaccinated in terms of availability for many months, and

18   so he could have consulted with his physicians about that.

19   Also, in terms of the arguments being made about the variance,

20   that's just one more reason to get vaccinated early.

21             So I'm not entirely persuaded by the arguments

22   regarding the COVID vaccination.

23             The other arguments advanced to extend the dates are

24   the need for him to be available to consult with his counsel as

25   they prepare a motion for release pending appeal.

1          You know, Mr. Zuberi chose to change counsel.  His

2   previous counsel -- at least some of them had security

3   clearances.  So I'm not really very persuaded that he needs to

4   be physically present with them to consult; although, it's

5   definitely more of a challenge to do so if he is in custody.

6          And the other argument that's advanced, which is

7   similar to the argument about the vaccination, is the

8   prevalence of COVID-19 infected inmates.  But I checked the

9   most recent statistics available on Friday.  As to MDC L.A. as

10  of Friday, one inmate and zero staff are infected and that only

11  one inmate has died from COVID-19.  129 staff members and

12  225 inmates as of Friday had received both doses of the

13  COVID-19 vaccine.

14         So, I mean, to the extent that he was at MDC L.A.

15  before he transferred to Leavenworth, unless he's planning to

16  report directly, I'm not very persuaded by that argument

17  either.

18         What I'm inclined to do, just to make sure that the

19  defendant is fully vaccinated, is to extend the time for

20  30 days and no further than that.

21         Who is going to -- Mr. O'Brien, are you going to

22  argue for the Government?

23         MR. O'BRIEN:  Yes, Your Honor.

24         Um, well, I mean, obviously the Government

25  understands why the Court loosened it a bit to allow the

1  defendant to be vaccinated.  But the Government opposes that,

2  nevertheless, because of the concern it has as to the risk of

3  flight.  It's going to extend the time frame within which

4  defendant can flee.

5          And if the Court will indulge me, there's quite a

6  lot to unpack here to respond to the reply brief.

7          THE COURT:  Go -- you may also mention -- I

8  neglected to mention that the Government pointed out -- and, of

9  course, I was aware from communications from Probation or

10  Pretrial Services -- that the defendant has not been entirely

11  compliant with his -- although -- and I did, you know, instruct

12  Pretrial and Probation that I wanted to know if there were any

13  failures to comply.  And I have still allowed him to remain out

14  of custody, even after being notified.

15          So I'm not going to say that those violations were

16  minor, as certainly, if there were there were any further

17  violations, I would be very concerned.  But at this point, I

18  don't think they indicate intent to flee.

19          And you may --

20          MR. O'BRIEN:  Well, I --

21          THE COURT:  You may argue the other issues raised in

22  the reply.

23          MR. O'BRIEN:  All right.  Well, first of all, I

24  mean, I guess there's -- the Court has already stated that, as

25  to the misconduct issues, that it's outside the -- of the

1    instant matter.  Ms. Fernandez was prepared to respond to that.

2    She was also going to address the issue as to -- for the

3    defense counsel.  And so if -- such on that issue, I defer to

4    her on that.

5            THE COURT:  Well, if you want to address what's set

6    forth in the reply for the record on the misconduct, you may.

7    I don't think it's fair not to let you respond.  Although, as

8    I've said, I don't think it's particularly germane to the -- to

9    the outcome of this motion.

10           So, Ms. Fernandez, do you wish to be heard?

11           MS. FERNANDEZ:  Yes, Your Honor, just briefly.

12           Defendant's -- as the Court pointed out, defendant's

13   reply brief raises for the first time collateral matters that

14   were not addressed before and not germane to the motion before

15   the Court.  In fact, it is essentially an attempt to try to

16   re-litigate two issues that were fully briefed and considered

17   by the Court prior to sentencing.

18           That first issue is whether the doctrine of

19   obstruction of justice was misplaced.  The second is whether

20   the sentence imposed fully considered similar -- similarly

21   situated defendants that had been charged under Title 18,

22   United States Code, Section 3553(a)(6).

23           As to the first issue, the defense fails to

24   recognize the Government's obstruction arguments, and the

25   Court's enhancement was based solely on discovery that was

1   produced to counsel and available on the public record,

2   arguments available on the public record.

3          And as to the second issue, this transcript showed

4   that the Court did consider disparate sentencing.  And they

5   point out to one particular case of which the facts are not

6   similar in this particular instance and they are not similar

7   to -- or similarly situated to the defendant.

8          On this issue of -- the Government has fully

9   complied with its discovery obligations and will continue to do

10  so.  As of last Friday, at least one counsel for the defendant,

11  current new counsel, has been cleared and essentially can now

12  begin to access information.

13         On Friday, as soon as we were notified, the

14  Government did send a memorandum of understanding and a

15  stipulation to that cleared counsel, essentially asking them to

16  abide by that preexisting classified protective order that

17  would enable them to have access to those documents.

18         In regards to the allegations generally that he

19  levied certain objections or allegations to one individual

20  AUSA, we would just like to put on the record that the

21  prosecution team consists of multiple AUSAs in two different

22  criminal divisions and includes one DOJ attorney.

23         And that's it, Your Honor.

24         MR. O'BRIEN:  Your Honor, if I can speak, then, on

25  the remaining issues.

1          I think that the concern as to flight is not merely

2     the two violations that were referenced by the Probation Office

3     but, rather, the circumstances under which this request for

4     extension has been raised.

5          When the defendant filed his initial request, the

6     statement was that he was, quote, "unable to be vaccinated."

7     And that's a quote, and that's not true.

8          The defendant actually voluntarily chose not to

9     receive a vaccination.  And, of course, that's his right.  Many

10    people have chosen not to vaccinate, and the Government is not

11    criticizing his decision to either forego or delay a

12    vaccination.

13         But it's important to realize that if the Court were

14    to extend the surrender date, it's essentially treating the

15    defendant as though he is sincere and acting in good faith.

16    And the fact that he initially represented that he was unable

17    to get the vaccine, I think, is one of many examples as to why

18    he shouldn't be trusted.

19         The defendant's history in this case -- and by that,

20    I mean the offenses of conviction as well as the related

21    conduct of defrauding investors, multiple obstructions of

22    justice, is reneging on agreements with the Government.  And as

23    the Court found, his lack of acceptance of responsibility show

24    a lack of good faith and sincerity.

25         And his more recent conduct is more than just simply

1   the two violations of curfew.

2          The defendant first asked the Probation Office to

3   permit him to circumvent the Court's bond order when he asked

4   them to permit him to stay over the weekend in Orange County.

5   I want to point out that the Government agreed to the defendant

6   traveling to Orange County because the defendant represented

7   that his mother is buried there and, also, he has two relatives

8   that live there.

9          And while he was certainly within his rights to --

10  under the terms of the bond order, to go to the beach in

11  Huntington Beach, um, it strikes the Government as another

12  example as to where he was trying to push the envelope to see

13  how far he could go and how much liberty he could extend under

14  the current bond conditions.

