TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
Public Corruption & Civil Rights Section
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Trial Attorney, National Security Division
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2468/7383/7280
     Facsimile: (213) 894-2927
     E-mail:  daniel.obrien@usdoj.gov
     E-mail:  elisa.fernandez@usdoj.gov
     E-mail:  judith.heinz@usdoj.gov
EVAN N. TURGEON (D.C. Bar No. 1010816)
Trial Attorney, National Security Division
United States Department of Justice
     950 Pennsylvania Avenue, N.W., Suite 7700
     Washington, D.C. 20530
     Telephone: (202) 353-0176
     E-mail:     evan.turgeon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>                    v.<br><br>IMAAD SHAH ZUBERI,<br><br>              Defendant. | No. LACR19-642-VAP<br>No. LACR20-155-VAP<br><br>GOVERNMENT'S OPPOSITION TO<br>DEFENDANT'S MOTION FOR RELEASE<br>PENDING APPEAL; MEMORANDUM OF<br>POINTS AND AUTHORITIES;<br>DECLARATIONS OF JOHN M. LUCERO AND<br>DANIEL J. O'BRIEN<br><br>Hearing Date: June 7, 2021<br>Time: 9:00 a.m.<br>Courtroom: 8A |

1

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby opposes defendant Imaad Shah Zuberi's motion for release pending appeal.

This opposition is based upon the attached Memorandum of Points and Authorities, the attached Declarations of John M. Lucero and Daniel J. O'Brien, and the files and records in this case.

Dated: May 17, 2021                   Respectfully submitted,

                                      TRACY L. WILKISON
                                      Acting United States Attorney

                                      BRANDON D. FOX
                                      Assistant United States Attorney
                                      Chief, Criminal Division


                                      _____/s/_____
                                      DANIEL J. O'BRIEN
                                      Assistant United States Attorney


                                      _____/s/_____
                                      ELISA FERNANDEZ
                                      Assistant United States Attorney


                                      _____/s/_____
                                      JUDITH A. HEINZ
                                      Senior Trial Attorney


                                      _____/s/_____
                                      EVAN N. TURGEON
                                      Trial Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                                                    PAGE

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   INTRODUCTION....................................................1

II.  DEFENDANT CANNOT DEMONSTRATE BY CLEAR AND CONVINCING
     EVIDENCE THAT HE IS NOT LIKELY TO FLEE DURING THE PENDENCY
     OF HIS APPEAL..................................................2

III. DEFENDANT HAS NOT RAISED SUBSTANTIAL QUESTIONS OF LAW OR
     FACT THAT ARE LIKELY TO RESULT IN REVERSAL, NEW TRIAL, NO
     TERM OF IMPRISONMENT, OR A TERM OF IMPRISONMENT LESS THAN
     THE DURATION OF THE APPEAL PROCESS.............................4

     A.   Defendant Ignores the Standards of Review that Govern
          the Issues on Appeal......................................4

     B.   Even If Successful, Defendant's Challenge Is Not
          Likely to Result in a Term of Imprisonment Less than
          the Duration of the Appeal Process........................6

     C.   Defendant's "Brady" Claims Do Not Concern Brady
          Material..................................................7

     D.   Defendant Has Failed to Raise a Substantial Question
          of Law or Fact as To His Sixth Amendment Claim...........9

     E.   The Government Did Not Fraudulently Induce...............14

     Defendant's Guilty Plea......................................14

     F.   The Government's Position on the Application of the
          Obstruction of Justice Adjustment at Sentencing Was
          Entirely Consistent With Its Position in Its
          Classified Sentencing Position Pleading..................18

IV.  CONCLUSION....................................................21

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                                    <u>PAGE</u>

Page(s)

Cases

<u>Cuyler v. Sullivan</u>,
  446 U.S. 335 (1980) ............................................... 10
<u>Holloway v. Arkansas</u>,
  435 U.S. 475 (1978) ............................................... 12
<u>Lockhart v. Terhune</u>,
  250 F3d 1223 (9th Cir. 2001) ..................................... 12
<u>McNeil v. Wisconsin</u>,
  501 U.S. 171 (1991) ................................................ 9
<u>Mickens v. Taylor</u>,
  535 U.S. 162 (2001) ............................................... 12
<u>United States v. Allen</u>,
  831 F.2d 1487 (1987) ............................................. 11
<u>United States v. Baker</u>,
  790 F.2d 1437 (9th Cir. 1986) ................................. 5, 13
<u>United States v. Fokker Services B.V.</u>,
  818 F.3d 733 (D.C. Cir. 2016) ..................................... 8
<u>United States v. Gouveia</u>,
  467 U.S. 180 (1984) ................................................ 9
<u>United States v. Handy</u>,
  761 F.2d 1279 (9th Cir. 1985) ................................. 1, 2
<u>United States v. King</u>,
  257 F.3d 1013 (9th Cir. 2001) ................................. 5, 18
<u>United States v. Mills</u>,
  641 F.2d 785 (9th Cir. 1981) ..................................... 10
<u>United States v. Moody</u>,
  778 F.2d 1380 (9th Cir. 1985) .................................... 13
<u>United States v. Nagra</u>,
  147 F.3d 875 (9th Cir. 1998) ............................. 5, 18, 21
<u>United States v. Percy</u>,
  250 F.3d 720 (9th Cir. 2001) ..................................... 10
<u>United States v. Sustaita</u>,
  1 F.3d 950 (9th Cir. 1993) .............................. 13, 14, 16
<u>United States v. Walter-Eze</u>,
  869 F.3d 891 (9th Cir. 2017) ..................................... 12
<u>Willis v. United States</u>,
  614 F.2d 1200 (9th Cir. 1979) .................................... 11
<u>Wood v. Georgia</u>,
  450 U.S. 261 (1981) ........................................... 10, 12

