TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
Public Corruption & Civil Rights Section
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Trial Attorney, National Security Division
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2468/7383/7280
    Facsimile: (213) 894-2927
    E-mail:  daniel.obrien@usdoj.gov
    E-mail:  elisa.fernandez@usdoj.gov
    E-mail:  judith.heinz@usdoj.gov
EVAN N. TURGEON (D.C. Bar No. 1010816)
Trial Attorney, National Security Division
United States Department of Justice
    950 Pennsylvania Avenue, N.W., Suite 7700
    Washington, D.C. 20530
    Telephone: (202) 353-0176
    E-mail:    evan.turgeon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>        v.<br><br>IMAAD SHAH ZUBERI,<br><br>     Defendant. | No. LACR19-642-VAP<br>No. LACR20-155-VAP<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF JOHN M. LUCERO AND DANIEL J. O'BRIEN<br><br>Hearing Date: June 7, 2021<br>Time: 9:00 a.m.<br>Courtroom: 8A |

1

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby opposes defendant Imaad Shah Zuberi's motion for release pending appeal.

This opposition is based upon the attached Memorandum of Points and Authorities, the attached Declarations of John M. Lucero and Daniel J. O'Brien, and the files and records in this case.

Dated: May 17, 2021                    Respectfully submitted,

                                       TRACY L. WILKISON
                                       Acting United States Attorney

                                       BRANDON D. FOX
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                              /s/
                                       DANIEL J. O'BRIEN
                                       Assistant United States Attorney


                                              /s/
                                       ELISA FERNANDEZ
                                       Assistant United States Attorney


                                              /s/
                                       JUDITH A. HEINZ
                                       Senior Trial Attorney


                                              /s/
                                       EVAN N. TURGEON
                                       Trial Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

## TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES..............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   DEFENDANT CANNOT DEMONSTRATE BY CLEAR AND CONVINCING
      EVIDENCE THAT HE IS NOT LIKELY TO FLEE DURING THE PENDENCY
      OF HIS APPEAL...............................................2

III.  DEFENDANT HAS NOT RAISED SUBSTANTIAL QUESTIONS OF LAW OR
      FACT THAT ARE LIKELY TO RESULT IN REVERSAL, NEW TRIAL, NO
      TERM OF IMPRISONMENT, OR A TERM OF IMPRISONMENT LESS THAN
      THE DURATION OF THE APPEAL PROCESS..........................4

      A.   Defendant Ignores the Standards of Review that Govern
           the Issues on Appeal...................................4

      B.   Even If Successful, Defendant's Challenge Is Not
           Likely to Result in a Term of Imprisonment Less than
           the Duration of the Appeal Process.....................6

      C.   Defendant's "Brady" Claims Do Not Concern Brady
           Material...............................................7

      D.   Defendant Has Failed to Raise a Substantial Question
           of Law or Fact as To His Sixth Amendment Claim.........9

      E.   The Government Did Not Fraudulently Induce.............14

      Defendant's Guilty Plea....................................14

      F.   The Government's Position on the Application of the
           Obstruction of Justice Adjustment at Sentencing Was
           Entirely Consistent With Its Position in Its
           Classified Sentencing Position Pleading...............18

IV.   CONCLUSION.................................................21

i

1

**TABLE OF AUTHORITIES**

2

DESCRIPTION                                                                                    PAGE

3                                                                                          Page(s)

4    Cases

5    Cuyler v. Sullivan,
6        446 U.S. 335 (1980) ............................................... 10
     Holloway v. Arkansas,
7        435 U.S. 475 (1978) ............................................... 12
     Lockhart v. Terhune,
8        250 F3d 1223 (9th Cir. 2001) ...................................... 12
     McNeil v. Wisconsin,
9        501 U.S. 171 (1991) ................................................ 9
     Mickens v. Taylor,
10       535 U.S. 162 (2001) ............................................... 12
11   United States v. Allen,
         831 F.2d 1487 (1987) .............................................. 11
12   United States v. Baker,
         790 F.2d 1437 (9th Cir. 1986) .................................. 5, 13
13   United States v. Fokker Services B.V.,
         818 F.3d 733 (D.C. Cir. 2016) ...................................... 8
14   United States v. Gouveia,
         467 U.S. 180 (1984) ................................................ 9
15   United States v. Handy,
16       761 F.2d 1279 (9th Cir. 1985) .................................. 1, 2
     United States v. King,
17       257 F.3d 1013 (9th Cir. 2001) ................................. 5, 18
     United States v. Mills,
18       641 F.2d 785 (9th Cir. 1981) ..................................... 10
19   United States v. Moody,
         778 F.2d 1380 (9th Cir. 1985) ..................................... 13
20   United States v. Nagra,
         147 F.3d 875 (9th Cir. 1998) ............................. 5, 18, 21
21   United States v. Percy,
         250 F.3d 720 (9th Cir. 2001) ..................................... 10
22   United States v. Sustaita,
23       1 F.3d 950 (9th Cir. 1993) ............................... 13, 14, 16
     United States v. Walter-Eze,
24       869 F.3d 891 (9th Cir. 2017) ..................................... 12
     Willis v. United States,
25       614 F.2d 1200 (9th Cir. 1979) .................................... 11
     Wood v. Georgia,
26       450 U.S. 261 (1981) ........................................... 10, 12

27

28

Statutes

18 U.S.C. § 3141...................................................... 2
18 U.S.C. § 3142...................................................... 3
18 U.S.C. § 3143(b)(1)................................................ 1
18 U.S.C. § 3553(a)(6)............................................... 13

Rules

Fed. R. Crim. P 11(e)................................................. 5
Fed. R. Crim. P. 11(d)(2)(B)........................................ 10
USSG § 3C1.1........................................................ 19

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Title 18, United States Code, Section 3143(b)(1) requires that:

"a judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

(A)   by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B)   that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i)    reversal,

(ii)   an order for a new trial,

(iii)  a sentence that does not include a term of imprisonment, or

(iv)   a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."

18 U.S.C. § 3143(b)(1) (emphasis added).

Defendant cannot satisfy by the clear and convincing evidence standard that he is not likely to flee should his release be extended beyond the current date of June 18, 2021.