15         Um, we then have the quitclaim deeds which was an

16  obligation imposed by the Court.  And he was late submitting to

17  the Government the quitclaim deeds by one month.

18         And I can see why the Court would think that the

19  bond violations are rather picayune.  In a normal case, the

20  Government would agree.  But, again, we have the history of

21  this case.  And these violations have to be viewed in their

22  totality and they have to be viewed with the defendant's

23  history of obstruction and manipulation that goes back to 2017

24  when he first became aware of the Government's investigation.

25         As a side note, with respect to the quitclaim deeds,

1   the defense blames the revenue agent for not providing an

2   address to which the quitclaim deeds could be submitted.  And,

3   frankly, the Government thinks that's specious.

4        The defense had the revenue agent's e-mail.  It's

5   the defendant's obligation to comply with the Court's bond

6   order, not the Government.  And while it's true that the

7   Government entertained the defendant's request to modify the

8   order regarding the quitclaims, the Government declined to do

9   so on March 11th.  And then afterwards, it took the defendant

10  two weeks to execute the quitclaims.

11       Now, the Government has no idea as to when the

12  defendant actually transmitted the quitclaims to defense

13  counsel, so it could have been even later than a two-week

14  delay.  Um, and the Government's unaware because the defense

15  provided no notification to the Government that the quitclaims

16  have been signed and that is until the defense wanted something

17  and that is an extension of the surrender date.

18       The delaying of the quitclaim deeds for one month as

19  part of a pattern of delay that the defendant has engaged in,

20  again going back to 2017 -- and I would cite the Court to

21  Docket No. 42, which was the Government's obstruction brief,

22  and Docket 229, which is the acceptance of responsibility

23  brief.

24       For two-and-a-half years, while the defendant was

25  claiming he wanted to cooperate with the Government, he was

1   actually tampering with witnesses.  The Court, I'm sure,

2   recalls that the day that the defense -- the defendant was

3   calendared for his change of plea, he tried to delay that.

4         He delayed his payment of taxes that were due, um,

5   in February 2020 to basically today.  And only after the

6   Government repeatedly had to fight with him to get him to pay

7   these amounts, including the filing of nominee liens and asking

8   for a bond modification after his sentencing that required him

9   to tender the quitclaim deeds over to the Government.

10        So now that the Government has the quitclaim deeds,

11   the defendant has sold those properties, um, the two properties

12   that were governed by the quitclaims.  Um, and he's paid, um,

13   his tax obligations with the exception of some -- about -- I

14   think it's about a half a million dollars of interest that has

15   accrued.

16        But what has happened as a result of the sale of

17   those two properties is that now defendant has now about

18   7-and-a-half-million dollars of cash.  It was roughly about

19   13-and-a-half-million dollars.  The two properties were sold.

20   Um, and once the tax obligations were paid, there's, by my

21   calculations, about 7-and-a-half-million dollars cash.

22        And so the concern by the Government is about that

23   cash.  I mean, you know, what's to stop the defendant from

24   wiring that cash out of the country and then deciding to flee

25   after that point in time?

1            And, again, the fact that the defendant wants to

2    delay his surrender and the way he's gone about it is another

3    reason the Government has a concern of flight.  I mean, why

4    should the Court trust the defendant's good faith when the

5    arguments in his motion have shifted upon Government's

6    scrutiny?

7            Also, why should the Court trust the defendant's

8    good faith when he's still violating the FARA statute?

9            And here I need to reply to Mr. Warrington's

10   declaration.  In complete candor, Your Honor, it's rather

11   mind-boggling what's being said there.  The defendants raised

12   new arguments as to why it's not a violation of FARA.  All

13   that's sufficient for the Court to be convinced otherwise is

14   for the Court to read the factual basis to the plea in which

15   the defendant admitted his FARA filing was false, in part

16   because he failed to report between February 26th and

17   August 14, 2014, quote, "dozens of contributions of money from

18   his own funds in connection with elections."

19           And FECA records, Federal Elections Campaign Act

20   records, show that the defendant had two dozen contributions

21   with his own funds in his own name during the reporting period,

22   and those contributions are not in the FARA filing as is

23   required.

24           Also, the defendant conceded, in connection with

25   sentencing, that he made another two dozen illegal

1  contributions within the reporting period.  That's reflected on

2  Docket 258, Exhibit 1.  That's the spreadsheet that the

3  Government provided and which the defense chose certain

4  contributions that they agreed were illegal and other ones that

5  they said -- they disputed.  And specifically, line items 66

6  through 91 are contributions within the reporting period that

7  the defendant conceded were illegal that are not in the FARA

8  filing.

9        It's also not true that the Court failed to make a

10 finding with regards to specific Federal Election Campaign Act

11 violations.  The Court adopted the specific figure provided by

12 the Government of $774,158.  And that figure is the sum of the

13 contributions enumerated by the Government in that same

14 exhibit, Exhibit 1, Docket 258.  And they include contributions

15 the defendant concede were illegal within the reporting period.

16       So I guess the bottom line here with respect to the

17 FARA allegations is that the defendant's FARA submission is

18 false, he knows it's false, he admitted under oath that it was

19 false, it's still false, and he refuses to amend it to comply

20 with the law.  So he's still engaged in the continuing

21 violation with respect to the FARA offense.

22       So it's with all of this background and history that

23 the Court should examine the flight risk.  Um, delaying the

24 surrender only expands the window of then which the defendant

25 can make arrangements to flee.  He has now about

1  7-and-a-half-million dollars in cash that could be used to aid

2  that flight.

3          Um, and I think essentially what it comes down to is

4  that now that the tax arrears have been mostly been paid and

5  the fine has mostly been paid, what's keeping the defendant

6  from fleeing is a $3 million cash bond and an ankle bracelet.

7          And given the choice of flight with millions of

8  dollars with his wife who was also born overseas, who has

9  family overseas, with children that are in preschool -- they're

10  4, they don't have significant ties to the community -- and by

11  the defendant's own concession, millions of dollars overseas,

12  why wouldn't he choose to leave the country rather than spend

13  12 years in Leavenworth?

14          So that's why the Government opposes further delay.

15          And I would point out that the Director of the

16  Bureau of Prisons has announced that all inmates by mid-May

17  will be given an opportunity to receive the vaccine, regardless

18  of their health condition.  And so if defendant was required to

19  surrender, he could always obtain the vaccine during the

20  quarantine period that he is at Bureau of Prisons.

21          MR. RAM:  Your Honor, I -- I believe you're muted,

22  Your Honor.

23          THE COURT:  Mr. Ram, you may address those

24  arguments.  But before you do, I'm very puzzled by the request

25  that was submitted for a limited withdrawal.  If I understand

1    it correctly, the new defense team is going to separate out

2    functions of addressing reported *Brady* violations, and that's

3    the basis for this request for a limited withdrawal.

4          But for the Court's purposes, if your request for

5    withdrawal is granted, that means you wouldn't be receiving any

6    of the CM/ECF notifications.  So I don't think that that's the

7    appropriate vehicle to do that.  We don't have -- I have never

8    heard of a limited withdrawal.