Statutes

18 U.S.C. § 3141.......................................................... 2
18 U.S.C. § 3142.......................................................... 3
18 U.S.C. § 3143(b)(1)..................................................... 1
18 U.S.C. § 3553(a)(6).................................................... 13

Rules

Fed. R. Crim. P 11(e)...................................................... 5
Fed. R. Crim. P. 11(d)(2)(B).............................................. 10
USSG § 3C1.1.............................................................. 19

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.   INTRODUCTION**

Title 18, United States Code, Section 3143(b)(1) requires that:

"a judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

(A)  <u>by clear and convincing evidence that the person is not likely to flee</u> or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B)  that <u>the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in</u>—

(i)   reversal,

(ii)  an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv)  <u>a reduced sentence to a term of imprisonment less than</u> the total of the time already served plus <u>the expected duration of the appeal process</u>."

18 U.S.C. § 3143(b)(1) (emphasis added).

Defendant cannot satisfy by the clear and convincing evidence standard that he is not likely to flee should his release be extended beyond the current date of June 18, 2021.

Defendant also cannot demonstrate that his appeal raises a "substantial question of law or fact" under § 3143(b).  A "substantial question" refers to an issue that is "fairly debatable" or "fairly doubtful," and is of more substance than would be necessary to a finding that it is not frivolous.  <u>United States v. Handy</u>, 761 F.2d 1279, 1283 (9th Cir. 1985).  "Fairly debatable" questions are those that are novel or not readily answerable, or that

1

pose issues "'debatable among jurists of reason.'"  Id. at 1281-82.
This standard does not require that reversal be more likely than not,
id. at 1280-81, but neither is it so toothless that it eviscerates
Congress' intent to "tighten[] the standards for bail pending
appeal[.]"  Id. at 1283.

Defendant's claims raise no substantial basis for reversal, new
trial, non-custodial sentence, or a reduced sentence below the
expected duration of the appeal because they are dependent upon
defendant obtaining permission to set aside his guilty plea and void
his plea agreement.  Defendant cannot show a "manifest injustice" in
this case that would merit such extraordinary relief.  Even if the
Court embraced defendant's acceptance-of-responsibility and Brady
arguments that pertain to the Federal Election Campaign Act ("FECA")
and Foreign Agents Registration Act ("FARA") counts (which it should
not), the other counts would remain.  This Court sentenced defendant
to a twelve-year term of imprisonment.  (Dkt. 332)[1]  The sentencing
guidelines for the tax count recommended 97-121 months and the Court
imposed a 60-month sentence on that count.  The Court also imposed a
consecutive 84-month sentence on the obstruction count.  (Id.)

## II.   DEFENDANT CANNOT DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT HE IS NOT LIKELY TO FLEE DURING THE PENDENCY OF HIS APPEAL

After sentencing, pursuant to authority granted by 18 U.S.C. §
3141, the Court ordered defendant released until his surrender to the
U.S. Bureau of Prisons ("USBOP") on May 25, 2021.  (Dkt. 336)  On May
3, 2021, at a hearing on a defense motion, the Court extended

---

[1] References to "Dkt" are to the docket in CR 19-642-VAP.

1   defendant's surrender date to June 18, 2021.  (Dkt. 364)  As the

2   Court's comments at the hearing made clear, the reason for this

3   extension was to provide defendant with additional time to be

4   vaccinated against the coronavirus.[2]

5       Throughout the post-sentencing period of release, the Court has

6   imposed, pursuant to 18 U.S.C. § 3142, in various iterations,

7   conditions of release to mitigate the risk of defendant's flight.  At

8   the May 3 hearing, the Court directed the government to file a motion

9   setting forth its recommendation for additional conditions to reduce

10   the risk of flight.

11       The government's motion, which the court granted in part, was

12   based upon the incontrovertible fact that circumstances have changed

13   over the course of defendant's release.  (Dkt. 351)[3]  The entire

14   basis for release pending surrender has changed because vaccinations

15   are now widely available and the pandemic has eased.  Moreover,

16   defendant has not demonstrated good faith, honesty, reliability, or

17   responsible behavior during the period of release.  He misled the

18   Court by offering contradictory explanations as to why he has not

19

20

21       [2] Indeed, the Court calculated that if defendant were to obtain

22   his first vaccination dose by May 7, 2021, defendant would have ample
time prior to his surrender to both obtain a second vaccination dose

23   and benefit from the two-week efficacy period recommended by the
Centers for Disease Control and Prevention ("CDC").

24       [3] Factors that demonstrate defendant's likely flight remain
unchanged.  Defendant was born in Pakistan, has family in Pakistan,

25   routinely traveled overseas, and has real estate holdings and bank
accounts overseas worth many millions of dollars.  Defendant's wife

26   was born in China and their children are of pre-school age.  (Dkt.
328)  Defendant has a history of obstructing justice, engaging in

27   tactics of delay, and not accepting responsibility for his criminal
conduct.  (Dkt. 42, 53, 229, & 267)  The Court imposed a sentence of

28   12 years imprisonment rather than the sentence of home confinement
that defendant sought.  (Dkt. 328)

1   been vaccinated.  He violated the terms of his release on multiple

2   occasions.  He has shown contempt for the law by continuing to

3   violate FARA and by perpetrating a fraud upon the government by

4   collecting social security benefits in the name of his deceased

5   father.  (See attached Declaration of John M. Lucero)  He has

6   associated with an individual charged in both federal and state

7   courts with money laundering and suspiciously offered that defendant

8   a "gift" of $100,000 so that he might post bail.  (Dkt. 351)

9       The extension of defendant's surrender to June 18 was another

10   changed circumstance that will necessarily tax the government's

11   ability to monitor defendant's whereabouts effectively over the next

12   month.  Granting defendant's release throughout the entire appellate

13   process would increase the risk of his flight to a much greater

14   degree.  It would be impractical for the government to maintain

15   effective surveillance for such a lengthy period.  There are no

16   conditions of release that provide clear and convincing proof that

17   defendant is not likely to flee over this extended time.