Defendant also cannot demonstrate that his appeal raises a "substantial question of law or fact" under § 3143(b).  A "substantial question" refers to an issue that is "fairly debatable" or "fairly doubtful," and is of more substance than would be necessary to a finding that it is not frivolous.  United States v. Handy, 761 F.2d 1279, 1283 (9th Cir. 1985).  "Fairly debatable" questions are those that are novel or not readily answerable, or that

1

pose issues "'debatable among jurists of reason.'"  Id. at 1281-82.
This standard does not require that reversal be more likely than not,
id. at 1280-81, but neither is it so toothless that it eviscerates
Congress' intent to "tighten[] the standards for bail pending
appeal[.]"  Id. at 1283.

Defendant's claims raise no substantial basis for reversal, new
trial, non-custodial sentence, or a reduced sentence below the
expected duration of the appeal because they are dependent upon
defendant obtaining permission to set aside his guilty plea and void
his plea agreement.  Defendant cannot show a "manifest injustice" in
this case that would merit such extraordinary relief.  Even if the
Court embraced defendant's acceptance-of-responsibility and Brady
arguments that pertain to the Federal Election Campaign Act ("FECA")
and Foreign Agents Registration Act ("FARA") counts (which it should
not), the other counts would remain.  This Court sentenced defendant
to a twelve-year term of imprisonment.  (Dkt. 332)[1]  The sentencing
guidelines for the tax count recommended 97-121 months and the Court
imposed a 60-month sentence on that count.  The Court also imposed a
consecutive 84-month sentence on the obstruction count.  (Id.)

## II.   DEFENDANT CANNOT DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT HE IS NOT LIKELY TO FLEE DURING THE PENDENCY OF HIS APPEAL

After sentencing, pursuant to authority granted by 18 U.S.C. §
3141, the Court ordered defendant released until his surrender to the
U.S. Bureau of Prisons ("USBOP") on May 25, 2021.  (Dkt. 336)  On May
3, 2021, at a hearing on a defense motion, the Court extended

---

[1] References to "Dkt" are to the docket in CR 19-642-VAP.

1    defendant's surrender date to June 18, 2021.  (Dkt. 364)  As the

2    Court's comments at the hearing made clear, the reason for this

3    extension was to provide defendant with additional time to be

4    vaccinated against the coronavirus.[2]

5         Throughout the post-sentencing period of release, the Court has

6    imposed, pursuant to 18 U.S.C. § 3142, in various iterations,

7    conditions of release to mitigate the risk of defendant's flight.  At

8    the May 3 hearing, the Court directed the government to file a motion

9    setting forth its recommendation for additional conditions to reduce

10   the risk of flight.

11        The government's motion, which the court granted in part, was

12   based upon the incontrovertible fact that circumstances have changed

13   over the course of defendant's release.  (Dkt. 351)[3]  The entire

14   basis for release pending surrender has changed because vaccinations

15   are now widely available and the pandemic has eased.  Moreover,

16   defendant has not demonstrated good faith, honesty, reliability, or

17   responsible behavior during the period of release.  He misled the

18   Court by offering contradictory explanations as to why he has not

19

20   _____

21        [2] Indeed, the Court calculated that if defendant were to obtain
22   his first vaccination dose by May 7, 2021, defendant would have ample
     time prior to his surrender to both obtain a second vaccination dose
23   and benefit from the two-week efficacy period recommended by the
     Centers for Disease Control and Prevention ("CDC").

24        [3] Factors that demonstrate defendant's likely flight remain
     unchanged.  Defendant was born in Pakistan, has family in Pakistan,
25   routinely traveled overseas, and has real estate holdings and bank
     accounts overseas worth many millions of dollars.  Defendant's wife
26   was born in China and their children are of pre-school age.  (Dkt.
     328)  Defendant has a history of obstructing justice, engaging in
27   tactics of delay, and not accepting responsibility for his criminal
     conduct.  (Dkt. 42, 53, 229, & 267)  The Court imposed a sentence of
28   12 years imprisonment rather than the sentence of home confinement
     that defendant sought.  (Dkt. 328)

1   been vaccinated.  He violated the terms of his release on multiple

2   occasions.  He has shown contempt for the law by continuing to

3   violate FARA and by perpetrating a fraud upon the government by

4   collecting social security benefits in the name of his deceased

5   father.  (See attached Declaration of John M. Lucero)  He has

6   associated with an individual charged in both federal and state

7   courts with money laundering and suspiciously offered that defendant

8   a "gift" of $100,000 so that he might post bail.  (Dkt. 351)

9        The extension of defendant's surrender to June 18 was another

10  changed circumstance that will necessarily tax the government's

11  ability to monitor defendant's whereabouts effectively over the next

12  month.  Granting defendant's release throughout the entire appellate

13  process would increase the risk of his flight to a much greater

14  degree.  It would be impractical for the government to maintain

15  effective surveillance for such a lengthy period.  There are no

16  conditions of release that provide clear and convincing proof that

17  defendant is not likely to flee over this extended time.

18  **III.  DEFENDANT HAS NOT RAISED SUBSTANTIAL QUESTIONS OF LAW OR FACT
        THAT ARE LIKELY TO RESULT IN REVERSAL, NEW TRIAL, NO TERM OF
19      IMPRISONMENT, OR A TERM OF IMPRISONMENT LESS THAN THE DURATION
        OF THE APPEAL PROCESS**

20
        **A.    Defendant Ignores the Standards of Review that Govern the
21             Issues on Appeal**

22       For purposes of determining whether defendant raises

23  "substantial questions of law or fact," it is necessary to consider

24  the posture in which these arguments will be reviewed by the Ninth

25  Circuit.  Defendant incorrectly suggests that the "setting aside" of

26  his plea agreement will be reviewed under the plain error standard.

27  (Dkt. 368 at 2, 19)  Instead, under Ninth Circuit precedent,

28  permitting a defendant to set aside a guilty plea requires a showing

4

1  of "manifest injustice."  Because defendant's claims do not

2  demonstrate manifest injustice (or even plain error), defendant has

3  not raised "substantial questions" under § 3143.

4         After the court imposes sentence, a defendant may not withdraw a

5  plea of guilty and the plea may only be set aside on direct appeal or

6  collateral attack.  Fed. R. Crim. P 11(e); United States v. King, 257

7  F.3d 1013, 1023 (9th Cir. 2001); United States v. Baker, 790 F.2d

8  1437 (9th Cir. 1986).  To prevail on such a post-conviction appeal to

9  set aside a guilty plea, a defendant must demonstrate "a fundamental

10  defect which inherently results in a complete miscarriage of justice"

11  or "an omission inconsistent with the rudimentary demands of fair

12  procedure."  Baker, 790 F.2d at 14.  A defendant's dissatisfaction

13  with his sentence does not meet this standard.  See King, 257 F.3d at

14  1024 ("Given the evidence indicating [defendant] hoped to withdraw

15  his plea primarily because he was unhappy with his sentence, denial

16  of his request creates no manifest injustice."); United States v.