9          If you want to file with the Court something showing

10   that your client has consented to that arrangement and has been

11   fully advised about the possible conflicts, you may do that.

12   But I'm not going to accept that request for a limited

13   withdrawal because the withdrawal really goes to whether you're

14   going to get served with all of the notices in this case.

15         MR. RAM:  I understand.  So you're saying the form

16   which was submitted, we can submit a brief with an affidavit

17   explaining that the client consents to our limited waiver on

18   the -- our limited withdrawal on the issue of -- it's not

19   really -- there's the *Brady* issue, but it's a particular

20   individual that is related to that *Brady* issue that -- that

21   Steptoe has previously represented, which was brought to my

22   knowledge after the -- our reply brief, Your Honor.

23         THE COURT:  Well, all I'm saying is if you want to

24   file something, of course go ahead.  But I am not going to -- I

25   mean, if you're going to remain as an attorney for Mr. Zuberi

1  in this case, whatever the issues your representation may be

2  limited to, I am not going to sign off on the order for a

3  withdrawal.

4          I know he's got two sets of -- he's got the Steptoe

5  attorneys, he's got the Kutak & Rock attorneys.  And he's

6  entitled to have, you know, whatever counsel he chooses.  But

7  this vehicle for announcing that there is a limitation on the

8  representation is not the appropriate vehicle.

9          MR. JENKINS:  Your Honor, this is Mack Jenkins.  Can

10  I be heard very briefly?

11          THE COURT:  Certainly.

12          MR. JENKINS:  Mack Jenkins on behalf of the

13  United States.

14          I would just point out the other client that Steptoe

15  represented, Gilbert Chagoury, was represented by Steptoe at

16  the time, which is the basis, I presume, for the conflict.  So

17  any sort of waiver should also, in the Government's view,

18  include Mr. Chagoury's waiver that Steptoe can continue to

19  represent Mr. Zuberi at any capacity while making arguments

20  about Gilbert Chagoury's case.  We'd just like to put that on

21  the record.

22          THE COURT:  All right.  Mr. Ram, you may address the

23  arguments made by Ms. Hernandez and Mr. O'Brien.

24          MR. RAM:  Okay.  There was a lot there, Your Honor.

25          I think at a very basic minimum point, we filed a --

1   you know, a motion that really sought to extend the report date

2   for two reasons.  One is basic risk mitigation with respect to

3   Mr. Zuberi's health conditions and how those health conditions

4   play a role in deciding when and what vaccine he should

5   receive.  That's one piece of this.

6          And then there was a separate piece that related to

7   a point that, frankly, the Government and defense agree, which

8   is that we should be able to submit a bail pending appeal

9   motion prior to his report date.  And currently, we're not able

10  to do that.

11          THE COURT:  Well, I don't know that -- I don't know

12  that that has to be done prior to a report date.  I mean, I

13  have had other cases where that motion was filed after the

14  report date.  So, I mean, I understand your client doesn't want

15  to report, but it's not necessary that it be done before he

16  does.

17          MR. RAM:  On the bail pending appeal motion,

18  Your Honor?

19          THE COURT:  Yes.  Yes.

20          MR. RAM:  Okay.  So let me start by addressing that

21  first point on basic mitigation.

22          I believe Mr. O'Brien quoted language from our

23  initial moving paper which references his inability -- he was

24  unable to get a vaccine.  And it is true that, literally

25  speaking, a vaccine would have been able -- available to

1    Mr. Zuberi, given his health condition, as -- I believe the

2    Government said March 15th.  We don't dispute that.  That's not

3    the issue, that he can't physically go in and get a vaccine.

4              I think the real issue, just so you understand the

5    good faith nature of this, is he's having conversations with

6    his doctors.  He's, frankly, afraid.  He's scared, given his

7    health conditions.  If he -- if he gets a vaccine, the vaccine

8    itself could harm him, cause complications.

9              He's not a doctor.  He's heard horror stories of

10   people getting sick, you know, having adverse reactions to the

11   vaccine and I think there's even instances where people have

12   died.  And that -- that is what's scaring him.

13             And all things equal, Your Honor, if he didn't have

14   this report date pending, given this one-month extension that

15   Your Honor had suggested, you know, he probably would wait --

16   he would wait and see as long as possible.  You know,

17   whether -- because right now he controls his environment.  He

18   controls who he meets with, whether those people -- he knows

19   whether those people have had a vaccine, he can distance

20   himself.  Right?  He can do all those things.  And he

21   recognizes when he reports, that's going to change.

22             And he understands that there's a cost-benefit

23   analysis of the harm to him from the vaccine versus being in a

24   prison environment.  You know, I looked up the same stats that

25   Your Honor referenced last night.  You know, five staff members

1    at Leavenworth were on the active infected list.

2              So -- and prisons are obviously a close-quarter

3    place.  You can't really socially distance.  So he recognizes

4    he needs to get a vaccine before he reports.  From his good

5    faith standpoint -- and I think this is, frankly, true for a

6    lot of people, including myself -- I was waiting for the last

7    possible moment to get a vaccine.  The only reason I got one on

8    Thursday is because I have a trial June 15th.  But for that

9    trial, I would have waited to get the vaccine as long as I

10   could because I never leave this room in my house -- or my

11   house.  Right, Your Honor?

12             And -- and the point is if there's -- if you're

13   afraid of getting a vaccine because you have health

14   conditions -- he has Type II diabetes, he has a heart

15   condition, he has kidney issues, these are all classic

16   complicating factors which his doctor kind of addressed in his

17   affidavit.

18             So he recognizes, absolutely, that he needs to get a

19   vaccine before reporting to prison.  That's not the issue.

20   It's just a question of the timing and what vaccine to get.

21             THE COURT:  Well, but if that's -- if that's -- if

22   that's not the issue, then he should have gotten a vaccine.  If

23   what you're arguing is he knows he needs to get a vaccine,

24   intends to get a vaccine before he is required to report --

25   he's known since February of a report date, which was 90 days

1    away, which is longer than I usually grant.  And, you know,

2    even before the date of his sentencing, he could have been

3    consulting with his doctors.

4           So that's just not a persuasive argument to me.  I

5    mean, you referenced --

6           MR. RAM:  Yes.  And --

7           THE COURT:  You referenced that a few people have

8    died.  Out of the millions of people around the world who have

9    been vaccinated, the attention recently has been on one or two

10   women within a certain age group who have died from one form of

11   the vaccine, the Johnson & Johnson.

12          So, I'm sorry, but this is not persuasive.

13          MR. RAM:  Yes.  And the other piece of that,

14   Your Honor -- and I appreciate that.  The other piece of this

15   is really just basic risk mitigation.  Right?  We're working

16   from home right now.  We're not in the courtroom right now

17   because COVID is still a risk.  It's in the community.  There's

18   maybe 50 percent of the adult population that's been

19   vaccinated.