18   **III.  DEFENDANT HAS NOT RAISED SUBSTANTIAL QUESTIONS OF LAW OR FACT**

19   **THAT ARE LIKELY TO RESULT IN REVERSAL, NEW TRIAL, NO TERM OF IMPRISONMENT, OR A TERM OF IMPRISONMENT LESS THAN THE DURATION OF THE APPEAL PROCESS**

20

21   **A.  Defendant Ignores the Standards of Review that Govern the Issues on Appeal**

22       For purposes of determining whether defendant raises

23   "substantial questions of law or fact," it is necessary to consider

24   the posture in which these arguments will be reviewed by the Ninth

25   Circuit.  Defendant incorrectly suggests that the "setting aside" of

26   his plea agreement will be reviewed under the plain error standard.

27   (Dkt. 368 at 2, 19)  Instead, under Ninth Circuit precedent,

28   permitting a defendant to set aside a guilty plea requires a showing

of "manifest injustice."  Because defendant's claims do not demonstrate manifest injustice (or even plain error), defendant has not raised "substantial questions" under § 3143.

After the court imposes sentence, a defendant may not withdraw a plea of guilty and the plea may only be set aside on direct appeal or collateral attack.  Fed. R. Crim. P 11(e); United States v. King, 257 F.3d 1013, 1023 (9th Cir. 2001); United States v. Baker, 790 F.2d 1437 (9th Cir. 1986).  To prevail on such a post-conviction appeal to set aside a guilty plea, a defendant must demonstrate "a fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  Baker, 790 F.2d at 14.  A defendant's dissatisfaction with his sentence does not meet this standard.  See King, 257 F.3d at 1024 ("Given the evidence indicating [defendant] hoped to withdraw his plea primarily because he was unhappy with his sentence, denial of his request creates no manifest injustice."); United States v. Nagra, 147 F.3d 875, 880 (9th Cir. 1998) ("There can be no manifest injustice in refusing to permit a defendant to withdraw a guilty plea when there is no serious contention that the defendant is innocent of the crimes charged.").[4]

As detailed below, none of defendant's claims meet this standard because none supports the contention that defendant was actually innocent of the crimes to which he pleaded guilty.  Indeed, at no

_____

[4] To the extent that defendant plans to appeal the substance of the Court's sentence, the Ninth Circuit will review this Court's application of the Guidelines to the facts for abuse of discretion and this Court's factual findings for clear error.  See King, 257 F.3d at 1024.  Defendant has not identified a substantial question regarding the Court's rulings under these standards.

point -- including in the instant motion -- has defendant ever asserted factual innocence.

### B. Even If Successful, Defendant's Challenge Is Not Likely to Result in a Term of Imprisonment Less than the Duration of the Appeal Process

Even if the Court embraced defendant's argument that had he known prosecutors offered deferred prosecution agreements ("DPAs") to other individuals in connection with the filing of FECA charges, he would not have pleaded guilty to a FECA offense, and that this count should be set aside, the resulting Sentencing Guideline range would have nevertheless resulted in a sentence far in excess of the expected duration of the appeal process.  Indeed, the tax offense alone resulted in a Sentencing Guideline range of 97 to 121 months imprisonment.

Even if defendant were somehow to prevail on his claims and successfully withdraw his guilty plea not only to the FECA offense, but also his pleas of guilty to the FARA and tax charges, he still would not satisfy § 3143's "substantial question" standard because he separately admitted facts proving his guilt as to obstruction of justice.  That plea of guilty occurred at a separate change-of-plea hearing and pursuant to a separate plea agreement, the terms and circumstances of which defendant does not challenge.  See Case No. 2:20-cr-00155-VAP at Dkt. 5, 14.

With regard to the obstruction-of-justice count, defendant offers only the baffling, counterfactual argument that if his guilty pleas to the FARA, FECA, and tax charges were all set aside, he would be eligible for home confinement or probation on the obstruction count.  (Dkt. 368 at 24-25)  This fantasy does not account for the fact that the Court imposed a separate sentence for obstruction of

1 justice: 84 months imprisonment, to be served consecutively to the

2 60-month sentence for the FARA, FECA, and tax counts.  Nothing in the

3 record and none of defendant's claims in his motion supports the

4 contention that defendant is likely to receive a substantially

5 reduced sentence for obstruction.  Moreover, defendant's argument --

6 that the Court could issue a shorter sentence on one count if he

7 successfully challenges other counts -- would justify bond pending

8 appeal in virtually any multi-count case, rendering § 3143(b)(1) a

9 dead letter.  Challenging one sentence should not enable a defendant

10 to avoid serving another sentence.

11 **C.   Defendant's "Brady" Claims Do Not Concern Brady Material**

12

13 Defendant argues that DPAs executed by the government in

14 unrelated matters constitute discoverable <u>Brady</u> material because such

15 material is "favorable to the defense and bears directly on guilt or

16 punishment."  (Dkt. 368 at 14)  In reality, however, DPAs in

17 unrelated cases bear on neither.