17  Nagra, 147 F.3d 875, 880 (9th Cir. 1998) ("There can be no manifest

18  injustice in refusing to permit a defendant to withdraw a guilty plea

19  when there is no serious contention that the defendant is innocent of

20  the crimes charged.").[4]

21         As detailed below, none of defendant's claims meet this standard

22  because none supports the contention that defendant was actually

23  innocent of the crimes to which he pleaded guilty.  Indeed, at no

24

25

26         [4] To the extent that defendant plans to appeal the substance of
   the Court's sentence, the Ninth Circuit will review this Court's
27  application of the Guidelines to the facts for abuse of discretion
   and this Court's factual findings for clear error.  See King, 257
28  F.3d at 1024.  Defendant has not identified a substantial question
   regarding the Court's rulings under these standards.

                                    5

1   point -- including in the instant motion -- has defendant ever

2   asserted factual innocence.

3       **B.   Even If Successful, Defendant's Challenge Is Not Likely to
             Result in a Term of Imprisonment Less than the Duration of
4            the Appeal Process**

5       Even if the Court embraced defendant's argument that had he

6   known prosecutors offered deferred prosecution agreements ("DPAs") to

7   other individuals in connection with the filing of FECA charges, he

8   would not have pleaded guilty to a FECA offense, and that this count

9   should be set aside, the resulting Sentencing Guideline range would

10  have nevertheless resulted in a sentence far in excess of the

11  expected duration of the appeal process.  Indeed, the tax offense

12  alone resulted in a Sentencing Guideline range of 97 to 121 months

13  imprisonment.

14      Even if defendant were somehow to prevail on his claims and

15  successfully withdraw his guilty plea not only to the FECA offense,

16  but also his pleas of guilty to the FARA and tax charges, he still

17  would not satisfy § 3143's "substantial question" standard because he

18  separately admitted facts proving his guilt as to obstruction of

19  justice.  That plea of guilty occurred at a separate change-of-plea

20  hearing and pursuant to a separate plea agreement, the terms and

21  circumstances of which defendant does not challenge.  See Case No.

22  2:20-cr-00155-VAP at Dkt. 5, 14.

23      With regard to the obstruction-of-justice count, defendant

24  offers only the baffling, counterfactual argument that if his guilty

25  pleas to the FARA, FECA, and tax charges were all set aside, he would

26  be eligible for home confinement or probation on the obstruction

27  count.  (Dkt. 368 at 24-25)  This fantasy does not account for the

28  fact that the Court imposed a separate sentence for obstruction of

                                    6

1  justice: 84 months imprisonment, to be served consecutively to the
2  60-month sentence for the FARA, FECA, and tax counts.  Nothing in the
3  record and none of defendant's claims in his motion supports the
4  contention that defendant is likely to receive a substantially
5  reduced sentence for obstruction.  Moreover, defendant's argument --
6  that the Court could issue a shorter sentence on one count if he
7  successfully challenges other counts -- would justify bond pending
8  appeal in virtually any multi-count case, rendering § 3143(b)(1) a
9  dead letter.  Challenging one sentence should not enable a defendant
10 to avoid serving another sentence.

11 **C.   Defendant's "Brady" Claims Do Not Concern Brady Material**

12
13      Defendant argues that DPAs executed by the government in
   unrelated matters constitute discoverable <u>Brady</u> material because such
14 material is "favorable to the defense and bears directly on guilt or
15 punishment."  (Dkt. 368 at 14)   In reality, however, DPAs in
16 unrelated cases bear on neither.
17
      By definition, a DPA in an unrelated case does not bear upon a
18 defendant's guilt because a DPA signatory does not admit guilt.[5]
19 Although defendant argued at sentencing that "Courts Show Leniency
20 Towards FECA Violations" (Dkt. 122 at 20-23) and the parties debated
21 whether the Court should sentence FECA matters leniently or instead
22

23 _____

24
      [5] For example, in Gilbert Chagoury's publicly available DPA, it
25 makes clear that, among other things: (a) he did not admit legal
   guilt as to any offense; (b) he did not admit to any FARA conduct;
26 (c) he did not admit to any tax violations; (d) he did not admit to
   any obstruction conduct; (e) he did not admit to any fraud conduct;
27 (f) he was a foreign national outside the jurisdiction of the USAO;
   (g) he accepted responsibility for making $180,000 in foreign conduit
28 contributions; and (h) he provided unique cooperation as assessed by
   the USAO.

1   embrace the policy statements set forth in the Sentencing Guidelines

2   (Dkt. 233 at 15-20), a DPA does not bear upon how courts sentence

3   individual defendants.  Indeed, during the pendency of a DPA, no

4   conviction is entered and no sentence is imposed.

5       A DPA is the product of prosecutorial discretion.  See United

6   States v. Fokker Services B.V., 818 F.3d 733 (D.C. Cir. 2016)

7   (district court lacked power to deny joint motion to suspend running

8   of time under Speedy Trial Act based upon its view that prosecution

9   had been too lenient in DPA because the Executive retains

10  independence with regard to charging decisions).  The existence of

11  such an agreement bears no relevance to an unrelated defendant's

12  case, either as to that defendant's guilt or to the punishment that

13  that defendant should receive.  Nor does it diminish the importance

14  of criminal statutes passed by Congress or policy statements and

15  guidelines issued by the U.S. Sentencing Commission.  There is no

16  duplicity in the government arguing that, "a sentence within the

17  guideline range is necessary to deter other would-be FARA and FECA

18  offenders from compromising our elections and institutions with

19  foreign cash"[6] and entering into DPAs in an unrelated case.  Because

20  such information was not mitigating with respect to this defendant's

21  sentencing, it does not constitute Brady material.[7]

---

[6] The defendant has submitted no evidence that the AUSA who
drafted this statement was then aware of DPAs executed in connection
with the Chagoury investigation other than a conclusory statement
that as a Deputy Chief, he must have been aware of actions undertaken
by the Chief of the Public Corruption & Civil Rights Section.