20          I'm not going back into the office until September.

21   A number of large law firms and smaller law firms have made

22   that same decision.  Courts have made that decision.  Trials

23   have been delayed.  In this district, Your Honor, I believe the

24   first trial is going to be available June 7th in Los Angeles.

25   You know, it looks like I'll be in trial June 15th.

1          The reason for those delays, those are all risk

2   mitigation measures, Your Honor.  And we're looking at the big

3   picture and, you know -- and because he does have these health

4   conditions or because COVID is a real phenomenon still right

5   now, we're in the fourth wave, you know, frankly, Mr. Zuberi

6   looks at his family and my family in India and Pakistan and,

7   you know, people are dying right now.  That's a real thing.

8          My uncle just passed away last week, and that's

9   real.  And he sees that.  He looks at getting a vaccine.  He's

10  scared of it.  And, you know, the bigger picture point -- if

11  the first one wasn't, you know -- I understand Your Honor has

12  addressed that --

13         THE COURT:  Well, if he's afraid -- again, I -- and

14  I am sorry to hear of your family's loss.  If he's afraid of

15  getting COVID, then he has the option of getting the vaccine.

16  And he's chosen not to do that or he's delayed doing it.

17         So those are very contradictory arguments that

18  you're making.  You argue that he's afraid.  That's not unique

19  during the past year that people have been afraid of getting

20  COVID and afraid of getting a vaccine.  That's not -- I would

21  say someone who's not been afraid is -- that's a more unique

22  situation than being afraid.  But --

23         MR. RAM:  Understood, Your Honor.

24         THE COURT:  I'm not sure that -- your arguments are

25  sort of internally contradictory.

1          MR. RAM:  If I may reconcile the paradox,

2     Your Honor.  I think --

3          THE COURT:  You may try.

4          MR. RAM:  Yeah.

5          So bigger picture -- and this is true for more than

6     half the adult population potentially.  A lot of people want to

7     wait and see.  What's the next vaccine?  Is it going to be

8     effective against the UK variants -- right? -- which is now the

9     predominant variant in the U.S.?  How is J&J, Moderna, and

10    Pfizer going to react to these variants?  What's the

11    transmission rate?  All these things are changing on the fly.

12          There was an article in the *New York Times* this

13    morning, Your Honor, where, you know -- where Dr. Fauci was

14    interviewed and he's now said -- and that we were all planning

15    for and hoping to hit at the end of the summer -- that's not

16    going to happen.  That was this morning.  That's not going to

17    happen.

18          And because of the UK variant and some of these

19    other variants, the percentage of people that would need to get

20    a vaccination is now approaching 80 percent.  Right?  Before it

21    was 70, now it's 80.  And so this is constantly evolving and

22    changing.

23          And the point I'm making here is the simple

24    undisputed point, no one has perfect information.  The facts on

25    the ground are constantly changing.  And all things equal,

1   people would want to wait to see is there going to be a better

2   vaccine that comes out that's more effective against some of

3   these variants and when.

4          And Mr. Zuberi, to your point, Your Honor, may not

5   have that luxury of waiting to see.  But from a logical

6   standpoint, from a good faith standpoint, he's not wrong to

7   want to -- to want to wait to the last possible moment to see

8   what's the best vaccine he could get before he has to report to

9   prison and do that in conjunction with his doctors and address

10  some of the -- some of his risk factors.  Right?  That's the

11  bigger picture point, I think.

12         THE COURT:  Well, in terms of waiting to the last

13  possible moment, he had a report date -- has a report date of

14  May 25th, and that's what he should have been taking into

15  account.

16         MR. RAM:  I understand that, Your Honor.

17         So that -- so the first piece of that is the basic

18  risk mitigation.  COVID is a real thing.  No one's saying it's

19  not right now.

20         And I think unquestionably -- the reason we ask for

21  90 days, that gets us closer to Labor Day, there's no question

22  that I think we're going to be in a different world come

23  Labor Day and I think businesses, law firms, and companies

24  across the country are making that same calculus in having

25  their employees kind of delay their return to work after

1   Labor Day.

2           And that's not a magic day, of course, Your Honor,

3   but that's, in part, what informed the 90-day extension

4   request, which would get us pretty close to Labor Day.  And

5   that -- and at that point, the medical science is showing

6   the -- even if we don't hit herd immunity, we're going to get

7   pretty close.  Right now we're at 50 percent of the adult

8   population has been vaccinated.  We'll be probably closer to

9   70-plus percent of the overall population by that time.  And

10  that's -- that's a critical factor.

11          And that's why we asked for the 90 days, in part,

12  too.  And then all -- every other argument I made would still

13  equally apply.  It would give Mr. Zuberi additional time to

14  evaluate the best possible vaccine that could be made available

15  at that time for him to take.  That would address some of these

16  variant issues.  That would address his comorbidities and risk

17  factors in taking the vaccine.

18          So I'll leave it at that on the -- on the COVID

19  piece.

20          The other piece of the motion was simply we don't

21  know -- we don't have the full record right now to even assess

22  what are the issues on bail pending appeal and ultimately for

23  the appeal.

24          The Government mentioned that someone on the defense

25  team received their clearance on Friday.  I was unaware of that

```
 1    until this moment.  I don't know who that is.

 2              Do we know who has their clearance?

 3              MR. O'BRIEN:  You're muted.

 4              MR. RAM:  I think you're muted.

 5              MS. FERNANDEZ:  Your Honor, it's, um -- it's

 6    Mr. Ram.  And we were notified on Friday.  And we sent an

 7    e-mail to Mr. Ram with the proposed memorandum of understanding

 8    and the protective orders which he would need to execute so he

 9    would have expedited access to the classified information.

10              MR. RAM:  Okay.  So I'm the person that got that

11    notice, which I didn't -- I hadn't seen that yet, Your Honor.

12    I'm sure it's there, and I will look.

13              But the bigger picture point is it would help to

14    understand what are -- and Your Honor has made a point that

15    bail pending appeal doesn't have to be filed prior to a report

16    date.

17              I think it would be helpful, to the extent there's

18    some meritorious arguments for bail pending appeal, that he not

19    have to report in Kansas and then be essentially released back

20    out -- right? -- just from a logistic standpoint and everything

21    that goes into his preparing to surrender and report.  If

22    there's bail pending appeal issues, which we believe there are

23    a couple substantial questions, Your Honor, where he would be

24    entitled to bail pending appeal, we'd like that to be litigated

25    before his report date.  And I believe the Government said they
```

1    agree with that general proposition in their opposition.  And

2    it would be helpful if the defense team had access to the full

3    record in making that evaluation and understanding the case.

4           There's also some unique issues in this case where

5    it -- Mr. Zuberi's background and insights for the defense team

6    are critical just to understand the issues as they were

7    presented.  You heard Mr. O'Brien rattle off, you know, I don't

8    know, ten minutes of issues relating to FARA and the underlying

9    issues in the case.  We don't know really any of those issues.