18 By definition, a DPA in an unrelated case does not bear upon a

19 defendant's guilt because a DPA signatory does not admit guilt.[5]

20 Although defendant argued at sentencing that "Courts Show Leniency

21 Towards FECA Violations" (Dkt. 122 at 20-23) and the parties debated

22 whether the Court should sentence FECA matters leniently or instead

23 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

24

25 [5] For example, in Gilbert Chagoury's publicly available DPA, it
makes clear that, among other things: (a) he did not admit legal
guilt as to any offense; (b) he did not admit to any FARA conduct;

26 (c) he did not admit to any tax violations; (d) he did not admit to
any obstruction conduct; (e) he did not admit to any fraud conduct;

27 (f) he was a foreign national outside the jurisdiction of the USAO;
(g) he accepted responsibility for making $180,000 in foreign conduit

28 contributions; and (h) he provided unique cooperation as assessed by
the USAO.

1    embrace the policy statements set forth in the Sentencing Guidelines

2    (Dkt. 233 at 15-20), a DPA does not bear upon how courts sentence

3    individual defendants.  Indeed, during the pendency of a DPA, no

4    conviction is entered and no sentence is imposed.

5         A DPA is the product of prosecutorial discretion.  See United

6    States v. Fokker Services B.V., 818 F.3d 733 (D.C. Cir. 2016)

7    (district court lacked power to deny joint motion to suspend running

8    of time under Speedy Trial Act based upon its view that prosecution

9    had been too lenient in DPA because the Executive retains

10   independence with regard to charging decisions).  The existence of

11   such an agreement bears no relevance to an unrelated defendant's

12   case, either as to that defendant's guilt or to the punishment that

13   that defendant should receive.  Nor does it diminish the importance

14   of criminal statutes passed by Congress or policy statements and

15   guidelines issued by the U.S. Sentencing Commission.  There is no

16   duplicity in the government arguing that, "a sentence within the

17   guideline range is necessary to deter other would-be FARA and FECA

18   offenders from compromising our elections and institutions with

19   foreign cash"[6] and entering into DPAs in an unrelated case.  Because

20   such information was not mitigating with respect to this defendant's

21   sentencing, it does not constitute Brady material.[7]

---

[6] The defendant has submitted no evidence that the AUSA who drafted this statement was then aware of DPAs executed in connection with the Chagoury investigation other than a conclusory statement that as a Deputy Chief, he must have been aware of actions undertaken by the Chief of the Public Corruption & Civil Rights Section.

[7] The government respectfully requests that the Court make a finding that even if the Court had been aware of the resolution of
(footnote cont'd on next page)

### D.   Defendant Has Failed to Raise a Substantial Question of Law or Fact as To His Sixth Amendment Claim

Defendant claims that one of his several attorneys labored under an "actual conflict" that "infected" defendant's plea and sentencing when he represented another individual in an unrelated investigation involving FECA and tax violations.  (Dkt. 385 at 10)  Defendant is unable to show a substantial issue of either law or fact as to this claim.

### 1. The Sixth Amendment Right to Counsel Does Not Extend to Pre-Indictment Plea Negotiations

Defendant's principal argument is that the alleged conflict adversely affected his counsel's advocacy during pre-indictment plea negotiations and that had defendant known that one of his counsel's other clients had received a DPA, defendant would have rejected the plea deal.[8]  (Dkt. 368 at 12, 12 fn. 28)

The Sixth Amendment guarantees an "accused" the right to the assistance of counsel in "all criminal prosecutions."  U.S. Const. Amend. VI.  "[T]he right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant", United States v. Gouveia, 467 U.S. 180, 187-189 (1984), that is, after the initiation of criminal proceedings "by way of formal charge, preliminary hearing, indictment, information, or arraignment."  McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); see

_____

Chagoury's unrelated matter, this fact would not have altered the Court's imposition of defendant's within-guidelines sentence, which was supported by the individualized analysis the Court cited in imposing it.

[8] As a threshold matter, it would not make sense for a defendant to reject a plea offer and instead proceed to trial based solely upon the disposition of an unrelated investigation.

9

1  United States v. Percy, 250 F.3d 720, 725 (9th Cir. 2001) ("This

2  Circuit adheres to the bright-line rule that the Sixth Amendment's

3  right to counsel attaches upon the initiation of formal charges.").

4        Here, defendant was charged via information, not by indictment.

5  (Dkt. 1).  As such, all plea discussions occurred *before* any formal

6  charge.  As defendant acknowledges, United States v. Olson makes

7  clear that "the Sixth Amendment right to counsel does not attach to

8  purely pre-indictment plea bargaining."  (Dkt. 368, fn. 28)

9  Accordingly, defendant's Sixth Amendment claim fails as a matter of

10 law.  See United States v. Mills, 641 F.2d 785, 788 (9th Cir. 1981).

11       **2. Defendant Has Failed to Raise a Substantial Question as to**
         **Whether an Actual Conflict of Interest Existed**

12

13       Seeking to avoid the unavailability of relief under the Sixth

14 Amendment, defendant argues that his attorney was also ineffective at

15 the change of plea hearing on November 22, 2019 and again prior to

16 sentencing.  (Dkt. 368 at 12, fn. 28)  Defendant argues that had

17 counsel disclosed the alleged conflict at the plea hearing or prior

18 to sentencing "Zuberi could still have moved to withdraw the plea

19 pursuant to Fed. R. Crim. P. 11(d)(2)(B)."  (Dkt. 368 at 12-13)

20       The Sixth Amendment affords a defendant the right to be

21 represented by counsel whose loyalties are undivided.  See Wood v.