[7] The government respectfully requests that the Court make a
finding that even if the Court had been aware of the resolution of
*(footnote cont'd on next page)*

8

**D.    Defendant Has Failed to Raise a Substantial Question of Law or Fact as To His Sixth Amendment Claim**

Defendant claims that one of his several attorneys labored under an "actual conflict" that "infected" defendant's plea and sentencing when he represented another individual in an unrelated investigation involving FECA and tax violations.  (Dkt. 385 at 10)  Defendant is unable to show a substantial issue of either law or fact as to this claim.

**1. The Sixth Amendment Right to Counsel Does Not Extend to Pre-Indictment Plea Negotiations**

Defendant's principal argument is that the alleged conflict adversely affected his counsel's advocacy during pre-indictment plea negotiations and that had defendant known that one of his counsel's other clients had received a DPA, defendant would have rejected the plea deal.[8]  (Dkt. 368 at 12, 12 fn. 28)

The Sixth Amendment guarantees an "accused" the right to the assistance of counsel in "all criminal prosecutions."  U.S. Const. Amend. VI.  "[T]he right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant", United States v. Gouveia, 467 U.S. 180, 187-189 (1984), that is, after the initiation of criminal proceedings "by way of formal charge, preliminary hearing, indictment, information, or arraignment."  McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); see

---

Chagoury's unrelated matter, this fact would not have altered the Court's imposition of defendant's within-guidelines sentence, which was supported by the individualized analysis the Court cited in imposing it.

[8] As a threshold matter, it would not make sense for a defendant to reject a plea offer and instead proceed to trial based solely upon the disposition of an unrelated investigation.

9

1   United States v. Percy, 250 F.3d 720, 725 (9th Cir. 2001) ("This

2   Circuit adheres to the bright-line rule that the Sixth Amendment's

3   right to counsel attaches upon the initiation of formal charges.").

4        Here, defendant was charged via information, not by indictment.

5   (Dkt. 1).  As such, all plea discussions occurred *before* any formal

6   charge.  As defendant acknowledges, United States v. Olson makes

7   clear that "the Sixth Amendment right to counsel does not attach to

8   purely pre-indictment plea bargaining."  (Dkt. 368, fn. 28)

9   Accordingly, defendant's Sixth Amendment claim fails as a matter of

10  law.  See United States v. Mills, 641 F.2d 785, 788 (9th Cir. 1981).

11          **2. Defendant Has Failed to Raise a Substantial Question as to
                Whether an Actual Conflict of Interest Existed**

12

13       Seeking to avoid the unavailability of relief under the Sixth

14  Amendment, defendant argues that his attorney was also ineffective at

15  the change of plea hearing on November 22, 2019 and again prior to

16  sentencing.  (Dkt. 368 at 12, fn. 28)  Defendant argues that had

17  counsel disclosed the alleged conflict at the plea hearing or prior

18  to sentencing "Zuberi could still have moved to withdraw the plea

19  pursuant to Fed. R. Crim. P. 11(d)(2)(B)."  (Dkt. 368 at 12-13)

20       The Sixth Amendment affords a defendant the right to be

21  represented by counsel whose loyalties are undivided.  See Wood v.

22  Georgia, 450 U.S. 261, 271 (1981).  To establish a Sixth Amendment

23  violation based on a conflict of interest, a defendant must show: (1)

24  that counsel actively represented conflicting interests, and (2) that

25  an actual conflict of interest adversely affected his lawyer's

26  performance.  See Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  The

27  mere "possibility of conflict is insufficient to impugn a criminal

28  conviction."  Id.  Instead, "the conflict must be actual rather than

10

1  potential or speculative." See United States v. Allen, 831 F.2d

2  1487, 1495 (1987).  The Ninth Circuit requires "a factual showing on

3  the record that a conflict existed, for 'while we cannot indulge in

4  nice calculations about the amount of prejudice which results from a

5  conflict of interest . . . , neither can we create a conflict of

6  interest out of mere conjecture as to what might have been shown.'"

7  Willis v. United States, 614 F.2d 1200, 1203 (9th Cir. 1979).

8       Defendant has failed to raise a substantial issue as to the

9  threshold requirement for seeking relief under the Sixth Amendment --

10 that a conflict, in fact, existed.  Defendant has not identified

11 anything in the record to demonstrate an actual conflict; instead, he

12 merely speculates that because his counsel represented Arsan, a

13 client in an unrelated matter, on unrelated tax and FECA charges, the

14 attorney must have had divided loyalties.  (Dkt. 39 at 8-13)  But the

15 charges against defendant have nothing to do with Arsan, Chagoury,[9]

16 or any other individual ("the Chagoury Subjects") who entered into a

17 DPA with the government.  Defendant does not allege that the Chagoury

18 Subjects were targets, subjects, or witnesses in either of the

19 investigations that resulted in defendant twice pleading guilty.

20 Defendant alleges no facts that would raise a substantial question as

21 to whether defendant's interests were averse to those of the Chagoury

22 Subjects.

23      The cases relied upon by the defendant are inapposite.  All the

24 cases cited by defendant involve conflict concerns arising out of

25

26

27      [9] Defendant does not assert that the attorney labored under a
   conflict as to Chagoury, but merely speculates that he likely knew of
28 all three individuals who received DPAs "because the cases were
   investigated together for the same scheme."  (Dkt. 368 at fn. 24)

multiple representations within the same case or investigation.  In
Wood v. Georgia, 450 U.S. 261, 271 (1981), the Supreme Court
discussed a conflict of interest where all three defendants in the
same case had been represented by a single lawyer.  In Holloway v.
Arkansas, 435 U.S. 475, 490 (1978), a single attorney represented
three defendants in the same trial.  In Lockhart v. Terhune, 250 F3d
1223, 1230 (9th Cir. 2001), the defense attorney simultaneously
represented two clients who were implicated in the same murder.  In
Mickens v. Taylor, 535 U.S. 162, 163-67 (2001), defendant's claim was
based on counsel having previously represented the victim of the
murder from which defendant appealed his conviction and sentence.
Defendant's reference to United States v. Walter-Eze, 869 F.3d 891,
901 (9th Cir. 2017) is inapplicable.  In Walter-Eze, a direct
conflict between the defendant and his own counsel's economic
interests arose after the district court offered counsel the choice
"of obtaining a requested continuance but paying fees" and a
potential state bar reprimand "or foregoing the continuance and
avoiding the fees and possible sanctions."  Id. at 900.