10   And it's critical to have Mr. Zuberi in putting those arguments

11   and issues into context for us, Your Honor.

12          And this is just a plus factor to the COVID motion,

13   but I think it's an important one.  And we'd like to have an

14   orderly schedule for bail pending appeal rather than seeking a

15   shortened time frame and -- to file the motion.

16          If Your Honor's, you know, willing to grant the

17   extension that you had proffered initially, I think that would

18   address the briefing schedule once the defense -- the whole

19   defense team has security clearances.

20          I would ask the Court if we could do a 60-day

21   extension.  That would allow for orderly briefing of the bail

22   pending appeal issue.  It would allow for a potential appeal of

23   any issues from the bail pending appeal without straining court

24   resources or forcing the Government or the defense team to have

25   to shorten times to have replies.  And it gives the Court

1    sufficient time to review and fully consider the issues that

2    we'd be presenting to it.

3         So for those reasons, Your Honor, both the COVID

4    piece of this and the bail pending appeal issues and us

5    being -- trying to be effective appellate counselors, I'd ask

6    for a 60-day extension, if Your Honor would entertain it.

7         There's many, many other issues that were raised by

8    the Government relating to FARA and quitclaim deeds.  And I'm

9    not going to get into the weeds of all of that other than maybe

10   a couple of observations.

11        One, I want to be clear for the record, the

12   quitclaim deeds that were prepared by counsel at the time,

13   Mr. Evan Davis, were delivered to the Government by Steptoe

14   prior to the deadline set by the Court.  That is an undisputed

15   fact.

16        The issue is when the deeds were delivered, there

17   was ambiguity in what name the quitclaim deeds were supposed to

18   be written to.  Specifically, the quitclaim deeds had followed

19   prior practice in the case -- and this is all being explained

20   to me by other counsel, Your Honor, and I was on a phone call

21   with Mr. O'Brien and Mr. Davis when this was discussed.

22        And the quitclaim deeds were delivered, I believe --

23   so the whole -- I don't want to get into the weeds of it.  But

24   the big picture was some of these properties were held in LLC

25   names, entity names as opposed to Mr. Zuberi.  So the tax lien

1   that was in place wouldn't attach if it's in the LLC name, so

2   it had to be in Mr. Zuberi's name.  Hence, the quitclaim

3   deeds -- quitclaim to Mr. Zuberi which, by operation of law,

4   would trigger the tax lien.

5            And so that's what Mr. Davis put together and I

6   delivered -- or I had delivered to the Government on time.

7            And then after it was delivered to the Government,

8   Dan -- Mr. O'Brien raised -- AUSA O'Brien raised an issue about

9   whether they should be in the defendant's name.  And that

10  wasn't clear to me.  And we know it wasn't clear because it was

11  discussed for something like five to six days.  And even after

12  it was discussed, the question was who should be -- you know,

13  whose name should it be in?  You know, that wasn't something

14  addressed in the Court's -- with that level of specificity in

15  the Court's order.

16           So that dialogue went back and forth.  Mr. O'Brien

17  said that an IRS agent would provide further details on

18  delivery.

19           So after -- Mr. Zuberi signed and redid the

20  quitclaim deeds.  That's -- that's what I want to be clear

21  about.  It's not that they weren't done.  And they were pending

22  with me in my house here because, as I mentioned, because of

23  COVID, I don't generally leave this house unless I have to.

24           And I was under no -- and any -- any error there is

25  entirely on my part, and I take full responsibility for that,

```
1   Your Honor.  That was not Mr. Zuberi at all.  Those quitclaim
2   deeds were sitting on this desk in this office in my house, the
3   physical copies, which were messengered to me.
4        So that's one minor -- I don't think these are --
5   none of these issues are driving the Court's decision, but I
6   just wanted you to know Mr. Zuberi --
7        THE COURT:  You may want to -- Mr. Ram, excuse me
8   for interrupting you.
9        MR. RAM:  Sure.
10        THE COURT:  But you haven't addressed the argument
11   that Mr. Zuberi now has 7-and-a-half million dollars in cash.
12        THE DEFENDANT:  Can I address that, Your Honor?
13        THE COURT:  No.  You have counsel representing you,
14   Mr. Zuberi.
15        THE DEFENDANT:  Okay.  Because there's something
16   called --
17        THE COURT:  Mr. Zuberi -- Mr. Zuberi, you have
18   counsel representing you.
19        MR. RAM:  Yeah.  If you don't mind, I would like to
20   address that argument.
21        So I've now read some of the sentencing papers in
22   this case, the Government's position and the Court's
23   sentencing -- the sentencing transcript.  What is clear to me
24   at all times in this case, it was understood that Mr. Zuberi
25   had millions and millions and millions of dollars in assets
```

1    overseas.  And the Government went out of its way in its papers

2    to indicate, even in California, Mr. Zuberi had approximately

3    $30 million in assets.

4         So this is not a new circumstance or a changed fact.

5    In fact, if Mr. Zuberi only had $7 million, that would be a

6    dramatically changed circumstance in terms of a reduction in

7    his assets that are available to him.

8         This was always known to the Government.  It's

9    highlighted in their sentencing papers, touting his vast

10   resources overseas and domestically.

11        And, Your Honor, the bigger picture question to

12   address is Mr. Zuberi in no sense of the word is a flight risk.

13   He has his entire family here, his children are here.  You

14   know, the fact that he was born in Pakistan and left when -- I

15   don't know how young he was.  3 years old?  He -- Pakistan is

16   not going to take him, especially after the fact that this

17   case -- he's got nowhere to go.  He's not a flight risk in any

18   sense of the word.

19        You know, and this -- this notion that he now has

20   $7 million, which I'm not even sure is true, by the way, and

21   I'm not prepared to speak to it.  I suspect that's not true.

22   Based on everything I know of Mr. Zuberi's finances, that

23   couldn't be further from the truth, that he has some surplus of

24   7 million sitting in an account here.

25        But putting that aside, even if it is true, that is

1    not a new circumstance or changed fact.  And Mr. Zuberi who's

2    being monitored with an ankle monitor in seconds is not a

3    flight risk.

4              There is a related point I do want to address.

5    Mr. O'Brien raised the fact that there were two violations of

6    his curfew.  He came in a few minutes after 5:00 p.m.  Both of

7    those were related to defense team meetings.

8              And it was after the first instant -- the first

9    instance, due to my -- again, that was my fault.  I called his

10   probation officer when Mr. Zuberi was at Steptoe & Johnson's

11   offices downtown.  And I said, "It's already 4:00 o'clock or

12   something around that time.  Because of traffic, by the time he

13   gets home, even if he left now, he's probably going to be late.

14   Is there any issue with extending the curfew for today since

15   he's meeting with defense counsel?"