22 Georgia, 450 U.S. 261, 271 (1981).  To establish a Sixth Amendment

23 violation based on a conflict of interest, a defendant must show: (1)

24 that counsel actively represented conflicting interests, and (2) that

25 an actual conflict of interest adversely affected his lawyer's

26 performance.  See Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  The

27 mere "possibility of conflict is insufficient to impugn a criminal

28 conviction."  Id.  Instead, "the conflict must be actual rather than

1  potential or speculative."  See United States v. Allen, 831 F.2d

2  1487, 1495 (1987).  The Ninth Circuit requires "a factual showing on

3  the record that a conflict existed, for 'while we cannot indulge in

4  nice calculations about the amount of prejudice which results from a

5  conflict of interest . . . , neither can we create a conflict of

6  interest out of mere conjecture as to what might have been shown.'"

7  Willis v. United States, 614 F.2d 1200, 1203 (9th Cir. 1979).

8        Defendant has failed to raise a substantial issue as to the

9  threshold requirement for seeking relief under the Sixth Amendment --

10 that a conflict, in fact, existed.  Defendant has not identified

11 anything in the record to demonstrate an actual conflict; instead, he

12 merely speculates that because his counsel represented Arsan, a

13 client in an unrelated matter, on unrelated tax and FECA charges, the

14 attorney must have had divided loyalties.  (Dkt. 39 at 8-13)  But the

15 charges against defendant have nothing to do with Arsan, Chagoury,[9]

16 or any other individual ("the Chagoury Subjects") who entered into a

17 DPA with the government.  Defendant does not allege that the Chagoury

18 Subjects were targets, subjects, or witnesses in either of the

19 investigations that resulted in defendant twice pleading guilty.

20 Defendant alleges no facts that would raise a substantial question as

21 to whether defendant's interests were adverse to those of the Chagoury

22 Subjects.

23       The cases relied upon by the defendant are inapposite.  All the

24 cases cited by defendant involve conflict concerns arising out of

25

26

27       [9] Defendant does not assert that the attorney labored under a
   conflict as to Chagoury, but merely speculates that he likely knew of
28 all three individuals who received DPAs "because the cases were
   investigated together for the same scheme."  (Dkt. 368 at fn. 24)

11

multiple representations within the same case or investigation.  In Wood v. Georgia, 450 U.S. 261, 271 (1981), the Supreme Court discussed a conflict of interest where all three defendants in the same case had been represented by a single lawyer.  In Holloway v. Arkansas, 435 U.S. 475, 490 (1978), a single attorney represented three defendants in the same trial.  In Lockhart v. Terhune, 250 F3d 1223, 1230 (9th Cir. 2001), the defense attorney simultaneously represented two clients who were implicated in the same murder.  In Mickens v. Taylor, 535 U.S. 162, 163-67 (2001), defendant's claim was based on counsel having previously represented the victim of the murder from which defendant appealed his conviction and sentence. Defendant's reference to United States v. Walter-Eze, 869 F.3d 891, 901 (9th Cir. 2017) is inapplicable.  In Walter-Eze, a direct conflict between the defendant and his own counsel's economic interests arose after the district court offered counsel the choice "of obtaining a requested continuance but paying fees" and a potential state bar reprimand "or foregoing the continuance and avoiding the fees and possible sanctions."  Id. at 900.

Defendant has not argued that his interests were averse to the interests of any of the individuals who entered into DPAs or to the interests of his attorney.  Rather, defendant merely speculates that his attorney's duty to Arsan "sealed his lips" to seeking a DPA for defendant and precluded the defense from arguing a sentencing disparity among similarly situated defendants.  (Dkt. 368 at 10) Both arguments are contradicted by the record.  First, the defense, including the attorney at issue, expressly sought a DPA from the government as early as 2018.  (Lucero Declaration, Ex. 1, IRS Memorandum of Contact, dated April 12, 2018)  At the time, AUSA Mack

1  Jenkins advised that "a deferred prosecution ha[d] not been

2  rejected." Id. at 2.  AUSA O'Brien made clear that should defendant

3  seek to proffer information to the government, defendant should not

4  do so with the expectation that a DPA would be offered.  Id.[10]

5  Second, the record contradicts defendant's assertion that the alleged

6  conflict "sealed" counsel's lips on arguing unwarranted sentencing

7  disparities.  (Dkt. 368 at 11)  Prior to sentencing, the defense

8  submitted statistical surveys of sentences imposed in unrelated cases

9  to argue that courts show leniency toward FECA violations.  (Dkt. 122

10  at 20-23)  The defense similarly argued, "courts have consistently

11  found that the advisory Guideline range for tax crimes overstates the

12  punishment necessary to meet the goals of section 3553(a)."  (Id. at

13  26-28)  Defense counsel also argued that courts have shown leniency

14  towards similarly situated defendants convicted of FARA violations.

15  (Id. at 35-43)

16      Contrary to defendant's assertions, none of the Chagoury

17  Subjects are similarly situated defendants within the meaning of 18

18  U.S.C. § 3553(a)(6).  Pursuant to 18 U.S.C. § 3553(a)(6), prior to

19  the imposition of a sentence, a Court shall consider several factors,

20  including "the need to avoid unwarranted sentence disparities among

21  *defendants* with similar records *who have been found guilty of similar*

22  *conduct*."  See 18 U.S.C. § 3553(a)(6)(emphasis added).  None of the

23  recipients of DPAs has been found guilty of any crime, much less

---

26  [10] There is no constitutional right to a plea bargain, United
    States v. Moody, 778 F.2d 1380, 1385-86 (9th Cir. 1985), amended, 791
27  F.2d 707 (9th Cir. 1986), let alone to a specific plea offer.  "[T]he
    decision whether to offer a plea bargain is a matter of prosecutorial
28  discretion." Id.; see also United States v. Sustaita, 1 F.3d 950, 952
    (9th Cir. 1993).

similar conduct.  The public press release cited by the defense shows that the DPAs at issue did not include admissions to FARA violations, tax violations, or obstruction of justice.  Id.  Moreover, in the case of Arsan,[11] the press release and DPA show that unlike the defendant, Arsan cooperated with the government's investigation (rather than repeatedly obstructing an investigation, as defendant did) and demonstrated acceptance of responsibility.  Id.  The record clearly shows that defendant has failed to identify a substantial issue as to whether an actual conflict of interest adversely affected his lawyer's performance.