Defendant has not argued that his interests were averse to the
interests of any of the individuals who entered into DPAs or to the
interests of his attorney.  Rather, defendant merely speculates that
his attorney's duty to Arsan "sealed his lips" to seeking a DPA for
defendant and precluded the defense from arguing a sentencing
disparity among similarly situated defendants.  (Dkt. 368 at 10)
Both arguments are contradicted by the record.  First, the defense,
including the attorney at issue, expressly sought a DPA from the
government as early as 2018.  (Lucero Declaration, Ex. 1, IRS
Memorandum of Contact, dated April 12, 2018)  At the time, AUSA Mack

12

1  Jenkins advised that "a deferred prosecution ha[d] not been
2  rejected." Id. at 2. AUSA O'Brien made clear that should defendant
3  seek to proffer information to the government, defendant should not
4  do so with the expectation that a DPA would be offered. Id.[10]
5  Second, the record contradicts defendant's assertion that the alleged
6  conflict "sealed" counsel's lips on arguing unwarranted sentencing
7  disparities. (Dkt. 368 at 11)  Prior to sentencing, the defense
8  submitted statistical surveys of sentences imposed in unrelated cases
9  to argue that courts show leniency toward FECA violations. (Dkt. 122
10 at 20-23)  The defense similarly argued, "courts have consistently
11 found that the advisory Guideline range for tax crimes overstates the
12 punishment necessary to meet the goals of section 3553(a)." (Id. at
13 26-28)  Defense counsel also argued that courts have shown leniency
14 towards similarly situated defendants convicted of FARA violations.
15 (Id. at 35-43)

16      Contrary to defendant's assertions, none of the Chagoury
17 Subjects are similarly situated defendants within the meaning of 18
18 U.S.C. § 3553(a)(6).  Pursuant to 18 U.S.C. § 3553(a)(6), prior to
19 the imposition of a sentence, a Court shall consider several factors,
20 including "the need to avoid unwarranted sentence disparities among
21 *defendants* with similar records *who have been found guilty of similar*
22 *conduct*." See 18 U.S.C. § 3553(a)(6)(emphasis added).  None of the
23 recipients of DPAs has been found guilty of any crime, much less

---

26  [10] There is no constitutional right to a plea bargain, United
    States v. Moody, 778 F.2d 1380, 1385-86 (9th Cir. 1985), amended, 791
27  F.2d 707 (9th Cir. 1986), let alone to a specific plea offer.  "[T]he
    decision whether to offer a plea bargain is a matter of prosecutorial
28  discretion." Id.; see also United States v. Sustaita, 1 F.3d 950, 952
    (9th Cir. 1993).

similar conduct.   The public press release cited by the defense shows that the DPAs at issue did not include admissions to FARA violations, tax violations, or obstruction of justice.   Id.   Moreover, in the case of Arsan,[11] the press release and DPA show that unlike the defendant, Arsan cooperated with the government's investigation (rather than repeatedly obstructing an investigation, as defendant did) and demonstrated acceptance of responsibility.   Id.   The record clearly shows that defendant has failed to identify a substantial issue as to whether an actual conflict of interest adversely affected his lawyer's performance.

### E.   The Government Did Not Fraudulently Induce Defendant's Guilty Plea

Defendant's claim that the government concealed from defendant a hidden agenda not to recommend credit for acceptance of responsibility is entirely divorced from the facts and the evidentiary record in this case.   It paints an upside-down portrait of events as they actually transpired.

Rather than conceal the fact that acceptance of responsibility was at issue, the government *highlighted* it for defendant prior to his execution of the plea agreement, as set forth in the government's unrebutted declaration.   (Dkt. 267 at ¶ 11)   The parties negotiated language in the plea agreement to address this issue and supplanted boilerplate language contained within the government's standard plea agreements that states that acceptance-of-responsibility credit would

---

[11] The Arsan DPA, CR 21159-PSG, also resolved the USAO's criminal investigation of defendant Arsan's tax violations.   The civil aspects were the subject of a closing agreement with the Internal Revenue Service.

be recommended by the government "provided that defendant demonstrates an acceptance of responsibility for the offense[s] up to and including the time of sentencing" with the specific criteria set forth in the sentencing guidelines: "provided that defendant demonstrates an acceptance of responsibility for the charged offenses *as defined in U.S.S.G. § 1BE1.1, including as further explained in its application notes and in particular Note 1(A)."* (attached Declaration of Daniel J. O'Brien; Dkt. 5 at ¶ 5(c) (emphasis added))

Rather than a "pre-planned strategy" to deny defendant an acceptance-of-responsibility recommendation, the government provided defendant with numerous opportunities to merit the sentencing reduction.  The government provided advance discovery on every issue the parties agreed to litigate prior to filing position papers to give the defendant ample time to digest the evidence and not make false representations to the Court.  The government repeatedly extended the time for defendant to make good on his promises in the plea agreement to pay his tax obligations and to correct his FARA filings.  (Dkt. 120; Dkt. 267, Ex. 1A)  In its first filing devoted to the issue of acceptance of responsibility, despite defendant's breaches of the plea agreement, the government nevertheless kept open the possibility that it would recommend acceptance-of-responsibility credit in the future if defendant ultimately fulfilled his obligations under the plea agreement.  (Dkt. 120 at 3 ("Defendant's recent behavior has made it impossible for the government to recommend acceptance of responsibility *at this time*" (emphasis added)); id. at 6 ("government declines *at this time* to move for a third point reduction" (emphasis added)); id. at 7 ("Absent some extraordinary efforts by defendant to promptly rectify the situation,

15

1  the government will maintain this position at time of sentencing.'"))

2  The unfortunate and inexplicable history of this case involves a

3  defendant repeatedly compounding his transgressions despite the

4  government's numerous efforts to save him from himself.

5      Defendant claims that the government attempted to use the

6  acceptance-of-responsibility recommendation to extort concessions on

7  issues the parties agreed to litigate, but this claim is both refuted

8  by unrebutted evidence and is a logical impossibility under the law.