16             At that time, the probation officer made clear to me

17   that he did not have discretion to extend the curfew because it

18   was actually a Court order.  Apparently after sentencing, an

19   order was issued limiting his curfew to 5:00 p.m.  And so that

20   was the first instance.  And that was --

21             THE COURT:  But, you know, it's puzzling to me,

22   given what you've said -- and I understand that he was meeting

23   with counsel from Kutak on that occasion -- but, you know,

24   you've been arguing that it's so important that we all stay --

25   you know, you stay in your home and you haven't gone out.

34

1    These meetings did not need to take place in person.

2              MR. RAM:  And, Your Honor, they did and they were

3    socially distanced meetings.  I'm glad you asked.

4              So it was Mr. Zuberi -- so we have had in-person

5    meetings, to be clear.  And we have the largest conference --

6    it's Steptoe & Johnson, not Kutak & Rock.  Although, I see

7    Mr. Warrington's Kutak background.  I don't know if he's

8    actually in the office right now or not.

9              The meetings we had with Mr. Zuberi did need to be

10   in person for our initial debriefings to go over the materials

11   in the case, Your Honor.

12             THE COURT:  So you met with him -- excuse me.  You

13   met with him in person in the office, you or anybody else.

14             MR. RAM:  Correct.  I was personally in the office.

15   We were in a massive conference room and we were socially

16   distanced, more than, I would say, ten feet apart from each

17   other.

18             THE COURT:  Okay.  But so then what you said

19   earlier, that you haven't been out of your house in a year,

20   that was -- what? -- rhetorical --

21             MR. RAM:  No, no, I have been -- yes, Your Honor.

22   And to be clear out, I have been out of my house in the last

23   year.  In fact, one of the times -- both of the times I was

24   out of -- in, like, the office, I messaged the Government to

25   let them know, hey, I'm going to be in the office.  And this is

1    actually attached to the -- to the papers we submitted, if you

2    look at the e-mail chains that are the exhibits.

3            Both times when I was planning on being in the

4    office, I let the Government know I'm planning on being in the

5    office.  I -- I can drop off the quitclaim deeds -- this is the

6    first time.  This is, like, May -- I want to say March 5th when

7    they were timely submitted the first time.  They were timely

8    submitted because, A, they needed to be but also I went into

9    the office and had a meeting to kill two birds with one stone.

10           It's also the second time when they -- when the

11   second set was delivered, Your Honor.  If you look at the

12   e-mail correspondence that I had with the IRS agent, it said

13   that I'm going to be downtown going to the Steptoe office.

14   I -- I have these quitclaim deeds that I've had with me for

15   some time.  I'd like to drop them off.  Can we coordinate so I

16   can drop them off in the federal building on the first floor as

17   I drive by?

18           So, yes, in fact, I have been to my office.  That's

19   not an issue.  And I think I've been there approximately three

20   times.  And we have had in-person meetings with Mr. Zuberi,

21   particularly when members of the defense team come in from

22   Washington, DC.

23           And it is incredibly difficult to have these

24   meetings, Your Honor, with a 5:00 p.m. curfew.  Because by the

25   time Mr. Zuberi gets to the office, it's already 10:00 a.m. --

1    right? -- because he can't leave his home until -- I think

2    9:00 a.m. is the start of his -- when he can leave the home.

3    So by the time we get started with our meeting, it's 10:00 a.m.

4    and we have to stop by 4:00 p.m.

5         So I -- and interestingly enough, it was the

6    probation officer who suggested that we reach out to

7    AUSA O'Brien to get an extension of the curfew, specifically

8    and limited to when there's meetings with defense counsel.

9         So I would ask as part of the discussion, if the

10   Court was willing to, that we -- that you allow his curfew to

11   be extended when he's meeting with the defense team,

12   specifically when there's meetings with the defense team.

13        THE COURT:  I don't understand why it would take an

14   hour.  These days -- Mr. Zuberi lives in Altadena.  Altadena to

15   downtown Los Angeles -- I've made pretty much that same commute

16   occasionally, including last week, and it took me, I think,

17   19 minutes to get to the courthouse.  So it is not an hour

18   commute these days from Altadena to downtown L.A.

19        MR. RAM:  That's actually amazing because I just

20   moved to La Cañada.  I was in an apartment in Koreatown where I

21   was five minutes from the office.  And now it took me about 35,

22   40 minutes to get home from downtown when I was there because

23   we were also leaving at the height of traffic.

24        But you're right, coming in in the morning on the 2,

25   it's like the best thing in the world.  It is quicker.  I don't

1    believe he lives in Altadena.  I believe he lives in Arcadia,

2    Your Honor, which is a little farther east.

3         I will say I had another court hearing on Friday

4    which I had to appear for in person, and it took me -- and I

5    drove from Arcadia, ironically, to the court, which was the

6    CCB, the Clara Shortridge Foltz court next to -- you know, next

7    to 312 Spring Street.  And that took me approximately 40-some

8    minutes, Your Honor.

9         THE COURT:  Well, I'm not -- I don't -- we don't

10   necessarily need to --

11        MR. RAM:  Yeah, yeah.

12        THE COURT:  -- to say commuting times.  I'm just

13   saying --

14        MR. RAM:  Right.

15        THE COURT:  -- I find a lot of contradictions in

16   your arguments.

17        MR. RAM:  Specifically on -- on the curfew,

18   Your Honor, or --

19        THE COURT:  Well, I think I've pointed them out on

20   whether or not people are going into the office or making court

21   appearances or whether someone wants to get a vaccine or

22   whether it's more dangerous to get a vaccine than to go to a

23   prison where, as of now, you know, most of the inmates have

24   been vaccinated or have recovered from COVID.

25        So do you have anything else that you want to put on

1  the record briefly?

2          MR. RAM:  If Mr. Warrington wanted to speak to

3  the -- if it's useful to the Court, we're happy to speak to

4  some of the other issues that were raised.  Frankly, I'd like

5  to focus on --

6          THE COURT:  We're not going to re-litigate the

7  sentencing issues at this point.  And many of the arguments

8  raised in the motion and particularly in the reply are

9  essentially a re-litigation of sentencing.

10          MR. RAM:  I think that's right, Your Honor.  I don't

11  think they're particularly germane to the request here of the

12  report date extension.

13          I think the two big picture pieces here is this is a

14  basic risk mitigation request.  I don't think anyone disputes

15  the fundamental aspect of there's an increased risk right now

16  and that risk would be dramatically diminished with the 90-day

17  extension.

18          And then we're now at -- even if the Court would

19  entertain a 60-day extension, that would serve two functions,

20  both in dramatically decreasing Mr. Zuberi's risk with getting

21  a vaccine and reporting to prison and, second, it would

22  dramatically help the defense in preparing an appeal, both

23  getting access to the information that was under seal and

24  reviewing those materials, designating the transcripts,

25  reviewing it, going over those materials so we understand them.

1   And then --

2             THE COURT:  I understand your argument.

3             MR. RAM:  Okay.  Thank you, Your Honor.

4             THE COURT:  All right.  Does the Government wish to

5   respond?