### E. The Government Did Not Fraudulently Induce Defendant's Guilty Plea

Defendant's claim that the government concealed from defendant a hidden agenda not to recommend credit for acceptance of responsibility is entirely divorced from the facts and the evidentiary record in this case.  It paints an upside-down portrait of events as they actually transpired.

Rather than conceal the fact that acceptance of responsibility was at issue, the government *highlighted* it for defendant prior to his execution of the plea agreement, as set forth in the government's unrebutted declaration.  (Dkt. 267 at ¶ 11)  The parties negotiated language in the plea agreement to address this issue and supplanted boilerplate language contained within the government's standard plea agreements that states that acceptance-of-responsibility credit would

---

[11] The Arsan DPA, CR 21159-PSG, also resolved the USAO's criminal investigation of defendant Arsan's tax violations.  The civil aspects were the subject of a closing agreement with the Internal Revenue Service.

be recommended by the government "provided that defendant demonstrates an acceptance of responsibility for the offense[s] up to and including the time of sentencing" with the specific criteria set forth in the sentencing guidelines: "provided that defendant demonstrates an acceptance of responsibility for the charged offenses *as defined in U.S.S.G. § 1BE1.1, including as further explained in its application notes and in particular Note 1(A)."* (attached Declaration of Daniel J. O'Brien; Dkt. 5 at ¶ 5(c) (emphasis added))

Rather than a "pre-planned strategy" to deny defendant an acceptance-of-responsibility recommendation, the government provided defendant with numerous opportunities to merit the sentencing reduction. The government provided advance discovery on every issue the parties agreed to litigate prior to filing position papers to give the defendant ample time to digest the evidence and not make false representations to the Court. The government repeatedly extended the time for defendant to make good on his promises in the plea agreement to pay his tax obligations and to correct his FARA filings. (Dkt. 120; Dkt. 267, Ex. 1A) In its first filing devoted to the issue of acceptance of responsibility, despite defendant's breaches of the plea agreement, the government nevertheless kept open the possibility that it would recommend acceptance-of-responsibility credit in the future if defendant ultimately fulfilled his obligations under the plea agreement. (Dkt. 120 at 3 ("Defendant's recent behavior has made it impossible for the government to recommend acceptance of responsibility *at this time*" (emphasis added)); id. at 6 ("government declines *at this time* to move for a third point reduction" (emphasis added)); id. at 7 ("Absent some extraordinary efforts by defendant to promptly rectify the situation,

15

the government will maintain this position at time of sentencing.""))
The unfortunate and inexplicable history of this case involves a
defendant repeatedly compounding his transgressions despite the
government's numerous efforts to save him from himself.

Defendant claims that the government attempted to use the
acceptance-of-responsibility recommendation to extort concessions on
issues the parties agreed to litigate, but this claim is both refuted
by unrebutted evidence and is a logical impossibility under the law.
The government never "demanded that Zuberi stipulate to obstruction
of justice," and the defendant's citation to the government's brief
(Dkt. 54 at 9-10)[12] does not say any such thing.[13]  The government
repeatedly stated that defendant had "the right to litigate both
issues of fact and the sentencing guideline enhancements," that "he
should not be punished for doing so," and that both the government
and the Court "should lean heavily in favor of recommending an
acceptance reduction where a defendant agrees to plead guilty,
particularly prior to indictment."  (Id. at 7; Dkt. 229 at 8)  The
"Catch-22" scenario posited by defendant is neither a creation of the
government nor a Catch-22.  The Sentencing Guidelines set forth the
criteria with respect to litigating issues in good faith: "[A]
defendant who falsely denies, or frivolously contests relevant
conduct that the court determines to be true has acted in a manner

---

[12] The government's page citations are to the docketed pdf.  The
defense page citations are to the memorandum of points and
authorities.

[13] Instead, the government provided *discovery* to the defense and
and "informed the defense that it would hold off filing its
obstruction of justice position long enough to give defendant ample
time to review the evidence and consider stipulating to the
enhancement."  (Id.)

inconsistent with acceptance of responsibility."  U.S.S.G. § 3E1.1,
Application Note 1(A).  The law does not create an irreconcilable
dilemma.  A defendant is free to present evidence, contest the
government's evidence, and argue the law; a defendant is not
permitted, without penalty, to make false representations to the
Court or frivolously deny the truth.

Nor did the government, as defendant claims (Dkt. 368 at 22-23),
argue that defendant's pre-plea acts of obstruction should provide
the basis for denying acceptance of responsibility.  Instead, the
government argued the opposite, stating, "Defendant's plea of guilty
would have likely merited a reduction for acceptance of
responsibility but for his more recent conduct."  (Dkt. 120 at 3)
The several bases for the government's arguments on acceptance of
responsibility are clearly set forth in the record.  (Dkt. 229 at 6-
28)  None of those arguments pertained to defendant's pre-plea
obstruction.  The government's arguments that defendant cites (Dkt.
120 at 4-6; Dkt. 229 at 6-8) do not say anything about pre-plea
obstruction of justice.[14]