9  The government never "demanded that Zuberi stipulate to obstruction

10  of justice," and the defendant's citation to the government's brief

11  (Dkt. 54 at 9-10)[12] does not say any such thing.[13]  The government

12  repeatedly stated that defendant had "the right to litigate both

13  issues of fact and the sentencing guideline enhancements," that "he

14  should not be punished for doing so," and that both the government

15  and the Court "should lean heavily in favor of recommending an

16  acceptance reduction where a defendant agrees to plead guilty,

17  particularly prior to indictment."  (Id. at 7; Dkt. 229 at 8)  The

18  "Catch-22" scenario posited by defendant is neither a creation of the

19  government nor a Catch-22.  The Sentencing Guidelines set forth the

20  criteria with respect to litigating issues in good faith: "[A]

21  defendant who falsely denies, or frivolously contests relevant

22  conduct that the court determines to be true has acted in a manner

_____

[12] The government's page citations are to the docketed pdf.  The defense page citations are to the memorandum of points and authorities.

[13] Instead, the government provided *discovery* to the defense and and "informed the defense that it would hold off filing its obstruction of justice position long enough to give defendant ample time to review the evidence and consider stipulating to the enhancement."  (Id.)

16

inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, Application Note 1(A). The law does not create an irreconcilable dilemma. A defendant is free to present evidence, contest the government's evidence, and argue the law; a defendant is not permitted, without penalty, to make false representations to the Court or frivolously deny the truth.

Nor did the government, as defendant claims (Dkt. 368 at 22-23), argue that defendant's pre-plea acts of obstruction should provide the basis for denying acceptance of responsibility. Instead, the government argued the opposite, stating, "Defendant's plea of guilty would have likely merited a reduction for acceptance of responsibility but for his more recent conduct." (Dkt. 120 at 3) The several bases for the government's arguments on acceptance of responsibility are clearly set forth in the record. (Dkt. 229 at 6-28) None of those arguments pertained to defendant's pre-plea obstruction. The government's arguments that defendant cites (Dkt. 120 at 4-6; Dkt. 229 at 6-8) do not say anything about pre-plea obstruction of justice.[14]

_____

[14] Defendant devotes a substantial portion of his motion (Dkt. 368 at 24-26) to discussing the inapplicability of U.S.S.G. 3E1.1, Application Note 4, which states that typically, obstructive conduct indicates that a defendant has not accepted responsibility, but that in extraordinary cases both the enhancement and the reduction might apply. The government cited this provision in its initial sentencing brief on acceptance of responsibility. (Dkt. 120 at 3-4) The government nevertheless argued in that same brief (id. at 3) and subsequently (Dkt. 229) that defendant should not be denied the acceptance of responsibility reduction based upon pre-plea obstructive conduct. Rather, the government argued that the Court should not grant the reduction given his repeated violations of the terms of the plea agreement by failing to pay his tax obligations and
*(footnote cont'd on next page)*

17

1    Finally, defendant's evident satisfaction with the plea

2 agreement before sentencing belies any claim that he was prejudiced.

3 Defendant admits that he became aware of the government's purported

4 fraudulent inducement within weeks of executing the plea agreement

5 (Dkt. 368 at 22-23), at which time he specifically determined not to

6 withdraw his plea but rather to seek "specific performance" of the

7 government's "promise."  (Id. at 26)  Only after the Court imposed

8 sentence did defendant attempt to have his guilty plea set aside.

9 The Ninth Circuit has expressly rejected this sort of gamesmanship.

10 See, e.g., King, 257 F.3d at 1024; Nagra, 147 F.3d at 880.

11

12    **F.    The Government's Position on the Application of the
          Obstruction of Justice Adjustment at Sentencing Was**

13       **Entirely Consistent With Its Position in Its Classified
          Sentencing Position Pleading**

14

15    Defendant argues that he is entitled to "set aside" his plea

16 agreement post-sentencing because the government argued that he

17 "obstructed justice by deleting emails even after conceding he did so

18

19 _____

20 committing ongoing FARA violations, his false representations to the
   Court, and his frivolous sentencing arguments.  (Dkt. 229 at 6-28)
21 The government identified the legal basis for its position by citing
   to various provisions of Application Note 1, not Application Note 4.
22 The Court did not impose a reduction for acceptance of
   responsibility.
23
   Defendant also appears to complain that the government did not
24 provide warnings in the plea agreement that reneging on his tax
   obligations and FARA registration promises could jeopardize his
25 receiving the acceptance-of-responsibility reduction.  (Dkt. 368 at
   24)  In fact, however, the plea agreement does provide such warnings
26 because it cites the relevant Sentencing Guideline provision, Section
   3E1.1, which sets forth the law on this issue. (Dkt. 5 at ¶ 5(c))
27 Moreover, the government could not have fraudulently induced
   defendant's plea by withholding such an admonition because defendant
28 could not breach his agreement prior to signing it (nor did the
   government have reason to believe he would eventually do so).

18

at the government's direction." (Dkt. 368 at 23)  This claim
misstates the facts and is without merit.

At sentencing, the government argued that defendant should
receive a two-level enhancement for obstruction of justice pursuant
to USSG § 3C1.1.  (Dkt. 42; Dkt. 53)  The basis for the government's
argument was that defendant had tampered with multiple witnesses
(Dkt. 42 at 6-27) and had caused certain emails, and whole email
accounts, to be deleted from documentary evidence previously
identified by defendant's counsel, Mr. James Bowman.  (Dkt. 42 at 27-
33)

As explained in the government's Amended Sentencing Position Re:
Obstruction of Justice (Dkt. 42) and the Declaration and Exhibits
filed in support (Dkt. 53), during January and February 2018, Mr.
Bowman, in response to a grand jury subpoena seeking emails, advised
the government, *inter alia*, that (1) email correspondence using the
domain avenueventure.com was retained on servers maintained by
GoDaddy, Inc. ("GoDaddy"); (2) in addition to defendant's
avenueventure.com account, there were 14 avenueventure.com accounts
currently stored on the GoDaddy servers, including
job@avenueventure.com, john.warren@avenueventure.com,
jon.carpenter@avenueventure.com, and renee.wu@avenueventure.com; and
(3) defendant had the power to access these third-party
avenueventure.com email accounts in his capacity as administrator or
by changing the account passwords.  (Dkt. 53 at ¶ 10)  On January 29,
2018, the government agreed to a defense request to delay production
of emails on the GoDaddy servers provided that the defense would
retain said emails for later production.  (Id. at ¶ 11; Lucero

Declaration, Ex. 1)[15]  On February 8, 2019, Mr. Bowman informed the government that his firm no longer represented defendant and that it had returned to defendant the materials previously collected from defendant and the Avenue Companies.  (Id. at ¶ 15)