6             MR. O'BRIEN:  Your Honor, yes.

7             First of all, as to the security clearance issue,

8   I'm not well versed in that.  I haven't been throughout the --

9   the litigation of this case.  This is something that's been

10  handled by Mr. Turgeon and Ms. Heinz and Ms. Fernandez.  I did

11  have an oral conversation with Mr. Turgeon with regard to how

12  much review is actually needed with respect to classified

13  materials, and so I'd like to defer to him on that.

14            THE COURT:  All right.  Mr. Turgeon.

15            MR. TURGEON:  Thank you.  Good morning, Your Honor.

16  Evan Turgeon for the United States.

17            Your Honor, the one point I wanted to make on this

18  was a point of which you are certainly aware, the classified

19  record in this case is very short.  So a thorough review of

20  that record would take a matter of hours, not days.  And

21  Mr. Ram, as we learned, has been cleared.  So as soon as he

22  signs the memorandum of understanding, he will have access to

23  that record.  So the Government does not believe that that

24  forms a basis to extend the surrender date.

25            MR. O'BRIEN:  I wanted to -- Daniel O'Brien speaking

1  now.  I wanted to touch on some of these other issues that

2  Mr. Ram raised.

3         First of all, the issue isn't a question as to the

4  defendant's net worth.  That's not what's changed.  What's

5  changed is that money that was previously tied up in real

6  estate is now liquid and it's in the form of cash, which can be

7  easily sent outside the country.

8         Now, Mr. Zuberi might very well have a fair point

9  with regard to mortgages.  When I quoted the figure of

10 7-and-a-half-million dollars, I was merely referring to the

11 difference between the sale prices of those two properties that

12 had been covered by the quitclaim deeds and the amount of money

13 that was transferred to the IRS.

14        I -- the -- I'm sorry.  The IRS agent in this case,

15 John Lucero, served subpoenas on the two bank accounts that

16 were involved in those two sales.  And as we -- Mr. Ram was

17 speaking, I received an e-mail from him.  Unfortunately, the

18 information is not quite complete.

19        But on the HSBC account as of today, the balance is

20 $1,350,761.  The East West Bank account, the only information I

21 have is the balance as of April 22nd.  That is $5,280,78.  I

22 believe that that account was the source of one of the payments

23 to the IRS, so it should be either $2.7 million less than that

24 or 3 million less than that.  But if it's $3 million, that

25 still is $2.2 million in the East West Bank account.

1          So I have limited information.  And I'm sure the

2   defendant has much more information that he can share with his

3   counsel who will inform the Court exactly how much liquidity he

4   has.  But the essential point is that previously much of the

5   defendant's wealth was tied up in real estate.  And through

6   these transactions, a significant portion of it is now liquid.

7          With respect to the FARA issues discussed by

8   Mr. Ram, he said that he's unaware of it because of classified

9   filings.  None of the information that I provided the Court

10  with respect to FARA is the -- is found in classified filings.

11  This is all public information.  I quoted the factual basis to

12  the plea.  I quoted the public records.  I quoted the findings

13  by the Court at sentencing.  This is all public information of

14  which Mr. Ram should be aware.

15          Um, with respect to the quitclaim deeds --

16          MR. RAM:  Your Honor, can I just interject there

17  because I actually never said that.  I never said I'm not aware

18  of FARA issues because of classified information filings.  I

19  think Mr. O'Brien misheard me.

20          What I said was Mr. Warrington could address those

21  points if necessary, but they're probably irrelevant to the

22  Court's determination of an extension of the report date.

23  That's what I actually said.

24          MR. O'BRIEN:  Well, if I could just continue.

25          With respect to the quitclaim deeds, it's not true

1    that the quitclaim deeds complied with the terms of the bond

2    order when they were initially provided to the Government.

3    Okay?  What was provided were quitclaim deeds that the

4    defendant executed on behalf of the LLCs that transferred title

5    to the properties to himself.  The bond order required it to be

6    transferred to the Government.

7              It is true that I felt that Mr. Davis, that's

8    Evan Davis of the Hochman firm, had a good faith basis to

9    believe that the Government might entertain accepting that in

10   lieu of what was required by the bond order.  And the

11   Government in good faith discussed this with him over a period

12   of several days.

13             But as I indicated to the Court, by March 11th the

14   Government stated that it would not be willing to do so and yet

15   the defendant then took another two weeks to even execute the

16   deeds, much less provide them to the Government.

17             So I guess the bottom line there is that it's the

18   defendant's responsibility to comply with the orders of the

19   Court, not the Government.  And he failed to do so with respect

20   to the quitclaim deeds and also in various other respects.  And

21   that's one factor that the Court should consider in assessing

22   whether or not the defendant is acting in good faith when he's

23   saying that, well, he's delaying vaccination for sincere

24   reasons.

25             I'm a bit troubled by Mr. Ram's reference to

Steptoe's policies, his own experiences with regard to the

virus, or his anecdotal references as to what the situation is

with respect to COVID.  There's a record in this case that's

been established.  The Government filed with the Court the

declaration of Eliezer Ben-Shmuel of the Bureau of Prisons.

And the Court should rely on that information to determine the

situation as to COVID, particularly within the prisons.  What

he says is that the situation has not gotten worse at the

Bureau of Prisons, it's gotten better.

He has said that there's not a single case of COVID

at any of the facilities that were discussed in his

declaration, including Leavenworth, place of designation.

And as the Court points out -- Mr. Ram talks about

herd immunity at about 50 percent.  It's clearly much higher

than the Bureau of Prisons because of the number of prior

infections they had, coupled with the vaccines.

Finally, part of Mr. Ram's request that this be

delayed is that he believes that a lot of things will be

cleared up with respect to the virus, should a delay be

granted, but I don't think that's necessarily true.

The -- the situation with respect to the virus, um,

is that we will always have various variants of the disease.

And variants of the disease are never going to go away because

obviously viruses mutate.  There will always be a risk of

infection.  There will always be some minor risks associated

1    with vaccines.  And so the defendant will always have an

2    argument as to why he wants to delay receiving the vaccine.

3           I think the Court made a very good point, is that

4    his surrender date that was set by the Court should have been

5    part of his calculus as to when he received the vaccine.  He

6    was eligible to receive it as of March 15th.  The Court had

7    provided a specific date for his surrender of May 25th.  That

8    gave him ample time to discuss the situation with his doctors,

9    and he should have factored that into the equation.

10          As I said before, the virus *[sic]* will be available

11   to the defendant at the Bureau of Prisons by the time of his

12   current date of surrender, according to the director of Bureau

13   of Prisons.

14          And I think it's -- there's still -- I'm trying to

15   compute the time.  He still has 22 days between the date of

16   surrender, which is plenty of time to get at least his first

17   vaccination shot, if he chose Moderna or Pfizer, or get -- now

18   the J&J vaccine has now been made available again.  He could

19   always receive the one shot prior to showing up at the Bureau

20   of Prisons.

21          But still, Bureau of Prisons will be able to provide

22   him the vaccine, should he choose to go that route.