_____

[14] Defendant devotes a substantial portion of his motion (Dkt.
368 at 24-26) to discussing the inapplicability of U.S.S.G. 3E1.1,
Application Note 4, which states that typically, obstructive conduct
indicates that a defendant has not accepted responsibility, but that
in extraordinary cases both the enhancement and the reduction might
apply.  The government cited this provision in its initial sentencing
brief on acceptance of responsibility.  (Dkt. 120 at 3-4)  The
government nevertheless argued in that same brief (id. at 3) and
subsequently (Dkt. 229) that defendant should not be denied the
acceptance of responsibility reduction based upon pre-plea
obstructive conduct.  Rather, the government argued that the Court
should not grant the reduction given his repeated violations of the
terms of the plea agreement by failing to pay his tax obligations and
*(footnote cont'd on next page)*

17

Finally, defendant's evident satisfaction with the plea agreement before sentencing belies any claim that he was prejudiced. Defendant admits that he became aware of the government's purported fraudulent inducement within weeks of executing the plea agreement (Dkt. 368 at 22-23), at which time he specifically determined not to withdraw his plea but rather to seek "specific performance" of the government's "promise."  (<u>Id.</u> at 26)  Only after the Court imposed sentence did defendant attempt to have his guilty plea set aside. The Ninth Circuit has expressly rejected this sort of gamesmanship. <u>See</u>, <u>e.g.</u>, <u>King</u>, 257 F.3d at 1024; <u>Nagra</u>, 147 F.3d at 880.

> **F.    The Government's Position on the Application of the Obstruction of Justice Adjustment at Sentencing Was Entirely Consistent With Its Position in Its Classified Sentencing Position Pleading**

Defendant argues that he is entitled to "set aside" his plea agreement post-sentencing because the government argued that he "obstructed justice by deleting emails even after conceding he did so

---

committing ongoing FARA violations, his false representations to the Court, and his frivolous sentencing arguments.  (Dkt. 229 at 6-28) The government identified the legal basis for its position by citing to various provisions of Application Note 1, not Application Note 4. The Court did not impose a reduction for acceptance of responsibility.

Defendant also appears to complain that the government did not provide warnings in the plea agreement that reneging on his tax obligations and FARA registration promises could jeopardize his receiving the acceptance-of-responsibility reduction.  (Dkt. 368 at 24)  In fact, however, the plea agreement does provide such warnings because it cites the relevant Sentencing Guideline provision, Section 3E1.1, which sets forth the law on this issue. (Dkt. 5 at ¶ 5(c)) Moreover, the government could not have fraudulently induced defendant's plea by withholding such an admonition because defendant could not breach his agreement prior to signing it (nor did the government have reason to believe he would eventually do so).

18

at the government's direction."  (Dkt. 368 at 23)  This claim
misstates the facts and is without merit.

At sentencing, the government argued that defendant should
receive a two-level enhancement for obstruction of justice pursuant
to USSG § 3C1.1.  (Dkt. 42; Dkt. 53)  The basis for the government's
argument was that defendant had tampered with multiple witnesses
(Dkt. 42 at 6-27) and had caused certain emails, and whole email
accounts, to be deleted from documentary evidence previously
identified by defendant's counsel, Mr. James Bowman.  (Dkt. 42 at 27-
33)

As explained in the government's Amended Sentencing Position Re:
Obstruction of Justice (Dkt. 42) and the Declaration and Exhibits
filed in support (Dkt. 53), during January and February 2018, Mr.
Bowman, in response to a grand jury subpoena seeking emails, advised
the government, *inter alia*, that (1) email correspondence using the
domain avenueventure.com was retained on servers maintained by
GoDaddy, Inc. ("GoDaddy"); (2) in addition to defendant's
avenueventure.com account, there were 14 avenueventure.com accounts
currently stored on the GoDaddy servers, including
job@avenueventure.com, john.warren@avenueventure.com,
jon.carpenter@avenueventure.com, and renee.wu@avenueventure.com; and
(3) defendant had the power to access these third-party
avenueventure.com email accounts in his capacity as administrator or
by changing the account passwords.  (Dkt. 53 at ¶ 10)  On January 29,
2018, the government agreed to a defense request to delay production
of emails on the GoDaddy servers provided that the defense would
retain said emails for later production.  (Id. at ¶ 11; Lucero

Declaration, Ex. 1)[15]  On February 8, 2019, Mr. Bowman informed the government that his firm no longer represented defendant and that it had returned to defendant the materials previously collected from defendant and the Avenue Companies.  (Id. at ¶ 15)

On February 21, 2019, the government informed defendant's new counsel, Thomas O'Brien, that it required production of the emails stored on the GoDaddy server.  (Id. at ¶ 16)  On August 15, 2019, defense counsel Ivy Wang produced emails that had been stored on the GoDaddy server; however, the production consisted of only 246 documents that were irrelevant to the government's investigation, many of which appeared to be personal (non-corporate and spam).  (Id. at ¶ 17)  While earlier defense productions had tendered some avenueventure.com emails going back as far as 2010, the August 2019 production only went as far back as August 12, 2016.  (Id.) Moreover, in connection with this production, Ms. Wang stated that the following accounts, previously represented by Mr. Bowman to be residing on the GoDaddy server, "do not exist on the GoDaddy server":

---

[15] The defense also successfully convinced the government to refrain from issuing any third-party subpoenas during the period of April 2017 through February 2019 while the parties discussed defendant's possible cooperation.  (Dkt. 53 at ¶ 6)  During this period, defendant embarked on his witness-tampering scheme in which he offered millions of dollars to six witnesses in exchange for their silence.  (Id. at ¶ 19-50; Dkt. 42 at 6-27)

Indeed, there is ample evidence in the record to demonstrate that defendant's current application is yet another episode in a long series of delaying tactics.  Defendant's purpose of delay provides another basis for rejecting this motion.  In addition to the above, defendant delayed the sale of properties to finance his restitution obligations (Dkt. 229 at 20-22), the execution of quitclaim deeds to satisfy bond conditions (Dkt. 351 at 7, fn 5), and his surrender. (Id. at 5-7)

job@avenueventure.com, john.warren@avenueventure.com,
jon.carpenter@avenueventure.com, and renee.wu@avenueventure.com.
(Id. at ¶ 18)  Of these four email accounts,
renee.wu@avenueventure.com figured prominently in the government's
proof of defendant's criminal conduct.  (Dkt. 42 at 33)

In his response to the government's claims that defendant
obstructed justice, defendant argued that he had not tampered with
several witnesses -- Person LL, Person C, Person MN, or US Cares
investors.  (Dkt. 122 at 38-49)  However, defendant offered no
rebuttal to the government's argument that he had deleted these email
accounts.  (Id.)