On February 21, 2019, the government informed defendant's new counsel, Thomas O'Brien, that it required production of the emails stored on the GoDaddy server.  (Id. at ¶ 16)  On August 15, 2019, defense counsel Ivy Wang produced emails that had been stored on the GoDaddy server; however, the production consisted of only 246 documents that were irrelevant to the government's investigation, many of which appeared to be personal (non-corporate and spam).  (Id. at ¶ 17)  While earlier defense productions had tendered some avenueventure.com emails going back as far as 2010, the August 2019 production only went as far back as August 12, 2016.  (Id.) Moreover, in connection with this production, Ms. Wang stated that the following accounts, previously represented by Mr. Bowman to be residing on the GoDaddy server, "do not exist on the GoDaddy server":

---

[15] The defense also successfully convinced the government to refrain from issuing any third-party subpoenas during the period of April 2017 through February 2019 while the parties discussed defendant's possible cooperation.  (Dkt. 53 at ¶ 6)  During this period, defendant embarked on his witness-tampering scheme in which he offered millions of dollars to six witnesses in exchange for their silence.  (Id. at ¶ 19-50; Dkt. 42 at 6-27)

Indeed, there is ample evidence in the record to demonstrate that defendant's current application is yet another episode in a long series of delaying tactics.  Defendant's purpose of delay provides another basis for rejecting this motion.  In addition to the above, defendant delayed the sale of properties to finance his restitution obligations (Dkt. 229 at 20-22), the execution of quitclaim deeds to satisfy bond conditions (Dkt. 351 at 7, fn 5), and his surrender. (Id. at 5-7)

job@avenueventure.com, john.warren@avenueventure.com,
jon.carpenter@avenueventure.com, and renee.wu@avenueventure.com.
(Id. at ¶ 18)  Of these four email accounts,
renee.wu@avenueventure.com figured prominently in the government's
proof of defendant's criminal conduct.  (Dkt. 42 at 33)

In his response to the government's claims that defendant
obstructed justice, defendant argued that he had not tampered with
several witnesses -- Person LL, Person C, Person MN, or US Cares
investors.  (Dkt. 122 at 38-49)  However, defendant offered no
rebuttal to the government's argument that he had deleted these email
accounts.  (Id.)

Defendant did not delete these email accounts at the behest of
any U.S. government entity, and the government never conceded or
suggested that he did.  See Gov't Classified Response to Defendant's
Motion for Release Pending Appeal.  As a result, the government's
position that defendant deserved an obstruction-of-justice Sentencing
Guideline enhancement for deleting these four email accounts is not
inconsistent with any other government representation.

**IV.   CONCLUSION**

Defendant cannot show a substantial question of law or fact
likely to result in the setting aside of his guilty plea.  His motion
should be denied.

**DECLARATION OF JOHN M. LUCERO**

I, JOHN M. LUCERO, declare as follows:

1.    I have been a Special Agent ("SA") with the Internal Revenue Service – Criminal Investigation ("IRS-CI") for approximately 16 years.  I am presently assigned to the El Monte, Post of Duty in the Los Angeles Field Office.  My official duties include the investigation of possible criminal violations of the Internal Revenue laws, codified in Title 26 of the United States Code; domestic currency reporting and money laundering violations, codified in Titles 31 and 18 of the United States Code; and related statutes. During my career as a Special Agent, I have conducted or assisted in the investigation of numerous suspected violations of financial fraud, criminal tax fraud, Bank Secrecy Act violations, and money laundering statutes.

2.    Since 2016, I have been assigned to the investigation of Imaad Shah Zuberi ("defendant") for tax offenses.

3.    Subsequent to defendant's sentencing and release pending surrender, the IRS has tried to monitor defendant's sale of properties and the disposition of proceeds from such sales.  As part of that effort, I served subpoenas upon various financial institutions with a return date of May 3, 2021, the hearing date on defendant's motion to extend the time of his surrender.

4.    I reviewed documents produced by the USC Credit Union in response to one such subpoena that pertain to a joint account in the names of defendant and his deceased mother, Asifa Zuberi ("the joint account").  The joint account reflects an April 15, 2021 deposit of a $106,275 check from a law firm with a reference to "Return of client funds."

1        5.   I also saw two $819 direct deposits from the U.S. Treasury

2    referenced as "Deposit ACH SSA TREAS 310 TYPE: XXSOC SEC CO: SSA

3    TREAS 310" and a $1,400 direct deposit from the U.S. Treasury which,

4    given the timing and amount, appears to be a coronavirus stimulus

5    payment.

6        6.   I searched IRS records for 1099s issued to defendant from

7    the Social Security Administration ("SSA") and found none.

8        7.   IRS records for 1099s issued to defendant's mother, Asifa,

9    show that the last 1099 she received from the SSA was for calendar

10   year 2016.  IRS records for defendant's father, Mubarak, show that

11   the SSA issued 1099s with Mubarak as the recipient of funds for each

12   year from 2011 through 2020.  The SSA issued the most recent 1099 on

13   or about February 11, 2021.  The 1099 identifies the payee's address

14   as 10166 Rush Street, South El Monte, California 91773, which I know

15   based upon my familiarity with filings in this case, was often

16   utilized by defendant during the course of his FECA offenses.  The

17   total amount of payments to Mubarak during the period of 2011 through

18   2020 was $78,958.

19       8.   I am aware from filings in this case that defendant's

20   mother passed away in April 2016 and that his father died before that

21   time.

22       9.   I have spoken to a Customer Service Representative at the

23   Social Security Administration, and have been informed that a common

24   practice that reduces the opportunity for Social Security benefits

25   fraud is that the county of the place of death or the funeral home

26   will notify the SSA of a beneficiary's death.

27       10.  I reviewed the database Accurint to see if the deaths of

28   defendant's parents were reported there.  The database indicates that

1  Asifa Zuberi died in April 2016.  There is no indication that Mubarak
2  Zuberi ever died.
3      11.  Bank statements obtained by the government during the
4  course of its initial investigation show that the defendant
5  frequently used the joint account during the period 2012 through
6  October 2016.  There were over 400 transactions engaged in by
7  defendant over this period including ATM withdrawals outside the
8  United States, election campaign contributions, credit card payments,
9  and checks to escrow companies.
10     12.  In addition to the $106,275 deposit, the recent bank
11 statements show that on or about April 1, 2021, an $11,000 check
12 cleared from the joint account.
13     13.  Attached as Exhibit 1 is a redacted Memorandum of Contact I
14 prepared, dated April 12, 2018, that memorialized discussions between
15 prosecutors and defense counsel during the course of the Zuberi
16 investigation.
17      I declare under penalty of perjury under the laws of the
18 United States of America that the foregoing is true and correct and
19 that this declaration is executed at Los Angeles, California, on May
20 17, 2021.