23          The Government doesn't feel there's a basis for

24   delay in this case.  We think this is a situation where the

25   defendant is again engaging in delay.  And the defendant's

1    history shows that he has repeatedly engaged in delay.  The

2    defendant's history shows that he has not acted in good faith.

3    This is a case that has a history of obstruction and

4    manipulation and delay by the defendant.  And I think this is

5    another example of this going on.

6         THE COURT:  All right.  Thank you.

7         I have considered everything that was submitted in

8    writing and I've considered all of the arguments.  And although

9    I am troubled by the delay that has been caused by the -- well,

10   I don't know caused by -- but by the delay in the defendant

11   obtaining a vaccine when, as a person suffering from diabetes,

12   he had priority access to it, for the purposes of him getting a

13   vaccination -- being fully vaccinated before his surrender

14   date, I'm going to grant the motion to a limited extent.

15        And if he, in consultation with his physicians, got

16   a vaccine by this Friday, which is the 7th, you know, six weeks

17   after that, if he got -- he gets a vaccination, two or three

18   weeks before he gets the second shot, if he uses something

19   other than Johnson & Johnson, and two weeks after that.  So,

20   you know, really six weeks from today would be sufficient time.

21        So six weeks from today is just shortly after the

22   May 25th date.  And I would -- so I'd extend the surrender-by

23   date to June -- let's see --

24        MR. RAM:  Your Honor, I think the declaration from

25   his doctor said it would take eight weeks to be fully effective

1    under any scenario.  And it's unclear whether he could even get

2    the vaccine by this Friday.

3           So if that's the Court's basis, I would ask for the

4    30-day extension that Your Honor had suggested at the outset of

5    the proceedings.  And that way, there is no issue.  It's clear,

6    he can get scheduled, he can talk to his doctor, he can do what

7    he needs to, and the report date would be the end of June with

8    those 30 days.  Because we do want this to be fully --

9           THE COURT:  Well, he's going to be -- he's going to

10   be quarantined when he goes in.

11          So his -- the motion is granted, and his new report

12   date will be Friday, June 18th, by 12:00 o'clock noon.

13          Now, the only other question -- and nobody has --

14   well, it's only been raised sort of tangentially -- is whether,

15   in light of the liquidity of his assets now, an additional cash

16   bond should be required.

17          MR. RAM:  Your Honor, I'd be happy to brief the

18   issue.  I can tell you that the -- and I think Mr. O'Brien

19   corrected himself.  He doesn't have $7 million of liquidity,

20   given the accounts he cited.

21          I think the big reason, as Mr. O'Brien realized, is

22   that there were -- there were mortgages on the -- there are

23   mortgages on the property.  So just because there's a sale

24   amount, you can't subtract that and say, oh, that's how much

25   money you have.  The bank --

 1            THE COURT:  Well, but wouldn't the mortgages have

 2    been paid off in escrow on the sales?

 3            MR. RAM:  No.  I don't -- so, Your Honor, I'm happy

 4    to brief this and get you the actual numbers that are in his

 5    accounts.  I can -- I can tell you for a fact it's nothing

 6    close to 7 million.  And even in those two accounts Mr. O'Brien

 7    read off, one of those was used to pay -- so just so

 8    Your Honor's clear, the full amount of the taxes restitution

 9    has been paid.  Mr. Zuberi also paid his $1.75 million fine

10    which I don't think was accounted for.  So everything has been

11    paid --

12            THE COURT:  Well, I believe -- Mr. O'Brien, you can

13    correct me if I misunderstood or if I'm remembering this

14    inaccurately.  But I thought you said between the two accounts,

15    it was over $1 million in one and over $5 million in another as

16    of Friday.

17            MR. O'BRIEN:  As of today, in the HSBC account, I

18    see that there's a balance of $1.350 million.  And in the

19    East West Bank account, that's of -- as of April 22nd,

20    $5,280,782.  Now, I think that the East West Bank --

21            THE DEFENDANT:  The checks have not been cashed.

22            MR. O'BRIEN:  -- have less than that because --

23    because there was a transfer from that account that I don't

24    think is yet posted on that account.  So I don't know the exact

25    balance as of today.

1          I think I have a temporary solution to this issue

2    about the liquidity, and that is if the bond order were to be

3    revised "prohibit any international transfers," in other words,

4    any money going out of the country, that would be helpful.  And

5    then defense counsel and the Government could discuss the issue

6    as to how much cash is actually in the country and discuss an

7    appropriate additional bond amount at that time.

8          I would also ask, because of something the Court

9    pointed out, um, the current bond orders are inconsistent

10   because they require the defendant to remain within Los Angeles

11   and Orange Counties, yet they require him to report to the

12   place of designation.  And so I'd also ask that the bond be

13   modified to require the defendant to report to the U.S.

14   Marshals here in Los Angeles.

15         I think given the Court's partial granting of the

16   motion, some other appropriate bond modifications would be

17   appropriate and would certainly benefit the Government in its

18   task trying to make sure that the defendant is in compliance.

19         The travel to Orange County, for example, is

20   difficult to police.  And, um, the Government was very

21   sensitive to the defendant's desire to visit his mother's

22   graveside.  But I would ask that the bond be modified to limit

23   his travel for that -- to Orange County for that specific

24   purpose and only with prior notification to the Government and

25   the U.S. Probation Office.

1          I'm also concerned about the defendant being at

2     liberty over the weekends when law enforcement will have a

3     different -- staffing difficulty with regard to policing his

4     whereabouts.  And so I'd ask that the curfew be extended over

5     the course of the weekend as well.

6          MR. RAM:  Your Honor, can I speak to some of this?

7          THE COURT:  Well, this is what I'm going to do,

8     because I do have another matter on calendar.  So both sides

9     may submit in writing their request regarding change to the

10    terms and conditions of release at this time.  The Government

11    should file its request for any changes in the bond conditions

12    no later than Wednesday.

13          And then, Mr. Ram, you can respond by Friday.

14          MR. RAM:  Yes, Your Honor.

15          THE COURT:  Oh.  It seems clear that one of the

16    conditions is that there be no overseas transfers of funds.

17    And that's effective immediately.

18          MR. O'BRIEN:  Thank you, Your Honor.

19          THE COURT:  All right.  I will consider any changes

20    once I have received all of the briefing on the bond

21    conditions.

22          MR. RAM:  Would Your Honor also be willing to

23    entertain extending the curfew to meet with counsel

24    specifically?

25          THE COURT:  No.

```
1              MR. RAM:  Okay.

2              THE COURT:  All right.  Thank you very much.

3              MR. O'BRIEN:  Thank you, Your Honor.

4              MR. RAM:  Thank you, Your Honor.

5              MS. FERNANDEZ:  Thank you, Your Honor.

6              (Proceedings concluded at 10:14 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

       I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

       DATED THIS 5TH DAY OF MAY, 2021.

       /S/ MYRA L. PONCE
_____
    MYRA L. PONCE, CSR NO. 11544, CRR, RDR
      FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**