Defendant did not delete these email accounts at the behest of
any U.S. government entity, and the government never conceded or
suggested that he did.  See Gov't Classified Response to Defendant's
Motion for Release Pending Appeal.  As a result, the government's
position that defendant deserved an obstruction-of-justice Sentencing
Guideline enhancement for deleting these four email accounts is not
inconsistent with any other government representation.

**IV.  CONCLUSION**

Defendant cannot show a substantial question of law or fact
likely to result in the setting aside of his guilty plea.  His motion
should be denied.

1

**DECLARATION OF JOHN M. LUCERO**

2      I, JOHN M. LUCERO, declare as follows:

3      1.   I have been a Special Agent ("SA") with the Internal

4  Revenue Service – Criminal Investigation ("IRS-CI") for approximately

5  16 years.  I am presently assigned to the El Monte, Post of Duty in

6  the Los Angeles Field Office.  My official duties include the

7  investigation of possible criminal violations of the Internal Revenue

8  laws, codified in Title 26 of the United States Code; domestic

9  currency reporting and money laundering violations, codified in

10  Titles 31 and 18 of the United States Code; and related statutes.

11  During my career as a Special Agent, I have conducted or

12  assisted in the investigation of numerous suspected violations

13  of financial fraud, criminal tax fraud, Bank Secrecy Act

14  violations, and money laundering statutes.

15      2.   Since 2016, I have been assigned to the investigation of

16  Imaad Shah Zuberi ("defendant") for tax offenses.

17      3.   Subsequent to defendant's sentencing and release pending

18  surrender, the IRS has tried to monitor defendant's sale of

19  properties and the disposition of proceeds from such sales.  As part

20  of that effort, I served subpoenas upon various financial

21  institutions with a return date of May 3, 2021, the hearing date on

22  defendant's motion to extend the time of his surrender.

23      4.   I reviewed documents produced by the USC Credit Union in

24  response to one such subpoena that pertain to a joint account in the

25  names of defendant and his deceased mother, Asifa Zuberi ("the joint

26  account").  The joint account reflects an April 15, 2021 deposit of a

27  $106,275 check from a law firm with a reference to "Return of client

28  funds."

5.    I also saw two $819 direct deposits from the U.S. Treasury referenced as "Deposit ACH SSA TREAS 310 TYPE: XXSOC SEC CO: SSA TREAS 310" and a $1,400 direct deposit from the U.S. Treasury which, given the timing and amount, appears to be a coronavirus stimulus payment.

6.    I searched IRS records for 1099s issued to defendant from the Social Security Administration ("SSA") and found none.

7.    IRS records for 1099s issued to defendant's mother, Asifa, show that the last 1099 she received from the SSA was for calendar year 2016.  IRS records for defendant's father, Mubarak, show that the SSA issued 1099s with Mubarak as the recipient of funds for each year from 2011 through 2020.  The SSA issued the most recent 1099 on or about February 11, 2021.  The 1099 identifies the payee's address as 10166 Rush Street, South El Monte, California 91773, which I know based upon my familiarity with filings in this case, was often utilized by defendant during the course of his FECA offenses.  The total amount of payments to Mubarak during the period of 2011 through 2020 was $78,958.

8.    I am aware from filings in this case that defendant's mother passed away in April 2016 and that his father died before that time.

9.    I have spoken to a Customer Service Representative at the Social Security Administration, and have been informed that a common practice that reduces the opportunity for Social Security benefits fraud is that the county of the place of death or the funeral home will notify the SSA of a beneficiary's death.

10.    I reviewed the database Accurint to see if the deaths of defendant's parents were reported there.  The database indicates that

Asifa Zuberi died in April 2016.  There is no indication that Mubarak Zuberi ever died.

11.  Bank statements obtained by the government during the course of its initial investigation show that the defendant frequently used the joint account during the period 2012 through October 2016.  There were over 400 transactions engaged in by defendant over this period including ATM withdrawals outside the United States, election campaign contributions, credit card payments, and checks to escrow companies.

12.  In addition to the $106,275 deposit, the recent bank statements show that on or about April 1, 2021, an $11,000 check cleared from the joint account.

13.  Attached as Exhibit 1 is a redacted Memorandum of Contact I prepared, dated April 12, 2018, that memorialized discussions between prosecutors and defense counsel during the course of the Zuberi investigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on May 17, 2021.

_John M. Lucero_
JOHN LUCERO

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF DANIEL J. O'BRIEN

I, DANIEL J. O'BRIEN, declare as follows:

1.   I am an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the Central District of California ("the USAO") responsible for the matters of United States v. Imaad Shah Zuberi, CR 19-642-VAP, and United States v. Imaad Shah Zuberi, CR 20-155-VAP.

2.   The USAO maintains a database that houses form plea agreements for AUSAs to use in formulating plea agreements offered to defendants.  The relevant language in the USAO's general plea agreement form that pertains to acceptance of responsibility reads as follows: "At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense[s] up to and including the time of sentencing, [the government agrees to] recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on May 17, 2021.

         /s/
DANIEL J. O'BRIEN

25