21
22
23                                  JOHN LUCERO
24
25
26
27
28

                                   24

EXHIBIT 1



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Contact

| | | | |
|---|---|---|---|
| **Investigation #:** | ███████ | **Location:** | USAO 15th Floor Conference Room |
| **Investigation Name:** | IMAAD S. ZUBERI | | |
| **Date:** | April 12, 2018 | | |
| **Approximate Time:** | 11:05AM-12:31PM | | |
| **Participants:** | James Bowman, Subject's Defense Attorney | | |
| | Evan Davis, Subject's Defense Attorney | | |
| | Grant M. Damon-Feng, Subject's Defense Attorney | | |
| | Daniel O'Brien, Assistant U.S. Attorney | | |
| | Mack Jenkins, Assistant U.S. Attorney | | |
| | Hans Park, FBI Special Agent | | |
| | Leah Tanner, FBI Special Agent | | |
| | Crystal Young, IRS Revenue Agent | | |
| | John M. Lucero, IRS Revenue Agent | | |

On the above date and time, a meeting was held at the U.S. Attorney's Office in Los Angeles, California, and present at the meeting were Assistant United States Attorneys ("AUSA") Daniel O'Brien ("O'Brien") and Mack Jenkins ("Jenkins"), FBI Special Agents Hans Park and Leah Tanner, IRS Revenue Agent Crystal Young, and IRS-CI Special Agent John M. Lucero. Also present were IMAAD ZUBERI's ("ZUBERI") attorneys James Bowman ("Bowman"), Evan Davis ("Davis"), and Grant M. Damon-Feng. Below is a summary of the meeting and information proffered by ZUBERI's attorneys.

1. Bowman inquired as to whether he needed to contact the U.S. Attorney's Office in the Southern District of New York. Jenkins responded by saying not at this point, but at some point we will have you contact them since we don't want to be the middleman.

2. O'Brien would like to schedule a follow up meeting sometime at the end of April or early May for Davis and ZUBERI's C.P.A.'s to do their complete presentation.

3. Davis mentioned ZUBERI is out of town and needs time to review the accuracy of the defense analysis. ███████████████████████████████
███████████████████████████████████████████

4. Bowman stated ZUBERI is still seeking a deferred prosecution in light of what he could provide.

ZUB00000351

5.  Jenkins responded and stated a deferred prosecution has not been rejected at his level or higher.  O'Brien added that he does not want the defense or ZUBERI coming into proffer sessions with the expectation of getting a deferred prosecution given that O'Brien does not see that happening at this point.

6.  Bowman said that ZUBERI still has ███████████████████████████████████
    ███████████████████████████.  ZUBERI also wants to explore other areas of cooperation.

█  ██████████████████████████████████████████████████
    ██████████ Davis advised that there are some litigation hazards regarding the tax loss discussion and the size of the case, which is still significant. ████████████
    █████████████████████████████████████████████████████
    █████████████████████████████████████████████████████

8.  From a civil aspect, █████████████████████████████████████
    ████████████████ Davis instructed the accountants that if the expense was reasonable then give it to ZUBERI. ████████████████
    █████████████████████████████████████████████████████
    █████████████████████████████████████████████████████

9.  Bowman added that ZUBERI's business does not operate like a large firm.
    █████████████████████████████████████████████████████
    █████████████████████████████████████████████████████
    ██████████████████████████████

10. Davis stated looking for documents was challenging ██████████████
    █████████████████████████████████████████████████████
    █████████████████████████████████████████

11. ████████████████ ith respect to ZUBERI's business relationships there are two aspects Davis mentioned. █████████████████████████
    █████████████████████████████████████████████████████
    █████████████████████████████████████████████████████
    █████████████████████████████

ZUB00000352

12.  investments for USCares,

13. The two big ticket sources of money that ZUBERI received were for USCares and money from J█████.

14. The two options in terms of looking at the money ZUBERI received are either, one he stole it, or two ZUBERI owes the money back to them and they are fine with it.



15. Davis' ballpark figure for unreported income is approximately █████████.

16. Davis' spoke to various third parties and has some physical written statements as well as some discussions with third parties.

17. Davis' mentioned that if the government is looking for sophisticated means or other such enhancements ZUBERI has various defenses.

18. With respect to completing the subpoena production, Bowman stated there are about 280 more documents to produce to complete production.  If things do not work out with respect to these negotiations, then the subpoena production will be completed.  Bowman provided assurance that nothing will be destroyed.

19. As a housekeeping matter, ZUBERI has had banks reach out regarding shutting down his accounts.



I prepared this memorandum after refreshing my memory from notes made during and immediately after the meeting.

John M. Lucero
Special Agent

ZUB00000354

1

### DECLARATION OF DANIEL J. O'BRIEN

2      I, DANIEL J. O'BRIEN, declare as follows:

3      1.   I am an Assistant United States Attorney ("AUSA") in the

4  United States Attorney's Office for the Central District of

5  California ("the USAO") responsible for the matters of <u>United States</u>

6  <u>v. Imaad Shah Zuberi</u>, CR 19-642-VAP, and <u>United States v. Imaad Shah</u>

7  <u>Zuberi</u>, CR 20-155-VAP.

8      2.   The USAO maintains a database that houses form plea

9  agreements for AUSAs to use in formulating plea agreements offered to

10 defendants.  The relevant language in the USAO's general plea

11 agreement form that pertains to acceptance of responsibility reads as

12 follows: "At the time of sentencing, provided that defendant

13 demonstrates an acceptance of responsibility for the offense[s] up to

14 and including the time of sentencing, [the government agrees to]

15 recommend a two-level reduction in the applicable Sentencing

16 Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend

17 and, if necessary, move for an additional one-level reduction if

18 available under that section."

19     I declare under penalty of perjury under the laws of the United

20 States of America that the foregoing is true and correct and that

21 this declaration is executed at Los Angeles, California, on May 17,

22 2021.

23                         _____/s/_____
                           DANIEL J. O'BRIEN
24

25

26

27

28